John T. Jasnoch (CA 281605)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-236-0508
jjasnoch@scott-scott.com

*Attorney for Plaintiff and the Proposed Class*

[Additional Counsel on Signature Page.]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN HUEGERICH, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>STEVE GENTILE, GIOVANNI PERONE, JUSTIN FRENCH, KIMBERLY KARDASHIAN, FLOYD MAYWEATHER, JR., PAUL PIERCE, DEFENDANT "X", and JOHN DOES 1-10,<br><br>                    Defendants. | Case No.  2:22-cv-00163<br><br>**CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Ryan Huegerich ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint ("Complaint") against Defendant EthereumMax (or, the "Company"), Steve Gentile, Giovanni Perone, Justin French (the "Executive Defendants"), Kimberly Kardashian, Floyd Mayweather, Jr., and Paul Pierce (the "Promoter Defendants" and, together with the Executive Defendants, the "Defendants").  The following allegations are based upon personal knowledge as to Plaintiff's own facts, upon investigation by Plaintiff's counsel, and upon information and belief where facts are solely in possession of Defendants.

## NATURE OF THE CASE

1.     Plaintiff brings this action on behalf of all investors who purchased EthereumMax tokens ("EMAX Tokens") between May 14, 2021 and June 27, 2021, and were damaged thereby.

2.     This case arises from a scheme among various individuals in the cryptocurrency sector to misleadingly promote and sell the digital asset associated with EthereumMax (the EMAX Tokens) to unsuspecting investors.   The Company's executives, collaborating with several celebrity promotors, (a) made false or misleading statements to investors about EthereumMax through social media advertisements and other promotional activities and (b) disguised their control over EthereumMax and a significant percent of the EMAX Tokens that were available for public trading during the Relevant Period (the "Float").

3.     In furtherance of this scheme, Defendants touted the prospects of the Company and the ability for investors to make significant returns due to the favorable "tokenomics" of the EMAX Tokens.  In truth, Defendants marketed the EMAX Tokens to investors so that they could sell their portion of the Float for a profit.

4.     Defendants' strategy was a success.  The misleading promotions and celebrity endorsements were able to artificially increase the interest in and price of

the EMAX Tokens during the Relevant Period, causing investors to purchase these losing investments at inflated prices.  In addition, the Executive Defendants disguised their control of EthereumMax to avoid scrutiny and facilitate this scheme.  The Executive Defendants then conspired with the Promoter Defendants to sell their EMAX Tokens to investors for a profit.

5.     Plaintiff brings this class action on behalf of themselves and an objectively identifiable class consisting of all investors that purchased EthereumMax's EMAX Tokens between May 14, 2021 and June 17, 2021.

## PARTIES

6.     Plaintiff Ryan Huegerich is a resident and citizen of New York, living in Brooklyn, New York.  Plaintiff Huegerich purchased EMAX Tokens and suffered investment losses as a result of Defendants' conduct.

7.     Defendant Steve Gentile is a resident and citizen of Connecticut, living in Monroe, Connecticut.  Gentile is the co-founder/creator of EthereumMax and exercised control over EthereumMax and directed and/or authorized, directly or indirectly, the sale and/or solicitations of EMAX Tokens to the public.

8.     Defendant Giovanni Perone is a resident and citizen of Florida, living in Miami, Florida.  Perone is the co-founder/creator of EthereumMax and exercised control over EthereumMax and directed and/or authorized, directly or indirectly, the sale and/or solicitations of EMAX Tokens to the public.

9.     Defendant Justin French is a resident and citizen of South Carolina, living in Myrtle Beach, South Carolina.  French served as a consultant, developer, and spokesman for EthereumMax, and he exercised control over EthereumMax and directed and/or authorized, directly or indirectly, the sale and/or solicitations of EMAX Tokens to the public.

10.     Defendant Kimberly Kardashian is a resident and citizen of California, living in Hidden Hills, California.  Kardashian acted as a promotor for EthereumMax and the EMAX Tokens.

11.     Defendant Floyd Mayweather, Jr. is a resident and citizen of Nevada, living in Las Vegas, Nevada.   Mayweather, Jr. acted as a promotor for EthereumMax and the EMAX Tokens.

12.     Defendant Paul Pierce is a resident and citizen of California, living in Inglewood, California.   Pierce acted as a promotor for EthereumMax and the EMAX Tokens.

13.     Corporate Defendant X is the corporate entity behind EthereumMax and the EMAX Tokens, who participated in the wrongdoing alleged herein but whose identity is currently unknown to Plaintiff.   Plaintiff will identify the appropriate Corporate Defendant through discovery of the Executive Defendants.

14.     Defendants John Does 1-10 are persons who participated in the wrongdoing alleged herein but whose identities are currently unknown to Plaintiff. Plaintiff will identify the John Doe Defendants through discovery of the yet-to-be-discovered Corporate Defendant and/or the Executive Defendants.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest or costs; and (3) there is minimal diversity because at least one Plaintiff and Defendant are citizens of different states.   This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

16.     This Court may exercise jurisdiction over Defendants because they have continuous and systematic contacts with this District, do substantial business in this State and within this District, and engage in unlawful practices in this District as described in this Complaint, so as to subject themselves to personal jurisdiction in this District, thus rendering the exercise of jurisdiction by this Court proper and necessary.

CLASS ACTION COMPLAINT

17.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) because certain Defendants live and/or conduct business in this District, therefore, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## FACTUAL ALLEGATIONS

**EthereumMax Background**

18.     The EMAX Token is a speculative digital token created by a mysterious group of cryptocurrency developers, including, but not limited to the Executive Defendants.   In particular, the EMAX Tokens are blockchain-based digital assets known as "ERC-20 tokens" that are created using the Ethereum blockchain.   After an ERC-20 token is created, it can be traded, spent, or otherwise transacted with.   The EMAX Tokens were primarily traded against Ether, the native currency of the Ethereum blockchain network[1] on Uniswap and other decentralized exchanges that allow anyone to list a token.

19.     On May 14, 2021, the Executive Defendants launched the EMAX Tokens with a transaction volume of $16.11 million and a price of $0.00000005875, according to data from CoinMarketCap.

20.     At the time of launch, and throughout the Relevant Period, the EMAX Tokens were not sold pursuant to a "whitepaper."   Whitepapers in cryptocurrency are documents released by the founders of the project that gives investors technical information about its concept, and a roadmap for how it plans to grow and succeed.

---

[1]     EthereumMax has no connection to the second largest cryptocurrency, Ethereum.   This name association appears to be an effort by the Company and the Executive Defendants to mislead investors into believing that the EMAX Tokens were a part of the Ethereum network (when they are not).   It would be akin to marketing a restaurant as "McDonald'sMax" when it had no affiliation with McDonald's other than the name similarity and the fact that both companies sell food products.

21.     Subsequently, however, the Company did release a whitepaper in October 2021 entitled: "EthereumMax – Disrupt History," which explained the business model for EthereumMax and described its activities during the Relevant Period.

22.     According to the Company, "We launched EMAX with a vision to bridge the gap between the emergence of community-driven tokens and the well-known foundational coins of crypto, creating a unique token that provides lifestyle perks with financial rewards and incentives to its holders with a pathway for practical long-term use in everyday life."[2]   The founders' "approach to bridging this gap was to simplify the complex and instill confidence through a trusted circle that can provide guidance and instill trust."[3]

23.     In plain terms, EthereumMax's entire business model relies on using constant marketing and promotional activities, often from "trusted" celebrities, to dupe potential investors into trusting the financial opportunities available with EMAX Tokens.   The whitepaper was reviewed by ICOLAW P.C., a law firm located in Los Angeles, California.

24.     The Company later even bragged in its whitepaper that its "expertise in marketing strategy and managing relationships" was a "key area" for EthereumMax's successful promotional efforts in the preceding six months (*i.e.*, the Relevant Period):

> Each week we track and analyze our marketing efforts, continuing to make strategic modifications to optimize engagement for week-over-week improvements and impact.  If we can do all of this in less than 6 months, imagine what the future holds?  The best is yet to come.[4]

---

[2]     *See* Whitepaper, *EthereumMax–Disrupt History*, ETHEREUMMAX.ORG (v.1, Oct. 2021), https://ethereummax.org/wp-content/uploads/EthereumMax-Whitepaper-v1-Final.pdf (last visited Jan. 5, 2022), at 5.

[3]     *Id.* at 7.
[4]     *Id*. at 48.

**The Pump – Promotor Defendants Shill EthereumMax**

25.     As the subsequently released whitepaper acknowledged, the Executive Defendants actively recruited and retained the Promoter Defendants to serve as the promotors for the launch of the EMAX Tokens in May 2021.

26.     Upon information and belief, the Promoter Defendants received EMAX Tokens and/or other forms of consideration as part or all of their compensation for promoting EthereumMax.

27.     The Promotor Defendants are sophisticated public figures with familiarity and experience with endorsement contracts.

28.     On May 26, 2021, former NBA player and television personality Defendant Paul Pierce, promoted EthereumMax in a widely discussed post on the social media platform Twitter during an online dispute between Defendant Pierce and the television broadcasting network ESPN.[5]   Prior to the May 26 post, Defendant Pierce had worked for ESPN as a sports analyst and commentator until he was fired for an unrelated video he had previously posted to his social media account.   After his firing, Defendant Pierce publicly slammed ESPN while conversely praising EthereumMax's ability to make money for him at the same time:

---

[5]     *See, e.g.*, Jenna Lemoncelli, *Paul Pierce's ESPN revenge after firing over stripper video*, N.Y. POST (May 26, 2021), https://nypost.com/2021/05/26/paul-pierce-slams-espn-with-cryptocurrency-claim/.

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15      29.     That same day, EthereumMax issued a press release announcing that
16  it was "now the exclusive CryptoCurrency accepted for online ticket purchasing
17  for the highly anticipated Floyd Mayweather vs. Logan Paul Pay-Per-View event,
18  June 6, 2021 in Miami Gardens, Florida."[6]   The press release directed investors
19  seeking "more information" to visit the Company's social media accounts and the
20  "Fight Website" with the following hyperlink: https://mayweatherpaultickets.com/.
21      30.     The  Fight  Website  featured  Defendant  Mayweather  and  offered
22  various  incentives  for  those  purchasing  online  tickets  with  EMAX  Tokens,
23  including: "Orders over $5000 will receive authentic, signed Floyd Mayweather
24  boxing gloves"; "2 front row ringside tickets available exclusively for Ethereum
25  Max purchase"; "All Ethereum Max purchases receive 10% discount at checkout";

26  _____
27  [6]     Press Release, EthereumMax, *Huge Milestone for Practical Use of $eMax*
    (May 26, 2021, PR Newswire), https://www.prnewswire.com/news-releases/huge-
28  milestone-for-practical-use-of-emax-301300421.html.

1   and "Tickets purchased with Ethereum Max automatically entered into a lottery
2   drawing to attend the official Mayweather after-party at a private table at LIV."[7]

3       31.    The trading volume for the EMAX Token exploded as a result of
4   Defendant Pierce's post and the Company's announcement that it was partnering
5   with Defendant Mayweather.  On May 26, 2021, the volume reached $44.43
6   million – ***almost five times higher than the previous day***.[8]  Then on May 27th, the
7   volume more than doubled reaching $107.7 million.[9]

8       32.    On May 28, 2021, EthereumMax released a similar press release
9   entitled "EthereumMax ($eMax) Disrupts Miami Ahead of Mayweather vs. Paul
10  Fight as the First Crypto Currency of Major Nightclubs LIV and Story."  The press
11  release came out of Los Angeles and highlighted the previous Mayweather v. Paul
12  release and quoted Defendant Pierce's tweet verbatim.[10]

13      33.    On June 4, 2021, former world champion boxer, Defendant Floyd
14  Mayweather, Jr., attended the "Bitcoin 2021" conference in Miami.  While there,
15  instead of discussing the cryptocurrency that was the focus of the conference (*i.e.*,
16  Bitcoin), Defendant Mayweather promoted EthereumMax.   In particular,
17  Defendant Mayweather and his entourage wore t-shirts with EthereumMax
18  emblazoned across the chest.   At the same time, Defendant Mayweather

---

[7]    Fight Website, https://mayweatherpaultickets.com/.

[8]    Nomics, EMAX - EthereumMax 3 Historical Price Data, https://nomics.com/assets/emax3-ethereummax-3/history/3.

[9]    *Id.*

[10]    Press Release, EthereumMax, *EthereumMax ($eMax) Disrupts Miami Ahead of Mayweather vs. Paul Fight as the First Crypto Currency of Major Nightclubs LIV and Story* (May 28, 2021, PR Newswire), https://www.prnewswire .com/news-releases/ethereummax-emax-disrupts-miami-ahead-of-mayweather-vs-paul-fight-as-the-first-crypto-currency-of-major-nightclubs-liv-and-story-301301958.html.

1  proclaimed during a panel discussion: "I believe there's gonna be another
2  cryptocurrency just as large as Bitcoin some day."[11]

3      34.    Two days later, on June 6, 2021, Defendant Mayweather similarly
4  promoted EthereumMax during his highly viewed exhibition boxing match with
5  internet celebrity-turned-boxer, Logan Paul.[12]

6      35.    Between June 4, 2021 and June 6, 2021, the trading volume for
7  EMAX Tokens spiked from $15.7 million to $24.5 million.[13]

8      36.    On June 8, 2021, Executive Defendants Gentile and Perone, along
9  with Josh James (the lead developer at EthereumMax), uploaded a video of
10  themselves on YouTube entitled "Addressing the $eMax Community –
11  EthereumMax."[14]   Defendants Gentile and Perone identified themselves as the
12  "creators" of EthereumMax, and explained that Mr. James had recently joined
13  EthereumMax as its new lead developer.

14      37.    Defendant Perone described his prior experience in "the hedge fund
15  space" and had "significant experience structuring nuanced securitizations and
16  financing arrangements," and he touted EthereumMax as something "special" with
17  "real sustainability."  Defendant Perone also stated that they were able to forge a
18  "landmark agreement with the Mayweather team" and reassured investors
19  regarding the "volatility" in the EMAX Token price.  Defendant Gentile further

20  ───────────────
21  [11]    Jeff Benson, *Floyd Mayweather, Sponsored by Ethereum Token, Gets Booed
    at Bitcoin Conference*, DECRYPT (June 4, 2021), https://decrypt.co/72807/floyd-
22  mayweather-sponsored-ethereum-token-gets-booed-bitcoin-conference.

23  [12]   Brendan Rearick, *EthereumMax (EMAX) Price Predictions: Can Floyd
    Mayweather Help EMAX Win the Fight?*, MSN (June 7, 2021), https://www.
24  msn.com/en-us/money/markets/ethereummax-emax-price-predictions-can-floyd-
25  mayweather-help-emax-win-the-fight/ar-AAKNxNi.

26  [13]   NOMICS, EMAX - EthereumMax 3 Historical Price Data, https://nomics.
    com/assets/emax3-ethereummax-3/history/3.

27  [14]   Mike Speer, *Addressing the $eMax Community – EthereumMax*, YOUTUBE
28  (June 7, 2021), https://www.youtube.com/watch?v=CkR8QJrNubI.

CLASS ACTION COMPLAINT

1    stated that EthereumMax's work with "launching ambassadorships and working

2    with influencers" was not solely in preparation for the Mayweather fight, but rather

3    "the launch point" with "great prospects moving forward."

4        38.    Defendant Gentile also noted that his background involved specialties

5    revolved around marketing and brand development, and he exclaimed that

6    EthereumMax was a "super exciting project" and that he was "excited for the

7    updates" that would be "rolling out in the near future."  Defendant Gentile claimed

8    that it was "going to be beneficial not only to the token, but more importantly the

9    community."

10       39.    During a pseudo question and answer portion of the video, Defendant

11   Gentile brought up investors' questions about a "rug pull" of the EMAX Token

12   and asked Defendant Perone to "nip it in the bud."  Defendant Perone stressed that

13   the EthereumMax team was in for the long term, stating, among other things, that

14   the Executive Defendants were "looking to lock the wallets" to show investors that

15   they "were here to stay."

16       40.    On June 14, 2021, reality television personality Defendant Kim

17   Kardashian posted the following solicitation for EthereumMax on her Instagram

18   account, which has over 250 million followers:

19

20

21

22

23

24

25

26

27

28



CLASS ACTION COMPLAINT

41.     As noted in a scathing op-ed piece called "Celebrity Crypto Shilling Is a Moral Disaster," Defendant Kardashian's "post was an immediate sensation, and a touch controversial."  The EMAX Token was "only a month old, few had heard of it, and it wasn't even obvious how the 'token' was supposed to work.  More than that, Kardashian was urging her 251 million Instagram followers to get involved in a highly volatile, speculative market that's little different than gambling in the world's most fraudulent casino."[15]

42.     Defendant Kardashian's promotion had tremendous reach.  The financial services company, Morning Consult, analyzed "the impact of celebrities on crypto investor decisions," and, in particular, the impact of Defendant Kardashian's EthereumMax post.  The survey found that up to 21 percent of all American adults and nearly half of all cryptocurrency owners had seen this ad for a risky financial instrument.  Furthermore, Defendant Kardashian's "conversion was also impressive: ***A striking 19% of respondents who said they heard about the post invested in EthereumMax as a result***."[16]

43.     The chair of the Financial Conduct Authority ("FCA") in the United Kingdom, Charles Randall, in a September 6, 2021 speech given to the Cambridge International Symposium on Economic Crime, remarked that Defendant Kardashian's EthereumMax post was "the financial promotion with the single biggest audience reach in history."[17]

---

[15]     Ben McKenzie and Jacob Silverman, *Celebrity Crypto Shilling Is a Moral Disaster*, SLATE (Oct. 7, 2021), https://slate.com/technology/2021/10/ben-mckenzie-crypto-celebrities-kardashian-brady-lohan.html.

[16]     Charlotte Principato, *Kim Kardashian, Cryptocurrency and Celebrity Clout*, MORNING CONSULT (Sept. 21, 2021), https://morningconsult.com/2021/09/21/kim-kardashian-crypto-celebrity/.

[17]     Speech by Charles Randell, *The risks of token regulation,* Cambridge International Symposium on Economic Crime, Sept. 6, 2021,

1    44.    Notably, Defendant Kardashian's post did include a promotional

2  disclosure in the post itself.  However, this disclosure is tucked in the far bottom

3  right of the post and is just three characters long: "#AD."  While it is unclear what

4  the precise terms of the financial compensation that Defendant Kardashian was

5  given by the Executive Defendants, Defendant Kardashian routinely gets paid

6  between $300,000 and $1 million for most promotional posts.    Defendant

7  Kardashian even stated that she makes more money off these promotions than an

8  entire season of her reality television show.[18]

9    45.    Defendant Kardashian also has experience and familiarity with

10  making misleading claims in similar promotional endorsements on her Instagram

11  and Twitter accounts.  For example, in 2015, the United States Food and Drug

12  Administration ordered Defendant Kardashian to remove a promotional post she

13  had made with a strikingly similar beginning to the EthereumMax Post at issue in

14  this action[19]:

15  


16  

17  

18  

19  

20  

21  

22  https://www.fca.org.uk/news/speeches/risks-token-regulation (last visited Jan. 5,

23  2022).

24  [18]    Alicia Brunker, *Kim Kardashian Says She Makes More Money on Instagram Than for an Entire Season of KUWTK*, INSTYLE (Oct. 18, 2020),

25  https://www.instyle.com/celebrity/kim-kardashian-makes-more-money-on-

26  instagram-than-kuwtk.

27  [19]    Mark Sweney, *Kim Kardashian forced to delete selfie endorsing morning sickness drug*, THE GUARDIAN (Aug. 12, 2015),  https://www.theguardian.com

28  /media/2015/aug/12/kim-kardashian-selfie-morning-sickness-drug-instagram.

46.    Defendant Pierce did not include any promotional disclosure when he tweeted about EthereumMax on May 26, 2021.

47.    It does not appear that Defendant Mayweather has disclosed any payments either for his promotion of EthereumMax on June 4 and 6.  Defendant Mayweather does have experience with being fined previously over improper cryptocurrency promotion,[20] and, as a result, he knew or should have known that his conduct alleged herein was improper.

48.    In November 2018, Defendant Mayweather and another celebrity promotor settled charges with the United States Securities and Exchange Commission for failing to disclose payments they received for promoting fraudulent cryptocurrency investments.  One of the posts at issue there was one that Defendant Mayweather made on Twitter, stating "You can call me Floyd Crypto Mayweather from now on" and a promotion with the message to his Twitter followers that a company's fraudulent initial coin offering "starts in a few hours.  Get yours before they sell out, I got mine[.]"  As part of the settlement, Defendant Mayweather agreed to pay "$300,000 in disgorgement, a $300,000 penalty, and $14,775 in prejudgment interest."  In addition, Defendant Mayweather agreed not to promote any securities – digital or otherwise – for three years.  The settlement was dated November 29, 2018, meaning that this agreement was blatantly violated in connection with Defendants Mayweather's EthereumMax promotion.  Defendant Mayweather, therefore, had an understanding that his own conduct, as well as the conduct of Executive Defendants, was improper and fraudulent.

---

[20]    Press Release, SEC, *Two Celebrities Charged with Unlawfully Touting Coin Offerings*, (Nov. 29, 2018), https://www.sec.gov/news/press-release/2018-268.

CLASS ACTION COMPLAINT

**The Dump – EMAX Token price plummets**

49.     Following the EMAX Token's launch and Defendants' promotional activities in May 2021, the trading volume and price of EthereumMax surged.  By May 30, EMAX already had a transaction volume of over $100 million, up 632% in just two weeks.  The day before, it reached its maximum price of $0.000000863, which represents a rise of 1,370% more than its initial price of $0.00000005875.

50.     However, this meteoric rise did not last long, and EthereumMax began to deflate immediately after Defendant Kardashian's post.  On July 15, the price of the EMAX Token hit its all-time low: $0.000000017 per unit, a 98% drop from which it has not been able to recover.  On August 1, its transaction volume plummeted to $157,423, which is less than a hundredth of its initial capital.

51.     The Promoter Defendants' improper promotional activities generated the trading volume needed for all the Defendants to offload their EMAX Tokens onto unsuspecting investors.  While Plaintiff and Class members were buying the inappropriately promoted EMAX Tokens, Defendants were able to, and did, sell their EMAX Tokens during the Relevant Period for substantial profits.  According to Defendant Perone, the Executive Defendants did not "lock" their EMAX Token wallet addresses until after the Relevant Period.

52.     The EMAX Token price still has not recovered and trading volume remains down significantly.  As bluntly noted in McKinnon's op-ed: "If you bought EthereumMax after Kardashian pushed it and didn't sell fast enough, all you were left with was a practically worthless digital asset."[21]

**Regulators Raise Concerns that EthereumMax Is a "Pump and Dump" Scam**

53.     Following the precipitous drop of the EMAX Token price in the wake of Defendant Kardashian's EthereumMax post, the United Kingdom's FCA chair

---

[21]     *See* n.9, *supra*.

1    issued a statement noting that Defendant Kardashian's promotion of the EMAX

2    Token could be "fraudulent."  Specifically, Charles Randall, director of the FCA,

3    gave a speech about the need for a "permanent and consistent solution to the

4    problem of online fraud from paid-for advertising."[22]

5      54.    Cryptocurrency "scams" were one of the topics that Randall

6    specifically addressed, and during that portion of the speech, Randall specifically

7    took issue with Defendant Kardashian's EthereumMax post.  Randall noted that

8    "social media influencers [like the Promoter Defendants] are routinely paid by

9    scammers to help them pump and dump new tokens on the back of pure

10    speculation."[23]

11      55.    Randall further observed that the hype around speculative digital

12    assets like the EMAX Token "generates a powerful fear of missing out from some

13    consumers who may have little understanding of their risks.  There is no shortage

14    of stories of people who have lost savings by being lured into the crypto bubble

15    with delusions of quick riches, sometimes after listening to their favourite

16    influencers, ready to betray their fans' trust for a fee."[24]

17      56.    This is precisely what occurred with the Executive Defendants' stated

18    marketing strategy to use celebrities like the Promoter Defendants to "instill trust"

19    from investors in EthereumMax in exchange for fees and/or EMAX Tokens – that

20    the Promotor Defendants could sell for profits.

21                **CLASS ALLEGATIONS**

22      57.    Plaintiff brings this action, individually, and on behalf of a nationwide

23    class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3),

24    defined as follows:

25

26    [22]    *Id.*

27    [23]    *Id.*

28    [24]    *See* n.9, *supra.*

All persons who, during the Class Period, purchased EthereumMax's EMAX Tokens and were subsequently damaged thereby.

58.     The Class Period is defined as the period between May 14, 2021 and June 27, 2021.[25]

59.     Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers and directors; (c) Plaintiff's counsel and Defendant's counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family.  Plaintiff reserves the right to modify, change, or expand the various class definitions set forth above based on discovery and further investigation.

60.     **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable.  While the exact number and identity of individual members of the Class is unknown currently, such information being in the sole possession of EthereumMax and/or third parties and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that the Class consists of at least hundreds of people.  The number of Class members can be determined based on EthereumMax's and other third party's records.

61.     **Commonality**: Common questions of law and fact exist as to all members of each Class.  These questions predominate over questions affecting individual Class members.  These common legal and factual questions include, but are not limited to:

a.      whether Defendants improperly and misleadingly marketed EMAX Tokens;

---

[25]     Plaintiff reserves the right to expand or amend the Class Period based on discovery produced in this matter.

CLASS ACTION COMPLAINT

b.  whether Defendants' conduct violates the state consumer protection statutes asserted herein;

c.  whether Promoter Defendants aided and abetting violations of the state consumer protection statutes asserted herein;

d.  whether Executive Defendants conspired to artificially inflate the price to the EMAX Tokens and then sell their EMAX Tokens to unsuspecting investors;

e.  whether Defendants been unjustly and wrongfully enriched as a result of their conduct;

f.  whether the proceeds that the Defendants obtained as a result of the sale of EMAX Tokens rightfully belongs to Plaintiff and Class members;

g.  whether Defendants should be required to return money it received as a result of the sale of EMAX Tokens to Plaintiff and Class members;

h.  whether Executive Defendants breached the implied covenant of good faith and fair dealing; and

i.  whether Plaintiff and Class Members have suffered damages, and, if so, the nature and extent of those damages.

62.  **Typicality**: Plaintiff has the same interest in this matter as all Class members, and Plaintiff's claims arise out of the same set of facts and conduct as the claims of all Class members.  Plaintiff's and Class members' claims all arise out of EthereumMax's uniform misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the sale of EMAX Tokens.

63.  **Adequacy**: Plaintiff has no interest that conflicts with the interests of the Class and is committed to pursuing this action vigorously.  Plaintiff has retained counsel competent and experienced in complex consumer class action litigation.  Accordingly, Plaintiff and his counsel will fairly and adequately protect the interests of the Class.

64.   **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by EthereumMax's conduct.   It would be virtually impossible for individual Class members to effectively redress the wrongs done to them.   Even if Class members could afford individualized litigation, the court system could not.  Individualized litigation would increase delay and expense to all parties, and to the court system, because of the complex legal and factual issues of this case.  Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

65.   Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS

66.   California's substantive laws apply to every member of the Class, regardless of where in the United States the Class members reside.

67.    California's substantive laws may be constitutionally applied to the claims of Plaintiff and the Class under the Due Process Clause, 14th Amend. §1, and the Full Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. California has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiff and all Class members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.

68.   The Executive Defendants primarily reside in, and upon information and belief operate EthereumMax's headquarters and principal place of business is located in California.   Upon information and belief, EthereumMax also owns

18

property and conducts substantial business in California, and therefore California has an interest in regulating EthereumMax's conduct under its laws. EthereumMax's decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible.

69.     California is also the state from which the Executive Defendants' alleged misconduct emanated.  On information and belief, the decision-making regarding the parameters of EthereumMax marketing strategy and related sale of EMAX Tokens, occurred in and emanated from California.  As such, the conduct complained of herein emanated from California.  This conduct similarly injured and affected Plaintiff and all other Class members.

70.     The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiff and the proposed Class, and California has a greater interest in applying its laws here than any other interested state.

## FIRST CAUSE OF ACTION

**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §17200**
**(Against All Defendants)**

71.     Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

72.     Plaintiff is a resident of the State of California.

73.     At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

74.     EthereumMax also engaged in business acts and practices deemed "unfair" under the UCL, because the conduct, statements, and omissions described

above.   Unfair acts under the UCL have been interpreted using different tests, including: (1) whether the public policy which is a predicate to a consumer unfair competition action under the unfair prong of the UCL is tethered to specific constitutional, statutory, or regulatory provisions; (2) whether the gravity of the harm to the consumer caused by the challenged business practice outweighs the utility of the defendant's conduct; and (3) whether the consumer injury is substantial, not outweighed by any countervailing benefits to consumers or competition, and is an injury that consumers themselves could not reasonably have avoided.   Defendant's conduct is unfair under each of these tests.

75.    As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiff and Class members suffered damages.   The Executive Defendants' activities with the Promoter Defendants caused Plaintiff and the Class members to purchase and/or hold the EMAX Tokens when they otherwise would not have done so.

76.    Plaintiff seeks to enjoin further unlawful, unfair, and/or fraudulent acts or practices by EthereumMax, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under California Business & Professions Code §17200.

### SECOND CAUSE OF ACTION

**Violation of the California Consumers Legal Remedies Act**
**Cal. Code Civ. Proc. §1770**
**(Against All Defendants)**

77.    Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

78.    Plaintiff is a resident of the State of California.

79.    At all relevant times there was in full force and effect Cal. Civ. Code §1770, which prohibits, *inter alia*, various methods of "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer," including, but not

limited to, "[m]isrepresenting the affiliation, connection, or association with, or certification by, another" and "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have." Cal. Civ. Code §1770(a)(3) & (5).

80. Defendants engaged in business acts and practices deemed "deceptive" because of the conduct, statements, and omissions described above, including, but not limited to, the following:

      (a)   knowingly and intentionally concealing the Executive Defendants' specific roles and ownership interests in EthereumMax; and

      (b)   knowingly and intentionally using and/or failing to disclose the use of the Promotor Defendants to "instill trust" in uninformed investors to promote the financial benefits of a highly speculative and risky investment in EMAX Tokens, in an effort to manipulate and artificially inflate the price and trading volume of the EMAX tokens and allow Defendants to sell their EMAX Tokens at those inflated prices.

81. As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiff and Class members suffered damages. The Executive Defendants' activities with the Promoter Defendants caused Plaintiff and the Class members to purchase and/or hold the EMAX Tokens when they otherwise would not have done so.

82. Plaintiff seeks to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under Cal. Civ. Code §1780.

1     83.    Plaintiff additionally seeks punitive damages under Cal. Civ. Code

2  §1770(a)(4).

3     84.    Plaintiff has complied with Cal. Civ. Code §1780(d), which requires

4  the concurrent filing of an "affidavit stating facts showing that the action has been

5  commenced in a county described in this section as a proper place for the trial of

6  the action."

7                              **THIRD CAUSE OF ACTION**

8                                  **Aiding and Abetting**
                                **California Common Law**
9                            **(Against Promoter Defendants)**

10     85.    Plaintiff restates and realleges all preceding allegations above as if

11  fully set forth herein.

12     86.    Under California law, aiding and abetting requires not agreement, but

13  simply assistance.  The elements of aiding and abetting liability have cited the

14  elements of the tort as they are set forth in the RESTATEMENT (SECOND) OF TORTS

15  §876, and have omitted any reference to an independent duty on the part of the

16  aider and abettor.

17     87.    Under California law, "[l]iability may . . . be imposed on one who

18  aids and abets the commission of an intentional tort if the person (a) knows the

19  other's conduct constitutes a breach of duty and gives substantial assistance or

20  encouragement to the other to so act or (b) gives substantial assistance to the other

21  in accomplishing a tortious result and the person's own conduct, separately

22  considered, constitutes a breach of duty to the third person." *Neilson v. Union*

23  *Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1118 (C.D. Cal. 2003) (citations

24  omitted).

25     88.    "Unlike a conspirator, an aider and abettor does not 'adopt as his or

26  her own' the tort of the primary violator.  Rather, the act of aiding and abetting is

27  distinct from the primary violation; liability attaches because the aider and abettor

28

                              CLASS ACTION COMPLAINT

1  behaves in a manner that enables the primary violator to commit the underlying
2  tort." *Id.*

3       89.    The Promoter Defendants have previous knowledge and experience
4  with making misleading promotional statements (with Defendant Mayweather
5  having nearly an identical experience with a previous fraudulent cryptocurrency
6  promotion), and, as such, knew or should have known that the marketing strategy
7  employed by the Executive Defendants for the EMAX Tokens was unlawful,
8  deceitful, fraudulent, and/or violated the terms of the California state statutes
9  described in this Complaint.

10      90.    By promoting the EMAX Tokens on their social media platforms and
11 through their reported conduct, the Promotor Defendants provided assistance that
12 was a substantial factor causing the EMAX Token price to both surge and do so
13 long enough to allow all Defendants to sell their EMAX Tokens for huge profits at
14 the expense of their followers and investors.  Without the help of the Promoter
15 Defendants' activities, the Executive Defendants would have been unable to use
16 the misleading marketing strategy devised by Defendant Gentile, and Defendants
17 would not have been able to commit the violations of California state consumer
18 protection statutes alleged herein.

19      91.    As a direct and proximate result of Promotor Defendants' unlawful,
20 unfair, and deceptive practices, Plaintiff and Class members suffered damages.
21 The Executive Defendants' activities with the Promoter Defendants caused
22 Plaintiff and the Class members to purchase and/or hold the EMAX Tokens when
23 they otherwise would not have done so.

24      92.    Plaintiff seeks to enjoin further unlawful, unfair, and/or fraudulent
25 acts or practices by EthereumMax, to obtain monetary damages, restitution and
26 disgorgement of all monies generated as a result of such practices, and for all other
27 relief allowed under California law.

28

## FOURTH CAUSE OF ACTION

**Unjust Enrichment/Restitution**
**(California Common Law, In the Alternative)**
**(Against All Defendants)**

93.     Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

94.     Plaintiff and members of the Class conferred a monetary benefit on Defendants by raising the price and trading volume of the EMAX Tokens, which allowed Defendants to sell their EMAX Tokens to Plaintiff and Class members at inappropriately and artificially inflated prices.

95.     Defendants received a financial benefit from the sale of their EMAX Tokens at inflated prices and are in possession of this monetary value that was intended to be used for the benefit of, and rightfully belongs to, Plaintiff and members of the Class.

96.     Plaintiff seeks restitution in the form of the monetary value of the difference between the purchase price of the EMAX Tokens and the price those EMAX Tokens sold for.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of all others similarly situated, respectfully requests that this Court:

A.     Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more of the Classes defined above;

B.     Appoint Plaintiff as the representative of the Class and his counsel as Class counsel;

C.     Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiff and the Class members are entitled;

1       D.     Award post-judgment interest on such monetary relief;

2       E.     Grant appropriate injunctive and/or declaratory relief;

3       F.     Award reasonable attorneys' fees and costs; and

4       G.    Grant such further relief that this Court deems appropriate.

5                      **<u>JURY DEMAND</u>**

6       Plaintiff, individually and on behalf of the putative Class, demands a trial by

7  jury on all issues so triable.

8  DATED:  January 7, 2022      **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

9                        /s/ *John T. Jasnoch*

10                       John T. Jasnoch (CA 281605)
                          600 W. Broadway, Suite 3300

11                     San Diego, CA 92101
                       Tel.: 619-233-4565

12                     Fax: 619-236-0508

13                     jjasnoch@scott-scott.com

14

15                     Sean T. Masson (*pro hac vice* forthcoming)
                     The Helmsley Building

16                     230 Park Avenue, 17th Floor
                     New York, NY 10169

17                     Tel.: 212-223-6444

18                     Fax: 212-223-6334
                     smasson@scott-scott.com

19

20                     *Counsel for Plaintiff and the Proposed Class*

21

22

23

24

25

26

27

28

25