John T. Jasnoch (CA 281605)
jjasnoch@scott-scott.com
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-236-0508

*Lead Counsel for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| IN RE ETHEREUMMAX INVESTOR LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Lead Case No. 2:22-cv-00163-MWF-(SKx)<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiffs Ryan Huegerich, Jonathan Semerjian, Nabil Nahlah, Till Freeman, Marko Ciklic, Tunisia Brignol, Milan Puda, Neil Shah, and Christopher DeLuca ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint ("Complaint") against Defendant EthereumMax (or, the "Company"), Steve Gentile, Giovanni Perone, Justin French, Mike Speer, and Justin Maher (the "Executive Defendants"), Kimberly Kardashian, Floyd Mayweather, Jr., Paul Pierce, Russell Davis, and Antonio Brown (the "Promoter Defendants" and, together with the Executive Defendants, the "Defendants").  The following allegations are based upon personal knowledge as to Plaintiffs' own facts, upon investigation by Plaintiffs' counsel, and upon information and belief where facts are solely in possession of Defendants.

## NATURE OF THE CASE

1.     Plaintiffs bring this action on behalf of all investors who purchased EthereumMax tokens ("EMAX Tokens") between May 14, 2021 and June 27, 2021, (the "Relevant Period") and were damaged thereby.

2.     This case arises from a scheme among various individuals in the cryptocurrency sector to misleadingly promote and sell the digital asset associated with EthereumMax (the EMAX Tokens) to unsuspecting investors.  The Company's executives, collaborating with several celebrity promotors, (a) made false or misleading statements to investors about EthereumMax through social media advertisements and other promotional activities, and (b) disguised their control over EthereumMax and a significant percent of the EMAX Tokens that were available for public trading during the Relevant Period (the "Float").

3.     In furtherance of this scheme, Defendants touted the prospects of the Company and the ability of investors to make significant returns due to the favorable "tokenomics" of the EMAX Tokens.  In truth, Defendants marketed the EMAX Tokens to investors so that they could sell their portions of the Float for a profit.

4. Defendants' strategy was a success. The misleading promotions and celebrity endorsements were able to artificially increase the interest in and price of the EMAX Tokens during the Relevant Period, causing investors to purchase these losing investments at inflated prices. In addition, the Executive Defendants disguised their control of EthereumMax to avoid scrutiny and facilitate this scheme. The Executive Defendants then conspired with the Promoter Defendants to sell their EMAX Tokens to investors for a profit.

5. Plaintiffs bring this class action on behalf of themselves and an objectively identifiable class consisting of all investors that purchased EthereumMax's EMAX Tokens between May 14, 2021 and June 17, 2021.

## PARTIES

### *Plaintiffs*

6. Plaintiff Ryan Huegerich ("Huegerich") is a resident and citizen of New York, living in Brooklyn, New York. After viewing numerous celebrity endorsements of EMAX, Plaintiff Huegerich purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

7. Plaintiff Jonathan Semerjian ("Semerjian") is a resident and citizen of California, living in Valencia, California. After viewing numerous celebrity endorsements of EMAX, Plaintiff Semerjian purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

8. Plaintiff Nabil Nahlah ("Nahlah") is a resident and citizen of Florida, living in Miami Beach, Florida. After viewing numerous celebrity endorsements of EMAX, Plaintiff Nahlah purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

9. Plaintiff Till Freeman ("Freeman") is a resident and citizen of Florida, living in Hallandale, Florida. After viewing numerous celebrity endorsements of

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

EMAX, Plaintiff Freeman purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

10. Plaintiff Marko Ciklic ("Ciklic") is a resident and citizen of New York, living in Brooklyn, New York. After viewing numerous celebrity endorsements of EMAX, Plaintiff Ciklic purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

11. Plaintiff Tunisia Brignol ("Brignol") is a resident and citizen of Florida, living in Miami, Florida. After viewing numerous celebrity endorsements of EMAX, Plaintiff Brignol purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

12. Plaintiff Milan Puda ("Puda") is a resident and citizen of Florida, living in Miami, Florida. After viewing numerous celebrity endorsements of EMAX, Plaintiff Puda purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

13. Plaintiff Neil Shah ("Shah") is a resident and citizen of California, living in San Jose, California. After viewing numerous celebrity endorsements of EMAX, Plaintiff Shah purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

14. Plaintiff Christopher DeLuca ("DeLuca") is a resident and citizen of New Jersey, living in Cranford, New Jersey. After viewing numerous celebrity endorsements of EMAX, Plaintiff DeLuca purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

### *Defendants*

15. Defendant Justin Maher ("Maher") is a resident and citizen of Connecticut, living in Milford, Connecticut. Maher is the co-founder/creator of EthereumMax and exercised control over EthereumMax and directed and/or

authorized, directly or indirectly, the sale and/or solicitations of EMAX Tokens to the public.

16.     Defendant Steve Gentile ("Gentile") is a resident and citizen of Connecticut, living in Monroe, Connecticut.  Gentile is the co-founder/creator of EthereumMax and exercised control over EthereumMax and directed and/or authorized, directly or indirectly, the sale and/or solicitations of EMAX Tokens to the public.

17.     Defendant Giovanni Perone ("Perone") is a resident and citizen of Florida, living in Miami, Florida.  Perone is the co-founder/creator of EthereumMax and exercised control over EthereumMax and directed and/or authorized, directly or indirectly, the sale and/or solicitations of EMAX Tokens to the public.

18.     Defendant Mike Speer ("Speer") is a resident and citizen of Texas, living in Georgetown, Texas.  Speer is the co-founder/creator of EthereumMax and exercised control over EthereumMax and directed and/or authorized, directly or indirectly, the sale and/or solicitations of EMAX Tokens to the public.

19.     Defendant Justin French ("French") is a resident and citizen of South Carolina, living in Myrtle Beach, South Carolina.  French served as a consultant, developer, and spokesman for EthereumMax, and he exercised control over EthereumMax and directed and/or authorized, directly or indirectly, the sale and/or solicitations of EMAX Tokens to the public.

20.     Defendant Kimberly Kardashian ("Kardashian") is a resident and citizen of California, living in Hidden Hills, California.  Kardashian acted as a promotor for EthereumMax and the EMAX Tokens.

21.     Defendant Floyd Mayweather, Jr. ("Mayweather, Jr.") is a resident and citizen of Nevada, living in Las Vegas, Nevada.  Mayweather, Jr. acted as a promotor for EthereumMax and the EMAX Tokens.

22.     Defendant Paul Pierce ("Pierce") is a resident and citizen of California, living in Inglewood, California.  Pierce acted as a promotor for EthereumMax and the EMAX Tokens.

23.     Defendant Russell Davis ("Davis") is a resident and citizen of Connecticut, living in Woodmont, Connecticut.   Davis acted as a consultant, developer, promoter, and spokesman for EthereumMax, and he exercised control over EthereumMax and directed and/or authorized, directly or indirectly, the sale and/or solicitations of EMAX Tokens to the public.

24.     Defendant Antonio Brown ("Brown") is a resident and citizen of Florida, living in Miami, Florida.  Brown acted as a promotor for EthereumMax and the EMAX Tokens.

25.     Corporate Defendant X is the corporate entity behind EthereumMax and the EMAX Tokens, who participated in the wrongdoing alleged herein but whose identity is currently unknown to Plaintiffs.   Plaintiffs will identify the appropriate Corporate Defendant through discovery of the Executive Defendants.

26.     Defendants John Does 1-7 are persons who participated in the wrongdoing alleged herein but whose identities are currently unknown to Plaintiffs. Plaintiffs will identify the John Doe Defendants through discovery of the yet-to-be-discovered Corporate Defendant and/or the Executive Defendants.[1]

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000,

---

[1]     While the identities of John Does 1-7 cannot yet be confirmed, there are clues. For example, as a now-deleted telegram post from the EMAX official account admitted: "Kim Kardashian is a family member of someone on the team."   In addition, one of Kardashian's EthereumMax promotions is made in conjunction with a nightclub, LIV, and Groot Hospitality, both of which are partially owned by David Grutman.  Since at least 2017, Grutman has been friends with Scott Disick, who also happens to be the father of Kardashian's niece and nephews.

exclusive of interest or costs; and (3) there is minimal diversity because at least one Plaintiff and Defendant are citizens of different states.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

28.    This Court may exercise jurisdiction over Defendants because they have continuous and systematic contacts with this District, do substantial business in this State and within this District, and engage in unlawful practices in this District as described in this Complaint, so as to subject themselves to personal jurisdiction in this District, thus rendering the exercise of jurisdiction by this Court proper and necessary.

29.    Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) because certain Defendants live and/or conduct business in this District, therefore, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

30.    For example, Executive Defendant Steve Gentile's September 13, 2021 post congratulating the winners of EthereumMax's "exclusive in-person LA influencer event with CRE8LUCK" is still pinned (Pinned Message # 93) as a top post on the Ethereum Max official Telegram account.  *See also* Pinned Messages 86-87.  Similarly, Gentile's September 17, 2021 post bragging that the "influencer event with CRE8LUCK in Los Angeles at the Petersen Automotive Museum was a success.  Lots of exciting EMAX content coming soon" is also still pinned on the official EthereumMax Telegram account (Pinned Message # 99) for investors to see in particular.  In addition, the EthereumMax Telegram page promotes as part of its "Business of the Week" and "Vender of the Week" promotions, businesses like aerial photography business Diablo Drone Services located "in the California bay area" and cannabis delivery service CVALT located in Alameda, Tulare, Fresno, and Kern Counties, which have started "accepting payments" in EMAX Tokens.

# FACTUAL ALLEGATIONS

**EthereumMax Background**

31.     EthereumMax is a cryptocurrency-related project founded by Justin Maher, Steve Gentile, Giovani Perone, and at least seven other undisclosed individuals.[2]  Maher and others funded the development and creation of the EMAX Token.

32.     The EMAX Tokens are blockchain-based digital assets known as "ERC-20 tokens" that are created using the Ethereum blockchain.  After an ERC-20 token is created, it can be traded, spent, or otherwise transacted with.

33.     EMAX Tokens were not sold on popular centralized exchanges like Coinbase or Gemini, which generally require that the tokens be compliant with local laws and regulations.  Instead, the EMAX Tokens traded exclusively on decentralized exchanges, like Uniswap, that allow anyone to list and sell their tokens.

34.     Uniswap and other decentralized exchanges are known as "automated market makers" which use liquidity pools and smart contracts to allow investors to exchange one asset for another without a direct counterparty.  Users called liquidity providers add an equal value of two tokens into a smart contract pool to create a market.  When executing a trade on a decentralized exchange, an investor does not have a counterparty and is instead executing the trade against the liquidity in the liquidity pool.  In order to execute trades on a decentralized exchange, users must pay "gas fees" in order to process the transaction on the Ethereum blockchain.  The gas fee can be significant, as it takes into account the amount of computing power needed to process the transaction, as well as the amount of traffic on the network.

---

[2]     *See* https://www.youtube.com/watch?v=EkBOlCK3cuU.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

35.    The EMAX Tokens were primarily traded against Ether, the native currency of the Ethereum blockchain network.[3]

36.    At inception, Maher was ranked seventh out of the ten original founders in terms of ownership interest in EthereumMax, with a 5.9% stake in the project.

37.    The developer held the number one rank with 23% ownership interest.

38.    After an initial failed attempt to launch the EMAX Tokens, Maher tapped into a network of 20 traders of collectibles he knew prior to creating EthereumMax to assist in the operation and promotion of the EthereumMax project. These individuals previously served as the moderators for the social media accounts for the cryptocurrency, Shiba Inu coin.  Between them, this group had upward of 400,000 followers across their various social media accounts.

39.    Maher tasked this group to work as the moderators for the various EthereumMax social media accounts, including those on Twitter, Telegram, Reddit, and Discord.  In particular, the group was meant to "shill" the EMAX Tokens to their followers, enticing potential investors with claims that the EMAX Tokens were up "8000%" (after the EMAX Token price had been artificially inflated) and would continue to rise.  Maher himself served as the administrator/moderator of the EthereumMax Facebook page.

40.    On May 14, 2021, the Executive Defendants launched the EMAX Tokens with a transaction volume of $16.11 million and a price of $0.00000005875, according to data from CoinMarketCap.

---

[3]    EthereumMax has no connection to the second largest cryptocurrency, Ethereum.  This name association appears to be an effort by the Company and the Executive Defendants to mislead investors into believing that the EMAX Tokens were a part of the Ethereum network (when they are not).  It would be akin to marketing a restaurant as "McDonald'sMax" when it had no affiliation with McDonald's other than the name similarity and the fact that both companies sell food products.  In fact, the founder of Ethereum, Vitalik Buterin, called for Kardashian to be "cancelled" for her shilling of EthereumMax tokens.  *See* https://www.youtube.com/watch?v=oLsb7clrXMQ&t=793s.

41.     Liquidity pools were created on Uniswap to allow users to purchase EMAX Tokens with Ether.   Wallets associated with Defendants continually provided Emax Tokens to the pool as retail investors provided Ether to purchase EMAX Tokens.

42.     At the time of launch, and throughout the Relevant Period, the EMAX Tokens were not sold pursuant to a "whitepaper."   Whitepapers in cryptocurrency are documents released by the founders of the project that gives investors technical information about its concept, and a roadmap for how it plans to grow and succeed.

43.     Subsequently, however, the Company did release a whitepaper in October 2021 entitled: "EthereumMax – Disrupt History," which explained the business model for EthereumMax and described its activities during the Relevant Period.

44.     According to the Company, "We launched EMAX with a vision to bridge the gap between the emergence of community-driven tokens and the well-known foundational coins of crypto, creating a unique token that provides lifestyle perks with financial rewards and incentives to its holders with a pathway for practical long-term use in everyday life."[4]   The founders' "approach to bridging this gap was to simplify the complex and instill confidence through a trusted circle that can provide guidance and instill trust."[5]

45.     In plain terms, EthereumMax's entire business model relies on using constant marketing and promotional activities, often from "trusted" celebrities, to dupe potential investors into trusting the financial opportunities available with EMAX Tokens.  The whitepaper was reviewed by ICOLAW P.C., a law firm located in Los Angeles, California.

---

[4]     *See* Whitepaper, *EthereumMax–Disrupt History*, ETHEREUMMAX.ORG, at 5 (v.1, Oct. 2021), https://ethereummax.org/wp-content/uploads/EthereumMax-Whitepaper-v1-Final.pdf.

[5]     *Id.* at 7.

9

46.     The Company later even bragged in its whitepaper that its "expertise in marketing strategy and managing relationships" was a "key area" for EthereumMax's successful promotional efforts in the preceding six months (*i.e.*, the Relevant Period):

> Each week we track and analyze our marketing efforts, continuing to make strategic modifications to optimize engagement for week-over-week improvements and impact.  If we can do all of this in less than 6 months, imagine what the future holds?  The best is yet to come.[6]

**The Pump – Promotor Defendants Shill EthereumMax**

47.     As the subsequently released whitepaper acknowledged, the Executive Defendants actively recruited and retained the Promoter Defendants to serve as the promotors for the launch of the EMAX Tokens in May 2021.

48.     The Promotor Defendants are sophisticated public figures with familiarity and experience with endorsement contracts.

49.     Upon information and belief, the Promoter Defendants received EMAX Tokens and/or other forms of consideration as part or all of their compensation for promoting EthereumMax.

50.     For example, a combined search of the Ethereum Blockchain Explorer ("Etherscan") and the non-fungible token marketplace OpenSea shows that a wallet owned/controlled by Pierce received and sold millions of dollars' worth of EMAX Tokens while Pierce simultaneously promoted EMAX Tokens to investors.

51.     As a starting point, on May 28, 2021 Pierce posted a screenshot of his trading account with 15,858,700,525,204.817 EMAX Tokens valued at "$2,519,268.89," which had increased "83.34% ($1,145,469.23)" on the one day chart.[7]  The caption to the image posted by Pierce contained the following string of emojis:

---

[6]     *Id*. at 48.

[7]     https://twitter.com/paulpierce34/status/1398294745806299139?s=20&t=V-OgyFf-y6rqaCh_CgzpGg.

10



52.    Notably, while Pierce covered up his wallet's actual address, he left the unique image displayed as the wallet's profile picture unredacted.  This image is a direct match to an image associated with Wallet 0x70f5A6 on the OpenSea exchange.  An examination on Etherscan of some of the other digital assets within Wallet 0x70f5A6 shows additional connections to Pierce, further confirming that Wallet 0x70f5A6 is under Pierce's ownership/control.   For example, Wallet 0x70f5A6 trades in Ethernity tokens.  Pierce has direct connections to Ethernity via his participation in a celebrity charity poker tournament sponsored and/or promoted by Ethernity.[8]  Pierce even played at the same table with Ethernity's CEO, Nick Rose, on September 26, 2021.

53.    An examination of Pierce's wallet's trading activity in conjunction with Pierce's social media activity shows that Pierce made millions of dollars trading (and selling) EMAX Tokens while simultaneously promoting the tokens to investors as sound long-term investments.

54.    Initially, on May 24, after making a small transfer of approximately $13,350 (seemingly as a test to confirm that the transfer between wallets could be

---

[8]    https://thecryptobasic.com/2021/09/26/paul-pierce-phil-ivey-mr-beast-and-joe-lubin-tonight-in-virtue-pokers-awaited-celebrity-charity-poker-tournament/.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

done successfully), Pierce's wallet received an "airdrop" of approximately 15 trillion now-defunct EMAX Tokens from the beta version of the EthereumMax deployer wallet.[9]

55.     On May 25, 2021, Pierce received an approximate equivalent of 15.4 trillion new EMAX Tokens via the EthereumMax deployer wallet, valued at around $1,350,000 in cash at the time.  That same day, Pierce also additionally purchased around 110 billion EMAX Tokens for about $10,000.

56.     On May 26, 2021, Pierce received approximately 247 billion additional EMAX Tokens from a second EthereumMax deployer wallet "airdrop."

57.     That same day, Pierce promoted EthereumMax in a widely discussed post on the social media platform Twitter during an online dispute between Pierce and the television broadcasting network ESPN.[10]  Prior to the May 26 post, Pierce had worked for ESPN as a popular sports analyst and commentator until he was fired for an unrelated video he had previously posted to his social media account.  After his firing, Pierce publicly slammed ESPN while conversely praising EthereumMax's ability to make money for him at the same time:

---

[9]     A "deployer wallet" refers to the original wallet or central interaction point for a token's liquidity.

[10]    *See, e.g.*, Jenna Lemoncelli, *Paul Pierce's ESPN revenge after firing over stripper video*, N.Y. POST (May 26, 2021), https://nypost.com/2021/05/26/paul-pierce-slams-espn-with-cryptocurrency-claim/.

58.    The trading volume for the EMAX Token exploded as a result of Pierce's post and the Company's announcement that it was partnering with Mayweather, Jr. (discussed further below).  On May 26, 2021, the volume reached $44.43 million – ***almost five times higher than the previous day***.[11]  Then, on May 27, the volume more than doubled reaching $107.7 million.[12]  That same day, Pierce purchased an additional 120 billion EMAX Tokens.

59.    Then on May 28, 2021, as noted above, Pierce again promoted EMAX Tokens' price growth to his followers on Twitter, boasting about the one-day increase in the EMAX Token price of over 83%.

60.    On May 29, 2021, the very next day, Pierce enacted 118 sells, totaling approximately 8.4 trillion EMAX Tokens that were valued at around $5,500,000 at the time.  Pierce then capitalized further on his successful pump of the EMAX Tokens trading volume.  Pierce made 12 buys totaling 1.214 trillion EMAX Tokens, then immediately turned around and sold those 1.214 trillion EMAX Tokens plus an additional 680 billion EMAX Tokens (*i.e.*, 1.89 trillion EMAX Tokens in total).

---

[11]    NOMICS, EMAX - EthereumMax 3 Historical Price Data, https://nomics.com/assets/emax3-ethereummax-3/history/3.

[12]    *Id.*

13

61.    From May 30, 2021 to June 2, 2021, Pierce amassed another 2.5 Trillion EMAX Tokens through numerous buys and sells.

62.    On May 30, 2021, Pierce posted the following tweet[13], promoting Ethereum Max:



> **Paul Pierce** ✔
> @paulpierce34
> ···
>
> People asking if they should jump on the @ethereum_max train I'm n for the long haul if u missed out on the 1st wave now is the time to jump on board #fuckespn 🚀
>
> 10:41 AM · May 30, 2021 · Twitter for iPhone
>
> **540** Retweets   **168** Quote Tweets   **2,597** Likes

63.    Three days after falsely telling investors he was in it "for the long haul" with EthereumMax, Pierce sold approximately 9.7 trillion EMAX Tokens worth approximately $1,300,000.

64.    On June 6, 2021, around 97.4 billion EMAX Tokens were transferred to Pierce's wallet.  That same day, Pierce promoted EthereumMax to investors, falsely stating that he was going to "double down" on Ethereum Max.[14]  Two days later, Pierce sold over 98% of those 97.4 billion EMAX Tokens.

65.    These complicated transactions demonstrate a pattern by which Pierce and other promotors, including the Promoter Defendants, are given tokens as a payment for promotions, they go out and post about the tokens on social media, then turn around and sell the tokens for profit as retail investors buy in.  The entire purpose of this paid promotion is for pumping and dumping the tokens based on the value created by the Promoter Defendants' direct action.  Furthermore, the complexity of these financial transactions and movements between wallet address

---

[13]  https://twitter.com/paulpierce34/status/1399013195151417345?s=20&t=qpvEL-yI0O2jszrSIxCfcA.

[14]  https://twitter.com/paulpierce34/status/1401413650691280899?s=20&t=SrB147wN07nQ8YSjpC6-PA.

1   demonstrates that the Promoter Defendants understand how to both time and execute

2   their selling strategy.

3         66.    Upon information and belief, all of the Promoter Defendants received

4   similar payments, including disbursements of tokens from the EthereumMax

5   deployer wallet and/or marketing wallet or for other consideration, and cashed out

6   shortly after engaging in their respective promotional activities in a similar manner

7   to Pierce.

8         67.    This is why Maher was a vital part of the Executive Defendants' plan

9   for marketing the EMAX Tokens.  He has direct, familial ties to certain Promotor

10   Defendants.  For example, Maher has a personal relationship with Davis, who is his

11   brother-in-law and business associate.  According to Maher, he brought the

12   EthereumMax project to Davis specifically to leverage Davis' cryptocurrency-

13   investing followers on social media.

14         68.    On or around May 16, 2021, Maher removed $10,000 from the EMAX

15   Token liquidity pool to pay cryptocurrency influencer and promotor Russ Davis and

16   professional football player Antonio Brown to promote EthereumMax.

17         69.    Davis reposted the following promotion from the EthereumMax official

18   Twitter account to his own personal "InRussWeTrustCrypo" account:[15]



27  —————————————

[15]   https://twitter.com/ethereum_max/status/1393984963616419842?s=20&t=
qpvEL-yI0O2jszrSIxCfcA.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

70.     Notably, according to Maher, the development team had "messed up" both the initial launch and the liquidity pool, leaving Maher and other insiders with a huge percentage of the available Float.  Moreover, the liquidity pool was underfunded.  Thus, small amounts of trading volume had a disproportionately large impact on the EMAX Tokens' price.

71.     That same day Speer promoted the EMAX Tokens in a video he posted to his personal YouTube channel, wherein Speer advised retail investors "How to buy EthereumMax."[16]  Notably, Speer told retail investors about "a coin that just launched about 48 hours ago and it is taking off."  Speer added that the EMAX Tokens price has "tons of room to go" and that the EthereumMax leadership team and insiders consisted of "lots of same hype and people behind it as Shiba."  Speer further compared EMAX Tokens' potential to the massive surge in price that occurred with the Shiba Inu coin, claiming that the EMAX Token price was "only going up long term."

72.     Throughout the video, Speer attempted to disclaim inside knowledge of the EMAX Token by stating he was not a "crypto expert" in an effort to mislead retail investors into believing that Speer simply stumbled onto the EMAX Token accidentally instead of him being an EthereumMax founder and/or insider.  For example, Speer states that the EthereumMax website is "vague" and that "they" did not yet have a whitepaper in a misleading attempt to distance himself from the EthereumMax leadership team.

73.     In the caption to Speers' video, he explains the following 18 steps that retail investors need to take to purchase the EMAX Tokens:

Step 1: Purchase your ETH on whatever exchange you use.

Step 2: Transfer to Coinbase Wallet.

Step 3: Go to https://app.uniswap.org/#/swap

---

[16]     https://www.youtube.com/watch?v=bi6ZeRzC-QQ.

Step 4: Click add token to transfer to from ETH.  **Paste in this address: 0x15874d65e649880c2614e7a480cb7c9A55787FF6.**

Step 5: Think long and hard, can you risk this money and still pay your bills?  It's a serious question.  It's ok if the answer is no.  Please do not proceed.

Step 6: **Can you leave this money in eMax for a couple of months? If yes, proceed below.  If the answer is no, the reason why you shouldn't buy is because you will be part of the reason for a price drop if you sell.  This coin is only a couple of days old as of May 16th.  Holders help the price stabilize. Paper hands drive price down**

Step 7: Click connect to wallet and click Coinbase

Step 8: Select ETH to eMax – Select the amount you want to transfer

Step 9: Click the gear in the top right, change slippage to 10%, close gear

Step 10: Make sure you have extra ETH outside of the amount you are using to purchase for the fees.

Step 11: Press swap + confirm / accept etc.

Step 12: There won't be any dollar value in your CB Wallet because it's new

Step 13: Go to the App Store and download Zerion

Step 14: Go to your CB Wallet click receive and get your ETH address

Step 15: Go back to Zerion and click import wallet

Step 16: Paste your ETH address

Step 17: Wait a few minutes and it will populate the dollar amount.

Step 18: Enjoy and HODL

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

74.     As the above instructions indicate, Speer's instructions to retail investors state that EMAX Token holders should be prepared to "leave this money in eMax for a couple of months," suggesting that the EMAX Tokens were a long-term investment because "Holders help the price stabilize.  Paper hands[17] drive price down."

75.     The promotion from Davis and Speer kick-started the interest in and buying of EMAX Tokens.  In fact, Maher used the large spikes in price chart (actually caused by the low liquidity pool funding) to promote EMAX Tokens' potential for significant returns to investors.

76.     Shortly after his promotion, Davis began selling off his EMAX Tokens, causing the price of the tokens to plummet until Maher was able to reach a deal with Davis to lock up some of the massive EMAX Token holdings.

77.     Upon information and belief, the following wallet addresses are owned/controlled by Davis and were used to conceal his transactions (*i.e.*, timing of sales) with EMAX Tokens:

- 0xe3FA73f404EA11C9Ce3DCA4B474cD99D6283134C
- 0xd0AEE2df438Ccea32194dACFf330083B04277D71
- 0x74dEc05E5b894b0EfEc69Cdf6316971802A2F9a1
- 0x663f4bf1816d771415fffa86aabc1ee273b92055
- 0xfEd37836fE065496c608E32073D0E759F96989b3
- 0xfb34b53aa6a5840ae740b9818db34b854818de85
- 0x9b1fbe51576d00d1f3a484d9c3c5c52a09866f78
- 0xacd3f3835a3dd7865560953eb745d5f8dba6ce33
- 0x037a7c7c8bAAbBd64aC735F505deF3423528dbA5
- 0x5e47AAE49eAA9D176E3c09b6bc0844BdfBBa27e0
- 0x027A16926de9f38523a71d19d6998923085Dc093

---

[17]     Having "paper hands" is a term used in cryptocurrency trading that refers to someone that sells at the first sign of a price drop.

1   • 0xeB3E690C8ee0299B18Fa40B9B21F54c690b00a7b

2   • 0x05e45ebBFD62b5E448e0073ABFB4a956FE13f4d1

3   • 0xE7494f0D06142c70eF1382bb4F5629bA3B377FCd

4   • 0x35278BF7f391285818F9092c860D698010802f7D

5   • 0xbcac50256345775e4bbff526b247b3d68a0f10ca

6   • 0xe277f115a3758e802e40869545646f8142be00ca

7   • 0x0eb5101719662a00bf4c22e03374a7ffd11f4092

8   • 0x45f433ae7553900d7ae7af8a1b0d35c3eb7ece46

9   • 0xce3e48caeb5d0e9124b2b1dcab8b47818fcedc7

10  • 0x47bA7f557a361A12BB1b28DA1Fb3323dc7C942f4

11  • 0xd7292AA5924D4f536B9E996cB7FC4bE21b6c3357

12  • 0xDF6300635c490408C393c1DAdBE7Ba8e88cdBb8B

13  • 0xBa299a1FE0Da7B443Bf444FDCd0C2a5F2506D2B1

14  • 0x77Dc423692480979DFdC904278D3d0ec0474782d

15  • 0xfF773b585638D599C64d8ac02e73D12bd9807C30

16  • 0x97758D2C5533663042D72d5389Ef4Bb5c89EAe60

17  • 0xe3254c36fEedF4211D405718702a0389f5871c85

18  • 0x1C58CE90Fa5A610649Ab172000F41b909A9Efc83

19  • 0x761493a52595F7016493b4a7515180d504CdF28f

20  • 0x1711bc52bf7e0494325799717fe640F1924617B7

21  • 0x53061173fbf4CD5886b01d1c68DA266A9B479E1b

22  • 0x4e28ab721c1C3180A82B6a758C081f9Cc4CDd702

23  • 0x233834E733EFf003598e8B6eD1082C984a1E8D53

24  • 0x967f1dC29158486eBE771942e094C41B0AD7F57d

25  • 0x1C473aFE50E060AD872Fb1a209C6b2F257Bdbd5B

26  • 0x4a302Af80dc286714fE22db4855B5024317449eB

27  • 0x7fFA930D3F4774a0ba1d1fBB5b26000BBb90cA70

28

19

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

- 0x2930662Fa96cA799C9913264B83E227C7f828105
- 0xbe3167f8687d0f6b81a053f938ae335333eeb549
- 0x1e7a2e2bbea1362d49c06951f3265d9d6bc90386
- 0x64fba1c5e31d8f7ee0194f67ed9c5fed1a17b241
- 0xe477aE0b50f2985592BDc1e5aC91f59c93111955
- 0xacD3f3835A3dd7865560953eb745d5F8dbA6CE33
- 0x74dEc05E5b894b0EfEc69Cdf6316971802A2F9a1
- 0x69c97ceb87f0b121d92a3aa57bf7845d2dda4e3e

78.    On May 21, 2021, Speer uploaded another video to his YouTube channel promoting EthereumMax generally and specifically providing investors with instructions on how to purchase EMAX Tokens.[18]  Again, Speer did not reveal to investors that he was a part of the EthereumMax leadership team.

79.    Two days later, on May 23, 2021, Speer uploaded an audio recording from Perone to Speer's YouTube channel,[19] wherein Perone states that Ethereum Max's use of "high level" brand ambassadors and promotors "legitimized" the project.  Perone also touted the "technological upgrades" that were on the way for the EthereumMax project.  Perone repeatedly proclaimed that he will be meeting retail investors "on the moon" when the price of EMAX Tokens rises after the marketing campaign created by the Executive Defendants and executed by the Promotor Defendants was successful.

80.    According to Maher, the Executive Defendants were "wildly connected" and understood the impact that celebrity promotion and marketing could have on the price and trading volume of the EMAX Tokens.  Upon information and belief, the Executive Defendants leveraged their respective contacts to recruit

---

[18]    https://www.youtube.com/watch?v=3CZv0FFn7S8.

[19]    https://www.youtube.com/watch?v=HMbWVXUWB5I.

1    additional celebrities to promote the EMAX Tokens in exchange for a portion of the
2    Float.

3        81.    For example, Maher, Perone, and Davis arranged to hire former world
4    champion boxer, Floyd Mayweather, Jr. as Ethereum Max's "marquee" promotor
5    for a fee of $1,000,000 as his "first down payment" and then $1,500,000 as a second
6    payment.  Notably, "everything that was sent to Mayweather was in Ethereum and
7    cashed out immediately."   According to Maher, Mayweather's representatives
8    refused payment in EMAX Tokens and instead received payment in Ethereum,
9    which has significantly more price stability.  In order to raise the Ethereum needed
10   for Mayweather's payment, Maher and Davis sought out large holders of Ethereum
11   and offered them a "sweetheart" deal relative to the amount of Ethereum needed for
12   celebrity promotion payments.  For example, in exchange for providing $500,000
13   worth of Ethereum, they would give the Ethereum provider $2,000,000 of EMAX
14   Tokens.  As Maher observed, however, most often, the Ethereum provider would
15   then immediately sell the $2,000,000 in EMAX Tokens on the open market.  This
16   tremendous downward selling pressure caused the price of the EMAX Tokens to
17   drop.

18       82.    Upon information and belief, the Executive Defendants were able to
19   and did make similar payments to other celebrity promoters during the Relevant
20   Period to "shill" the EMAX Tokens, including social media influencer Amber Rose,
21   nightclub promotor and hotelier David Grutman, celebrity jeweler "Eric da Jeweler,"
22   NFL wide receiver Juju Smith Schuster, and musician French Montana.

23       83.    On May 26, 2021, at the same time Pierce was promoting EMAX
24   Tokens as paying him more than ESPN, EthereumMax issued a press release
25   announcing that it was "now the exclusive CryptoCurrency accepted for online ticket
26   purchasing  for  the  highly  anticipated  pay-per-view  boxing  event  between
27   Mayweather  and  social  media  influencer  Logan  Paul  on  June  6,  2021  in  Miami

28

Gardens, Florida."[20]   The press release directed investors seeking "more information" to visit the Company's social media accounts and the "Fight Website" with the following hyperlink: https://mayweatherpaultickets.com/.

84.    The Fight Website featured Mayweather and offered various incentives for those purchasing online tickets with EMAX Tokens, including: "Orders over $5000 will receive authentic, signed Floyd Mayweather boxing gloves"; "2 front row ringside tickets available exclusively for EthereumMax purchase"; "All EthereumMax purchases receive 10% discount at checkout"; and "Tickets purchased with EthereumMax automatically entered into a lottery drawing to attend the official Mayweather after-party at a private table at LIV."[21]

85.    On May 28, 2021, EthereumMax released a press release entitled "EthereumMax ($eMax) Disrupts Miami Ahead of Mayweather vs. Paul Fight as the First Crypto Currency of Major Nightclubs LIV and Story."  The press release came out of Los Angeles and highlighted the previous Mayweather v. Paul release and quoted Pierce's tweet verbatim.[22]

86.    On or about May 29, 2021, Brown promoted EthereumMax in the following now-deleted "story" post on his personal Instagram account:

---

[20]    Press Release, EthereumMax, *Huge Milestone for Practical Use of $eMax* (May 26, 2021, PR Newswire), https://www.prnewswire.com/news-releases/huge-milestone-for-practical-use-of-emax-301300421.html.

[21]    Fight Website, https://mayweatherpaultickets.com/.

[22]    Press Release, EthereumMax, *EthereumMax ($eMax) Disrupts Miami Ahead of Mayweather vs. Paul Fight as the First Crypto Currency of Major Nightclubs LIV and Story* (May 28, 2021, PR Newswire), https://www.prnewswire.com/news-releases/ethereummax-emax-disrupts-miami-ahead-of-mayweather-vs-paul-fight-as-the-first-crypto-currency-of-major-nightclubs-liv-and-story-301301958.html.

1
2
3
4
5
6
7
8
9
10



11    87.    On May 30, 2021, Kardashian and nightclub promotor and hotelier

12  David Grutman promoted EthereumMax on their respective social media accounts.

13  For example, Kardashian's promotion of the EMAX Tokens to her hundreds of

14  millions of followers also did double duty of promoting the club "LIV" which is

15  partly owned by Grutman (also a longtime friend and associate of Kardashian):

16
17
18
19
20
21
22
23
24
25
26
27
28



88.     Following the aforementioned promotions from Brown and Kardashian, and the announcement of the partnership with Mayweather, the trading volume for EMAX Tokens spiked.  In particular, the volume went from $25 million on May 27, 2021 to $80.9 million on May 28 after the Mayweather announcement. Then it jumped to $112.5 million following Brown's post.  Kardashian's promotion generated another $75.5 million in EMAX Token trading volume on May 30, 2021 before dropping precipitously.[23]

89.     On June 1, 2021, Maher left the EthereumMax project with about $4.1 million worth of Ethereum Max, of which he subsequently sold off approximately 98%.  No later than July 22, 2021, Maher was confronted about his selling activities with EMAX Tokens.  In particular, in the comments section of one of Davis' Facebook posts, an investor posted a wallet address speculated to belong to Maher, which showed suspicious selling activity.  Maher bragged about his ability to conceal his financial movements and mocked the investor who tried to identify Maher's wallet address: "haha yeah unfortunately that's not one of my secret wallets. Good try though sleuth. *I cleaned all the money I shifted through exchanges first. You'd never be able to track it to what wallets I sent it to.*  Good try though."[24]

90.     On June 4, 2021, former world champion boxer, Mayweather, Jr., attended the "Bitcoin 2021" conference in Miami.  While there, instead of discussing the cryptocurrency that was the focus of the conference (*i.e.*, Bitcoin), Mayweather promoted EthereumMax.  In particular, Mayweather and his entourage wore t-shirts with EthereumMax emblazoned across the chest.  At the same time, Mayweather proclaimed during a panel discussion: "I believe there's gonna be another cryptocurrency just as large as Bitcoin some day."[25]

---

[23]     https://coinmarketcap.com/currencies/ethereummax/historical-data/.

[24]     *See* https://www.youtube.com/watch?v=iyDeOfZnOaY.

[25]     Jeff Benson, *Floyd Mayweather, Sponsored by Ethereum Token, Gets Booed at Bitcoin Conference*, DECRYPT (June 4, 2021), https://decrypt.co/72807/floyd-mayweather-sponsored-ethereum-token-gets-booed-bitcoin-conference.

91.    Two days later, on June 6, 2021, Mayweather similarly promoted EthereumMax during his highly viewed exhibition boxing match with internet celebrity-turned-boxer, Logan Paul.[26]

92.    Between June 4, 2021 and June 6, 2021, the trading volume for EMAX Tokens spiked from $15.7 million to $24.5 million.[27]

93.    On June 8, 2021, Executive Defendants Gentile and Perone, along with Josh James (the lead developer at EthereumMax), uploaded a video of themselves on Executive Defendant Speers' YouTube channel entitled "Addressing the $eMax Community – EthereumMax."[28]   Gentile and Perone identified themselves as the "creators" of EthereumMax, and explained that Mr. James had recently joined EthereumMax as its new lead developer.

94.    Perone described his prior experience in "the hedge fund space" and had "significant experience structuring nuanced securitizations and financing arrangements," and he touted EthereumMax as something "special" with "real sustainability."   Perone also stated that they were able to forge a "landmark agreement with the Mayweather team" and reassured investors regarding the "volatility" in the EMAX Token price.  Gentile further stated that EthereumMax's work with "launching ambassadorships and working with influencers" was not solely in preparation for the Mayweather fight, but rather "the launch point" with "great prospects moving forward."

95.    Gentile also noted that his background-involved specialties revolved around marketing and brand development and he exclaimed that EthereumMax was

---

[26]    Brendan Rearick, *EthereumMax (EMAX) Price Predictions: Can Floyd Mayweather Help EMAX Win the Fight?*,  MSN (June 7, 2021), https://www.msn.com/en-us/money/markets/ethereummax-emax-price-predictions-can-floyd-mayweather-help-emax-win-the-fight/ar-AAKNxNi.

[27]    NOMICS, EMAX - EthereumMax 3 Historical Price Data, https://nomics.com/assets/emax3-ethereummax-3/history/3.

[28]    Mike Speer, *Addressing the $eMax Community – EthereumMax*, YOUTUBE (June 7, 2021), https://www.youtube.com/watch?v=CkR8QJrNubI.

a "super exciting project" and that he was "excited for the updates" that would be "rolling out in the near future." Gentile claimed that it was "going to be beneficial not only to the token, but more importantly the community."

96. During a pseudo question and answer portion of the video, Gentile brought up investors' questions about a "rug pull" of the EMAX Token and asked Perone to "nip it in the bud." Perone stressed that the EthereumMax team was in for the long term, stating, among other things, that the Executive Defendants were "looking to lock the wallets" to show investors that they "were here to stay."

97. On June 14, 2021, Kardashian posted the following solicitation for EthereumMax on her Instagram account, which has over 250 million followers:



98. As noted in a scathing op-ed piece called "Celebrity Crypto Shilling Is a Moral Disaster," Kardashian's "post was an immediate sensation, and a touch controversial." The EMAX Token was "only a month old, few had heard of it, and it wasn't even obvious how the 'token' was supposed to work. More than that, Kardashian was urging her 251 million Instagram followers to get involved in a

highly volatile, speculative market that's little different than gambling in the world's most fraudulent casino."[29]

99.    Kardashian's promotion had tremendous reach.  The financial services company, Morning Consult, analyzed "the impact of celebrities on crypto investor decisions," and, in particular, the impact of Kardashian's EthereumMax post.  The survey found that up to 21% of all American adults and nearly half of all cryptocurrency owners had seen this ad for a risky financial instrument.  Furthermore, Kardashian's "conversion was also impressive: *A striking 19% of respondents who said they heard about the post invested in EthereumMax as a result*."[30]

100.   The chair of the Financial Conduct Authority ("FCA") in the United Kingdom, Charles Randall, in a September 6, 2021 speech given to the Cambridge International Symposium on Economic Crime, remarked that Kardashian's EthereumMax post was "the financial promotion with the single biggest audience reach in history."[31]

101.   Notably, Kardashian's post did include a promotional disclosure in the post itself.  However, this disclosure is tucked in the far bottom right of the post and is just three characters long: "#AD."  The promotion was false and misleading in that Kardashian was purportedly just "sharing what my friends just told me about the Ethereum Max Token!"  Moreover, by stating that "Ethereum Max Burned 400 trillion tokens – Literally 50% of their Admin Wallet" the promotion created a false

---

[29]    Ben McKenzie and Jacob Silverman, *Celebrity Crypto Shilling Is a Moral Disaster*, SLATE (Oct. 7, 2021), https://slate.com/technology/2021/10/ben-mckenzie-crypto-celebrities-kardashian-brady-lohan.html.

[30]    Charlotte Principato, *Kim Kardashian, Cryptocurrency and Celebrity Clout*, MORNING CONSULT (Sept. 21, 2021), https://morningconsult.com/2021/09/21/kim-kardashian-crypto-celebrity/.  [Emphasis added.]

[31]    Speech by Charles Randell, *The risks of token regulation,* Cambridge International Symposium on Economic Crime, Sept. 6, 2021, https://www.fca.org.uk/news/speeches/risks-token-regulation.

impression that the EMAX Tokens were scarce.  Because two quadrillion tokens had been originally created, the burning of 400 trillion tokens did not meaningfully impact the availability of EMAX Tokens.

102.   While it is unclear what the precise terms are of the financial compensation that Kardashian was given by the Executive Defendants, Kardashian routinely gets paid between $300,000 and $1 million for most promotional posts. Kardashian even stated that she makes more money off these promotions than an entire season of her reality television show.[32]

103.   Kardashian also has experience and familiarity with making misleading claims in similar promotional endorsements on her Instagram and Twitter accounts. For example, in 2015, the United States Food and Drug Administration ordered Kardashian to remove a promotional post she had made with a strikingly similar beginning to the EthereumMax Post at issue in this action[33]:



104.   Pierce, Brown, and Davis did not include any promotional disclosures when they promoted EthereumMax throughout May and June of 2021.

---

[32]   Alicia Brunker, *Kim Kardashian Says She Makes More Money on Instagram Than for an Entire Season of KUWTK*, INSTYLE (Oct. 18, 2020), https://www.instyle.com/celebrity/kim-kardashian-makes-more-money-on-instagram-than-kuwtk.

[33]   Mark Sweney, *Kim Kardashian forced to delete selfie endorsing morning sickness drug*, THE GUARDIAN (Aug. 12, 2015), https://www.theguardian.com/media/2015/aug/12/kim-kardashian-selfie-morning-sickness-drug-instagram.

105.   It does not appear that Mayweather has disclosed any payments either for his promotion of EthereumMax on June 4 and 6.   Mayweather does have experience with being fined previously over improper cryptocurrency promotion,[34] and, as a result, he knew or should have known that his conduct alleged herein was improper.

106.   In November 2018, Mayweather and another celebrity promotor settled charges with the United States Securities and Exchange Commission for failing to disclose payments they received for promoting fraudulent cryptocurrency investments.   One of the posts at issue there was one that Mayweather made on Twitter, stating "You can call me Floyd Crypto Mayweather from now on" and a promotion with the message to his Twitter followers that a company's fraudulent initial coin offering "starts in a few hours.   Get yours before they sell out, I got mine[.]"   As part of the settlement, Mayweather agreed to pay "$300,000 in disgorgement, a $300,000 penalty, and $14,775 in prejudgment interest."   In addition, Mayweather agreed not to promote any securities – digital or otherwise – for three years.   The settlement was dated November 29, 2018, meaning that this agreement was blatantly violated in connection with Mayweather's EthereumMax promotion.   Mayweather, therefore, had an understanding that his own conduct, as well as the conduct of the Executive Defendants, was improper and fraudulent.

107.   Maher has experience with financial regulations from his position as a financial advisor at Northwestern Mutual Investment Services, LLC from 2011 to October 13, 2021.   Maher knew or should have known that his conduct alleged herein was improper.   Notably, Maher was "permitted to resign" from this position in 2021 "while under internal review for allegations that [Maher] was involved in a cryptocurrency shilling scam."[35]

---

[34]   Press Release, SEC, *Two Celebrities Charged with Unlawfully Touting Coin Offerings*, (Nov. 29, 2018), https://www.sec.gov/news/press-release/2018-268.
[35]   https://adviserinfo.sec.gov/individual/summary/5504995.

**The Dump – EMAX Token price plummets**

108.   Following the EMAX Tokens' launch and Defendants' promotional activities in May 2021, the trading volume and price of EthereumMax surged.  By May 30, EMAX already had a transaction volume of over $100 million, up 632% in just two weeks.  The day before, it reached its maximum price of $0.000000863, which represents a rise of 1,370% more than its initial price of $0.00000005875.

109.   However, this meteoric rise did not last long, and EthereumMax began to deflate immediately after Kardashian's post.  On July 15, 2021, the price of the EMAX Token hit its all-time low: $0.000000017 per unit, a 98% drop from which it has not been able to recover.  Investors were left holding worthless tokens, with the cost in transaction fees and gas fees to swap back into Ether far exceeding what investors would actually receive in Ether.  On August 1, 2021, its transaction volume plummeted to $157,423, which is less than a hundredth of its initial capital.  On April 1, 2022, transaction volume was less than $13,000.

110.   The Promoter Defendants' improper promotional activities generated the trading volume needed for all the Defendants to offload their EMAX Tokens onto unsuspecting investors.  While Plaintiffs and Class members were buying the inappropriately promoted EMAX Tokens, Defendants were able to, and did, sell their EMAX Tokens during the Relevant Period for substantial profits.  According to Perone, the Executive Defendants did not "lock" their EMAX Token wallet addresses until after the Relevant Period.

111.   The EMAX Token price still has not recovered and trading volume remains down significantly.  As bluntly noted in McKenzie's op-ed: "If you bought EthereumMax after Kardashian pushed it and didn't sell fast enough, all you were left with was a practically worthless digital asset."[36]

---

[36]   *See* n.29, *supra.*

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

112.   The following chart from the *London Financial Times*[37] shows the rise and fall of the EMAX Tokens' price in conjunction with the Promoter Defendants' promotional activities:



**Regulators Raise Concerns that EthereumMax Is a "Pump and Dump" Scam**

113.   Following the precipitous drop of the EMAX Token price in the wake of Kardashian's EthereumMax post, the United Kingdom's FCA chair issued a statement noting that Kardashian's promotion of the EMAX Token could be "fraudulent."   Specifically, Charles Randall, director of the FCA, gave a speech about the need for a "permanent and consistent solution to the problem of online fraud from paid-for advertising."[38]

114.   Cryptocurrency "scams" were one of the topics that Randall specifically addressed, and during that portion of the speech, Randall specifically took issue with Kardashian's EthereumMax post.  Randall noted that "social media

---

[37]   https://www.ft.com/content/a6dd4d6f-6a86-48cc-992c-f8a32c64fdd7.
[38]   *Id*.

influencers [like the Promoter Defendants] are routinely paid by scammers to help them pump and dump new tokens on the back of pure speculation."[39]

115.   Randall further observed that the hype around speculative digital assets like the EMAX Token "generates a powerful fear of missing out from some consumers who may have little understanding of their risks.  There is no shortage of stories of people who have lost savings by being lured into the crypto bubble with delusions of quick riches, sometimes after listening to their favourite influencers, ready to betray their fans' trust for a fee."[40]

116.   This is precisely what occurred with the Executive Defendants' stated marketing strategy to use celebrities like the Promoter Defendants to "instill trust" from investors in EthereumMax in exchange for fees and/or EMAX Tokens – that the Promotor Defendants could sell for profits.

## **CLASS ALLEGATIONS**

117.   Plaintiffs bring this action, individually, and on behalf of a nationwide class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons who, during the Class Period, purchased EthereumMax's EMAX Tokens and were subsequently damaged thereby.

118.   The Class Period is defined as the period between May 14, 2021 and June 27, 2021.[41]

119.   Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers and directors; (c) Plaintiffs' counsel and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family.  Plaintiffs reserve the right to modify, change, or

---

[39]   *Id.*

[40]   *See* n.29, *supra*.

[41]   Plaintiffs reserve the right to expand or amend the Class Period based on discovery produced in this matter.

1  expand the various class definitions set forth above based on discovery and further
2  investigation.

3        120.  **Numerosity**: Upon information and belief, the Class is so numerous
4  that joinder of all members is impracticable.  While the exact number and identity
5  of individual members of the Class is unknown currently, such information being in
6  the sole possession of EthereumMax and/or third parties and obtainable by Plaintiffs
7  only through the discovery process, Plaintiffs believe, and on that basis allege, that
8  the Class consists of at least hundreds of people.  The number of Class members can
9  be determined based on EthereumMax's and other third party's records.

10        121.  **Commonality**: Common questions of law and fact exist as to all
11  members of each Class.  These questions predominate over questions affecting
12  individual Class members.  These common legal and factual questions include, but
13  are not limited to:

14        a.      whether Defendants improperly and misleadingly marketed EMAX
15  Tokens;

16        b.      whether Defendants' conduct violates the state consumer protection
17  statutes asserted herein;

18        c.      whether Promoter Defendants aided and abetted violations of the state
19  consumer protection statutes asserted herein;

20        d.      whether Executive Defendants conspired to artificially inflate the price
21  to the EMAX Tokens and then sell their EMAX Tokens to unsuspecting investors;

22        e.      whether Defendants have been unjustly and wrongfully enriched as a
23  result of their conduct;

24        f.      whether the proceeds that the Defendants obtained as a result of the sale
25  of EMAX Tokens rightfully belongs to Plaintiffs and Class members;

26        g.      whether Defendants should be required to return money they received
27  as a result of the sale of EMAX Tokens to Plaintiffs and Class members;

28

h.     whether Executive Defendants breached the implied covenant of good faith and fair dealing; and

i.     whether Plaintiffs and Class members have suffered damages, and, if so, the nature and extent of those damages.

122.   **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members.  Plaintiffs' and Class members' claims all arise out of EthereumMax's uniform misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the sale of EMAX Tokens.

123.   **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class and are committed to pursuing this action vigorously.  Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation.   Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

124.   **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by EthereumMax's conduct.  It would be virtually impossible for individual Class members to effectively redress the wrongs done to them.  Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would increase delay and expense to all parties and to the court system because of the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals.   By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

125.   Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS

126.   California's substantive laws apply to every member of the Class, regardless of where in the United States the Class members reside.

127.   California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process Clause, 14th Amend. §1, and the Full Faith and Credit Clause, Art. IV §1 of the U.S. Constitution.  California has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.

128.   The Executive Defendants primarily reside in, and upon information and belief operate EthereumMax's headquarters and principal place of business, located in California.   Upon information and belief, EthereumMax also owns property and conducts substantial business in California, and therefore California has an interest in regulating EthereumMax's conduct under its laws. EthereumMax's decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible.

129.   California is also the state from which the Executive Defendants' alleged misconduct emanated.   On information and belief, the decision-making regarding the parameters of EthereumMax marketing strategy and related sale of EMAX Tokens, occurred in and emanated from California.   As such, the conduct complained of herein emanated from California.   This conduct similarly injured and affected Plaintiffs and all other Class members.

130.   The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the proposed Class, and California has a greater interest in applying its laws here than any other interested state.

## FIRST CAUSE OF ACTION

### Violation of the California Unfair Competition Law
### Cal. Bus. & Prof. Code §17200
### (Against All Defendants)

131.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

132.   Plaintiffs Semerjian and Shah are residents of the State of California.

133.   At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

134.   EthereumMax also engaged in business acts and practices deemed "unfair" under the UCL, because of the conduct, statements, and omissions described above.  Unfair acts under the UCL have been interpreted using different tests, including: (1) whether the public policy which is a predicate to a consumer unfair competition action under the unfair prong of the UCL is tethered to specific constitutional, statutory, or regulatory provisions; (2) whether the gravity of the harm to the consumer caused by the challenged business practice outweighs the utility of the defendant's conduct; and (3) whether the consumer injury is substantial, not outweighed by any countervailing benefits to consumers or competition, and is an injury that consumers themselves could not reasonably have avoided. Defendants' conduct is unfair under each of these tests.

135.   As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages.  The Executive

1  Defendants' activities with the Promoter Defendants caused Plaintiffs and the Class
2  members to purchase and/or hold the EMAX Tokens when they otherwise would
3  not have done so.

4      136.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts
5  or practices by EthereumMax, to obtain restitution and disgorgement of all monies
6  generated as a result of such practices, and for all other relief allowed under
7  California Business & Professions Code §17200.

8                    **SECOND CAUSE OF ACTION**

9          **Violation of the California Consumers Legal Remedies Act**
                    **Cal. Civil Code §1770**
10                   **(Against All Defendants)**

11     137.   Plaintiffs restate and reallege all preceding allegations above as if fully
12  set forth herein.

13     138.   Plaintiffs Semerjian and Shah are residents of the State of California.

14     139.   At all relevant times there was in full force and effect Cal. Civil Code
15  §1770, which prohibits, *inter alia*, various methods of "unfair or deceptive acts or
16  practices undertaken by any person in a transaction intended to result or that results
17  in the sale or lease of goods or services to any consumer," including, but not limited
18  to, "[m]isrepresenting the affiliation, connection, or association with, or certification
19  by, another" and "[r]epresenting that goods or services have sponsorship, approval,
20  characteristics, ingredients, uses, benefits, or quantities that they do not have or that
21  a person has a sponsorship, approval, status, affiliation, or connection that the person
22  does not have."  Cal. Civil Code §1770(a)(3) & (5).

23     140.   Defendants engaged in business acts and practices deemed "deceptive"
24  because of the conduct, statements, and omissions described above, including, but
25  not limited to, the following:

26          (a)   knowingly   and   intentionally   concealing   the   Executive
27  Defendants' specific roles and ownership interests in EthereumMax; and

28

(b)      knowingly and intentionally using and/or failing to disclose the use of the Promotor Defendants to "instill trust" in uninformed investors to promote the financial benefits of a highly speculative and risky investment in EMAX Tokens, in an effort to manipulate and artificially inflate the price and trading volume of the EMAX tokens and allow Defendants to sell their EMAX Tokens at those inflated prices.

141.   As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages.  The Executive Defendants' activities with the Promoter Defendants caused Plaintiffs and the Class members to purchase and/or hold the EMAX Tokens when they otherwise would not have done so.

142.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under Cal. Civil Code §1780.

143.   Plaintiffs additionally seek punitive damages under Cal. Civil Code §1770(a)(4).

144.   Plaintiffs have complied with Cal. Civil Code §1780(d), which requires the concurrent filing of an "affidavit stating facts showing that the action has been commenced in a county described in this section as a proper place for the trial of the action."

## **THIRD CAUSE OF ACTION**

**Aiding and Abetting
California Common Law
(Against Promoter Defendants)**

145.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

146.   Under California law, aiding and abetting requires not agreement, but simply assistance.  The elements of aiding and abetting liability have cited the elements of the tort as they are set forth in the RESTATEMENT (SECOND) OF TORTS §876, and have omitted any reference to an independent duty on the part of the aider and abettor.

147.   Under California law, "[l]iability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1118 (C.D. Cal. 2003).

148.   "Unlike a conspirator, an aider and abettor does not 'adopt as his or her own' the tort of the primary violator.  Rather, the act of aiding and abetting is distinct from the primary violation; liability attaches because the aider and abettor behaves in a manner that enables the primary violator to commit the underlying tort." *Id.*

149.   The Promoter Defendants have previous knowledge and experience with making misleading promotional statements (with Mayweather having nearly an identical experience with a previous fraudulent cryptocurrency promotion), and, as such, knew or should have known that the marketing strategy employed by the Executive Defendants for the EMAX Tokens was unlawful, deceitful, fraudulent, and/or violated the terms of the California, Florida, and New York state statutes described in this Complaint.

150.   By promoting the EMAX Tokens on their social media platforms and through their reported conduct, the Promotor Defendants provided assistance that was a substantial factor causing the EMAX Token price to both surge and do so long enough to allow all Defendants to sell their EMAX Tokens for huge profits at the

expense of their followers and investors.   Without the help of the Promoter Defendants' activities, the Executive Defendants would have been unable to use the misleading marketing strategy devised by Gentile, and Defendants would not have been able to commit the violations of California state consumer protection statutes alleged herein.

151.   As a direct and proximate result of the Promotor Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages.   The Executive Defendants' activities with the Promoter Defendants caused Plaintiffs and the Class members to purchase and/or hold the EMAX Tokens when they otherwise would not have done so.

152.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by EthereumMax, to obtain monetary damages, restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under California law.

### FOURTH CAUSE OF ACTION

**Violation of the Racketeer Influenced
and Corrupt Organizations Act ("RICO")
18 U.S.C. §1961, *et seq*.
(Against Executive Defendants and Promoter Defendants)**

153.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

154.   This claim is brought on behalf of the class against Defendants for actual damages, treble damages, and equitable relief under 18 U.S.C. §1964 for violations of 18 U.S.C. §1962, *et seq*.   Defendants are "person[s]" within the meaning of 18 U.S.C. §1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §1962(c).

155.   Plaintiffs and the members of the class are each "persons," as that term is defined in 18 U.S.C. §1961(3) who were injured in their business or property as a result of Defendants' wrongful conduct.

**The EMAX Token Enterprise**

156.   Under 18 U.S.C. §1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to pursue the enterprise's purpose.

157.   Defendants formed such an association-in-fact enterprise, namely, the EMAX Token Enterprise that included Maher, Gentile, Perone, and the seven other undisclosed individuals that comprise the Executive Defendants, along with Promoter Defendants Davis, Pierce, Mayweather, and Kardashian.  For the purpose of this claim, these Defendants are collectively referred to as the "RICO Defendants."

158.   The EMAX Token Enterprise are ongoing and continuing business organizations consisting of "persons" within the meaning of 18 U.S.C. §1961(3) that created and maintained systematic links for a common purpose: to ensure that the RICO Defendants could sell off their EMAX Token holdings to retail investors at artificially inflated prices without their fraud being detected.

159.   To accomplish this purpose, the EMAX Token Enterprise periodically and systematically promoted the EMAX Tokens — either affirmatively or through half-truths and omissions — to retail investors, including Plaintiffs and the class, that the EMAX Tokens had real utility (as opposed to pure speculation).  The EMAX Token Enterprise concealed from investors, like Plaintiffs and the Class members, that the EMAX Tokens were not the sound investment that the RICO Defendants claimed.  This scheme of the EMAX Token Enterprise translated into increased volume and more EMAX Token investors buying at artificially inflated prices (and therefore, more profits) for the RICO Defendants.

160.   The persons engaged in the EMAX Token Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination

of activities, as spearheaded by the Executive Defendants and Promoter Defendant Davis.  There is regular communication between the RICO Defendants, in which information is shared.  Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which RICO Defendants share information regarding various timing and content of promotional activities for the EMAX Tokens.  Maher and Davis also shared such information with each other privately during family functions and private business meetings.   The RICO Defendants through their administration, funding, and execution of the scheme to misleadingly market the EMAX Tokens each functioned as a continuing unit for the purposes of implementing, respectively, the EMAX Token pump and dump scheme and, as set forth above, when issues arise during the scheme, the scheme's participants agreed to take actions to hide the scheme and continue its existence.

161.   At all relevant times, Executive Defendants were aware of the Promoter Defendants' conduct, were knowing and willing participants in that conduct, and reaped profits from that conduct.  Executive Defendants concealed the members of the EthereumMax leadership and founding team, which allowed the unidentified co-conspirators to sell their portion of the Float without any scrutiny or complaint. Executive Defendants represented to investors that EthereumMax had staying power, long term value, and tremendous growth potential.  But they knew that the conduct of the Promotor Defendants was artificially inflating the price of the EMAX Tokens.  Executive Defendants also knew, but did not disclose, that both the trading volume and price action for the EMAX Tokens would plummet if the promotional activities ceased.  Promotor Defendants Davis, Pierce, and Kardashian also knew that their promotional activities artificially caused spikes in the EMAX Token price and trading volume, but likewise would not disclose the fraud.  By failing to disclose this information, the RICO Defendants perpetuated the EMAX Token Enterprise's scheme, and reaped substantial profits.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

162.   During the time that the EMAX Tokens were being launched and first publicly marketed to retail investors it, the Executive Defendants were aware of the promotional activities of Davis, Pierce, and Kardashian, were knowing and willing participants in that conduct, and reaped profits from that conduct.  The Executive Defendants knew that using misleading marketing would result in lawsuits and even criminal charges.  Accordingly, the Executive Defendants concealed the identities of the EthereumMax founders and insiders in order to escape detection and punishment for their participation in the EMAX Token Enterprise.  The RICO Defendants knew, but did not disclose, that they were promoting the EMAX Tokens, then turning around and selling off their holdings as retail investors, like Plaintiffs and the Class members, were buying in.  The Executive Defendants knew, but did not disclose, that they were allowing the Promoter Defendants to engage in this fraud to the detriment of retail investors.

163.   The RICO Defendants participated in the conduct of the EMAX Token Enterprise, sharing the common purpose of inflating the price and trading volume of EMAX Tokens in order to sell their respective portion of the Float for substantial profit, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. §1341, and multiple instances of wire fraud in violation of 18 U.S.C. §1343.  In the EMAX Token Enterprise, the RICO Defendants knowingly made material misstatements to retail investors in furtherance of the fraudulent scheme regarding:

        a.     the ownership interests and identities of the EthereumMax founders;

        b.     the timing and amount of EMAX Token sales made by the RICO Defendants; and

c.   the RICO Defendants' intent to sell their EMAX Tokens after artificially inflating the price.

164.   The Executive Defendants alone could not have accomplished the purpose of the EMAX Token Enterprise without the assistance of the Promoter Defendants.  For the Executive Defendants to profit from the scheme, the Promoter Defendants needed to use their influence to mislead investors into buying the EMAX Tokens.   And the Promoter Defendants did so.   They then, through misrepresentations and failures to disclose material information, failed to disclose to investors that the Promoter Defendants were simultaneously selling their EMAX Tokens at inflated prices.  Without these misrepresentations, the EMAX Token Enterprise could not have achieved its common purpose.

165.   The EMAX Token Enterprise engaged in and affected interstate commerce because, *inter alia*, it created the EMAX Tokens that were paid for by thousands of Class members throughout the United States.

166.   The foregoing evidences that the RICO Defendants were each willing participants in the EMAX Token Enterprise, that the EMAX Token Enterprise had a common purpose and interest in the objective of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose, *i.e.*, through the Executives' creation of the EMAX Tokens, coupled with the Promoter Defendants' misleading promotion of the EMAX Tokens.

167.   During the Relevant Period, the RICO Defendants exerted control over the EMAX Token Enterprise and participated in the operation or management of the affairs of the EMAX Token Enterprise, directly or indirectly, in the following ways:

a.   Underfunding the EMAX Token liquidity pool to the point where small buys would cause large spikes to the price, then using the artificially inflated prices to promote to investors that the EMAX Tokens were poised for future;

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

b.      The RICO Defendants concealed the identities of the leadership team behind EthereumMax in order to get away with improperly promoting the EMAX Tokens to investors;

c.      The RICO Defendants concealed that they were causing the EMAX Token price to artificially inflate in order to allow themselves to sell off their respective EMAX Token holdings at that inflated price; and

d.      The Executive Defendants expected and intended that the Promoter Defendants would (and did) distribute through the U.S. Mail and interstate wire facilities, communications that failed to disclose that the RICO Defendants were pumping up price and trading volume of EMAX Tokens artificially.

168.   The scheme had a hierarchical decision-making structure that was headed by the Executive Defendants.  They controlled the minting of the EMAX Tokens and directed the Promotor Defendants to misleadingly promote the EMAX Tokens to their social media audiences.

169.   The scheme devised and implemented by the RICO Defendants, as well as other members of the EMAX Token Enterprise, amounted to a common course of conduct intended to (a) allow the RICO Defendants to artificially inflate the price of and trading volume for the EMAX Tokens; and (b) sell their respective portion of the Float for a profit at the expense of Plaintiffs and the Class members.

**RICO Defendants' Pattern of Racketeering Activity**

170.   The RICO Defendants conducted and participated in the conduct of the affairs of the EMAX Token Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. §1341, relating to mail fraud, and 18 U.S.C. §1343, relating to wire fraud.  The pattern of racketeering activity by the EMAX Token Enterprise likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful HSP pricing scheme.   Each of these fraudulent mailings and interstate wire transmissions

constitutes "racketeering activity" within the meaning of 18 U.S.C. §1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. §1961(5), through which the RICO Defendants intended to defraud Plaintiffs, members of the class, and other intended victims.

171.   Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and members of the class.  The RICO Defendants calculated and intentionally crafted the EMAX Token Enterprise to ensure their own profits remained high, without regard to the effect such behavior had on Plaintiffs and members of the class who would were buying the EMAX Tokens at artificially inflated prices.

172.   By intentionally and artificially inflating the EMAX Token prices, and then subsequently failing to disclose such practices to the investors, the RICO Defendants engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

173.   The pattern of racketeering activity alleged herein was continuing until June 27, 2021.

**The RICO Defendants' Use of the U.S. Mail and Interstate Wire Facilities**

174.   The EMAX Token Enterprise engaged in and affected interstate commerce because it transmistted and published false and misleading information concerning the growth potential for EtheruemMax across state lines.

175.   During the Class Period, the EMAX Token Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, communications, information, products, and funds by the U.S. Mail and interstate wire facilities.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

176. The nature and pervasiveness of the fraudulent token promotion scheme, which was orchestrated by Executive Defendants, necessarily required those headquarters to communicate directly and frequently by U.S. Mail and interstate wire facilities.

177. Many of the precise dates of the EMAX Token Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the Executive Defendants' or the Promoter Defendants. Indeed, an essential part of the successful operation of the Enterprise alleged herein depended upon secrecy. However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme; Plaintiffs describe this below.

178. The RICO Defendants' use of the U.S. Mail and interstate wire facilities to perpetrate the fraudulent promotion scheme involved thousands of communications throughout the class period including, *inter alia*:

a. Communications on official EthereumMax accounts on various social media platforms, including, but not limited to: Twitter, Reddit, Telegram, and Discord to investors, which occurred on a regular basis as investors like Plaintiffs and Class members purchased EMAX Tokens;

b. Written representations and telephone calls between the Executive Defendants and Promotor Defendants regarding the promotion of EMAX Tokens and the financial benefits to the RICO Defendants for doing so;

c. Written representations and telephone calls between any of the RICO Defendants and David Grutman regarding the promotion of EMAX Tokens and the financial benefits to the RICO Defendants for doing so;

d. Written representations and telephone calls between the RICO Defendants and the moderators of the EthereumMax social media accounts

regarding the promotion of EMAX Tokens and the financial benefits to the RICO Defendants for doing so;

e.      Emails between the Executive Defendants and Promotor Defendants agreeing to or effectuating the implementation of the EMAX Token fraud scheme;

f.      Written and oral communications directed to retail investors that fraudulently misrepresented the growth potential for the EMAX Tokens that were designed to conceal the scheme and deter investigations into the EMAX Token Enterprise; and

g.      Receipts of increased profits sent through the U.S. Mail and interstate wire facilities — the wrongful proceeds of the scheme.

179.   In addition to the above-referenced RICO predicate acts, it was foreseeable to the Executive Defendants that the Promoter Defendants would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, conceal that the EMAX Token price was fraudulently inflated.

**Motive and Common Purpose**

180.   The RICO Defendants' motive and purpose in creating and conducting the scheme and the Enterprise(s) was to increase the price and trading volume for the EMAX Tokens so that they could sell off their portion of the Float for grossly inflated prices.  Each person joined in that common purpose because each person made more money the higher the EMAX Token price rose and, as trading volume increased, the RICO Defendants would be able to sell off in the increased liquidity.

**Damages Caused by the RICO Defendants Marketing Fraud**

181.   The RICO Defendants violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiffs and Class members to be financially injured as a result of purchasing the EMAX Tokens.

182.   As described above, when the RICO Defendants executed the EMAX Token promotional scheme, the result was an artificial increase in both price and

trading volume.  When the EMAX Token price and trading volume is artificially inflated, investors like Plaintiffs and the class overpay due to a fraudulent price.

183.   Plaintiffs' injuries, and those of the Class members, were proximately caused by the RICO Defendants' racketeering activity.  But for the misleading statements and omissions made by the RICO Defendants, Plaintiffs and others similarly situated would have paid less for the EMAX Tokens.

184.   Plaintiffs' injuries were directly caused by the RICO Defendants' racketeering activity.  The RICO Defendants' racketeering activity inflated the EMAX Token price, which was ultimately paid for by Plaintiffs and the other class members.

185.   Plaintiffs and those similarly situated were most directly harmed by the fraud, and there is no other Plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms to consumers from the RICO Defendants' fraudulent scheme.

186.   By virtue of these violations of 18 U.S.C. §1962(c), the RICO Defendants are liable to Plaintiffs for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## FIFTH CAUSE OF ACTION

### Common Law Conspiracy
### (Against All Defendants)

187.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

188.   Beginning in May 2021, and continuously thereafter up to and including the date of the filing of the Complaint, the Executive Defendants and Does 1-7 did engage in the formation and operation of a conspiracy with the Promotor Defendants to misleadingly promote the EMAX Tokens to retail investors in order

to artificially inflate the price and trading volume so that Defendants could sell their respective EMAX Tokens for substantial profits.

189.   As alleged above, each Defendant acted in furtherance of the conspiracy by, among other things, concealing the identity and ownership interests of, and association with, the EthereumMax leadership team; falsely promoting the EMAX Tokens as sound investments with significant growth potential; and making misleading statements about the Defendants holding their EMAX Tokens along with the retail investors who bought, while, in truth, the Defendants were selling their EMAX Tokens for substantial profits.

190.   As a proximate result of said conspiracy, as described in the foregoing paragraphs, Plaintiffs suffered, continue to suffer, and will suffer in the future, the damages alleged herein.

191.   For Defendants' conduct in the alleged conspiracy, Plaintiffs seek compensatory damages against all Defendants, and each of them, jointly and severely, in an as-yet undetermined amount; punitive damages, injunctive relief enjoining Defendants from continuing to falsely and misleadingly promote the EMAX Tokens; and divestiture of all money wrongfully obtained, whether directly or indirectly, as part of the alleged conspiracy.

## SIXTH CAUSE OF ACTION

**Violation of the California False Advertising Law**
**Cal. Bus. & Prof. Code §17500,** *et seq.*
**(Against Defendant Kardashian)**

192.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

193.   Plaintiffs Semerjian and Shah are residents of the State of California.

194.   At all relevant times there was in full force and effect the California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §17500, *et seq.*, which prohibits, *inter alia*, any public statement made "to induce the public to enter into

any obligation relating" to the disposal of real or personal property . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue and misleading."

195.   Kardashian used online and social media advertising to sell the EMAX Tokens.   Kardashian disseminated (and could continue to do so in the future) advertising concerning the EMAX Token which by its very nature is deceptive, untrue, or misleading within the meaning of Cal. Bus. & Prof. Code §17500 because those advertising statements are misleading and likely to deceive, and continue to deceive, members of the class and the general public.

196.   In making and disseminating the statements alleged herein, Kardashian knew or should have known that the statements were untrue or misleading, and acted in violation of Cal. Bus. & Prof. Code §17500.

197.   The misrepresentations and non-disclosures by Kardashian of the material facts detailed above constitute false and misleading advertising and therefore constitute a violation of Cal. Bus. & Prof. Code §17500.

198.   Through her deceptive acts and practices, Kardashian has improperly and illegally obtained money from Plaintiffs and the members of the Class.  As such, Plaintiffs request that this Court cause Defendant to restore this money to Plaintiffs and the members of the Class, and to enjoin Defendant from continuing to violate Cal. Bus. & Prof. Code §17500, as discussed above.  Otherwise, Plaintiffs and those similarly situated will continue to be harmed by Kardashian's false and/or misleading advertising regarding EMAX Tokens.

199.   "Any violation of [Cal. Bus. & Prof. Code §17500] is a misdemeanor punishable by imprisonment in county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment and fine."

200.   "Punishment is partly an expression of a society's desire to inflict pain on those who break the law.  But giving wealthy offenders a mere slap on the wrist makes a mockery of that objective.  And while punishment is supposed to prevent undesirable conduct from happening in the first place, flat fines deter the wealthy less than everyone else."[42]

201.   Given Kardashian's status as one of the country's most influential and wealth celebrity promotors – someone who regularly makes millions of dollars from similarly promoting products to her massive following on social media – the maximum fine of only $2,500 for a violation of Cal. Bus. & Prof. Code §17500 will do little, if anything, to deter Kardashian from making false and misleading advertisements in the future.

202.   In addition, pursuant to Cal. Bus. & Prof. Code §17535, Plaintiffs seek an Order of this Court ordering Defendants to fully disclose the true nature of their misrepresentations.  Plaintiffs additionally request an Order requiring Kardashian to disgorge her ill-gotten gains and/or award full restitution of all monies wrongfully acquired by Kardashian by means of such acts of false advertising, plus interest and attorneys' fees so as to restore any and all monies which were acquired and obtained by means of such untrue and misleading advertising, misrepresentations and omissions, and which ill-gotten gains are still retained by Kardashian.  Plaintiffs and those similarly situated may be irreparably harmed and/or denied an effective and complete remedy if such an Order is not granted.

203.   Kardashian's conduct is ongoing and continues to this date.  Plaintiffs and the Classes are therefore entitled to the relief sought.

---

[42]   Alec Schierenbeck, Op-Ed, *A Billionaire and a Nurse Shouldn't Pay the Same Fine for Speeding,* NY TIMES (March 15, 2018), https://www.nytimes.com/2018/03/15/opinion/flat-fines-wealthy-poor.html

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

## SEVENTH CAUSE OF ACTION

**Violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**Ch. 501, §211(1), Fla. Stat. Ann.**
**(Against All Defendants)**

204.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

205.   Plaintiffs Nahlah, Freeman, Brignol, and Puda are residents of the State of Florida.

206.   Chapter 501, Fla. Stat., FDUTPA is to be liberally construed to protect the consuming public, such as Plaintiffs in this case, from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce.

207.   Plaintiffs are "consumers" within the meaning of Fla. Stat. §501.203(7).

208.   By soliciting investor funds in the manner in which they did, Defendants engaged in "trade and commerce" within the meaning of Fla. Stat. §501.203(8).

209.   While FDUTPA does not define "deceptive" and "unfair," it incorporates by reference the Federal Trade Commission's interpretations of these terms.   The FTC has found that a "deceptive act or practice" encompasses "a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."

210.   The federal courts have defined a "deceptive trade practice" as any act or practice that has the tendency or capacity to deceive consumers and have defined an "unfair trade practice" as any act or practice that offends public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

211.   Defendants engaged in business acts and practices deemed "deceptive" because of the conduct, statements, and omissions described above, including, but not limited to, the following:

(a)   knowingly and intentionally concealing the Executive Defendants' specific roles and ownership interests in EthereumMax; and

(b)   knowingly and intentionally using and/or failing to disclose the use of the Promotor Defendants to "instill trust" in uninformed investors to promote the financial benefits of a highly speculative and risky investment in EMAX Tokens, in an effort to manipulate and artificially inflate the price and trading volume of the EMAX tokens and allow Defendants to sell their EMAX Tokens at those inflated prices.

212.   These acts and omissions constitute both deceptive and unfair trade practices because the false representations and omissions made by Defendants have a tendency or capacity to deceive consumers, such as Plaintiffs, into investing in the EMAX Tokens to their collective financial detriment.  Such conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

213.   As a result of Defendants' deceptive trade practices, Plaintiffs were deceived into retaining functionally worthless cryptocurrencies and/or investing their cryptocurrency and/or fiat currency with a company that functioned solely as an engine of fraud – thus causing significant economic damage to Plaintiffs.

214.   The materially false statements and omissions as described above, and the fact that this was a misleading investment, were unfair, unconscionable, and deceptive practices perpetrated on Plaintiffs which would have likely deceived a reasonable person under the circumstances.

215.   Defendants were on notice at all relevant times that the false representations of material facts described above were being communicated to prospective investors (such as Plaintiffs) by their authorized agents.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

216.   As a result of the false representations and violations of the laws described above, Plaintiffs have been damaged by, among other things losing the true value of their invested cryptocurrency.

217.   Plaintiffs have also been damaged in other and further ways subject to proof at trial.

218.   Therefore, Defendants engaged in unfair and deceptive trade practices in violation of Fla. Stat. §501.201, *et seq*.

219.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under Florida law.

220.   Pursuant to Fla. Stat. §§501.211(1) and 501.2105, Plaintiffs are entitled to recover from Defendants the reasonable amount of attorneys' fees Plaintiffs have had to incur in representing their interests in this matter.

## **EIGHTH CAUSE OF ACTION**

**Violation of New York's General Business Law
Art. 22-A, §349, *et seq*.
(Against All Defendants)**

221.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

222.   Plaintiffs Huegerich and Ciklik are residents of the State of New York.

223.   For the reasons discussed herein, Defendants violated and continued to violate Section 349(a) of the New York General Business Law by engaging in the herein described unfair or deceptive acts or practices.  Defendants acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.  Defendants engaged in deceptive acts and practices under New York law by taking advantage of the lack of knowledge,

ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including but not limited to, in the following ways:

(a)   knowingly   and   intentionally   concealing   the   Executive Defendants' specific roles and ownership interests in EthereumMax; and

(b)   knowingly and intentionally using and/or failing to disclose the use of the Promotor Defendants to "instill trust" in uninformed investors to promote the financial benefits of a highly speculative and risky investment in EMAX Tokens, in an effort to manipulate and artificially inflate the price and trading volume of the EMAX tokens and allow Defendants to sell their EMAX Tokens at those inflated prices.

224.   As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiffs and Class members suffered damages.  Defendants' activities caused Plaintiffs and the Class members to purchase and/or retain the EMAX Tokens when they otherwise would not have done so.

225.   Pursuant to GBL §349(h), Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under New York law.

226.   In addition, Plaintiffs are entitled to reasonable attorney's fees and exemplary damages not exceeding three times the value of the consideration given by the consumer, and any other relief this Court determined is appropriate. *See* GBL §349(h).

## NINTH CAUSE OF ACTION

### Violation of New Jersey Consumer Fraud Act
### NJSA 56:8-1 to 156
### (Against All Defendants)

227.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

1    228.   Plaintiff DeLuca is a resident of the State of New Jersey.

2    229.   For the reasons discussed herein, Defendants violated and continued to

3    violate the New Jersey Consumer Fraud Act by engaging in the herein described

4    unfair or deceptive acts or practices.  Defendants' acts and practices, including their

5    material omissions, described herein, were likely to, and did in fact, deceive and

6    mislead members of the public, including consumers acting reasonably under the

7    circumstances, to their detriment.   Defendants engaged in deceptive acts and

8    practices under New Jersey law by taking advantage of the lack of knowledge,

9    ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including but

10   not limited to, in the following ways:

11       (a)    knowingly and intentionally concealing the Executive Defendants'

12   specific roles and ownership interests in EthereumMax; and

13       (b)    knowingly and intentionally using and/or failing to disclose the use of

14   the Promotor Defendants to "instill trust" in uninformed investors to promote the

15   financial benefits of a highly speculative and risky investment in EMAX Tokens, in

16   an effort to manipulate and artificially inflate the price and trading volume of the

17   EMAX tokens and allow Defendants to sell their EMAX Tokens at those inflated

18   prices.

19   230.   As a direct and proximate result of Defendants' unfair and deceptive

20   practices, Plaintiffs and Class members suffered damages.  Defendants' activities

21   caused Plaintiffs and the Class members to purchase and/or retain the EMAX Tokens

22   when they otherwise would not have done so.

23   231.   Pursuant to NJSA 56:8-1 to 156, Plaintiffs seek to enjoin further

24   unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain

25   restitution and disgorgement of all monies generated as a result of such practices,

26   and for all other relief allowed under New York law.

27

28

232.   In addition, Plaintiffs are entitled to reasonable attorney's fees and an exemplary damages award of threefold the damages suffered by Plaintiffs and the Class Members. *See* NSJA 56:8-19.

## TENTH CAUSE OF ACTION

**Unjust Enrichment/Restitution**
**(California Common Law, in the Alternative)**
**(Against All Defendants)**

233.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

234.   Plaintiffs and members of the Class conferred a monetary benefit on Defendants by raising the price and trading volume of the EMAX Tokens, which allowed Defendants to sell their EMAX Tokens to Plaintiffs and Class members at inappropriately and artificially inflated prices.

235.   Defendants received a financial benefit from the sale of their EMAX Tokens at inflated prices and are in possession of this monetary value that was intended to be used for the benefit of, and rightfully belongs to, Plaintiffs and members of the Class.

236.   Plaintiffs seek restitution in the form of the monetary value of the difference between the purchase price of the EMAX Tokens and the price those EMAX Tokens sold for.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully request that this Court:

A.   Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more of the Classes defined above;

B.   Appoint Plaintiffs as representatives of the Class and their counsel as Class counsel;

1     C.     Award all actual, general, special, incidental, statutory, punitive, and

2 consequential damages and restitution to which Plaintiffs and the Class members are

3 entitled;

4     D.     Order appropriate relief under Cal. Bus. & Prof. Code §17500 for

5 Kardashian;

6     E.     Award post-judgment interest on such monetary relief;

7     F.     Grant appropriate injunctive and/or declaratory relief;

8     G.     Award reasonable attorneys' fees and costs; and

9     H.     Grant such further relief that this Court deems appropriate.

## JURY DEMAND

11     Plaintiffs, individually and on behalf of the putative Class, demand a trial by

12 jury on all issues so triable.

13 DATED:  April 18, 2022     **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

s/ *John T. Jasnoch*

John T. Jasnoch (CA 281605)
jjasnoch@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-236-0508

*Counsel for Plaintiffs and the Proposed Class*

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 18, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

_s/ John T. Jasnoch_
John T. jasnoch