John T. Jasnoch (CA 281605)
jjasnoch@scott-scott.com
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-236-0508

*Attorney for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| IN RE ETHEREUMMAX INVESTOR LITIGATION | Lead Case No. 2:22-cv-00163-MWF-SK |
|---|---|
| This Document Relates To: | **PLAINTIFFS' OPPOSITION TO DEFENDANT PAUL PIERCE'S MOTION TO DISMISS** |
| ALL ACTIONS | |

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................. 1

II.     STATEMENT OF FACTS RELEVANT TO CLAIMS
        AGAINST DEFENDANT PIERCE ......................................................... 2

III.    STANDARD OF REVIEW .................................................................... 6

IV.     ARGUMENT ....................................................................................... 6

        A.      Plaintiffs Adequately Allege that Pierce's Statements
                Were False and Misleading and Reckless ................................... 6

        B.      Pierce's Statements and Conduct Should Be Viewed in
                Totality ................................................................................... 8

V.      CONCLUSION .................................................................................. 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Apple Computer Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) ........................................................................... 10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................ 6

*In re B. Fennekohl & Co.*,
    41 S.E.C. 210 (1962) .......................................................................................... 9

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ............................................................................................ 9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 554 (2007) ............................................................................................ 6

*Bly-Magee v. State of Cal.*,
    236 F.3d 1014 (9th Cir. 2001) ........................................................................... 6

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008) .......................................................................................... 10

*Casella v. Webb*,
    883 F.2d 805 (9th Cir. 1989) ............................................................................. 9

*In re Convergent Techs Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991) ............................................................................. 8

*In re Cortlandt Investing Corp.*,
    44 S.E.C. 45 (Aug. 29, 1969) ............................................................................ 9

*Hoxworth v. Blinder, Robinson & Co., Inc.*,
    903 F.2d 186 (3d Cir. 1990) .............................................................................. 9

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27, 43 (2011) ...................................................................................... 9

*McMahan & Co. v. Wherehouse Ent., Inc.*,
    900 F.2d 576 (2d Cir. 1990) ............................................................................. 8

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ................................................................. 8

*Neubronner v. Milken*,
    6 F.3d 666 (9th Cir. 1993) ................................................................. 6

*In re Omnicare, Inc. Sec. Litig.*,
    769 F.3d 455 (6th Cir. 2014) ............................................................ 10

*S. Ferry LP No. 2 v. Killinger*,
    399 F. Supp. 2d 1121 (W.D. Wash. 2005) ......................................... 9

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ............................................................ 6

**Statutes, Rules, and Regulations**

Federal Rules of Civil Procedure
    Rule 9(b) ............................................................................................ 6
    Rule 12(b)(6) ...................................................................................... 6

## I.   INTRODUCTION

Plaintiffs Ryan Huegerich, Jonathan Semerjian, Nabil Nahlah, Till Freeman, Marko Ciklic, Tunisia Brignol, Milan Puda, Neil Shah, and Christopher DeLuca ("Plaintiffs"), individually, and on behalf of all other persons similarly situated, hereby submit this memorandum of law in response to and in opposition to the separate motion filed by Defendant Paul Pierce ("Pierce"), seeking dismissal of Plaintiffs' Consolidated Complaint against him.

This action seeks redress on behalf of all persons who suffered financial harm due to their investments in EthereumMax tokens from May 14 through June 21, 2021.   The Consolidated Complaint ("Complaint") alleges there was a scheme among various individuals in the cryptocurrency sector to misleadingly promote and sell the digital asset associated with EthereumMax (the "EMAX Tokens") to unsuspecting investors.   EthereumMax collaborated with several celebrity promotors, including Defendant Pierce, who made false and misleading statements to investors about EthereumMax while concealing his control over significant EthereumMax holdings that he was given as consideration for engaging in his promotions.

Motivated by a desire to serve his own financial interests as well as those of EthereumMax and the Executive Defendants, Defendant Pierce actively promoted the EthereumMax enterprise and solicited purchases of EMAX Tokens from the investing public.   Pierce's solicitations for purchases of EMAX Tokens were successful and his promotions lead to additional transaction volume and price increases.  Not only did Pierce unlawfully solicit investments into EthereumMax and EMAX Tokens, but he was an active participant in the overall scheme to create the public market for EMAX tokens while having actual knowledge or, at best, having been grossly reckless in disregarding the fact that the EMAX tokens had no value and the EthereumMax enterprise was conducting a pump and dump scheme. Pierce's participation in this fraudulent scheme involved, *inter alia*, personally

issuing false or misleading statements on EMAX, omitting material facts in his EMAX-related statements, trading EMAX tokens on inside information, and otherwise permitting his celebrity endorsement to be used by EthereumMax and the Executive Defendants in a company press release.

Simply put, Defendant Pierce was an active and knowing participant in the fraudulent scheme to sell worthless EMAX Tokens that caused public investors like Plaintiffs to suffer financial injuries. Despite this fact, Pierce now seeks to absolve himself of any and all responsibility for his role in perpetuating the EMAX scam by, in essence, broadly arguing that his tweets were literally true, puffery, and that no one should have listened to him. These arguments fail.

The question posed by the Court by Defendant Pierce's motion is whether he bears any civil liability for his promotional activities and solicitation of investors into the EthereumMax enterprise. Accepting as true the allegations (and all reasonable inferences therefrom) contained in Plaintiffs' complaint, it is apparent that Piece does indeed bear liability for his actions. The Motion to Dismiss should be denied, and Plaintiffs and the class should be afforded the ability to litigate claims against him, alongside the other Promotor and Executive defendants, for the damages caused by their interrelated acts in promoting the EthereumMax enterprise.

## II.  STATEMENT OF FACTS RELEVANT TO CLAIMS AGAINST DEFENDANT PIERCE

This case is the culmination of executives and celebrity promotors collaborating with each other in order to artificially inflate the price of the EMAX Tokens so as to defraud investors and gain significant returns. Paul Pierce ("Pierce") was one of the promoters of EthereumMax and the EMAX Tokens. The Executive Defendants actively searched for and recruited promoters for the launch of the EMAX tokens in May 2021. ¶47.[1] The Ethereum Max scam was predicated on the

---

[1]     Unless otherwise noted all "¶" references refer to the Consolidated Class Action Complaint.

use of celebrities like Defendant Pierce.  Executive Defendants confirm that Ethereum Max's use of "high level" brand ambassadors and promotors "legitimized" the project.  ¶79.

Pierce was paid in EMAX Tokens to promote them online and through his social media platforms.  ¶¶54-56.  Indeed, the complaint sets forth a combined search of the Ethereum Blockchain Explorer and the non-fungible token marketplace OpenSea, which demonstrate that a wallet owned/controlled by Pierce received and sold millions of dollars' worth of EMAX Tokens while Pierce simultaneously promoted EMAX Tokens to investors.  ¶¶52-56, 58, 60. 61, 63, 64.  While Pierce covered up his wallet's address in a tweet, he left the unique image displayed as the wallet's profile picture unredacted.  This image is a direct match to an image associated with Wallet 0x70f5A6 on the OpenSea exchange.  An examination on Etherscan of some of the other digital assets within Wallet 0x70f5A6 shows additional connections to Pierce, further confirming that Wallet 0x70f5A6 is under Pierce's ownership/control.  For example, Wallet 0x70f5A6 trades in Ethernity tokens.  Pierce has direct connections to Ethernity via his participation in a celebrity charity poker tournament sponsored and/or promoted by Ethernity.  ¶52.

An examination of Pierce's wallet's trading activity in conjunction with Pierce's social media activity shows that Pierce made millions of dollars trading (and selling) EMAX Tokens while simultaneously promoting the tokens to investors as sound long-term investments.  ¶53.  Before he began soliciting investment in EMAX tokens, on May 24, 2022, Pierce's wallet received an "airdrop" of approximately 15 trillion now-defunct EMAX Tokens from the beta version of the EthereumMax deployer wallet.  ¶53.  On May 25, 2021, Pierce received an approximate equivalent of 15.4 trillion new EMAX Tokens via the EthereumMax deployer wallet, valued at around $1,350,000 in cash at the time.  That same day, Pierce also additionally purchased around 110 billion EMAX Tokens for about $10,000.  This purchase was

made with insider information about the Executive Defendants' plans for a widespread celebrity shilling scheme for the EthereumMax tokens.  ¶55.

On May 26, 2021, Pierce received approximately 247 billion additional EMAX Tokens from a second EthereumMax deployer wallet "airdrop."  That same day, Pierce promoted EthereumMax in a widely discussed post on the social media platform Twitter during an online dispute between Pierce and the television broadcasting network ESPN.  Prior to the May 26, 2021 post, Pierce had worked for ESPN as a popular sports analyst and commentator until he was fired for an unrelated video he had previously posted to his social media account.  After his firing, Pierce publicly slammed ESPN while conversely praising EthereumMax's ability to make money for him at the same time.

Soon thereafter, the trading volume for the EMAX Token skyrocketed as a result of Pierce's Twitter post.  On May 26, 2021, EMAX Token volume reached $44.43 million – almost five times higher than the previous day.  Then, on May 27, 2021, the volume more than doubled reaching $107.7 million.  ¶58.  That same day, Pierce purchased an additional 120 billion EMAX Tokens on inside information about EthereumMax's promotional plans.

On May 28, 2021, Pierce tweeted again promoting the EMAX price growth by posting a screenshot of his trading account with 15,858,700,525,204.817 EMAX Tokens valued at "$2,519,268.89," which had increased "83.34% ($1,145,469.23)" according to the one day chart.  ¶51.  Also on May 28, 2021, EthereumMax issued a press release highlighting Pierce's posts.  The press release misleadingly noted "EthereumMax ($eMax) has quickly become the fastest-growing Altcoin on the market, is up over 21,000% with over 32,000 holders since its launch on May 14, 2021."  The press release further noted that the "coin has been gaining massive moment (sic) and popularity," before repeating Pierce's May 26, 201 tweet verbatim. ¶85.  EthereumMax highlighted Pierce's tweet in the press release to drum up

excitement and hype around the EMAX Token and the upcoming fight between Floyd Mayweather Jr. and Logan Paul.  ¶83.

On May 29, 2021, Pierce continued to sell his EMAX Tokens, with 118 sells, totaling approximately 8.4 trillion EMAX Tokens that were valued at around $5,500,000 at the time.  ¶60.  He then made 12 buys totaling 1.214 trillion EMAX Tokens, then he immediately turned around and sold those 1.214 trillion EMAX Tokens plus an additional 680 billion EMAX Tokens (*i.e.*, 1.89 trillion EMAX Tokens in total).  ¶60.

On May 30, 2021, Pierce issued a tweet stating, "People asking if they should jump on the @ethereum_max train I'm n for the long haul if you missed out on the 1st wave now is the time to jump on board."  After telling investors he was in "for the long haul" and telling them "now is the time to jump on board" Pierce sold approximately 9.7 trillion EMAX tokens worth approximately $1,300,000.

Pierce continued to promote EMAX Tokens and continued to buy and sell until his tweet on June 5, 2021, where he said he was going to "double down" on EthereumMax and then a few days later he sold 98% of the tokens he was recently airdropped.  ¶64.  The countless number of re-Tweets and comments on Pierce's Twitter show that he was very influential and caused many to believe in EthereumMax and believe that he was in it for the "long haul."  ¶62.  Throughout his time promoting, he did not include any promotional disclosures in his tweets. ¶104.

Pierce's actions were part of a pattern and a scheme where he was given free EMAX as a payment for his misleading promotions, then he went out and he posted about EthereumMax investment on social media, only to turn around and sell his tokens for profit as retail investors bought in.  The entire purpose of this paid promotion was the pumping and dumping of tokens based on the value created by Pierce's direct action.  Furthermore, the complexity of these financial transactions and movements between wallet address highlighted in the complaint demonstrate

that Pierce understood how to both time and execute their selling strategy.  Pierce knew that his tweets and promotions were misleading as he was selling his EMAX tokens in a fraudulent scheme pursuant to inside information.  At no point did Pierce include any promotional disclosures when he promoted EMAX.  ¶104.

## III.   STANDARD OF REVIEW

To prevail on a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  Further, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563 (noting that once a claim for relief has been stated, a plaintiff '"receives the benefit of imagination, so long as the hypotheses are consistent with the complaint'").

Under Rule 9(b), claims of fraud must be plead with particularity, which requires identifying the "who, what, when, where, and how" of the fraud alleged. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).  In order to comply with Rule 9(b) the "allegations of fraud must be 'specific enough to give defendants notice of the particular misconduct.'" *Bly-Magee v. State of Cal.*, 236 F.3d 1014, 1019 (9th Cir. 2001) (quoting *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993)).

## IV.   ARGUMENT

### A.   Plaintiffs Adequately Allege that Pierce's Statements Were False and Misleading and Reckless

Defendant Pierce argues that his conduct is not actionable because his tweets were either literally true, puffery, or not meant to be taken seriously.  When taken in

totality and viewed in context of the broader scheme, however, it is clear that Pierce made false and misleading statements in his EMAX tweets.

Defendant Pierce's first tweet stated: "@espn I don't need you.  I got @ethereum_max I made more money with this crypto in the past month then I did with y'all in a year.  TRUTH shall set u Free my own Boss http://EthereumMax.org check it out for yourself."  Defendant Pierce's statement "in the past month" was false and misleading as the operative deployer wallet had only sent him the tokens the day prior to his tweet and they sent him additional tokens on same date of the tweet.  The phrase "my own boss" was also false and misleading as it omits that he was being paid for these promotions.  Pierce was given these tokens for free from the deployer wallet as payment to conduct his promotions.  ¶¶54-56.  Pierce also omitted that he was planning on dumping the tokens he was paid on unsuspecting investors pursuant to inside information.  To amplify already wide reach, Pierce's first tweet was thereafter quoted verbatim in a misleading EthereumMax Press Release.  ¶85.

Pierce did nothing to distance himself from the EthereumMax press release. Instead, Pierce continued to misleadingly promote EthereumMax in a deceptive and reckless manner.  Pierce's second tweet promoted the EMAX price growth, a screenshot of his trading account with 15,858,700,525,204.817 EMAX Tokens valued at "$2,519,268.89," which had increased "83.34% ($1,145,469.23)" according to the one-day chart.  ¶51.  While Defendant Pierce argues that the screenshot of the wallet and the price increase shows facts that were literally true, the tweet held a deeper purpose.  The tweet was a misleading promotion of EthereumMax as a way to create widespread news and buzz about the EMAX token so that there would be more retail interest so that he could offload his tokens for a higher price.  Again, the tweet failed to disclose that he had received consideration in exchange for promoting the token, namely the airdropped tokens from the Deployer Wallet.  Furthermore, this tweet failed to disclose that Pierce was preparing

to offload massive amounts of tokens as retail investors began to buy.  The May 28 tweet hyping the EMAX price jump was also issued in conjunction with the misleading EthereumMax press release that quoted Defendant Pierce verbatim.  ¶85.

On May 30, 2021, Pierce's third tweet stated, "People asking me if they should jump on the @ethereum_max train I'm n for the long haul if u missed out on the 1st wave now is the time to jump on board." ¶62.  This tweet was also false and misleading because Pierce was not in "for the long haul" instead, he was planning on selling large portions of his tokens, which he did three days later.  ¶63.  In addition, May 30 was certainly not the "time to jump on board" because it was near the absolute peak of the EMAX price pump, just prior to the large dump that he participated in.  ¶88 n.23.

On June 6, 2021, Pierce received 97.4 billion EMAX tokens and made a final false and misleading tweet stating that he was going to "double down" on EMAX. ¶64.  This final tweet was false and misleading because of instead of doubling down, he sold 98% of the 97.4 billion tokens before the price eventually fell off a cliff.  *Id*.

## B.   Pierce's Statements and Conduct Should Be Viewed in Totality

Rather than viewing each word or phrase of Defendant Pierce's tweets in isolation as Pierce suggests, each of his tweets must be looked at as a whole, and in conjunction with the deceptive press release and Pierce's trading activity.  Pierce's words cannot be viewed "in complete isolation" but must instead be "read in light of all the information then available to the market" to decide if they "conveyed a false or misleading impression."  *In re Convergent Techs Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991).  With that in mind, statements "literally true on their face may nonetheless be misleading when considered in context."  *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).  Circumstance, setting, and even "manner of presentation" all matter.  *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

When considering the totality of the statements and the unique context in which they were made, reasonable investors would have been misled in a material way by Pierce's tweets had they known about the airdropped tokens and trading activity. When viewed in totality, the complaint sets forth a course of misleading conduct which furthered the interests of the EthereumMax enterprise. None of Pierce's tweets referenced being airdropped or transferred free EMAX tokens prior to his promotions. None of Pierce's tweets referenced the fact that he was making large sales of these free EMAX tokens. Pierce was not in "for the long haul," "doubling down," or making any promotional disclosures. ¶¶63, 64, 104.

Moreover, when viewed in totality, the statements are not puffery and constituted a necessary component to a broader scheme to solicit retail investors to invest so that the EthereumMax enterprise could conduct their exit scam on Plaintiffs and the class. Indeed, "[w]hat might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989); "'Strictly speaking, the securities laws recognize no distinct "puffing" exception. To say a statement is mere "puffing" is, in essence, to say that it is immaterial[.]'" *S. Ferry LP No. 2 v. Killinger*, 399 F. Supp. 2d 1121, 1129 (W.D. Wash. 2005) (quoting *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 200-01 (3d Cir. 1990)); *See In re B. Fennekohl & Co.*, 41 S.E.C. 210, 216 (1962) (puffery is a species of caveat emptor antithetical to the federal securities laws); *In re Cortlandt Investing Corp.*, 44 S.E.C. 45, 50 (Aug. 29, 1969) (same).

Furthermore, materiality presents "a 'fact-specific' inquiry that requires consideration of the source, content, and context." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011). "Any approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive." *Basic Inc. v.*

*Levinson*, 485 U.S. 224, 236 (1988); *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 472 (6th Cir. 2014) (the "judiciary has a limited understanding of investor behavior," thus when faced with purported "puffery," courts "must tread lightly" and engage "carefully with the facts of a given case and consider[] them in their full context"). Only through Celebrity endorsement, could a cryptocurrency project with no history and no white paper generate such massive hype and overvaluation, and the Court should not rule, as a matter of law, that such conduct is inactionable.

Defendant Pierce argues dismissal is appropriate because there is no direct relationship between any of the Plaintiffs and Pierce. As an initial matter, Plaintiffs assert claims that do not require direct reliance on Pierce's tweets, such as RICO. *See, e.g.*, *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 660 (2008). In any event, each named Plaintiff specifically alleges that they made their EMAX purchases after viewing "numerous celebrity endorsements of EMAX." ¶¶6-14. At the time of the tweets, Defendant Pierce was in a very public dispute with ESPN, and his initial tweet was amplified by the EthereumMax press release. ¶¶57, 83. This media attention, combined with a wide-spread social media campaign and press release, had an incredibly wide reach.

It is without question that Pierce's actions directly affected the value of the EMAX tokens purchased by Plaintiffs. His tweets certainly caused a significant price impact, and the Complaint cites a chart from *London Financial Times* demonstrating the dramatic rise in the EMAX token price in conjunction with Pierce's promotional activities. ¶112. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989) ("Dramatic price movements . . . would provide a strong indication that the statement itself was material[.]"). Pierce also impacted Plaintiffs when he made numerous sales of his EMAX tokens on inside information as Plaintiffs and other retail investors began buying in. ¶¶60-61, 63-64.

While Pierce quibbles with the exact meaning of his tweets, and requests judicial notice for a dictionary's definition of "double down," the factual distinctions

10

he raises are inappropriate on a motion to dismiss.  At this point, Plaintiffs' allegations regarding the true meanings and motivations of Pierce's tweets and trades, and all reasonable inferences therefrom, must be accepted as true.

## V.    CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request that the Court deny Defendant Pierce's Motion to Dismiss.[2]

Dated: September 16, 2022                Respectfully submitted,


s/ *John T. Jasnoch*
John T. Jasnoch (CA 281605)
jjasnoch@scott-scott.com
**SCOTT+SCOTT ATTORNEYS
AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-236-0508

*Attorneys for Lead Plaintiffs
and the Proposed Class*

---

[2]        Although Plaintiffs believe that the Complaint sufficiently alleges claims against defendant Pierce, if this Court were to find otherwise, Plaintiffs request leave to amend their complaint to cure any deficiencies as Plaintiffs have not yet had the benefit of a court ruling addressing the sufficiency of their allegations.

# **CERTIFICATE OF SERVICE**

I, John T. Jasnoch, hereby certify that on September 16, 2022, I caused the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

Executed on September 16, 2022, at San Diego, California.

*s/ John T. Jasnoch*
John T. Jasnoch

PLAINTIFFS' OPPOSITION TO DEFENDANT PAUL PIERCE'S MOTION TO DISMISS
CASE NO. 2:22-cv-00163-MWF-SK