UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** CV 22-00163-MWF (SKx)                **Date:** June 6, 2023
Title:  In Re Ethereummax Investor Litigation

Present:   The Honorable MICHAEL W. FITZGERALD, U.S. District Judge

Deputy Clerk:                          Court Reporter:
Rita Sanchez                           Not Reported

Attorneys Present for Plaintiff:       Attorneys Present for Defendant:
None Present                           None Present

**Proceedings (In Chambers):**         ORDER GRANTING IN PART AND
                                       DENYING IN PART DEFENDANTS'
                                       OMNIBUS MOTIONS TO DISMISS AND
                                       THE INDIVIDUAL DEFENDANTS'
                                       MOTIONS TO DISMISS AND STRIKE [119,
                                       120, 121, 122, 123, 124, 126, 127]

Before the Court are eight motions:

- The Motion to Dismiss Claims 8, 10, 11, and 12 of Plaintiffs' Second Amended Complaint ("SAC") filed by Defendants Giovanni Perone, EMAX Holdings LLC ("the Company"), Jona Rechnitz, Floyd Mayweather Jr., and Paul Pierce on February 21, 2023 (the "Securities Motion"). (Docket No. 120).

- The Motion to Dismiss Claims 1-7, 9, and 13 of Plaintiffs' SAC filed by Defendants Perone, the Company, Rechnitz, Mayweather, Pierce, and Kimberly Kardashian on February 21, 2023 (the "Consumer Law or CL Motion"). (Docket No. 119).

- The Motion to Dismiss the SAC filed individually by Kardashian on February 21, 2023 (the "Kardashian Motion"). (Docket No. 121).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

- The Motion to Dismiss the SAC filed individually by Defendant Mayweather on February 21, 2023 (the "Mayweather Motion").  (Docket No. 122).

- The Motion to Dismiss the SAC filed by Defendant Perone and the Company on February 21, 2023 (the "Perone Motion").  (Docket No. 123).

- The Motion to Dismiss the SAC filed individually by Defendant Pierce on February 21, 2023 (the "Pierce Motion").  (Docket No. 124).

- The Motion to Dismiss the SAC and the Motion to Strike Portions of the SAC filed individually by Defendant Rechnitz on February 21, 2023. (The "Rechnitz Motion") (Docket No. 126); (the "Rechnitz MTS") (Docket No. 127).

Plaintiffs filed Oppositions to each Motion and Defendants likewise filed Replies.  Additionally, Pierce filed an unopposed Request for Judicial Notice (the "Pierce RJN") and Plaintiffs filed an opposed Request for Judicial Notice (the "Plaintiffs' RJN") in support of their Opposition to Pierce's Motion.  (Docket Nos. 125, 140).

The Court has read and considered the papers on the Motions and held a video hearing on **May 16, 2023**.  In sum, the Securities Motion is mostly granted with leave to amend for lack of specificity, but not for lack of privity.  The CL Motion is mostly denied because Plaintiffs have now adequately alleged and articulated their theories of injury and reliance, while most other issues raised are unsuitable for disposition on the pleadings.  Specifically, the Court rules as follows:

- The Securities Motion is **GRANTED** *without leave to amend* to the extent it seeks dismissal of Claim 8 given it states a non-existent cause of action under California's Securities Law.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

- The Securities Motion is **GRANTED** *with leave to amend* to the extent it seeks dismissal of Claims 10 and 11 under California's Securities Law.  In the absence of expert analysis describing the intricacies of the relevant trading platform, the Court is unwilling to conclude, as a matter of law, that Plaintiffs will be unable to prove some form of "privity."  The SAC includes sufficient allegations to raise a plausible inference that Plaintiffs purchased Tokens that were deposited in the liquidity pool by the Executive Defendants and/or Pierce.  However, the allegations are insufficient to establish privity as to Mayweather, but Plaintiffs will have an opportunity to amend.  While the Court rejects Defendants' privity argument, Claims 10 and 11 nonetheless fail for lack of specificity.

- The Securities Motion is **DENIED** to the extent it seeks dismissal of Claim 12 under Florida's Securities Law because Plaintiffs have plausibly alleged that they can prove privity and have clearly articulated a straightforward claim for the sale of unregistered securities under Florida law.  And the SAC includes sufficient allegations that the moving Executive Defendants participated in or aided the sale of the Tokens.

- The CL Motion is **DENIED** to the extent it seeks dismissal of the state consumer law claims based on the argument that the securities claims may not be pled in the alternative.  Given the issue of whether the Tokens are a "security" is a genuinely unanswered legal question, it would be unfair (and contrary to Rule 8) to prohibit alternative pleading at this stage of the litigation.

- The CL Motion is **DENIED** to the extent it seeks dismissal of the state consumer law claims based on Plaintiffs' failure to plausibly allege injury.  Plaintiffs have more clearly articulated their theory of harm by connecting the alleged misconduct directly to the price of the Tokens and/or their decision to purchase the Tokens.  Further, certain of the state consumer laws recognize diminished value and/or expectancy interests as cognizable harms.  In sum, the Court does not view its prior RICO analysis as

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No. CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

dispositive given the unique concerns raised by that statute, the different standards that apply to the state law claims, and the new allegations and arguments advanced by Plaintiffs.

- The CL Motion is **GRANTED** *with leave to amend* to the extent it seeks dismissal of Claim 13 for unjust enrichment for failure to allege inadequate legal remedies given the Court previously identified this deficiency and Plaintiffs failed to cure it.  However, the Court will not dismiss *all* equitable claims for this reason given Defendants' failure to raise this argument in their previous motions.  The alleged facts already allow for an inference of inadequate legal remedies, but as the Court made clear, it reads binding Ninth Circuit precedent as mandating an explicit allegation to that effect.  Plaintiffs will be granted leave to amend to *explicitly* allege inadequate legal remedies and *must* do so to sustain any equitable claims against Defendants.

- The CL Motion is **DENIED** to the extent it seeks dismissal of Claim 2 for unfair conduct against all Moving Defendants under California's Unfair Competition Law.  The Court is unwilling to conclude that the utility of Defendants' conduct outweighs the harm to investors as a matter of law. While Defendants may be able to establish utility or Plaintiffs may fail to establish unavoidable and substantial harm on a full record, the Court cannot make that assessment on the pleadings.

- The CL Motion is **GRANTED** *with leave to amend* to the extent it seeks dismissal of Claim 9 for Aiding and Abetting because the Court remains unsure what primary wrong the Aiding and Abetting claim is meant to serve, given Plaintiffs have alleged violations of the state consumer laws directly against the Promoter Defendants.  As such, the Court declines to reach the issue of knowledge.

- The CL Motion is **GRANTED** *with leave to amend* to the extent it seeks dismissal of the prayer for injunctive relief because Plaintiffs fail to allege that they face imminent future injury.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

- The Kardashian Motion is **DENIED** to the extent it seeks dismissal of Claims 1 and 3-7 based on her EMAX social media posts as Plaintiffs have adequately alleged that the May Post was literally false (i.e., Club Liv and Story never had the capability to accept EMAX Tokens) and that the June Post was misleading (i.e., it falsely suggested that the EMAX Tokens were scarce).  The Court is not persuaded that Plaintiffs must plead Kardashian's knowledge of the falsity of her claims given the allegations concern affirmative misrepresentations.

- The Mayweather Motion is **GRANTED** *without leave to amend* to the extent it seeks dismissal of Claims 1, 3, and 5-7 based on Mayweather's statement at the Bitcoin 2021 conference because it was a statement of his "belief" regarding the future growth of EMAX, which is quintessential nonactionable puffery.  The Mayweather Motion is **GRANTED** *with leave to amend* to the extent it seeks dismissal of the same claims based on Mayweather's failure to disclose that he was being paid to promote EMAX because Plaintiffs fail to establish a duty to disclose and to otherwise allege the fraud-by-omission claim with the requisite specificity.

- The Pierce Motion is **DENIED** to the extent it seeks dismissal of Claims 1, 3, and 5-7 based on Pierce's tweets claiming he "made more money" from EMAX in a month than he did in a year from his ESPN contract and/or that he was investing in EMAX for the "long haul."  The SAC gives rise to reasonable inferences of deception, materiality, and reliance as to both statements.  The Pierce Motion is **GRANTED** *with leave to amend* to the extent it seeks dismissal of the same claims based on the June 6th tweet, given Plaintiffs have not pled exposure and reliance on that tweet.

- The Perone Motion is **GRANTED** *with leave to amend* to the extent it seeks dismissal of Claims 1, 3, and 5-7 because the statements Plaintiffs attribute to Perone are nonactionable puffery and/or premised on a fraud-by-omission theory (but fail to establish Perone's and/or the Company's

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

duty to disclose).  The Court accepts Plaintiffs' arguments concerning
alter ego between Perone and the Company, but Plaintiffs should
specifically plead that it is seeking to hold Perone and the Company liable
under an alter ego theory in the amended Complaint.

- The Rechnitz Motion is **GRANTED** *with leave to amend* to the extent it
  seeks dismissal of Claims 1, 3, and 5-7 given Plaintiffs fail to identify a
  single public EMAX promotion that is plausibly attributable to Rechnitz.

- The Rechnitz MTS is **GRANTED** *in part* and **DENIED** *in part*.  The
  Court **STRIKES** the allegations in the SAC concerning Rechnitz's
  unrelated guilty plea and sentencing; the alleged ongoing federal
  investigation for unspecified conduct; and the counterfeit watch dispute
  (particularly given the dispute arose after the Relevant Period).  (*See* SAC
  ¶¶ 42 at 11:11, 43-49, 54 at 14:16-18, 105, 164 at 57:5-13, 165, and 167).
  The MTS is otherwise **DENIED** given the remainder of the allegations
  Rechnitz seeks to strike tend to demonstrate the nature of the connections
  between Rechnitz and other Defendants and/or tend to make the
  allegations in the SAC more plausible by showing a pattern of conduct /
  lack of accident.  The Court cannot say that such allegations have no
  bearing on the facts of this action.  Whether evidence of those allegations
  is admissible is a separate question that the Court does not reach.

- The Pierce RJN is **GRANTED** as unopposed.  Plaintiffs' RJN is
  **GRANTED** but only to the extent it seeks judicial notice of the fact that
  the Securities Exchange Commission ("SEC") made certain statements in
  the press or took certain actions against Pierce for his role in promoting
  EMAX.  The Court does not accept the SEC's statements regarding
  Pierce's conduct for the truth of the matters asserted as that would
  impermissibly allow Plaintiffs the ability to amend the SAC through their
  Opposition.

Plaintiffs are warned that they will have *one, and only one,* opportunity to cure
the deficiencies in the SAC.  There will be no Fourth Amended Complaint.  Therefore,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

Plaintiffs must put their best foot forward in any amended Complaint.  The Court notes that it is particularly concerned with the clarity and quality (not quantity) of the allegations.  Plaintiffs artfully cured the reliance/causation deficiencies in the SAC, and the Court expects the same attention to detail to be given to any other identified deficiency in the next iteration of the Complaint.

## I.   **BACKGROUND**

The Court previously summarized the central facts of this action in its Order Granting Defendants' Omnibus Motion to Dismiss.  ("Prior Order" (Docket No. 99)).  The Court incorporates by reference the Background Section of the Prior Order and limits its recitation of the facts to those necessary for context and to summarize the new allegations in the SAC.

EthereumMax ("EMAX") is a cryptocurrency project centered around the EthereumMax tokens ("EMAX Tokens" or "Tokens"), a blockchain-based digital asset.  (SAC ¶¶ 31-32).  EMAX Tokens function like other digital cryptocurrencies; they can be traded, spent, or otherwise transacted between token holders.  (*Id.* ¶ 32).  EMAX Tokens were sold on decentralized exchanges, like Uniswap, that allow anyone to list and sell their tokens.  (*Id.* ¶ 33).  Decentralized exchanges such as Uniswap are known as "automated market makers," which use liquidity pools and smart contracts to allow investors to exchange one asset for another without a direct counterparty.  (*Id.* ¶ 34).  When executing a trade on Uniswap, an investor is trading against the liquidity in the liquidity pool.  (*Id.*).  In order to execute trades on a decentralized exchange, users must pay "gas fees" in order to process the transaction on the Ethereum blockchain.  (*Id.*).  The gas fee can be significant, as it factors in the amount of computing power needed to process the transaction, as well as the amount of traffic on the network.  (*Id.*).

EMAX Token launched on May 14, 2022, with a transaction volume of $16.11 million and a price of $0.00000005875 per EMAX Token.  (*Id.* ¶ 58).  Liquidity pools were created on Uniswap to allow users to purchase EMAX Tokens by swapping another cryptocurrency, called Ether.  (*Id.* ¶ 59).  Wallets associated with Defendants continually provided EMAX Tokens to the pool as retail investors provided Ether to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

purchase EMAX Tokens.  (*Id.*).  At the time of launch, the EMAX Tokens were not
sold pursuant to a "whitepaper."  (*Id.* ¶ 60).  Whitepapers in cryptocurrency are
documents released by the founders of the project that give investors technical
information about its concept, and a roadmap for how it plans to grow and succeed.
(*Id.*).  Subsequently, however, EMAX did release a whitepaper in October 2021, which
explained the business model for EMAX.  (*Id.* ¶ 61).  Plaintiffs allege that the
whitepaper reveals that EMAX's "entire business model relies on using constant
marketing and promotional activities, often from 'trusted' celebrities, to dupe potential
investors into trusting the financial opportunities available with EMAX Tokens."  (*Id.* ¶
63).

##    A.    __Original Claims and Prior Order__

        In the previous iteration of the Complaint, Defendants Justin Maher, Steve
Gentile, Mike Speer, Justin French, and Giovani Perone were collectively referred to as
"Executive Defendants," as they were allegedly the co-founders and/or key consultants
for EMAX during the relevant time.  Defendants Kim Kardashian, Floyd Mayweather,
Jr., Paul Pierce, Russell Davis, and Antonio Brown were collectively referred to as the
"Promoter Defendants" and Plaintiffs alleged that they conspired with the Executive
Defendants to artificially inflate the price of the EMAX Tokens.  There were nine
named Plaintiffs who sought to bring a putative class action against Corporate
Defendant X (the "corporate entity" behind EMAX), the Executive Defendants, and the
Promoter Defendants.  Plaintiffs alleged that they purchased EMAX Tokens between
May 14, 2021, and June 27, 2021 (the "Relevant Period") and suffered damages as a
result.  Plaintiffs brought ten claims for relief including a claim under the federal
Racketeer Influenced and Corrupt Organizations Act ("RICO") against all Defendants
as well as claims for violations of the state consumer laws of California, New York,
Florida, and New Jersey.

        In the Prior Order, the Court granted the moving Defendants' Omnibus Motion
in full and denied all but one of the Individual Defendants' Motions as moot (granting
Defendant Gentile's motion for lack of personal jurisdiction).  (Prior Order at 3-4).
The Court dismissed with leave to amend the RICO claim concluding Plaintiffs failed

---

**CIVIL MINUTES—GENERAL**                                                    **8**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

to adequately allege RICO standing and to plausibly allege a RICO enterprise amongst
the various Defendants.  (*Id*. at 4).  The Court also questioned whether the Private
Securities Litigation Reform Act ("PSLRA") barred Plaintiffs' RICO claims and
instructed the parties to address that issue in the next iteration of the Complaint and any
motions to dismiss.  (*Id*. at 23-24).  The Court further dismissed with leave to amend
each of the claims under the various state consumer laws because Plaintiffs failed to
adequately plead actual reliance and/or causation.  (*Id*. at 4).  The Court reached that
holding because Plaintiffs had not specified which promotions they saw nor did they
specify when each Plaintiff purchased the EMAX Tokens.  (*Id.* at 34).  The other state
law claims were dismissed with leave to amend, except for the claim under California's
Consumer Legal Remedies Act ("CLRA"), which was dismissed without leave to
amend because the Court concluded it did not apply to intangible goods.  (*Id.* at 4).

## B.    New Allegations and Claims in SAC

Plaintiffs substantially amended the previous Complaint, adding over 100 pages
of new allegations.  Plaintiffs have dropped their RICO claim but added four claims for
securities violations under California and Florida law.  (SAC ¶¶ 367–376, 385–489
(securities claims under Cal. Corp. Code §§ 25401, 25402, 25403, 25404, 25110 and
Fla. Stat. § 517.07)).

Further, the SAC adds a new named Plaintiff, Michael Buckley, a California
resident.  (*Id.* ¶ 14).

The SAC also adds two Defendants, EMAX Holdings, LLC ("the Company"),
and Defendant Jona Rechnitz, who is allegedly part of the group of "Executive
Defendants," and who served as a "consultant, recruiter, and spokesman" for EMAX.
(*Id.* ¶¶ 19, 25).  Rechnitz allegedly has long standing relationships with several of the
Promoter Defendants, including Defendants Kardashian and Mayweather.  Rechnitz
allegedly played an instrumental role in securing those Promoter Defendants'
agreements to shill EMAX without disclosing their connections to him or the payments
they received.  (*Id.* ¶ 42).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

Further, the SAC identifies a Confidential Witness ("CW1") who is allegedly a "former social acquaintance" of Rechnitz and Mayweather who frequently socialized with those in the "Rechnitz orbit."  (*Id.* ¶ 94).  Plaintiffs further allege that CW1 has personally conducted or explored business dealings with Kardashian and Mayweather. (*Id.*).

The SAC also adds substantial specificity to the previous allegations.  The new allegations include substantial details regarding the specific promotion each named Plaintiff saw; when each Plaintiff made his or her purchase of EMAX Tokens; why each Plaintiff relied on those statements when doing so; and how each Plaintiff would have been aware of the omitted information and behaved differently had it been disclosed.  Plaintiffs also add new allegations that tend to make more plausible the idea that each Defendant was aware that they were touting a worthless Token in order to sell off the Tokens and make a quick profit on the heels of the celebrity promotions.  For instance, Plaintiffs now allege that non-moving Defendant Davis has stated publicly that the Executive Defendants were "literally in there to pump and dump" and though certain Executive Defendants said "the wallets were locked, they were not."  (*Id.* ¶ 40). Davis hinted that he was referring specifically to Defendant Perone.  (*Id.*).

As for CW1, Defendant Rechnitz allegedly tried to recruit CW1 into the scheme around the time of Pierce's promotions.  (*Id.* ¶ 95).  According to CW1, Rechnitz demonstrated how he made trades immediately following a celebrity promotion to make a quick profit.  (*Id.* ¶ 97).  As he was demonstrating his trades, CW1 allegedly observed Rechnitz jump out of his seat and "danc[e] in a circle [] chanting 'pump and dump . . . pump and dump' in an apparent victory dance."  (*Id.*).  Defendant Rechnitz also allegedly confirmed to CW 1 that his celebrity promoter cohorts "were aware that they were shilling the dubious EMAX Tokens for his (and their collective) benefit." (*Id.* ¶ 96).  CW1 inquired as to why the celebrities would engage in such solicitations, and Rechnitz explained that the Executive Defendants gave the Promoter Defendants millions of Tokens.  (*Id.*).  According to CW1, Rechnitz was constantly in touch with the Promoter Defendants, including Defendant Kardashian who Rechnitz allegedly spoke with every few days during the Relevant Period.  (*Id.*).  Further, Plaintiffs have

CIVIL MINUTES—GENERAL                                              10

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

been able to identify the exact time and amount of certain allegedly improper trades by both Rechnitz and Pierce.  (*Id.* ¶¶ 98-100, 77-91).

Based on the above allegations and those in the original Complaint, Plaintiffs assert 13 claims for relief.   Specifically, Plaintiffs bring four securities claims under the following "State Securities Laws:"

1.    California Common Law Conspiracy to Commit Insider Trading (Cal. Corp. Code § 25402) (against Perone, Rechnitz, Mayweather, and Pierce) (Claim 8);
2.    Fraudulent and Prohibited Securities Practices under California Law (Cal. Corp. Code §§ 25110, 25401, 25403, 25404, and 25400) (against the Company and Executive Defendants) (Claim 10);
3.    Insider Trading under California Law (Violation of California Corporations Code section 25402 (against Perone, Rechnitz, Maher, Mayweather, and Pierce) (Claim 11); and
4.    Sale of Unregistered Securities under Florida Law (Violation of Fla. Stat. § 517.07) (against the Company and Executive Defendants) (Claim 12).

Plaintiffs also bring nine claims under the state consumer laws of California, Florida, New Jersey, and New York ("State Consumer Laws") and California common law as follows:

1.    California Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code § 17200, *et seq*.) (against all Defendants) (Claims 1–3 under the unlawful, unfair, and fraudulent prongs);
2.    California False Advertising Law ("FAL") (Cal. Bus. & Prof. Code § 17500, *et seq*.) (against Defendant Kardashian) (Claim 4);
3.    Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Ch. 501, § 17200, Fla. Stat.) (against all Defendants) (Claim 5);
4.    New York General Business Law ("NYGBL") (Art. 22-A, § 349, *et seq*.) (against the Executive Defendants and Pierce, Brown, Mayweather, and Kardashian) (Claim 6);

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

5.     New Jersey Consumer Fraud Act ("NJCFA") (NJSA 56:8-1, *et seq*.)
       (against the Executive Defendants and Mayweather and Kardashian
       (Claim 7)
6.     California Common Law Aiding and Abetting (against Maher and
       Promoter Defendants) (Claim 9);
7.     California Common Law Unjust Enrichment/Restitution (against all
       Defendants) (Claim 13).

Defendants Kardashian, Mayweather, Pierce, Rechnitz, Perone, and the
Company all move to dismiss all claims against them.

## II.     LEGAL STANDARDS

"Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a
cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable
legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013). "Federal Rule
of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim
showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice
of what the . . . claim is and the grounds upon which it rests . . . .'" *Bell Atl. Corp. v.
Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47
(1957)).

In ruling on the Motion under Rule 12(b)(6), the Court follows *Twombly*,
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and their Ninth Circuit progeny. "To survive a
motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a
claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*,
550 U.S. at 570). The Court must disregard allegations that are legal conclusions, even
when disguised as facts. *See id*. at 681 ("It is the conclusory nature of respondent's
allegations, rather than their extravagantly fanciful nature, that disentitles them to the
presumption of truth."); *Eclectic Properties E., LLC v. Marcus & Millichap Co*., 751
F.3d 990, 996 (9th Cir. 2014). "Although 'a well-pleaded complaint may proceed even
if it strikes a savvy judge that actual proof is improbable,' plaintiffs must include
sufficient 'factual enhancement' to cross 'the line between possibility and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

plausibility.'" *Eclectic Properties*, 751 F.3d at 995 (quoting *Twombly*, 550 U.S. at 556–57) (internal citations omitted).

The Court must then determine whether, based on the allegations that remain and all reasonable inferences that may be drawn therefrom, the complaint alleges a plausible claim for relief. *See Iqbal*, 556 U.S. at 679; *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011).  "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

Fraud-based claims are governed by Rule 9(b).  *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (Rule 9(b) standard applies to California consumer protection claims, including under the CLRA and UCL).  "Rule 9(b) demands that, when averments of fraud are made, the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge[.]" *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal citations omitted).  Under Rule 9(b), fraud allegations must include the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citing *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)).  In other words, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess*, 317 F.3d at 1106. Such averments must be specific enough to "give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Id.*  (quoting *Bly–Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)).

Whereas allegations concerning the circumstances of fraud must include the "the who, what, when, where, and how of the misconduct charged," *Id.* (internal quotation marks and citations omitted), issues of "[m]alice intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

### III.     DISCUSSION

In some respects, it is as if the Prior Order and motion to dismiss briefing never happened.  The Court is essentially dealing with an entirely new Complaint, with new Defendants and several new claims (none of which Plaintiffs sought leave to add).  Likewise, Defendants casually raise arguments that could have been, but were not, previously raised in the first round of motions, without even addressing why this Court should allow their successive Rule 12(b)(6) arguments despite Rule 12(g)(2).  *See In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 317-18 (9th Cir. 2017), *aff'd sub nom. Apple Inc. v. Pepper* 139 S. Ct. 1514 (2019) ("Rule 12(g)(2) provides that a defendant who fails to assert a failure-to-state-a-claim defense in a pre-answer Rule 12 motion cannot assert that defense in a later pre-answer motion under Rule 12(b)(6)," but the defense may be asserted "only in a pleading under Rule 7, in a post-answer motion under Rule 12(c), or at trial[.]"); *Coles Valley Church v. Oregon Land Use Bd. of Appeals*, No. 6:20-CV-00661-MK, 2021 WL 1950181, at *8 (D. Or. May 14, 2021) (noting that while the Ninth Circuit has indicated that it will be "forgiving" over a district court's decision to entertain a successive Rule 12(b)(6) motion when it is done in the interest of efficiency, *In re Apple* "does not stand for the blanket proposition that district courts may freely flout the Federal Rules whenever a party asks them to do so").

The Court has considered Plaintiffs' new claims and Defendants and has similarly considered Defendants' successive Rule 12(b)(6) arguments in the interest of efficiency and out of fairness to both sides.  The Court also recognizes that certain of the new claims and arguments directly arise out of this Court's reasoning in the Prior Order.  Nonetheless, going forward, the Court expects that the only issues that should be raised by any future motion to dismiss should be whether Plaintiffs have cured identified deficiencies in the Complaint.  Defendants must bring all other Rule 12(b)(6) arguments pursuant to the appropriate procedural mechanism under the Federal Rules.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

### C.   Securities Laws

Plaintiffs bring four securities claims against certain Defendants under California's and Florida's securities laws (Claims 8, 10, 11, and 12).  Defendants contend that a claim for conspiracy to commit insider trading (Claim 8) does not exist under California law and Plaintiffs do not respond to that argument.  Therefore, the Court deems the argument conceded.  Accordingly, the Motion is **GRANTED** *without leave to amend* Claim 8 given Plaintiffs do not defend it as a valid cause of action.

The Court addresses the three other claims for relief under the State Securities Laws below.  The Court notes that Defendants do not specifically move to dismiss any of the securities claims based on an argument that the Tokens do not constitute a "security," but they "reserve the right to contest" such an allegation at later stages of the litigation.  (Securities Motion at 1 n.1).  Therefore, at least for purposes of this section of the Order, the Court has assumed the EMAX Tokens are securities.

### 1.   Violations of the California Corporate Securities Law

### a.  Privity

Defendants' central argument for dismissal of the securities claims is that Plaintiffs have not and cannot allege privity between themselves and any Defendant.  Given the way Uniswap is alleged to work (the decentralized trading platform on which EMAX was bought and sold), if this theory were accepted, no plaintiff could ever allege privity based on the purchase of a security on Uniswap.  In the Court's view, that conclusion would essentially amount to a disguised contention that the EMAX Tokens are not in fact securities under California law, because almost all of the California securities provisions that provide a right of action limit the class of defendants to those from whom, or to whom, the securities were purchased.

Plaintiffs generally allege that they "purchased Tokens from Defendants" (SAC ¶ 439) but Defendants contend that such an allegation is contradicted by the more specific allegation regarding the innerworkings of the trading platform.  (Securities

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

Motion at 3).  As noted, the EMAX Tokens were exclusively available on a platform
called Uniswap, which is a "decentralized exchange," which "allow investors to
exchange one asset for another ***without a direct counterparty***."  (SAC ¶ 34) (emphasis
added).  Instead, investors execute trades against the liquidity in the liquidity pool.
(*Id.*).  Plaintiffs allege that they bought tokens from the liquidity pool and that "wallets
associated with Defendants" contributed Tokens to that liquidity pool.  (*Id.* ¶ 59).
Defendants contend that because each Plaintiff purchased from the liquidity pool rather
than from a specific Defendant, the securities claims fail for lack of privity.  (*See*
Securities Motion at 3 n.5).

        To better situate Defendants' argument, the Court provides a brief overview of
the relevant sections of California's Securities Law.  The first relevant section is the
provision making it unlawful to offer or sell securities without being "qualified" based
on certain requirements (which is akin to the registration requirement under federal
securities law).  *See* Cal. Corp. Code § 25110 (the "Qualification Section").  Plaintiffs
appear to contend that the Company and the Executive Defendants violated the
Qualification Section by listing the EMAX Tokens on the Uniswap trading platform
without qualifying the Tokens as securities in accordance with California law.  (*See*
SAC ¶ 385) (listing Qualification Section as part of Claim 10).

        California's Securities Law also has a provision that creates three types of
"fraudulent and prohibited practices" in the purchase and sale of securities.
Specifically, section 25400 prohibits, among other things, false and misleading
statements designed to manipulate the securities' markets (the "Manipulation
Section").  *See California Amplifier, Inc. v. RLI Ins. Co.*, 94 Cal. App. 4th 102, 108,
113 Cal. Rptr. 2d 915 (2001) (citing *Diamond Multimedia Systems, Inc. v. Superior
Court*, 19 Cal. 4th 1036, 1049, 80 Cal. Rptr. 2d 828 (1999)).  "'Market manipulation,'
essentially a term of art, covers fraudulent practices such as wash sales, matched
orders, and rigged prices, that are intended to mislead investors by artificially creating
market activity in a security."  *Id.* (internal citations omitted).  Section 25401 is a
broader section that prohibits misrepresentations in connection with the purchase or
sale of securities (the "Misrepresentation Section") (similar to Rule 10(b)-5 under

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

federal securities law).  *Id.* at 108-09.  Then, section 25402 prohibits insider trading
(the "Insider Trading Section").  *Id.* at 109.

Plaintiffs appear to bring claims against the Company and the Executive
Defendants under the Manipulation and Misrepresentation Sections, and Insider
Trading Section claims against Perone, Mayweather, Rechnitz, Maher, Mayweather,
and Pierce.  (*See* SAC ¶ 385) (Claim 10) (listing violations of several different sections
of California's Securities Law against EMAX and the Executive Defendants); *see id.* ¶
434 (Claim 11) (alleging claim for Insider Trading violations against specific
Defendants)).

Each of the substantive violation sections has a corresponding section which
establishes a private remedy for damages.  (Section 25503 for section 25110 violations
(Qualification Sections); section 25500 for section 25400 violations (Manipulation
Sections); section 25501 for section 25401 violations (Misrepresentation Sections); and
section 25502 for section 25402 violations (Insider Trading Sections).

Additionally, sections 25504 and 25504.1 create secondary liability, but only for
specific individuals and specific substantive sections, including the Qualification
Section and the Misrepresentation Section.  Specifically, section 25504 makes the
following people liable for Qualification Section violations: "a principal executive
officer or director of a corporation so liable, every person occupying a similar status or
performing similar functions, every employee of a person so liable who materially aids
in the act or transaction constituting the violation, and every broker-dealer or agent
who materially aids in the act or transaction constituting the violation."  Cal. Corp.
Code § 25504.  Section 25504.1 makes anyone who, with "intent to deceive or
defraud," "materially assists" the primary perpetrator of a Misrepresentation Section
violation.  *See id.* § 25504.1.  There does not appear to be a provision providing for
secondary liability for the Insider Trading Section or Manipulation Section, which
means secondary liability is unavailable for those violations because the law makes
clear that there is no liability for securities violations "[e]xcept as explicitly provided"
by statute.  *See id.* § 25510; *see also AREI II Cases*, 216 Cal. App. 4th 1004, 1014, 157

CIVIL MINUTES—GENERAL                                              17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

Cal. Rptr. 3d 368 (2013) (noting that the purpose of section 25510 "is to prevent the courts from using other provisions of the statute to create implied causes of action[.]").

As further explained by the California Court of Appeal, "[t]he purpose of the Act . . . is to create statutory liability that eliminates some of the elements of common law fraud, but balances this expansion of liability by placing other restrictions on recovery." *See California Amplifier*, 94 Cal. App. 4th at 109 (internal citations omitted).  For instance, section 25500, the private right of action for the Manipulation Section, extends liability to *all* persons affected by market manipulation without requiring reliance or privity, though the manipulation must be at least reckless. *Id.*  On the other hand, the Misrepresentation and Insider Trading Sections extend liability to some negligent conduct but retain the privity requirement from common law fraud. *Id.* And even though sections 25504 and 25504.1 create secondary liability against defendants who may not have a direct relationship with the plaintiff, courts have required that secondary liability be premised on a primary violation in which privity has been demonstrated. *See, e.g.*, *Moss*, 197 Cal. App. 4th 860, 878, 129 Cal. Rptr. 3d 220 (2011) ("While we agree ... that ordinary principles of rescission require strict privity in order to rescind contracts ... we conclude that the Legislature, when it enacted sections 25504 and 25504.1, intended to depart from those principles by placing these certain secondary actors in the shoes of the principal violator for the purpose of civil liability *as long as the original direct violator was in privity with the plaintiff*.") (emphasis added); *see also Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1064 (N.D. Cal. 2013) ("[I]n the absence of a viable claim of primary liability, plaintiff cannot state a claim against the D & O defendants for control person liability under § 25504[.]").

In sum, almost all of the provisions explicitly providing causes of action for the substantive sections of California's Securities Law require there to be privity between *someone* and the plaintiff in order for the plaintiff to recover for securities violations. The only section of California securities law that does not appear to have a privity requirement is the Manipulation Section. *See California Amplifier*, 94 Cal. App. 4th at 109.  Therefore, if the Court were to agree with Defendants that the lack of an explicit counterparty on the Uniswap platform prohibits a finding of privity, no plaintiff that purchases cryptocurrency from such a platform will ever be in privity with any other

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

person.  In other words, even if the Court were to conclude that the Tokens are
securities, as it assumes here, violators of the securities laws would escape liability
merely because advanced technology has eliminated the need to deal directly with a
counterparty.

        While the Court acknowledges that the privity requirement undoubtedly is meant
to limit exposure for securities violations to a finite group of defendants, the Court does
not read the privity requirement as intending to eliminate exposure to any defendant.
And the Court is mindful that because the California securities laws are "designed for
the protection of purchasers and other members of the public, it is to be construed
liberally to effect that purpose" and "should not be given a technical construction that
would invalidate contracts and enable promoters to evade repayment of money
received[.]"  *See* Blum & Holben, 57 Cal. Jur. 3d Securities Regulations § 13 (May
2023 Update) (collecting cases).

        Unfortunately, this precise issue – how to assess the privity requirement in the
context of a decentralized cryptocurrency exchange – is not a widely discussed issue in
the case law given the relatively new type of technology involved.  Fortunately,
however, the Court is not the very first to have considered the issue.  Indeed, Plaintiffs
identify one case that has dealt with this precise issue.  Because it is the only instructive
case, the Court details the facts and reasoning of the relevant order in some depth.

        In *Zakinov v. Ripple Labs, Inc*., No. CV 18-06753-PJH, 2020 WL 922815, at *1
(N.D. Cal. Feb. 26, 2020), the plaintiff brought claims under the Qualification and
Misrepresentation Sections of the California securities law against two corporate
defendants and their CEO.  Defendants sold XRP, which like EMAX Tokens were a
form of cryptocurrency sold on a cryptocurrency exchange.  *Id*. at *1-*3.  The single
lead plaintiff of the putative class action alleged that he purchased roughly 129,000
units of XRP for about $307,700.00 in other cryptocurrencies "from [the] defendants"
and sold the cryptocurrency for a $118,100 loss.  *Id.* at *3.  Similar to the situation
here, the defendants did not contest, for the purpose of the motion to dismiss, that the
cryptocurrency was a security.  *Id.* at *2.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

_____

However, with respect to the Qualification Violation, the *Ripple* defendants argued in relevant part that the claim failed because (1) the plaintiff failed to allege that he purchased his XRP as part of an "issuer transaction" and (2) the plaintiff failed to allege that he purchased his XRP from the defendants, in satisfaction of the purported privity requirement.  *Id*. at *14.  Although Defendants here do not make the "issuer transaction" argument, the Court discusses *Ripple*'s analysis of the issue because it bears on the privity argument.

The *Ripple* court noted that the California Supreme Court has concluded (albeit in dicta) that Qualification Violations are limited to the sale of "unqualified securities made as part of an 'issuer transaction'" as opposed to "aftermarket transactions."  *Id*. (citing *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1104, 23 Cal. Rptr. 2d 101 (1993)).  The California Securities Law defines a "nonissuer transaction" as any transaction that is not directly or indirectly for the benefit of the issuer.  *Id.* (citing Cal. Corp. Code § 25011).  A transaction is indirectly for the benefit of the issuer if any portion of the purchase price of any securities involved in the transaction will be received indirectly by the issuer.  *Id*.  The law further provides that an offering which involves both an issuer transaction and a nonissuer transaction is treated for certain purposes as an issuer transaction.  *Id*. at *15.  The *Ripple* court reasoned that, because the defendants decided to list XRP on a cryptocurrency exchange and listing the currency on such an exchange undeniably benefited the defendants, listing the XRP on the exchange qualified as an issuer transaction, and therefore, "any purchase of XRP by plaintiff on an exchange" qualified as an "issuer transaction."  *Id.*

Next, the *Ripple* court reasoned that the plaintiff had sufficiently alleged privity for purposes of the pleading stage.  Specifically, the court noted that, "plaintiff allege[d] that he, along with members of the putative class, purchased XRP securities from defendants." *Id.* at *16 (citation omitted).  The court noted that while the plaintiff did "not specify a direct purchase" from the defendants, the allegations also did "not foreclose any inference of such purchase."  *Id.*  Rather, the court concluded that the plaintiff's "129,000 XRP unit purchase during 2018 Q1, when compared to defendants sale of 0.095 percent of the XRP traded on the market that quarter, support[ed] the inference that plaintiff purchased approximately 122 XRP units from defendant[.]"  *Id.*

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

The court also noted that the more "glaring issue" presented by the privity argument was "to what extent may [the] defendants be considered in privity with an exchange purchaser when a subsequent purchase qualifies as part of an issuer transaction under section 25011". *Id.*  The court noted that at the pleading stage the "relationship between defendants, subsequent purchasers, and the exchange [wa]s unclear," and therefore, the court concluded the allegations were sufficient to allege privity regardless of whether the plaintiff would ultimately be able to prove it. *Id.*

The Court reads *Ripple* as suggesting that there are potentially two ways of proving privity on decentralized cryptocurrency exchanges.  First, if the amount of people or entities selling or providing the cryptocurrency to the liquidity pool is finite, one may be able to determine with reasonable certainty what percentage of the liquidity pool was provided by the specific defendants at any given time.  If so, it may be possible to determine who is the relevant defendant(s) providing the cryptocurrency to the pool at the time in which the plaintiff makes a relevant purchase from the pool, even in the absence of a direct contract linking the two parties.  Second, more broadly speaking, to the extent that the issuers of the cryptocurrencies are benefiting from making the asset available on the exchange, there may be an argument that privity exists between the issuers and all those making purchases from the exchange.

The parties focus primarily on the first method of proving privity.  Defendants contend that *Ripple* involved "far more specific allegations than those here" because the court was able to reason that some percentage of the plaintiff's XRP came from the defendants based on the specific amounts allegedly bought and sold into/out of the exchange from the defendants and the plaintiff.  (Reply at 2).  By contrast, Defendants contend that Plaintiffs specifically allege that the liquidity pools do ***not*** provide for a "counterparty" and therefore Plaintiffs' own allegations foreclose an inference that Plaintiffs bought any alleged security directly from any Defendant.  (*Id.*).

The Court is not persuaded.  The plaintiff in *Ripple* was able to allege specific allegations regarding how much the defendants had sold of the XRP because those defendants were transparent about their holdings and sales and listed how much they sold each quarter according to a specific investment plan.  *See Ripple*, 2020 WL

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

922815 at *4.  Here, the nature of Plaintiffs' allegations is that the Executive
Defendants intentionally obscured their ownership interests and trade activities, which
furthered their ability to orchestrate the pump-and-dump scheme.  (*See*, *e.g.,* SAC ¶
355(a)).  Moreover, rather than being less specific than the plaintiff in *Ripple*,
Defendants actually rely on Plaintiffs' ***more specific*** allegations regarding the
mechanics of the exchange to try to plead them out of the securities claims.  The Court
does not view the facts that Defendants were intentionally obscure and utilized a
particularly anonymous platform as suggesting persuasive reasons to reach a different
result than in *Ripple*.

        It seems plausible, based on the SAC allegations, that the Tokens in the liquidity
pool were provided or sold into the pool by the Executive Defendants, given they
allegedly created the liquidity pool and launched the pool with a massive amount of
trading volume within the first day.  (*See* SAC ¶ 58) ("On May 14, 2021, the Executive
Defendants launched the EMAX Tokens with a transaction volume of $16.11 million
and a price of $0.00000005875, according to data from CoinMarketCap[.]").  EMAX
Tokens did not just miraculously appear in the liquidity pool; rather, it is a reasonable
inference that Executive Defendants had to provide the pool with liquidity.  And
Plaintiffs specifically allege that the Executive Defendants manipulated the price of
EMAX Tokens in the early days of the EMAX launch by engaging in wash trading
(which the Court understands as engaging in fake purchases and sales of the Tokens to
create the appearance of organic trading activity).  (*Id.* ¶ 430).  Therefore, it is
plausible, if not likely, that many of the Tokens in the pool were provided by the
Executive Defendants.

        The Court is also interested in the idea suggested by the *Ripple* court that, to the
extent the issuer is benefiting per sale on the exchange, there may be an argument that
the issuer is to some extent in privity with ***each*** exchange purchaser.  Further
supporting this idea is Plaintiffs' allegation that users must pay "gas fees" in order to
process their transactions on the exchange.  (*See* SAC ¶ 34).  To the extent that these
fees are being paid to the issuers of the Tokens (i.e., those who created the liquidity
pools or put the initial liquidity Tokens into the pool to create the market), there is a
plausible argument that anyone receiving such a gas fee is in "privity" with each

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

exchange purchaser since a portion of the purchase price of the Tokens is going to the fees.  (*See id.*; *see also id.* ¶ 59 ("Wallets associated with Defendants continually provided EMAX Tokens to the pool as retail investors provided Ether [another more valuable cryptocurrency] to purchase EMAX Tokens.").   While this concept might not enable Plaintiffs to recover the entire price paid for the EMAX Tokens, it could potentially support recovery of the fees paid to the liquidity providers.

At the hearing, counsel inquired whether the Court's tentative ruling on privity suggested that Plaintiffs would need to produce evidence of privity or if the Court was accepting the allegations of privity at face value.  The Court clarified that Plaintiffs will certainly have to prove privity at some point.  The Court is merely ruling that it cannot now determine a lack of privity as a matter of law, based on the existing allegations.

The concept of privity will need to be substantially fleshed out by Plaintiffs and will likely need to be supported by expert testimony or other appropriate evidence to survive summary judgment.  But, at this stage, the Court does not expect Plaintiffs to provide an expert-level analysis of the mechanics of the Uniswap exchange.  In the absence of contrary authority, the Court declines to conclude that the gas fees cannot constitute some form of "privity" to support a securities claim under California law.  Rather, the facts give rise to a plausible inference that the Executive Defendants received "gas fees" from each exchange purchaser and that could support a finding of privity to some extent.  Perhaps on a fuller, expert-informed record (and in the face of more developed legal arguments), the Court will take a different view.  But for now, the allegations are sufficient.

Accordingly, the Motion is **DENIED** to the extent it seeks dismissal of the securities claims against the Company and the Executive Defendants based on lack of privity.

As for the allegations of privity against the moving Promoter Defendants, Mayweather and Pierce, the Court concludes that the facts are sufficiently plausible at this stage as to Pierce but not Mayweather.  As the court in *Ripple* reasoned, there could be a plausible argument that the Tokens Plaintiffs' purchased were the same

---

**CIVIL MINUTES—GENERAL**                                                    23

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

Tokens Pierce sold off given the massive number of Tokens he is alleged to have sold on dates in which certain Plaintiffs purchased Tokens.  For instance, Plaintiff Shah and Plaintiff Puda purchased EMAX Tokens on May 29, 2021.  (*See* SAC ¶ 200; *id.* ¶ 300). Plaintiffs simultaneously allege that on that date Pierce "enacted 118 sells, totaling approximately 8.4 trillion EMAX Tokens that were valued at around $5,500,000."  (*Id.* ¶ 85).  It is plausible that Plaintiffs will be able to determine with some degree of certainty whether a percentage of their purchases came from the 8.4 trillion Tokens sold into the pool by Pierce on May 29th.

Admittedly, the Court does not know if the alleged amounts of Tokens sold by Pierce on any given day represents a large enough portion of the total universe of Tokens to be able to calculate whether the individuals likely received their Tokens in part from the Tokens Pierce sold into the pool.  But given the complex and technical nature of the exchange, the Court will accept the allegations as raising a plausible inference of privity between Plaintiffs and Pierce.  The Court likely needs expert or some sort of statistical analysis to conclusively determine otherwise.

Accordingly, the Motion is **DENIED** to the extent it seeks dismissal of the securities claims against Pierce based on lack of privity.

As for Mayweather, however, the allegations are too sparse regarding his sale or contribution of EMAX Tokens to the liquidity pool to raise a plausible inference of privity.  Plaintiffs essentially rely on two allegations to conclude that Mayweather sold large quantities of EMAX Tokens into the pool:

First, Plaintiffs contend that, although Mayweather's representatives refused payment for his promotions in EMAX Tokens, Defendant Davis "later clarified" during a podcast that Mayweather did get paid in EMAX Tokens and then sold them off. (SAC ¶ 123).  This allegation is far too vague to raise an inference of privity, as it does not specify how many Tokens Mayweather supposedly received or when he sold them off.

Second, Plaintiffs rely on a text message thread titled "eMAX team marketing" in which Defendant Perone states that "Jona [i.e., Defendant Rechnitz] wired Floyd the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

250k he wants his in EMAX[.]"  (*Id.* ¶ 171).  However, the most natural reading of that exchange indicates that Defendant Rechnitz paid Defendant Mayweather for a promotion through a wired bank transfer, but that Defendant Rechnitz wanted his fee for securing Defendant Mayweather in the form of EMAX Tokens.  While wiring money is a commonly understood activity in the mainstream banking industry, nowhere else in the SAC do Plaintiffs use the term "wired" to describe a transfer of EMAX Tokens.  Rather, Plaintiffs' suggest the Tokens are "airdropped," "traded" or "swapped."  (*See id.* ¶¶ 79, 99, 209).  Indeed, in reciting this text message in their Opposition to Rechnitz's Motion, it is clear that Plaintiffs read this text message to mean that Rechnitz, not Mayweather, was paid in EMAX Tokens.  (*See* Rechnitz Opp. at 5) (citing SAC ¶ 171).  Therefore, there are insufficient allegations concerning Mayweather's sales to infer privity.

Accordingly, the Motion is **GRANTED** to the extent it seeks dismissal of the Insider Trading claim (Claim 11) against Mayweather because that claim requires privity and does not seem to provide for secondary liability.  However, such a conclusion does not preclude other securities claims against Mayweather to the extent they are premised on secondary liability or the Manipulation Section (which does not require privity).

### b.  Insider Trading Violations (Claim 11)

Defendants Perone, Rechnitz, and Pierce argue that the Insider Trading claim against them fails not only for lack of privity but also because (1) Plaintiffs fail to plead the specific sales with the requisite specificity; and (2) Plaintiffs fail to allege what "nonpublic, material information any Defendant knew."  (Securities Motion at 4).

As for the first argument, the Court concludes that the SAC sufficiently specifies both Rechnitz's and Pierce's sales, coupled with specific allegations of each Plaintiffs' purchases.  (*See* SAC ¶¶ 76-91 (describing specific transactions on specific dates effectuated by Defendant Pierce); *see id.* ¶¶ 98-99 (describing specific transactions on specific dates effectuated by Defendant Rechnitz).  However, Plaintiffs do not allege even a single sale of EMAX Tokens by Defendant Perone.  The only allegation

---

**CIVIL MINUTES—GENERAL**                                           **25**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

supporting the Insider Trading claim against him is that another Defendant apparently accused Perone of being in on the scheme for the purpose of pumping and dumping the Tokens.  (*See* SAC ¶ 40).  This allegation is insufficient to meet Rule 9(b).  *See In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1221 (N.D. Cal. 2007) (holding that a claim under section 25402 must be pled with particularity).

Accordingly, the Motion is **GRANTED** *with leave to amend* to the extent it seeks dismissal of the Insider Trading claim (Claim 11) against Defendant Perone.

As for the second argument, the Court concludes that Plaintiffs make clear enough that the specific non-public information allegedly known to Defendant Pierce and Rechnitz was the impending celebrity promotions.  But Plaintiffs fail to connect that knowledge to the relevant purchases and/or sales in a way that allows for the Court to engage in meaningful analysis.

It appears to the Court that the thrust of the argument is that the improper conduct starts with Pierce and Rechnitz *accumulating* massive amounts of Tokens right *before* celebrity promotions that they exclusively knew were coming (and that they knew would increase the Tokens' price).  It is not clear to the Court that the *sale* of the Tokens, after the celebrity promotions were publicized, can be regarded as improper given the sales occurred once the relevant information became public.  While the amassing of Tokens prior to the celebrity promotions certainly appears problematic, one issue with that theory of wrongdoing is that Defendants Pierce and Rechnitz are alleged to have freely obtained the EMAX Tokens from the Executive Defendants.  It is not clear to the Court whether, as a legal matter, the receipt (as opposed to the purchase) of securities suffices to state a claim under the Insider Trading Section.  While it is possible that such conduct constitutes insider trading, Plaintiffs cite no authority to that effect.  Perhaps, cases dealing with employees' receipt of stock prior to a material announcement could provide a sufficiently analogous framework, but the Court cannot determine in a vacuum whether the conduct here constitutes insider trading within the meaning of the California securities law.  Absent additional case law, it appears to the Court that the conduct might be better captured by the Manipulation Section of the law.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

Indeed, the only substantive case Plaintiffs cite is an unpublished California case that confirmed a judgment against a defendant who purchased stock from the plaintiff knowing "specifically the target date for the IPO and the target pricing," despite that information not being generally available and which impacted the price for which the plaintiff was willing to sell his shares. *See Wang v. Xue*, No. B184706, 2006 WL 3423862, at *5 (Cal. Ct. App. Nov. 29, 2006).  Plaintiffs entirely fail to explain what relevance *Wang* has to this action and the similarities (if any) are not obvious.  Plaintiffs must do more to sustain their claim for insider trading.

Accordingly, the Motion is **GRANTED** *with leave to amend* to the extent it seeks dismissal of the Insider Trading claim (Claim 11) against Defendant Perone and Rechnitz.

### c.  Claim 10 (The Kitchen-Sink Claim)

The Court agrees with Defendants that Claim 10 is an impermissible shotgun pleading that flunks Rule 8 on every level.  It incorporates by reference all previous paragraphs, cites to multiple disparate sections of the securities laws, does not distinguish between Defendants, and altogether fails to provide Defendants or the Court with notice of the nature of the claim against each Defendant.

Specifically, the heading for Claim 10 cites four different substantive sections of the Securities Law (i.e., sections 25110, 25401, 25403, and 25404).  (SAC ¶ 135).  Then, Plaintiffs substantively rely on different and additional sections (sections 25400 and 25500) in the body of the claim.  Plaintiffs also suggest the Executive Defendants are liable under four different subsections of 25400(b)-(e), without differentiating among the sections and/or Defendants.  (*See* SAC ¶¶ 392, 429, 432).  Each of these sections of the Securities Law bars different activity and has different requirements to plead a claim.  Importantly, Plaintiffs also fail to specify which Defendants are primary violators, which Defendants are secondarily liable, and which sections were violated by which Defendant.  Neither Defendants nor the Court should be required to parse through the mass of allegations to determine which Defendant and which conduct Plaintiffs are targeting.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

In any amended Complaint, Plaintiffs should separate their claims by related sections (i.e., one claim should be brought under the Misrepresentation Section and the corresponding private right of action (sections 25401 and 25501); another claim under the Manipulation Section (specifying which subsection is relied on) etc.).  Further, Plaintiffs must specify whether each Defendant is alleged to be a primary violator or secondarily liable (and why).  The Court neither requires that Plaintiffs plead facts that are in the exclusive knowledge of Defendants nor prohibits Plaintiffs from specifying that more than one Defendant is liable for the same conduct, but Plaintiffs must specify what theory they are relying on to hold each Defendant liable.

However, the Court notes that it rejects Defendants' argument that the allegations against the Company necessarily fail prior to the date of incorporation. Plaintiffs may rely on the theories of de facto corporation and/or corporation by estoppel but should specify if they are suggesting the Company is the primary violator. *See Communist Party v. 522 Valencia*, Inc., 35 Cal. App. 4th 980, 993–94, 41 Cal. Rptr. 2d 618 (1995) (collecting cases) ("[P]ersons who themselves control a corporation, who have used the corporate form of doing business for their benefit, who have dealt with and treated the corporation as a separate entity, or who have otherwise by their actions expressly or impliedly recognized its corporate existence, may be estopped to deny the corporation's separate legal existence.").

Finally, while Plaintiffs may incorporate by reference previous paragraphs of the Complaint into each claim, they may ***not*** incorporate each and every factual allegation into each claim.  Plaintiffs should cite to the ***specific paragraph(s)*** that detail the conduct they believe renders that specific Defendant liable for a specific securities violation.

Accordingly, the Motion is **GRANTED** ***with leave to amend*** as to Claim 10.

## 2.      Florida's Securities Law

Neither Plaintiffs nor Defendants discuss the Florida securities claim in much detail.  However, Claim 12, unlike Claim 10, is much more straightforward as alleged,

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

and appears to simply allege that the Company and Executive Defendants are liable for selling unregistered securities under Florida law.  (*See* SAC ¶¶ 446-489).

As noted, Defendants do not contest the "security" designation for purposes of this Motion, but rather, they contend that the Florida securities claim fails because of the lack of alleged privity and because Plaintiffs fail to allege that Defendants "personally participated or aided in making the sale," of any securities.  (Securities Motion at 14) (citing Fla. Stat. § 517.211(1)).  However, for the reasons discussed above, the Court concludes that the allegations of privity are sufficiently alleged against the Company and Executive Defendants (the only Defendants against whom this claim is brought).

At the hearing, Rechnitz's counsel emphasized the lack of allegations concerning each Defendant's personal participation or aid in making a sale of the Tokens.  The Court, however, concludes that there are ample allegations to sufficiently demonstrate that each moving Executive Defendant (against whom this claim is brought) "aided" the relevant sales.  (*See, e.g.*, SAC ¶ 25 (alleging Perone incorporated EMAX Holdings LLC in Florida after the launch of the Tokens); *see id.* ¶ 31 (alleging Perone is a founder of the EMAX project); *see id.*  ¶ 121 (alleging that Perone "repeatedly proclaimed that he w[ould] be meeting retail investors 'on the moon' when the price of EMAX Tokens r[ose]"); *see id.* ¶ 69 (detailing promotional posts on the EMAX Instagram account); *see id.* ¶ 66 (alleging that "Rechnitz provided the Executive Defendants with access to several high-profile celebrities that were willing to tout EMAX Tokens in exchange for under-the-table payments and the ability to front run EMAX Tokens investors"); *see id.* ¶ 97 ("Rechnitz once pulled out his phone and demonstrated how he made trades on his trading app immediately following a celebrity promotion."); *see id.* ¶ 171 (text message thread indicating that Perone was orchestrating the celebrity promotions and that Rechnitz "wired Floyd the 250k")).

Accordingly, the Motion is **DENIED** to the extent it seeks dismissal of Claim 12 based on the sale of unregistered securities in violation of Florida Law.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

D.     **Sufficiency of State Consumer Law Claims and California**
       **Common Law Claims**

Plaintiffs bring nine claims against certain Defendants under various State
Consumer Laws and California common law.  Defendants move to dismiss on several
grounds, which the Court discusses in turn.

## 1. Alternative Pleading

Now that Plaintiffs have added state securities claims to the SAC, Defendants
argue that the State Consumer Law claims all must be dismissed because none of the
relevant State Consumer Laws apply to securities transactions.  (CL Motion at 6)
(collecting cases under each State Consumer Law alleged).  Plaintiffs respond that the
argument fails because they can plead the State Consumer Law claims in the alternative
to the securities claims.  (CL Opp. at 22).

To the extent Defendants' argument is that the SAC lacks the magic words "in
the alternative," the Court rejects that argument because Defendants cite no authority
suggesting that those words are explicitly required.  Indeed, Rule 8 specifically
provides that "[a] party may state as many separate claims or defenses as it has,
regardless of consistency" and that "[p]leadings must be construed so as to do justice,"
which suggests that courts should construe inconsistent claims as pled in the alternative
regardless of inclusion of the magic words.  *See* Fed. R. Civ. P. 8(d)(3), (e); *G-I
Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521, 536 (S.D.N.Y. 2002) (declining
to dismiss a claim for failure to make explicit that it was pled in the alternative because
Rule 8(a) "does not state that a party must explicitly identify alternative pleadings, and
the court will not dismiss plaintiff's complaint on that basis") (internal citation
omitted).

To the extent Defendants' argument is premised on the notion that alternative
pleading in this case is an attempt to "abridge, enlarge, or modify" substantive rights
under state law, the Court is again unpersuaded.  (CL Reply at 3).  Defendants rely on
two cases for this argument.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

First, Defendants cite *Rollolazo v. BMW of N. Am., LLC*, No. CV 16-00966-BRO (SSx), 2017 WL 6888501, at *11- *13 (C.D. Cal. May 2, 2017), which dismissed at the pleading stage design defect tort claims and unjust enrichment claims because the plaintiffs pled express breach of warranty claims based on an unambiguous contract provision regarding defects in workmanship.  The Court understands *Rollolazo* and the cases cited therein as standing for the proposition that complaints stating alternative theories must allege facts that make each of the alternative theories plausible in order for each theory to survive dismissal.  However, the Court views this situation as more akin to the classic situation where alternative pleading is expected and clearly appropriate —where a party alleges breach of contract, but the key dispute is the existence of a contract.  In such a scenario, there is no good reason why both a contract claim and an unjust enrichment claim should not be entitled to proceed.  Of course, upon the finding of an express contract, the unjust enrichment will become unavailable and unnecessary, but a Court should not be required to determine the factual question of whether a contract exists at the pleading stage.

Likewise, here the Court cannot conclude at this stage that the State Consumer Law claims are barred by the securities law claims because whether the cryptocurrency at issue here is a "security" is a hotly contested topic and Defendants have expressly reserved the right to contest the characterization of the Tokens as a security.  (*See* Securities Motion at 1 n.1).  It would be unfair to allow Defendants to refrain from contesting the characterization of the Tokens as a security at the motion to dismiss stage and achieve dismissal of the State Consumer Laws on that basis, only to successfully argue that the Tokens are not securities at summary judgment.  The Court concludes that Plaintiffs have plausibly alleged that the Tokens may be considered either a "digital asset" or a "security."  (*See* SAC ¶¶ 32, 388).

Second, Defendants cite to *Clune v. Barry*, No. CIV 16-4441-NSR-JCM, 2023 WL 2929388, at *8 (S.D.N.Y. Apr. 13, 2023) to argue that in the "analogous context of the statutory bar to federal RICO claims concerning securities," courts have "reject[ed] attempts to circumvent the limited scope of RICO through alternative pleading should a court ultimately find no actionable securities fraud."  (CL Reply at 3).  However, there are critical distinctions that make *Clune* less "analogous" than Defendants suggest.  For

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

instance, *Clune* reasoned that allowing plaintiffs to plead securities and RICO claims in the alternative would contravene the explicit legislative intent of the PSLRA bar, which was to "prevent litigants from using artful pleading to boot-strap securities fraud cases into RICO cases, with their threat of treble damages."  *Clune*, 2023 WL 2929388, at *8.

        Here, there is no concern that Plaintiffs are bootstrapping their State Consumer Law claims to coerce a settlement with the threat of treble damages.  And *Clune* is further distinguished because the issue of whether shares of a company are "securities" raises a run-of-the-mill, frequently litigated issue that the plaintiffs could fairly be charged with assessing in order to make an informed strategic decision on which claims to bring against the defendants.  By contrast, here it is clearly unsettled whether the specific type of cryptocurrency at issue is a security and the answer to that question may directly rely on expert analysis and evidence that Plaintiffs should not be expected to adduce at this stage.  And, as demonstrated by the privity analysis above, it may only become clear upon further evidence and analysis that the securities laws are not well suited to deal with decentralized cryptocurrency exchanges.  Given the application of securities laws to cryptocurrency exchanges undeniably raises genuine, unanswered legal and factual questions, Plaintiffs alternative pleading is not an act of gamesmanship but based on genuine uncertainty about the legal status of the asset involved.

        Therefore, Plaintiffs may plead the claims in the alternative.  *See, e.g., Ripple*, 2020 WL 922815, at *23 (coming to the same conclusion in response to the same argument by a different defendant and holding that in the event the Court "factually determined" that the cryptocurrency was not a security, the plaintiffs could recover for false advertising based on misrepresentations in the sale of the cryptocurrency under the UCL and FAL).

        Moreover, Defendants have not convinced the Court that even if the Tokens are securities, that each and every State Consumer Law claim warrants dismissal.  Several California courts have narrowly construed the (judicially-created) UCL securities bar, holding that UCL claims are only barred where the claim directly involves a securities

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

transaction between the parties.  *See San Francisco Residence Club, Inc. v. Amado*, 773
F. Supp. 2d 822, 833–34 (N.D. Cal. 2011) (collecting cases allowing both a securities
claim and a UCL claim to proceed where the UCL claim "did not target a securities
***transaction***") (emphasis in original).  Neither party has specifically identified which
claims may directly involve "securities transactions," so the Court has not engaged in
such an analysis.  At this stage, the Court not will not dismiss wholesale the State
Consumer Law claims but will instead construe the State Consumer Law claims as pled
in the alternative to the extent they appear to directly involve a potential securities
transaction.

Accordingly, the Motion is **DENIED** to the extent it seeks dismissal of the State
Consumer Law claims (Claims 1-7) based on the argument that the securities law
claims may not be pled in the alternative.

### 2.  Statutory Standing (Whether Plaintiffs Suffered a Cognizable Injury)

In the Prior Order, even though Plaintiffs brought the same claims under the
State Consumer Laws, Defendants did not contest Plaintiffs' standing to bring such
claims.   Rather, Defendants previously argued that Plaintiffs failed to plead reliance
and/or causation because the Complaint did not specify whether the named Plaintiffs
had even seen each of the relevant social media posts nor the precise date on which
they purchased the Tokens.  The Court agreed and dismissed the State Consumer Law
claims for that reason alone.  (*See* Prior Order at 34).  In the SAC, Plaintiffs have added
significant facts alleging each Plaintiffs' exposure to the relevant posts, their reliance
on those posts in purchasing Tokens, and the date on which they purchased the Tokens.
As a result, Defendants no longer challenge reliance and/or causation.

Now, Defendants argue that Plaintiffs lack standing to bring claims under any of
the State Consumer Laws because they fail to "plausibly allege that Defendants' []
statements or omissions caused any cognizable injury."  (CL Motion at 7).  Defendants'
standing argument stems from this Court's analysis of whether Plaintiffs had
adequately pled ***RICO*** standing in the previous iteration of the Complaint.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

At the outset, the Court notes that it understands Defendants' argument to be one of statutory standing, not Article III standing (with the exception of the injunction arguments discussed separately).  Nonetheless, taken to its logical conclusion, Defendants' argument seemingly amounts to an Article III argument as well.  But given the parties briefed the issue as one of statutory standing, the Court has addressed standing based on the State Consumer Law authorities that the parties rely on (and because the Court concludes that Plaintiffs have sufficiently alleged statutory standing based on economic injury, it is satisfied that Plaintiffs have likewise pled Article III standing).  *See In re LinkedIn User Priv. Litig*., No. CV 12-03088-EJD, 2014 WL 1323713, at *6 (N.D. Cal. Mar. 28, 2014) ("Ninth Circuit cases indicate that plaintiffs whose allegations meet the *Kwikset* [UCL] criteria will at least satisfy the Article III injury in fact requirement.") (citing *Hinojos v. Kohl's Corp*., 718 F.3d 1098, 1104 n.3 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013)).

Secondly, the Court notes that a wholesale adoption of the Court's previous injury analysis will not suffice as several factors complicate the injury analysis in this action, including the difficulty in defining what the Tokens are (i.e., securities, currency, and/or goods), the various and disparate allegations defining the deceptive conduct that allegedly caused the injury, the numerous theories of injury being advanced, and the differing standing standards per statute claimed to be violated.

In the Prior Order, the Court explained that to have standing to bring a RICO claim, Plaintiffs must allege a "concrete financial loss" not a "mere expectancy interest."  *See Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc); *Chaset v. Fleer/Skybox Int'l*, 300 F.3d 1083, 1087 (9th Cir. 2002).  The Court concluded that "Plaintiffs [] failed to allege facts supporting the contention that they paid more than fair market value for the EMAX Tokens at the time of their purchase." (Prior Order at 25).  In the Court's view (at the time), the essence of Plaintiffs' harm was not that they had paid an "artificially high price" but that the Tokens are now (months later) worthless.  (*Id*.).  In reaching that conclusion, the Court relied on the specific arguments Plaintiffs advanced and what it believed to be analogous case law from other RICO cases.  *See, e.g*., *Chaset*, 300 F.3d at 1087.  Although the Court found the allegations insufficient to confer RICO standing, the Court specifically granted

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

Plaintiffs leave to amend, as Plaintiffs persuasively argued at the hearing on the previous motions to dismiss that they could allege additional facts and advance alternative arguments to establish standing.  (*See* Prior Order at 31).

The Prior Order ultimately concluded that Plaintiffs had failed to plead injury because Plaintiffs' argument failed to connect the RICO violations to the injuries alleged.  It therefore appeared to the Court that the price of the Tokens had not been ***artificially*** raised by any misrepresentation, but rather, the allegations seemed to suggest that the price increase was a direct result of increased popularity and market demand.  Therefore, the Court concluded that Plaintiffs had failed to push the facts over the line of plausibility to show that they paid more than the fair market price.

However, Plaintiffs have now added additional supporting facts and further fleshed out their theories of harm, bringing the allegations much closer to well-recognized forms of competitive injury.  The primary theories of harm now advanced are as follows: (1) Plaintiffs lost money in the form of the purchase price for (and fees associated with purchasing) the Tokens because they would not have purchased the Tokens at all had they known of the Defendants scheme to pump-and-dump the Tokens; (2) Plaintiffs purchased the Tokens at a premium price because Defendants promised the Tokens had certain specific features and/or ability to produce returns that they did not actually have; and (3) Defendants' conduct of pumping-and-dumping and/or making false promises caused their Tokens to diminish in value.

As for the lost purchase price of the Tokens and associated fees, Defendants do not directly explain why such a theory is not cognizable other than to suggest that the theory fails for the same reason the price premium theory fails.

As for the price premium theory, the Court agrees with Plaintiffs that the starting point of the analysis must be rooted in the state law standards, not this Court's Prior Order interpreting a different federal statute that raises a unique set of policy concerns. The RICO statute, primarily penal in nature, threatens civil defendants with the prospect of treble damages, and therefore limits recoverable damages to specific, concrete financial losses.  On the other hand, the statutory standing requirements in the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

State Consumer Laws are aimed at limiting the *class of plaintiffs* bringing such claims but the remedies are equitable in nature and do not necessarily require as "concrete" a loss.  *Compare Chaset*, 300 F.3d at 1087 ("Congress enacted RICO "to combat organized crime, not to provide a federal cause of action and treble damages" for personal injuries) (internal citation omitted) *with Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 321, 120 Cal. Rprt. 3d 741 (2011) ("The intent of this change [i.e., imposing the economic injury requirement onto UCL claims] was to . . . curtail the prior practice of filing suits on behalf of clients who have not used the defendant's product or service, viewed the defendant's advertising, or had any other business dealing with the defendant.") (internal citation and quotation marks omitted).  Therefore, the RICO standing analysis (and reasoning behind the standing requirement) does not necessarily translate to the State Consumer Law analysis.

Under the UCL, the California Supreme Court has explained that a plaintiff suffers an economic injury if the unfair practice causes the plaintiff to: 1) *surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have*; (2) have a present *or future property interest diminished*; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary.  *Kwikset Corp.*, 51 Cal. 4th at 323 (emphasis added).  So, unlike RICO, the UCL clearly encompasses future expectancy interests, and therefore, much of the reasoning of the Prior Order is inapplicable.

Nonetheless, Defendants suggest that Plaintiffs' purchase price and/or price premium theory of harm is doomed at its inception based on the Court's Prior Order.  But the Court has never taken that position.  The Court clearly recognizes that economic harm *can* take the form of a price premium and therefore the mere fact that Plaintiffs rely on a price premium theory is not fatal.  What the Court previously deemed as fatal was that the alleged price premium paid did not appear to be *artificially* inflated but, as alleged and argued, the price appeared to be a direct result of celebrity endorsements that increased the popularity of the Tokens.  That market participants were willing to (and that Plaintiffs in fact did) pay more because celebrities

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

were connected to the Tokens did not appear to the Court to be a concrete loss sufficient to establish a RICO "injury."

The Court deemed the facts distinguishable from cases where, for instance, the plaintiffs could allege that the harm was the difference between the market value for a vehicle with emission defects compared to a vehicle without such defects.  *See, e.g.*, *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 957 (N.D. Cal. 2018).  The Court struggled to compare the allegations in this action to those cases because it seemed that Plaintiffs were asking the Court to merely compare the price of the Tokens before and after the celebrities had endorsed them.  The problem was that the celebrity endorsements appeared to genuinely increase the popularity of the Token (i.e., demand), and thereby, directly raised the price.  In other words, the increased price appeared to be the result of celebrity endorsements, not RICO violations.  (*See* Prior Omnibus Opp. at 14-15 (describing the various RICO predicate acts vaguely as "misleading[] promotions"); *see also id.* at 20 ("[A] reasonable person would think that Kardashian is rich therefore she must be financially savvy.  Thus, if someone as wealthy as her is getting in on an investment, the reasonable person could easily believe that it would be beneficial for them to invest as well.").  In sum, the Court concluded that the alleged theory of liability – celebrity promotions – led to a real (as opposed to artificial) increase in price.

However, Plaintiffs have now advanced, in more concrete terms, a theory of harm that is plausibly tied to a theory of liability by arguing that the price of the Tokens at the time of sale was "artificially inflated" because Defendants distorted and/or manipulated the market for the Tokens, and therefore, distorted the amount the public was willing to pay.  The Court now understands the theory as a fraud-on-the-market type of harm, which would be actionable regardless of the celebrity status of the speaker.

Specifically, Plaintiffs now connect the actual alleged misstatements and/or omissions to their purchasing decisions.  For instance, Plaintiffs explain that "one of the primary promotions at issue related to the ability of [] [] purchasers to actually use their EMAX Tokens as currency to pay for goods and services."  (CL Opp. at 12).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

Specifically, Defendants promoted the ability to use EMAX Tokens for purchases in nightclubs like Club LIV and Story.  (*Id.* at 13) (citing SAC ¶¶ 128, 140).  Plaintiffs further explain that this feature of the Token was material because the idea that popular venues were *exclusively* accepting EMAX Tokens indicated "that EMAX Tokens were taking market share from other (more established) cryptocurrencies[.]"  (*Id.* at 13) (citing SAC ¶¶ 297-98, 300-305, 315).  Plaintiffs further allege that the price of EMAX Tokens "dropped sharply on the news that EMAX Tokens would not be available for payment at Club LIV as promised."  (*Id.*) (citing SAC ¶¶ 131, 132, 172).  Such detailed allegations regarding the impact of this false promise did not previously appear in the Complaint.  Therefore, based on these new allegations, Plaintiffs more persuasively argue that the false representation that certain venues were exclusively accepting EMAX Tokens as payment was material and distorted the price the market was willing to pay for the Tokens.

Defendants contend that even if Plaintiffs have now adequately alleged a price premium theory, there is no allegation that Plaintiffs tried to use the Tokens at Club LIV but that the Tokens were rejected.  (CL Reply at 5 n.5).  But Plaintiffs do allege facts that the Defendants publicly announced that the Tokens could not be used at Club LIV as promised, sufficient to demonstrate falsity.  (SAC ¶ 132).  Plaintiffs do not need to allege that they were rejected at Club LIV because the alleged harm is not the rejection.  The harm is the ***price premium*** associated with a marketed (but false) feature of the Tokens.  If Plaintiffs can prove that objectively reasonable people are willing to pay more for cryptocurrencies that can be used at venues in the real world than they are willing to pay for Tokens that cannot be so used, Plaintiffs may be able to prove that they paid more for EMAX Tokens than the fair market value.

This is not an inherently implausible theory.  Indeed, as Plaintiffs allege, following the news that the Tokens would not be accepted at the nightclub, Executive Defendant Maher tweeted: "So what, they don't have E[MAX] being used to [pay] LIV Bottle service  . . . Name a single crypto that you can pay your bar tab with?"  (SAC ¶ 132).  This allegation (absent from the original Complaint) tends to show that the promise of use of the Tokens at the venues served to differentiate these Tokens from their competitors, and therefore could have conferred a price premium.  Accordingly,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

Plaintiffs have alleged a viable theory of economic harm under each State Consumer Law.  *See, e.g.*, *Hinojos*, 718 F.3d at 1106 (concluding that misleading marketing practices, such as advertising products as on "sale," "not available in stores," "available for a limited time only," "the same model of shoe worn by LeBron James," if false, could be used to deceive consumers into making purchases they would not otherwise make, and therefore, sufficient to demonstrate an economic injury under the UCL); *Valiente v. Unilever United States*, Inc., No. CIV 22-21507, 2022 WL 18587887, at *5 (S.D. Fla. Dec. 8, 2022) (collecting FDUPTA price premium cases);  *Orlander v. Staples, Inc*., 802 F.3d 289, 302 (2d Cir. 2015) (noting that a plaintiff sufficiently pleads injury under NYGBL where he or she alleges a "connection between the misrepresentation and [some] harm from, or failure of, the product") (internal citation omitted); *Alpizar-Fallas v. Favero*, 908 F.3d 910, 919 (3d Cir. 2018) (noting that the NJCFA requires only allegations of "ascertainable losses" defined as "either an out-of-pocket loss or a demonstration of loss in value that is quantifiable or measurable").

While Plaintiffs allege that it was primarily Defendant Kardashian who represented that the Tokens could be purchased at nightclub venues, presumably Plaintiffs could hold the Executive Defendants jointly liable for such representations upon a showing that the representation was stated on the Executive's and/or the Company's behalf.  *See People v. JTH Tax, Inc*., 212 Cal. App. 4th 1219, 1242, 151 Cal. Rptr. 3d 728, 747–48 (2013) (holding that the UCL and FAL incorporate the concept of principal-agent liability and that a principal may be jointly liable for advertisements of its agents).  The inferences from the allegations are sufficient for now.

Plaintiffs next theory of harm, although less fleshed out, appears to focus on the alleged fact that the Executive Defendants and some of the Promoter Defendants were selling off their free Tokens just as they promoted them, thereby engaging in an "unfair" practice by "diminishing the value" of Plaintiffs' Tokens based on market manipulation.  (*See* CL Opp. at 13-14) (explaining that the Tokens diminished in value because of Defendants' orchestrated pump-and-dump scheme).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation
_____

Defendants contend that Plaintiffs insufficiently plead that they suffered any diminution in value because they do explain how Plaintiffs will be able to quantify their purported losses.  (CL Reply at 7).  Relatedly, Defendants contend that Plaintiffs fail to sufficiently allege the diminution in value was **caused** by each Defendant.  (*Id.* at 7-8).  To the extent this argument is about quantifying losses, the Court rejects the notion that Plaintiffs must calculate their exact losses at this stage.  *See, e.g., Alpizar*, 908 F.3d at 919 (noting that "a plaintiff is not required to allege the nature of the loss or present evidence of it at the motion to dismiss stage" and that allegations as vague as "impairment of [] earning capacity" sufficed to plead loss under the NJCFA).

To the extent Defendants take issue with Plaintiffs' causation allegations, while the Court tends to agree that it might be quite difficult for Plaintiffs to **prove** a price premium or loss caused by each Defendant's misconduct, the Court is not persuaded that causation has been insufficiently **pled**.  Unlike with the RICO claim, where Plaintiffs vaguely claimed injury from the collective RICO enterprise's "misleading promotions," the State Consumer Laws do not seek to hold Defendants liable as one collective enterprise, but rather allege different theories of liability as to each Defendant.  Therefore, the Court is less concerned about proof of causation at this stage because whether Plaintiffs will be able to prove causation against each Defendant will likely correlate with the proof of liability as to each Defendant.

In sum, Plaintiffs adequately allege that they each viewed certain promotions, relied on those promotions, and purchased Tokens because of those promotions.  (*See generally*, SAC ¶¶ 186-366 (detailing each of the named Plaintiff's individualized exposure, reliance, and purchases under each State Consumer Law claim).  Further, Plaintiffs adequately allege that the price rose in relation to each Promoter Defendants' statements and/or omissions and fell either upon news that the substance of the promotion was false or based on the undisclosed and allegedly unfair selling activities of the insider Defendants who possessed massive amounts of free Tokens.  (*See, e.g.*, SAC ¶ 172 (chart showing the rise and fall of the EMAX Tokens' price in conjunction with promotional activities); *see id.* ¶¶ 78-92 (alleging that Pierce told consumers that he made substantial gains from his investments, thereby inducing them to purchase the Tokens, while he simultaneously sold off massive amounts of Tokens, causing sharp

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                  Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

decreases in price following temporary spikes in demand); *see id.* ¶ 131 (noting 60% drop in price of Tokens on the news that the Tokens could not be used at Club LIV); *see id.* ¶ 298 (noting that sharp decreases in price in early June after certain promotions can be traced back to huge sell offs from Executive Defendant Maher); *see id.* ¶ 443 (alleging huge price drop was caused by Mayweather selling large numbers of EMAX Tokens following his promotions).

Ultimately, Plaintiffs will bear the burden of demonstrating that the alleged unfair conduct caused their losses.  This burden will likely require Plaintiffs to more critically and selectively hone in on their theory of harm(s) in order to isolate the price increases attributable to specific wrongdoing by specific Defendants.  However, that causation analysis necessarily requires expert opinion or other specific evidence, and the Court will not dismiss at the pleading stage for failure to prove causation and harm.  Given Plaintiffs have sufficiently added extensive allegations of exposure, reliance, and timing, the Court leaves for another day the task of isolating the losses attributable to each deceptive act.  *See Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 789, 111 Cal. Rptr. 3d 666 (2010) ("That a party may ultimately be unable to prove a right to damages (or, here, restitution) does not demonstrate that it lacks standing to argue for its entitlement to them.").

At the hearing, Kardashian's counsel pointed the Court's attention to the chart in the SAC, paragraph 172.  The chart shows the price volatility of the EMAX Token over the course of the Relevant Period.  Counsel argued that the chart shows that the price of the Tokens was already increasing three days before Kardashian's June Post.  Counsel also pointed out that the price immediately went down right after both of Kardashian's posts, suggesting that her Posts did not provide a price premium.

The Court agrees that the price volatility and the many factors affecting the price make the injury analysis quite difficult – which is precisely why injury has been a primary focus of both motion to dismiss orders.  However, that the price was starting to rise prior to Kardashian's posts and dropping right after her posts, could very well be a result of the pump-and-dump scheme.  In other words, the insiders were accumulating Tokens prior to the impending posts, causing the price to rise, and then selling off

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

immediately after the posts, causing the price to plummet – leaving those who bought in reliance on the post with losses and providing the insiders, who sold off in tandem with the posts, a profit.  This classic type of scheme is clearly a recognized harm in the securities context and therefore the Court cannot conclude at this stage that there was no injury caused by the false advertising.  Plaintiffs will ultimately have to prove damages attributable to each theory of harm, but the Court is not willing to resolve the issue at this stage.

Accordingly, the Motion is **DENIED** to the extent it seeks dismissal of the State Consumer Law claims (Claims 1-7) based on failure to plead injury.

### 3.     Adequacy of Legal Remedies and Entitlement to Restitution

The Court next deals with two related remedy issues; (1) whether Plaintiffs have pled inadequate legal remedies and (2) whether Plaintiffs have adequately pled an entitlement to restitution.

***Inadequate Legal Remedies Allegation***: The Court previously dismissed Plaintiffs' unjust enrichment claim (pled independently from the State Consumer Law claims) because Plaintiffs failed to even plead a conclusory allegation that they lacked legal remedies.  (Prior Order at 43).  Admittedly, it is clear from the facts alleged that this action raises the legitimate possibility that Plaintiffs will lack an adequate legal remedy given the Court previously dismissed the CLRA claim as inapplicable to intangible goods and the real possibility that the Court may later conclude that the Tokens are not securities.  Therefore, this case is a prime example of a situation where Plaintiffs have all the facts they need to plausibly allege that they lack adequate legal remedies and the Court will be very unlikely to accept any argument to the contrary on the merits at this stage.  However, the Court emphasizes that legal remedies must actually be unavailable or inadequate for Plaintiffs to eventually recover on the equitable claims.  Therefore, abandoning the securities claim simply because the equitable claims appear to be easier to obtain will not be a viable option.  *See Guzman v. Polaris Indus. Inc.*, 49 F. 4th 1308, 1313 (9th Cir. 2022) (concluding that UCL claims should be dismissed where the plaintiff had (but failed to timely pursue) a legal

---

**CIVIL MINUTES—GENERAL**                                            42

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

remedy because failure to pursue an adequate legal remedy does not make the remedy
"inadequate" for purposes of invoking a district court's "equitable jurisdiction").

        But, for now, the main problem is that despite this Court's explicit instruction in
the Prior Order, Plaintiffs still fail to include even a bare allegation that they lack
adequate legal remedies.  While the Court does not typically require parties to plead
magic words to survive dismissal, this Court has already explained to Plaintiffs that it
has interpreted the Ninth Circuit's guidance on this particular issue as, at the very least,
***requiring*** a simple allegation that legal remedies are inadequate in order to state an
equitable claim for relief.  (*See* Prior Order at 43) (citing *Guthrie v. Transamerica Life
Ins. Co*., 561 F. Supp. 3d 869, 875 (N.D. Cal. 2021) (collecting cases for the
proposition that the Ninth Circuit requires plaintiffs to, "at a minimum, plead that
[they] lack adequate remedies at law if [they] seek equitable relief").  Plaintiffs'
argument that *Sonner* does not require such an allegation is unavailing.  (*See* CL Opp.
at 23).

        Plaintiffs' failure to cure this simple deficiency has led to a frustrating situation
because Defendants seize on this failure not only to argue for dismissal of the unjust
enrichment claim but also to contend that ***all*** equitable claims should be dismissed,
including the UCL and FAL claims.  While the Court recognizes that case law is
consistent with Defendants' position, the Court must also consider the fact that
Defendants failed to raise this argument in the first round of briefing with respect to the
viability of the UCL and FAL claims, and instead only raised the argument with respect
to the unjust enrichment claim.  *See In re Apple*., 846 F.3d at 318 (indicating that the
Ninth Circuit will be "forgiving" over a district court's decision to entertain a
successive Rule 12(b)(6) motion but only when it is done in the interest of furthering
Rule 1's directive that the rules be construed "to secure the just, speedy, and
inexpensive determination of every action").

        If the Court were to dismiss the UCL/FAL claims solely because Plaintiffs failed
to allege that they lack adequate legal remedies, a large portion of this round of briefing
would have been a complete waste of time and resources.  The Court could have easily
addressed it before Plaintiffs amended and filed the SAC – directly undermining the

_____

**CIVIL MINUTES—GENERAL**                                                    **43**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

purpose of Rule 1.  Had this issue been raised as a basis for dismissing the UCL/FAL claims in the previous round of briefing, the Court is confident that Plaintiffs would not have overlooked this deficiency in the SAC given the prominent role of the UCL/FAL claims.

Accordingly, because Plaintiffs were warned about the deficiency with respect to the unjust enrichment claim, the Court again will dismiss the unjust enrichment claim for failure to plead inadequate legal remedies.  On the other hand, while not expressly dismissing the UCL/FAL claims, given the inadequate legal remedies allegation is at least quasi-jurisdictional, the Court will grant leave to amend each equitable claim to also add allegations concerning the lack of adequate legal claims.  *Accord In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 638 (N.D. Cal. 2020) (declining to expressly dismiss UCL claims based on failure to plead inadequate legal remedies where it was clear that the plaintiffs would be able to so allege but granting "leave to amend to expressly allege that their remedies at law are inadequate and to support their claim to equitable restitution under the UCL and FAL[.]"); *cf. See Multicultural Radio Broad., Inc. v. Korean Radio Broad., Inc.*, No. CV 15-1961 (SRC), 2017 WL 436250, at *12 (D.N.J. Jan. 31, 2017) (explaining that 28 U.S.C. § 1653 allows plaintiffs the ability to amend their complaints to cure defective allegations of jurisdiction or "technical errors in jurisdictional pleading" where the issue is unintentional omissions of jurisdictional allegations).

Failure to include such allegations in any amended complaint, however, ***will result in dismissal without leave to amend***.  Plaintiffs are being given one more opportunity to fix this obviously curable deficiency.

**Entitlement to Restitution:** Defendants also argue that the UCL and FAL claims must be dismissed because the only available monetary remedies under those claims are restitution and restitution is unavailable here because "Plaintiffs fail to allege any money or property that can be clearly traced to particular money or property in any Defendant's possession."  (CL Motion at 23).  The Court again views this argument as an improper successive Rule 12(b)(6) argument.  Nonetheless, the Court considers and rejects the argument on the merits.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

_____

Under the FAL and UCL, "the remedy of restitution serves two purposes —
returning to the plaintiff monies in which he or she has an interest and deterring the
offender from future violations."  *Colgan v. Leatherman Tool Grp., Inc*., 135 Cal. App.
4th 663, 695–96, 38 Cal. Rptr. 3d 36 (2006), *as modified on denial of reh'g* (Jan. 31,
2006) (internal citations omitted).  The trial court has "broad authority" under the UCL
to fashion a remedy.  *Id.* (citing *Fletcher v. Sec. Pac. Nat'l Bank*, 23 Cal. 3d 442, 450,
153 Cal. Rptr. 28 (1979)).

Defendants' argument essentially tries to read a privity requirement into the
UCL and FAL that does not exist.  The UCL, among other things, authorizes a court to
make any order "as may be necessary to restore to any person in interest any money or
property, real or personal, which may have been acquired by means of such unfair
competition."  Cal. Bus. & Prof. Code § 17203.  While the language of the statute
requires that Plaintiffs have an "interest" in the money sought and proof that the
defendant "may" have acquired a benefit from an unfair practice, no direct privity
requirement is imposed.  *See id.*; *see also* William L. Stern, *Remedies Available for
Unfair Business Practice*, Business & Professions Code Section 17200 Practice Guide
(Mar. 2023 Update) ("Restitution does not require tracing of money, i.e., proof that
money received was in fact obtained as a direct result of the unlawful business
practice.") (collecting cases); *Shersher v. Superior Ct*., 154 Cal. App. 4th 1491, 1498,
65 Cal. Rptr. 3d 640 (2007) ("[I]n appropriate circumstances, the plaintiff in a UCL
action may obtain restitution from a defendant with whom the plaintiff did not deal
directly."); *Troyk v. Farmers Grp., Inc*., 171 Cal. App. 4th 1305, 1340, 90 Cal. Rptr. 3d
589, 618 (2009) (same); *Hirsch v. Bank of America*, 107 Cal. App. 4th 708, 132 Cal.
Rptr. 2d 220 (2003) (same).

Given the weight of California authority suggests that there is no privity
requirement to recover under the UCL/FAL, the Court rejects the argument that
Plaintiffs have failed to plead an entitlement to restitution.

Accordingly, the CL Motion is **GRANTED *with leave to amend*** to the extent it
seeks dismissal of the unjust enrichment claim but the CL Motion is **DENIED** to the
extent it seeks dismissal for failure to plead entitlement to restitution.

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

And the Motion is **DENIED** to the extent it seeks dismissal of any other claim based on the failure to plead inadequate legal remedies.  However, Plaintiffs are granted leave to amend, and are ***explicitly instructed to amend***, all other equitable claims to allege inadequate legal remedies.

### 4.    Whether the Alleged Misrepresentations and/or Omissions are Actionable

The Court next turns to the substance of the State Consumer Law claims, starting first with the allegations that Defendants made false or misleading misrepresentations or engaged in fraud by omission.  Defendants have advanced broad arguments for dismissal of the misrepresentation and omission claims in the CL Motion and have also advanced individualized arguments in the individually filed Motions.  The Court views the omnibus arguments as too abstract to provide useful analysis and therefore has relied primarily on the individual Motions to determine if each alleged misrepresentation and/or omission by a moving Defendant is actionable.

### a.  Kardashian

Plaintiffs bring their State Consumer Law claims against Defendant Kardashian based on two social media posts that were allegedly paid advertisements.  The Court discusses each post in turn.

***May Post:*** Plaintiffs allege that an Instagram post by Kardashian on May 30, 2021, was likely to deceive reasonable consumers regarding the value of the EMAX Tokens (the "May Post").  The May Post indicated that Club LIV and Story were "now accepting" EMAX Tokens "for all table reservations and bookings."  (SAC ¶ 128). The Court provides the May Post as it appears in the SAC as follows:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

<u>CIVIL MINUTES—GENERAL</u>

**Case No.  CV 22-00163-MWF (SKx)**                **Date:  June 6, 2023**
Title:  In Re Ethereummax Investor Litigation



(SAC ¶ 128).

Defendant Kardashian argues that the false advertising claims against her based on the May Post fail for the following two reasons: (1) Plaintiffs fail to explain why this post was false and (2) Plaintiffs fail to allege that Defendant Kardashian knew the statement was untrue.  (Kardashian Motion at 4-5).  The Court disagrees with both propositions.

***First,*** Plaintiffs plausibly allege that the statement that Club LIV and Story were "now accepting" EMAX Tokens was false at the time Defendant Kardashian made the May Post.  Plaintiffs allege that, on June 3, 2023, the EMAX Instagram account released another post explaining that "due to time constraints and the technical complexity behind being able to seamlessly process crypto payments, the venues have determined they do not have the ***immediate ability*** to accept $eMax as a payment option this weekend."  (SAC ¶ 131) (emphasis added).

Kardashian contends that the alleged inability to accept Tokens on June 3, a few days after her post on May 30th, is insufficient to demonstrate that the statement was untrue at the time she posted the advertisement.  That argument is unavailing.  There is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

no plausible reason to believe that Club LIV had the technical capability to accept the currency on May 30th but suddenly lost that capability a few days later on June 3rd. Further, the EMAX Instagram post explained that they only had "one chance [sic] to make a good first impression" and that EMAX wanted to get it right the first time.  (*Id.* ¶ 131).  Given the founders spoke in terms of wanting to make a good *first* impression in the future, it is clear that the club did not accept the Tokens at any time prior to June 3rd.  Because the May Post said that Club LIV was "now accepting" the Token as of May 30th and the allegations plausibly allege that Club LIV never had the ability to accept the Tokens as payment, Plaintiffs have sufficiently alleged that the statement was literally false.  (*See id.* ¶ 128).

       ***Second,*** the Court is not convinced that the false advertising claims brought against Kardashian require Plaintiffs to plead that Kardashian knew the statement was false because the May Post claim is premised on an affirmative misrepresentation.  To support this position, Kardashian cites to a non-binding case, which (although somewhat unclear), appears to be discussing the knowledge requirement in a product defect case where the primary issue was whether the failure to ***disclose*** certain information was actionable.  (*See* Kardashian Motion at 5) (citing *Smith v. LG Electronics U.S.A., Inc*., No. C 13-4361, 2014 WL 989742, at *9, 12 (N.D. Cal. Mar. 11, 2014) (dismissing the plaintiff's claim regarding the failure to disclose a washing machine's defects because there were no facts to suggest that the defendant was aware of the excessive noise and/or vibration defects at the time of sale).  In other words, while in certain omission-based cases a duty disclose arises based on knowledge of a defect, the Court does not read *Smith* as suggesting that there is a general "knowledge" requirement where the false advertising claim is premised on an affirmative misrepresentation.

       Rather, to state a claim under either the UCL or the FAL based on affirmative representations, "it is necessary only to show that members of the public are likely to be deceived."  *Kasky v. Nike, Inc*., 27 Cal. 4th 939, 951, 119 Cal. Rptr. 2d 296 (2002), *as modified* (May 22, 2002).  The statutory language of the FAL makes explicit that the standard is one of negligence and does not require knowledge.  The statute provides that plaintiffs can recover for advertisements that were "known, or which by the

___

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

exercise of reasonable care *should be known*, to be untrue or misleading." Cal. Bus. &
Prof. Code § 17500 (emphasis added).  "It is not necessary that defendant intended to
mislead the public or that [he or she] had actual knowledge of the falsity of the
advertisement[.]"  Judge Kimberly A. Gaab and Sara Church Reese, *Elements of
Claim*, Cal. Prac. Guide Civ. Pro. Trial Claims and Def., Ch. 14(I)-B (Oct. 2022
Update) (collecting cases); *see also In re Tobacco II Cases*, 46 Cal. 4th 298, 312, 93
Cal. Rptr. 3d 559 (2009) ("The fraudulent business practice prong of the UCL has been
understood to be distinct from common law fraud.  A common law fraudulent
deception must be actually false, known to be false by the perpetrator and reasonably
relied upon by a victim who incurs damages. *None of these elements* are required to
state a claim . . . under the UCL.") (internal citations and quotation marks omitted)
(emphasis added).  Therefore, Kardashian has not established that lack of knowledge is
a defense under the UCL or FAL.  It is clear that, with the "exercise of reasonable
care," (i.e., simply confirming the truth of the statement with the people on behalf of
whom she was promoting), Kardashian should have known that Club LIV lacked the
immediate ability to accept the Tokens at the time of the May Post.

Further, Kardashian does not cite to any cases suggesting that any of the other
State Consumer Laws for false advertising imposes a knowledge requirement regarding
affirmative misrepresentations.  And such a requirement seems untenable — it would
effectively allow advertisers to make false representations about their products without
any basis for doing so and then claim lack of knowledge as a defense.  As a paid
spokesperson, a celebrity endorser stands in the shoes of the company she is promoting,
and such an endorser should be expected to take at least some steps to confirm the truth
of any statement she wishes to disseminate to the public.

Accordingly, the Motion is **DENIED** to the extent it seeks dismissal of the State
Consumer Law claims (Claims 1 and 3-7) against Kardashian based on the May Post.

*June Post:* Plaintiffs also base their false advertising claims against Defendant
Kardashian on her Instagram Story post from June 14, 2021 (the "June Post").  The
June Post stated as follows:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

<u>CIVIL MINUTES—GENERAL</u>

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation



(SAC ¶ 147).

Plaintiffs contend that Kardashian's June Post was false and/or misleading for primarily two reasons:  (1) Kardashian was not organically "sharing" what friends had told her about EMAX but was being paid to share the post and (2) the content of the message created the false impression that the EMAX Tokens were scarce because it indicated that the founders had "burned" "50% of their Admin Wallet."  (Opposition at 5-6).

As for the first theory of deception, the question is whether reasonable consumers would read the phrase "sharing what my friend just told me" as implying that Kardashian was not being paid to post the advertisement.  The Court concludes that the answer to that question is no.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)               Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

The Ninth Circuit has repeatedly stressed that the allegedly misleading statement "must be examined in the full context of the advertising or promotional materials in which the statement was made." *Tracy Anderson Mind & Body, LLC v. Roup, No*. CV 22-4735-RSWL (Ex), 2022 WL 17670418, at *4 (C.D. Cal. Dec. 12, 2022) (citing *Southland Sod Farms v. Stover Seed Co*., 108 F.3d 1134, 1139 (9th Cir. 1997)); *see also Moore v. Trader Joe's Co*., 4 F.4th 874, 882 (9th Cir. 2021) ("The context of the entire packaging is relevant.") (internal citation omitted); *Freeman v. Time, Inc*., 68 F.3d 285, 290 (9th Cir. 1995) (affirming dismissal of false advertising claim where the advertisement "when read reasonably and in context" made no misrepresentation).

Here the June Post includes a "#AD" disclaimer making it clear that Kardashian was being paid.  Although the hashtag is toward the bottom of the post, given there is a banner in big and bold font stating "SWIPE UP" placed ***below*** the string of hashtags, any reasonable consumer would inevitably see the hashtags before swiping up to purchase the Tokens.  (*See* SAC ¶ 147).  Moreover, based on the Court's common sense and experience, hashtags are a commonly used mechanism of communicating information on social media platforms and one would reasonably expect to see such an advertising disclaimer in the form of a hashtag below the substance of the post.  Further, because Kardashian explicitly stated that the post was "not financial advice," the fact that she was "sharing" what her friend just told her, made it arguably even more clear that she was acting as a spokesperson for others.

Given Kardashian's background and experiences, there is nothing to suggest that she was speaking on her own behalf, and she did not even imply that she was using or buying the Tokens herself.  It is widely understood that Kardashian is paid for many of her social media posts, and therefore, it should not come as a surprise to any reasonable consumer that she was paid for the June Post given it included the "#AD" disclaimer.  Therefore, the Court concludes that the context of the June Post made clear that the message was an advertisement.  *See, e.g*., *Sponchiado v. Apple Inc*., Case No. CV 18-07533-HSG, 2019 WL 6117482, at *3 (N.D. Cal. Nov. 18, 2019) (collecting cases granting motions to dismiss where the context of the advertisement and/or qualifying language "make the meaning of the representation clear"); *see also Estrella-Rosales v. Taco Bell Corp*., No. CV 19-18192-WJM, 2020 WL 1685617, at *2 (D.N.J. Apr. 7,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

2020) (noting that an advertisement with a disclaimer indicating that a deal at a restaurant was only available at participating locations dispelled any deception despite the fact that the disclaimer was "at the end of the ad toward the bottom of the screen" because it was "nevertheless clear and conspicuous" and "anyone familiar with television ads for consumer products knows that these disclaimers are often presented" in that exact manner).

Accordingly, the Motion is **GRANTED** *without leave to amend* to the extent it seeks dismissal based on the alleged deception associated with the phrase "sharing what my friend just told me" in the June Post.

However, the latter half of the June Post is more specific and more likely to deceive.  The central message the June Post conveyed was that "400 trillion tokens – Literally 50% of the[] Admin Wallet" had been "burned," which Plaintiffs contend created a false impression that the EMAX Tokens were scarce and that investors would miss out if they did not immediately purchase them.  (Opposition at 5) (citing SAC ¶ 151).  Further, even if 400 trillion tokens were in fact burned, Plaintiffs explain that the statement was still misleading because the burning of 400 trillion Tokens did not meaningfully impact the availability of EMAX Tokens given *two quadrillion* Tokens had been originally created.  (*Id.* at 6; *see also* SAC ¶¶ 276, 328, 330 (several Plaintiffs alleging that they interpreted the June Post "as indicating that the decrease in supply would cause their current investments in EMAX Tokens to correspondingly increase in value").  Kardashian argues that given the statement indicates that at least 400 trillion Tokens *remained* in the Admin Wallet, no reasonable consumer could plausibly view the statement as claiming that the Tokens were scarce.  (Motion at 6).

On the "scarcity" theory of deception, the Court agrees with Plaintiffs.   The only possible reason that a business would pay someone to tell millions of followers that its product was rapidly being "burned" is to create an impression of scarcity, which as a matter of common sense economics, is intended to drive up demand and price.  Advertising that conveys messages concerning limited supply or limited time offers are meant to create a sense of urgency and will inevitably be material to consumers who want the product or price offered.  *Cf. Carvalho v. HP, Inc.*, No. CV 21-08015-BLF,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

2022 WL 2290595, at *5 (N.D. Cal. June 24, 2022) (denying motion to dismiss UCL, FAL, and CLRA claims based on representation about "the limited-time nature of the advertised discounts" because the plaintiff plausibly alleged that the statements were misleading and reasonable consumers would rely on such statements).  The scarcity statement in the June Post was clearly framed in a way to make the burning of 400 trillion Tokens appear to be a large number because it suggested that 50% *of the entire universe of Tokens* had been burned, and consumers reasonably would expect to be told if the percentage related to some metric other than the total universe of Tokens.

Therefore, the Court cannot conclude as a matter of law that the June Post was not deceptive and/or material, particularly in light of the allegation that at least one consumer survey found that 19% of respondents that saw the June Post invested in EMAX Tokens as a result.  (SAC ¶ 149).  Whether 19% will be enough in later stages of the litigation remains to be seen, but at this stage, Plaintiffs have demonstrated "more than a mere possibility that [the June Post] might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner[.]"  *See Moore*, 4 F.4th at 882 (internal citations and quotation marks omitted); *see also Oshana v. Coca–Cola Co.*, No. 04 C 3596, 2005 WL 1661999, *9 (N.D. Ill. July 13, 2005) (presumption of materiality applied where 24% of consumers indicated they "would behave differently" without the misrepresentation).

Accordingly, the Motion is **DENIED** to the extent it seeks dismissal of the false advertising claims (Claims 1 and 3-7) premised on the scarcity message of the June Post.

### b. Mayweather

Plaintiffs' allegations against Mayweather are a bit more scattershot as Mayweather's statements about the Tokens were less explicit, although based on the allegations he was clearly involved in their promotion and his association with the Tokens did appear to have a large impact on the price.  The Court deals here only with the allegations suggesting that Mayweather made an affirmative misrepresentation or

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

fraudulent omission.  To the extent any of his conduct can more generally be described as an "unfair practice" under the UCL, the Court deals with that issue separately.

The only possible misrepresentations or omissions that can be directly attributable to Mayweather as a form of false advertising are his statements at the "Bitcoin 2021" conference and the fact that he wore clothing with the EMAX label during widely publicized events without disclosing that he was being paid to do so. The Court deals with these two allegations in turn.

*Bitcoin 2021*:  Plaintiffs allege that on June 4, 2021, Defendant Mayweather attended the "Bitcoin 2021" conference, and during a panel discussion, he stated:  "I believe there's gonna be another cryptocurrency just as large as Bitcoin someday." (*Id.* ¶ 135).  Mayweather was wearing a t-shirt with "EthereumMax" emblazoned across the chest when he made this statement.  (*Id.* ¶ 133).

Even assuming that the statement, coupled with the fact that he was wearing an EMAX-branded t-shirt, suggest that Mayweather was referring to EMAX, the statement is clearly puffery, upon which no reasonable consumer could rely.

An advertising statement may be non-actionable if it constitutes "puffery," which is defined as "exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely."  *Southland*, 108 F.3d 1134, at 1145.  Puffery includes "statement[s] of fact [in]capable of being proved false," statements that are not "specific and measurable," or statements that otherwise cannot be "reasonably interpreted as a statement of objective fact."  *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999); *see also Glen Holly Ent., Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1015 (9th Cir. 2003) (establishing that "generalized, vague, or unspecific assertions" constitute unactionable puffery).  A statement is also considered puffery if the claim is extremely unlikely to induce consumer reliance. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1054 (9th Cir. 2008).  Ultimately, the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim.  *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 246 (9th Cir. 1990).   Thus, a statement that is quantifiable, that makes a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title: In Re Ethereummax Investor Litigation

claim as to the "specific or absolute characteristics of a product," may be an actionable statement of fact while a general, subjective claim about a product is non-actionable puffery.  *Id.*  Courts may determine as a matter of law at the motion-to-dismiss stage whether an alleged misrepresentation is a statement of fact or mere puffery.  *Newcal Indus., Inc.*, 513 F.3d at 1053.

Mayweather's statement, that he "believe[d]" that a cryptocurrency would be as big as Bitcoin one day", is a statement of opinion about the prospects for the future, not a measurable, objective statement of fact.  (*See* SAC ¶ 135); *see also Neu-Visions Sports, Inc. v. Soren/McAdam/Bartells*, 86 Cal. App. 4th 303, 309–10, 103 Cal. Rptr. 2d 159 (2000) ("It is hornbook law that an actionable misrepresentation must be made about past or existing facts; statements regarding future events are merely deemed opinions.") (internal citations omitted).  In the Mayweather Opposition, Plaintiffs do not advance any substantive argument to suggest otherwise.

Therefore, the Motion is **GRANTED *without leave to amend*** to the extent it seeks dismissal of the false advertising laws (Claims 1, 3, and 5-7) against Mayweather premised on the Bitcoin 2021 statement.

***EMAX Clothing and Fight Website***:  Plaintiffs argue that, by wearing a shirt and boxing gear bearing the EMAX name and allowing EMAX to use his name and fame to promote EMAX in association with the Mayweather vs. Logan Paul fight, without disclosing that Mayweather was being paid to do so, Mayweather falsely led consumers to believe that he was organically interested in EMAX and that he was a key investor in the Token, as opposed to a paid celebrity endorser.  (Mayweather Opp. at 8).  Mayweather argues that "simply wearing a logo, of course, is not a false or misleading statement" and that if Plaintiffs' theory is correct "then any person wearing, for example clothing bearing a 'Nike' logo could be held liable for damages arising from the purchase of a Nike product."  (Mayweather Motion at 5).

Mayweather's argument misses the broader point that Plaintiffs are not suggesting that anyone wearing certain clothing can be liable for false advertising, but rather, Plaintiffs claim that Mayweather is liable given his extensive unspoken

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

endorsement of EMAX all while omitting the fact that he was **paid** to wear specific articles of clothing and to allow the Fight Website to exploit his name and likeness. The difference of course is that consumers may believe that a celebrity's use or association with a product says something about the product if they tend to trust that celebrities' judgment or believe the celebrity has valuable insight on a particular product's features.  That reliance alone would not give rise to a claim for false advertising.  However, if the consumer is aware that the celebrity has used/worn a product, not because of its inherent benefits, but because he or she is being paid to do so, that could change the consumer's perception of the product.  (*See* Mayweather Opp. at 9) (noting that named Plaintiffs viewed Mayweather's promotional activities as suggesting that he was "an actual backer/investor in EMAX Tokens, and that he was making EMAX a part of his multimillion-dollar investment strategy").  In other words, the thrust of Plaintiffs' argument is that Mayweather falsely advertised for EMAX by failing to disclose that he was being paid by EMAX's founders.

In assessing whether an omission is fraudulent or deceptive, courts typically consider whether the omission satisfies one or more of the four factors set forth in *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336, 60 Cal. Rptr. 2d 539 (1997), as cited in *People v. Johnson & Johnson*, 77 Cal. App. 5th 295, 325, 292 Cal. Rptr. 3d 424, 448 (2022), *as modified on denial of reh'g* (Apr. 27, 2022).  "There are four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts."  *Id.* (internal citation omitted).

Plaintiffs do not cite any case law or even make a reasoned argument to establish Mayweather's duty to disclose his payments.  And fraud-by-omission claims must meet Rule 9(b)'s pleading standards.  Plaintiffs must "describe the content of the omission and where the omitted information should or could have been revealed.'" *Shamamyan v. FCA US LLC*, Case No. CV 19-5422-DMG (FFMx), 2020 WL 3643481, at *7 (C.D. Cal. Apr. 1, 2020) (citing *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 1002 (N.D.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV 22-00163-MWF (SKx)**                    **Date:  June 6, 2023**
Title:  In Re Ethereummax Investor Litigation

Cal. 2009)).  It is possible that under the alleged facts, Mayweather did have a duty to disclose that he was being paid, but in the absence of both case law and additional factual details regarding the omitted information, the Court cannot conclude that this claim is sufficiently pled under Rule 9(b).

Accordingly, the Motion is **GRANTED** *with leave to amend* to the extent it seeks dismissal of the fraud-by-omission claim against Mayweather.

### c.  Pierce

Plaintiffs allege that Pierce promoted EMAX on Twitter on four occasions (on May 26, 2022, May 28, 2022, May 30, 2022, and June 6, 2022).  (SAC ¶¶ 76-110) (describing Pierce's posts and coinciding EMAX trading activity).  The Court provides screenshots of three of the tweets and describes the fourth as follows:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation







UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

(SAC ¶¶ 76, 82, 87).

Pierce also allegedly tweeted on June 6, 2021, the same day as the Mayweather-Logan fight, that he was going to "double down" on EMAX.  (*Id.* ¶ 89).  However, at the hearing, Pierce's counsel noted that there are no allegations that any Plaintiff actually saw or relied on the June 6th tweet about doubling down on EMAX. Plaintiffs' counsel acknowledged there were no such allegations.  As the Court explained in the Prior Order, the consumer law claims fail without allegations of actual exposure to the advertisement.

Accordingly, the Pierce Motion is **GRANTED *with leave to amend*** to the extent it seeks dismissal of the claims against Pierce premised on the June 6th tweet.

As for the other tweets, the Court notes that several of Plaintiffs' arguments explaining why each of these statements is false do not appear as allegations in the SAC but rather are supported by documents attached to Plaintiff's RJN.  While information made available on government websites is a proper subject of judicial notice, if the Court were to accept the truth of the contents of the SEC documents, it would effectively allow Plaintiffs to amend their complaint in the Opposition.  The Court is somewhat weary of disregarding the judicially noticed documents simply to have us end up back in the same position in a month deciding the same motion, but given Pierce opposed the request for judicial notice, and the Court agrees that consideration of the documents for the truth of the matters asserted would amount to an amendment of the SAC, the Court will ***not*** consider the truth of the contents in the SEC documents.

But, even without the SEC documents, the SAC itself alleges two theories of deception against Pierce: (1) that Pierce falsely represented that he made substantial money through EMAX investments (though much of his returns were attributable to selling the ***free*** EMAX Tokens he obtained as compensation for his promotions) and (2) representations indicating that he was committed to investing in EMAX as a long-term investment (despite the fact that he was simultaneously selling off large numbers of EMAX Tokens).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

Plaintiffs' first theory of deception, that Pierce represented that he "made more money" from EMAX than ESPN, differs in a significant way from the allegations against Mayweather, in that he explicitly represented that he was an actual investor in EMAX, making it even more important that he disclose his payments.  Moreover, Pierce not only failed to disclose that he was being paid but failed to disclose that his "investment" in EMAX was largely based on free Tokens given to him in exchange for his posts.  That fact is significant because it tends to demonstrate that his affirmative representations could be construed as false by reasonable investors.  For instance, in Pierce's first tweet about EMAX he implied that that he had made huge profits from his EMAX investments.  (*See* SAC ¶¶ 79, 81, 82) (explaining Pierce was "airdrop[ped]" billions of Tokens prior to making a post in which he stated he "made more money in this [i.e., EMAX] crypto in the past month" then he did at ESPN in a year).  A fair reading of the SAC demonstrates that Pierce's representations could be misleading because they implied that his ***investment*** in EMAX resulted in substantial returns, when as alleged, it was actually the receipt and sale of freely obtained Tokens that was driving his returns.  Given the fact that Pierce did not pay any money for a large portion of his EMAX Tokens in the first place, inevitably, selling the Tokens for any amount of money over and above $0 would result in a return.  By contrast, had Pierce invested large sums of his own money to purchase the Tokens, the value of the Tokens would have to rise above the amount paid before he would see a return.  In sum, the SAC plausibly alleges that Pierce represented that he made more money on his investment in EMAX than he actually made.

In response, Pierce argues that "there was nothing false about any statement or alleged implication made regarding growth potential or price increases" because "the Tokens did increase in value" around the time of his posts.  (Reply at 2).  However, even if the Tokens did increase in value, by suggesting that he "made more money" with EMAX than ESPN, Plaintiffs still plausibly allege that Pierce falsely represented the possible returns on investments for those who had not received free Tokens.  Pierce further contends that no reasonable consumer could rely on a statement regarding the future value of the Tokens.  (*Id.*).  But Pierce's Tweets were not forward-looking.  Rather, he stated that he had ***already*** "made more money" in "the past month" than he did in a year at ESPN, which is a specific, measurable statement of existing fact,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

pushing the statement over the line from mere boasting to misrepresentation.  Indeed, because one can objectively determine if Pierce did in fact make more from his EMAX investments than he did from his ESPN contract, the statement is not puffery.  *See Southland*, 108 F.3d at 1145 (distinguishing between "Less is More" claim and "50% Less Mowing Claim" and concluding that only the former claim is puffery because the latter claim "is a specific and measurable" claim); *cf. In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143-44 (9th Cir. 2017) (concluding, in the context of a securities claim under federal law, that a CEO's statement that the "pipeline continues to build to record levels" was a non-forward looking statement of fact that was non-puffery because it "provided a concrete description of the past and present state of the pipeline").

Pierce further contends that it is not plausible that consumers would be unaware that Pierce was a paid promoter, pointing to this Court's Prior Order stating "the Twitter posts by Pierce make clear to the public the fact that he had invested in the EMAX Tokens and had a financial interest in the price of the Tokens." (Pierce Motion at 8) (citing Prior Order at 11).  While the Court agrees that Pierce did not hide that he had a financial interest in the price of the Tokens, the Court disagrees that it would be obvious to a reasonable consumer that Pierce had been paid to promote EMAX in the form of EMAX Tokens.  The difference is important because had Pierce actually invested large amounts of money in EMAX, his incentive would be aligned with other investors — namely, to ensure the price stayed high.  But since he was given EMAX Tokens for free, he had much more incentive to sell the Tokens given any amount sold would produce a return.  In sum, given he did not disclose that he was paid in EMAX Tokens, it is plausible that reasonable consumers could find it material that he had "made more money" with EMAX than he had with ESPN within a month.  (*See* SAC ¶ 82).

As for the second theory of deception, Plaintiffs' allege that Pierce falsely represented that he was invested in EMAX as a long-term investment, despite the fact that he was simultaneously selling off large amounts of Tokens.  (*See id.* ¶ 78) ("Pierce's wallet's trading activity in conjunction with Pierce's social media activity shows that Pierce made millions of dollars trading (and selling) EMAX Tokens while simultaneously promoting the tokens to investors as sound long-term investments.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

Pierce argues that the statement that he was invested in EMAX for the "long haul" was a vague, highly subjective statement that amounted to nothing more than puffery.  Pierce contends that there is no way of measuring the truth or falsity of that statement because there is no uniform definition of "long haul," especially in the context of cryptocurrency.

The Court disagrees.  Pierce's promotion cannot be characterized as vague opinion about the sustainability of the Tokens.  His statement was an affirmative representation of his personal investment position, which could be proven false if Plaintiffs can prove that reasonable consumers have a common understanding of what "long haul" means in the relevant context.  Whether the statement was likely to deceive reasonable consumers is a question of fact that will be determined based on an objective standard.  *See Alvarado v. Peloton Interactive, Inc*., No.  CV 19-CV-11711 (LJL), 2023 WL 3195941, at *10 (S.D.N.Y. May 2, 2023) ("Whether or not a statement is misleading, like whether or not a statement is material, requires an objective inquiry[.]"); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc*., 326 F.R.D. 592, 613 (N.D. Cal. 2018) ("[T]he standard [under California law] requires only that the [c]ourt find there is a probability that reasonable consumers could be misled, not that they all believed 'Made From Real Ginger' means the same thing.").  Pierce's trading activity lasted a total of 16 days, and that fact alone could suggest falsity.  (*See* SAC ¶¶ 79-89).  It is plausible that Plaintiffs will at least be able to prove that objectively reasonable consumers understand the term "long haul" as conveying a sense of permanency longer than a few days.  Yet, three days after telling investors he was invested for the "long haul," Pierce sold 9.7 trillion EMAX Tokens.  (SAC ¶ 88).

The closer question is whether the statements would be material to reasonable consumers.  Pierce emphasizes that he is not a well-known financial advisor and Plaintiffs had no reason to believe that he would give sound financial advice.  (Pierce Motion at 7).  Pierce's counsel reiterated this point at the hearing.

The Court would likely find this argument more persuasive if it were not for the context of Pierce's other tweets.  Consumers need not have thought of Pierce as a sound financial advisor to have relied on his statements.  Pierce specifically posted a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

tweet representing that he held a sizeable position in EMAX (worth over
$2,000,000.00).  (SAC ¶ 76).  Given the Tokens were a newly minted currency that
was fresh on the market at the time of the tweets, it is plausible that consumers could
believe that Pierce held a large enough stake in the Tokens that his retention of the
Tokens would significantly impact the market price (and Plaintiffs allege that his
trading activity did in fact affect the market price).  (*See, e.g.,* ¶¶ 172 (showing chart
indicating price rose and fell according to Pierce's promotions and subsequent trades,
including a drastic drop on June 8, 2021, when Pierce sold nearly 97.4 billion Tokens
two days after saying he would double down).  Therefore, the Court cannot conclude
that the statement was not misleading and/or material to a reasonable consumer as a
matter of law.

Accordingly, the Motion is **DENIED** to the extent it seeks dismissal of the false
advertising claims (Claims 1, 3, and 5-7) against Pierce based on the three tweets
identified above.

### d.  Perone and the Company

Plaintiffs do not do much to articulate a clear theory of false advertising against
Perone or the Company.  Rather, the arguments almost entirely center on Perone's
alleged role in orchestrating the entire scheme — especially his decision to give the
Promoter Defendants free Tokens.  (Perone Opp. at 2-5).  The Court deals with those
allegations under the "unfair" UCL prong as they do not concern false advertising.

As for the false advertising claims, the Court concludes that the claims against
Perone and/or the Company are not pled with the requisite specificity and otherwise
constitute non-actionable puffery.  Specifically, Plaintiffs identify the following four
statements for which they seek to hold Perone and the Company liable:

- Perone's statement that "technological upgrades" were on the way for
  EMAX.  (SAC ¶ 121);
- that EMAX had secured a "landmark agreement" with the Mayweather
  team (*id.* ¶ 144);

---

**CIVIL MINUTES—GENERAL**                                                        63

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

- that he downplayed any notion of a "rug pull" (*id.* ¶ 146); and
- that the founders were "looking to lock their wallets" (*id.*).

Other than identifying these statements, the Perone Opposition merely recites dozens of other factual allegations against Perone and asks the Court to do the entire substantive legal analysis for Plaintiffs.  The Court will not do so.

The Court cannot conclude that any of the above statements adequately serves as the basis for a false advertising claim.  The statements about future "technical upgrades" and the future intention to "lock their wallets" are too vague and unmeasurable such that they fail to constitute objective statements of specific fact upon which a false advertising claim can be based.  *See Glen*, 343 F.3d at 1015 (affirming district court's dismissal of claim based on company personnel's statement that development of a new software was being treated as a "high priority" and that the company had "more than enough engineers and programmers to meet [their] goals" which was "generalized, vague, and unspecific" as opposed to the actionable statement that a specific feature of the software would be delivered in a "couple of months").  As for the statement downplaying the notion of a "rug pull," Plaintiffs fail to specify what was actually said to downplay that concern.  And, as for the statement concerning a "landmark agreement" with Mayweather, Plaintiffs fail to adequately explain why that statement was false.  It appears that Plaintiffs contend that it was false because the ***nature*** of the agreement was nefarious and/or because Perone failed to disclose that the agreement entailed paying Mayweather to promote the Tokens.  (*See* Perone Opp. at 7.)

However, that argument is better characterized as a fraud-by-omission claim, and again, Plaintiffs fail to provide any reasoned argument regarding Perone's duty to disclose.  And while Plaintiffs add many allegations concerning reliance on other Defendants' statements, it does not appear that any named Plaintiff has alleged that they relied on any of the above statements before purchasing Tokens.  Therefore, the SAC insufficiently pleads false advertising claims against Perone.

The Court notes, however, there are certain statements throughout the SAC made from the EMAX social media accounts.  To the extent Plaintiffs have reason to believe

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No. CV 22-00163-MWF (SKx)                Date: June 6, 2023
Title: In Re Ethereummax Investor Litigation

Perone was posting those statements, the Court would consider attributing such statements to Perone in an amended complaint that included adequate allegations of his own personal involvement. (*See, e.g.,* SAC ¶ 69) (describing May 16, 2021, Instagram post from the EMAX Instagram account, which stated that EMAX Tokens were up "500,000+% in the first 24 hours"). Some of the statements in the Company social media posts have the requisite specificity required to constitute false advertising and ***someone*** must be responsible for those posts. Given the current allegations, it appears plausible that Perone was behind the Company's social media accounts.

However, Plaintiffs have not specifically argued that any particular statement by the Company was written by Perone and/or that Plaintiffs relied on any of the Company social media posts before purchasing Tokens. Therefore, the Court has not considered the sufficiency of any statements contained in the Company's social media posts.

Plaintiffs will be given ***one more opportunity*** to allege with particularity any other misrepresentation attributable to Perone and/or the Company, but as currently alleged and argued in the Opposition, the Court views the statements as nonactionable puffery and/or premised on a fraud-by-omission theory with no requisite analysis regarding Perone's and/or the Company's duty to disclose.

Accordingly, the Perone Motion is **GRANTED** ***with leave to amend*** to the extent it seeks dismissal of the false advertising claims (Claims 1, 3, and 5-7) against Perone.

### e. Rechnitz

Plaintiffs fail to allege any specific representation and/or omission made to the public by Rechnitz. While Plaintiffs attribute some statements generally to the "Executive Defendants," the Court concludes that Plaintiffs have only plausibly alleged that Perone may be the actor behind the EMAX social media posts. Nothing in the SAC suggests that posts made by the EMAX social media accounts were created or posted by Rechnitz. Rechnitz's stated role in the scheme was to recruit celebrity endorsers in exchange for free EMAX Tokens that he then allegedly sold off for a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

profit.  (SAC ¶ 42).  The SAC does not include any allegations that give rise to an inference that Rechnitz held a position within the scheme that would confer power to post social media messages on the Company's behalf.  In fact, Rechnitz is specifically **not** included in the text messaging thread titled "eMAX team marketing," in which other Defendants discuss paying Rechnitz for his role in securing Mayweather's promotions.  (*Id.* ¶ 171).

Accordingly, the Rechnitz Motion is **GRANTED** *with leave to amend* as to the false advertising claims (Claims 1, 3, and 5-7) against Rechnitz.

### 5.    UCL Unlawful Prong

Because Plaintiffs' UCL unlawful claim is premised on violations of the false advertising laws, to the extent the Court concluded that those claims were sufficiently pled, the UCL unlawful prong claims are also sufficient.

Accordingly, the Motions are **DENIED** to the extent they seek dismissal of the UCL unlawful claim premised on sufficiently pled false advertising claims.  Otherwise, the Motion is **GRANTED** *with leave to amend*.

### 6.    UCL Unfair Prong

In this Court's Prior Order, the Court dismissed Plaintiffs' UCL unfair prong claim because the previous Complaint dedicated merely a single sentence to the claim, which the Court deemed as insufficient to put Defendants on notice of the conduct alleged to be unfair.  (Prior Order at 38).  In the SAC, Plaintiffs have substantially expanded their allegations and analysis under the unfair prong of the UCL so the Court will more closely analyze the allegations.  (*See* SAC ¶¶ 212-244).

The Ninth Circuit has repeatedly acknowledged that "the proper definition of 'unfair' conduct against consumers 'is currently in flux' among California Courts." *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 866 (9th Cir. 2018) (quoting *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) ) ("The UCL does not define the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

term 'unfair.'  In fact, the proper definition of 'unfair' conduct against consumers 'is currently in flux' among California courts.").

The California Supreme Court has adopted an express rule as to what constitutes "unfair" conduct in the context of business competitor UCL cases:

> When a [party] who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

*Cel-Tech Comm'n, Inc., v Los Angeles Cellular Telephone Co*., 20 Cal. 4th 163, 187, 83 Cal. Rptr. 2d 548 (1999).

However, the *Cel-Tech* court limited its analysis to suits brought by competitors. *Id.* at 187 n. 12 ("This case involves an action by a competitor alleging anticompetitive practices. Our discussion and this test are limited to that context. Nothing we say relates to actions by consumers or by competitors alleging other kinds of violations of the unfair competition law such as 'fraudulent' or 'unlawful' business practices or 'unfair, deceptive, untrue or misleading advertising.'")  In the wake of *Cel-Tech*, the California Court of Appeal diverges as to the appropriate test to apply to consumer UCL cases.

Three strains have emerged.  Some cases have applied the *Cel-Tech* test noting the *Cel-Tech* court's disapproval of the amorphous nature of the earlier tests.  *See, e.g., Gregory v. Albertson's Inc.* 104 Cal. App. 4th 845, 851, 128 Cal. Rptr. 2d 389 (2002) (holding that allegations that grocery store was deliberating kept closed failed to allege a claim under UCL because it was insufficiently "tethered" to statutory or regulatory scheme).  Others utilize the pre-*Cel-Tech* balancing analysis that weighs the utility of conduct against the alleged harm.  *See, e.g., Smith v. State Farm Mutual Automobile Ins. Co.*, 93 Cal. App. 4th 700, 113 Cal. Rptr. 2d 399 (2001) (holding that practice of issuing separate policies to cover each of an insured's vehicles, but prohibiting waiver

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No. CV 22-00163-MWF (SKx)                    Date: June 6, 2023
Title: In Re Ethereummax Investor Litigation

of uninsured motorist coverage on anything but all the claims constituted an unfair business practice).  A third strand applies the three-pronged test articulated in section 5 of the FTC Act.  *See Camacho v. Auto. Club of S. California*, 142 Cal. App. 4th 1394, 1401, 48 Cal. Rptr. 3d 770 (2006) (discussing various analyses under the "unfair" prong in the wake of *Cel-Tech* and adopting the three-prong FTC Act test).

In the SAC, Plaintiffs set out facts under each unfair test but in the briefs both parties focus primarily on the FTC test given this Court has previously applied that test in consumer actions.  However, in more recent cases, this Court has relied on the balancing test, given the Court has identified Ninth Circuit case law explicitly noting that the Ninth Circuit does "not agree that the FTC test is appropriate" in consumer UCL cases and has declined "to apply the FTC standard in the absence of a clear holding from the California Supreme Court."  *Lozano v. AT&T Wireless Servs., Inc*., 504 F.3d 718, 736 (9th Cir. 2007).  In *Lozano*, the Ninth Circuit held that "the district court did not apply the wrong legal standard by relying on the balancing test from *South Bay*," thereby implicitly approving of the balancing test.  *See id.*  In a later case, the Ninth Circuit applied both the balancing test and the *Cel-Tech* tethering test to a plaintiff's UCL claim.  *See Davis,* 691 F.3d at 1170.

Therefore, the Court applies the *South Bay* balancing test but notes where other laws, regulations, or policies appear to condemn similar conduct, such that liability in this action could be "tethered" to public policy.  The Court has applied the parties' arguments made in support of the FTC test directly to the balancing test in light of the Ninth Circuit authority identified above.

The Court reads the SAC as bringing a UCL claim based on three distinct theories of unfairness.  **First,** Plaintiffs' unfair UCL claim against the Promoter Defendants seems to be premised on the celebrities' promotions of worthless investments to their loyal followings without at least vetting the Tokens and/or disclosing that they received substantial compensation for their promotions.  (*See* SAC ¶ 222) (noting the promoters failed to disclose that they were "being paid to promote the EMAX Tokens" and led consumers to believe they were "organic[lly] interest[ed]/support[ive]" of EMAX); *see also id.* ¶ 163 ("If you bought [EMAX] after Kardashian pushed it and didn't sell fast enough, all you were left with was a

CIVIL MINUTES—GENERAL                                                    68

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

practically worthless digital asset[.]"); *see id.* ¶ 228 ("Mayweather's statements and promotions of EthereumMax gave Semerjian the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy."); *see id.* ¶ 228 ("Semerjian saw the promotions by Pierce on May 26, 2021, May 28, 2021, and May 30, 2021, respectively. These promotions regarding the growth potential and price increases for EMAX Tokens induced Semerjian to make his first and second purchases of EMAX Tokens.").

*Second*, Plaintiffs' unfair UCL claim against the Executive Defendants as well as Defendants Mayweather and Pierce appears to be premised on those Defendants' knowing orchestration of a "pump-and-dump" scheme of the Tokens.  (*See id.* ¶ 4 (accusing Executive Defendants of hiding their unlocked ownership of huge portions of the total number of Tokens to "avoid scrutiny and facilitate this [pump-and-dump] scheme"); *see id.* ¶ 40 (noting that one of the Executive Defendants admitted certain of the founders were "literally in there to pump and dump").

*Third*, while not stated as explicitly, a theme running through the SAC is that the Executive Defendants' conduct was unfair because they knowingly solicited investor funds with no legitimate business plan for sustainable returns.  (*See id.* ¶ 3 ("Defendants touted the prospects of the Company and the ability of investors to make significant returns due to the favorable "tokenomics" of the EMAX Tokens.  In truth, Defendants marketed the EMAX Tokens to investors so that they could sell their portions of the Float for a profit."); *see id.* ¶ 60 ("At the time of launch, and throughout the Relevant Period, the EMAX Tokens were not sold pursuant to a 'whitepaper.' Whitepapers in cryptocurrency are documents released by the founders of the project that gives investors technical information about its concept, and a roadmap for how it plans to grow and succeed."); *see id.* ¶ 60 ("In plain terms, [EMAX's] entire business model relies on using constant marketing and promotional activities, often from 'trusted' celebrities, to dupe potential investors into trusting the financial opportunities available with EMAX Tokens."); *see id.* ¶ 221 (describing Executive Defendants' conduct as the creation of a "bogus crypto 'investment opportunity' scam").

The Court discusses these alleged "unfair" practices separately:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No. CV 22-00163-MWF (SKx)                    Date: June 6, 2023
Title:  In Re Ethereummax Investor Litigation

*__Undisclosed and Reckless Paid Promotions:__*  While the Promoter Defendants did not all engage in the same conduct and are not necessarily equally culpable, central to the allegations against Kardashian, Mayweather, and Pierce are the facts that they knowingly exploited their celebrity status to encourage their followers to invest in a business that, at the very least, the celebrities did not adequately vet, and did so in exchange for an undisclosed fee.  In other words, the celebrities did not just profit from their endorsements but profited directly at the consumers' expense.

Defendants argue that Plaintiffs do not adequately state a UCL unfair claim because they do not plead any injury, let alone a "substantial" injury.  Further, they contend that Plaintiffs could have avoided the injury by more scrupulously conducting research before making investments based on celebrity endorsements.  (CL Motion at 20-21).  Defendants do not make any arguments regarding the utility of their conduct, even though the countervailing benefits of a defendant's conduct is a central aspect of both the FTC and balancing tests.

Plaintiffs contend that the SAC alleges substantial injury to consumers, and they cite to an FTC Report noting that cryptocurrency has become "an alarmingly common method for scammers to get peoples' money" and that since the start of 2021, more than 46,000 people have reported losing over $1 billion in crypto scams," which is more than any other payment method.  (SAC ¶ 221) (citing Emma Fletcher, *Data Spotlight: Reports show scammers cashing in on crypto craze*, FTC.GOV, June 3, 2022), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze).  The median individual reported losses are $2,600.  (*Id.*).  The Report explained that social media and crypto are a "combustible combination for fraud, with nearly half the people who reported losing crypto to a scam since 2021 reporting that it started with an ad, post, or message on a social media platform."  (*Id.*).  Since 2021, "$575 million of all crypto fraud losses reported to the FTC were about bogus investment opportunities, far more than any other fraud type."  (*Id.*).

Plaintiffs also point to the substantial profits the Promoter Defendants made from their promotional activities.  (SAC ¶ 78) (alleging that Pierce "made millions of dollars trading (and selling) EMAX Tokens while simultaneously promoting the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

Tokens to investors as sound long-term investments") *see also id*. ¶ 129 (alleging that Defendants' promotions generated approximately $240 million dollars in trading volume); *id*. ¶ 123 (alleging Mayweather made $2.5 million from his promotions); *id*. ¶ 152 (alleging that Kardashian was paid $250,000 for her June Post).

To reiterate, a practice is "unfair" if the conduct is "immoral, unethical, oppressive, unscrupulous *or* substantially injurious to consumers" and the "utility" of the "defendant's conduct [does not outweigh] the gravity of the harm to the alleged victim." *Copart, Inc. v. Sparta Consulting, Inc*., 339 F. Supp. 3d 959, 992 (E.D. Cal. 2018) (emphasis added).

Under this balancing test, the Court concludes that Plaintiffs have stated an unfair UCL claim against the Promoter Defendants based on the practice of touting an investment opportunity to their followers without vetting the opportunity or disclosing compensation for their endorsements.  The conduct can at least be considered "unscrupulous" given the Promoter Defendants were profiting off endorsements at their fans' expense by touting an investment opportunity that had no legitimate business plan.  Further, by promoting the security without disclosing payment for the promotion, it is plausible that the Promoter Defendants were suggesting they were genuinely invested or at least supportive of the business opportunity.  (*See, e.g*., SAC ¶ 82 (Pierce publicizing substantial returns from EMAX investments); *see id*. ¶ 147 (Kardashian directing her followers to "SWIPE UP TO JOIN THE E-MAX COMMUNITY"); *see id*. ¶ 125 (Mayweather allowing Executive Defendants to incentivize fans to purchase EMAX in exchange for Mayweather paraphernalia).

Pierce argues that because he is not a financial expert, it was obvious that his promotions were paid endorsements.  (Pierce Motion at 7).  However, a reasonable person could conclude the opposite because he explicitly represented that he was personally invested.  Further, in his tweets, Pierce boasted that he had made significant money through such an investment, so even if consumers did not regard Pierce as financially savvy, they could have found persuasive his own experience with the Tokens (as tweeted).  (*See* SAC ¶ 82).  Likewise, because Mayweather allowed his fight with Logan Paul to be a launch point for the Tokens, consumers could have concluded that Mayweather had a real, as opposed to paid, stake in the venture,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

especially given he already has a presence in the cryptocurrency community as
reflected by his attendance at the Bitcoin 2021 conference.  (*See id.* ¶¶ 124, 133).

While the arguments are weaker for Kardashian, given it was clear that she was
being paid for her posts, there is still a plausible argument that the practice of touting a
financial investment to her millions of loyal followers (and encouraging them to
purchase), without any sound basis for believing it to be a worthwhile investment is an
unscrupulous and thereby unfair practice.  Though the Court is assessing the Promoter
Defendants' conduct together for purposes of these Motions, Plaintiffs will have to
prove that the specific conduct of each individual was unfair.

As for the harm to consumers, Defendants contend that Plaintiffs' cited FTC
statistics regarding the number of losses attributable to cryptocurrency scams
advertised on social media over the past few years is irrelevant because it does not
directly relate to the alleged scam at issue here.  (CL Motion at 20).  Defendants
contend they cannot be liable for the conduct of other unnamed individuals that have
reportedly scammed millions of people to invest in bogus cryptocurrencies.  (*Id.*).
While the Court generally agrees that the most relevant harm and conduct to consider is
that of the named Defendants and Plaintiffs, Plaintiffs argue that Defendants "engaged
in the exact kind of bogus crypto 'investment opportunity' scam that the FTC Data
Spotlight reported on as causing hundreds of millions (and rising) of dollars of damage
to investors."  (CL Opp. at 18).

The Court tends to agree with Plaintiffs that the statistics at least make Plaintiffs'
contention that they acted reasonably more plausible given it cannot be the case that the
many thousands of people that have been defrauded by crypto scams are all
unreasonable consumers.  Further, while the injury analysis must be individualized and
directly connected to the scheme at issue in the context of standing, the authorities
Defendants cite do not preclude an assessment of the broader consumer impact caused
by the type of scam allegedly orchestrated.  Given the UCL is "directed toward the
***public's*** right to protection" there is reason to believe that the larger societal impact of
the type of scheme involved is somewhat relevant to the harm analysis.  *See Hewlett v.
Squaw Valley Ski Corp.*, 54 Cal. App. 4th 499, 519–520, 63 Cal. Rptr. 2d 118 (1997)
(emphasis added).  Indeed, the "unfairness[] prong of the UC[L] is intentionally broad,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

thus allowing courts maximum discretion to prohibit new schemes to defraud."  *Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144, 1166, 93 Cal. Rptr. 2d 439, 455–56 (2000) (internal citation and quotation marks omitted).  Therefore, the Court concludes that the fact that cryptocurrency scams advertised through social media are an increasingly frequent source of investment losses is relevant in determining the gravity of the harm for purposes of the unfair balancing test.  Here, it is undeniable that there were winners and losers in the EMAX charade, and the Plaintiffs argue that it is unfair that the celebrities were the winners who profited off of the exploitation of their fans.  The Court cannot conclude that such an argument fails as a matter of law.

Defendants also contend that Plaintiffs could have avoided the losses by refraining from investing or doing more research before investing.  While the Court agrees that prudent consumers should not make investments solely based on the word of celebrities with no recognized financial expertise, unfortunately the facts (as alleged) tend to show that many consumers did just that.  (*See* SAC ¶129) (detailing how Defendants' promotions generated approximately $240 million dollars in trading volume).  Therefore, the Court is not prepared to allow its own sensibilities to dictate what might be fair to the average reasonable consumer, particularly at this stage.

It is also significant that the social media posts and promotions were specifically aimed at the celebrities' already-dedicated followers.  By definition, such "followers" are inevitably predisposed to place significance on what the celebrities they follow are doing and saying.  Therefore, the celebrities' own followers are particularly vulnerable to the messages conveyed to them, perhaps suggesting that such consumers should not bear all the risk.  *See Fletcher*, 23 Cal. 3d at 451 ("Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society.") (internal citation omitted).

Moreover, because the relevant information here (i.e., that the celebrities were promoting the Tokens in exchange for a commission as opposed to an honest belief in the soundness of the investment) was not disclosed anywhere by anyone, even if consumers could have suspected that the celebrities were being paid to promote the Tokens, there was nothing they could do to confirm or dispel that belief.  Therefore, the fault cannot entirely be blamed, as a matter of law, on even the unwary investor.  *See*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

*Camacho*, 142 Cal. App. 4th at 1405 (explaining that "consumers cannot have reasonably avoided the injury . . . if their free market decisions were unjustifiably hampered by the conduct of the seller").  And given the nature of cryptocurrency, there is no way for Plaintiffs to seek a refund, also suggesting the injury is not entirely avoidable.  *See, e.g., Nygren v. Hewlett-Packard Co.*, No. C 07-05793 JW, 2009 WL 10696446, at *5 (N.D. Cal. May 28, 2009) (denying motion to dismiss under the unfair prong of the UCL after plaintiffs alleged among other facts that the defendant "ha[d] refused to honor refund requests from Plaintiffs and other class members.").

And Defendants do not offer *a single countervailing benefit* of allowing celebrities to endorse unvetted products without disclosing that they are being paid to do so.

Finally, the Court's analysis is further supported by the publicly stated position of the SEC, which the Court has judicially noticed.  (*See* Plaintiffs' RJN (Docket No. 140), Ex. A (SEC Press Release re: Pierce Promotions); *see also Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08-CV-1166-IEG POR, 2009 WL 6597891, at *2 (S.D. Cal. Dec. 23, 2009) ("Information on government agency websites has often been treated as properly subject to judicial notice.") (internal citation omitted).  In the SEC Press Release, SEC Chair Gary Gensler issued a "reminder to celebrities: The law requires you to disclose to the public from whom and how much you are getting paid to promote investment in securities, and you can't lie to investors when you tout a security."  (*Id.* at 1).  To the extent the Court later concludes that the Tokens are not securities such that the UCL claim is not barred, the SEC's publicly stated position of what the Securities Exchange Act requires demonstrates that Plaintiffs' position is tethered to legislative and regulatory policy.

Accordingly, the Court cannot conclude that the balance tilts in favor of dismissal of the UCL unfair claim against the Promoter Defendants.  Rather, any amount of harm potentially caused by such promotions outweighs the seemingly nonexistent utility of the practice.  *See Jonna v. Latinum*, 617 F. Supp. 3d 758, 784–85 (E.D. Mich. 2022) (concluding that the plaintiff's allegations regarding misrepresentations and omissions in the promotion of a cryptocurrency plausibly stated both a securities-fraud and unfair UCL claim under California law against the

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

defendant promoter); *cf. Longest v. Green Tree Servicing LLC*, 74 F. Supp. 3d 1289,
1303 (C.D. Cal. 2015) (concluding that allegations that lenders and insurance
companies were engaged in self-dealing that inflated the price of insurance and put the
insureds own profit ahead of the interests of the insured were sufficient to state an
unfair UCL claim).

     At later stages of this action, Defendants are free to argue that the utility of their
undisclosed and unvetted paid endorsements outweighs any harm.  The Court simply
concludes that the UCL unfair claim does not fail as a matter of law.  Therefore, the CL
Motion is **DENIED** to the extent it seeks dismissal of the UCL unfair prong against the
Promoter Defendants for their promotions.

     ***Pump-and-Dump Scheme***:  To the extent that Plaintiffs' unfair UCL claim is
brought against the Executive Defendants as well as Mayweather and Pierce for their
alleged roles in the pump-and-dump scheme, and to the extent the claim is not barred
by the securities laws, Plaintiffs have stated an unfair UCL claim against those
Defendants.  It is clear enough that such a practice could be deemed "unethical" and/or
"unscrupulous," the utility of which would not outweigh the harm.  Therefore, the
claim survives the balancing test.  *Cf. Roskind v. Morgan Stanley Dean Witter & Co*.,
80 Cal. App. 4th 345, 347, 95 Cal. Rptr. 2d 258, 259 (2000), *as modified on denial of
reh'g* (May 26, 2000) (concluding that the plaintiffs could state a UCL claim against a
defendant brokerage-firm that did not execute "their orders for stock sales in a fair and
timely manner," but "instead 'trad[ed] ahead' for its own benefit before processing
those sales for its customers").  Further, the fact that the securities laws prohibit such
conduct demonstrates that the claim is tethered to legislative public policies and
advances the spirit of such laws.

     Accordingly, the Motion is **DENIED** to the extent it seeks dismissal of the UCL
unfair claim based on Defendants' alleged role in the pump-and-dump scheme.  The
Court reiterates, however, that this claim must be pursued only in the alternative to the
securities claim.

     ***Unscrupulous Solicitations of Investments:***  To the extent the UCL unfair claim
is premised on the solicitation of investments promising substantial returns despite the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

lack of any legitimate business plan, the Court also concludes that Plaintiffs have stated an unfair UCL claim against the Executive Defendants.  The practice is certainly unscrupulous and unethical, and (as has been discussed) caused losses to at least certain consumers, leaving them with a "practically worthless digital asset."  (SAC ¶163).  It is understood that one soliciting investments is placed in a position of trust and is expected to responsibly and in good-faith manage the funds they solicit.  *Cf. Eisenbaum v. W. Energy Res., Inc.*, 218 Cal. App. 3d 314, 322, 267 Cal. Rptr. 5 (1990). ("A promoter or insider, or a seller of a limited partnership interest, owes a fiduciary duty to the prospective purchaser of such an interest.").  There is no apparent (or argued) utility in allowing investment ventures to take off without any legitimate business plan in place.  Therefore, Plaintiffs have stated an unfair UCL claim against the Executive Defendants.  *Cf. In re R.E. Loans LLC*, 519 B.R. 499, 503, 519 (Bankr. N.D. Tex. 2014) (applying California law, holding that the plaintiffs stated a UCL claim based on the defendant's alleged mismanagement of real estate investment loans but noting that it might be difficult to prove an entitlement to restitution damages); *Benson v. JPMorgan Chase Bank, N.A.*, No. C-09-5272 EMC, 2010 WL 1526394, at *3, *9-*10 (N.D. Cal. Apr. 15, 2010) (concluding the plaintiffs had sufficiently stated a UCL claim (without specifying which prong) against the defendant bank for its role in aiding the fraudulent sale of CDs to innocent investors, whose funds were ultimately used by participants for their own personal benefit[.]"); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 553 (N.D. Cal. 2009) (concluding that the plaintiffs stated a UCL unfair claim based on the defendants unsuccessful change in investment policy that was enacted without a majority vote of the shareholders, as (they alleged) was legally required).

Accordingly, the Motion is **DENIED** to the extent it seeks dismissal of the unfair UCL claim against the Executive Defendants based on their role in soliciting investor funds without any legitimate business plan.

### 7.   Aiding and Abetting (Against Promoter Defendants)

Plaintiffs again bring an aiding and abetting common law claim against the Promoter Defendants.  The Court previously dismissed the claim because Plaintiffs

---

**CIVIL MINUTES—GENERAL**                                        76

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

failed to adequately allege the "primary wrong" Defendants allegedly assisted and their "knowledge" of that wrong.  (Prior Order at 40-41).

The Court remains unsure of what "primary wrong" the aiding and abetting claim is intended to encompass as it is simply titled as a claim for "Aiding and Abetting."  (SAC ¶ 377).  Typically, "aiding and abetting" is a "theor[y] of liability, not [a] distinct cause[] of action under California law."  *Kelley v. Mortg. Elec. Registration Sys., Inc.*, 642 F. Supp. 2d 1048, 1057 (N.D. Cal. 2009).  Absent a stated wrong, the Court is left unsure what purpose this claim is meant to serve.

As alleged in the SAC, it appears as though the claim is premised on violations of the State Consumer Laws prohibiting misleading advertisements.  (*See* SAC ¶ 381).  In the Opposition, however, Plaintiffs also mention the "insider trading" violations in relation to this claim.  (*See* CL Opposition at 21).

To the extent the aiding and abetting claim is focused on the allegedly misleading statements, the Court fails to understand why the claim is necessary given the Court deems the Promoter Defendants as directly liable (as alleged) for the statements they made on behalf of the Company.  And to the extent Plaintiffs are actually seeking to hold the ***Executive Defendants*** liable for the Promoter Defendants' statements, the operative legal concept would seemingly be one of agency (and regardless the claim is not brought against any moving Executive Defendant).  Finally, to the extent the aiding and abetting claim is an attempt to extend the reach of the securities law violations, the claim fails because, as noted, the securities law claims explicitly preclude courts from extending liability beyond the statutory causes of action.  Therefore, the claim again fails to sufficiently identify the primary wrong.

At the hearing, Plaintiffs' counsel suggested that the "primary wrong" the Promoter Defendants are alleged to have aided and abetted is the insider trading.  However, Plaintiffs must grapple with the case law that common law theories of liability may not be used to expand liability for securities violations (at least under California law).  Therefore, this claim still does not appear to be viable.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

The Court notes that while Plaintiffs still fail to identify the primary wrong, Plaintiffs have added substantial allegations, relaying information from CW1, in order to establish the Promoter Defendants' knowledge of the "scam."  (SAC ¶¶ 94-96) (alleging that Defendant Rechnitz "confirmed to CW 1 that [EMAX] was a scam and that his celebrity promoter cohorts were aware that they were shilling the dubious EMAX Tokens for his (and their collective) benefit").  Were this action a federal securities law case, in which Plaintiffs would be charged with pleading scienter with a high degree of particularity, the Court would engage in a much more extensive analysis regarding the reliability and relevance of CW1's allegations.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (setting forth the test for consideration of confidential witness statements in federal securities cases).  But, given this is not a federal securities case, perhaps the new allegations make the claim of "knowledge" somewhat more plausible under Rule 8, which is the only Rule that applies to the allegation of knowledge here.  Nonetheless, because the Court does not understand what precise wrong Plaintiffs are claiming the Promoter Defendants knew they were assisting, the Court declines to rule on the sufficiency of the knowledge allegations at this time.  Both sides should more fully address the impact of CW1's statements on the plausibility of the allegations of knowledge in any future briefing on this claim.

Accordingly, the Motion is **GRANTED *with leave to amend***.  If there is a genuine purpose for this claim (i.e., Plaintiffs see this claim as a genuine means of holding specific Defendants liable for specific conduct), Plaintiffs must make that abundantly clear in any amended Complaint in order to survive dismissal.

### E.      Standing for Injunctive Relief

Defendants argue that Plaintiffs lack Article III standing to seek injunctive relief because there is no real and immediate threat of imminent harm given Plaintiffs do not allege any intent to purchase EMAX Tokens in the future.  (Motion at 24-25).  Plaintiffs do not respond to this argument.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

Given standing is a jurisdictional requirement and Plaintiffs have the burden of pleading and proving standing to seek specific types of relief, Plaintiffs failure to respond to this argument warrants dismissal on that basis alone.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (internal citations omitted) ("The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the[] elements [of standing].").  "Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element."  *Id.* (internal citation and quotation marks omitted).

The argument prevails on the merits because Plaintiffs fail to allege any genuine threat of future harm, whether that be in the form of a thwarted desire to purchase additional Tokens or any other cognizable theory.  *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969-971 (9th Cir. 2018) (concluding that while consumers in false advertising cases may be able to allege standing for injunctive relief the complaint must include allegations that the plaintiffs face "an imminent or actual a threat of future harm"); *see also Vitiosus v. Alani Nutrition, LLC*, No. 21-CV-2048-MMA (MDD), 2022 WL 2441303, at *7 (S.D. Cal. July 5, 2022) (granting motion to dismiss based on the plaintiffs' failure to allege any likelihood of future harm).

Accordingly, the Motion is **GRANTED** *with leave to amend* to the extent it seeks dismissal of Plaintiffs' prayer for injunctive relief.

## F.    Motion to Strike

Defendant Rechnitz independently moves to strike various allegations in the SAC pursuant to Federal Rule 12(f), arguing that the allegations constitute "immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f); (*see also* Rechnitz MTS at 1).  The relevant allegations primarily concern specific instances of past crimes and/or wrongdoing unrelated to the EMAX venture.  Plaintiffs contend that the allegations are relevant primarily for the following three reasons: (1) the allegations concerning Rechnitz's criminal history make the EMAX allegations against Defendant Rechnitz more plausible; (2) the allegations establish Rechnitz's "modus operandi" in using his celebrity connections to give his business ventures a false sense of credibility; and (3)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

the allegations establish Rechnitz's connections to various Promoter Defendants including Mayweather, Kardashian, and Antonio Brown.  (*See* Rechnitz MTS Opp. at 1).

Rule 12(f) provides that a "court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  The motion is disfavored because it "proposes a drastic remedy," is of "limited importance . . . in federal practice," and is "often used as a delaying tactic."  2 *Moore's Federal Practice* § 12.37[1] (3d ed. 2004); *Lazar v. Trans Union LLC*, 195 F.R.D. 665, 669 (C.D. Cal. 2000); *Bureerong v. Uvawas*, 922 F. Supp. 1450, 1478 (C.D. Cal. 1996).  District courts have concluded that "[a] motion to strike should not be granted unless the matter to be stricken clearly could have no possible bearing on the subject of the litigation.  If there is any doubt whether the portion to be stricken might bear on an issue in the litigation, the court should deny the motion."  *ThermoLife Int'l LLC v. NeoGenis Labs Inc*., No. CV 18-02980-PHX-DWL, 2020 WL 6395442, at *16 (D. Ariz. Nov. 2, 2020) (internal citation omitted).  "In spite of this reluctance, allegations may be stricken if they have no real bearing on the case, will likely prejudice the movant, or where they have criminal overtones."  *G-I Holdings*, 238 F. Supp. 2d at 555 (internal citation omitted).

"Immaterial matter is that which has no essential or important relationship to the claim for relief or the defenses being plead."  *Whittlestone, Inc. v. Handi-Craft Co*., 618 F.3d 970, 974 (9th Cir. 2010) (internal citation omitted).  "Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question."  *Id.*  "A 'scandalous' matter improperly casts a derogatory light on someone, usually a party."  *Wilkerson v. Butler*, 229 F.R.D. 166, 170 (E.D. Cal. 2005).

To the extent the allegations relate to dissimilar criminal conduct and appear to be included solely to demonstrate Rechnitz's "willingness to violate applicable laws," the allegations are "scandalous" and "immaterial" and are appropriate targets of a motion to strike.  *See, e.g., Bioriginal Food & Sci. Corp. v. Biotab Nutraceuticals Inc*., No. CV 13-05704-CAS (Ex), 2014 WL 12597153, at *6 (C.D. Cal. Mar. 19, 2014) (striking allegations that the defendants had "previously been sued for fraud or other misconduct unrelated to this case, as well as that a former owner of the defendants was

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

previously convicted of tax fraud" given such allegations were "immaterial" as well as "scandalous" under Rule 12(f)"); *United States v. Med-Care Diabetic & Med. Supplies, Inc.*, No. CIV 10-81634, 2014 WL 12279511, at *1-*2 (S.D. Fla. June 17, 2014) (striking allegations regarding the defendant's "past criminal conduct and judgments" as they were "matters intended to cast [the defendant] and his alleged associates in a derogatory light and lead the jury to draw unwarranted inferences about their participation in the purported FCA scheme at issue") (internal citations omitted); *Homecare CRM, LLC v. Adam Grp., Inc. of Middle Tennessee*, No. CV 12-1958-TCB, 2012 WL 12847231, at *1-*2 (N.D. Ga. Nov. 8, 2012) (granting motion to strike allegations in counterclaim where the defendant included allegations of the plaintiff's criminal history such as a guilty plea for tax fraud as well as references to other civil litigation concerning different misrepresentations and plaintiff argued that the allegations were relevant to show the plaintiff's character for dishonesty).

Certain allegations in the SAC discussing Rechnitz's unrelated guilty plea and sentencing in another action, an alleged ongoing federal investigation for unspecified conduct, and/or disputes between certain of the parties regarding unrelated counterfeit watches, impermissibly paint Rechnitz in a negative light without any real connection to the central allegations in this action.  The Court agrees with Rechnitz that, like the plaintiffs in *Bioriginal*, Plaintiffs here fail to articulate "a link between the various misconduct alleged" in certain paragraphs and the facts at issue "beyond the generalized accusation that the defendant[] [is a] bad actor[]."  *See* 2014 WL 12597153, at *6.

Accordingly, the Court concludes that the following allegations are immaterial, impertinent, and/or scandalous and are hereby **STRICKEN** from the SAC:

- Paragraph 42 at 11:11 ("[Rechnitz] is a convicted felon whose brazen criminality");

- Paragraph 43 (including footnote 7) (concerning Rechnitz's guilty plea in unrelated criminal action);

- Paragraph 44 (including footnote 8) (concerning Rechnitz's testimony at the trial of co-conspirator in unrelated criminal action);

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

- Paragraph 45 (including footnote 9) (concerning Rechnitz's testimony at the trial of co-conspirator in unrelated criminal action);

- Paragraph 46 (including footnotes 10 and 11) (reciting portions of the Government's sentencing memorandum and court's commentary at sentencing hearing in unrelated criminal action);

- Paragraph 47 (including footnotes 12 and 13) (court's commentary at sentencing in unrelated criminal action) (though this allegation vaguely references Rechnitz's connection to Mayweather, it is redundant of other allegations clearly demonstrating that connection and otherwise lacks any substance relevant to this action);

- Paragraph 48 (including footnote 14) (describing Rechnitz's sentence for unrelated criminal action);

- Paragraph 49 (regarding Rechnitz's release from confinement on bond);

- Paragraph 54 (referencing bankruptcy proceedings involving Rechnitz);

- Paragraph 55 at 14:16-18 and footnote 24 (referencing money laundering allegation);

- Paragraph 105 (including footnote 52) (concerning an unrelated ongoing federal investigation into Rechnitz's unspecified conduct);

- Paragraph 164 at 57:5-13 (including footnote 88) (concerning an unrelated dispute between Rechnitz, Brown, and Mayweather about counterfeit watches) (though these allegations further corroborate the connection between the Defendants, the allegations regarding this apparent feud between these Defendants *after* the EMAX scam (and about a non-EMAX related issue) are immaterial, redundant, and impertinent);

- Paragraph 165 (including footnote 89) (concerning the unrelated watch dispute);

- Paragraph 167 (concerning a deleted, hard-to-comprehend social media post by Defendant Brown that merely references Rechnitz and Mayweather but fails to convey anything of substance).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                    Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

However, the Court cannot conclude that the other allegations Rechnitz moves to strike have no possible bearing on the facts of this action.  The other allegations are conceivably relevant to show connections between the Defendants (making a common scheme and/or knowledge of the scheme more plausible) and tend to make it more plausible that Defendant Rechnitz engaged in a common course of conduct in his role in EMAX, in which he exploited his celebrity connections to scam victims out of money.

While character evidence is typically not admissible to show someone's character for unlawfulness, allegations (and eventually evidence) of past misdeeds may be admissible and relevant to show knowledge, opportunity, absence of mistake, and lack of accident.  *See* Fed. R. Evid. 403(b)(2).  Moreover, at this stage the Court is not concerned with the admissibility and evidentiary value of the information contained in the paragraphs in question; the Court is only concerned with the plausibility of the allegations.  To the extent that the allegations tend to make Plaintiffs' legal theories more plausible, they are relevant at this stage.  *See, e.g., ThermoLife*, 2020 WL 6395442, at *17 (denying motion to strike allegations concerning the defendant's criminal history because it was "at least possible that the challenged allegations concerning Kramer's criminal history" could "have some bearing on" the plaintiff's position "that it perceived [the defendant's] threats to be genuine"); *Hockaday v. Aries Logistics, Inc*, No. CV 14-260-J, 2015 WL 13752620, at *2 (D. Wyo. Aug. 20, 2015) (denying motion to strike where "the criminal convictions mentioned in the [a]mended [c]omplaint involve[d] the same facts and circumstances giving rise to the underlying action").

As such, the Rechnitz MTS is **DENIED** as to the following paragraphs:

•    Paragraph 53 (including footnotes 19, 20, and 21); (discussing Rechnitz's exploitation of Kardashian connection to orchestrate another scheme to defraud concerning jewelry) (potentially relevant to show lack of accident)

•    Paragraph 56 at 15:4-6 and the accompanying Instagram post (demonstrating a connection between Rechnitz and Defendant Brown (potentially relevant to show connection and/or knowledge of scheme);

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 22-00163-MWF (SKx)                  Date:  June 6, 2023
Title:  In Re Ethereummax Investor Litigation

- Paragraph 57 as well as the accompanying text message (providing text message in which Rechnitz boasts of his connections to Promoter Defendants) (relevant to demonstrate Rechnitz had and often exploited his connections to the Promoter Defendants);

- Paragraph 104 (including footnote 51) (discussing Rechnitz's exploitation of Mayweather connection to orchestrate another scheme to defraud) (potentially relevant to show lack of accident);

- Paragraph 166 (including footnote 90) and the accompanying Tweet (shows Defendant Brown's tweet calling Rechnitz a "scam just like the Mayweather Fights") (clearly relevant as suggestive of Defendants' Rechnitz's and Mayweather's knowledge that the Fights were used as a pump-and-dump scam).

Accordingly, the Rechnitz MTS is **GRANTED** *in part* and **DENIED** *in part*.

## IV.    **CONCLUSION**

Plaintiffs may file an amended complaint, if any, by no later than **June 26, 2023**. Defendants must respond to any amended complaint by no later than **July 17, 2023**.

*This will be Plaintiffs' final opportunity to amend.  Any future successful motion to dismiss will be granted <u>without leave to amend</u>.*

IT IS SO ORDERED.