John T. Jasnoch (CA 281605)
jjasnoch@scott-scott.com
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-236-0508

*Lead Counsel for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| IN RE ETHEREUMMAX INVESTOR LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Lead Case No. 2:22-cv-00163-MWF-(SKx)<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

1

## <u>TABLE OF CONTENTS</u>

NATURE OF THE CASE .................................................................................... 1

PARTIES ........................................................................................................... 2

    Plaintiffs ...................................................................................................... 2

    Defendants .................................................................................................. 4

JURISDICTION AND VENUE ........................................................................ 6

FACTUAL ALLEGATIONS ............................................................................ 7

        EthereumMax Background ........................................................ 7

        The Pump – Shilling EthereumMax ..................................... 14

        The Dump – EMAX Token Price Plummets ........................ 56

        Regulators Raise Concerns that EthereumMax Is a "Pump and
        Dump" Scam ........................................................................ 61

CLASS ALLEGATIONS ................................................................................ 62

FIRST CAUSE OF ACTION .......................................................................... 65

SECOND CAUSE OF ACTION ..................................................................... 78

THIRD CAUSE OF ACTION ......................................................................... 92

FOURTH CAUSE OF ACTION ................................................................... 106

FIFTH CAUSE OF ACTION ........................................................................ 110

SIXTH CAUSE OF ACTION ....................................................................... 123

SEVENTH CAUSE OF ACTION ................................................................. 131

EIGHTH CAUSE OF ACTION .................................................................... 138

NINTH CAUSE OF ACTION ....................................................................... 148

TENTH CAUSE OF ACTION ...................................................................... 153

ELEVENTH CAUSE OF ACTION .............................................................. 162

PRAYER FOR RELIEF ................................................................................ 163

JURY DEMAND ........................................................................................... 164

Plaintiffs Ryan Huegerich, Jonathan Semerjian, Nabil Nahlah, Till Freeman, Marko Ciklic, Tunisia Brignol, Milan Puda, Neil Shah, Michael Buckley, and Christopher DeLuca ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint ("Complaint") against Defendant EMAX Holdings, LLC ("EMAX Holdings" or the "Company"), Giovanni Perone, Mike Speer, Justin Maher, and Jona Rechnitz (the "Executive Defendants"), Kimberly Kardashian, Floyd Mayweather, Jr., Paul Pierce, Russell Davis, and Antonio Brown (the "Promoter Defendants" and, together with the Executive Defendants, the "Defendants").  The following allegations are based upon personal knowledge as to Plaintiffs' own facts, upon investigation by Plaintiffs' counsel, and upon information and belief where facts are solely in possession of Defendants.

## NATURE OF THE CASE

1.    Plaintiffs bring this action on behalf of all investors who purchased EthereumMax tokens ("EMAX Tokens") between May 14, 2021 and June 27, 2021, (the "Relevant Period") and were damaged thereby.

2.    This case arises from a scheme among various individuals in the cryptocurrency sector to misleadingly promote and sell the digital asset associated with EthereumMax (the EMAX Tokens) to unsuspecting investors.  The Company's executives, collaborating with several celebrity promotors, (a) made false or misleading statements to investors about EthereumMax through social media advertisements and other promotional activities, and (b) disguised their control over EthereumMax and a significant percent of the EMAX Tokens that were available for public trading during the Relevant Period (the "Float").

3.    In furtherance of this scheme, Defendants touted the prospects of the Company and the ability of investors to make significant returns due to the favorable "tokenomics" of the EMAX Tokens.  In truth, Defendants marketed the EMAX Tokens to investors so that they could sell their portions of the Float for a profit.

4.      Defendants' strategy was a success.  The misleading promotions and celebrity endorsements were able to artificially increase the interest in and price of the EMAX Tokens during the Relevant Period, causing investors to purchase these losing investments at inflated prices.  In addition, the Executive Defendants disguised their control of EthereumMax to avoid scrutiny and facilitate this scheme.  The Executive Defendants then conspired with the Promoter Defendants to improperly use inside information to sell their EMAX Tokens to investors for a profit.

5.      Plaintiffs bring this class action on behalf of themselves and an objectively identifiable class consisting of all investors that purchased EthereumMax's EMAX Tokens between May 14, 2021 and June 27, 2021.

## PARTIES

*Plaintiffs*

6.      Plaintiff Ryan Huegerich ("Huegerich") is a resident and citizen of New York, living in Brooklyn, New York.   After viewing numerous celebrity endorsements of EMAX, Plaintiff Huegerich purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

7.      Plaintiff Jonathan Semerjian ("Semerjian") is a resident and citizen of California, living in Valencia, California.   After viewing numerous celebrity endorsements of EMAX, Plaintiff Semerjian purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

8.      Plaintiff Nabil Nahlah ("Nahlah") is a resident and citizen of Florida, living in Miami Beach, Florida.  After viewing numerous celebrity endorsements of EMAX, Plaintiff Nahlah purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

9.      Plaintiff Till Freeman ("Freeman") is a resident and citizen of Florida, living in Hallandale, Florida.  After viewing numerous celebrity endorsements of EMAX, Plaintiff Freeman purchased EMAX Tokens, paid fees, and suffered

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

investment losses as a result of Defendants' conduct.

10. Plaintiff Marko Ciklic ("Ciklic") is a resident and citizen of New York, living in Brooklyn, New York. After viewing numerous celebrity endorsements of EMAX, Plaintiff Ciklic purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

11. Plaintiff Tunisia Brignol ("Brignol") is a resident and citizen of Florida, living in Miami, Florida. After viewing numerous celebrity endorsements of EMAX, Plaintiff Brignol purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

12. Plaintiff Milan Puda ("Puda") is a resident and citizen of Florida, living in Miami, Florida. After viewing numerous celebrity endorsements of EMAX, Plaintiff Puda purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

13. Plaintiff Neil Shah ("Shah") is a resident and citizen of California, living in San Jose, California. After viewing numerous celebrity endorsements of EMAX, Plaintiff Shah purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

14. Plaintiff Michael Buckley ("Buckley") is a resident and citizen of California, living in Sherman Oaks, California. After viewing numerous celebrity endorsements of EMAX, Plaintiff Buckley purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

15. Plaintiff Christopher DeLuca ("DeLuca") is a resident and citizen of New Jersey, living in Cranford, New Jersey. After viewing numerous celebrity endorsements of EMAX, Plaintiff DeLuca purchased EMAX Tokens, paid fees, and suffered investment losses as a result of Defendants' conduct.

*Defendants*

16.   Defendant Justin Maher ("Maher") is a resident and citizen of Connecticut, living in Milford, Connecticut.  Maher is the co-founder/creator of EthereumMax and exercised control over EthereumMax and directed and/or authorized, directly or indirectly, the sale and/or solicitations of EMAX Tokens to the public.

17.   Defendant Giovanni Perone ("Perone") is a resident and citizen of Florida, living in Miami, Florida.  Perone is the co-founder/creator of EthereumMax and served as the sole director of EMAX Holdings, LLC.  Perone exercised control over EthereumMax and directed and/or authorized, directly or indirectly, the sale and/or solicitations of EMAX Tokens to the public.

18.   Defendant Mike Speer ("Speer") is a resident and citizen of Texas, living in Georgetown, Texas.  Speer is the co-founder/creator of EthereumMax and exercised control over EthereumMax and directed and/or authorized, directly or indirectly, the sale and/or solicitations of EMAX Tokens to the public.

19.   Defendant Jona Rechnitz ("Rechnitz") is a resident and citizen of California, living in Los Angeles, California.  Rechnitz served as a consultant, recruiter, and spokesman for EthereumMax, and he exercised control over EthereumMax and directed and/or authorized, directly or indirectly, the sale and/or solicitations of EMAX Tokens to the public.

20.   Defendant Kimberly Kardashian ("Kardashian") is a resident and citizen of California, living in Hidden Hills, California.  Kardashian acted as a promoter for EthereumMax and the EMAX Tokens.

21.   Defendant Floyd Mayweather, Jr. ("Mayweather, Jr.") is a resident and citizen of Nevada, living in Las Vegas, Nevada.  Mayweather, Jr. acted as a promoter for EthereumMax and the EMAX Tokens.

22.   Defendant Paul Pierce ("Pierce") is a resident and citizen of California,

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1  living in Inglewood, California.  Pierce acted as a promotor for EthereumMax and
2  the EMAX Tokens.

3       23.   Defendant Russell Davis ("Davis") is a resident and citizen of
4  Connecticut, living in Woodmont, Connecticut.  Davis acted as a consultant,
5  developer, promoter, and spokesman for EthereumMax, and he exercised control
6  over EthereumMax and directed and/or authorized, directly or indirectly, the sale
7  and/or solicitations of EMAX Tokens to the public.

8       24.   Defendant Antonio Brown ("Brown") is a resident and citizen of
9  Florida, living in Miami, Florida.  Brown acted as a promoter for EthereumMax and
10  the EMAX Tokens.

11      25.   Defendant EMAX Holdings, LLC is a Florida limited liability company
12  with its principal place of business located at 851 Northeast 1st Avenue, Miami,
13  Florida 33132.  EMAX Holdings is the corporate entity created by Perone after the
14  launch of the EMAX Tokens to hold the EthereumMax intellectual property, and it
15  was incorporated on June 6, 2021.  On December 22, 2021, the Company filed
16  trademark applications for various software for "financial exchange of virtual
17  currency, utility tokens and digital tokens."  EMAX Holdings was dissolved on
18  September 23, 2022.

19      26.   Defendants John Does 1-7 are persons who participated in the
20  wrongdoing alleged herein but whose identities are currently unknown to Plaintiffs.
21  Plaintiffs will identify the John Doe Defendants through discovery.[1]

22

23

24

25  [1]    While the identities of John Does 1-7 cannot yet be confirmed, there are clues.
26  For example, as a now-deleted telegram post from the EMAX official account
    admitted: "Kim Kardashian is a family member of someone on the team."  In
27  addition, one of Kardashian's EthereumMax promotions is made in conjunction with
    a nightclub, LIV, and Groot Hospitality, both of which are partially owned by David
28  Grutman.  Since at least 2017, Grutman has been friends with Scott Disick, who also
    happens to be the father of Kardashian's niece and nephews.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

**JURISDICTION AND VENUE**

27.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest or costs; and (3) there is minimal diversity because at least one Plaintiff and Defendant are citizens of different states.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

28.    This Court may exercise jurisdiction over Defendants because they have continuous and systematic contacts with this District, do substantial business in this State and within this District, and engage in unlawful practices in this District as described in this Complaint, so as to subject themselves to personal jurisdiction in this District, thus rendering the exercise of jurisdiction by this Court proper and necessary.

29.    Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) because certain Defendants live and/or conduct business in this District, therefore, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

30.    For example, one of the Company's marketing executives, Steve Gentile's September 13, 2021 post congratulating the winners of EthereumMax's "exclusive in-person LA influencer event with CRE8LUCK" is still pinned (Pinned Message # 93) as a top post on the Ethereum Max official Telegram account.[2] *See also* Pinned Messages 86-87.  Similarly, Gentile's September 17, 2021 post bragging that the "influencer event with CRE8LUCK in Los Angeles at the Petersen Automotive Museum was a success.  Lots of exciting EMAX content coming soon" is also still pinned on the official EthereumMax Telegram account (Pinned Message # 99) for investors to see in particular.  In addition, the EthereumMax Telegram page

---

[2]    EthereumMax (@EthereumMax), TELEGRAM, https://t.me/EthereumMax (last visited Dec. 21, 2022).

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1  promotes as part of its "Business of the Week" and "Vender of the Week"
2  promotions, businesses like aerial photography business Diablo Drone Services
3  located "in the California bay area" and cannabis delivery service CVALT located in
4  Alameda, Tulare, Fresno, and Kern Counties, which have started "accepting
5  payments" in EMAX Tokens.

## FACTUAL ALLEGATIONS

### EthereumMax Background

8      31.    EthereumMax is a cryptocurrency-related project founded by Justin
9  Maher, Steve Gentile, Giovanni Perone, and at least seven other undisclosed
10  individuals.[3]  Maher and others funded the development and creation of the EMAX
11  Token.

12      32.    The EMAX Tokens are blockchain-based digital assets known as "ERC-
13  20 tokens" that are created using the Ethereum blockchain.  After an ERC-20 token
14  is created, it can be traded, spent, or otherwise transacted with.

15      33.    EMAX Tokens were not sold on popular centralized exchanges like
16  Coinbase or Gemini, which generally require that the tokens be compliant with local
17  laws and regulations.  Instead, the EMAX Tokens traded exclusively on decentralized
18  exchanges, like Uniswap, that allow anyone to list and sell their tokens.

19      34.    Uniswap and other decentralized exchanges are known as "automated
20  market makers" which use liquidity pools and smart contracts to allow investors to
21  exchange one asset for another without a direct counterparty.  Users called liquidity
22  providers add an equal value of two tokens into a smart contract pool to create a
23  market.  When executing a trade on a decentralized exchange, an investor does not
24  have a single traditional counterparty and is instead executing the trade against the
25  liquidity in the liquidity pool.  The buyer's true counterparties, then, are the suppliers

26

27  _____
[3]      *See* DeFi Angels, *Defi Angels Illumination Series: EMAX Cofounder, Justin
28  Maher dishes the real story behind EMAX*, YOUTUBETELEGRAM (Sept. 28, 2021),
https://www.youtube.com/watch?v=EkBOlCK3cuU.

of the liquidity, *i.e.*, the Executive Defendants that created the token and liquidity pools, and other sellers like Defendant Pierce that had outsized portions of the overall token supply.

35.     In order to execute trades on a decentralized exchange, users must pay "gas fees" to miners or validators in order to process the transaction on the Ethereum blockchain.  The gas fee can be significant, as it takes into account the amount of computing power needed to process the transaction, as well as the amount of traffic on the network.  Making a purchase transaction using a liquidity pool smart contract on a decentralized exchange like Uniswap is far more complex (and costly) than the sending of tokens from one wallet to another.  When making their purchases, Plaintiffs and other buyers (as opposed to the liquidity pool creators or the liquidity providers) paid the gas fees necessary to effectuate the transactions.

36.     Plaintiffs and other buyers also paid a separate fee to the liquidity pool creators and liquidity providers in the form of the 0.3% Uniswap fee.  The 0.3% fee is paid as a precondition to the transaction and is paid directly to the suppliers of the liquidity in the pool (*e.g.*, Defendants Perone, Maher, Rechnitz, Davis, and Pierce) and not to Uniswap.

37.     In the purchasing instructions for EMAX Tokens from the Company and Executive Defendants, users were told to increase their "slippage tolerance" to 10%.  Slippage is the difference between the quoted price for the token transaction and the actual price that the swap is executed at.  The default slippage tolerance for Uniswap is set at 0.5%.  By instructing users to increase the slippage tolerance so significantly, the liquidity providers benefited by fewer transactions being rejected, even if that meant buyers could receive as much as 10% fewer tokens as they were quoted due to slippage.

38.     The EMAX Tokens were primarily traded against Ether, the native

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

currency of the Ethereum blockchain network.[4]

39.     At inception, Maher was ranked seventh out of the ten original founders in terms of ownership interest in EthereumMax, with a 5.9% stake in the project.

40.     The developer held the number one rank with 23% ownership interest.

41.     After an initial failed attempt to launch the EMAX Tokens, Maher tapped into a network of 20 traders of collectibles he knew prior to creating EthereumMax to assist in the operation and promotion of the EthereumMax project. These individuals previously served as the moderators for the social media accounts for the cryptocurrency, Shiba Inu coin.  Between them, this group had upward of 400,000 followers across their various social media accounts.

42.     Maher tasked this group to work as the moderators for the various EthereumMax social media accounts, including those on Facebook, Instagram, Twitter, Telegram, Reddit, and Discord.  In particular, the group was meant to "shill" the EMAX Tokens to their followers, enticing potential investors with claims that the EMAX Tokens were up "8000%" (after the EMAX Token price had been artificially inflated) and would continue to rise.  Maher himself served as the administrator/ moderator of the EthereumMax Facebook page.

43.     According to Defendant Davis, he created the "roadmap" for EthereumMax following the failed launch.  Davis also admitted that about half of the EthereumMax founders were "literally in there to pump and dump.  They said the wallets were locked, they were not.  It was all just like handshake deals, . . . but you

---

[4]     EthereumMax has no connection to the second largest cryptocurrency, Ethereum.  This name association appears to be an effort by the Company and the Executive Defendants to mislead investors into believing that the EMAX Tokens were a part of the Ethereum network (when they are not).  It would be akin to marketing a restaurant as "McDonald'sMax" when it had no affiliation with McDonald's other than the name similarity and the fact that both companies sell food products.   In fact, the founder of Ethereum, Vitalik Buterin, called for Kardashian to be "cancelled" for her shilling of EMAX Tokens.  *See* Grand Amphi Théatre, *Vitalik Buterin: Things that matter outside of defi*, YOUTUBE (July 21, 2021), https://www.youtube.com/watch?v=oLsb7clrXMQ&t=793s.

need to respect that."[5]   Davis further described this undisclosed half of the EthereumMax development team as "scumbags, absolute scumbags."  Davis did, however, reveal that the name of one of the individuals he was referring to "rhymes with Gio Perone."[6]

44.   Upon information and belief, one of the other individuals that Davis was referring to was Defendant Jona Rechnitz.

45.   Rechnitz played an instrumental role in effectuating two aspects of the EthereumMax scam.  First, Rechnitz secured the Promoter Defendants' agreements to shill EthereumMax without disclosing their connection to him or the payments they each received for the solicitations.  Second, Rechnitz, along with co-conspirators Mayweather, Pierce, Maher, and Davis, personally traded EMAX Tokens based on insider knowledge of the timing of the celebrity promotions.  Rechnitz has close personal and business connections to Promotor Defendants Pierce, Mayweather, Kardashian, Brown, and was the key player in securing their assistance in this scheme.

46.   Prior to that, Rechnitz first went to Florida in order to explore becoming involved with digital assets and cryptocurrencies.  Upon information and belief, while there, Rechnitz first met with Defendant Perone.

47.   After making that connection, Rechnitz and his wife moved to California and started a jewelry business through two similarly named entities, Jadelle Inc. and Jadelle Jewelry and Diamonds, LLC, whose purported marquee client was the Kardashian family.

48.   Through their jewelry business, Defendant Rechnitz and his wife promoted and advertised political and powerful celebrity connections to create a false sense of credibility about themselves and their business, posting photos on their social

---

[5]   Emax Holder, *RussPodcastsCompilation*, YOUTUBE (Nov. 11, 2022), https://www.youtube.com/watch?v=gwrmpNHHVfw.

[6]   *Id.*

media of Defendant Kardashian and other members of her family wearing their jewelry.  For example, Defendant Kardashian wrote on Instagram that "New jeweler alert  Follow @jadellebh for the 🔥"[7] and has made numerous posts promoting Jadelle.[8]  Jadelle posted on its Facebook a picture of Defendant Kardashian wearing Jadelle jewelry stating, "The gorgeous @kimkardashian glowing in her custom @jadellebh necklaces."  Defendant Kardashian's sisters Kourtney Kardashian[9] and Kylie Jenner[10] have posted advertisements for Jadelle. Defendant Kardashian's mother, Kris Jenner, has also made social media posts promoting "@jadellebh" bracelets.

---

[7]    Pinterest, https://www.pinterest.com/pin/600597300287966070/.

[8]    Kellie Chudzinski, *Kim Kardashian flaunts her curves and toned abs in crop top and skintight skirt as she stops by Ulta to see her new KKW Beauty displays*, DAILY MAIL (Oct. 23, 2019 9:46 AM) https://www.dailymail.co.uk/tvshowbiz/article-7603407/Kim-Kardashian-reveals-curves-toned-abs-tight-two-piece-outfit-Ulta-visit.html.

[9]    Alina Torres, *Kourtney Kardashian explota contra sus hermanas*, ENPAREJA (Dec. 17, 2019 5:32 PM), https://www.enpareja.com/break/Kourtney-Kardashian-explota-contra-sus-hermanas-20191217-0041.html.

[10]    Pinterest, https://www.pinterest.com/pin/430586414376243338/.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

49. Defendant Rechnitz is also a close personal friend, business partner, and member of the "inner circle" of Defendant Mayweather. Rechnitz is a member of "The Money Team" and is listed as a collaborator in Defendant Mayweather's GOAT (greatest of all time) documentary series.[11] Rechnitz has control over ticket sales and resulting proceeds for Defendant Mayweather's recent exhibit boxing matches. Rechnitz has been photographed sitting next to Defendant Mayweather courtside at Los Angeles Lakers games.[12] Rechnitz recently partied "the night away" at Art Basel in 2022 with Defendants Mayweather and Kardashian.[13] TMZ recently reported that Defendant Mayweather gifted Defendant Rechnitz a custom jacket.

50. Until recently, Defendant Rechnitz was also close personal friends with Defendant Antonio Brown.

51. On May 14, 2021, the Executive Defendants launched the EMAX Tokens with a transaction volume of $16.11 million and a price of $0.00000005875, according to data from CoinMarketCap.[14] The total market supply of EMAX Tokens minted was 4 quadrillion.

52. Liquidity pools were created on Uniswap to allow users to purchase EMAX Tokens with Ether. Wallets associated with Defendants continually provided EMAX Tokens to the pool as retail investors provided Ether to purchase EMAX Tokens.

---

[11] *Floyd Mayweather Making 'Last Dance' Style Docuseries . . . 'The GOAT'*, TMZ (Oct. 6, 2022, 10:00 AM), https://www.tmz.com/2022/10/06/floyd-mayweather-signs-deal-docuseries-show-last-dance-the-goat-boxing-tbe/.

[12] *Floyd Mayweather Makes Good on Promise . . . Sends Kids to Clips Game*, TMZ (Oct. 31, 2022, 9:04 AM), https://www.tmz.com/2022/10/31/floyd-mayweather-gifts-young-fans-tickets-clippers-game-lakers/.

[13] Jeroslyn JoVonn, *Floyd Mayweather drops over $4M on Art Basel Pieces by Warhol, Rober Indiana, and Alexander Calder*, BLACK ENTERPRISE (Dec. 2, 2022), https://www.blackenterprise.com/floyd-mayweather-drops-over-4m-on-art-basel-pieces-by-warhol-robert-indiana-and-alexander-calder/.

[14] *Historical Data for EthereumMax*, COINMARKETCAP, https://coinmarketcap.com/currencies/ethereummax/historical-data/ (last visited Dec. 19, 2022).

53.     At the time of launch, and throughout the Relevant Period, the EMAX Tokens were not sold pursuant to a "whitepaper."  Whitepapers in cryptocurrency are documents released by the founders of the project that gives investors technical information about its concept, and a roadmap for how it plans to grow and succeed.

54.     Subsequently, however, the Company did release a whitepaper in October 2021 entitled: "EthereumMax – Disrupt History," which explained the business model for EthereumMax and described its activities during the Relevant Period.

55.     According to the Company, "[w]e launched EMAX with a vision to bridge the gap between the emergence of community-driven tokens and the well-known foundational coins of crypto, creating a unique token that provides lifestyle perks with financial rewards and incentives to its holders with a pathway for practical long-term use in everyday life."[15]  The founders' "approach to bridging this gap was to simplify the complex and instill confidence through a trusted circle that can provide guidance and instill trust."[16]

56.     In plain terms, EthereumMax's entire business model relies on using constant marketing and promotional activities, often from "trusted" celebrities, to dupe potential investors into trusting the financial opportunities available with EMAX Tokens.  The whitepaper was reviewed by ICOLAW P.C., a law firm located in Los Angeles, California.

57.     The Company later even bragged in its whitepaper that its "expertise in marketing strategy and managing relationships" was a "key area" for EthereumMax's successful promotional efforts in the preceding six months (*i.e.*, the Relevant Period):

> Each week we track and analyze our marketing efforts, continuing to make strategic modifications to optimize engagement for week-over-week improvements and impact.  If we can do all of this in

---

[15]     *See* Whitepaper, *EthereumMax – Disrupt History*, ETHEREUMMAX, 5 (Oct. 2021), https://ethereummax.org/wp-content/uploads/EthereumMax-White paper-v1-Final.pdf.

[16]     *Id.* at 7.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

less than 6 months, imagine what the future holds?  The best is yet to come.[17]

58.     This so-called expertise in "marketing strategy and managing relationships" came primarily from three individuals: Defendants Perone, Maher, and Rechnitz.  Upon information and belief, Rechnitz was either (1) one of the undisclosed founders of EthereumMax, or (2) brought in by Perone and/or Maher prior to the launch of the EMAX Token to help the Execute Defendants recruit the Promotor Defendants.

59.     Rechnitz provided the Executive Defendants with access to several high-profile celebrities that were willing to tout EMAX Tokens in exchange for under-the-table payments and the ability to frontrun EMAX Tokens investors.  For example, as Davis subsequently disclosed, Davis and the Executive Defendants were able to recruit Mayweather as an EMAX Token promoter due to them having "two degrees of separation" from Mayweather (*i.e*., via Rechnitz).

**The Pump – Shilling EthereumMax**

60.     On May 14, 2021, the day of the EMAX Token launch, Defendant Maher posted a promotion and solicitation for EMAX Tokens on the "InRussWeTrust" Facebook page (which was owned and operated by Defendant Russell Davis).  Specifically, the following post showed a screenshot of the financial metrics for the EMAX Tokens and displayed a "466,590.48%" increase in the EMAX Tokens price over a 24-hour period:

---

[17]     *Id*. at 48.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

61.     The next day, after the price of EMAX Tokens sharply decreased,
Maher made the following post on Facebook to ease concerns from EMAX Token
investors and encourage further purchasing and/or holding of the tokens:

> I've been getting a lot of questions about this being a rug pull or a dump
> and dump.  It's easy to be pessimistic when you see a 50-75% drop in
> a day much less a half hour.  After further look though the massive sell
> off came from one single account, that bought 35 ETH worth of coins
> and sold off his entire position after a sharp bump.  This cause a cascade
> of panic selling wiping out all the gains from the day.  You can view
> his account, he does this regularly to new alt coins at our stage of the
> game.

The good news, neither of the two largest accounts sold a single penny. These are held by the coin developers and their marketing team. After speaking with the development team they've assured us that aside from marketing expenses they will not sell off any of their position for at least six months.

If you've invested in new coins before (Shiba, Kishu, etc.), you'll have been through this ride already. The lessons we've learned from those coins, is that in turbulent times, it's actually best to do nothing. That's naturally hard to do when you see a dramatic movement, so have a plan in place for what your goal is and stick to it. Don't feel bad about taking small profits to the sideline as the coin appreciates. This will help you let the rest ride without letting your emotions get in the way.

There's going to be a lot of bumps along the way. Stay strong, and hold tight. #EthereumMax

62.     On May 16, 2021, the EthereumMax Instagram account (which was ultimately controlled by Perone via his position as CEO of the de facto corporation, and operated by Perone or an agent working on his behalf) posted the following promotion titled the "EthereumMax Pre-launch Kickoff" (the "Pre-launch Kickoff post"), which touted, among other things, how (1) the EMAX Tokens grew "500,000+% in the first 24 hours"; (2) the Executive Defendants had "locked in partnership with global digital marketing agency" and "lined up a knockout influencer" for a "nationwide campaign"; and (3) "We are 3 days in with ~$100M market cap and the train is just getting rolling":[18]

---

[18] EthereumMax   (@ethereummax),   INSTAGRAM   (May   16,   2021), https://www.instagram.com/p/CO87bQ0srEF/.

16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

**EthereumMax Pre-launch Kickoff**

There is nobody who believes in $eMax more than the team writing this - but we would be lying if we told you we thought it would grow 500,000+% in the first 24 hours. We've been called the fastest growing cryptocurrency in history, BUT our journey has only just begun. This isn't supposed to happen in the first two days - but it did, because of you.

So Far:
◆ Taken off four 0's
◆ 7K+ holders
◆ 1,100+ Telegram members
◆ 900+ Twitter followers
◆ CoinGecko launch
◆ Soft website launch (new website launching this week)
◆ Locked in partnership with a global digital marketing agency
◆ Applied and in process to join multiple new exchanges/listings (ASAP)
◆ Lined up a knockout influencer
◆ Nationwide campaign… keep your head up and eyes open!

We are 3 days in with ~$100M market cap and the train is just getting rolling. We, as the development team, have been fully inundated with growing the $eMax community and that is our only goal.

**NOW IS THE TIME, EVERYONE LEARNS WHO $EMAX IS!**

17   63.    On May 17, 2021, Maher issued the following statement regarding the
18   Prelaunch Kickoff Post from the EMAX team:

19
20   **Justin Maher** · 17 May 2021 · 

Hey guys,
I know everyone probably saw the brief release last night from the Emax team. While they can't
let out all their information I can tell you after talking with their marketing team last night that
there are exciting moves going on behind the scenes between celebrity endorsement and
partnerships with major corporations.

Anyone telling you this is a scam or pump and dump has no idea the bigger picture on where this
coin is going to be taken.

As always with crypto or any security, invest responsibly, risk what you can afford to lose. There
are many whales in there right now making waves in the day to day trades. So try not to time this
market right now, try to take emotion out of the decisions. You may buy in right before a brief dip
or correction. Those are to be expected when you have such a meteoric rise in such a short period
of time. Long term this is a hold all the way.

#EthereumMax

👍❤️ 84                                                                                          64 comments

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

64.     On May 18, 2021, Defendant Davis posted to his followers that it was "Not too late for Emax and Bezoge!  Just the start!"

65.     As the subsequently released whitepaper acknowledged, the Executive Defendants actively recruited and retained the Promoter Defendants to serve as the promotors for the launch of the EMAX Tokens in May 2021.

66.     The Promotor Defendants are sophisticated public figures with familiarity and experience with endorsement contracts.

67.     Upon information and belief, the Promoter Defendants received EMAX Tokens and/or other forms of consideration as part or all of their compensation for promoting EthereumMax.

68.     For example, a combined search of the Ethereum Blockchain Explorer ("Etherscan") and the non-fungible token marketplace OpenSea shows that a wallet closely connected to Pierce received and sold millions of dollars' worth of EMAX Tokens while Pierce simultaneously promoted EMAX Tokens to investors.

69.     As a starting point, on May 28, 2021, Pierce posted a screenshot of his trading account with 15,858,700,526,204.817 EMAX Tokens valued at "$2,520,087.34," which had increased "83.34% ($1,145,469.23)" on the one-day chart.[19]  The caption to the image posted by Pierce contained the following string of emojis:



---

[19]     Paul Pierce (@paulpierce34), TWITTER (May 28, 2021, 8:07 AM), https://twitter.com/paulpierce34/status/1398294745806299139?s=20&t=V-OgyFf-y6rqaCh_CgzpGg.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

70.     Pursuant to his settlement with the SEC, as described below, Pierce made his post without disclosing that the issuer was compensating him for the promotion or the amount of the compensation and revealed that his own personal holdings were lower than the screenshot in the tweet.  The SEC order states that the tweet of the screenshot was of another person's holdings that were provided to him for promotional purposes.

71.     Notably, while Pierce covered up the wallet's actual address, he left the unique image displayed as the wallet's profile picture unredacted.  This image is a direct match to an image associated with wallet address 0x70f5a6ebc69087996ce5eb94b799e15994beae10 on the OpenSea exchange.  An examination on Etherscan of some of the other digital assets within Wallet 0x70f5A6 shows additional direct connections to Pierce, further confirming that Wallet 0x70f5A6 [20] is controlled by someone either working as an agent on his behalf or close to him personally.  For example, Wallet 0x70f5A6 trades in Ethernity tokens. Pierce has direct connections to Ethernity via his participation in a celebrity charity poker tournament sponsored and/or promoted by Ethernity.[21]  Pierce even played at the same table with Ethernity's CEO, Nick Rose, on September 26, 2021.

72.     An examination of the Pierce display wallet's trading activity in conjunction with Pierce's social media activity shows that someone closely connected to Defendant Pierce made millions of dollars trading (and selling) EMAX Tokens while simultaneously promoting the tokens to investors as sound long-term investments.

---

[20]     https://etherscan.io/address/0x70f5a6ebc69087996ce5eb94b799e15994beae10.

[21]     blockchainnews, *Paul Pierce, Phil Ivey, Mr. Beast and Joe Lubin Tonight In Virtue Poker's Awaited Celebrity Charity Poker Tournament*, THE CRYPTO BASIC (Sept. 26, 2021), https://thecryptobasic.com/2021/09/26/paul-pierce-phil-ivey-mr-beast-and-joe-lubin-tonight-in-virtue-pokers-awaited-celebrity-charity-poker-tournament/.

73.     Initially, on May 24, 2021, after making a small transfer of approximately $13,350 (seemingly as a test to confirm that the transfer between wallets could be done successfully), the Pierce display wallet received an "airdrop" of approximately 15 trillion now-defunct EMAX Tokens from the beta version of the EthereumMax deployer wallet.[22]

74.     On May 25, 2021, Pierce received an approximate equivalent of 15.4 trillion new EMAX Tokens via the EthereumMax deployer wallet, valued at around $1,350,000 in cash at the time.   That same day, the Pierce display wallet also additionally purchased around 110 billion EMAX Tokens for about $10,000.[23]

75.     On May 26, 2021, the Pierce display wallet received approximately 247 billion additional EMAX Tokens from a second EthereumMax deployer wallet "airdrop."[24]

---

[22]     A "deployer wallet" refers to the original wallet or central interaction point for a token's liquidity.

[23]     https://etherscan.io/token/0x15874d65e649880c2614e7a480cb7c9a55787ff6?a=0x70f5a6ebc69087996ce5eb94b799e15994beae10.

[24]     https://etherscan.io/address/0x7e3c20044ac242acc6340d73ab56f7a7b305411d#tokentxns.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

76.     That same day, Pierce promoted EthereumMax in a widely discussed post on the social media platform Twitter during an online dispute between Pierce and the television broadcasting network ESPN.[25]  Prior to the May 26 post, Pierce had worked for ESPN as a popular sports analyst and commentator until he was fired for an unrelated video he had previously posted to his social media account.  After his firing, Pierce publicly slammed ESPN while conversely praising EthereumMax's ability to make money for him at the same time:



77.     In his SEC settlement, Pierce agreed that he did not disclose that he was compensated by the issuer for the promotion, nor did he disclose the amount and nature of the compensation.  Furthermore, the tweet was false and misleading because Pierce's gross compensation from ESPN was over $1 million the prior year, and he had only received EMAX Tokens two days prior to the post, the value of which was approximately $46,000 at the time he was paid.

---

[25]     *See, e.g.*, Jenna Lemoncelli, *Paul Pierce's ESPN revenge after firing over stripper video*, N.Y. POST (May 26, 2021), https://nypost.com/2021/05/26/paul-pierce-slams-espn-with-cryptocurrency-claim/.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

78.     The trading volume for the EMAX Token exploded as a result of Pierce's post and the Company's announcement that it was partnering with Defendant Mayweather, Jr. (discussed further below).  On May 26, 2021, the volume reached $44.43 million – *almost five times higher than the previous day*.[26]  Then, on May 27, the volume more than doubled, reaching $107.7 million.[27]  That same day, Pierce purchased an additional 120 billion EMAX Tokens.[28]

79.     Then on May 28, 2021, as noted above, Pierce again promoted EMAX Tokens' price growth to his followers on Twitter, boasting about the one-day increase in the EMAX Token price of over 83%.[29]

80.     On May 29, 2021, the very next day, the Pierce display wallet enacted 118 sells, totaling approximately 8.4 trillion EMAX Tokens that were valued at around $5,500,000 at the time.  The Pierce display wallet then capitalized further on his successful pump of the EMAX Tokens trading volume.  The Pierce display wallet made 12 buys totaling 1.214 trillion EMAX Tokens, then immediately turned around and sold those 1.214 trillion EMAX Tokens plus an additional 680 billion EMAX Tokens (*i.e.*, 1.89 trillion EMAX Tokens in total).[30]

81.     From May 30, 2021 to June 2, 2021, the Pierce display wallet amassed another 2.5 Trillion EMAX Tokens through numerous buys and sells.[31]

---

[26]     *EMAX – EthereumMax 3 Historical Price Data*, NOMICS, https://nomics.com/assets/emax3-ethereummax-3/history/3 (last visited Dec. 20, 2022).

[27]     *Id*.

[28]     https://etherscan.io/token/0x15874d65e649880c2614e7a480cb7c9a55787ff6?a=0x70f5a6ebc69087996ce5eb94b799e15994beae10.

[29]     *See* n.31, *supra*.

[30]     https://etherscan.io/token/0x15874d65e649880c2614e7a480cb7c9a55787ff6?a=0x70f5a6ebc69087996ce5eb94b799e15994beae10.

[31]     https://etherscan.io/token/0x15874d65e649880c2614e7a480cb7c9a55787ff6?a=0x70f5a6ebc69087996ce5eb94b799e15994beae10.

82.     On May 30, 2021, Pierce posted the following tweet[32], promoting Ethereum Max:



83.     Three days after falsely telling investors he was in it "for the long haul" with EthereumMax, the Pierce display wallet sold approximately 9.7 trillion EMAX Tokens worth approximately $1,300,000.[33]

84.     On June 14, 2021 (*i.e.*, the day that Kardashian promoted EMAX Tokens to her 250 million followers on Instagram), the Pierce display wallet traded EMAX Tokens, selling off approximately 1.17 trillion EMAX Tokens.[34]  Similarly, around that same time frame, the Pierce display wallet received over 462 billion EMAX Tokens from wallet address 0x2671663ff57fdb0ee8a8613286802ae4d1c72428, which, upon information and belief, is owned, controlled and/or operated by the Executive Defendant Perone.[35]

85.     Pierce himself, as well as the ultimate owner of the Pierce display wallet had access to material, non-public information about the timing of various celebrity promotions of the EMAX Tokens (including his own), and improperly used that

---

[32]     Paul Pierce (@paulpierce34), TWITTER (May 30, 2021, 7:41 AM), https://twitter.com/paulpierce34/status/1399013195151417345?s=20&t=qpvEL-yI0O2jszrSIxCfcA.

[33]     https://etherscan.io/token/0x15874d65e649880c2614e7a480cb7c9a55787ff6?a=0x70f5a6ebc69087996ce5eb94b799e15994beae10.

[34]     https://etherscan.io/token/0x15874d65e649880c2614e7a480cb7c9a55787ff6?a=0x70f5a6ebc69087996ce5eb94b799e15994beae10.

[35]     https://etherscan.io/tx/0x0c4825fcb332f9d791980b9b95903f94331c0113a516c9b95c91e0cf18dffa0d.

information to perfectly time his purchases and sale of EMAX Tokens to maximize his ill-gotten profits.   Pursuant to the SEC Order, Pierce himself received approximately 1,622,319,996,192 EMAX Tokens, worth approximately $244,116 at the time he received them, from EthereumMax and/or its agents between May 24, 2021 and June 18, 2021 in exchange for his promotional tweets.

86.   These complicated transactions demonstrate a pattern by which Pierce and other promotors, including the Promoter Defendants, are given tokens as a payment for promotions, they go out and post about the tokens on social media, then they and their close associates turn around and sell the tokens for profit as retail investors buy in.   The entire purpose of this paid promotion is for pumping and dumping the tokens based on the value created by the Promoter Defendants' direct action.   Furthermore, the complexity of these financial transactions and movements between wallet addresses demonstrates that the Promoter Defendants understand how to both time and execute their selling strategy.

87.   Pierce was not alone with the insider trading scheme.   His friend and business associate Rechnitz was another prime culprit for this portion of the scheme. Upon information and belief, Rechnitz engaged in various forms of frontrunning his transactions with EMAX Tokens based on material, non-public information in his possession. Given Rechnitz's intimate connection to Mayweather and his being authorized by Mayweather to conduct business on Mayweather's behalf, Mayweather had actual knowledge of Rechnitz's insider trading scheme. Upon information and belief, Mayweather received a cut of the money that Rechnitz generated from improperly frontrunning the celebrity promotions of EMAX Tokens.

88.   Confidential Witness #1 (CW1) is a former social acquaintance of Defendants Rechnitz and Mayweather, having first met Rechnitz in 2017 and Mayweather in 2019.  CW1 lived near Rechnitz and frequently socialized with him

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1   and those in the Rechnitz orbit.  Over the years, CW1 also had conducted or explored

2   business dealings with Defendants Kardashian and Mayweather.

3       89.    Beginning in May 2021, Defendant Rechnitz proposed that CW1 "get in

4   on" the EthereumMax scam.  Defendant Rechnitz told CW1 at least ten times that he

5   had a connection to a "garbage crypto" that would pay Defendant Mayweather to

6   advertise on his boxing shorts during the June 6 exhibition match.  In addition to

7   Mayweather, Rechnitz told CW1 that he and the Company were going to have

8   Defendants Pierce and Kardashian to solicit EthereumMax sales.

9       90.    Defendant Rechnitz confirmed to CW1 that EthereumMax was a scam

10  and that his celebrity promoter cohorts were aware that they were shilling the dubious

11  EMAX Tokens for his (and their collective) benefit.  CW1 inquired as to why the

12  celebrity promotors would engage with these solicitations, Rechnitz revealed that the

13  Executive Defendants give the Promotor Defendants millions of tokens.  Rechnitz

14  further disclosed that he knew exactly when these promotions would occur and used

15  this knowledge to front run the posts and sell tokens into the market in the aftermath.

16  According to CW1, Defendant Rechnitz was constantly in touch with the Promotor

17  Defendants, including Defendant Kardashian, who Rechnitz would speak with at

18  least every few days.

19      91.    On one occasion taking place on or around the same time as Pierce's

20  promotions, Rechnitz again tried to convince CW1 to get in on the scheme to front

21  run investors.  Because CW1 was not crypto-savvy, Rechnitz once pulled out his

22  phone and demonstrated how he made trades on his trading app immediately

23  following a celebrity promotion.  As Rechnitz was demonstrating his illicit trading

24  strategy, CW1 observed Rechnitz jump out of his seat, point his fingers in the air and

25  proclaim that it was "so easy."  CW1 then saw Rechnitz dancing in a circle and

26  chanting "pump and dump . . . pump and dump" in an apparent victory dance for

27  successfully capitalizing on his inside information regarding Pierce's promotions.

28

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

92.     According to transactions from the Ethereum blockchain, starting on May 19, 2021, the wallet address 0x1439caa755c82c300b9fc2cd86c9a9b2565606fd (which was identified by Defendant Maher as being owned by Rechnitz) (the "Rechnitz Wallet") began receiving trillions of EMAX tokens for free and then transferring them to various pass-through wallets.

93.     On May 19, 2021, the Rechnitz Wallet received a transfer of 239.9 billion EMAX Tokens.  The wallet[36] that initially sent the EMAX Tokens to the Rechnitz Wallet plausibly belonged to an EMAX founder as it first began interacting with the EthereumMax liquidity pool on Uniswap less than 24 hours after the liquidity pool was created (the "0x8ba wallet").

94.     Likewise, on May 20, 2021, the Rechnitz wallet received two successive transfers of EthereumMax tokens of 2.45 trillion tokens.  The wallet that made the aforementioned May 20, 2021 transfers began receiving EMAX tokens less than two hours following the creation of the Uniswap liquidity pool on May 14 ("the 0x81E" wallet).  On May 21, 2021, the Rechnitz wallet transferred 1.7 trillion tokens back to the 0x8ba wallet and received another 2.401 trillion tokens from the 0x81E wallet.  On May 22, 2021, the Rechnitz wallet transferred 1.769 trillion tokens back to the 0x8ba wallet and received 114.6 billion tokens from the 0x81E wallet via a pass-through.  Because of this transfer activity and the wallets' activity during the time creation of the liquidity pools, it is reasonable to infer that these wallets were owned or controlled by other EMAX founders or by Defendant Rechnitz himself.

95.     On May 23, 2021, Rechnitz begins to sell EMAX Tokens into the Uniswap liquidity pool.  On May 25, 2021, the Rechnitz Wallet received 3.263 trillion tokens.  Rechnitz then sold off his "old contract" EMAX Tokens and began to aggressively supply the liquidity pool with the "new contract" EMAX Tokens.  Indeed, the Rechnitz Wallet made a series of five transactions that supplied a total of

---

[36]     0x8ba9B5a254a9d9A4C96C5460b1B617FA5E84e78A.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1.851 trillion EMAX Tokens into the Uniswap EMAX liquidity pool.  These actions interacting with the new contract and the new contract token's liquidity pool laid the groundwork for the unveiling of the "new version" of the token and the start of the celebrity shilling scheme.

96.    Knowing that the celebrity endorsements were incoming, on May 26, 2021, the Rechnitz Wallet supplied another 141.8 billion EMAX Tokens into the Uniswap liquidity pool and was thereafter obtained another 25.8 billion tokens from the Deployer Wallet to better front run the celebrity endorsements.

97.    Thereafter, on May 26, 2021, EthereumMax's official Twitter page (which, upon information and belief, is controlled by Executive Defendant Perone) issued a tweet stating "Our new token to buy $eMax is LIVE!  This is our updated and ONLY contract address – 0x15874d65e649880c2614e7a480cb7c9A55787FF6." The Tweet also had a lengthy how to buy picture called the "Beginners Guide to Buying EthereumMax."[37]

98.    After the Pierce promotions began on May 26, on May 27, 2021, the Rechnitz wallet received two transfers from a new wallet[38], (the "0x62a wallet") for one for 4.065 trillion tokens and one for 784 billion tokens.  The 0x62a wallet received its EMAX Tokens from a pass-through wallet[39] which received them from an additional wallet[40], the ("0x8bD wallet").  The 0x8bD wallet first began interacting with the Uniswap EMAX liquidity pool less than two minutes after the liquidity pool was first created.[41]  After being freshly restocked with new tokens, the Rechnitz wallet continued to provide EMAX tokens to the Uniswap liquidity pool on May 27,

---

[37]    EthereumMax (@ethereum_max), TWITTER (May 26, 2021, 11:09 AM), https://twitter.com/ethereum_max/status/1397615924446830592.
[38]    0x62a7DFC0037D97775fBCe582cC4FF0dd9b7f1Ecb.
[39]    0x061419b8684c56F27Aabc1B9e22425951f6B1197.
[40]    0x8bD2995C7F7C95c07F2AC4c5b6309fdb118FEE0d.
[41]    *Compare,* Creation of EMAX liquidity pool on May 14, 2021 at 5:19:28 AM; https://etherscan.io/tx/0x5ef14f548586c583e9acc75b000ffdcce6712384b052f5432f0c9d9a1a99831b with EMAX token swap by the 0x8bD wallet on May 14, 2021 at 5:21:08   AM;   https://etherscan.io/tx/0x2e830e1245e3bb38c0b4c11f62c0401a4354c11acf63231120b29f66e5ccf11a.

1   2021.  In a series of six transactions, the Rechnitz wallet provided 1.769 trillion

2   EMAX tokens into the Uniswap liquidity pools, drawing out eth tokens in return.

3       99.    The Rechnitz wallet then swapped this converted his eth tokens into

4   tether, a stablecoin pegged to the United States Dollar.  These swaps were effectuated

5   using the Coinbase Wallet, a wallet software released by Coinbase that allows users

6   to interact with Uniswap and purchase tokens that Coinbase does not directly list

7   itself.

8       100.   After conducting numerous swaps and cashing out via Tether, the

9   Rechnitz Wallet was again replenished with tokens from another wallet, the 0xE02

10  wallet, belonging to an EMAX founder, insider, or Rechnitz himself.  To wit, the

11  0xE02 wallet received 27 trillion free EMAX Tokens directly from the Deployer

12  wallet on May 25, 2021, and also received free tokens from the pass-through wallet

13  mentioned above associated with the 0x8bD wallet, which had interacted with the

14  EMAX Uniswap liquidity pool less than two minutes after its creation.

15      101.   On May 28, 2021, the Rechnitz Wallet transferred billions of EMAX

16  tokens to a "dgroot.eth" wallet address, likely in exchange for the promotional efforts

17  of Groot Hospitality and/or Dave Grutman in connection with the LIV Nightclub

18  promotions.  Also on May 28th, the Rechnitz Wallet makes several swaps of EMAX

19  tokens into the Uniswap liquidity pools, with the Rechnitz Wallet obtaining hundreds

20  of thousands of dollars' worth of eth and Tether.

21      102.   These EMAX Token transactions in the Rechnitz Wallet line up within

22  the same timeframe that Rechnitz engaged in a live "pump and dump" after the price

23  of EMAX Tokens increased due to Pierce's promotions in order to convince CW1 to

24  join in the conspiracy to engaging in unlawful insider trading.

25      103.   Over the next several days, the Rechnitz wallets engaged in numerous

26  swaps with the Uniswap liquidity pool, providing EMAX Tokens to the pool and

27  withdrawing eth tokens and immediately converting them to Tether and the USDC

28

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

stablecoin.  The various wallets that provided tokens to or received transfers directly from the Rechnitz wallet display the similar behavior of providing significant amounts of EMAX Tokens into the Uniswap liquidity pools in exchange for eth and tether tokens in conjunction with the celebrity endorsements.  Wallet 0xE02 for example, made no fewer than 50 swaps using the EMAX liquidity pool, supplying trillions of tokens and often obtaining hundreds of thousands of dollars' worth of eth or stablecoins at a time.

104.   The Rechnitz wallet continued to receive free EMAX Tokens through June 18, 2021.

105.   According to CW1, besides Mayweather, Rechnitz is also a close personal friend of Defendant Pierce.  Defendant Rechnitz would even bring Pierce to CW1's house to sign basketballs and shoot hoops with members of CW1's family.

106.   Defendant Pierce, in turn, is also close friends with Defendant Mayweather.  Pierce attended the EthereumMax-connected June 6 Mayweather bout and sat with Mayweather in the locker room prior to the fight.[42]  Pierce also attended the pre-fight media scrum leading up to the fight.[43]

107.   According to CW1, Rechnitz was also in the locker room with Mayweather and Pierce before the EthereumMax-promoted June 6 exhibition.  Notably, Defendant Russell Davis also bragged of meeting with Mayweather prior to the match.

---

[42]   Viral Star Videos, *Floyd Mayweather a& Paul Pierce in the Locker Room Before the Fight*, YOUTUBE (June 7, 2021), https://www.youtube.com/shorts/qHK6B8E8x-0.

[43]   Sipa USA, *Former NBA player Paul Pierce attends media availability ahead of the June 6th exhibition boxing match between Floyd Mayweather and Logan Paul on June 03, 2021 at Villa Casa Casuarina at the former Versace Mansion in Miami Beach, Florida*, (June 3, 2021), https://www.alamy.com/former-nba-player-paul-pierce-attends-media-availability-ahead-of-the-june-6th-exhibition-boxing-match-between-floyd-mayweather-and-logan-paul-on-june-03-2021-at-villa-casa-casuarina-at-the-former-versace-mansion-in-miami-beach-florida-photo-by-jlsipa-usa-image430892482.html.

108.   Upon information and belief, all of the Promoter Defendants received similar payments funneled by Defendant Rechnitz, including disbursements of tokens from the EthereumMax deployer wallet and/or marketing wallet or for other consideration, and cashed out shortly after engaging in their respective promotional activities in a similar manner to Pierce.  At the same time, Rechnitz, Mayweather, and Perone separately entered into a conspiracy to engage in insider trading of EMAX Tokens that was correlated with the dates and times of the celebrity promotional activities alleged herein.

109.   This is also why Defendants Rechnitz and Maher were a vital part of the Executive Defendants' plan for marketing the EMAX Tokens.  Rechnitz has direct, longstanding personal and business relationships with Promoter Defendants Mayweather, Kardashian, and Pierce.

110.   Maher has direct, familial ties to Promotor Defendant Davis, who is both his brother-in-law and business associate.  According to Maher, he brought the EthereumMax project to Davis specifically to leverage Davis' cryptocurrency-investing followers on social media.

111.   On or around May 16, 2021, Maher removed $10,000 from the EMAX Token liquidity pool to pay cryptocurrency influencer and promotor Russ Davis and professional football player Antonio Brown to promote EthereumMax.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

112.   Davis reposted the following promotion from the EthereumMax official Twitter account to his own personal "InRussWeTrustCrypto" account:[44]



113.   Notably, according to Maher, the development team had "messed up" both the initial launch and the liquidity pool, leaving Maher and other insiders with a huge percentage of the available Float.  Moreover, the liquidity pool was underfunded.  Thus, small amounts of trading volume had a disproportionately large impact on the EMAX Tokens' price.

114.   That same day, Speer promoted the EMAX Tokens in a video he posted to his personal YouTube channel, wherein Speer advised retail investors "[h]ow to buy EthereumMax."[45]  Notably, Speer told retail investors about "a coin that just launched about 48 hours ago and it is taking off."  Speer added that the EMAX Tokens price has "tons of room to go" and that the EthereumMax leadership team and insiders consisted of "lots of same hype and people behind it as Shiba."  Speer further compared EMAX Tokens' potential to the massive surge in price that occurred with the Shiba Inu coin, claiming that the EMAX Token price was "only going up long term."[46]

---

[44]   EthereumMax (@ethereum max). TWITTER (May 16. 2021, 10:41 AM), https://twitter.com/ethereum_max/status/1393984963616419842.

[45]   Mike Speer, *How to buy EthereumMax*, YOUTUBE (May 16, 2021), https://www.youtube.com/watch?v=bi6ZeRzC-QQ.

[46]   *Id.*

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

115.   Throughout the video, Speer attempted to disclaim inside knowledge of the EMAX Token by stating he was not a "crypto expert" in an effort to mislead retail investors into believing that Speer simply stumbled onto the EMAX Token accidentally instead of him being an EthereumMax founder and/or insider.   For example, Speer states that the EthereumMax website is "vague" and that "they" did not yet have a whitepaper in a misleading attempt to distance himself from the EthereumMax leadership team.

116.   In the caption to Speer's video, he explains the following 18 steps that retail investors need to take to purchase the EMAX Tokens:[47]

Step 1: Purchase your ETH on whatever exchange you use.

Step 2: Transfer to Coinbase Wallet.

Step 3: Go to https://app.uniswap.org/#/swap

Step 4: Click add token to transfer to from ETH. **Paste in this address: 0x15874d65e649880c2614e7a480cb7c9A55787FF6.** [the "Deployer Wallet"]

Step 5: Think long and hard, can you risk this money and still pay your bills?  It's a serious question.  It's ok if the answer is no.  Please do not proceed.

Step 6: **Can you leave this money in eMax for a couple of months?  If yes, proceed below.  If the answer is no, the reason why you shouldn't buy is because you will be part of the reason for a price drop if you sell.  This coin is only a couple of days old as of May 16th.  Holders help the price stabilize. Paper hands drive price down**

Step 7: Click connect to wallet and click Coinbase

Step 8: Select ETH to eMax – Select the amount you want to transfer

---

[47]    *Id.*

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

Step 9: Click the gear in the top right, change slippage to 10%, close gear

Step 10: Make sure you have extra ETH outside of the amount you are using to purchase for the fees.

Step 11: Press swap + confirm / accept etc.

Step 12: There won't be any dollar value in your CB Wallet because it's new

Step 13: Go to the App Store and download Zerion

Step 14: Go to your CB Wallet click receive and get your ETH address

Step 15: Go back to Zerion and click import wallet

Step 16: Paste your ETH address

Step 17: Wait a few minutes and it will populate the dollar amount.

Step 18: Enjoy and HODL

117.    As the above instructions indicate, Speer's instructions to retail investors state that EMAX Token holders should be prepared to "leave this money in eMax for a couple of months," suggesting that the EMAX Tokens were a long-term investment because "[h]olders help the price stabilize.  Paper hands[48] drive price down."

118.    The promotion from Davis and Speer kick-started the interest in and buying of EMAX Tokens.  In fact, Maher used the large spikes in price chart (actually caused by the low liquidity pool funding) to promote EMAX Tokens' potential for significant returns to investors (*see supra* 67-69).

119.    Shortly after his promotion, Davis began selling off his EMAX Tokens, causing the price of the tokens to plummet until Maher was able to reach a deal with Davis to lock up some of the massive EMAX Token holdings.

---

[48]    Having "paper hands" is a term used in cryptocurrency trading that refers to someone that sells at the first sign of a price drop.

120.    Upon information and belief, the following wallet addresses are owned/controlled by Davis and were used to conceal his transactions (*i.e.*, timing of sales) with EMAX Tokens:

- 0xe3FA73f404EA11C9Ce3DCA4B474cD99D6283134C
- 0xd0AEE2df438Ccea32194dACFf330083B04277D71
- 0x74dEc05E5b894b0EfEc69Cdf6316971802A2F9a1
- 0x663f4bf1816d771415fffa86aabc1ee273b92055
- 0xfEd37836fE065496c608E32073D0E759F96989b3
- 0xfb34b53aa6a5840ae740b9818db34b854818de85
- 0x9b1fbe51576d00d1f3a484d9c3c5c52a09866f78
- 0xacd3f3835a3dd7865560953eb745d5f8dba6ce33
- 0x037a7c7c8bAAbBd64aC735F505deF3423528dbA5
- 0x5e47AAE49eAA9D176E3c09b6bc0844BdfBBa27e0
- 0x027A16926de9f38523a71d19d6998923085Dc093
- 0xeB3E690C8ee0299B18Fa40B9B21F54c690b00a7b
- 0x05e45ebBFD62b5E448e0073ABFB4a956FE13f4d1
- 0xE7494f0D06142c70eF1382bb4F5629bA3B377FCd
- 0x35278BF7f391285818F9092c860D698010802f7D
- 0xbcac50256345775e4bbff526b247b3d68a0f10ca
- 0xe277f115a3758e802e40869545646f8142be00ca
- 0x0eb5101719662a00bf4c22e03374a7ffd11f4092
- 0x45f433ae7553900d7ae7af8a1b0d35c3eb7ece46
- 0xce3e48caeb5d0e9124b2b1dcab8b47818fcedc7
- 0x47bA7f557a361A12BB1b28DA1Fb3323dc7C942f4
- 0xd7292AA5924D4f536B9E996cB7FC4bE21b6c3357
- 0xDF6300635c490408C393c1DAdBE7Ba8e88cdBb8B
- 0xBa299a1FE0Da7B443Bf444FDCd0C2a5F2506D2B1

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1    •    0x77Dc423692480979DFdC904278D3d0ec0474782d

2    •    0xfF773b585638D599C64d8ac02e73D12bd9807C30

3    •    0x97758D2C5533663042D72d5389Ef4Bb5c89EAe60

4    •    0xe3254c36fEedF4211D405718702a0389f5871c85

5    •    0x1C58CE90Fa5A610649Ab172000F41b909A9Efc83

6    •    0x761493a52595F7016493b4a7515180d504CdF28f

7    •    0x1711bc52bf7e0494325799717fe640F1924617B7

8    •    0x53061173fbf4CD5886b01d1c68DA266A9B479E1b

9    •    0x4e28ab721c1C3180A82B6a758C081f9Cc4CDd702

10   •    0x233834E733EFf003598e8B6eD1082C984a1E8D53

11   •    0x967f1dC29158486eBE771942e094C41B0AD7F57d

12   •    0x1C473aFE50E060AD872Fb1a209C6b2F257Bdbd5B

13   •    0x7fFA930D3F4774a0ba1d1fBB5b26000BBb90cA70

14   •    0x2930662Fa96cA799C9913264B83E227C7f828105

15   •    0xbe3167f8687d0f6b81a053f938ae335333eeb549

16   •    0x1e7a2e2bbea1362d49c06951f3265d9d6bc90386

17   •    0x64fba1c5e31d8f7ee0194f67ed9c5fed1a17b241

18   •    0xe477aE0b50f2985592BDc1e5aC91f59c93111955

19   •    0xacD3f3835A3dd7865560953eb745d5F8dbA6CE33

20   •    0x74dEc05E5b894b0EfEc69Cdf6316971802A2F9a1

21    121.   On May 19, 2021, Executive Defendant Perone (or an agent of his)

22   posted a message to investors on the EthereumMax Instagram account, with a caption

23   that stated: "Accepted at top global exchanges ✅ Roadmap and White Paper coming

24   ✅ Hired marketing agency ✅ Influencer campaign initiated ✅ Real-world

25   applications . . . 👀 #disrupthistory $eMax #TellYourGrandma." The message itself

26   stated:

27            To the eMax community,

28

35

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1

2

3

4

5

> As we quickly approach our first full week of being live, we as a team could not be prouder to see the rapid growth and expansion of not only the token itself, but the strong community that eMax has built. We've just weathered one of the biggest crypto drops in history, better than any other token. Consumers are now looking beyond products and services. They want benefits, and $eMax holders have seen the impact of a 2% benefit. We've broken down barriers, soared past goals, and have achieved more than expected from any other new crypto currency out there.[49]

6

7

8

9

122.   On May 21, 2021, Speer uploaded another video to his YouTube channel promoting EthereumMax generally and specifically providing investors with instructions on how to purchase EMAX Tokens.[50]   Again, Speer did not reveal to investors that he was a part of the EthereumMax leadership team.

10

11

12

13

14

15

16

123.   Two days later, on May 23, 2021, Speer uploaded an audio recording from Perone to Speer's YouTube channel,[51] wherein Perone states that EthereumMax's use of "high level" brand ambassadors and promotors "legitimized" the project.  Perone also touted the "technological upgrades" that were on the way for the EthereumMax project.  Perone repeatedly proclaimed that he will be meeting retail investors "on the moon" when the price of EMAX Tokens rose from the efforts of the Executive Defendants and Promotor Defendants.

17

18

19

20

21

22

23

124.   On May 24, 2021, the day after Perone's statements about meeting EMAX Token investors "on the moon", a wallet (the "0xc46 wallet")[52] dumped over 58.4 trillion EMAX Tokens into the liquidity pool.  An hour and a half after the final sale in this series, the Deployer Wallet refilled the 0xc46 wallet with approximately 44.1 trillion EMAX Tokens.   This wallet is closely connected to the Executive Defendants because it began interacting with the original EthereumMax token

24

25

26

27

28

---

[49]    EthereumMax (@ethereummax), INSTAGRAM (May 19, 2021), https://www.instagram.com/p/CPE3yvtsQNo/.

[50]    Mike Speer, *Buying Ethereum Max? Gas Fees? Buying The Dip? WTF*, YOUTUBE (May 21, 2021), https://www.youtube.com/watch?v=3CZv0FFn7S8.

[51]    Mike Speer, *EthereumMax – MAYWEATHER v. PAUL – "Culture Coin" Announcement*, YOUTUBE (May 23, 2021), https://www.youtube.com/watch?v=HMbWVXUWB5I.

[52]    0xc46f3364E9900029e339093Dd53551248230D9F3.

36

contract in the hours following the creation of the liquidity pool.  The 0xc46 wallet is also connected directly to the Executive Defendants, particularly Perone, because it, via a passthrough wallet, **funded** the "EthereumMax: Expense Wallet," which was an official EthereumMax public wallet controlled by Perone due to his position as CEO and de facto head of the Company.[53]

125.   On May 25, 2021, Executive Defendants again sold off portions of their EMAX Token allocation.   In particular, the 0xc46 wallet obtained hundreds of thousands of dollars' worth of Wrapped Ethereum over 11 transactions.

126.   On May 25, 2021 the 0xc46 wallet received 311.3 trillion tokens from the Deployer Wallet in two transactions.

127.   The following day, as the new token contract was released and when the celebrity promotions began, on May 26, 2021, the 0xc46 wallet received over 306 trillion EMAX Tokens from the Deployer Wallet and then sold approximately 35 trillion EMAX Tokens.

128.   According to Maher, the Executive Defendants were "wildly connected" and understood the impact that celebrity promotion and marketing could have on the price and trading volume of the EMAX Tokens.  Upon information and belief, the Executive Defendants leveraged their respective contacts to recruit additional celebrities to promote the EMAX Tokens in exchange for a portion of the Float.

129.   For example, early on Defendants Maher, Perone, and Davis worked with Rechnitz to recruit world champion boxer, Floyd Mayweather, Jr. as EthereumMax's "marquee" promotor for a fee of $1,000,000 as his "first down payment" and then $1,500,000 as a second payment.  Notably, "everything that was sent to Mayweather was in Ethereum and cashed out immediately."[54]  According to

---

[53]    0x331626d097cc466f6544257c2Dc18f60f6382414.
[54]    NeverHedge – Crypto, NFTs, Sports Betting, Stocks, *Emax Talk with Justin Ep. 02: Hard Fork Rundown: Mayweather Fight Updates: Hodler (sic) Questions Answered*, YOUTUBE (May 26, 2021), https://www.youtube.com/watch?app=desktop&v=bPT0Tnmt63A&feature=youtu.be&fbclid=IwAR2w8sHjsGnrXL6G9N8Nc0hWAyjn2w3mmSOOTnoWZCnYyERZrSM_k9Q9En8.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

Maher, Mayweather's representatives refused payment in EMAX Tokens and instead received payment in Ethereum, which has significantly more price stability. In order to raise the Ethereum needed for Mayweather's payment, Maher and Davis sought out large holders of Ethereum and offered them a "sweetheart" deal relative to the amount of Ethereum needed for celebrity promotion payments. For example, in exchange for providing $500,000 worth of Ethereum, they would give the Ethereum provider $2,000,000 of EMAX Tokens. As Maher observed, however, most often, the Ethereum provider would then immediately sell the $2,000,000 in EMAX Tokens on the open market. This tremendous downward selling pressure caused the price of the EMAX Tokens to drop. Defendant Davis later clarified during his InRussWeTrust podcast on April 30, 2022, that Mayweather was not paid in Ethereum or cash, but rather he was actually paid in EMAX Tokens for promoting EthereumMax. Davis in particular stated that Mayweather "should have sold [his EMAX Token promotional fee] and that's exactly what he did." Davis claimed to have warned Perone and others that paying celebrity promoters in the EMAX Token would cause downward selling pressure.[55]

130. On May 26, 2021, at the same time Pierce was promoting EMAX Tokens as paying him more than ESPN, EthereumMax issued a press release announcing that it was "now the exclusive CryptoCurrency accepted for online ticket purchasing for the highly anticipated Floyd Mayweather vs. Logan Paul Pay-Per-View event, June 6, 2021 in Miami Gardens, Florida."[56] The press release directed investors seeking "more information" to visit the Company's social media accounts and the "Fight Website" with the following hyperlink: https://mayweatherpaultickets.com/.

---

[55] Emax Holder, *RussPodcastsCompilation*, YOUTUBE (Nov. 11, 2022), https://www.youtube.com/watch?v=gwrmpNHHVfw.

[56] Press Release, PR NEWSWIRE, *Huge Milestone for Practical Use of $eMax* (May 26, 2021), https://www.prnewswire.com/news-releases/huge-milestone-for-practical-use-of-emax-301300421.html.

131.   Because the press release purportedly was from simply "EthereumMax," it can be inferred that whatever company or entity behind EthereumMax is the source.   Because Defendant Perone was the sole director of EMAX Holdings, LLC, Perone was the Executive Defendant that was primarily responsible for the content and issuance of the May 26, 2021 press release.

132.   Perone and the Executive Defendants also took advantage of the artificially inflated price of EMAX Tokens caused by these misleading promotions to sell off a portion of their EMAX Token allocations.   On May 27, 2021, the 0xc46 wallet 1 sold 36.8 trillion EMAX Tokens for $88,096.29 in wETH tokens.

133.   The Fight Website featured Mayweather and offered various incentives for those purchasing online tickets with EMAX Tokens, including: "Orders over $5000 will receive authentic, signed Floyd Mayweather boxing gloves"; "2 front row ringside tickets available exclusively for EthereumMax purchase"; "All EthereumMax purchases receive 10% discount at checkout"; and "Tickets purchased with EthereumMax automatically entered into a lottery drawing to attend the official Mayweather after-party at a private table at LIV."[57]

134.   On May 28, 2021, EthereumMax released a press release out of Los Angeles entitled: "EthereumMax ($eMax) Disrupts Miami Ahead of Mayweather vs. Paul Fight as the First Crypto Currency of Major Nightclubs LIV and Story" (the "5/28/21 Press Release").   The 5/28/21 Press Release stated: "The upcoming boxing match is the single largest sporting event in history to accept cryptocurrency as payment, making it a huge move for the practical use of $eMax."   The 5/28/21 Press Release touted the EMAX Token as the "fastest-growing Altcoin on the market," bragging that the EMAX Token price "is up over 21,000% with over 32,000 holders since its launch on May 14, 2021."   The 5/28/21 Press Release further claimed that the EMAX Token "has been gaining massive moment [sic] and popularity," and

---

[57]   Fight Website, https://mayweatherpaultickets.com/.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

quoting Defendant Pierce's tweet verbatim as an example of this popularity.  Finally, the 5/28/21 Press Release announced that the partnership with Groot Hospitality would "bring eMAX and Cryptocurrency to Miami Nightlife & Entertainment.  This is the first of many opportunities where we see EthereumMax as a reliable payment method for real-life usage."[58]

135.  Because the press release purportedly was from simply "EthereumMax," it can be inferred that whatever company or entity behind EthereumMax is the source.  Because Defendant Perone was the sole director of EMAX Holdings, LLC, he was the Executive Defendant primarily responsible for the content and issuance of the May 28, 2021 press release.

---

[58]   Press Release, PR NEWSWIRE, *EthereumMax ($eMax) Disrupts Miami Ahead of Mayweather vs. Paul Fight as the First Crypto Currency of Major Nightclubs LIV and Story* (May 28, 2021), https://www.prnewswire.com/news-releases/ethereummax-emax-disrupts-miami-ahead-of-mayweather-vs-paul-fight-as-the-first-crypto-currency-of-major-nightclubs-liv-and-story-301301958.html.

136.   On or about May 29, 2021, Defendant Antonio Brown promoted EthereumMax in the following now-deleted "story" post on his personal Instagram account:



137.   On May 30, 2021, Defendant Kimberly Kardashian and nightclub promotor and hotelier David Grutman promoted EthereumMax on their respective social media accounts.  For example, Kardashian's promotion of the EMAX Tokens to her hundreds of millions of followers also did double duty of promoting the nightclub "Club LIV" which is partly owned by Grutman (also a longtime friend and associate of Kardashian):



138.    Following the aforementioned promotions from Brown and Kardashian (both of which were made on behalf of the Executive Defendants and/or the Company to the extent it operated as a de facto corporation prior to its incorporation), and the announcement of the partnership with Mayweather, the trading volume for EMAX Tokens spiked.  In particular, the volume went from $25 million on May 27, 2021 to $80.9 million on May 28 after the Mayweather announcement.  Then it jumped to $112.5 million following Brown's post.  Kardashian's promotion generated another $75.5 million in EMAX Token trading volume on May 30, 2021 before dropping precipitously.[59]

139.    Perone and the Executive Defendants took advantage of the still artificially high price of EMAX Tokens to sell off a portion of his EMAX token allocation.  On May 31, 2021, the 0xc46 wallet 1 sold 4.7 trillion EMAX Tokens for $8,748.26 in wETH.

---

[59]    *See* n.26, *supra*.

140.    On June 1, 2021, Mather left the EthereumMax project with about $4.1 million worth of EMAX Tokens, of which he subsequently sold off approximately 98%.  No later than July 22, 2021, Maher was confronted about his selling activities with EMAX Tokens.   In particular, in the comments section of one of Davis's Facebook posts, an investor posted a wallet address speculated to belong to Maher, which showed suspicious selling activity.  Maher bragged about his ability to conceal his financial movements and mocked the investor who tried to identify Maher's wallet address: "haha yeah unfortunately that's not one of my secret wallets.  Good try though sleuth. *I cleaned all the money I shifted through exchanges first*.  *You'd never be able to track it to what wallets I sent it to*.  Good try though."[60]

141.    On June 3, 2021, the Executive Defendants posted the following statement on the EthereumMax Instagram account,[61] which, upon information and belief, was released in response to Defendant Maher's selling activities:

> eMax Community,
>
> We are fully aware of the drastic price fluctuation that took place with eMax on June 3rd, 2021 and wanted to address this matter with the community head-on.  First and foremost, we are here for the long haul, we are committed to our community, committed to our growth plans, and that is not changing.  This is not a short-term project and there is no single moment, dip, or increase that will derail EthereumMax from fulfilling our vision and strategic efforts to create a powerful movement and fill a void for a new/improved category that is long overdue within the cryptocurrency space.
>
> Last night we released our multi-phase roadmap with excitement and passion, sharing our future plans to expand our community and significantly enhance the benefits of the eMax token.  Today, we had a very upfront and honest conversation with David Grutman, and unfortunately, due to time constraints and the technical complexity behind being able to seamlessly process crypto payments, the venues have determined they do not have the immediate ability to accept $eMax as a payment option this weekend.  Therefore, we collectively decided that it made sense for Groot Hospitality, EthereumMax, and the eMax community, to not force the roll-out process of accepting

---

[60]    *See* JusticeForCrypto, *InRussWeTrust Fully Exposed within the Crypto Space*, YOUTUBE, at 7:17-24 (July 25, 2021), https://www.youtube.com/watch?v=iyDeOfZnOaY.

[61]    EthereumMax (@ethereummax), INSTAGRAM (June 3, 2021), https://www.instagram.com/p/CPrUCO5szYi/?igshid=YzdkMWQ2MWU.

eMax for payment and run the risk of a bigger dilemma this week in Miami, potentially making for an unpleasant user experience for eMax holders.   We want to stress that this decision did not result in EthereumMax ending a business relationship with David Grutman or the Groot Hospitality team, but rather we're aligned about being smart about future partnerships.   We're looking forward to continuing this conversation and confident a collaboration is in our near future.   It's true that in nightlife grand openings are everything, and with that truth, we have one change to make a good first impression and that's what we'll do.

As some people have noticed, of late, there are a handful of larger wallets that have been selling and taking a profit.  When that news from David Grutman was released, several of these large wallets, who were early investors and not part of the development team, began to sell in panic.  As with almost anything, people started to copy their actions and the price of eMax continued to drop (about 60%).  Since the time of this release, eMax has recovered amazingly well and has continued to regain value.

To be fully transparent with our community, we've almost been living in our own world these past few weeks and going at Mach 5 speed.  In just twenty days, eMax has taken over our lives and has been such a huge part of so many others.  As a community, we could not have dreamed of this speed of growth.  The truth is – eMax is still very young and very small, but with these young beginnings, we have only scratched the surface of our true potential.  Even though we've been the fastest growing cryptocurrency, with over 75,000 holders in less than 3 weeks, people speak about eMax as if the token has been around for months or even years, and that in and of itself is exciting.

Right now, EthereumMax is ecstatic to be heading to Miami this weekend to take part in the largest sporting event to ever accept cryptocurrency as payment and they're exclusively accepting $eMax (the flow of that payment process is already finalized and active).  In just 3 weeks we've accomplished milestones that no other crypto has every done, to this scale or at this speed – and we will continue to set the bar higher for ourselves.

This is Chapter 1.  Chapter 1 of a story, written in real-time, that has us on a path to shatter records and bring cryptocurrency into walks of life we have yet seen or even imagined.

75,000 holders know eMax today.  On Sunday, June 6th, millions and millions of people from across the world find out who eMax is.  Then, the next chapter begins and the story only continues to grow.

This journey has just begun and our future has never been brighter.

142.   The price of EMAX Tokens dropped sharply on the news that EMAX Tokens would not be available for payment at Club LIV as promised.  In response,

the Executive Defendants sent Maher and Davis out to do some damage control.
Maher posted the following message to the InRussWeTrust Facebook group: "Trust
me I know it's tough to watch your account plummet in a matter of minutes.  Here's
my wallet.  I was down to $400k at one point today.  I didn't sell a penny.  In fact I
dumped $25k at the bottom.  You can't let one bad news piece trash your long term
goals."  Maher counseled investors: "Put your emotions aside.  So what, they don't
have Emax being used to LIV Bottle service.  Who gives a fuck. Name a single crypto
that you can pay your bar tab with?  The Emax team is trying to make radical moves.
If you can't stomach that then don't play the game.  #EthereumMax."  Similarly,
Defendant Davis also attempted to ease investor concerns and solicit new purchases
on June 3, 2021.   He posted the following message on the "InRussWeTrust"
Facebook group: "Well I'm sure everyone sees Emax plummeting.  The reason
behind it is because the credit card processor did not know how to program to accept
a cryptocurrency on a credit card machine for Liv nightclub after party.  This has
nothing to do with the coin.  I think it is a rock bottom right now which is why I'm
posting.  If anybody wants emax for 90% off. Now is the time!!  This is a Solid
BUYING OPPORTUNITY in my mind!!"

143.   On June 4, 2021, former world champion boxer, Mayweather, Jr.,
attended the "Bitcoin 2021" conference in Miami.  While there, instead of discussing
the cryptocurrency that was the focus of the conference (*i.e.*, Bitcoin), Mayweather
promoted EthereumMax.  In particular, Mayweather and his entourage wore t-shirts
with EthereumMax emblazoned across the chest.  The following are images of
Mayweather being interviewed by Fox Business at the Bitcoin 2021 event, which
described it as the "largest cryptocurrencies event ever to be held on the planet":[62]

---

[62]   *Floyd Mayweather raves about crypto: 'It's the new wave,'* FOX BUSINESS
(June 4, 2021), https://video.foxbusiness.com/v/6257455680001#sp=show-clips.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17   144. The same day, Defendant Maher posted this interview on the
18  EthereumMax Facebook page, while Defendant Perone posted it on the
19  EthereumMax Instagram account.[63]   Maher also posted this interview on the
20  InRussWeTrust Facebook group.   In the introduction to the video, the reporter
21  observed that the attendees at the Bitcoin 2021 event "were attracted here because of
22  a lot of prime-time stars and that does include Floyd Mayweather."   During the
23  interview itself, Mayweather, with the EthereumMax name and logo prominently
24  displayed on the front of his shirt, stated that cryptocurrency investing is "the new
25  wave." Mayweather then described how he first made his money through boxing and
26  then with real estate.   After recounting his previous success at making money,
27  Mayweather reemphasized that investing in cryptocurrency was the next big thing.
28

145.   Later in the day, the EthereumMax Instagram account posted a video promoting a shopping event at a jewelry story in Miami.   The caption stated in relevant part: "#Ethereummax will be accepted for the premier event 50 Karats by @floydmayweather."[64]

146.   The combination of Mayweather's statements on investing and promotion of EthereumMax falsely gave investors the impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion dollar investment strategy.

147.   Two days later, on June 6, 2021, Mayweather similarly promoted EthereumMax during his highly viewed exhibition boxing match with internet celebrity-turned-boxer, Logan Paul.[65]   For example, during the highly-publicized weigh-in before the fight, Mayweather again wore a shirt with EthereumMax and its logo on the front:

---

[63]     EthereumMax, *Cryptocurrency week is here in Miami and Floyd Mayweather shared his thoughts on crypto with FOXBusiness*, FACEBOOK (June 4, 2021), https://www.facebook.com/EthereumMax/videos/173981531399668/;
EthereumMax (@ethereummax), INSTAGRAM (June 4, 2021), https://www.instagram.com/p/CPt34eUA7d9/?igshid=YzdkMWQ2MWU; *see also* Ethereum Max (@ethereummax), INSTAGRAM (June 4, 2021), https://www.instagram.com/p/CPtfEZ8MeFV/?igshid=YzdkMWQ2MWU.

[64]     EthereumMax (@ethereummax), INSTAGRAM (June 4, 2021), https://www.instagram.com/p/CPsiR_PAZXr/?igshid=YzdkMWQ2MWU.

[65]     Brendan Rearick, *EthereumMax (EMAX) Price Predictions: Can Floyd Mayweather Help EMAX Win the Fight?*   MSN (June 7, 2021), https://www.msn.com/en-us/money/markets/ethereummax-emax-price-predictions-can-floyd-mayweather-help-emax-win-the-fight/ar-AAKNxNi.

148.   During the fight itself, Mayweather's trunks adorned the EthereumMax brand on the front waist of his boxing trunks:



1      149.   Mayweather also promoted EthereumMax in connection with the

2   "Official Afterparty" for his fight held at Club LIV. Mayweather served as the host

3   for this afterparty. The following is a promotion from Club LIV, which tags the

4   EthereumMax Instagram page and features the EthereumMax logo and website:



17     150.   That same day, Defendant Davis posted the following picture in the

18   InRussWeTrust group on Facebook of himself and Mayweather together in Las

19   Vegas earlier in the day, announcing a "long term deal" between Emax,

20   Mayweather, and Davis' InRussWeTrust cryptocurrency consulting business:[66]

---

[66]   John Hyatt, *The Untold Story Behind Emax, The Cryptocurrency Kim Kardashian Got Busted For Hyping*, FORBES (Nov. 11, 2022), https://www.forbes.com/sites/johnhyatt/2022/11/11/the-untold-story-behind-emax-the-cryptocurrency-kim-kardashian-got-busted-for-hyping/?sh=18c82ea940d7.



151.    Between June 4, 2021 and June 6, 2021, the trading volume for EMAX Tokens spiked from $15.7 million to $24.5 million.[67]

152.    On June 8, 2021, Executive Defendant Perone, along with Steve Gentile and Josh James (the lead developer at EthereumMax), uploaded a video of themselves on Executive Defendant Speer's YouTube channel entitled: "Addressing the $eMax Community – EthereumMax."[68]    Gentile and Perone identified themselves as the

---

[67]    *See* n.38, *supra*.

[68]    Mike Speer, *Addressing the $eMax Community – EthereumMax*, YᴏᴜTᴜʙᴇ (June 7, 2021), https://www.youtube.com/watch?v=CkR8QJrNubI.

1  "creators" of EthereumMax, and explained that Mr. James had recently joined
2  EthereumMax as its new lead developer.

3      153.   Perone described his prior experience in "the hedge fund space" and had
4  "significant experience structuring nuanced securitizations and financing
5  arrangements," and he touted EthereumMax as something "special" with "real
6  sustainability." Perone also stated that they were able to forge a "landmark agreement
7  with the Mayweather team" and reassured investors regarding the "volatility" in the
8  EMAX Token price. Gentile further stated that EthereumMax's work with
9  "launching ambassadorships and working with influencers" was not solely in
10 preparation for the Mayweather fight, but rather "the launch point" with "great
11 prospects moving forward."

12     154.   Gentile also noted that his background involved specialties revolving
13 around marketing and brand development and he exclaimed that EthereumMax was
14 a "super exciting project" and that he was "excited for the updates" that would be
15 "rolling out in the near future." Gentile claimed that it was "going to be beneficial
16 not only to the token, but more importantly the community."

17     155.   During a pseudo question and answer portion of the video, Gentile
18 brought up investors' questions about a "rug pull" of the EMAX Token and asked
19 Perone to "nip it in the bud." Perone stressed that the EthereumMax team was in for
20 the long term, stating, among other things, that the Executive Defendants were
21 "looking to lock the wallets" to show investors that they "were here to stay."

22
23
24
25
26
27
28

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

156.   On June 14, 2021, Kardashian posted the following solicitation for EthereumMax on her Instagram account, which has over 250 million followers:



157.   As noted in a scathing op-ed piece called "Celebrity Crypto Shilling Is a Moral Disaster," Kardashian's "post was an immediate sensation, and a touch controversial."  The EMAX Token was "only a month old, few had heard of it, and it wasn't even obvious how the 'token' was supposed to work.  More than that, Kardashian was urging her 251 million Instagram followers to get involved in a highly volatile, speculative market that's little different than gambling in the world's most fraudulent casino."[69]

---

[69]   Ben McKenzie & Jacob Silverman, *Celebrity Crypto Shilling Is a Moral Disaster*, SLATE (Oct. 7, 2021), https://slate.com/technology/2021/10/ben-mckenzie-crypto-celebrities-kardashian-brady-lohan.html.

158.   Kardashian's promotion had tremendous reach.  The financial services company, Morning Consult, analyzed "the impact of celebrities on crypto investor decisions," and, in particular, the impact of Kardashian's EthereumMax post.  The survey found that up to 21% of all American adults and nearly half of all cryptocurrency owners had seen this ad for a risky financial instrument.  Furthermore, Kardashian's "conversion was also impressive: ***A striking 19% of respondents who said they heard about the post invested in EthereumMax as a result***."[70]

159.   On June 14, 2021, Perone and the Executive Defendants facilitated several EMAX Token transfers through a wallet under his ownership and/or control. First, the EMAX Deployer wallet sent 560.2 trillion EMAX Tokens to the "0x3B6 wallet."[71]  The 0x3B6 wallet then sent 116.5 billion EMAX Tokens to the "0x267 wallet".[72]  The Executive Defendant-connected 0xc46 wallet sent another 317.6 trillion EMAX Tokens to the 0x267 wallet.  Six minutes later, further evidencing these wallets' ties to the Executive Defendants, including Defendant Perone, the 0x267 wallet funded the Company's "EthereumMax: Expense Wallet" with 109.4 trillion EMAX Tokens.

160.   On June 18, 2021, the 0x267 wallet sent approximately $9,650 worth of EMAX tokens to the Rechnitz Wallet.  Upon information and belief, part or all of this transfer went towards Rechnitz's and/or Mayweather's payment for the Mayweather promotional activities.  The 0x267 wallet also sent $45,561,51 in EMAX tokens to the Pierce display wallet.

161.   The chair of the Financial Conduct Authority ("FCA") in the United Kingdom, Charles Randell, in a September 6, 2021 speech given to the Cambridge International Symposium on Economic Crime, remarked that Kardashian's

---

[70]   Charlotte Principato, *Kim Kardashian, Cryptocurrency and Celebrity Clout*, MORNING CONSULT (Sept. 21, 2021), https://morningconsult.com/2021/09/21/kim-kardashian-crypto-celebrity/ (Emphasis added).

[71]   0x3B6c70A76465fA7B1b6aB10634E1D91D73054638.
[72]   0x2671663fF57fDB0EE8a8613286802AE4D1C72428

EthereumMax post was "the financial promotion with the single biggest audience reach in history."[73]

162.  Notably, Kardashian's post did include a promotional disclosure in the post itself.  However, this disclosure is tucked in the far bottom right of the post and is just three characters long: "#AD."  The promotion was false and misleading in that, by stating that "Ethereum Max Burned 400 trillion tokens – Literally 50% of their Admin Wallet," the promotion created a false impression that the EMAX Tokens were scarce.  Because two quadrillion tokens had been originally created, the burning of 400 trillion tokens did not meaningfully impact the availability of EMAX Tokens.

163.  According to the SEC Order, "EthereumMax, through an intermediary, paid Kardashian $250,000 for this promotion."  Upon information and belief, this intermediary was Defendant Rechnitz.  Kardashian and Rechnitz have a long history together.

164.  Upon information and belief, Kardashian received a similar payment from Rechnitz and Perone for her May 30, 2021 promotion.

165.  Kardashian also has experience and familiarity with making misleading claims in similar promotional endorsements on her Instagram and Twitter accounts.  For example, in 2015, the United States Food and Drug Administration ordered Kardashian to remove a promotional post she had made with a strikingly similar beginning to the EthereumMax Post at issue in this action[74]:

---

[73]  Charles Randell, Chair, Fin. Conduct Auth., *The risks of token regulation*, Speech at Cambridge International Symposium on Economic Crime (Sept. 6, 2021) https://www.fca.org. uk/news/speeches/risks-token-regulation.

[74]  Mark Sweney, *Kim Kardashian forced to delete selfie endorsing morning sickness drug*, THE GUARDIAN (Aug. 12, 2015), https://www.theguardian.com /media/2015/aug/12/kim-kardashian-selfie-morning-sickness-drug-instagram.

166.   Pierce, Brown, and Davis did not include any promotional disclosures when they promoted EthereumMax throughout May and June of 2021.

167.   It does not appear that Mayweather has disclosed any payments either for his promotion of EthereumMax on June 4 and 6, 2021.  Mayweather does have experience with being fined previously over improper cryptocurrency promotion,[75] and, as a result, he knew that his conduct alleged herein was improper.

168.   In November 2018, Mayweather and another celebrity promotor settled charges with the United States Securities and Exchange Commission ("SEC") for failing to disclose payments they received for promoting fraudulent cryptocurrency investments.  One of the posts at issue there was one that Mayweather made on Twitter, stating: "You can call me Floyd Crypto Mayweather from now on" and a promotion with the message to his Twitter followers that a company's fraudulent initial coin offering "starts in a few hours.  Get yours before they sell out, I got mine."  As part of the settlement, Mayweather agreed to pay "$300,000 in disgorgement, a $300,000 penalty, and $14,775 in prejudgment interest."  In addition, Mayweather agreed not to promote any securities – digital or otherwise – for three years.[76]  The

---

[75]   Press Release, U.S. SEC. & EXCH. COMM'N, *Two Celebrities Charged with Unlawfully Touting Coin Offerings* (Nov. 29, 2018), https://www.sec.gov/news/press-release/2018-268.

[76]   *Id.*

settlement was dated November 29, 2018, meaning that this agreement was blatantly violated in connection with Mayweather's EthereumMax promotion.  Mayweather, therefore, had an understanding that his own conduct, as well as the conduct of the Executive Defendants, was improper and fraudulent.

169.   Maher has experience with financial regulations from his position as a financial advisor at Northwestern Mutual Investment Services, LLC from 2011 to October 13, 2021.  Maher knew that his conduct alleged herein was improper. Notably, Maher was "permitted to resign" from his financial advisor position in 2021 "while under internal review for allegations that [Maher] was involved in a cryptocurrency shilling scam."[77]

170.   Similarly, when discussing the Promoter Defendants' EMAX Token promotions, Davis acknowledged that "when you are a celebrity and you don't know the law and say . . . invest in this . . . that's financial advice.  You can't say that."[78]

**The Dump – EMAX Token Price Plummets**

171.   Following the EMAX Tokens' launch and Defendants' promotional activities in May 2021, the trading volume and price of EthereumMax surged.  By May 30, EMAX already had a transaction volume of over $100 million, up 632% in just two weeks.  The day before, it reached its maximum price of $0.000000863, which represents a rise of 1,370% more than its initial price of $0.00000005875.[79]

172.   However, this meteoric rise did not last long, and EthereumMax began to deflate immediately after Kardashian's post.  On July 15, 2021, the price of the

---

[77]   *Investment Adviser Public Disclosure: Justin Thomas Maher*, U.S. SEC. & EXCH.  COMM'N, https://adviserinfo.sec.gov/individual/summary/5504995  (last visited Dec. 19, 2022).

[78]   NeverHedge – Crypto, NFTs, Sports Betting, Stocks, *Emax Talk with Justin Ep. 02: Hard Fork Rundown: Mayweather Fight Updates: Hodler (sic) Questions Answered*, YOUTUBE (May 26, 2021), https://www.youtube.com/watch?app=desktop&v=bPT0Tnmt63A&feature= youtu.be&fbclid=IwAR2w8sHjsGnrXL6G9N8Nc0hWAyjn2w3mmSOOTnoWZC nYyERZrSM_k9Q9En8.

[79]   *See* n.38, *supra*.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

EMAX Token hit its all-time low: $0.000000017 per unit, a 98% drop from which it has not been able to recover.  Investors were left holding worthless tokens, with the cost in transaction fees and gas fees to swap back into Ether far exceeding what investors would actually receive in Ether.  On August 1, 2021, its transaction volume plummeted to $157,423, which is less than a hundredth of its initial capital.  On April 1, 2022, transaction volume was less than $13,000.[80]

173.   The Promoter Defendants' improper promotional activities generated the trading volume needed for all the Defendants to offload their EMAX Tokens onto unsuspecting investors.   While Plaintiffs and Class members were buying the inappropriately-promoted EMAX Tokens, Defendants were able to, and did, sell their EMAX Tokens during the Relevant Period for substantial profits.  According to Perone, the Executive Defendants did not "lock" their EMAX Token wallet addresses until after the Relevant Period.

174.   The EMAX Token price still has not recovered and trading volume remains down significantly.  As bluntly noted in actor Benjamin McKenzie's op-ed: "If you bought EthereumMax after Kardashian pushed it and didn't sell fast enough, all you were left with was a practically worthless digital asset."[81]

175.   In the wake of the dramatic decline in the EMAX Token price, the cabal became fractured with some of the Defendants even pointing fingers at one another.

176.   On October 10, 2022, the SEC issued an Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Making Findings, and Imposing a Cease-and-Desist Order ("the SEC Order") against Defendant Kardashian in relation to her June 13, 2021 promotion of EMAX Tokens. The SEC Order contained several factual findings that, while not binding outside of

---

[80]   *Id.*
[81]   *See* n.77, *supra.*

SEC's proceeding against Kardashian, still formed the basis of the SEC Order and the related settlement and tracked closely to the misconduct alleged herein.

177. The SEC Order stated the following:

- Kardashian did not disclose that she had been paid by EthereumMax or the amount of compensation she received from EthereumMax for making [the June 13, 2021] post.

- Kardashian's crypto asset security promotion occurred after the Commission warned in its July 25, 2017, DAO Report of Investigation that digital tokens or coins offered and sold may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws.  The promotion also occurred nearly four years after the Commission's Division of Enforcement and Office of Compliance Inspections and Examinations issued a statement reminding market participants that a]ny celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion.  A failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws.

- Kardashian violated Section 17(b) of the Securities Act by touting the EMAX token sale on her social media account without disclosing that she received compensation from the issuer for doing so, and the amount of the consideration.[82]

178. Pursuant to the SEC Order and related settlement, Kardashian was ordered to pay disgorgement of $250,000, prejudgment interest of $10,415.35, and a civil money penalty in the amount of $1,000,000 to the SEC.  The SEC Order also barred Kardashian from receiving any payments or compensation for promoting any digital assets for three years.  Kardashian was also ordered to cease and desist from committing or causing any violations and any future violations of Section 17(b) of the Securities Act.

179. Likewise, on February 17, 2023, the SEC issued a press release titled "SEC Charges NBA Hall of Famer Paul Pierce for Unlawfully Touting and Making Misleading Statements about Crypto Security" and issued an Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Making Findings, and Imposing a Cease-and-Desist Order.  The Press Release and

---

[82]     SEC Order, ¶¶10-12.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1  Order described the settlement between Defendant Pierce and the SEC over the

2  improper promotion of the EMAX Tokens.

3      180.   Notably, the Pierce SEC Order makes several findings of fact regarding

4  Pierce's conduct. See, *e.g.*, *id.*, ¶¶4-23.  According to the Order, Pierce received

5  approximately $244,116 worth of EMAX Tokens in exchange for his promotional

6  tweets.  *Id.*, ¶¶4,22.  Pierce did not disclose that he had been paid by EthereumMax

7  or the amount of compensation he received from EthereumMax for making his posts.

8  *Id.*, ¶¶11, 13, 18, 21.  Additionally, the SEC Order states that the multiple statements

9  by Pierce were "materially misleading" or "false and misleading." *Id.*, ¶¶12, 14, 17,

10  20.  Pursuant to the settlement, the SEC required Defendant Pierce to disgorge the

11  $244,116 in token value he received from EthereumMax and pay a civil penalty of

12  $1.15 million. The SEC also banned Defendant Pierce from promoting digital assets

13  for a period of three years.

14      181.   On November 15, 2022, Maher made several statements in response to

15  the October 3, 2022 announcement from SEC Chairman Gensler regarding the SEC's

16  investigation into Kardashian's promotional activities with the EMAX Tokens.  In

17  particular, Maher stated: "I mean I wish Gio had been paying me like he did with

18  everyone else. Then I'd at least have made these millions they claimed I did."[83]

19  Maher then gave "one freebie" to investigators, saying that "Blockchain doesn't lie

20  right? Have fun going down the rabbit hole with this one… #JonaRechnitz."  Maher

21  attached the following screenshot of a text conversation between the "eMax team

22  marketing," which included Steve Gentile, and Defendants Perone and Speer, which

23  confirmed that Rechnitz negotiated and facilitating the payments to Mayweather for

24  promoting EMAX Tokens.

25

26

27

28  _____
[83]   Justin    Maher    (@TrustInJustin83),    Twitter    (Nov.    22,    2022),
https://twitter.com/TrustInJustin83/status/1592501917804302337/photo/1.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



22
23
24
25
26
27
28

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

182.   The following chart from *The Financial Times*[84] shows the rise and fall of the EMAX Tokens' price in conjunction with the Promoter Defendants' promotional activities:



**Regulators Raise Concerns that EthereumMax Is a "Pump and Dump" Scam**

183.   Following the precipitous drop of the EMAX Token price in the wake of Kardashian's EthereumMax post, the United Kingdom's FCA chair issued a statement noting that Kardashian's promotion of the EMAX Token could be "fraudulent."  Specifically, Charles Randell, director of the FCA, gave a speech about the need for a "permanent and consistent solution to the problem of online fraud from paid-for advertising."[85]

184.   Cryptocurrency "scams" were one of the topics that Randell specifically addressed, and during that portion of the speech, Randell specifically took issue with Kardashian's EthereumMax post.  Randell noted that "social media influencers [like

---

[84]   Joshua Oliver & Madison Darbyshire, *Kim Kardashian, Floyd Mayweather and a crypto token's wild ride*, THE FIN. TIMES (Jan. 14, 2022), https://www.ft.com/content/a6dd4d6f-6a86-48cc-992c-f8a32c64fdd7.

[85]   *See* n.79, *supra*.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

the Promoter Defendants] are routinely paid by scammers to help them pump and dump new tokens on the back of pure speculation."[86]

185.   Randell further observed that the hype around speculative digital assets like the EMAX Token "generates a powerful fear of missing out from some consumers who may have little understanding of their risks.  There is no shortage of stories of people who have lost savings by being lured into the crypto bubble with delusions of quick riches, sometimes after listening to their favourite influencers, ready to betray their fans' trust for a fee."[87]

186.   This is precisely what occurred with the Executive Defendants' stated marketing strategy to use celebrities like the Promoter Defendants to "instill trust" from investors in EthereumMax in exchange for fees and/or EMAX Tokens – that the Promotor Defendants could sell for profits.

## **CLASS ALLEGATIONS**

187.   Plaintiffs bring this action, individually, and on behalf of a nationwide class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons who, during the Class Period, purchased EthereumMax's EMAX Tokens and were subsequently damaged thereby.

188.   The Class Period is defined as the period between May 14, 2021 and June 27, 2021.[88]

189.   Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers and directors; (c) Plaintiffs' counsel and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family.  Plaintiffs reserve the right to modify, change, or

---

[86]   *Id*.

[87]   *Id.*

[88]   Plaintiffs reserve the right to expand or amend the Class Period based on discovery produced in this matter.

1  expand the various class definitions set forth above based on discovery and further
2  investigation.

3      190.  **Numerosity**: Upon information and belief, the Class is so numerous that
4  joinder of all members is impracticable.  While the exact number and identity of
5  individual members of the Class is unknown currently, such information being in the
6  sole possession of EthereumMax and/or third parties and obtainable by Plaintiffs only
7  through the discovery process, Plaintiffs believe, and on that basis allege, that the
8  Class consists of at least hundreds of people.  The number of Class members can be
9  determined based on EthereumMax's and other third parties' records.

10     191.  **Commonality**: Common questions of law and fact exist as to all
11 members of each Class.  These questions predominate over questions affecting
12 individual Class members.  These common legal and factual questions include, but
13 are not limited to:

14     a.    whether Defendants improperly and misleadingly marketed EMAX
15 Tokens;

16     b.    whether Defendants' conduct violates the state consumer protection
17 statutes asserted herein;

18     c.    whether Promoter Defendants aided and abetted violations of the state
19 consumer protection statutes asserted herein;

20     d.    whether Executive Defendants conspired to artificially inflate the price
21 of the EMAX Tokens and then sell their EMAX Tokens to unsuspecting investors;

22     e.    whether Defendants have been unjustly and wrongfully enriched as a
23 result of their conduct;

24     f.    whether the proceeds that the Defendants obtained as a result of the sale
25 of EMAX Tokens rightfully belongs to Plaintiffs and Class members;

26     g.    whether Defendants should be required to return money they received
27 as a result of the sale of EMAX Tokens to Plaintiffs and Class members;

28

h.      whether Executive Defendants breached the implied covenant of good faith and fair dealing; and

i.      whether Plaintiffs and Class members have suffered damages, and, if so, the nature and extent of those damages.

192.   **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members.  Plaintiffs' and Class members' claims all arise out of EthereumMax's uniform misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the sale of EMAX Tokens.

193.   **Adequacy**: Plaintiffs have no interests that conflict with the interests of the Class and are committed to pursuing this action vigorously.  Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation.  Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

194.   **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by EthereumMax's conduct.  It would be virtually impossible for individual Class members to effectively redress the wrongs done to them.  Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would increase delay and expense to all parties and to the court system because of the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

195.   Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §17200**
**(Based on Unlawful Acts and Practices)**
**(Against all Defendants)**

196.   Plaintiffs restate and reallege all preceding allegations in paragraphs 1 to 185 above as if fully set forth herein, and further allege the following:

197.   Plaintiffs Semerjian, Buckley, and Shah are residents of the State of California.

198.   Plaintiffs Semerjian, Buckley, and Shah paid for or purchased EMAX Tokens in California and thus the deceptive transactions alleged herein occurred in California.

199.   At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

200.   "'[A]n act can be alleged to violate any or all three of the three prongs of the UCL — unlawful, unfair, or fraudulent.'"   *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1149 (N.D. Cal. 2010) (quoting *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007)).

201.   The "unlawful" prong of the UCL prohibits "anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).   By proscribing "any unlawful" business practice, the UCL permits injured consumers to "borrow" violations of other laws and treat them as unlawful competition that is

1    independently actionable.  In other words, an "unlawful" business practice under the

2    UCL is a practice that violates any other law.

3           202.   Any violation of the California false advertising laws (*e.g.*, Cal. Bus. &

4    Prof. Code §17500) necessarily violates the "unlawful" prong of the UCL.  Likewise,

5    any violations of other state consumer protection laws, such as New York G.B.L.

6    §349(a); NJSA §§56:81-156; and Fla. Stat. Ann Ch. 501, §211(1) also constitutes a

7    violation of the unlawful prong of the UCL.

8           203.   To meet the heightened pleading standard of Federal Rule of Civil

9    Procedure ("Rule") 9(b) for claims that sound in fraud, plaintiffs must plead "'the

10   who, what, when, where, and how'" of the alleged fraud.  *Vess v. Ciba-Geigy Corp.*

11   *USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

12          204.   In order to have standing for a UCL claim, a plaintiff must meet the

13   injury-in-fact requirement.  This requirement is met where a plaintiff can "show that,

14   by relying on a misrepresentation on a product label, they 'paid more for a product

15   than they otherwise would have paid, or bought it when they otherwise would not

16   have done so.'"  *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015).  A

17   plaintiff's claims under this California statute are governed by the "reasonable

18   consumer" test.  *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) ("'[T]he

19   false or misleading advertising and unfair business practices claim must be evaluated

20   from the vantage of a reasonable consumer.'").  Under the reasonable consumer

21   standard, a plaintiff must "show that 'members of the public are likely to be

22   deceived.'"  *Id.* (quoting *Bank of the West v. Super. Ct.*, 2 Cal. 4th 1254, 1267 (1992)).

23          205.   Plaintiff Semerjian is a lifelong fan of professional sports, particularly

24   basketball and boxing.  Semerjian regularly watched Defendant Pierce when the latter

25   played basketball professionally and then as a commentator on ESPN.  Semerjian

26   saw the promotions by Pierce on May 26, 2021, May 28, 2021, and May 30, 2021,

27   respectively.  These promotions regarding the growth potential and price increases

28

for EMAX Tokens induced Semerjian to make his first and second purchases of EMAX Tokens on May 31, 2021 and June 1, 2021.  Semerjian has also been aware of Defendant Mayweather from his many years of being a world champion boxer. Semerjian regularly sees posts from and about Mayweather on various social media platforms via the trending or discovery features of the platform.  Semerjian specifically saw Mayweather's promotions of EthereumMax during the Bitcoin Miami conference (which were also promoted on social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release.  Mayweather's statements and promotions of EthereumMax gave Semerjian the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy.  Each of these promotions induced Semerjian to make another purchase of EMAX Tokens on June 4, 2021.  Semerjian is also aware of Defendant Kardashian's reputation as a celebrity influencer, and in particular, her renowned business savvy.  Semerjian also saw Defendant Kardashian's June 14, 2021 promotion of the EMAX Tokens.  Semerjian believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value.  Kardashian's promotion induced Semerjian to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

206.  Semerjian also followed the EthereumMax Instagram page during the Relevant Period and saw the promotions from the Executive Defendants that were posted on that platform.  Semerjian specifically saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling.  Semerjian reasonably believed that the price drop on EMAX Tokens only came from "a handful

1   of larger wallets" of "early investors" who were "not part of the development team."
2   Similarly, Semerjian believed the statements that EthereumMax would still be
3   accepted as a payment at David Grutman's venues at a future date, despite the issues
4   that caused the delay of the rollout.  The misleading statements and omissions within
5   the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with
6   the above-mentioned promotions from Defendants Pierce, Mayweather, and
7   Kardashian, induced Semerjian to make his June 4, 2021 purchase of EMAX Tokens.
8   Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the
9   ability to use EMAX Tokens as an accepted payment and the increase in value his
10  investments in EMAX Tokens would receive if he continued to hold, caused
11  Semerjian to retain his EMAX Token investment when he otherwise would not have
12  done so.

13       207.   Plaintiff Buckley is a lifelong fan of professional sports, particularly
14  basketball and boxing.  Buckley regularly watched Defendant Pierce when the latter
15  played professionally and then as a commentator on ESPN.  Buckley saw the
16  promotions by Pierce on May 26, 2021, and May 28, 2021, respectively.  These
17  promotions regarding the growth potential and price increases for EMAX Tokens
18  induced Buckley to make his first two purchases of EMAX Tokens on May 28, 2021.
19  In addition to Pierce, Buckley is aware of Defendant Brown's football career and
20  off-field conduct, and he specifically saw Brown's May 29, 2021 promotion wherein
21  Brown indicated that he wanted his next football contract to be paid in EMAX
22  Tokens.  Buckley also saw Pierce's May 30, 2021 promotion of EthereumMax.
23  Buckley has also been aware of Defendant Mayweather from his many years of
24  being a world champion boxer.  Buckley regularly sees posts from and about
25  Mayweather on various social media platforms via the trending or discovery features
26  of the platform.  Buckley specifically saw Mayweather's promotions of
27  EthereumMax during the Bitcoin Miami conference (which were also promoted on
28

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1   the Perone owned/controlled/operated social media accounts for EthereumMax, as
2   well as the personal accounts of Maher and Davis), as well as the promotions of
3   EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul,
4   including the 5/28/21 Press Release.  Mayweather's statements and promotions of
5   EthereumMax gave Buckley the false impression that Mayweather was more than a
6   celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens,
7   and that he was making this particular cryptocurrency a part of his multimillion-
8   dollar investment strategy.  Buckley also saw Defendant Kardashian's June 14, 2021
9   promotion of the EMAX Tokens.  Buckley believed Kardashian's promotion and
10  statements about the number of tokens being burned as indicating that the decrease
11  in supply would cause his current investments in EMAX Tokens to correspondingly
12  increase in value.  Each of these promotions induced Buckley to make his third and
13  final purchase of EMAX Tokens on June 18, 2021.  These promotions also induced
14  Buckley to continue to hold on to his investment in EMAX Tokens when he
15  otherwise would not have done so.

16      208.  Buckley also followed the EthereumMax Instagram page during the
17  Relevant Period and saw the promotions that Defendant Perone posted (or caused to
18  be posted) on that platform.  Buckley specifically saw the June 3, 2021 post
19  regarding the EMAX Token price volatility that came from insider selling.  Buckley
20  reasonably believed that the price drop on EMAX Tokens only came from "a handful
21  of larger wallets" of "early investors" who were "not part of the development team."
22  Similarly, Buckley believed the statements that EthereumMax would still be
23  accepted as a payment at David Grutman's venues at a future date, despite the issues
24  that caused the delay of the rollout.  The misleading statements and omissions within
25  the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with
26  the above-mentioned promotions from Defendants Pierce, Mayweather, and
27  Kardashian, induced Buckley to make his June 18, 2021 purchase of EMAX Tokens.
28

Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Buckley to retain his EMAX Token investment when he otherwise would not have done so.

209.   Buckley also saw the statements and promotions from Defendants Maher and Davis that were posted and/or reposted on various social media platforms. Buckley specifically saw the May 14, 2021 promotion from Maher touting the approximately 500,000% increase in the EMAX Token Price.  Buckley reasonably believed that this price increase was the result of genuine investor interest.  Buckley also saw Maher's May 15, 2021 statement dismissing concerns about price volatility because the Executive Defendants "assured" Maher that "aside from marketing expenses they will not sell off any of their position[s] for at least six months." Buckley believed the statement that EthereumMax insiders would not be selling their portion of the Float and driving the price of EMAX Tokens down.  Similarly, Buckley saw and believed Maher's solicitations in his May 17, 2021 social media post dismissing claims that EthereumMax was a "scam or pump and dump" and touting EMAX Tokens were a "[l]ong term" investment that investors like Plaintiffs and the class should "hold all the way."  Buckley also saw and relied on Davis' May 18, 2021 solicitation that it was "not too late" to purchase EMAX Tokens given their growth potential.  These misleading statements and omissions by Davis and Maher induced Buckley to make his May 28, 2021 purchase of EMAX Tokens.

210.   Plaintiff Shah is a lifelong fan of professional sports, particularly basketball and boxing.  Shah regularly watched Defendant Pierce when the latter played basketball professionally and then as a commentator on ESPN.  Shah follows Pierce on Twitter and saw the promotions by Pierce on May 26, 2021, May 28, 2021, and May 30, 2021, respectively.  These promotions regarding the growth potential

and price increases for EMAX Tokens induced Shah to make his first and second purchases of EMAX Tokens on May 29, 2021 and June 1, 2021. Shah has also been aware of Defendant Mayweather from his many years of being a world champion boxer. Shah follows Mayweather on social media. Shah specifically saw Mayweather's promotions of EthereumMax during the Bitcoin Miami conference (which were also promoted on the social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release. Mayweather's statements and promotions of EthereumMax gave Shah the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy. Each of these promotions induced Shah to make another purchase of EMAX Tokens on June 3, 2021 and June 11, 2021. Shah is also aware of Defendant Kardashian's reputation as a celebrity influencer, and in particular, her renowned business savvy. Shah also saw Defendant Kardashian's May 30, 2021 and June 14, 2021 promotion of the EMAX Tokens. Shah believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value. Kardashian's promotion induced Shah to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

211. Shah also followed the EthereumMax Instagram page and other social media platforms like Telegram, Reddit, and Twitter during the Relevant Period and saw the promotions from the Executive Defendants that were posted. Shah specifically saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling. Shah reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who

1   were "not part of the development team."  Similarly, Shah believed the statements

2   that EthereumMax would still be accepted as a payment at David Grutman's venues

3   at a future date, despite the issues that caused the delay of the rollout.  The misleading

4   statements and omissions within the June 3, 2021 Instagram post from the Executive

5   Defendants, in conjunction with the above-mentioned promotions from Defendants

6   Pierce, Mayweather, and Kardashian, induced Shah to make his June 3, 2021 and

7   June 11, 2021 purchases of EMAX Tokens.  Similarly, this post, in conjunction with

8   Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an

9   accepted payment and the increase in value his investments in EMAX Tokens would

10  receive if he continued to hold, caused Shah to retain his EMAX Token investment

11  when he otherwise would not have done so.

12      212.   Defendants engaged in deceptive acts and practices under California law

13  by taking advantage of the lack of knowledge, ability, experience, or capacity of

14  Plaintiffs to a grossly unfair degree, including but not limited to, in the following

15  ways:

16      (a)    knowingly   and   intentionally   concealing   the   Executive

17  Defendants' specific roles and ownership interests in EthereumMax;

18      (b)    failing to disclose that the huge increase in price of the EMAX

19  Tokens during the first days following launch were caused by manipulation by the

20  Executive Defendants instead of being due to an organic increase in interest from

21  investors;

22      (c)    failing to disclose that EMAX Tokens were not being accepted as

23  a payment and would not be at any point in the foreseeable future; and

24      (d)    knowingly and intentionally using and/or failing to disclose the

25  use of the Promotor Defendants to "instill trust" in uninformed investors to promote

26  the financial benefits of a highly speculative and risky investment in EMAX Tokens,

27  in an effort to manipulate and artificially inflate the price and trading volume of the

28

1   EMAX Tokens and allow Defendants to sell their EMAX Tokens at those inflated

2   prices.

3       213.   The Executive Defendants did not disclose that the EMAX Token

4   developer held the number one rank with 23% ownership interest.  Nor did they

5   disclose until much later that the Executive Defendants had purposefully chosen not

6   to lock the wallets of the EthereumMax insiders.  Semerjian, Buckley, and Shah

7   would have found it material to their decisions to purchase EMAX Tokens to know

8   whether or not insiders had significant percentages of the available Float of EMAX

9   Tokens with the ability to freely sell those EMAX Tokens and create massive

10  downward pressure.  Likewise, had Semerjian, Buckley, and Shah been made aware

11  of that information at the times of their respective purchases, as well as the later-

12  revealed admission from Steve Gentile that the Executive Defendants had chosen not

13  to "lock the wallets" (which gives the ten original founding members, including

14  Defendant Maher who held 5%, the ability to sell off their portions of EMAX Tokens

15  without restriction), it would have altered their decision to both purchase the EMAX

16  Tokens for the price they paid as well and hold on to those EMAX Tokens when they

17  otherwise would not have done so.

18      214.

19      215.   The facts that the Executive Defendants and Promoter Defendants

20  Pierce, Mayweather, and Kardashian misrepresented and concealed were material to

21  the decisions of Plaintiffs Semerjian, Buckley, and Shah and the members of the

22  class about whether to pay for or purchase EMAX Tokens (at all or for the price they

23  paid), in that they would not have proceeded with their transactions but for the

24  deceptive, fraudulent, and false acts and practices.  For example, both Kardashian's

25  and Mayweather's misleading statements and omissions concerning the ability to

26  use EMAX Tokens to purchase goods and services relate to "'the central

27  functionality of the product,'" which is required to plead a fraud by omission claim

28

1    under the UCL.  *See Hall v. SeaWorld Ent., Inc.*, 747 F. App'x 449, 451 (9th Cir.

2    2018) (citing *Hodson v. Mars, Inc.*, 891 F.3d 857, 863 (9th Cir. 2018)).  The

3    omissions about the inability to use EMAX Tokens were only known to Defendants

4    and were contrary to representations and omissions previously made concerning the

5    "exclusive" ability to use EMAX Tokens to purchase goods and services.

6        216.   Defendants, collectively and individually, had superior knowledge of

7    information regarding the ownership interests and ability to use EMAX Tokens as

8    advertised.

9        217.   Notably, Mayweather could have (and should have) corrected these

10   particular misleading statements and omissions when they were made on June 6,

11   2021, but failed to do so despite him being tagged in Defendant Davis's posts

12   containing the misleading information about the Mayweather joint venture and, thus,

13   being on notice of the fraudulent omissions regarding his status as a long term

14   partner of Ethereummax and Davis's cryptocurrency investing company

15   InRussWeTrust.  Indeed, the Company and Defendants Maher and Davis made

16   several representations indicating that Mayweather's involvement was not limited to

17   a one-off promotion related to the Mayweather v. Paul boxing event but rather the

18   beginning of a "long term" partnership deal that had been reached between

19   Mayweather, Davis, and the Company.  Mayweather's exclusive knowledge that he

20   was simply a paid promotor (as opposed to a "an actual backer/investor in EMAX

21   Tokens, and that he was making EMAX a part of his multimillion-dollar") was not

22   known to Plaintiffs or the members of the Class when each was respectively deciding

23   whether or not to purchase EMAX Tokens.  This gave rise to Mayweather's duty to

24   disclose that information, and by failing to disclose that information, Mayweather is

25   liable for a UCL fraud by omission claim.  *See In re Carrier IQ, Inc.*, 78 F. Supp. 3d

26   1051, 1113-14 (N.D. Cal. 2015) ("Finally, Plaintiffs have alleged that the

27   information regarding the Carrier IQ Software was in the exclusive knowledge of

28

Defendants.  These allegations are sufficient to plausibly allege that Defendants had exclusive knowledge of a material fact that they had a duty to disclose but chose to omit."); *see also In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F. Supp. 3d 1284, 1303 (S.D. Cal. 2020) (finding that the plaintiffs adequately alleged a fraudulent omission UCL claim where they pled "a duty to disclose based upon [d]efendant's exclusive knowledge of the alleged inadequacy of its security measures").

218.   Additionally, Mayweather used his business associate and agent Defendant Rechnitz to act as a middleman between Mayweather and the Company in order to actively conceal the true nature of Mayweather's business relationship with the Company and its insiders.  To state a claim for active concealment, a plaintiff must allege specific "'affirmative acts on the part of the [D]efendants in hiding, concealing or covering up the matters complained of.'" *Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161, 1176 (E.D. Cal. 2013) (citing *Lingsch v. Savage*, 213 Cal. App. 2d 729, 734 (1963)).

219.   The Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian intended for Plaintiffs Semerjian, Buckley, and Shah and the members of the class to pay for EMAX Tokens in reliance upon their deceptive and fraudulent acts and practices.

220.   Had the Promoter Defendants disclosed the omitted information, Semerjian, Buckley, and Shah would have been aware of it because (a) they saw the actual promotions by Promoter Defendants Pierce, Mayweather, and Kardashian and would have concurrently seen any disclosure on the promotions themselves had it been included, and (b) they follow, directly or indirectly, the social media accounts of, and news reports on, Promoter Defendants Pierce, Mayweather, and Kardashian.

221.   As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages.  The Executive

1  Defendants' activities with the Promoter Defendants caused Plaintiffs and the Class

2  members to purchase and/or hold the EMAX Tokens when they otherwise would not

3  have done so.

4      222.  The statements from Executive Defendants and Promoter Defendants

5  Pierce, Mayweather, and Kardashian are actionable and not puffery.  "'The

6  distinguishing characteristics of puffery are vague, highly subjective claims as

7  opposed to specific, detailed factual assertions.'"  *Orlick v. Rawlings Sporting Goods*

8  *Co.*, No. CV 12-6787-GHK (RZX), 2013 WL 12139142, at *5 (C.D. Cal. Feb. 20,

9  2013).  Under California law, there is no requirement that for a statement to be

10  actionable it must also be false — the UCL also prohibits "'advertising which,

11  although true, is either actually misleading or which has a capacity, likelihood or

12  tendency to deceive or confuse the public.'"  *Williams v. Gerber Prods. Co.*, 552 F.3d

13  934, 938 (9th Cir. 2008).  Significantly, even if certain statements would be non-

14  actionable on their own, where there are multiple statements at issue, courts must

15  consider "as a whole."  *Id.* at 939 n.3; *Lima v. Gateway, Inc.*, 710 F. Supp. 2d 1000,

16  1007-08 (C.D. Cal. 2010) (denying motion to dismiss where some specific

17  representations could be considered puffery, but all of defendants' statements "taken

18  as a whole" might be actionable); *In re NJOY, Inc. Consumer Class Action Litig.*, No.

19  CV 14-00428 MMM (JEMx), 2015 WL 12732461, at *10 (C.D. Cal. May 27, 2015)

20  ("'Even assuming . . . that some of the statements would themselves be non-

21  actionable, they "cannot be considered in isolation because they contribute to the

22  [potentially] deceptive context" of the packaging and marketing "as a whole."'")

23  (alteration in original).

24      223.  As alleged further above, Executive Defendant Perone's May 16, 2021

25  Pre-launch Kickoff post stated, among other things, that (1) EMAX Tokens were up

26  "500,000+% in the first 24 hours"; (2) the Executive Defendants had "locked in

27  partnership with global digital marketing agency" and "lined up a knockout

28  

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

influencer" for a "nationwide campaign"; and (3) "We are 3 days in with ~$100M market cap and the train is just getting rolling."  These statements from Executive Defendants are specific, detailed factual assertions the Executive Defendants were using to encourage purchases and increase the price of the EMAX Tokens.  At the same time, the Executive Defendants Maher and Speer, with Promoter Defendant Davis, each failed to disclose that these metrics were the result of the failed launch that allowed insiders, including but not limited to Maher, to disproportionately increase the price of the EMAX Tokens with their early trades.

224.   Taken together, the misleading statements and omissions of the Executive Defendants and Promoter Defendants Davis, Pierce, Mayweather, and Kardashian contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of EMAX Tokens.

225.   In the event that Plaintiffs' state securities and consumer law claims are found to be inapplicable to the wrongdoing alleged herein against Defendant Kardashian, Plaintiffs will be unable to obtain monetary damages in an amount that would make Plaintiffs and the members of the Class whole.

226.   In addition, Plaintiff and the Class lack an adequate remedy at law because the elements of the other state securities and consumer law claims require proof of conduct beyond that which must be shown to establish liability under the UCL and FAL.  *See M.O. Dion & Sons, Inc. v. VP Racing Fuels, Inc.*, No. CV 19-5154-MWF (SSX), 2022 WL 18281526, at *8 (C.D. Cal. Nov. 2, 2022).

227.   The lack of an adequate remedy at law entitles Plaintiffs and the Class to pursue equitable restitution under the UCL.

228.   Concurrently, "restitution under the . . . UCL would be more certain, prompt, or efficient than the legal remedies" available with state securities and consumer law claims.  *See Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1009 (N.D. Cal. 2020) (citing *Am. Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937)).  For

example, the price premium damages model will likely require expert analysis to calculate, whereas equitable restitution will only require a showing of what each member of the Class paid for their EMAX Tokens.  Restitution would, therefore, be much more prompt and efficient than this remedy at law.

229.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by EthereumMax, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under Cal. Bus. & Prof. Code §17200.

## SECOND CAUSE OF ACTION

**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §17200**
**(Based on Unfair Acts and Practices)**
**(Against All Defendants)**

230.   Plaintiffs restate and reallege all preceding allegations in paragraphs 1 - 185 above as if fully set forth herein, and further allege the following:

231.   Plaintiffs Semerjian, Buckley, and Shah are residents of the State of California.

232.   Plaintiffs Semerjian, Buckley, and Shah paid for or purchased EMAX Tokens in California and thus the deceptive transactions alleged herein occurred in California.

233.   At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

234.   "'[A]n act can be alleged to violate any or all three of the three prongs of the UCL — unlawful, unfair, or fraudulent.'"  *Stearns*, 763 F. Supp. 2d at 1149 (quoting *Berryman*, 152 Cal. App. 4th at 1554).

235.   The Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian engaged in business acts and practices deemed "unfair"

1  under the UCL, because of the conduct, statements, and omissions described above.

2  Unfair acts under the UCL have been interpreted using different tests, including:

3  (1) whether the public policy which is a predicate to a consumer unfair competition

4  action under the unfair prong of the UCL is tethered to specific constitutional,

5  statutory, or regulatory provisions; (2) whether the gravity of the harm to the

6  consumer caused by the challenged business practice outweighs the utility of the

7  defendant's conduct; and (3) whether the consumer injury is substantial, not

8  outweighed by any countervailing benefits to consumers or competition, and is an

9  injury that consumers themselves could not reasonably have avoided.

10    236.  The Executive Defendants and Promoter Defendants Pierce,

11  Mayweather, and Kardashian have engaged in, and continue to engage in, conduct

12  that violates the legislatively declared policies of: (1) California Civil Code

13  §§1572,1573, 1709, 1710, 1711 against committing fraud and deceit; (2) California

14  Civil Code §1770 against committing acts and practices intended to deceive

15  consumers regarding the representation of goods in certain particulars; and (3) the

16  Federal Tort Claims Act ("FTCA"), 15 U.S.C. §45(a)(1), against unfair or deceptive

17  practices.  The Executive Defendants and Promoter Defendants Pierce, Mayweather,

18  and Kardashian gain an unfair advantage over their competitors, whose practices

19  relating to other similar products must comply with these laws.

20    237.  Defendants' affirmative acts in soliciting sales of EMAX Tokens are

21  unfair within the meaning of the UCL, because they constituted immoral, unethical,

22  oppressive, and unscrupulous activity, caused substantial injury to consumers, and

23  provided no benefit to consumers or competition.

24    238.  The gravity of the harm to consumers caused by actions of Executive

25  Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian far

26  outweighs the utility of their conduct.  According to a "Data Spotlight" from the

27  Federal Trade Commission from June 3, 2022 (the "FTC Data Spotlight"), entitled:

28

1  "Reports show scammers cashing in on crypto craze," "[s]ince the start of 2021, more

2  than 46,000 people have reported losing over $1 billion in crypto to scams – that's

3  about one out of every four dollars reported lost, more than any other payment

4  method.  The median individual reported loss?  A whopping $2,600."[89]

5       239.   The FTC Data Spotlight further stated that "[r]eports point to social

6  media and crypto as a combustible combination for fraud.  Nearly half the people

7  who reported losing crypto to a scam since 2021 said it started with an ad, post, or

8  message on a social media platform."[90]   Furthermore, "[d]uring this period, nearly

9  four out of every ten dollars reported lost to a fraud originating on social media was

10  lost in crypto, far more than any other payment method."[91]   Of the reported crypto

11  fraud losses that began on social media, most are investment scams.[92]   Indeed, since

12  2021, $575 million of all crypto fraud losses reported to the FTC were about bogus

13  investment opportunities, far more than any other fraud type.  Executive Defendants

14  and Promoter Defendants Pierce, Mayweather, and Kardashian engaged in the exact

15  kind of bogus crypto "investment opportunity" scam that the FTC Data Spotlight

16  reported on as causing hundreds of millions (and rising) of dollars of damage to

17  investors.

18       240.   The conduct of the Executive Defendants and Promoter Defendants

19  Pierce, Mayweather, and Kardashian – including, but not limited to, failing to

20

21  [89]   Emma Fletcher, *Data Spotlight: Reports show scammers cashing in on crypto

22  craze*, FED. TRADE COMM'N (June 3, 2022), https://www.ftc.gov/news-events/data-
visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-

23  craze.

24  [90]   *Id*. ("From January 1, 2021 through March 31, 2022, 49% of fraud reports to
the FTC indicating cryptocurrency as the payment method specified that the scam

25  started on social media, compared to 37% in 2020, 18% in 2019, and 11% in 2018.").

  [91]   *Id*. ("From January 1, 2021 through March 31, 2022, $1.1 billion was reported

26  to the FTC as lost to fraud originating on social media.").

27  [92]   *Id*. ("From January 1, 2021 through March 31, 2022, people reported to the
FTC that $417 million in cryptocurrency was lost to fraud originating on social

28  media.  $273 million of these losses were to fraud categorized as investment related,
followed by romance scams ($69 million), and business imposters ($35 million).").

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

disclose that (1) insiders held a significant portion of the Float at the time of the EMAX Token launch; and (2) the promotions by Promoter Defendants Pierce, Mayweather, and Kardashian were the result of them being paid to promote the EMAX Tokens instead of an organic interest/support of EthereumMax – was and is substantially injurious to consumers.  Such conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have continued with the transaction but for the deceptive, fraudulent, false, and unfair acts and practices alleged herein.  Consumers have thus overpaid for EMAX Tokens.  Such injury is not outweighed by any countervailing benefits to consumers or competition.  Indeed, no benefit to consumers or competition results from the alleged conduct of the Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian.  Since consumers reasonably rely on the representations, and could not have known about the omitted disclosures, and the injury results from ordinary use of their product, consumers could not have reasonably avoided such injury.

241.  The Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian willfully and knowingly engaged in the deceptive and unfair acts and practices described above and knew or should have known that those acts and practices were unlawful and thus in violation of Cal. Bus. & Prof. Code §17200, *et seq.*

242.  These facts that the Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian omitted and concealed were material to the decisions of Plaintiffs Semerjian, Buckley, and Shah and the members of the class about whether to pay for EMAX Tokens, in that they would not have proceeded with the transaction but for the deceptive and unfair acts and practices.

243.  Defendants' conduct harmed competition.  While the Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian cut corners and minimized costs, their competitors spent the time and money necessary

1  to promote financial products and/or digital assets that complied with the applicable
2  state and federal laws.  Further, the injuries suffered by Plaintiffs are not outweighed
3  by any countervailing benefits to consumers or competition.  And because the
4  Executive Defendants and Promoter Defendants Pierce, Mayweather, and
5  Kardashian are solely responsible for their respective promotional activities and
6  related disclosures (or lack thereof), there is no way Plaintiffs Semerjian or Shah, or
7  the members of the class could have known about the payments that Promoter
8  Defendants Pierce, Mayweather, and Kardashian received for pretending that they
9  were interested in EthereumMax.  There were reasonably available alternatives to
10 further EthereumMax's legitimate business interests, such as including disclaimers,
11 other than the conduct alleged herein.

12        244.   In order to have standing for a UCL claim, a plaintiff must meet the
13 injury-in-fact requirement.  This requirement is met where a plaintiff can "show that,
14 by relying on a misrepresentation on a product label, they 'paid more for a product
15 than they otherwise would have paid, or bought it when they otherwise would not
16 have done so.'"  *Reid*, 780 F.3d at 958.  A plaintiff's claims under this California
17 statute are governed by the "reasonable consumer" test.  *Freeman*, 68 F.3d at 289
18 ("'[T]he false or misleading advertising and unfair business practices claim must be
19 evaluated from the vantage of a reasonable consumer.'").  Under the reasonable
20 consumer standard, a plaintiff must "show that 'members of the public are likely to
21 be deceived.'"  *Id.* (quoting *Bank of the West*, 2 Cal. 4th at 1267).

22        245.   To meet the heightened pleading standard of Rule 9(b) for claims that
23 sound in fraud, plaintiffs must plead "'the who, what, when, where, and how'" of the
24 alleged fraud.  *Vess*, 317 F.3d at 1106.

25        246.   Plaintiff Semerjian is a lifelong fan of professional sports, particularly
26 basketball and boxing.  Semerjian regularly watched Defendant Pierce when the latter
27 played basketball professionally and then as a commentator on ESPN.  Semerjian

28

saw the promotions by Pierce on May 26, 2021, May 28, 2021, and May 30, 2021, respectively. These promotions regarding the growth potential and price increases for EMAX Tokens induced Semerjian to make his first and second purchases of EMAX Tokens on May 31, 2021 and June 1, 2021. Semerjian has also been aware of Defendant Mayweather from his many years of being a world champion boxer. Semerjian regularly sees posts from and about Mayweather on various social media platforms via the trending or discovery features of the platform. Semerjian specifically saw Mayweather's promotions of EthereumMax during the Bitcoin Miami conference (which were also promoted on the social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release. Mayweather's statements and promotions of EthereumMax gave Semerjian the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy. Each of these promotions induced Semerjian to make another purchase of EMAX Tokens on June 4, 2021. Semerjian is also aware of Defendant Kardashian's reputation as celebrity influencer, and in particular, her renowned business savvy. Semerjian also saw Defendant Kardashian's June 14, 2021 promotion of the EMAX Tokens. Semerjian believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value. Kardashian's promotion induced Semerjian to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

247.  Semerjian also followed the EthereumMax Instagram page during the Relevant Period and saw the promotions from the Executive Defendants that were posted on that platform. Semerjian specifically saw the June 3, 2021 post regarding

the EMAX Token price volatility that came from insider selling. Semerjian reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team." Similarly, Semerjian believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout. The misleading statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Pierce, Mayweather, and Kardashian, induced Semerjian to make his June 4, 2021 purchase of EMAX Tokens. Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Semerjian to retain his EMAX Token investment when he otherwise would not have done so.

248. Plaintiff Buckley is a lifelong fan of professional sports, particularly basketball and boxing. Buckley regularly watched Defendant Pierce when the latter played professionally and then as a commentator on ESPN. Buckley saw the promotions by Pierce on May 26, 2021, and May 28, 2021, respectively. These promotions regarding the growth potential and price increases for EMAX Tokens induced Buckley to make his first two purchases of EMAX Tokens on May 28, 2021. In addition to Pierce, Buckley is aware of Defendant Brown's football career and off-field conduct, and he specifically saw Brown's May 29, 2021 promotion wherein Brown indicated that he wanted his next football contract to be paid in EMAX Tokens. Buckley also saw Pierce's May 30, 2021 promotion of EthereumMax. Buckley has also been aware of Defendant Mayweather from his many years of being a world champion boxer. Buckley regularly sees posts from and about Mayweather on various social media platforms via the trending or discovery features

1  of the platform.   Buckley specifically saw Mayweather's promotions of

2  EthereumMax during the Bitcoin Miami conference (which were also promoted on

3  the social media accounts for EthereumMax, Maher, and Davis), as well as the

4  promotions of EMAX Tokens on the lead up to and during the pay-per-view fight

5  with Logan Paul, including the 5/28/21 Press Release.   Mayweather's statements and

6  promotions of EthereumMax gave Buckley the false impression that Mayweather

7  was more than a celebrity endorser but rather that he was an actual backer/investor

8  in EMAX Tokens, and that he was making this particular cryptocurrency a part of

9  his multimillion-dollar investment strategy.   Buckley also saw Defendant

10  Kardashian's June 14, 2021 promotion of the EMAX Tokens.   Buckley believed

11  Kardashian's promotion and statements about the number of tokens being burned as

12  indicating that the decrease in supply would cause his current investments in EMAX

13  Tokens to correspondingly increase in value.   Each of these promotions induced

14  Buckley to make his third and final purchase of EMAX Tokens on June 18, 2021.

15  These promotions also induced Buckley to continue to hold on to his investment in

16  EMAX Tokens when he otherwise would not have done so.

17       249.   Buckley also followed the EthereumMax Instagram page during the

18  Relevant Period and saw the promotions from the Executive Defendants that were

19  posted on that platform.   Buckley specifically saw the June 3, 2021 post regarding

20  the EMAX Token price volatility that came from insider selling.   Buckley

21  reasonably believed that the price drop on EMAX Tokens only came from "a handful

22  of larger wallets" of "early investors" who were "not part of the development team."

23  Similarly, Buckley believed the statements that EthereumMax would still be

24  accepted as a payment at David Grutman's venues at a future date, despite the issues

25  that caused the delay of the rollout.   The misleading statements and omissions within

26  the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with

27  the above-mentioned promotions from Defendants Pierce, Mayweather, and

28

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1  Kardashian, induced Buckley to make his June 18, 2021 purchase of EMAX Tokens.

2  Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the

3  ability to use EMAX Tokens as an accepted payment and the increase in value his

4  investments in EMAX Tokens would receive if he continued to hold, caused

5  Buckley to retain his EMAX Token investment when he otherwise would not have

6  done so.

7      250.   Buckley also saw the statements and promotions from Defendants

8  Maher and Davis that were posted and/or reposted on various social media platforms.

9  Buckley specifically saw the May 14, 2021 promotion from Maher touting the

10  approximately 500,000% increase the EMAX Token Price.   Buckley reasonably

11  believed that this price increase was the result of genuine investor interest.   Buckley

12  also saw Maher's May 15, 2021 statement dismissing concerns about price volatility

13  because the Executive Defendants "assured" Maher that "aside from marketing

14  expenses they will not sell off any of their position[s] for at least six months."

15  Buckley believed the statement that EthereumMax insiders would not be selling their

16  portion of the Float and driving the price of EMAX Tokens down.   Similarly, Buckley

17  saw and believed Maher's solicitations in his May 17, 2021 social media post

18  dismissing claims that EthereumMax was a "scam or pump and dump" and touting

19  EMAX Tokens was a "[l]ong term" investment that investors like Plaintiffs and the

20  class should "hold all the way."   Buckley also saw and relied on Davis' May 18, 2021

21  solicitation that is was "not too late" to purchase EMAX Tokens given their growth

22  potential.   These misleading statements and omissions by Davis and Maher induced

23  Buckley to make his May 28, 2021 purchase of EMAX Tokens.

24      251.   Plaintiff Shah is lifelong fan of professional sports, particularly

25  basketball and boxing.   Shah regularly watched Defendant Pierce when the latter

26  played basketball professionally and then as a commentator on ESPN.   Shah follows

27  Pierce on Twitter and saw the promotions by Pierce on May 26, 2021, May 28, 2021,

28

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

and May 30, 2021, respectively.  These promotions regarding the growth potential and price increases for EMAX Tokens induced Shah to make his first and second purchases of EMAX Tokens on May 29, 2021 and June 1, 2021.  Shah has also been aware of Defendant Mayweather from his many years of being a world champion boxer.   Shah follows Mayweather on social media.   Shah specifically saw Mayweather's promotions of EthereumMax during the Bitcoin Miami conference (which were also promoted on the social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release. Mayweather's statements and promotions of EthereumMax gave Shah the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy.  Each of these promotions induced Shah to make another purchase of EMAX Tokens on June 3, 2021 and June 11, 2021.  Shah is also aware of Defendant Kardashian's reputation as a celebrity influencer, and in particular, her renowned business savvy. Shah also saw Defendant Kardashian's May 30, 2021 and June 14, 2021 promotion of the EMAX Tokens.  Shah believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX tokens to correspondingly increase in value. Kardashian's promotion induced Shah to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

252.   Shah also followed the EthereumMax Instagram page and other social media platforms like Telegram, Reddit, and Twitter during the Relevant Period and saw the promotions from the Executive Defendants that were posted.   Shah specifically saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling.  Shah reasonably believed that the price drop on

EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team."  Similarly, Shah believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout.  The misleading statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Pierce, Mayweather, and Kardashian, induced Shah to make his June 3, 2021 and June 11, 2021 purchases of EMAX Tokens.  Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Shah to retain his EMAX Token investment when he otherwise would not have done so.

253.   Defendants engaged in deceptive acts and practices under California law by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including but not limited to, in the following ways:

(a)   knowingly and intentionally concealing the Executive Defendants' specific roles and ownership interests in EthereumMax;

(b)   failing to disclose that the huge increase in price of the EMAX Tokens during the first days following launch were caused by manipulation by the Executive Defendants instead of being due to an organic increase in interest from investors;

(c)   failing to disclose that EMAX Tokens were not being accepted as a payment and would not be at any point in the foreseeable future; and

(d)   knowingly and intentionally using and/or failing to disclose the use of the Promotor Defendants to "instill trust" in uninformed investors to promote the financial benefits of a highly speculative and risky investment in EMAX Tokens, in an effort to manipulate and artificially inflate the price and trading volume of the

1   EMAX Tokens and allow Defendants to sell their EMAX Tokens at those inflated
2   prices.

3       254.   The Executive Defendants did not disclose that the EMAX Token
4   developer held the number one rank with 23% ownership interest.  Nor did they
5   disclose until much later that the Executive Defendants had purposefully chosen not
6   to lock the wallets of the EthereumMax insiders.  Plaintiffs Semerjian, Buckley, and
7   Shah would have found it material to their decision to purchase EMAX Tokens to
8   know whether or not insiders had significant percentages of the available Float of
9   EMAX Tokens with the ability to sell freely those EMAX Tokens and create massive
10  downward pressure.  Likewise, had Semerjian, Buckley, and Shah been made aware
11  of that information at the times of their purchases, as well as the later-revealed
12  admission from Gentile that the Executive Defendants had chosen not to "lock the
13  wallets" (which gives the ten original founding members, including Defendant Maher
14  who held 5%, the ability to sell off their portions of EMAX Tokens without
15  restriction), it would have altered their respective decisions to both purchase the
16  EMAX Tokens for the price they paid as well and hold on to those EMAX Tokens
17  when they otherwise would not have done so.

18      255.   The facts that the Executive Defendants and Promoter Defendants
19  Pierce, Mayweather, and Kardashian misrepresented and concealed were material to
20  the decisions of Plaintiffs Semerjian, Buckley, and Shah and the members of the class
21  about whether to pay for or purchase EMAX Tokens (at all or for the price they paid),
22  in that they would not have proceeded with their transactions but for the deceptive,
23  fraudulent and false acts and practices.

24      256.   The Executive Defendants and Promoter Defendants Pierce,
25  Mayweather, and Kardashian intended for Plaintiffs Semerjian, Buckley, and Shah
26  and the members of the class to pay for EMAX Tokens in reliance upon their
27  deceptive and fraudulent acts and practices.

28

257.   Had the Promoter Defendants disclosed the omitted information, Semerjian would have been aware of it because (a) he saw the actual promotions by Promoter Defendants Pierce, Mayweather, and Kardashian and would have concurrently seen any disclosure on the promotions themselves had it been included, and (b) because he follows, directly or indirectly, the social media accounts of, and news reports on, Promoter Defendants Pierce, Mayweather, and Kardashian.

258.   As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages.  The Executive Defendants' activities with the Promoter Defendants caused Plaintiffs and the Class members to purchase and/or hold the EMAX Tokens when they otherwise would not have done so.

259.   The statements from Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian are actionable and not puffery.   "'The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions.'"  *Orlick*, 2013 WL 12139142, at *5.  Under California law, there is no requirement that for a statement to be actionable it must also be false — the UCL also prohibits "'advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'"  *Williams*., 552 F.3d at 938.  Significantly, even if certain statements would be non-actionable on their own, where there are multiple statements at issue, courts must consider "as a whole."  *Id*. at 939 n.3; *Lima*, 710 F. Supp. 2d at 1007–08 (denying motion to dismiss where some specific representations could be considered puffery, but all of defendants' statements "taken as a whole" might be actionable); *NJOY*, 2015 WL 12732461, at *10 ("'Even assuming . . . that some of the statements would themselves be non-actionable, they "cannot be considered in isolation because they contribute to the [potentially] deceptive context" of the packaging and marketing "as a whole."'") (alteration in original).

260.   As alleged further above, Defendant Perone's May 16, 2021 Pre-launch Kickoff post stated, among other things, that (1) EMAX Tokens were up "500,000+% in the first 24 hours"; (2) the Executive Defendants had "locked in partnership with global digital marketing agency" and "lined up a knockout influencer" for a "nationwide campaign"; and (3) "We are 3 days in with ~$100M market cap and the train is just getting rolling."   These statements from Executive Defendants are specific, detailed factual assertions the Executive Defendants were using to encourage purchases and increase the price of the EMAX Tokens.  At the same time, the Executive Defendants Maher and Speer, with Promoter Defendant Davis, each failed to disclose that these metrics were the result of the failed launch that allowed insiders, including but not limited to Maher, to disproportionately increase the price of the EMAX Tokens with their early trades.

261.   Taken together, the misleading statements and omissions of the Executive Defendants and Promoter Defendants Davis, Pierce, Mayweather, and Kardashian contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of EMAX Tokens.

262.   In the event that Plaintiffs' state securities and consumer law claims are found to be inapplicable to the wrongdoing alleged herein against Defendant Kardashian, Plaintiffs will be unable to obtain monetary damages in an amount that would make Plaintiffs and the members of the Class whole.

263.   In addition, Plaintiff and the Class lack an adequate remedy at law because the elements of the other state securities and consumer law claims require proof of conduct beyond that which must be shown to establish liability under the UCL and FAL.  *See M.O. Dion*, 2022 WL 18281526, at *8.

264.   The lack of an adequate remedy at law entitles Plaintiffs and the Class to pursue equitable restitution under the UCL.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

265.   Concurrently, "restitution under the . . . UCL would be more certain, prompt or efficient than the legal remedies" available with state securities and consumer law claims.  *See Anderson*, 500 F. Supp. 3d at 1009 (citing *Stewart*, 300 U.S. at 214).  For example, the price premium damages model will likely require expert analysis to calculate, whereas equitable restitution will only require a showing of what each member of the Class paid for their EMAX tokens.  Restitution would, therefore, be much more prompt and efficient than this remedy at law.

266.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by EthereumMax, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under California Business & Professions Code §17200.

## **THIRD CAUSE OF ACTION**

**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §17200**
**(Based on Fraudulent Acts and Practices)**
**(Against All Defendants)**

267.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein, and further alleges as follows.

268.   Plaintiffs Semerjian, Buckley, and Shah are residents of the State of California.

269.   Plaintiffs Semerjian, Buckley, and Shah paid for or purchased EMAX Tokens in California and thus the deceptive transactions alleged herein occurred in California.

270.   At all relevant times there was in full force and effect the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

271.   "'[A]n act can be alleged to violate any or all three of the three prongs of the UCL — unlawful, unfair, or fraudulent.'"  *Stearns*, 763 F. Supp. 2d at 1149 (quoting *Berryman*, 152 Cal. App. 4th at 1554).

272.   Any violation of the California false advertising laws (*e.g.*, §17500) necessarily violates the "fraudulent" prong of the UCL.

273.   To meet the heightened pleading standard of Rule 9(b) for claims that sound in fraud, plaintiffs must plead "'the who, what, when, where, and how'" of the alleged fraud.  *Vess*, 317 F.3d at 1106.

274.   In order to have standing under California law for a UCL claim, a plaintiff must meet the injury-in-fact requirement.  This requirement is met where a plaintiff can "show that, by relying on a misrepresentation on a product label, they 'paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so.'"  *Reid*, 780 F.3d at 958.

275.   A plaintiff's claims under this California statute are governed by the "reasonable consumer" test.  *Freeman*, 68 F.3d at 289 ("'[T]he false or misleading advertising and unfair business practices claim must be evaluated from the vantage of a reasonable consumer.'").  Under the reasonable consumer standard, a plaintiff must "show that 'members of the public are likely to be deceived.'"  *Id.* at 289 (quoting *Bank of the West*, 2 Cal. 4th at 1267).

276.   Plaintiff Semerjian is a lifelong fan of professional sports, particularly basketball and boxing. Semerjian regularly watched Defendant Pierce when the latter played professionally and then as a commentator on ESPN.  Semerjian saw the promotions by Pierce on May 26, 2021, May 28, 2021, and May 30, 2021, respectively.  These promotions regarding the growth potential and price increases for EMAX Tokens induced Semerjian to make his first and second purchases of EMAX Tokens on May 31, 2021 and June 1, 2021.  Semerjian has also been aware of Defendant Mayweather from his many years of being a world champion boxer.

1   Semerjian regularly sees posts from and about Mayweather on various social media
2   platforms via the trending or discovery features of the platform.   Semerjian
3   specifically saw Mayweather's promotions of EthereumMax during the Bitcoin
4   Miami conference (which were also promoted on the social media accounts for
5   EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens on
6   the lead up to and during the pay-per-view fight with Logan Paul, including the
7   5/28/21 Press Release.  Mayweather's statements and promotions of EthereumMax
8   gave Semerjian the false impression that Mayweather was more than a celebrity
9   endorser but rather that he was an actual backer/investor in EMAX Tokens, and that
10  he was making this particular cryptocurrency a part of his multimillion-dollar
11  investment strategy.  Each of these promotions induced Semerjian to make another
12  purchase of EMAX Tokens on June 4, 2021.  Semerjian also saw Defendant
13  Kardashian's June 14, 2021 promotion of the EMAX Tokens.  Semerjian believed
14  Kardashian's promotion and statements about the number of tokens being burned as
15  indicating that the decrease in supply would cause his current investments in EMAX
16  Tokens to correspondingly increase in value.   Kardashian's promotion induced
17  Semerjian to continue to hold on to his investment in EMAX Tokens when he
18  otherwise would not have done so.

19         277.   Semerjian also followed the EthereumMax Instagram page during the
20  Relevant Period and saw the promotions from the Executive Defendants that were
21  posted on that platform.  Semerjian specifically saw the June 3, 2021 post regarding
22  the EMAX Token price volatility that came from insider selling.   Semerjian
23  reasonably believed that the price drop on EMAX Tokens only came from "a handful
24  of larger wallets" of "early investors" who were "not part of the development team."
25  Similarly, Semerjian believed the statements that EthereumMax would still be
26  accepted as a payment at David Grutman's venues at a future date, despite the issues
27  that caused the delay of the rollout.  The misleading statements and omissions within

28

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Pierce, Mayweather, and Kardashian, induced Semerjian to make his June 4, 2021 purchase of EMAX Tokens. Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Semerjian to retain his EMAX Token investment when he otherwise would not have done so.

278.   Plaintiff Buckley is a lifelong fan of professional sports, particularly basketball and boxing.  Buckley regularly watched Defendant Pierce when the latter played professionally and then as a commentator on ESPN.  Buckley saw the promotions by Pierce on May 26, 2021, and May 28, 2021, respectively.  These promotions regarding the growth potential and price increases for EMAX Tokens induced Buckley to make his first two purchases of EMAX Tokens on May 28, 2021. In addition to Pierce, Buckley is aware of Defendant Brown's football career and off-field conduct, and he specifically saw Brown's May 29, 2021 promotion wherein Brown indicated that he wanted his next football contract to be paid in EMAX Tokens.  Buckley also saw Pierce's May 30, 2021 promotion of EthereumMax. Buckley has also been aware of Defendant Mayweather from his many years of being a world champion boxer.  Buckley regularly sees posts from and about Mayweather on various social media platforms via the trending or discovery features of the platform.   Buckley specifically saw Mayweather's promotions of EthereumMax during the Bitcoin Miami conference (which were also promoted on the social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release.  Mayweather's statements and promotions of EthereumMax gave Buckley the false impression that Mayweather

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1   was more than a celebrity endorser but rather that he was an actual backer/investor
2   in EMAX Tokens, and that he was making this particular cryptocurrency a part of
3   his multimillion-dollar investment strategy.   Buckley also saw Defendant
4   Kardashian's June 14, 2021 promotion of the EMAX Tokens.  Buckley believed
5   Kardashian's promotion and statements about the number of tokens being burned as
6   indicating that the decrease in supply would cause his current investments in EMAX
7   Tokens to correspondingly increase in value.  Each of these promotions induced
8   Buckley to make his third and final purchase of EMAX Tokens on June 18, 2021.
9   These promotions also induced Buckley to continue to hold on to his investment in
10  EMAX Tokens when he otherwise would not have done so.

11        279.   Buckley also followed the EthereumMax Instagram page during the
12  Relevant Period and saw the promotions from the Executive Defendants that were
13  posted on that platform.  Buckley specifically saw the June 3, 2021 post regarding
14  the EMAX Token price volatility that came from insider selling.   Buckley
15  reasonably believed that the price drop on EMAX Tokens only came from "a handful
16  of larger wallets" of "early investors" who were "not part of the development team."
17  Similarly, Buckley believed the statements that EthereumMax would still be
18  accepted as a payment at David Grutman's venues at a future date, despite the issues
19  that caused the delay of the rollout.  The misleading statements and omissions within
20  the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with
21  the above-mentioned promotions from Defendants Pierce, Mayweather, and
22  Kardashian, induced Buckley to make his June 18, 2021 purchase of EMAX Tokens.
23  Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the
24  ability to use EMAX Tokens as an accepted payment and the increase in value his
25  investments in EMAX Tokens would receive if he continued to hold, caused
26  Buckley to retain his EMAX Token investment when he otherwise would not have
27  done so.

28

280.   Buckley also saw the statements and promotions from Defendants Maher and Davis that were posted and/or reposted on various social media platforms. Buckley specifically saw the May 14, 2021 promotion from Maher touting the approximately 500,000% increase in the EMAX Token Price.  Buckley reasonably believed that this price increase was the result of genuine investor interest.  Buckley also saw Maher's May 15, 2021 statement dismissing concerns about price volatility because the Executive Defendants "assured" Maher that "aside from marketing expenses they will not sell off any of their position[s] for at least six months." Buckley believed the statement that EthereumMax insiders would not be selling their portion of the Float and driving the price of EMAX Tokens down.  Similarly, Buckley saw and believed Maher's solicitations in his May 17, 2021 social media post dismissing claims that EthereumMax was a "scam or pump and dump" and touting EMAX Tokens were a "[l]ong term" investment that investors like Plaintiffs and the class should "hold all the way."  Buckley also saw and relied on Davis' May 18, 2021 solicitation that is was "not too late" to purchase EMAX Tokens given their growth potential.  These misleading statements and omissions by Davis and Maher induced Buckley to make his May 28, 2021 purchase of EMAX Tokens.

281.   Plaintiff Shah is a lifelong fan of professional sports, particularly basketball and boxing.  Shah regularly watched Defendant Pierce when the latter played basketball professionally and then as a commentator on ESPN.  Shah follows Pierce on Twitter and saw the promotions by Pierce on May 26, 2021, May 28, 2021, and May 30, 2021, respectively.  These promotions regarding the growth potential and price increases for EMAX Tokens induced Shah to make his first and second purchases of EMAX Tokens on May 29, 2021 and June 1, 2021.  Shah has also been aware of Defendant Mayweather from his many years of being a world champion boxer.   Shah follows Mayweather on social media.   Shah specifically saw Mayweather's promotions of EthereumMax during the Bitcoin Miami conference

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

(which were also promoted on the social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release. Mayweather's statements and promotions of EthereumMax gave Shah the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy.  Each of these promotions induced Shah to make another purchase of EMAX Tokens on June 3, 2021 and June 11, 2021.  Shah is also aware of Defendant Kardashian's reputation as celebrity influencer, and in particular, her renowned business savvy.  Shah also saw Defendant Kardashian's May 30, 2021 and June 14, 2021 promotion of the EMAX Tokens.  Shah believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value.  Kardashian's promotion induced Shah to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

282.   Shah also followed the EthereumMax Instagram page and other social media platforms like Telegram, Reddit, and Twitter during the Relevant Period and saw the promotions from the Executive Defendants that were posted.   Shah specifically saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling.  Shah reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team."  Similarly, Shah believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout.  The misleading statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants

Pierce, Mayweather, and Kardashian, induced Shah to make his June 3, 2021 and June 11, 2021 purchases of EMAX Tokens. Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Shah to retain his EMAX Token investment when he otherwise would not have done so.

283. Nondisclosure or concealment may also constitute actionable fraud when, *inter alia*, the defendant "actively conceals a material fact from the plaintiff" or "makes partial representations but also suppresses some material facts." *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997). In fact, allegations of "intentional and systematic concealment by the defendants of highly material facts, which were peculiarly within their knowledge and which [plaintiffs] did not suspect and could not have discovered" satisfactorily pleads a claim of fraud by omission. *See Sime v. Malouf*, 95 Cal. App. 2d 82, 99-100 (1949) (finding "significant" that defendants "concealed their identity by proceeding entirely through agents acting ostensibly in their own behalf")

284. Further, a fraud by omission claim exists when "defendants not only had exclusive knowledge of the material facts, but knew that [plaintiff] was acting under a misapprehension, which they had cultivated." *Id.* at 100 (citing *Stewart v. Wyoming Cattle-Ranche Co.*, 128 U.S. 383, 388 (1888)); *Myers v. BMW of N. Am., LLC*, No. 16-CV-00412-WHO, 2016 WL 5897740, at *5 (N.D. Cal. Oct. 11, 2016) (finding a duty to disclose where defendant had exclusive knowledge of a product defect and made a partial representation about it and denying dismissal of UCL claim under fraud by omission theory).

285. "'Generally, courts have not defined "exclusive" literally, but have found such claims cognizable if the defendant had "superior" knowledge of a defect that was not readily apparent and there is no or only . . . limited publicly available

information about the defect.'" *Mosqueda v. Am. Honda Motor Co., Inc*., 443 F. Supp. 3d 1115, 1133 (C.D. Cal. 2020) (quoting *Salas v. Toyota Motor Sales, U.S.A., Inc*., No. CV 15-08629 FMO, 2016 WL 7486600, at *10 (C.D. Cal. Sept. 27, 2016)). Indeed, under California law a duty to disclose "may arise without any confidential relationship where defendant alone has knowledge of material facts that are not accessible to the plaintiff." 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, §799, p. 1156. These factors do not require a fiduciary relationship so long as there exists "some relationship" between the defendant and plaintiff, such as "between buyer and seller." *LiMandri*, 52 Cal. App. 4t at 336. Defendant Mayweather's omissions were fraudulent under these factors in *LiMandri*.

286. The facts that the Executive Defendants and Promoter Defendants Davis, Pierce, Mayweather, and Kardashian misrepresented and concealed were material to the decisions of Plaintiffs Semerjian, Buckley, and Shah and the members of the class about whether to pay for or purchase EMAX Tokens (at all or for the price they paid), in that they would not have proceeded with their transactions but for the deceptive, fraudulent, and false acts and practices. For example, both Kardashian's and Mayweather's misleading statements and omissions concerning the ability to use EMAX Tokens to purchase goods and services relate to "'the central functionality of the product,'" which is required to plead a fraud by omission claim under the UCL. *See Hall*, 747 F. App'x at 451 (citing *Hodsdon*, 891 F.3d at 863. The omissions about the inability to use EMAX Tokens were only known to Defendants and were contrary to representations and omissions previously made concerning the "exclusive" ability to use EMAX Tokens to purchase goods and services.

287. Defendants, collectively and individually, had superior knowledge of information regarding the ownership interests and ability to use EMAX Tokens as advertised.

288.   Notably, Mayweather could have (and should have) corrected these particular misleading statements and omissions when they were made on June 6, 2021, but failed to do so despite him being tagged in Defendant Davis's posts containing the misleading information about the Mayweather joint venture and, thus, being on notice of the fraudulent omissions regarding his status as a long term partner of EthereumMax and Davis's cryptocurrency investing company InRussWeTrust.   Indeed, the Company and Defendants Maher and Davis made several representations indicating that Mayweather's involvement was not limited to a one-off promotion related to the Mayweather v. Paul boxing event but rather the beginning of a "long term" partnership deal that had been reached between Mayweather, Davis, and the Company.  Mayweather's exclusive knowledge that he was simply a paid promotor (as opposed to a "an actual backer/investor in EMAX Tokens, and that he was making EMAX a part of his multimillion-dollar") was not known to Plaintiffs or the members of the Class when each was respectively deciding whether or not to purchase EMAX Tokens.  This gave rise to Mayweather's duty to disclose that information, and by failing to disclose that information, Mayweather is liable for a UCL fraud by omission claim. *See In re Carrier*, 78 F. Supp. 3d at 1113–14 ("Finally, Plaintiffs have alleged that the information regarding the Carrier IQ Software was in the exclusive knowledge of Defendants.  These allegations are sufficient to plausible allege that Defendants had exclusive knowledge of a material fact that they had a duty to disclose but chose to omit."); *see also In re Solara*, 613 F. Supp. 3d at 1303(finding that the plaintiffs adequately alleged a fraudulent omission UCL claim where they pled "a duty to disclose based upon [d]efendant's exclusive knowledge of the alleged inadequacy of its security measures").

289.   Additionally, Mayweather used his business associate and agent Defendant Rechnitz to act as a middleman between Mayweather and the Company in order to actively conceal the true nature of Mayweather's business relationship with

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1  the Company and its insiders.  To state a claim for active concealment, a plaintiff

2  must allege specific "affirmative acts on the part of the [D]efendants in hiding,

3  concealing or covering up the matters complained of." *Herron*, 924 F. Supp. 2d at

4  1176 (citing *Lingsch*, 213 Cal. App. 2d at 734).

5      290.   The Executive Defendants and Promoter Defendants Davis, Pierce,

6  Mayweather, and Kardashian intended for Plaintiffs Semerjian, Buckley, and Shah

7  and the members of the class to pay for EMAX Tokens in reliance upon their

8  deceptive and fraudulent acts and practices.

9      291.   Defendants engaged in deceptive acts and practices under California law

10  by taking advantage of the lack of knowledge, ability, experience, or capacity of

11  Plaintiffs to a grossly unfair degree, including but not limited to, in the following

12  ways:

13      (a)   knowingly   and   intentionally   concealing   the   Executive

14  Defendants' specific roles and ownership interests in EthereumMax;

15      (b)   failing to disclose that the huge increase in price of the EMAX

16  Tokens during first days following launch were caused by manipulation by the

17  Executive Defendants instead of being due to an organic increase in interest from

18  investors;

19      (c)   leading investors to believe that the EMAX Token would be

20  available for use as a payment at select locations when there was no such capability;

21  and

22      (d)   knowingly and intentionally using and/or failing to disclose the

23  use of the Promotor Defendants to "instill trust" in uninformed investors to promote

24  the financial benefits of a highly speculative and risky investment in EMAX Tokens,

25  in an effort to manipulate and artificially inflate the price and trading volume of the

26  EMAX Tokens and allow Defendants to sell their EMAX Tokens at those inflated

27  prices.

28

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

292.   The Executive Defendants did not disclose that the EMAX Token developer held the number one rank with 23% ownership interest.  Nor did they disclose until much later that the Executive Defendants had purposefully chosen not to lock the wallets of the EthereumMax insiders.  Semerjian, Buckley, and Shah would have found it material to their decision to purchase EMAX Tokens to know whether or not insiders had significant percentages of the available Float of EMAX Tokens with the ability to sell freely those EMAX Tokens and create massive downward pressure.  Likewise, had Semerjian, Buckley, and Shah been made aware of that information at the times of their purchases, as well as the later-revealed admission from Gentile that the Executive Defendants had chosen not to "lock the wallets" (which gives the ten original founding members, including Defendant Maher who held 5%, the ability to sell off their portions of EMAX Tokens without restriction), it would have altered their decisions to both purchase the EMAX Tokens for the price they paid as well and hold on to those EMAX Tokens when they otherwise would not have done so.

293.   Had the Promoter Defendants disclosed the omitted information, Semerjian, Buckley, and Shah would have been aware of it because (a) they saw the actual promotions by the Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian and would have concurrently seen any disclosure on the promotions themselves had it been included, and (b) because they follow, directly or indirectly, the social media accounts of, and news reports on, Promoter Defendants Pierce, Mayweather, and Kardashian.

294.   As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages.  The Executive Defendants' activities with the Promoter Defendants caused Plaintiffs and the Class members to purchase and/or hold the EMAX Tokens when they otherwise would not have done so.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

295.    The statements from Executive Defendants and Promoter Defendants Pierce, Mayweather, and Kardashian are actionable and not puffery.  "'The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions.'"  *Orlick*, 2013 WL 12139142, at \*5. Under California law, there is no requirement that for a statement to be actionable it must also be false — the UCL also prohibits "'advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'"  *Williams*., 552 F.3d at 938.  Significantly, even if certain statements would be non-actionable on their own, where there are multiple statements at issue, courts must consider "as a whole."  *Id*. at 939 n.3; *Lima*, 710 F. Supp. 2d at 1007-08 (denying motion to dismiss where some specific representations could be considered puffery, but all of defendants' statements "taken as a whole" might be actionable); *NJOY*, 2015 WL 12732461, at \*10 ("'Even assuming . . .  that some of the statements would themselves be non-actionable, they "cannot be considered in isolation because they contribute to the [potentially] deceptive context" of the packaging and marketing "as a whole."'") (alteration in original).

296.    As alleged further above, the Executive Defendant Perone's May 16, 2021 Pre-launch Kickoff post stated, among other things, that (1) EMAX Tokens were up "500,000+% in the first 24 hours"; (2) the Executive Defendants had "locked in partnership with global digital marketing agency" and "lined up a knockout influencer" for a "nationwide campaign"; and (3) "We are 3 days in with ~$100M market cap and the train is just getting rolling."  These statements from Executive Defendants are specific, detailed factual assertions the Executive Defendants were using to encourage purchases and increase the price of the EMAX Tokens.  At the same time, the Executive Defendants Maher and Speer, with Promoter Defendant Davis, each failed to disclose that these metrics were the result of the failed launch

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

that allowed insiders, including but not limited to Maher, to disproportionately increase the price of the EMAX Tokens with their early trades.

297.   Taken together, the misleading statements and omissions of the Executive Defendants and Promoter Defendants Davis, Pierce, Mayweather, and Kardashian contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of EMAX Tokens.

298.   In the event that Plaintiffs' state securities and consumer law claims are found to be inapplicable to the wrongdoing alleged herein against Defendant Kardashian, Plaintiffs will be unable to obtain monetary damages in an amount that would make Plaintiffs and the members of the Class whole.

299.   In addition, Plaintiff and the Class lack an adequate remedy at law because the elements of the other state securities and consumer law claims require proof of conduct beyond that which must be shown to establish liability under the UCL and FAL.  *See M.O. Dion*, 2022 WL 18281526, at *8. The lack of an adequate remedy at law entitles Plaintiffs and the Class to pursue equitable restitution under the UCL.

300.   Concurrently, "restitution under the . . . UCL would be more certain, prompt or efficient than the legal remedies" available with state securities and consumer law claims.  *See Anderson*, 500 F. Supp. 3d at 1009 (citing *Stewart*, 300 U.S. at 214).  For example, the price premium damages model will likely require expert analysis to calculate, whereas equitable restitution will only require a showing of what each member of the Class paid for their EMAX Tokens.  Restitution would, therefore, be much more prompt and efficient than this remedy at law.

301.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by EthereumMax, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under California Business & Professions Code §17200.

## FOURTH CAUSE OF ACTION

**Violation of the California False Advertising Law**
**Cal. Bus. & Prof. Code §17500, *et seq*.**
**(Against Defendant Kardashian)**

302.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

303.   Plaintiffs Semerjian, Buckley, and Shah are residents of the State of California.

304.   Plaintiffs Semerjian, Buckley, and Shah paid for or purchased EMAX Tokens in California and thus the deceptive transactions alleged herein occurred in California.

305.   The "'primary evidence'" is the "'advertising itself.'"   *Brockey v. Moore*, 107 Cal. App. 4th 86, 100 (2003).  The Ninth Circuit has recognized that the question of whether advertising materials are deceptive to a reasonable consumer "will usually be a question of fact not appropriate for decision" at the pleading stage. *Williams*, 552 F.3d at 938.

306.   In order to have standing under California law for a False Advertising Law ("FAL") claim, a plaintiff must meet the injury-in-fact requirement.   This requirement is met where a plaintiff can "show that, by relying on a misrepresentation on a product label, they 'paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so.'"  *Reid*, 780 F.3d at 958.

307.   Plaintiffs Semerjian, Buckley, and Shah saw Defendant Kardashian's May 30, 2021 and June 14, 2021 promotions of the EMAX Tokens.  Semerjian, Buckley, and Shah believed Kardashian's promotion and statements about the ability to use EMAX Tokens as an accepted payment at Club LIV and the number of tokens being burned as indicating that the decrease in supply would cause their current investments in EMAX Tokens to correspondingly increase in value.  Kardashian's

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1    promotions induced Semerjian, Buckley, and Shah to continue to hold on to their

2    respective investments in EMAX Tokens when they each otherwise would not have

3    done so.

4         308.   At all relevant times there was in full force and effect the California

5    False Advertising Law, Cal. Bus. & Prof. Code §17500, *et seq.*, which prohibits, *inter*

6    *alia*, any public statement made "to induce the public to enter into any obligation

7    relating" to the disposal of real or personal property "which is untrue or misleading,

8    and which is known, or which by the exercise of reasonable care should be known,

9    to be untrue and misleading."

10        309.   Kardashian used online and social media advertising to sell the EMAX

11   Tokens.   Kardashian disseminated (and could continue to do so in the future)

12   advertising concerning the EMAX Token which by its very nature is deceptive,

13   untrue, or misleading within the meaning of Cal. Bus. & Prof. Code §17500 because

14   those advertising statements are misleading and likely to deceive, and continue to

15   deceive, members of the Class and the general public.

16        310.   In making and disseminating the statements alleged herein, Kardashian

17   knew that the statements were untrue or misleading, and acted in violation of Cal.

18   Bus. & Prof. Code §17500.

19        311.   The misrepresentations and non-disclosures by Kardashian of the

20   material facts detailed above constitute false and misleading advertising and therefore

21   constitute a violation of Cal. Bus. & Prof. Code §17500.

22        312.   Through her deceptive acts and practices, Kardashian has improperly

23   and illegally obtained money from Plaintiffs and the members of the Class.  As such,

24   Plaintiffs request that this Court cause Defendant Kardashian to restore this money

25   to Plaintiffs and the members of the Class, and to enjoin Defendant from continuing

26   to violate Cal. Bus. & Prof. Code §17500, as discussed above.  Otherwise, Plaintiffs

27

28

1  and those similarly situated will continue to be harmed by Kardashian's false and/or

2  misleading advertising regarding EMAX Tokens.

3      313.   "Any violation of [Cal. Bus. & Prof. Code §17500] is a misdemeanor

4  punishable by imprisonment in county jail not exceeding six months, or by a fine not

5  exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment

6  and fine."  Cal. Bus. & Prof. Code §17500.

7      314.   "Punishment is partly an expression of a society's desire to inflict pain

8  on those who break the law.  But giving wealthy offenders a mere slap on the wrist

9  makes a mockery of that objective.  And while punishment is supposed to prevent

10  undesirable conduct from happening in the first place, flat fines deter the wealthy less

11  than everyone else."[93]

12      315.   Given Kardashian's status as one of the country's most influential and

13  wealth celebrity promotors – someone who regularly makes millions of dollars from

14  similarly promoting products to her massive following on social media – the

15  maximum fine of only $2,500 for a violation of Cal. Bus. & Prof. Code §17500 will

16  do little, if anything, to deter Kardashian from making false and misleading

17  advertisements in the future.

18      316.   Another genuine threat of future harm takes the form of Plaintiffs'

19  thwarted desire to purchase additional EMAX Tokens.  Plaintiffs will be unable to

20  rely on EMAX Token or any other cryptocurrency-related advertising by Kardashian

21  in the future, and so will not purchase EMAX Tokens although they each would like

22  to.  Alternatively, Plaintiffs might purchase EMAX Tokens in the future, despite the

23  fact that the EMAX Tokens were once marred by false advertising, as they may

24  reasonably, but incorrectly, assume that the ability to use the EMAX Tokens was

25  improved.

26

27  _____

[93]    Alec Schierenbeck, *A Billionaire and a Nurse Shouldn't Pay the Same Fine*

28  *for Speeding,* N.Y. TIMES (Mar. 15, 2018), https://www.nytimes.com/2018/03/15/opinion/flat-fines-wealthy-poor.html.

317.   In addition, pursuant to Cal. Bus. & Prof. Code §17535, Plaintiffs seek an Order of this Court ordering Defendants to fully disclose the true nature of their misrepresentations.  Plaintiffs additionally request an Order requiring Kardashian to disgorge her ill-gotten gains and/or award full restitution of all monies wrongfully acquired by Kardashian by means of such acts of false advertising, plus interest and attorneys' fees so as to restore any and all monies which were acquired and obtained by means of such untrue and misleading advertising, misrepresentations and omissions, and which ill-gotten gains are still retained by Kardashian.  Plaintiffs and those similarly situated may be irreparably harmed and/or denied an effective and complete remedy if such an Order is not granted.

318.   Kardashian's promotional activities are ongoing and continue to this date.

319.   In the event that Plaintiffs' state securities and consumer law claims are found to be inapplicable to the wrongdoing alleged herein against Defendant Kardashian, Plaintiffs will be unable to obtain monetary damages in an amount that would make Plaintiffs and the members of the Class whole.

320.   In addition, Plaintiff and the Class lack an adequate remedy at law because the elements of the other state securities and consumer law claims require proof of conduct beyond that which must be shown to establish liability under the UCL and FAL.  *See M.O. Dion*, 2022 WL 18281526, at *8.

321.   The lack of an adequate remedy at law entitles Plaintiffs and the Class to pursue equitable restitution, injunctive relief, and/or declaratory judgment under the FAL.

322.   Concurrently, restitution under the FAL would be "more certain, prompt or efficient than the legal remedies" available with state securities and consumer law claims.  *See Anderson*, 500 F. Supp. 3d at 1009 (citing *Stewart*, 300 U.S. at 214).  For example, the price premium damages model will likely require expert analysis to

calculate, whereas equitable restitution will only require a showing of what each member of the Class paid for their EMAX Tokens.  Restitution would, therefore, be much more prompt and efficient than this remedy at law.

### FIFTH CAUSE OF ACTION

**Violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**Ch. 501, §211(1), Fla. Stat. Ann.**
**(Against All Defendants)**

323.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein, and further alleges as follows:

324.   Plaintiffs Nahlah, Freeman, Brignol, and Puda are residents of the State of Florida.

325.   Plaintiffs Nahlah, Freeman, Puda, and Brignol paid for or purchased EMAX Tokens in Florida and thus the deceptive transactions alleged herein occurred in Florida.

326.   Chapter 501, Fla. Stat., FDUTPA is to be liberally construed to protect the consuming public, such as Plaintiffs in this case, from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce.

327.   Plaintiffs are "consumers" within the meaning of Fla. Stat. §501.203(7).

328.   By soliciting investor funds in the manner in which they did, Defendants engaged in "trade and commerce" within the meaning of Fla. Stat. §501.203(8).

329.   The elements comprising a consumer claim for damages under FDUTPA are: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.  *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016) (citing *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. Dist. Ct. App. 2008)).

330.  Under FDUTPA, "'deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'"  *Zlotnick v. Premier Sales Grp., Inc.*,

480 F.3d 1281, 1284 (11th Cir. 2007) (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)).  "Under Florida law, an objective test is employed in determining whether the practice was likely to deceive a consumer acting reasonably.  That is, '[a] party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.'" *Carriuolo*, 823 F.3d at 984 (quoting *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. Dist. Ct. App. 2000).

331.   Here, Plaintiffs Nahlah, Freeman, Puda and Brignol nevertheless did, in fact, reasonably rely on the alleged misleading statements and omissions when making their respective decisions to purchase the EMAX Tokens.

332.   A plaintiff's claims under FDUPTA are governed by the "reasonable consumer" test. *Piescik v. CVS Pharmacy, Inc.*, 576 F. Supp. 3d 1125, 1132 n.2 (S.D. Fla. 2021) ("This case was brought under California's consumer protection laws, which apply the same 'reasonable consumer' test for deception as applied in interpreting FDUTPA.").

333.   Plaintiff Nahlah is a lifelong fan of professional sports, particularly basketball and boxing.  Nahlah regularly watched Defendant Pierce when the latter played professionally and then as a commentator on ESPN.  Nahlah saw Defendant Pierce's May 26, 2021 and May 28, 2021, respectively.  These promotions induced Nahlah to make his first purchase of EMAX Tokens on May 28, 2021.  Nahlah also follows Defendant Mayweather's career and social media accounts.  Nahlah specifically saw Mayweather's promotion of EthereumMax during the Bitcoin Miami conference (which were also promoted on the social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release. Mayweather's statements and promotions of EthereumMax gave Nahlah the false impression that Mayweather was more than a celebrity endorser but rather that he

was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy.  These promotions induced Nahlah to make six more purchases of EMAX Tokens on June 4, 2021, June 5, 2021, June 6, 2021, June 7, 2021, June 8, 2021, and June 10, 2021.  Nahlah also saw Defendant Kardashian's May 30, 2021 and June 14, 2021 promotions of the EMAX Tokens.  Nahlah often visited Club LIV during the Relevant Period and was particularly enticed by Kardashian's promotion to use EMAX Tokens there.  Furthermore, Nahlah believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value.  Kardashian's promotions induced Nahlah to make additional purchases of EMAX Tokens as well as continuing to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

334.  Nahlah also followed the EthereumMax Instagram page during the Relevant Period and saw the promotions from the Executive Defendants that were posted on that platform.  Nahlah specifically saw the May 16, 2021 post related to the "EthereumMax Pre-launch Kickoff," which promoted the growth of the EMAX Tokens and alluded to a relationship with Defendant Mayweather as a "knockout influencer."  Nahlah also saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling.  Nahlah reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team," as opposed to those insiders like Defendant Maher.  Similarly, Nahlah believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout.  The misleading statements and omissions within the June 3, 2022 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Pierce,

Mayweather, and Kardashian, caused Nahlah to make his June 4, 2021, June 5, 2021, June 6, 2021, June 7, 2021, June 8, 2021, and June 10, 2021 purchases of EMAX Tokens.  Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Nahlah to retain his EMAX Token investment when he otherwise would not have done so.

335.   Nahlah also saw the statements and promotions from Defendants Maher and Davis that were posted and/or reposted on various social media platforms. Nahlah specifically saw the May 14, 2021 promotion from Maher touting the approximately 500,000% increase the EMAX Token Price. Nahlah reasonably believed that this price increase was the result of genuine investor interest. Nahlah also saw Maher's May 15, 2021 statement dismissing concerns about price volatility because the Executive Defendants "assured" Maher that "aside from marketing expenses they will not sell off any of their position for at least six months." Nahlah believed the statement that EthereumMax insiders would not be selling their portion of the Float and driving the price of EMAX Tokens down. Similarly, Nahlah saw and believed Maher's solicitations in his May 17, 2021 social media post dismissing claims that EthereumMax was a "scam or pump and dump" and touting EMAX Tokens was a "[l]ong term" investment that investors like Plaintiffs and the class should "hold all the way." Nahlah also saw and relied on Davis' May 18, 2021 solicitation that is was "not too late" to purchase EMAX Tokens given their growth potential. These misleading statements and omissions by Davis and Maher further induced Nahlah to make his May 28, 2021 purchase of EMAX Tokens.

336.   Plaintiff Puda followed the EthereumMax Instagram page during the Relevant Period and saw the promotions from the Executive Defendants that were posted on that platform.  Puda specifically saw the May 16, 2021 post related to the

"EthereumMax Pre-launch Kickoff," which promoted the growth of the EMAX Tokens and alluded to a relationship with Defendant Mayweather as a "knockout influencer." Each of the promotions, separately and taken together, induced Puda to purchase EMAX Tokens on May 29, 2021. Puda also saw Defendant Kardashian's May 30, 2021 promotion of the EMAX Tokens being accepted as payments as venues like Club LIV. Puda often visited Club LIV during the Relevant Period and was particularly enticed by Kardashian's promotion to use EMAX Tokens there. Puda is also a lifelong fan of professional sports, particularly boxing. Puda is aware of Defendant Mayweather from his career as a world champion boxer. Puda also follows Defendant Mayweather's career and social media accounts. Puda specifically saw Mayweather's promotion of EthereumMax during the Bitcoin Miami conference (which were also promoted on the social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens during the pay-per-view fight with Logan Paul. Mayweather's statements and promotions of EthereumMax, including the "EthereumMax Pre-launch Kickoff" post alluding to Mayweather, gave Puda the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy. Furthermore, Puda both saw and believed Kardashian's June 14, 2021 promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value. The promotions from Defendants Mayweather and Kardashian induced Puda to continue holding on to his investment in EMAX Tokens when he otherwise would not have done so.

337. Puda also saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling. Puda reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors"

who were "not part of the development team," as opposed to those like Defendant Maher and the other Executive Defendants.  Similarly, Puda believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout.  The misleading statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Mayweather and Kardashian, induced Puda to hold onto his investment in EMAX Tokens.  Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Puda to retain his EMAX Token investment when he otherwise would not have done so.

338.   Plaintiff Freeman is a lifelong fan of professional sports, particularly basketball, football, and boxing.  Freeman regularly watched Defendant Pierce when the latter played professionally and then as a commentator on ESPN.  Freeman saw Defendant Pierce's May 26, 2021 and May 28, 2021 promotions, respectively.  Each of these promotions, separately and taken together, induced Freeman to make his first and second purchases of EMAX Tokens on June 2, 2021.  Freeman is also aware of Defendant Brown's football career and off-field conduct, and he follows Brown's social media.  Freeman specifically saw Brown's May 29, 2021 promotion wherein Brown indicated that he wanted his next football contract to be paid in EMAX Tokens.  This promotion also caused Freeman to make his two separate purchases of EMAX Tokens on June 2, 2021.  Freeman is aware of Defendant Mayweather through several means and found Mayweather's promotions particularly influential on his decision to purchase EMAX Tokens.   First, Freeman regularly saw Mayweather at various events around Miami (*e.g.*, charity basketball games and night clubs).  Second, Freeman followed Mayweather's career throughout the years as a

world champion boxer.  Freeman specifically saw Mayweather's promotion of EthereumMax during the Bitcoin Miami conference (which were also promoted on the social media accounts for EthereumMax, Maher, and Davis), as well as the promotions of EMAX Tokens during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release.  Mayweather's statements and promotions of EthereumMax gave Freeman the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion dollar investment strategy.   These promotions from Defendant Mayweather and the Executive Defendants induced Freeman to make his third purchase of EMAX Tokens on June 6, 2021.  Freeman also saw Defendant Kardashian's May 30, 2021 and June 14, 2021 promotions of the EMAX Tokens.  Freeman often visited Club LIV during the Relevant Period and was particularly enticed by Kardashian's promotion to use EMAX Tokens there.  Furthermore, Freeman believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value.  Kardashian's promotions induced Freeman to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

339.   Freeman also followed the EthereumMax Instagram page during the Relevant Period and saw the promotions from the Executive Defendants that were posted on that platform.  Freeman specifically saw the May 16, 2021 post related to the "EthereumMax Pre-launch Kickoff," which promoted the growth of the EMAX Tokens and alluded to a relationship with Defendant Mayweather as a "knockout influencer."  Freeman also saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling.  Freeman reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team," as opposed to those insiders

like Defendant Maher.   Similarly, Freeman believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout.   The misleading statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Pierce, Mayweather, and Kardashian, caused Freeman to make his June 4, 2021 purchase of EMAX Tokens.   Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold while EMAX Tokens were being "burned" by the Executive Defendants, caused Freeman to retain his EMAX Token investment when he otherwise would not have done so.

340.   Plaintiff Brignol follows professional sports, in particular boxing and basketball.   Brignol regularly watched Defendant Pierce when the latter played professionally and then as a commentator on ESPN.   Brignol also followed Pierce's social media accounts and saw Defendant Pierce's May 26, 2021 and May 28, 2021 promotions, respectively.   These promotions induced Brignol to make her first purchases of EMAX Tokens on May 29, 2021 and May 31, 2021 (made in four separate transactions).   Brignol also follows Defendant Mayweather's career and social media accounts.   Brignol specifically saw Mayweather's promotions of EthereumMax on the lead up and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release.   Mayweather's statements and promotions of EthereumMax gave Brignol the false impression that Mayweather was more than a celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens, and that he was making this particular cryptocurrency a part of his multimillion-dollar investment strategy.   These promotions induced Brignol to make her fifth and final purchase of EMAX Tokens on June 8, 2021.   Brignol also followed Defendant

Kardashian's social media accounts and saw Kardashian's May 30, 2021 and June 14, 2021 promotions of the EMAX Tokens.  Brignol often visited Club LIV during the Relevant Period and was particularly enticed by Kardashian's promotion to use EMAX Tokens there.  Furthermore, Brignol believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause her current investments in EMAX Tokens to correspondingly increase in value.  Kardashian's promotions induced Brignol to continue to hold on to his investment in EMAX Tokens when she otherwise would not have done so.

341.  Brignol also followed the EthereumMax Instagram page during the Relevant Period and saw the promotions from the Executive Defendants that were posted on that platform.  Brignol specifically saw the May 16, 2021 post related to the "EthereumMax Pre-launch Kickoff," which promoted the growth of the EMAX Tokens and alluded to a relationship with Defendant Mayweather as a "knockout influencer."  Brignol also saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling.  Freeman reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team," as opposed to those insiders like Defendant Maher.  Similarly, Brignol believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout.  The misleading statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Pierce, Mayweather, and Kardashian, caused Freeman to make her May 29, 2021 and May 31, 2021, and June 8, 2021 purchases of EMAX Tokens.  Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value her investments in EMAX Tokens would receive if she continued to hold while EMAX Tokens were being

1   "burned" by the Executive Defendants, caused Brignol to retain her EMAX Token
2   investment when she otherwise would not have done so.

3       342.   To establish an unfair practice, the plaintiff must show that it is "one that
4   'offends established public policy' and one that is 'immoral, unethical, oppressive,
5   unscrupulous or substantially injurious to consumers.'" *Marrache v. Bacardi U.S.A.,*
6   *Inc.*, 17 F.4th 1084, 1098 (11th Cir. 2021) (quoting *PNR*, 842 So. 2d at 777); *see also*
7   *CMR Constr. & Roofing, LLC v. UCMS, LLC*, No. 21-11183, 2022 WL 3012298, at
8   *4 (11th Cir. July 29, 2022).

9       343.   Defendants engaged in business acts and practices deemed "deceptive"
10  because of the conduct, statements, and omissions described above, including, but
11  not limited to, the following:

12      (a)   knowingly   and   intentionally   concealing   the   Executive
13  Defendants' specific roles and ownership interests in EthereumMax;

14      (b)   failing to disclose that the huge increase in price of the EMAX
15  Tokens during first days following launch were caused by manipulation by the
16  Executive Defendants instead of being due to an organic increase in interest from
17  investors;

18      (c)   leading investors to believe that the EMAX Token would be
19  available for use as a payment at select locations when there was no such capability;
20  and

21      (d)   knowingly and intentionally using and/or failing to disclose the
22  use of the Promotor Defendants to "instill trust" in uninformed investors to promote
23  the financial benefits of a highly speculative and risky investment in EMAX Tokens,
24  in an effort to manipulate and artificially inflate the price and trading volume of the
25  EMAX Tokens and allow Defendants to sell their EMAX Tokens at those inflated
26  prices.

27
28

344.   The Executive Defendants did not disclose that the EMAX Token developer held the number one rank with 23% ownership interest.  Nor did they disclose until much later that the Executive Defendants had purposefully chosen not to lock the wallets of the EthereumMax insiders.  Nahlah, Freeman, Puda, and Brignol each would have found it material to their decision to purchase EMAX Tokens to know whether or not insiders had significant percentages of the available Float of EMAX Tokens with the ability to sell freely those EMAX Tokens and create massive downward pressure.  Likewise, had Nahlah, Freeman, Puda, and Brignol each been made aware of that information at the times of their respective purchases, as well as the later-revealed admission from Gentile that the Executive Defendants had chosen not to "lock the wallets" (which gives the ten original founding members, including Defendant Maher who held 5%, the ability to sell off their portions of EMAX Tokens without restriction) it would have altered each of their decisions to both purchase the EMAX Tokens for the price they paid as well and hold on to those EMAX Tokens when they otherwise would not have done so.

345.   These acts and omissions constitute both deceptive and unfair trade practices because the false representations and omissions made by Defendants have a tendency or capacity to deceive consumers, such as Plaintiffs, into investing in the EMAX Tokens to their collective financial detriment.  Such conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

346.   Had the Promoter Defendants disclosed the omitted information, Nahlah, Freeman, Puda, and Brignol would have been aware of it because (a) they saw the actual promotions by the Executive Defendants and Promoter Defendants Pierce, Brown, Mayweather, and Kardashian and would have concurrently seen any disclosure on the promotions themselves had it been included, and (b) because they each follow, directly or indirectly, the social media accounts of, and news reports on, Promoter Defendants Pierce, Mayweather, and Kardashian.

347.  As a direct and proximate result of Defendants' deceptive trade practices, Plaintiffs Nahlah, Freeman, Puda, and Brignol, and the members of the class, suffered damages.  The activities of the Executive Defendants and Promoter Defendants Pierce, Brown, Mayweather, and Kardashian caused Plaintiffs Nahlah, Freeman, Puda, and Brignol, and the members of the Class to purchase and/or hold the EMAX Tokens when they otherwise would not have done so.

348.  The materially false statements and omissions as described above, and the fact that this was a misleading investment, were unfair, unconscionable, and deceptive practices perpetrated on Plaintiffs which would have likely deceived a reasonable person under the circumstances.

349.  Defendants were on notice at all relevant times that the false representations of material facts described above were being communicated to prospective investors (such as Plaintiffs) by their authorized agents.

350.  As a result of the false representations and violations of the laws described above, Plaintiffs have been damaged by, among other things, overpaying for the EMAX Tokens that were artificially inflated by Defendants.

351.  Plaintiffs have also been damaged in other and further ways subject to proof at trial.  For example, an injury under FDUPTA is found when "the [defendant] made an allegedly misleading advertisement by making an offer or promise which the [defendant] did not intend to keep." *Stires v. Carnival Corp.*, No. 6:02-CV-542-ORL31JGG, 2003 WL 21356781, at *2 (M.D. Fla. Jan. 2, 2003).  As alleged herein, the Executive Defendants and Promoter Defendant Kardashian promoted the ability to use the EMAX Tokens as an accepted payment method at Club LIV, which was later disclosed to not have been possible due to supposed technical complexity that apparently had not been addressed prior to promising investors that they could use EMAX Tokens to purchase goods and services at Club LIV.  As noted above,

1  Plaintiffs Nahlah, Freeman, Puda, and Brignol all patronized Club LIV in Miami and
2  were induced to purchase EMAX Tokens because of these particular promotions.

3      352.  The statements from Executive Defendants and Promoter Defendants
4  Pierce, Mayweather, and Kardashian are actionable and not puffery.  Under Florida
5  law, "'specific and measurable claims' are not puffery 'and may be the subject of
6  deceptive advertising claims.'"  *Wyndham Vacation Ownership v. Reed Hein &*
7  *Assocs., LLC*, No. 618CV02171GAPDCI, 2019 WL 3934468, at *6 (M.D. Fla. Aug.
8  20, 2019) (citing *Fed. Trade Comm'n v. World Patent Mktg., Inc*., No. 17-CV-20848,
9  2017 WL 3508639, at *12 (S.D. Fla. Aug. 16, 2017)); *Luczak v. Nat'l Beverage*
10  *Corp*., 812 F. App'x 915, 925 (11th Cir. 2020) (finding that certain statements were
11  actionable because, while National Beverage's statements expressed optimism, they
12  did so by citing to specific strategies and metrics the company said it was using).
13  And while statements of opinion and puffery (*i.e*., exaggerated advertising,
14  blustering, and boasting upon which no reasonable buyer would rely) are not
15  actionable, a statement of opinion may be actionable if it "'fairly implies a [factual]
16  basis.'"  *Duty Free Americas, Inc. v. Estee Lauder Cos., Inc*., 797 F.3d 1248, 1277
17  (11th Cir. 2015) (quoting *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1311 (11th
18  Cir. 2010) (alteration in original).  As the Eleventh Court observed: "A conclusion
19  that a statement constitutes puffery doesn't absolve the reviewing court of the duty
20  to consider the possibility — however remote — that in context and in light of the
21  'total mix' of available information, a reasonable investor might nonetheless attach
22  importance to the statement."  *Carvelli v. Ocwen Fin. Corp*., 934 F.3d 1307, 1320–
23  21 (11th Cir. 2019).

24      353.  As alleged further above, Perone's May 16, 2021 Pre-launch Kickoff
25  post stated, among other things, that (1) EMAX Tokens were up "500,000+% in the
26  first 24 hours"; (2) the Executive Defendants had "locked in partnership with global
27  digital marketing agency" and "lined up a knockout influencer" for a "nationwide

28

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

campaign"; and (3) "We are 3 days in with ~$100M market cap and the train is just getting rolling." These statements from Executive Defendants are specific and measurable, and they relate to specific strategies and metrics the Company said it was using to encourage purchases and increase the price of the EMAX Tokens. At the same time, the Executive Defendants Maher and Speer, with Promoter Defendant Davis, each failed to disclose that these metrics were the result of the failed launch that allowed insiders, including but not limited to Maher, to disproportionately increase the price of the EMAX Tokens with their early trades.

354. Taken together the misleading statements and omissions of the Executive Defendants and Promoter Defendants Davis, Pierce, Brown, Mayweather, and Kardashian contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of EMAX Tokens.

355. Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under Florida law.

356. Pursuant to Fla. Stat. §§501.211(1) and 501.2105, Plaintiffs are entitled to recover from Defendants the reasonable amount of attorneys' fees Plaintiffs have had to incur in representing their interests in this matter.

## SIXTH CAUSE OF ACTION

### Violation of New York's General Business Law
### Art. 22-A, §349, *et seq*.
### (Against the Executive Defendants and Promoter Defendants Pierce, Brown, Mayweather, and Kardashian)

357. Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein, and further allege as follows:

358. Plaintiffs Huegerich and Ciklic are residents of the State of New York.

359.   Plaintiffs Huegerich and Ciklic paid for or purchased EMAX Tokens in New York and thus the deceptive transactions alleged herein occurred in New York.

360.   At all relevant and material times as described herein, the Executive Defendants and Promoter Defendants Brown, Mayweather, and Kardashian were engaged in "the conduct of any business, trade or commerce" in New York within the meaning of New York General Business Law ("GBL") §349 with respect to the act alleged herein.

361.   Section 349 proscribes "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]," N.Y. Gen. Bus. Law §349(a), and, further, provides a private right of action to "any person who has been injured by reason of any violation of th[e] section." *Id.*, §349(h). Although "[j]ustifiable reliance by the plaintiff is not an element of [a §349] claim" (*Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 676 (N.Y. 2012)), a plaintiff under that statute must ultimately "prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000); *see also Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014) (same).  Nevertheless, "an action under §349 is not subject to the pleading-with-particularity requirements of Rule 9(b) . . . but need only meet the bare-bones notice-pleading requirements of Rule 8(a)." *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005).

362.   In assessing whether an act is materially misleading, the inquiry is whether, objectively, the act is "'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20 (1995)).

363. At the threshold, a plaintiff must demonstrate that the §349 claim implicates "'consumer oriented'" conduct by the defendant. *Gaidon v. Guardian Life Ins. Co.*, 94 N.Y.2d 330 (1999). Under New York law, a deceptive act or practice "'that ha[s] "a broader impact on consumers at large"'" meets this threshold test. *Shapiro v. Berkshire Life Ins. Co.*, 212 F.3d 121, 126 (2d Cir. 2000) ("A 'deceptive act or practice' has been defined as a representation or omission 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'") (citing *Oswego Laborers*, 85 N.Y.2d at 26).

364. Plaintiff Huegerich is a lifelong fan of professional sports, particularly football and boxing. Huegerich is aware of Defendant Brown's football career and off-field conduct, and he specifically saw Brown's May 29, 2021 promotion wherein Brown indicated that he wanted his next football contract to be paid in EMAX Tokens. Additionally, Huegerich follows Defendant Mayweather's career and social media accounts. Huegerich specifically saw Mayweather's promotion of EthereumMax during the Bitcoin Miami conference, as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release. Each of these promotions induced Huegerich to purchase EMAX Tokens on June 6, 2021. Huegerich also follows Defendant Kardashian on Instagram and saw her June 14, 2021 promotion of the EMAX Tokens. Huegerich believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value. Kardashian's promotion induced Huegerich to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

365. Huegerich also followed the EthereumMax Instagram page during the Relevant Period and saw the promotions from the Executive Defendants that were posted on that platform. Huegerich specifically saw the June 3, 2021 post regarding

the EMAX Token price volatility that came from insider selling. Huegerich reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team." Similarly, Huegerich believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout. The misleading statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Brown, Mayweather, and Kardashian, induced Huegerich to make his June 6, 2021 purchase of EMAX Tokens. Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Huegerich to retain his EMAX Token investment when he otherwise would not have done so.

366.  Plaintiff Ciklic is a lifelong fan of professional sports, particularly football and boxing. Ciklic regularly watched Defendant Pierce when the latter played professionally and then as a commentator on ESPN. Ciklic also followed Pierce's social media accounts and saw Defendant Pierce's May 26, 2021, and May 28, 2021 promotions, respectively. Ciklic is aware of Defendant Brown's football career and off-field conduct, and he saw Brown's May 29, 2021 promotion wherein Brown indicated that he wanted his next football contract to be paid in EMAX Tokens. Additionally, Ciklic follows Defendant Mayweather's career and social media accounts. Ciklic specifically saw Mayweather's promotion of EthereumMax during the Bitcoin Miami conference, as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul, including the 5/28/21 Press Release. These promotions by Pierce, Brown, and Mayweather induced Ciklic to make two purchases of EMAX Tokens on May 28, 2021 and May 29, 2021

as a result. Ciklic is also aware of Defendant Kardashian from her reality television show and renowned business savvy, and Ciklic saw Kardashian's May 30, 2021 promotion of the EMAX Tokens being accepted as payment at Club LIV.  Ciklic knew about the high-end status of Club LIV during the Relevant Period and was particularly enticed by Kardashian's promotion to use EMAX Tokens there.  Ciklic also saw Kardashian's June 14, 2021 promotion of the EMAX Tokens.  Ciklic believed Kardashian's promotion and statements about the number of tokens being burned as indicating that the decrease in supply would cause his current investments in EMAX Tokens to correspondingly increase in value.  Kardashian's These promotions from Kardashian and Mayweather induced Ciklic to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so.

367.  Ciklic also followed the EthereumMax Instagram page during the Relevant Period and saw the promotions from the Executive Defendants that were posted on that platform.  Ciklic specifically saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling.  Ciklic reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team." Similarly, Ciklic believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout.  The misleading statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Brown, Mayweather, and Kardashian, induced Ciklic to make his June 6, 2021 purchase of EMAX Tokens. Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused Ciklic to retain his EMAX Token investment when he otherwise would not have done so.

368.   For the reasons discussed herein, Defendants violated and continued to violate Section 349(a) of the New York General Business Law by engaging in the herein described unfair or deceptive acts or practices.  Defendants' acts and practices, including the material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

369.   Defendants engaged in deceptive acts and practices under New York law by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including but not limited to, in the following ways:

(a)    knowingly and intentionally concealing the Executive Defendants' specific roles and ownership interests in EthereumMax;

(b)    failing to disclose that the huge increase in price of the EMAX Tokens during the first days following launch were caused by manipulation by the Executive Defendants instead of being due to an organic increase in interest from investors;

(c)    failing to disclose that EMAX Tokens were not being accepted as a payment and would not be at any point in the foreseeable future; and

(d)    knowingly and intentionally using and/or failing to disclose the use of the Promotor Defendants to "instill trust" in uninformed investors to promote the financial benefits of a highly speculative and risky investment in EMAX Tokens, in an effort to manipulate and artificially inflate the price and trading volume of the EMAX Tokens and allow Defendants to sell their EMAX Tokens at those inflated prices.

370.  The Executive Defendants did not disclose that the EMAX Token developer held the number one rank with 23% ownership interest.  Nor did they disclose until much later that the Executive Defendants had purposefully chosen not to lock the wallets of the EthereumMax insiders.  Huegerich would have found it

material to his decision to purchase EMAX Tokens to know whether or not insiders had significant percentages of the available Float of EMAX Tokens with the ability to sell freely those EMAX Tokens and create massive downward pressure. Likewise, had Huegerich and Ciklic been made aware of that information at the times of their purchases, as well as the later-revealed admission from Gentile that the Executive Defendants had chosen not to "lock the wallets" (which gives the ten original founding members, including Defendant Maher who held 5%, the ability to sell off their portions of EMAX Tokens without restriction), it would have altered their respective decisions to both purchase the EMAX Tokens for the price they each paid as well and hold on to those EMAX Tokens when they otherwise would not have done so.

371. The facts that the Executive Defendants and Promoter Defendants Brown, Mayweather, and Kardashian misrepresented and concealed were material to the decisions of Plaintiff Huegerich and Ciklic and the members of the New York Class about whether to pay for or purchase EMAX Tokens (at all or for the price he paid), in that he would not have proceeded with his transactions but for the deceptive, fraudulent, and false acts and practices.

372. The Executive Defendants and Promoter Defendants Brown, Mayweather, and Kardashian intended for Plaintiff Huegerich and the members of the New York Class to pay for EMAX Tokens in reliance upon their deceptive and fraudulent acts and practices.

373. Had the Promoter Defendants disclosed the omitted information, Huegerich and Ciklic would have been aware of it because (a) they saw the actual promotions by Promoter Defendants Brown, Mayweather, and Kardashian and would have concurrently seen any disclosure on the promotions themselves had it been included, and (b) because they follow, directly or indirectly, the social media

1  accounts of, and news reports on, Promoter Defendants Pierce, Brown, Mayweather,
2  and Kardashian.

3      374.  As a direct and proximate result of Defendants' unlawful, unfair, and
4  deceptive practices, Plaintiffs and Class members suffered damages.  The Executive
5  Defendants' activities with the Promoter Defendants caused Plaintiffs and the Class
6  members to purchase and/or hold the EMAX Tokens when they otherwise would not
7  have done so.

8      375.  The statements from Executive Defendants and Promoter Defendants
9  Pierce, Mayweather, and Kardashian are actionable and not puffery.  Puffery in the
10  Second Circuit includes "'generalized or exaggerated statements which a reasonable
11  consumer would not interpret as a factual claim upon which he could rely.'" *Lugones*
12  *v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 241 (S.D.N.Y. 2020)
13  (discussing puffery in context of GBL §349 claim).  It can also include "'an
14  exaggeration or overstatement expressed in broad, vague, and commendatory
15  language, as distinguished from misdescriptions or false representations of specific
16  characteristics of a product.'"  *Id*.  Significantly, even if certain statements would be
17  non-actionable on their own, where there are multiple statements at issue, courts must
18  consider "'as a whole.'"  *Id.* ("'The entire mosaic is viewed rather than each tile
19  separately.'") (quoting *Belfiore v. Procter & Gamble Co*., 311 F.R.D. 29, 53
20  (E.D.N.Y. 2015)); *see also In re Gen. Motors LLC Ignition Switch Litig*., 257 F. Supp.
21  3d 372, 457 (S.D.N.Y. 2017) (holding that, when "'viewed in isolation'" some
22  statements may constitute puffery, but "when viewed in conjunction with other
23  allegations in the [complaint] . . . many of these statements cross the line from mere
24  puffery to active misrepresentations").

25      376.  As alleged further above, Perone's May 16, 2021 Pre-launch Kickoff
26  post stated, among other things, that (1) EMAX Tokens were up "500,000+% in the
27  first 24 hours"; (2) the Executive Defendants had "locked in partnership with global

28

digital marketing agency" and "lined up a knockout influencer" for a "nationwide campaign"; and (3) "We are 3 days in with ~$100M market cap and the train is just getting rolling."  These statements from Executive Defendants are specific, detailed factual assertions the Executive Defendants were using to encourage purchases and increase the price of the EMAX Tokens.  At the same time, the Executive Defendants Maher and Speer, with Promoter Defendant Davis each knowingly failed to disclose that these metrics were the result of the failed launch that allowed insiders, including but not limited to Maher, to disproportionately increase the price of the EMAX Tokens with their early trades.

377.   Taken together the misleading statements and omissions of the Executive Defendants and Promoter Defendants Pierce, Brown, Mayweather, and Kardashian contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of EMAX Tokens.

378.   Pursuant to GBL §349(h), Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under New York law.

379.   In addition, Plaintiffs are entitled to reasonable attorney's fees and exemplary damages not exceeding three times the value of the consideration given by the consumer, and any other relief this Court determined is appropriate.  *See* GBL §349(h).

### SEVENTH CAUSE OF ACTION

**Violation of New Jersey Consumer Fraud Act ("NJCFA")**
**NJSA §§56:8-1 to 156**
**(Against the Executive Defendants and Promoter Defendants**
**Mayweather and Kardashian)**

380.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein and further alleges as follows:

381.   Plaintiff DeLuca is a resident of the State of New Jersey.

382.   Plaintiff DeLuca paid for or purchased EMAX Tokens in New Jersey and thus the deceptive transactions alleged herein occurred in New Jersey.

383.   Defendants sell "merchandise," as defined by N.J. Stat. Ann. §§56:8-1(c) & (e).

384.   The NJCFA authorizes "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act" to bring a private action.  N.J. Stat. Ann. §56:8-19.

385.   The NJCFA prohibits unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, as well as the knowing concealment, suppression, or omission of any material fact with the intent that others rely on the concealment, omission, or fact, in connection with the sale or advertisement of any merchandise.

386.   Under New Jersey law, NJCFA claims should be construed liberally in favor of consumers. *See Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 461 (N.J. 1994); *Barry v. Arrow Pontiac, Inc.*, 494 A.2d 804, 810-11 (N.J. 1985).

387.   There are three elements a plaintiff must show to state a prima facie case under the NJCFA: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss. *See Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) (citing *Cox*, 647 A.2d at 462-65).  There are three general types of "'[u]nlawful practices'": "'affirmative acts, knowing omissions, and regulation violations.'" *Id.* (quoting *Cox*, 647 A.2d at 462).  A plaintiff asserting a claim based on an omission must demonstrate that the defendant "(1) knowingly concealed (2) a material fact (3) with the intention that plaintiff rely upon the

1    concealment." *Judge v. Blackfin Yacht Corp*., 815 A.2d 537, 541 (N.J. Super. Ct.

2    App. Div. 2003); *see also* N.J. Stat. Ann. §56:8-2.

3          388.   To establish that information withheld was "material," a plaintiff needs

4    to show that "'a reasonable [person] would attach importance to its existence in

5    determining his [or her] choice of action.'" *Coba v. Ford Motor Co*., 932 F.3d 114,

6    125-26 (3d Cir. 2019) (quoting *Suarez v. E. Int'l Coll*., 50 A.3d 75, 89 (N.J. Super.

7    Ct. App. Div. 2012).  An "'unconscionable commercial practice'" is "'an amorphous

8    concept obviously designed to establish a broad business ethic.'"  The standard of

9    conduct that the term "'unconscionable'" implies is lack of "'good faith, honesty in

10   fact and observance of fair dealing.'"  *Cox*, 647 A.2d at 462 (quoting *Kugler v.

11   Romain*, 279 A.2d 640, 652 (N.J. 1971).

12         389.   Plaintiff DeLuca is a lifelong fan of professional sports, particularly

13   boxing.  DeLuca is aware of Defendant Mayweather's career as a world champion

14   boxer.  DeLuca specifically saw Mayweather's promotion of EthereumMax and the

15   EMAX Tokens in the lead up to and during the pay-per-view fight with Logan Paul,

16   including the 5/28/21 Press Release.  Mayweather's statements and promotions of

17   EthereumMax gave DeLuca the false impression that Mayweather was more than a

18   celebrity endorser but rather that he was an actual backer/investor in EMAX Tokens,

19   and that he was making this particular cryptocurrency a part of his multimillion-dollar

20   investment strategy.  DeLuca is also familiar with Defendant Kardashian's reality

21   television show and her renowned business savvy.  DeLuca saw Kardashian's May

22   30, 2021 promotion of the EMAX Tokens being accepted as payment at Club LIV.

23   DeLuca knew about the high-end status of Club LIV during the Relevant Period and

24   was particularly enticed by Kardashian's promotion to use EMAX Tokens there.

25   These promotions by Mayweather and Kardashian induced DeLuca to purchase

26   EMAX Tokens on June 2, 2021 and June 5, 2021 as a result.

27

28

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

390.   DeLuca also followed the news and updates on EthereumMax, which he accesses through various social media platforms like Telegram, Reddit, and Twitter during the Relevant Period and saw the promotions from the Executive Defendants that were posted.  DeLuca specifically saw the June 3, 2021 post regarding the EMAX Token price volatility that came from insider selling.  DeLuca reasonably believed that the price drop on EMAX Tokens only came from "a handful of larger wallets" of "early investors" who were "not part of the development team."  Similarly, DeLuca believed the statements that EthereumMax would still be accepted as a payment at David Grutman's venues at a future date, despite the issues that caused the delay of the rollout.   The misleading statements and omissions within the June 3, 2021 Instagram post from the Executive Defendants, in conjunction with the above-mentioned promotions from Defendants Mayweather and Kardashian, induced DeLuca to make his June 2, 2021 and June 5, 2021 purchases of EMAX Tokens. Similarly, this post, in conjunction with Defendant Kardashian's posts regarding the ability to use EMAX Tokens as an accepted payment and the increase in value his investments in EMAX Tokens would receive if he continued to hold, caused DeLuca to retain his EMAX Token investment when he otherwise would not have done so.

391.   Defendants engaged in deceptive acts and practices under New Jersey law by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including but not limited to, in the following ways:

(a)   knowingly and intentionally concealing the Executive Defendants' specific roles and ownership interests in EthereumMax;

(b)   failing to disclose that the huge increase in price of the EMAX Tokens during the first days following launch were caused by manipulation by the Executive Defendants instead of being due to an organic increase in interest from investors;

1       (c)     failing to disclose that EMAX Tokens were not being accepted as

2  a payment and would not be at any point in the foreseeable future; and

3       (d)     knowingly and intentionally using and/or failing to disclose the

4  use of the Promotor Defendants to "instill trust" in uninformed investors to promote

5  the financial benefits of a highly speculative and risky investment in EMAX Tokens,

6  in an effort to manipulate and artificially inflate the price and trading volume of the

7  EMAX Tokens and allow Defendants to sell their EMAX Tokens at those inflated

8  prices.

9       392.   The Executive Defendants did not disclose that the EMAX Token

10  developer held the number one rank with 23% ownership interest.  Nor did they

11  disclose until much later that the Executive Defendants had purposefully chosen not

12  to lock the wallets of the EthereumMax insiders.  DeLuca would have found it

13  material to his decisions to purchase EMAX Tokens to know whether or not insiders

14  had significant percentages of the available Float of EMAX Tokens with the ability

15  to sell freely those EMAX Tokens and create massive downward pressure.  Likewise,

16  had DeLuca been made aware of that information at the times of his purchases, as

17  well as the later-revealed admission from Gentile that the Executive Defendants had

18  chosen not to "lock the wallets" (which gives the ten original founding members,

19  including Defendant Maher who held 5%, the ability to sell off their portions of

20  EMAX Tokens without restriction) it would have altered DeLuca's decision to both

21  purchase the EMAX Tokens for the price he paid as well and hold on to those EMAX

22  Tokens when he otherwise would not have done so.

23      393.   The facts that the Executive Defendants and Promoter Defendants

24  Mayweather and Kardashian misrepresented and concealed were material to the

25  decisions of Plaintiff DeLuca and the members of the New Jersey Class about

26  whether to pay for or purchase EMAX Tokens (at all or for the price they paid), in

27

28

135

that they would not have proceeded with their transactions but for the deceptive, fraudulent and false acts and practices.

394. The Executive Defendants and Promoter Defendants Mayweather and Kardashian intended for Plaintiff DeLuca and the members of the New Jersey Class to pay for EMAX Tokens in reliance upon their deceptive and fraudulent acts and practices.

395. Had the Promoter Defendants disclosed the omitted information, DeLuca would have been aware of it because (a) he saw the actual promotions by Promoter Defendants Mayweather and Kardashian and would have concurrently seen any disclosure on the promotions themselves had it been included, and (b) he follows, directly or indirectly, the social media accounts of, and news reports on, Promoter Defendants Mayweather and Kardashian.

396. As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages. The Executive Defendants' activities with the Promoter Defendants caused Plaintiff DeLuca and the Class members to purchase (at all or at the premium price he paid) and/or hold the EMAX Tokens when they otherwise would not have done so. An ascertainable loss must be "quantifiable or measurable," but a plaintiff need not demonstrate an out-of-pocket loss where a diminution in the value of a product can be "'calculated within a reasonable degree of certainty.'" *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 793 (N.J. 2005) (citation omitted).

397. The statements from Executive Defendants and Promoter Defendants Mayweather and Kardashian are actionable and not puffery. "'The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions.'" *Hammer v. Vital Pharm., Inc.*, Civ. No. 11-4124, 2012 WL 1018842, at *6-*8 (D.N.J. Mar. 26, 2012) (citation omitted). New Jersey courts have held that "[e]ven if an advertisement is literally true, it may be actionable if "the

overall impression [it] create[s] . . . is misleading and deceptive to an ordinary reader.'" *Conner v. Perdue Farms, Inc*., No. CIV.A. 11-888, 2013 WL 5977361, at *6 (D.N.J. Nov. 7, 2013) (quoting *Union Ink Co., Inc. v. AT&T Corp.*, 801 A.2d 361, 379 (N.J. Super. Ct. App. Div. 2002).  Indeed, "'a claim of literal truth will not constitute a defense to a charge that the overall impression created by an advertisement is misleading and deceptive to an ordinary reader.'"  *Id*. (quoting *Miller v. Am. Fam. Publishers*, 663 A.2d 643, 653-54 (N.J. Super. Ct. Ch. Div. 1995). Thus, even a finding of literal accuracy will not bar a conclusion that a misleading or deceptive statement violates the Consumer Fraud Act.  *See id*. at 85.  As the *Miller* court explained:

> "To determine whether an advertisement or solicitation makes a false or misleading representation, the court must consider the effect that the advertisement, taken as a whole, would produce on one with an ordinary and unsuspecting mind.  A court must consider the implications of an advertisement because, if it is designed to deceive the reader, an advertisement 'may be completely misleading' even if 'every sentence separately considered is literally true.'  Taking an advertisement or solicitation as a whole means considering not only what it states literally, but also what it reasonably implies."

*Miller*, 663 A.2d at 653 (citation omitted).

398.   As alleged further above, Perone's May 16, 2021 Pre-launch Kickoff post stated, among other things, that (1) EMAX Tokens were up "500,000+% in the first 24 hours"; (2) the Executive Defendants had "locked in partnership with global digital marketing agency" and "lined up a knockout influencer" for a "nationwide campaign"; and (3) "We are 3 days in with ~$100M market cap and the train is just getting rolling."  These statements from Executive Defendants are specific, detailed factual assertions the Executive Defendants were using to encourage purchases and increase the price of the EMAX Tokens.  At the same time, the Executive Defendants Maher and Speer, with Promoter Defendant Davis each failed to disclose that these metrics were the result of the failed launch that allowed insiders, including but not

limited to Maher, to disproportionately increase the price of the EMAX Tokens with their early trades.

399.   Taken together the misleading statements and omissions of the Executive Defendants and Promoter Defendants Mayweather and Kardashian contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of EMAX Tokens.

400.   As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiffs and Class members suffered damages.  Defendants' activities caused Plaintiffs and the Class members to purchase and/or retain the EMAX Tokens when they otherwise would not have done so.

401.   Pursuant to NJSA §§56:8-1 to 156, Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under New Jersey law.

402.   In addition, Plaintiffs are entitled to reasonable attorney's fees and an exemplary damages award of threefold the damages suffered by Plaintiffs and the Class Members.  *See* N.J. Stat. Ann. §56:8-19.

## **EIGHTH CAUSE OF ACTION**

**Violations of California Corporate Securities Law of 1968**
**Cal. Corp. Code §§25110 & 25503**
**(Qualification)**
**(Against the Company and Executive Defendants)**

403.   Plaintiffs on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-422, and further alleges as follows:

404.   Plaintiffs bring this claim individually and on behalf of the members of the California Subclass against the Executive Defendants and the Company.

405.   Each of the Executive Defendants (both before and after the Company was incorporated) and the Company (from the time of incorporation) are the primary violators under this cause of action.

406.   The EMAX Tokens are securities within the meaning of the California Corporations Code.

407.   The EMAX Tokens were and are required to be registered with the Commissioner of Corporations under California law.

408.   Section 25110 (similar to a Section 12(a)(1) claim under the federal securities law) makes it illegal, in connection with the purchase or sale of any security, for any person, directly or indirectly, to offer or sell a security in California "unless such security or transaction is exempted or not subject to qualification under Chapter 1 (commencing with Section 25100) of this part."  Further, the offer or sale of such a security "in a manner that varies or differs from, exceeds the scope of, or fails to conform with either a material term or material condition of qualification of the offering . . . shall be an unqualified offer or sale."  Cal. Corp. Code §25110.

409.   Section 25503 establishes a private remedy for damages under Section 25110 of the California Corporations Code.  In particular, violators of Section 25110 "shall be liable to any person acquiring from them the security sold in violation of that section, who may sue to recover the consideration they paid for that security with interest thereon at the legal rate, and reasonable attorney's fees, less the amount of any income received therefrom, upon the tender of that security, or for damages, if they no longer own the security, or if the consideration given for the security is not capable of being returned."  In the event that the plaintiff no longer owns the security, damages "shall be equal to the difference between (a) the purchase price plus interest at the legal rate from the date of purchase, plus reasonable attorney's fees, and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff."  Cal. Corp. Code §25503.

410.   Conversely, Section 25503 provides that, if the consideration given for the security is not capable of being returned then damages shall be equal to the value of that consideration plus interest at the legal rate from the date of purchase, provided the security is tendered, plus reasonable attorney's fees; and if the plaintiff no longer owns the security, damages in that case shall be equal to the difference between (a) the value of the consideration given for the security plus interest at the legal rate from the date of purchase, plus reasonable attorney's fees; and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff.  *Id.*

411.   Under Section 25503, "[a]ny person on whose behalf an offering is made and any underwriter of the offering, whether on a best efforts or a firm commitment basis, shall be jointly and severally liable under this section."

412.   The EMAX Tokens have not been registered with the Commissioner, are not exempt from registration, and are not federally covered.  No registration statements have been filed with any state or federal government entity or have been in effect with respect to any of the offerings alleged herein.

413.   The Company, Promoter Defendant Pierce, and each of the Executive Defendants, by engaging in the conduct described above, directly or indirectly, sold and/or offered to sell securities.

414.   Plaintiffs purchased EMAX Tokens securities from the Company, Executive Defendants and/or Promoter Defendant Pierce.  The EMAX Tokens were provided and/or sold into the EthereumMax liquidity pool by Executive Defendants Perone, Maher, and Rechnitz (as well as Pierce). Upon information and belief, given the limited and measurable amount of individuals selling or providing the cryptocurrency to the EMAX Tokens liquidity pool, a large portion (if not all) of the EMAX Tokens liquidity pool were provided by Executive Defendants Perone, Maher, and Rechnitz.  Similarly, Pierce provided EMAX Tokens to the liquidity

pools when selling the tokens he was paid for his promotions. These actions coincided with Plaintiffs and Class members transacting with the liquidity pools as buyers. Thus, by providing EMAX Tokens to the liquidity pool at the time in which Plaintiffs and the members of the Class made their EMAX Token purchases from the liquidity pool on Uniswap, privity between Defendants Perone (personally and through the Company), Maher, Rechnitz, and Pierce and Plaintiffs is established even in the absence of a direct contract linking the two parties.

415. Privity also exists between the issuers and suppliers of the liquidity in the pool (*e.g.*, Defendants Perone, Maher, Rechnitz, and Pierce) and all those making purchases (*e.g.* Plaintiffs and the members of the Class) from the Uniswap exchange because these Defendants are receiving the benefit of a 0.3% fee per EMAX Token transaction on that exchange.

416. By reason of the foregoing, each of the Executive Defendants have violated Sections 25110 and 25503 of the California Corporations Code.

## <u>NINTH CAUSE OF ACTION</u>

**Violations of California Corporate Securities Law of 1968
Cal. Corp. Code §§25400 and 25500
(Manipulation Sections)
(Against Executive Defendants Perone, Rechnitz and Maher,
Promoter Defendants Davis and Pierce, and the Company)**

417. Plaintiffs on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-434, and further alleges as follows:

418. Plaintiffs bring this claim individually and on behalf of the members of the California Subclass against Individual Defendants Perone, Rechnitz, Maher, Davis, and Pierce, and the Company.

419. Section 25400 makes it illegal, in connection with the purchase or sale of any security, for any person in California, directly or indirectly, "[f]or the purpose

of creating a false or misleading appearance of active trading in any security or a false or misleading appearance with respect to the market for any security, (1) to effect any transaction in a security which involves no change in the beneficial ownership thereof, or (2) to enter an order or orders for the purchase of any security with the knowledge that an order or orders of substantially the same size, at substantially the same time and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or (3) to enter an order or orders for the sale of any security with the knowledge that an order or orders of substantially the same size, at substantially the same time and at substantially the same price, for the purchase of any such security, has been or will be entered by or for the same or different parties. Cal. Corp. Code §25400(a). It is similarly unlawful to effect, alone or with one or more other persons, a series of transactions in any security creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others. Cal. Corp. Code §25400(b).

420. Common examples of such manipulation are wash sales and matched orders. A wash sale is a fictitious sale where there is no change in beneficial ownership and thus no true economic consequence. A matched order occurs when orders are entered simultaneously to buy and sell the same security. Other illegal manipulative practices include, but are not limited to: transferring record ownership of securities in order to hide the true identity of the beneficial owner, which is known as "parking"; and executing a planned series of securities purchases that is specifically designed to artificially restrict the supply and thereby raise prices.

421. Manipulation can take many forms, but often has a number of common characteristics: (i) restriction of the "float" or floating supply of the securities in the public market; (ii) price leadership by the manipulator; (iii) dominating and

1   controlling the market for the security; and (iv) a collapse of the market for the

2   security after the manipulative activity has ceased.

3   422.   The Company and Individual Defendants Davis, Maher, and Perone,

4   directly or indirectly, singly or in concert, by the use of the means or instrumentalities

5   of interstate commerce, of the mails, for the purpose of creating a false or misleading

6   appearance of active trading in EMAX Tokens, or a false or misleading appearance

7   with respect to the market for the EMAX Tokens: (a) have engaged in wash sales of

8   EMAX Tokens which involved no change in the beneficial ownership thereof; (b)

9   have entered matched orders for the purchase of EMAX Tokens with the knowledge

10   that the orders of substantially the same size, at substantially the same time, and at

11   substantially the same price, for the sale of any such securities, had been or would be

12   entered by or for themselves or different parties; (c) have entered matched orders for

13   the sale of EMAX Tokens with the knowledge that an order or orders of substantially

14   the same size, at substantially the same time, and at substantially the same price, for

15   the purchase of any such securities had been or would be entered by or for themselves

16   or different parties; (d) have engaged in improper parking by transferring record

17   ownership of EMAX Tokens in order to hide the true identity of the beneficial owner;

18   and/or (e) have executed a planned series of securities purchases that was specifically

19   designed to artificially restrict the supply and thereby raise and/or decrease prices of

20   EMAX Tokens.

21   423.   As noted above, Defendant Maher, with the assistance and/or approval

22   of Defendants Davis and Perone, manipulated the price of EMAX Tokens by: (1)

23   effectively engaging in wash trading, (2) using matching buy and sell orders, and/or

24   (3) having executed a planned series of securities purchases that was specifically

25   designed to artificially restrict the supply and thereby raise and/or decrease prices of

26   EMAX Tokens in the early days of the EthereumMax launch in order to artificially

27   increase the price of the EMAX tokens and create the appearance of increased trading

28

activity.   Maher and Davis each made misleading statements regarding the exponential increase in the price of EMAX Tokens in the early days of the launch. Perone, having ownership/control over the Dev Wallet, personally or through his position as the de facto CEO of the yet-to-be-formed Company, facilitated Maher's wash trades and matching orders by providing Maher with access to the EMAX Token liquidity pool.  Perone, Maher, and the Company purposefully did not disclose to investors that the percentage increases that they were collectively touting was the result of price manipulation as opposed to real trading activity of EMAX Tokens.

424.   Likewise, Defendants Perone, Maher, Davis, Rechnitz, and Pierce, each engaged in improper parking by their use of various pass-through wallet addresses to obscure their respective ownership and control over the wallets and the digital assets within.

425.   Finally, Perone and the Company inappropriately executed a planned series of securities purchases that was specifically designed to artificially restrict the supply and thereby raise and/or decrease prices of EMAX Tokens.  The burning of portions of the circulating supply of EMAX Tokens by Perone and the Company was done to raise the actual price (and perceived value) of the EMAX Tokens.  Perone, through the Company's social media accounts, repeatedly used the promise of a token burn to induce investors to make a series of EMAX Tokens purchase under the belief that a token burn would decrease the supply of EMAX Tokens, which, in turn, would have a corresponding increase in the price of EMAX Tokens.

426.   These manipulations of the EMAX Token were part of the Defendants' goal of selling their unregistered securities to Plaintiffs and the Class at artificially inflated prices.  The collapse of the price of EMAX Tokens after the manipulative conduct alleged herein ceased further demonstrates that the Company and Individual Defendants Perone, Maher, Rechnitz, Davis, Pierce, and Mayweather violated Cal. Corp. Code, §25500(a)-(b).

427.   Plaintiffs and other members of the Class were damaged by relying on an assumption of an honest and fair market, free of manipulation, when buying and selling EMAX Tokens in the marketplace.

428.   The Company and Individual Defendants Perone, Maher, Rechnitz, Davis, and Pierce acted with scienter in connection with the manipulative acts alleged herein in that they acted knowingly and/or recklessly when they artificially inflated the trading volume and price of EMAX Tokens and thereby interfered with the market for EMAX Tokens.  Further, statements by Davis and Maher indicate that each of them knew that they were engaging in wash trading and matching orders.

429.   As a direct and proximate result of the wrongful conduct of the Company and Individual Defendants Davis, Maher, and Perone, Plaintiffs and other members of the Class were damaged as a result of their purchase or sale of EMAX Tokens.

430.   By reason of the foregoing, the Company and Individual Defendants Davis, Maher, and Perone have violated, and unless restrained and enjoined will again violate, Cal. Corp. Code, §25500(a)-(b).

431.   By virtue of the conduct alleged herein, the Company and Individual Defendants Davis, Maher, and Perone are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Subclass for rescission and/or damages suffered.

## TENTH CAUSE OF ACTION

**Violation of Sections 25401 and 25501 of the California Corporations Code (Misrepresentation Sections)
(Against the Company and Executive Defendants Perone, Rechnitz, and Maher)**

432.   Plaintiffs on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 1-449, and further alleges as follows:

145

433.    Plaintiffs bring this claim individually and on behalf of the members of the California Subclass against the Executive Defendants.

434.    This Count is asserted against Executive Defendants for violation of Sections 25401 and 25501 of the California Corporations Code.

435.    Section 25401 (similar to Rule 10b-5 under the federal securities law) makes it illegal, in connection with the purchase or sale of any security, for any person, directly or indirectly, to offer or sell a security in California "by means of any written or oral communications which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made . . . not misleading."  Cal. Corp. Code, §25401.

436.    Executive Defendants carried out a plan, scheme, and course of conduct that intended to and did deceive the retail investors – Plaintiffs and the other Class members – who acquired EMAX Tokens pursuant to the continuous offering and thereby caused them to purchase EMAX Tokens at artificially inflated prices.

437.    In connection with the continuous offering of EMAX Tokens, Executive Defendants Perone, Rechnitz, and Maher disseminated, approved, and/or endorsed the false statements and omissions described herein, which these Executive Defendants knew or recklessly should have known were materially misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

438.    Executive Defendants Perone, Rechnitz, and Maher employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Class members that resulted in artificially high market prices for EMAX

1    Tokens in connection with the continuous offering, in violation of Section 25401 and
2    25501.

3        439.   The Company and Executive Defendants Perone, Rechnitz, and Maher,
4    separately or together, directly or indirectly, caused a false statement or omission to
5    be made in connection with the offers or sales of a security.

6        440.   In ignorance of the fact that the price of EMAX Tokens was artificially
7    inflated, and relying directly or indirectly on the false, misleading, and materially
8    incomplete statements that Executive Defendants made and approved, or upon the
9    integrity of the market in which the EMAX Tokens were sold, or in the absence of
10   material adverse information that these Executive Defendants knew or recklessly
11   should have known of but failed to disclose in public statements, Plaintiffs and the
12   other Class members acquired EMAX Tokens at artificially high prices and were
13   damaged thereby.

14       441.  Plaintiffs purchased EMAX Tokens securities from Executive
15   Defendants and Promoter Defendant Pierce.  The EMAX Tokens were provided
16   and/or sold into the Ethereum Max liquidity pool by, at least, Executive Defendants
17   Perone, Maher, and Rechnitz (as well as Promoter Defendant Pierce).  Upon
18   information and belief, given the limited and measurable amount of individuals
19   selling or providing the cryptocurrency to the EMAX Tokens liquidity pool, a large
20   portion (if not all) of the EMAX Tokens liquidity pool were provided by, at least,
21   Executive Defendants Perone, Maher, and Rechnitz.  Thus, by providing EMAX
22   Tokens to the liquidity pool at the time in which Plaintiffs and the members of the
23   Class made their EMAX Token purchases from the liquidity pool on Uniswap, privity
24   between Defendants Perone, Maher, and Rechnitz and Plaintiffs is established even
25   in the absence of a traditional signed contract linking the two parties.

26       442.   Privity also exists between the issuers and suppliers of the liquidity in
27   the pool (*e.g.*, Defendants Perone, Maher, Rechnitz, and Pierce) and all those making
28

purchases (*e.g.* Plaintiffs and the members of the Class) from the Uniswap exchange because these Defendants are receiving the benefit of a 0.3% fee per EMAX Token transaction on that exchange.

443.   As a direct and proximate result of Executive Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with the respective purchases of EMAX Tokens and are entitled to an award compensating them for such damages.

444.   Indeed, the price of EMAX Tokens dropped significantly as Executive Defendants disclosed, and the market discovered the truth concerning the ability to immediately use EMAX Tokens to purchase goods and services at venues like LIV nightclub and the Company's prospects for the future.  For example, the price of EMAX Tokens dropped significantly following the announcement that Groot Hospitality venues would not actually be accepting EMAX Tokens.

445.   By virtue of the conduct alleged herein, Executive Defendants are liable, jointly or severally, for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

## NINTH CAUSE OF ACTION

**Violation of California Corporate Securities Law of 1968**
**Cal. Corp. Code §25402**
**(Insider Trading)**
**(Against Defendants Perone, Rechnitz, Maher, and Pierce)**

446.   Plaintiffs restate and reallege all preceding allegations above in paragraphs 1 - 185 as if fully set forth herein, and further allege as follows:

447.   Plaintiffs Semerjian, Buckley, and Shah are residents of the State of California.

448.   Plaintiffs Semerjian, Buckley, and Shah paid for or purchased EMAX Tokens in California and thus the deceptive transactions alleged herein occurred in California.

449.    The EMAX Token is a "security" within the meaning of the term as defined by Cal. Corp. Code §25019.

450.    This Count is asserted against Individual Defendants Perone, Rechnitz, Maher, and Pierce (collectively for this count referred to as the "Insider Trading Defendants") for violation of Section 25402 of the California Corporations Code.

451.    California Corporations Code section 25402 makes it unlawful for an issuer or any person who is an officer, director or controlling person of an issuer "or any other person whose relationship to the issuer gives him access, directly or indirectly, to material information about the issuer not generally available to the public," to purchase or sell any security of the issuer in California at a time when that person knows "material information about the issuer gained from such relationship which would significantly affect the market price of that security and which is not generally available to the public, and which he knows is not intended to be so available, unless that person has reason to believe that the person selling to or buying is also in possession of the information."  Cal. Corp. Code, §25402.

452.    Insider Trading Defendants separately or collectively had access to material, non-public information. In particular, in the leadup to the celebrity promotions beginning on May 26, 2021, Insider Trading Defendants had access to information evidencing the falsity of Executive Defendants' and Promoter Defendants' statements and omissions made in connection with the solicitations and sales of EMAX Tokens contemporaneously with when those statements and omissions were made.  Moreover, Insider Trading Defendants knew the precise date and time of the celebrity promotions of EMAX Tokens prior to the promotions being made to the public, and they used that information to optimally time their purchases and/or sales of EMAX Tokens to coincide with the artificial pump in the EMAX Token's price and volume that was created by those same misleading promotions.

453.   In addition, Defendants Rechnitz and Pierce violated Section 25402 by purchasing EMAX Tokens (in addition to those EMAX Tokens they each received from the Company and Perone as undisclosed payments for the promotional activities of Mayweather and Pierce) while in possession of material non-public information about the precise timing of the celebrity promotions.  Rechnitz and Pierce then used that inside information to time the sale of their EMAX Tokens as the price was artificially increased from those celebrity promotions.

454.   Insider Trading Defendants gained material, non-public information by virtue of their positions within the Company and/or relationship to Company CEO Perone and/or Executive Defendant Rechnitz.

455.   Defendants Perone, Rechnitz, Maher, and Pierce all made EMAX Tokens sales and/or transfers after they had access to, and knowledge of, the material, non-public information discuss herein.

456.   Insider Trading Defendants, directly or indirectly via Defendants Perone and/or Rechnitz, knew that investors like Plaintiffs and members of the Class did not have access to the aforementioned non-public information when selling EMAX Tokens.

457.   Insider Trading Defendants, separately or together, were, upon information and belief, aware that a fact being misrepresented or omitted was material to the buyer's decision to purchase EMAX Tokens.

458.   Despite knowing that this material non-public information would affect the market price of EMAX Tokens, Individual Defendants Perone, Rechnitz, Maher, and Pierce, separately or together, sold and/or transferred EMAX Tokens.

459.   Plaintiffs purchased EMAX Tokens securities from the Company, Executive Defendants, and/or Promoter Defendant Pierce.  The EMAX Tokens were provided and/or sold into the EthereumMax liquidity pool by Executive Defendants Perone, Maher, and Rechnitz (as well as Promoter Defendant Pierce). Upon

information and belief, given the limited and measurable amount of individuals selling or providing the cryptocurrency to the EMAX Tokens liquidity pool, a large portion (if not all) of the EMAX Tokens liquidity pool were provided by Executive Defendants Perone, Maher, and Rechnitz.  Thus, by providing EMAX Tokens to the liquidity pool at the time in which Plaintiffs and the members of the Class made their EMAX Token purchases from the liquidity pool on Uniswap, privity between Defendants Perone, Maher, and Rechnitz and Plaintiffs is established even in the absence of a direct contract linking the two parties.

460.   Privity also exists between the issuers and suppliers of the liquidity in the pool (*e.g.*, Defendants Perone, Maher, Rechnitz, and Pierce) and all those making purchases (*e.g.* Plaintiffs and the members of the Class) from the Uniswap exchange because these Defendants are receiving the benefit of a 0.3% fee per EMAX Token transaction on that exchange.

461.   Given the amounts of EMAX Tokens that Defendants Rechnitz, Maher, Pierce had received from Perone directly or other EMAX founders working at his behest, their trades of the same would significantly impact the market price of the EMAX Tokens. Indeed, upon information and belief, the price decrease occurring on or around June 2, 2021 (which the Executive Defendants claimed was caused by the news that Groot Hospitality would not be able to accept EMAX Tokens as a payment as promised) was actually caused when, as Defendants Davis revealed, Mayweather immediately sold off all of the EMAX Tokens that he was given as his fee for promoting EthereumMax.

## TWELFTH CAUSE OF ACTION

**Violation of Sections 25403(b), 25504 and 25504.1 of the California Corporations Code**
**(Secondary Liability Sections)**
**(Against Individual Defendants Perone, Rechnitz, and Mayweather)**

462.   Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference paragraphs 477, and further alleges as follows:

463.   This Count is asserted against Defendants Perone, Rechnitz, and Mayweather for violations of Sections 25403(b), 25504 and 25504.1 of the California Corporations Code.

464.   To the extent that the Company instead of Perone is determined to be a primary violator of Sections 25110 (qualification failure) or 25401 (misrepresentations), this Count is asserted against Defendant Perone because, as an officer and executive of the Company, he is secondarily liable under Section 25504. Perone is likewise alternatively secondarily liable under Sections 25504.1 and 25403(b) for materially aiding and abetting and/or providing substantial assistance to the Company's primary violations of California securities laws.

465.   This Count is asserted against Defendant Rechnitz because he is secondarily liable under (1) Section 25403(b) for providing substantial assistance to the Company's and/or Defendants Perone and Maher's primary violations of Section 25400 (manipulation of price) and (2) Section 25504.1 for materially assisting the violations of Section 25401 (misrepresentations) by primary perpetrators Executive Defendants Perone and Maher.

466.   This Count is asserted against Defendant Mayweather because he is secondarily liable under (1) Section 25504 for materially assisting, and/or aiding and abetting Defendants Perone's, Maher's, and Rechnitz's primary violations of Section 25110 and (2) Section 25403(b) for providing substantial assistance to Rechnitz's primary violation of Section 25402 (insider trading).

467.   Section 25504 makes the following people liable for Qualification Section (*i.e.* Cal. Corp. Code §25110 and 25503) violations: a "principal executive officer or director of a corporation so liable, every person occupying a similar status

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation." Cal. Corp. Code, §25004.

468.   Section 25403(b) makes it unlawful for any person to knowingly provide "substantial assistance" to another person violating Cal. Corp. Code §25000 *et seq*.

469.   Section 25504.1 makes anyone who, with "intent to deceive or defraud," "materially assists" the primary perpetrator of a Misrepresentation Section (*i.e.* Cal. Corp. Code §25401 and 25501) violation.

470.   The conduct of Perone, Rechnitz, and Mayweather described above, directly or indirectly, provided substantial assistance to the Company, Maher, and the Promoter Defendants, who issued the false statements and omissions made in connection with the offers or sales of an unregistered security alleged herein.  This aid and assistance provides for secondary liability for the other Defendants' primary violations.

471.   Perone, Rechnitz, and Mayweather, upon information and belief, had knowledge of the falsity or misleading nature of the statements or omissions made in connection with the offers or sales of the unregistered EMAX Tokens.

472.   By virtue of the conduct alleged herein, Perone, Rechnitz, and Mayweather are liable, jointly or severally, for the wrongful conduct of primary violators the Company and Executive Defendants complained of herein, and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

## TENTH CAUSE OF ACTION

**Violation of the Florida Securities and Investor Protection Act**
**Fl. Stat. Section 517.07**
**(Sale of Unregistered Securities)**
**(Against the Company and Executive Defendants)**

473.   Plaintiffs restate and reallege all preceding allegations above in paragraphs 1 – 185 as if fully set forth herein, and further allege as follows:

474.   Plaintiffs Nahlah, Freeman, Puda, and Brignol are residents of the State of Florida.

475.   Plaintiffs Nahlah, Freeman, Puda, and Brignol paid for or purchased EMAX Tokens in Florida and thus the deceptive transactions alleged herein occurred in Florida.

476.   The EMAX Token is a "security" within the meaning of the term as defined by Section 517.021(22), Fla. Stat. Additionally, the SEC has concurrently determined that the EMAX Tokens "were offered and sold as investment contracts and therefore securities pursuant to Section 2(a)(1) of the Securities Act."  SEC Order, ¶4.

477.   Defendants, and each of them, by engaging in the conduct described above within California, directly or indirectly, sold and offered to sell securities.

478.   Plaintiffs Nahlah, Freeman, Puda, and Brignol, and the members of the Class purchased EMAX Tokens from Defendants.

479.   Section 517.07(1) of the Florida Statute provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Florida Statute §517.051, is sold in a transaction exempt under Florida Statute §517.061, is a federally covered security, or is registered pursuant to Chapter 517 of the Florida Statute.

480.   Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."  Fla. Stat. §517.211(1).

481.   Under §2(a)(1) of the Securities Act of 1933, a "security" is defined to include an "investment contract." 15 U.S.C. §77b(a)(1).  The Supreme Court in *Howey* established the prevailing test for determining whether something is an investment contract, which is defined as "an investment of money in a common enterprise with profits to come solely from the efforts of others."  *Id.* at 301. Specifically, a transaction qualifies as an investment contract and, thus, a security if it is: (1) an investment; (2) in a common enterprise; (3) with a reasonable expectation of profits; and (4) to be derived from the entrepreneurial or managerial efforts of others. *See Forman*, 421 U.S. at 852-53.  This definition embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," and thereby "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'"  *Howey*, 328 U.S. at 299 (citation omitted).  Accordingly, in analyzing whether something is a security, "'form should be disregarded for substance,'" and the emphasis should be "on the economic realities underlying a transaction, and not on the name appended thereto." *Forman*, 421 U.S. at 848-49.

482.   The EMAX Token is a security pursuant to Fla. Stat. §517.021(22)(a).

483.   The EMAX Tokens sold and offered for sale to Plaintiffs and Class members were not:

       a.     exempt from registration under Fla. Stat. §517.051;

       b.     a federal covered security;

       c.     registered with the Office of Financial Regulations (OFR); or

       d.     sold in a transaction exempt under Fla. Stat. §517.061.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

484.   The Company and Executive Defendants sold and offered to sell the unregistered EMAX Tokens to Plaintiff Nahlah, Freeman, Puda, and Brignol, and the members of the Class.

485.   Defendants are directors, officers, partners and/or agents of the Company pursuant to Fla. Stat. §517.211.

486.   Investors who bought EMAX Tokens invested money or other valuable consideration in a common enterprise.  Investors had a reasonable expectation of profit based upon the efforts of the Defendants, including, among other things, Defendants' promotional efforts and business operations.  As stated in the SEC Order:

> Based on EthereumMax's marketing materials, as well as public statements by EthereumMax affiliates, the EthereumMax website, and EthereumMax social media handles, purchasers of EMAX tokens would have had a reasonable expectation of profits from their investment in the tokens.  EthereumMax frequently touted the token's rise in price on its social media pages as it offered and sold EMAX tokens.

> Based on EthereumMax's public statements, purchasers of the EMAX tokens would have had a reasonable expectation that EthereumMax and its agents would expend significant efforts to develop the EthereumMax platform, which would increase the value of their EMAX tokens, resulting in investor profit.  EthereumMax's marketing materials highlighted that the Company and its agents would ensure a secondary trading market for EMAX tokens by creating a trading market for EMAX tokens.  EthereumMax's marketing materials also emphasized the purported expertise of the Company's management.

> EthereumMax's marketing materials, moreover, contained numerous direct statements that the EMAX tokens would rise in value as a result of the efforts of the Company and its agents, including by touting future deals and relationships that would "drive value."  EthereumMax also promised to develop certain "token enhancements," including "additional tokenomics to enhance economic value," future rewards and staking programs, national sporting and event partnerships, and a general expansion of the EMAX token ecosystem.

487.   Plaintiffs Nahlah, Freeman, Puda, and Brignol and Class members invested fiat, including U.S. dollars, and digital currencies, such as Bitcoin and Ethereum, to purchase EMAX Tokens.

488.   Defendants sold EMAX Tokens to the general public on various cryptocurrency exchanges.

489.   Every purchase of EMAX Tokens by a member of the public is an investment contract.

490.   Additionally, investors were passive participants in the EMAX Tokens launch and the profits of each Plaintiff and the Class were intertwined with those of Defendants.

491.   The Executive Defendants also were responsible for supporting the EMAX Token products and its code.  Additionally, the Executive Defendants also were responsible for supporting EMAX Tokens, pooled investors' assets, and controlled those assets.

492.   Plaintiffs Nahlah, Freeman, Puda, and Brignol and Class members in the EMAX Tokens made their investment with a reasonable expectation of profits.

493.   Investors' profits in the EMAX Tokens were to be derived from the managerial efforts of others – specifically the Company, the Executive Defendants or any EthereumMax personnel responsible for developing the networks on which these tokens will operate and managing the proprietary trading codes.  EMAX Token investors relied on the managerial and entrepreneurial efforts of the Company and the Executive Defendants to manage, oversee, and/or develop the EthereumMax business and sales of EMAX Tokens.

494.   This dependency, however, on the managerial efforts of the Company and Executive Defendants was not apparent at issuance to a reasonable investor. Considering the limited available information about how these EMAX Tokens were designed and intended to operate, if such an investor were even able to interpret the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether the EMAX Tokens were securities until the platform at issue, and its relevant "ecosystem," had been given time to develop.  In the interim, the investor lacked the

facts necessary to conclude – let alone formally allege in court – that the EMAX Tokens they had acquired were securities.

495.   The SEC has also provided guidance for determining claims alleging the improper sale of unregistered securities.  On April 3, 2019, the SEC published its "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework") in which it "provided a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."[94]

496.   The Framework described how to analyze the various facts surrounding an ICO in making the determination of whether a given digital asset is a security.

497.   In particular, the Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on the efforts of an [Active Participant or "AP"]? Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"[95]

498.   The Framework further notes that the "stronger the[ ] presence" of the following factors, "the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others.'"[96]

499.   The first factor the SEC looked at was whether an AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

---

[94]   *See* n.103, *supra*.
[95]   *Id.*
[96]   *Id.*

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

500.   At the time of the EthereumMax launch, Defendants actively marketed the EMAX Token launch and the tokens' growth and utilization prospects, thereby necessitating the continued managerial efforts of the Company and Executive Defendants.  Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly).

501.   Another factor the Framework considers is whether the AP creates or supports a market for, or the price of, the digital asset.  This includes, inter alia, whether the AP "(1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities."[97]

502.   As noted above, all of the EMAX Tokens in circulation were created at the direction of the Executive Defendants.  Additionally, the Executive Defendants also created the protocols by which the EMAX Tokens are burned.

503.   The framework further states that "[a]n AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents."[98]

504.   Here, the Company and Executive Defendants have discussed the long-term prospects on extended frames, continually noting how the utilization of EMAX Tokens as a method of payment will grow in the future.

505.   The ability to determine whether and where the digital asset will trade is another factor discussed in the Framework.  For example, "purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or

---

[97]   *Id.*
[98]   *Id.*

promised to arrange for, the trading of the digital asset on a secondary market or platform."[99]

506.   Here, the Executive Defendants, in particular Defendant Maher, admitted that the Executive Defendants had access to and did manipulate the sales of EMAX Tokens in the first days, which had a dramatic impact on the EMAX Tokens price and effected the EMAX Token liquidity pool.

507.   Another factor the Framework notes is whether the AP has the ability to determine who will receive additional digital assets and under what conditions.  This could be, for example, "[m]aking or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset."[100]

508.   Here, the Company and Executive Defendants are the arbiters of funding for EthereumMax.

509.   Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

510.   The Framework also remarks that purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, including, but not limited to, the instances where the AP "has the ability to realize capital appreciation from the value of the digital asset.  This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset." According to the SEC, in these instances, "purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset."[101]

511.   Here, the Executive Defendants retain a significant interest in the Ethereum Max project even after selling off many EMAX Tokens at the height of the initial launch.

---

[99]   *Id.*

[100]   *Id.*

[101]   *Id.*

512. On May 7, 2021, on CNBC's "Squawk Box" television program, chairman of the SEC Gary Gensler stated that "a lot of crypto tokens – I won't call them cryptocurrencies for this moment – are indeed securities."[102] In addition to being the Chairman of the SEC, Mr. Gensler is also a world renowned expert on cryptocurrencies and blockchain technology, having taught the "Blockchain and Money" course at the Sloan School of Management at the Massachusetts Institute of Technology ("MIT").[103]

513. In a June 14, 2018 speech entitled "Digital Asset Transactions: When Howey Met Gary (Plastic)" that is available on the SEC's website,[104] the following observations were made on "when a digital transaction may no longer represent a security offering":

> If the network on which the token or coin is to function is sufficiently decentralized – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract. Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede. As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful.
>
> And so, when I look at Bitcoin today, I do not see a central third party whose efforts are a key determining factor in the enterprise. The network on which Bitcoin functions is operational and appears to have been decentralized for some time, perhaps from inception.

---

[102] Jesse Point, *SEC Chairman Gary Gensler says more investor protections are needed for bitcoin and crypto markets*, CNBC (May 7, 2021), https://www.cnbc.com/ 2021/05/07/sec-chairman-gary-gensler-says-more-investor-protections-are-needed-for-bitcoin-and-crypto-markets.html.

[103] Lectures and Materials from Chairman Gensler's MIT course are available to the public for free at: https://ocw.mit.edu/courses/sloan-school-of-management/15-s12-blockchain-and-money-fall-2018/video-lectures/session-1-introduction/.

[104] William Hinman, Director, Division of Corporation Finance, Remarks at the Yahoo Finance All Markets Summit, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

514.   A key factor in determining whether a digital asset is a security or not is whether the there is a centralized entity behind the digital asset.[105]   EMAX Holdings, LLC operated as the de facto corporate entity and Defendant Perone is the sole executive and director of this holding company.   Thus, there is a centralized entity behind the EMAX Tokens.

515.   Finally, the SEC also already concluded that another virtual currency (*i.e.*, DAO tokens) that are substantially similar to EMAX Tokens are "securities and therefore subject to the federal securities laws."   As stated by the SEC, "issuers of distributed ledger or blockchain technology-based securities must register offers and sales of such securities unless a valid exemption applies."[106]   More recently, on November 7, 2022, the SEC was granted summary judgment on the issue of whether or not the token at issue constituted a security, stating that "no reasonable trier of fact could reject the SEC's contention that LBRY offered LBC [tokens] as a security, and LBRY does not have a triable defense that it lacked fair notice [that it needed to register its offerings.]"   *LBRY*, 2022 WL 16744741, at *8.

516.   This analysis of whether the DAO and LBC tokens are securities should be applied here.

## ELEVENTH CAUSE OF ACTION

**Unjust Enrichment/Restitution**
**(California Common Law, in the Alternative)**
**(Against All Defendants)**

517.   Plaintiffs restate and reallege all preceding allegations above in paragraphs 1 – 185 as if fully set forth herein, and further allege as follows:

518.   This cause of action for equitable relief is pled in the alternative because, if Plaintiffs' state consumer or securities law claims are found to be inapplicable to

---

[105]   *Id.* (noting that the "decentralized structure" of Bitcoin and Ethereum placed these digital assets outside the "disclosure regime of the federal securities laws").

[106]   Press Release, U.S. SEC. & EXCH. COMM'N, *SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities* (July 25, 2017), https://www.sec.gov/news/press-release/2017-131.

the wrongdoing alleged herein, Plaintiffs will lack an adequate remedy at law since they will be unable to obtain monetary damages in an amount that would make Plaintiffs and the members of the Class whole.

519.   The lack of an adequate remedy at law entitles Plaintiffs and the Class to pursue equitable restitution and/or disgorgement.

520.   Plaintiffs and members of the Class conferred a monetary benefit on Defendants by raising the price and trading volume of the EMAX Tokens, which allowed Defendants to sell their EMAX Tokens to Plaintiffs and Class members at inappropriately and artificially inflated prices.

521.   Defendants received a financial benefit from the sale of their EMAX Tokens at inflated prices and are in possession of this monetary value that was intended to be used for the benefit of, and rightfully belongs to, Plaintiffs and members of the Class.

522.   Plaintiffs seek restitution in the form of the monetary value of the difference between the purchase price of the EMAX Tokens and the price those EMAX Tokens sold for.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully request that this Court:

A.   Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more of the Classes defined above;

B.   Appoint Plaintiffs as representatives of the Class and their counsel as Class counsel;

C.   Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and the Class members are entitled;

1        D.     Order appropriate relief under Cal. Bus. & Prof. Code §17500 for

2 Defendant Kardashian;

3        E.     Award post-judgment interest on such monetary relief;

4        F.     Grant appropriate injunctive and/or declaratory relief;

5        G.     Award reasonable attorneys' fees and costs; and

6        H.     Grant such further relief that this Court deems appropriate.

7 **JURY DEMAND**

8        Plaintiffs, individually and on behalf of the putative Class, demand a trial by

9 jury on all issues so triable.

10 DATED: June 26, 2023      **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

11                          */s/ John T. Jasnoch*

12                          John T. Jasnoch (CA 281605)
jjasnoch@scott-scott.com

13                          600 W. Broadway, Suite 3300
San Diego, CA 92101

14                          Tel.: 619-233-4565
Fax: 619-236-0508

15                          *Counsel for Plaintiffs and the Proposed Class*

16

17

18

19

20

21

22

23

24

25

26

27

28

164

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163

1

## <u>CERTIFICATE OF SERVICE</u>

2       I hereby certify that on June 26, 2023, I caused the foregoing to be

3   electronically filed with the Clerk of the Court using the CM/ECF system, which

4   will send notification of such filing to the email addresses denoted on the Electronic

5   Mail Notice List.

6                                        *s/ John T. Jasnoch*
                                          John T. Jasnoch
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 2:22-CV-00163