# EXHIBIT 9

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN HUEGERICH, JONATHAN SEMERJIAN, NABIL NAHLAH, TILL FREEMAN, MARKO CIKLIC, TUNISIA BRIGNOL, MILAN PUDA, NEIL SHAH, MICHAEL BUCKLEY, AND CHRISTOPHER DELUCA, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| vs. | CASE NO. 2:22-cv-00163-MWF-SK |
| EMAX Holdings, LLC, GIOVANNI PERONE, MIKE SPEER, JUSTIN MAHER, JONA RECHNITZ, KIMBERLY KARDASHIAN, FLOYD MAYWEATHER, JR., PAUL PIERCE, RUSSELL DAVIS, and ANTONIO BROWN, | |
| Defendants. | |

## EXPERT REPORT OF CLAUDIU V. DIMOFTE, PH.D.
### February 11, 2025

# TABLE OF CONTENTS

## EXPERT REPORT OF CLAUDIU V. DIMOFTE, PH.D.

| | |
|---|---|
| **I.  INTRODUCTION** | **3** |
| A.  Scope of Assignment | 4 |
| B.  Summary of Opinion | 4 |
| C.  Qualifications | 5 |
| **II.  CONSUMER PERCEPTIONS STUDY** | **6** |
| A.  Design | 6 |
| i. Survey Methodology | 7 |
| ii. Target Population and Sample | 7 |
| iii. Reliability and Validity Considerations | 8 |
| B.  Administration | 9 |
| i. Screening Section | 10 |
| ii. Main Questionnaire Section | 11 |
| iii. Final Section | 14 |
| C.  Data Analysis and Results | 14 |
| i. Respondent Statistics | 14 |
| ii. Findings | 14 |
| iii. Summary of Results | 17 |
| D. Summary of Consumer Perceptions Study Findings | 18 |
| **III. OVERALL CONCLUSIONS** | **18** |
| **Appendix A** | **19** |
| **Appendix B** | **26** |
| **Appendix C** | **30** |
| **Appendix D** | **31** |
| **Appendix E** | **32** |
| **Appendix F** | **33** |
| **Appendix G** | **59** |

## EXPERT REPORT OF CLAUDIU V. DIMOFTE, PH.D.

I. **INTRODUCTION**

1. I understand that the Plaintiffs in this matter, Ryan Huegerich, Jonathan Semerjian, Nabil Nahlah, Till Freeman, Marko Ciklic, Tunisia Brignol, Milan Puda, Neil Shah, Michael Buckley, and Christopher DeLuca ("Plaintiffs"), individually and on behalf of all others similarly situated, have brought an action against Defendants EMAX Holdings, LLC ("EMAX Holdings" Giovanni Perone, Jona Rechnitz, Kimberly Kardashian, Floyd Mayweather, Jr., Paul Pierce, and Russell Davis (the "Defendants"), arising out of an alleged scheme to misleadingly promote and sell the digital asset associated with EthereumMax (the EMAX Tokens cryptocurrency) to unsuspecting investors.

2. It is also alleged that "In furtherance of this scheme, Defendants touted the prospects of the project and the ability of investors to make significant financial returns," whereas "In truth, Defendants marketed the EthereumMax tokens to investors so that they could sell their tokens for profit." [1]

3. Furthermore, it is alleged that "EthereumMax's entire business model relies on using constant marketing and promotional activities, often from "trusted" celebrities, to dupe potential investors into trusting the financial opportunities available with EMAX Tokens." [2]

4. It is alleged that promotional social media posts by celebrities/public figures including Kim Kardashian, Floyd Mayweather, and Paul Pierce led to outcomes such as "the trading volume for the EMAX Token [having] exploded as a result." [3]

5. These endorsement behaviors, it is alleged, "demonstrate a pattern by which Pierce and other promotors, […], are given tokens as a payment for promotions, they go out and post about the tokens on social media, then they and their close associates turn around and sell the tokens for profit as retail investors buy in. The entire purpose of this paid promotion is for pumping and dumping the tokens based on the value created by the Promoter Defendants' direct action." [4]

---

[1] *See* Case No. 2:22-cv-00163-MWF-SK, United States District Court, Central District of California ("Complaint"), ¶ 2.
[2] Complaint, ¶ 56.
[3] Complaint, ¶ 78.
[4] Complaint, ¶ 86.

6. In so doing, Defendants allegedly "tout[ed] the EMAX token sale […] without disclosing [having] received compensation from the issuer for doing so, and the amount of the consideration," [5] as well as allegedly "engaged in deceptive acts and practices under California law by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree." [6]

### A. Scope of Assignment

7. I was asked by Scott+Scott Attorneys at Law LLC, representing the Plaintiffs, to conduct a survey, defined herein and below as the *Consumer Perceptions Study*, and to thereafter provide an expert report in which I disclose my conclusions and opinions in the above matter, in order to assist the trier of fact in assessing whether the alleged behavior of the Plaintiffs has produced consumer behavior in the marketplace that negatively impacted the welfare of cryptocurrency buyers—including but not limited to assessing any impact that public figure endorsements of tokens on social media may have on consumer decisions to buy, hold, and/or sell these tokens, as well as on their willingness to pay for them.

8. In performing this work and research, and in formulating my related opinions, I considered the items cited in the footnotes to this report as well as other relevant literature. All materials considered are listed in Appendix C hereto.

### B. Summary of Opinion

9. Based on the *Consumer Perceptions Study* performed according to the field's best practices, this research finds that the alleged conduct of Defendants including Kim Kardashian, Floyd Mayweather, and Paul Pierce has altered consumer response in a way consistent with the endorsement of public figures having a direct effect on consumer decisions to buy, hold, and/or sell cryptocurrency tokens. In addition, based on an assumption of endorsements made within a business model aiming to "instill confidence through a trusted circle" and "dupe potential investors into trusting the financial opportunities available with EMAX Tokens," [7] it can be argued that consumers suffered undue financial harm as a result.

---

[5] Complaint, ¶ 177.
[6] Complaint, ¶ 212.
[7] Complaint, ¶ 55, 56.

### C.    Qualifications

10. I am a tenured Professor of Marketing in the Fowler College of Business at San Diego State University and a Research Fellow at its Centre for Integrated Marketing Communications. I hold a doctoral degree in Marketing with a psychology minor from the Foster School of Business at the University of Washington in Seattle. My research interests span various areas of consumer psychology, with a focus on consumer response to marketing stimuli and its measurement via appropriate marketing metrics. My research has appeared in leading scholarly journals in the fields of marketing, consumer psychology, and management science.

11. I have co-chaired major academic marketing conferences and been a keynote speaker at practitioner conferences. I have been invited to give research talks at academic institutions across several continents and have served on the Editorial Boards of three of the leading academic journals in business: the *Journal of Consumer Psychology* (since 2012), the *Journal of the Academy of Marketing Science* (since 2017), and the *Journal of International Marketing* (since 2019). I have received awards for both my teaching and research.

12. My consulting work has involved clients ranging from non-profits to Fortune 500 firms, as well as expert witness research, reporting, deposition, and testimony in consumer litigation.

13. Over more than two decades of academic and consulting research I have been involved in hundreds of research projects and I am well equipped to perform scholarly and applied work from both theoretical and methodological perspectives.

14. In particular, my survey research experience includes performing and supervising thousands of surveys at all stages, including the methodologically rigorous selection of appropriate samples from the population of interest. One of my research interests involves the appropriate use of methodological approaches in marketing research, including the development of rigorous scales and assessing their associated psychometric properties.

15. My curriculum vitae, which provides more details about my background as well as a detailed list of my professional publications for at least the past ten years, is attached hereto as Appendix A. A list of cases where I provided expert deposition or testimony in the preceding five years is attached hereto as Appendix B.

16. I was paid a set fee as compensation for this assignment, in an amount totaling $46,000. Given the associated time commitment, this amounts to an average rate of $1,000 per hour. My compensation is not contingent upon the opinions I express or the outcome of the case.

2025 © Claudiu V. Dimofte, PhD

## II.    CONSUMER PERCEPTIONS STUDY

17. Prior to offering the opinions as set forth herein, I designed, coded, conducted, and analyzed a consumer perceptions survey to determine whether and how the alleged conduct of public figure Defendants would impact the responses of the relevant consumer population. This survey is referred to herein and throughout as the *Consumer Perceptions Study.*

18. I conducted the *Consumer Perceptions Study* in a manner consistent with the scientific standards of my profession. In particular, studies should adhere to the factors cited in the Federal Judicial Center's *Manual for Complex Litigation*: choosing and defining the appropriate population while using a representative sample, asking clear and not leading questions, gathering, analyzing, and reporting the data accurately and according to accepted statistical principles, conducting the survey by qualified persons following proper procedures, and conducting the entire process in an objective manner. [8]

19. The methodology employed in designing, coding, conducting, and analyzing the *Consumer Perceptions Study* conducted for this case is reliable, valid, and representative of those used in marketing research science and practice. The results of this study can be relied upon to draw conclusions about the issues under consideration.

20. The *Consumer Perceptions Study* was conducted in order to assess the effect that public figure endorsement of cryptocurrency tokens on social media has on consumer response, including likelihood to purchase, hold, and/or sell this cryptocurrency, and wiliness to pay for it. The design, administration, and analyses associated with the study are presented below.

### A.    Design

21. The following sections review the study design, including the target population, stimuli, and strategies employed to ensure the collection of valid and reliable data. They demonstrate how the methodological approach employed adheres to best practices, both generally for marketing research and for research conducted for the purpose of litigation.[9]

---

[8] *Manual for Complex Litigation*, Federal Judicial Center, Fourth Edition, 2004, p. 103.

[9] This research follows the standards established by the Federal Judicial Center in the "Reference Guide on Survey Research" and in the "Manual for Complex Litigation" for designing and conducting valid and reliable studies used in litigation. *See* Diamond, Shari S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, National Academies Press, 2011, pp. 359-423 ("Diamond"); *also see "*Manual for Complex Litigation."

2025 © Claudiu V. Dimofte, PhD

### i.   Survey Methodology

22. Much of the applied social research enterprise employs survey research for the measurement of respondent perceptions, attitudes, and behaviors. Survey research in general involves any measurement procedures that entail asking questions of respondents.

23. In particular, my survey research employed a questionnaire developed, administered, and analyzed with careful and objective consideration of appropriate targeting, question formulation and data analysis procedures and techniques,[10] as detailed below.

### ii.   Target Population and Sample

24. The appropriate universe or target population (i.e., that to which the sample results are meant to generalize) for the study is actual or potential U.S. individual buyers of cryptocurrency. Respondents were recruited to participate in the *Consumer Perceptions Study* only if they either (i) had purchased cryptocurrency in the previous year or two or (ii) were planning to purchase cryptocurrency in the next year or two. An overall time horizon of four years was deemed reasonable.

25. To further create a sample that reflected the class population in this case, respondents were retained if they reported (a) being an actual social media follower of Kim Kardashian, Floyd Mayweather, or Paul Pierce, or (b) seeing themselves as potentially becoming a social media follower of these public figures.

26. To remove individuals with specialized knowledge or expertise, respondents were screened out of the sample if they had ever worked themselves or had family members who had ever worked in the following industries: Advertising or market research, Cryptocurrency / virtual currency brokering, dealing, or marketing, Legal services, or Social networks and other media networks and content providers.

27. The survey employed start quotas based on relevant consumer age, gender, and income. By restricting survey starts such that potential respondents match the target population, a sampling group was obtained that was aimed to be representative of consumers who purchased or are planning to purchase cryptocurrency and would be actual or potential social media followers of the specific public figures at issue in this case.

---

[10] Manual for Complex Litigation, p. 103.

28. To ensure that all potential study respondents had the opportunity to participate, the studies were made available to panel participants over multiple days and at competitive pay rates. This is an important consideration in order to avoid *non-response bias*[11] – that is the possibility that non-respondents are in some way different from respondents, thus undermining the sample's representativeness. To assess this, I analyzed the demographic profiles of the respondents who were screened out during two different stages in the survey. Results suggest that respondent profiles remained relatively stable across screening instances and in line with the targeting, producing a final sample that represents the target consumer well.

### iii.    Reliability and Validity Considerations

29. *Demand effects*. To avoid "demand effects" (i.e., instances wherein the survey "suggests" to respondents that they should provide a particular response that is "demanded" or desired by the researcher), the study was pretested, employed a "blind" approach, asked questions in a double-sided manner, used randomization whenever appropriate, and did not give respondents any early indication that the survey was related to litigation involving celebrities/public figures who may have endorsed cryptocurrency on social media.

30. *Comprehension assessment*. This is common practice methodology that aims to confirm that all survey questions are understood by respondents from the target population (i.e., consumers who would be eligible to take the survey),[12] in order to ensure the reliability of the data. The comprehension question employed in the *Consumer Perceptions Study* was in line with best research practices to explore respondent understanding of the measures of interest.[13]

31. *Blind methodology*. Respondents were at no time aware of the sponsor or purpose of the study, nor was this information identified to them at any time before, during or after their completion of their study.[14] This ensured that respondents would not craft their responses in

---

[11] Diamond, p. 383.

[12] Diamond, pp. 388-389.

[13] After the collection of the key measures in the *Consumer Perceptions Study*, respondent comprehension was assessed. On a scale anchored at 1 = *very easy* and 7 = *very difficult*, respondents' scores on the comprehension check item ("Please rate how easy or difficult it was for you to understand the questions you were asked in this survey") averaged $M = 1.74$, significantly below the middle of the scale (i.e., 4) at $p < .001$. This is strong evidence that *Consumer Perceptions Study* respondents found the survey questions quite easy to comprehend.

[14] Diamond, pp. 410-411.

line with what they perceived the survey sponsors wanted. Additionally, since the study was administered online by a computer program, it was not possible for the survey administrator to provide any cues indicating the sponsor or purpose of the study. Finally, the anonymous nature of the study ensured that respondents could feel at ease and provided truthful and valid responses.

32. *Double-sided questions*. In providing response options to survey questions, "balanced and explicit emphasis to the neutral as well as affirmative and negative positions"[15] was placed, while a "No opinion" or "Do not recall" option was included whenever appropriate, to reduce guessing.[16]

33. *Randomization.* The "Reference Guide on Survey Research" recommends that "the order of the questions and the order of the response choices in a survey should be rotated."[17] In line with this recommendation and best practices, the order in which answer options were presented to respondents was randomized for all relevant questions. The full questionnaire presented in Appendix F describes the *Consumer Perceptions Study* items and coding.

34. *Follow-up items to assess litigation awareness*. Standard best practice is for the respondent to be blind to the survey sponsor and its purpose.[18] At the end of the survey, all respondents were asked whether they were aware of any pending litigation involving an online consumer electronics retailer and, if so, to describe their related knowledge. The answers were used to confirm that the survey results were not driven by respondents' potential awareness of the current litigation.

### B.    Administration

35. The *Consumer Perceptions Study* was administered online via the market-leading Qualtrics platform, [19,] using a PureSpectrum respondent panel.[20] Survey administration consisted of the following steps:

---

[15] Jacoby, Jacob, "Are Closed-Ended Questions Leading Questions?" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Shari S. Diamond and Jerre B. Swann, eds., American Bar Association, 2012, p. 275.

[16] Diamond, p. 390.

[17] Diamond, p. 396.

[18] Diamond, pp. 410-411.

[19] The survey was in the field between January 30 and February 4, 2025.

[20] PureSpectrum consolidates respondent panels that number millions of participants in 60 countries around the world. The company developed the industry's first respondent-level scoring system to create a new standard of data quality.

> i.    *Screening Section*

36. *Invitation*. Potential respondents were invited to participate via multiple channels and were provided competitive participation incentives depending on recruitment method and demographic group in order to optimize response rates. The requested sample was largely representative of the U.S. population with respect to demographics.

37. *Representative population*. The survey began with a screening section wherein potential respondents were asked to provide their age, gender, ethnicity, marital and parenthood status, education level, employment status, annual household income, and state of residence. Next, respondents were terminated if they themselves or a household member might have specialized knowledge of industries including Advertising/market research, Cryptocurrency/ virtual currency brokering, dealing, or marketing, Legal services, or Social networks and other media networks and content providers. [21]

38. *Cryptocurrency purchase history or intent*. Respondents were then screened for having purchased cryptocurrency within the past year or two and were allowed to proceed if they indicated they had done so within that time period. [22] Respondents who did not report having done so were then screened for whether they would be likely to purchase cryptocurrency in the next year or two, and allowed to proceed if they responded affirmatively. [23] Respondents who did not indicate that they had either purchased cryptocurrency within the past year or two or would do so in the next year or two were terminated.

39. *Initial attention checks*. The screening questions also ensured that respondents were involved in the study at the outset. First, one of the products that respondents were asked about having purchased in recent years was French Mirabelle plums from their local grocery store. These fruits are of protected origin designation (they originate in Lorraine, France) and their import to the U.S. is restricted,[24] making them unavailable for purchase in any local grocery store. Any respondent who reported having bought them in the past year was dropped from the survey. Respondents were also asked to report their ownership status

---

[21] See Appendix F for specific phrasing of the respective items.

[22] Respondents were asked, "In the past year, did you purchase...?" Several items were presented in randomized order. See Appendix F.

[23] Respondents were asked, "In the next year or two, do you plan to purchase...?" The same product options were presented in randomized order. See Appendix F.

[24] See https://www.bonappetit.com/trends/article/11-weird-food-bans-from-blood-to-bottled-water.

relative to a few items presented in alphabetical order: bicycle, boat, car, dog, graduate degree, smartphone, telegraph, toothbrush, and TV set. Only respondents who provided possible answers were permitted to continue to the main questionnaire section. [25]

40. The final selection criterion involved the need for respondents to be actual or potential followers of specific public figures. To that end, they were exposed to a list of 13 such names (listed in the alphabetical order of their full name, from Barack Obama to Taylor Swift) and were asked which of them they currently followed or may follow in the future on social media. Respondents were only permitted to continue if they selected at least one of three names: Floyd Mayweather (FM), Kim Kardashian (KK), or Paul Pierce (PP). [26]

    *ii.    Main Questionnaire Section*

41. *Introduction*. Qualified respondents were first told: "You have been assigned to answer questions about the following industry: Cryptocurrency / virtual currency brokering, dealing, or marketing." The purpose of this statement was to have respondents believe that the specific industry was randomly selected among the various categories presented in the screening section. This ensured that respondents would not adapt their responses to what they perceived the sponsors of the survey wanted (i.e., it prevented the emergence of demand effects).

42. *Crypto perceptions.* To introduce the general topic, respondents were first asked about the level of confidence they had that the current ways to invest in, trade, or use cryptocurrencies are reliable and safe (scale anchored at 1 = *not at all confident* and 5 = *extremely confident*).

43. To validate the fact that the sample included respondents with positive cryptocurrency leanings, they were then asked to report how they would feel if more businesses accepted cryptocurrency payments (1 = *very unhappy* and 7 = *very happy*).

44. *Category expertise*. Respondents were asked to describe their personal expertise in terms of investing in, trading, or using cryptocurrencies, on a scale anchored at 1 = *extremely limited* and 7 = *extremely extensive*.

---

[25] The response options to the ownership questions were: (1) "Do not have one," (2) "Have at least one," and (3) "Not sure." Respondents who answered (3) to any of the items, as well as those who answered (2) to the telegraph item or (1) to the toothbrush item were terminated. See Appendix F.

[26] If only one of the three public figures was selected, the focal study items referred to that figure for that respondent. Given the baseline chance of encountering followers of each (i.e., highest for KK and lowest for PP), if multiple selections were made respondents were directed to conditions in increasing order of market follower volume.

45. To introduce the focal questions, respondents were asked to imagine a scenario wherein they were browsing the X (formerly Twitter) feeds of some of their favorite celebrities and, while there, they ran across a post by one such public figure.

46. *Endorsed purchase likelihood*. Next, they were assigned to one of three identical conditions that differed simply in terms of the public figure described as the source of a social media post mentioning a new cryptocurrency that had been recommended by friends and shared with followers. Respondents were asked to estimate the probability (0-100%) that they would purchase that new cryptocurrency based on the respective post (by KK, FM, or PP).

47. *Baseline purchase likelihood*. The next item asked respondents to estimate the probability (0-100%) that they would purchase a new cryptocurrency based on online consumer chatter in the absence of an endorsing social media post from a followed public figure.

48. *Willingness-to-pay premium.* Respondents were asked to report the premium (0-100%) they would be willing to pay for a new cryptocurrency if endorsed by a followed public figure compared to the absence of that endorsement. [27]

49. *Purchase impact.* The next item elicited respondent perceptions regarding the effect of an endorsement from the respective public figure (i.e., KK, FM, or PP) on their decision to buy a new cryptocurrency (1 = *extremely unimportant*, 7 = *extremely important*).

50. *Endorsed hold/not sell likelihood*. At this point, respondents were told to imagine a different scenario, one where the public figure's post occurred after they had purchased the respective cryptocurrency and were asked to estimate the probability (0-100%) that they would hold on to it (and not sell it) based on the respective post (by KK, FM, or PP).

51. *Hold/not sell impact.* The final scenario-related item elicited respondent perceptions regarding the effect of an endorsement from the respective public figure (i.e., KK, FM, or PP) on their decision to hold on to (i.e., not sell) the purchased cryptocurrency (1 = *extremely unimportant*, 7 = *extremely important*).

52. *General public figure items*. All respondents were then asked about the extent to which eight specific affective responses would describe their feelings about the case of a public figure with a large following who would endorse a cryptocurrency in a social media post without

---

[27] Note that, at least conceptually, it is possible that this premium be negative if the celebrity endorsement creates avoidance rather than approach among investors. However, given the expectation that the use of endorsements from public figures elicits interest for the average consumer, the scale employed here merely allows for such endorsement to be, at worst, seen as inconsequential (i.e., when 0% is selected) rather than detrimental (i.e. for negative values).

disclosing that they were paid to do so (i.e., essentially advertising the cryptocurrency without clarifying that the post was an ad). The adjectives employed (and presented in random order in the evaluative item) included four positively valenced and four negatively valenced ones (i.e., *acceptable*, *appropriate*, *excusable*, *truthful*, and *deceptive*, *misleading*, *unacceptable*, *unethical*, respectively).

53. *Effect of hidden endorsement pay*. This item elicited respondent perceptions regarding the effect that learning of a public figure who endorsed a cryptocurrency but hid the fact that they had been paid for their endorsement would have on their decision to buy that cryptocurrency (1 = *Would make me much less likely to buy*, 7 = *Would make me much more likely to buy*; 8 = *Do not know/No opinion*).

54. *Effect of false exclusive acceptance claims*. This item elicited respondent perceptions regarding the effect that learning, after purchase, that a new cryptocurrency's initial claims of being the exclusive payment method accepted at specific venues and events were in fact not true would have had on their decision to buy it (1 = *Definitely would not have purchased*, 7 = *Definitely would have still purchased*; 8 = *Do not know/No opinion*).

55. *Endorsement cues*. Several public figure behaviors that involved marketplace brands were presented and respondents were asked to assess the extent to which they represented an endorsement of the brand by the public figure (1 = *Definitely not*, 7 = *Definitely yes*; 8 = *No opinion*). These behaviors (listed in random order) included *Asking followers to buy a product / brand*, *Attending a function at brand headquarters*, *Mentioning a brand in a personal story*, *Posting a photo of a branded product*, and *Wearing a brand logo on personal clothing*.

56. *Effect of whitepaper*. This item elicited respondent perceptions regarding the effect that learning, after purchase, that a new cryptocurrency's whitepaper described its business model as relying on using constant marketing and celebrity promotional work would have had on their likelihood to buy it (1 = *Would have made me much less likely to buy*, 7 = *Would have made me much more likely to buy*; 8 = *Do not know/No opinion*).

57. *Effect of hidden endorsement connection*. This item elicited respondent perceptions regarding how learning about a new cryptocurrency's celebrity endorsements being secured by someone convicted of wire fraud would impact their decision to consider it (1 = *Would*

have made me much less likely to consider it, 7 = Would have made me much more likely to consider it; 8 = Do not know/No opinion).

### iii.    Final Section

58. *Comprehension check*. Respondent were asked to rate how easy or difficult it was for them to understand the questions they were asked in the survey (1 = *very easy*, 7 = *very difficult*). [28]

59. *General lawsuit awareness and follow-up*. Close to the end of the survey, all respondents were asked whether they were aware of any current litigation involving FM, KK, or PP (*no, yes*). Those answering affirmatively were asked an additional question: "Please mention who that public figure is and briefly describe your knowledge about the litigation involving them." In this question, respondents were provided with an option to type in their response or select "Cannot remember."

60. The full questionnaire is presented in Appendix F.

### C.    Data Analysis and Results

### i.    Respondent Statistics

61. A total of 501 consumers who completed the *Consumer Perceptions Study* comprised its final analytical sample. A complete description of the response and completion rates for the *Consumer Perceptions Study* is provided in Appendix D. The data in Appendix E presents demographic comparisons across dropped and retained respondents to show that the analytical sample was unbiased and largely in line with the desired targeting.

### ii.    Findings

62. Response distributions for the key survey items discussed above are shown in Appendix G.

63. *Crypto perceptions*. Respondents displayed a relatively high level of confidence associated with the reliability and safety of current ways to invest in, trade, or use cryptocurrencies: $M$ = 4.04 ($p < .001$ in the contrast against the middle of the scale).

---

[28] After the first 37 respondents' data was submitted, the mean value for this item was assessed in order to spot any comprehension issue and make related changes. The low observed value in this pretest ($M_{check1}$ = 1.76) suggested that comprehension was very high and no changes were required. Indeed, the eventual analytical sample mean was identical ($M_{check2}$ = 1.76), significantly lower than 2 (i.e., below *easy*).

2025 © Claudiu V. Dimofte, PhD

64. Supporting the appropriateness of the targeting in this sample, respondents displayed positive cryptocurrency leanings, by reporting feeling happy about the possibility of more businesses accepting cryptocurrency payments: $M = 6.04$ ($p < .001$ in the contrast against the middle of the scale).

65. *Category expertise.* Similarly, respondents also reported overall a somewhat extensive level of personal expertise in terms of investing in, trading, or using cryptocurrencies: $M = 5.01$ ($p < .001$ in the contrast against the middle of the scale).

66. *Endorsed purchase likelihood.* In terms of a public figure posting on social media about a new cryptocurrency that had been recommended by friends and shared with followers, respondents revealed a relatively high chance of cryptocurrency purchase based on the respective post, across the board: $M = 66.12\%$ likelihood for KK, 65.90% for FM, and 69.05% for PP, respectively ($p < .001$ in the contrast against 50% for each value).

67. *Baseline purchase likelihood.* Respondents also revealed a relatively high chance of cryptocurrency purchase based on online consumer chatter, in the absence of an endorsing social media post from the public figure: $M = 61.48\%$ likelihood for KK, 60.62% for FM, and 63.09% for PP, respectively ($p < .001$ in the contrast against 50% for each value).

68. Importantly, for each of the three public figures, consumer exposure to their cryptocurrency endorsement on social media produced a statistically significant increase in purchase likelihood ($p < .01$ for KK, $p < .001$ for FM and PP, respectively) compared to lack thereof.

69. *Willingness-to-pay premium.* In line with the finding above, respondents also reported a willingness to pay a premium for an endorsed (vs. not endorsed) cryptocurrency: $M = 52.23\%$ extra for KK, 51.38% for FM, and 51.83% for PP, respectively ($p < .001$ in the contrast against 0% for each value).

70. *Purchase impact.* In terms of assessing the effect of an endorsement from the respective public figure on their decision to buy a new cryptocurrency, respondents found it somewhat important: $M = 4.81$ for KK, 4.89 for FM, and 5.11 for PP, respectively ($p < .001$ in the contrast against the middle of the scale for each value).

71. *Endorsed hold/not sell likelihood.* In terms of a public figure's social media endorsement on likelihood to hold the already purchased cryptocurrency, respondents revealed a relatively high chance of not selling based on the respective post: $M = 67.60\%$ likelihood for KK,

67.40% for FM, and 72.77% for PP, respectively ($p < .001$ in the contrast against 50% for each value).

72. *Hold/not sell impact.* When assessing the effect of an endorsement from the respective public figure on their decision to hold and not sell an already purchased cryptocurrency, respondents found it somewhat important: $M = 5.25$ for KK, 5.07 for FM, and 5.49 for PP, respectively ($p < .001$ in the contrast against the middle of the scale for each value).

73. Interestingly, for each of the three public figures, consumer exposure to their cryptocurrency endorsement on social media was seen to have a higher impact on respondents' holding decision relative to their purchasing decision (statistically significant contrasts at $p < .01$ for FM and $p < .001$ for KK and PP, respectively).

74. *General public figure items.* In terms of specific responses describing their feelings about the case of a public figure who would endorse a cryptocurrency without disclosing that they were paid to do so, respondents generally displayed low levels of related affect. $M_{acceptable} = 4.63$, $M_{appropriate} = 4.52$, $M_{excusable} = 4.14$, $M_{truthful} = 4.35$, $M_{deceptive} = 4.18$, $M_{misleading} = 4.06$, $M_{unacceptable} = 3.81$, and $M_{unethical} = 3.89$.

75. *Effect of hidden endorsement pay.* When it comes to the effect that learning of a public figure who endorsed a cryptocurrency having hidden the fact that they had been paid for their endorsement, respondents reported a relatively mild negative effect on their likelihood to buy that cryptocurrency: $M = 3.81$ ($p < .03$ in the contrast against middle of the scale).

76. *Effect of false exclusive acceptance claims.* In terms of respondent perceptions regarding the effect that learning, after purchase, that a new cryptocurrency's initial claims of being the exclusive payment method accepted at specific venues and events were false, respondents reported a very mild negative effect on their decision to have purchased that cryptocurrency: $M = 3.87$ ($p = .08$ in the contrast against middle of the scale).

77. *Endorsement cues.* All public figure behaviors that involved marketplace brands were perceived by respondents to represent an endorsement of the brand by the public figure $M_{asktobuy} = 5.38$, $M_{attendfunction} = 5.26$, $M_{mentionbrand} = 5.37$, $M_{postphoto} = 5.40$, $M_{wearlogo} = 5.35$ ($p < 001$ in the contrast against the middle of the scale in each case).

78. *Effect of whitepaper.* A whitepaper describing a cryptocurrency's business model as relying on using constant marketing and celebrity promotional work was sees as having a slight

positive effect on respondents' likelihood to buy it: $M = 4.51$ ($p < .001$ in the contrast against middle of the scale).

79. *Effect of hidden endorsement connection*. However, learning that the cryptocurrency's celebrity endorsements were secured by someone convicted of wire fraud had a negative impact on respondent decision to consider it: $M = 3.70$ ($p < .001$ in the contrast against middle of the scale).

80. *General lawsuit awareness and follow-up*. Finally, respondents reported their personal awareness of any current litigation involving the three public figures employed in this study. 78% of the sampled consumers reported no such awareness and 8.2% could not recall when asked to provide the name of the public figure and what the litigation was about. The remainder of the sample offered responses that only four times mentioned Kim Kardashian, twice Floyd Mayweather, and once Paul Pierce in the context of cryptocurrency. [29]

      *iii.*    *Summary of Results*

81. The main findings of the *Consumer Perceptions Study* can be summarized as follows:

(a)     A cryptocurrency's endorsement by public figures (such as KK, FM, and PP) renders consumers significantly more likely to purchase it or hold it (if already purchased).

(b)     Consumers are willing to pay a premium for a cryptocurrency that is endorsed by public figures (such as KK, FM, and PP).

(c)     Consumers deem the endorsement of a cryptocurrency by public figures (such as KK, FM, and PP) influential in their own related purchase or sell decisions.

(d)     There are negative effects on consumer decisions regarding a cryptocurrency if the endorsing public figure does not disclose being paid to endorse it, if the cryptocurrency issuer makes false claims regarding its acceptance, or if the public figure endorsement was secured by individuals with prior fraud records.

(e)     Consumers see public figure behaviors that involve brands as de facto endorsements.

---

[29] Removing these respondents from the analytical sample does not change any of the results in any meaningful way.

### D.    Summary of Consumer Perceptions Study Findings

82. The results of the *Consumer Perceptions Study* highlight that a cryptocurrency's endorsement by public figures is material to consumers' decisions regarding its purchase and sale. Consumers are more likely to behave in line with such endorsements and to pay a premium for acquiring endorsed cryptocurrencies. They express concern for lack of transparency regarding endorser pay and for the involvement of fraud-convicted promoters.

## III.    OVERALL CONCLUSIONS

83. In conclusion, as stated and detailed above and based on the study I conducted in this case, I have formed the following opinions:

(a) Consumers in the relevant population find public figure endorsements of a cryptocurrency to convey positive information about the promoted token.

(b) Consumers in the relevant population are willing to pay a premium for a cryptocurrency endorsed by public figures.

(c) Consumers in the relevant population find public figure endorsements important to their cryptocurrency-related decisions.

(d) Consumers in the relevant population assume bona fide behavior from public figures endorsing a cryptocurrency and the absence of that could change their related decisions.

(e) I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  February 11, 2025        _____

                                        Claudiu V. Dimofte, PhD

2025 © Claudiu V. Dimofte, PhD

**Appendix A**

# CLAUDIU V. DIMOFTE

Fowler College of Business                        Department of Marketing
San Diego State University                                    619.594.0209
5500 Campanile Drive                                    cdimofte@sdsu.edu
San Diego, CA 92182                                        dimofte.sdsu.edu

## EDUCATION

| | |
|---|---|
| University of Washington – Philosophiae Doctor (Marketing) | Seattle, WA (2004) |
| University of South Carolina – Master of Business Administration (Intl. Business) | Columbia, SC (1998) |
| West University – Bachelor of Science (Economics) | Timisoara, Romania (1996) |

## ACADEMIC POSITIONS

| | |
|---|---|
| San Diego State University – Professor of Marketing | San Diego, CA (2011-present) |
| Université Jean Monnet – Visiting Professor of Marketing | Saint-Étienne, France (2023) |
| Université Paris-Dauphine – Visiting Professor of Marketing | Paris, France (2016-present) |
| Rutgers University – Visiting Professor of Marketing | Camden, NJ (2016-2017) |
| Georgetown University – Assistant Professor of Marketing | Washington, DC (2004-2011) |

## RESEARCH

**Books and Book Chapters**

Dimofte, Claudiu V. (2024), "Advertising Threats to Consumer Self-Esteem." In Ruvio, Ayalla and Russell W. Belk (Eds.), *Handbook of Identity and Consumption*. New York, NY: Routledge.

Dimofte, Claudiu V. (2023), "Countering False Marketplace Information." In Florack, Arnd (Ed.), *Handbook of Social Cognition and Communication*. New York, NY: Routledge.

Dimofte, Claudiu V., Curtis P. Haugtvedt, and Richard F. Yalch (2015), *Consumer Psychology in a Social Media World*. New York, NY: Routledge.

Dimofte, Claudiu V. (2015), "Unconscious Cognition Effects in Consumer Research." In Jansson-Boyd, Cathrine, and Magdalena Zawisza (Eds.), *International Handbook of Consumer Psychology*. Abingdon, OX: Taylor & Francis.

Dimofte, Claudiu V. (2010), "Consumer Aspects of International Marketing." In Bagozzi, Richard P. and Ayalla Ruvio (Eds.), *Consumer Behavior*. New York, NY: Wiley & Sons.

Dimofte, Claudiu V. and Richard F. Yalch (2007), "The Use and Abuse of Polysemy." In Lowrey, Tina M. (Ed.), *Psycholinguistic Phenomena in Marketing Communications*. Mahwah, NJ: Erlbaum.

Dimofte, Claudiu V. and Richard F. Yalch (2005), "Consumer Disbelief and Attitudes: An Implicit Memory Explanation for Why Believability Is Not Necessary for Persuasion." In Kardes, Frank R., Paul M. Herr, Jaques Nantel. (Eds.), *Applying Social Cognition to Consumer-Focused Strategy*. Mahwah, NJ: Erlbaum.

**Refereed Journal Articles and Proceedings**

Zeugner-Roth, Katharina, Claudiu V. Dimofte, and Fabian Bartsch (2024), "Consumer Cosmopolitanism: a Meta-Analysis and New Applications," *Advances in Consumer Research* (ABS category 2 – "well regarded"), *forthcoming*.

Whaley, Reid C., Alyssa F Harlow, Evan A Kreuger, Matthew D. Stone, David R. Strong, Claudiu V. Dimofte, Jessica Barrington-Trimis (2024), "Importance of various e-cigarette device and e-liquid characteristics by smoking status among young adults who vape. *Substance Use and Misuse* (Q1 SJR, ranked 12th out of 35 journals in Addiction, Impact Factor: 2.362), *forthcoming*.

Dimofte, Claudiu V. (2023), "Brand Associations Can Produce Implicit Trademark Infringement," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 50.

Stone, Matthew D., Jessica L. Braymiller, David R. Strong, Sam N. Cwalina, , Claudiu V. Dimofte, and Jessica Barrington-Trimis (2023). "Differentiating Reasons for Young Adult E-cigarette Use Using Maximum Difference

Choice Models," *Nicotine and Tobacco Research* (Q1 SJR, ranked 4th out of 21 journals in Substance Abuse, Impact Factor: 5.830), 25 (6), 1117-1124.

Dimofte, Claudiu V. (2022), "Subjective Scales Can Enhance Consumer Expectations and Lower Product Evaluations," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 49.

Stone, Matthew D., Claudiu V. Dimofte, David R. Strong, Kim Pulvers, Noe Crespo, and John P. Pierce (2022), "Evaluating US Smokers Willingness-to-Pay for Different Cigarette Packaging Designs Before and After Real-world Exposure in a Randomized Trial," *Tobacco Control* (Q1 SJR, ranked 8th out of 530 journals in Public Health, Impact Factor: 6.221).

Dimofte, Claudiu V. (2021), "Assessing the Relationship between Product Scarcity and Consumer Utility," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 48.

Strong David R., John P. Pierce, Kim Pulvers, Matthew D. Stone, Adriana Villaseñor, Pu, M., Claudiu V. Dimofte, Eric Leas, Jesica Oratowski, Elizabeth Brighton, Samantha Hurst, Sheila Kealey, Ruifeng Chen, and Karen Messer (2021), "The effect of graphic warning labels on cigarette packs on US Smokers' cognitions and smoking behavior after 3 months: a randomized clinical trial," *JAMA Network Open* (Q1 SJR, ranked 15th out of 172 journals in Medicine – General and Internal, Impact Factor: 13.800), 4(8), e2121387-e2121387.

Andriuzzi, Andria, Géraldine Michel, and Claudiu V. Dimofte (2020), "How Brand Conversations on Social Media Prompt Jealousy in Brand Relationships," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 47.

Pierce, John P., David R. Strong, Stone, Matthew D., Adriana Villaseñor, Claudiu V. Dimofte, Leas, Eric, Oratowski, Jesica, Elizabeth Brighton, Samantha Hurst, Kim Pulvers, Sheila Kealey, Ruifeng Chen, and Karen Messer (2020), "Real-World Exposure to Graphic Warning Labels on Cigarette Packs in U.S. Smokers: The CASA Randomized Trial Protocol," *Contemporary Clinical Trials* (Q1 SJR, Impact Factor: 2.480), 98, 106152.

Stone, Matthew D., Claudiu V. Dimofte, David R. Strong, Adriana Villaseñor, Kim Pulvers, Karren Messer, and John P. Pierce (2020), "A Tool to Assess Appeal-Aversion Response to Graphic Warning Labels on Cigarette Packs among United States Smokers," *Tobacco Control* (Q1 SJR, ranked 8th out of 530 journals in Public Health, Impact Factor: 6.221), 30 (3), 312-319.

Dimofte, Claudiu V. (2019), "American Conservatives: Anti-Globalist Global Brand Consumers," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 46.

Leas, Eric C., John P. Pierce, Claudiu V. Dimofte, Dennis Trinidad, and David R. Strong (2018), "Standardized Cigarette Packaging May Decrease the Implied Safety of Natural American Spirit Cigarettes," *Tobacco Control* (Q1 SJR, ranked 8th out of 530 journals in Public Health, Impact Factor: 6.221), 27 (2), 118-123.

Latifi Kasani, Negin, and Claudiu V. Dimofte (2017), "The Dissimilarity Magnifying Bias," *Advances in Consumer Research* (ABS category 2 – "well regarded")*, 44.

Leas, Eric C., Claudiu V. Dimofte, and David R. Strong (2017), "Standardized Packaging May reduce the Perception that American Spirit Cigarettes Are Less Harmful," *Annals of Behavioral Medicine* (Q1 SJR, ranked 17th out of 137 journals in Psychology/Multidisciplinary, Impact Factor: 3.575), 51, S856-S857.

Leas, Eric C., John P. Pierce, Claudiu V. Dimofte, Adriana Villaseñor, and David R. Strong (2016), "US Adult Smokers' Perceptions of Australia's Cigarette Warning Labels: Variance by Warning Content and Consistency across Socio-Demographic Sub-Segments," *Tobacco Control* (Q1 SJR, ranked 8th out of 530 journals in Public Health, Impact Factor: 6.221), 25 (6), 485-496.

Dimofte, Claudiu V., and Negin Latifi Kasani (2016), "When Celebrity Ad Placements Backfire," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 43.

Dimofte, Claudiu V., Ronald C. Goodstein, and Anne M. Brumbaugh (2015), "A Social Identity Perspective on Aspirational Advertising: Implicit Threats to Collective Self-Esteem and Strategies to Overcome Them," *Journal of Consumer Psychology* (Q1 SJR, ABS category 4* – "world leading," listed among Financial Times' Top 50 Journals in Business Schools, Impact Factor: 3.385), 25 (3), 416-430.

Ivanic, Arti, Claudiu V. Dimofte, Rastislav Ivanic, and Maros Ivanic (2015), "The GroupSolver Method for Quantifying Qualitative Research," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 42.

Dimofte, Claudiu V., Kyra Wiggin, and Richard F. Yalch (2014), "To Wait or Not? Why Creating Curiosity May Increase Patience," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 41.

Dimofte, Claudiu V., and Katharina Zeugner-Roth (2013), "The Effects of Consumer Ethnocentrism and Cosmopolitanism on Consumers' Global/Local Brand Choice," *Advances in Consumer Research*, 40.

Dimofte, Claudiu V., and Chris Janiszewski (2013), "The Illusion of Lie Effect: The Suspicious Fluency of Round Numbers," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 40.

Johansson, Johny K., Claudiu V. Dimofte, and Sanal Mazvancheryl (2012), "The Performance of Global Brands in the 2008 Financial Crisis: A Test of Two Brand Value Measures," *International Journal of Research in Marketing* (Q1 SJR, ABS category 4 – "top journal," Impact Factor: 2.593), 29 (4), 235-245.

Ülkü, Sezer, Claudiu V. Dimofte, and Glen M. Schmidt (2012), "Consumer Valuation of Modularly Upgradeable Products," *Management Science* (Q1 SJR, ABS category 4* – "world leading," listed among Financial Times' Top 50 Journals in Business Schools, Impact Factor: 4.219), 58 (9), 1761-1776.

Florack, Arnd, Claudiu V. Dimofte, Karin Rossler, and Susanne Leder (2012), "Brand-Related Background Music and Consumer Choice," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 39.

Cassab, Harold, and Claudiu V. Dimofte (2012), "Everyday Objects of Desire: Dimensions of Design Innovation and the Centrality of Product Aesthetics," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 39.

Dimofte, Claudiu V., Richard F. Yalch, and Kyra Wiggin (2012), "False but Persuasive Information: The Automatic Success of Infomercials," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 39.

Dimofte, Claudiu V. and Richard F. Yalch (2011), "The Mere Association Effect and Brand Evaluations," *Journal of Consumer Psychology* (Q1 SJR, ABS category 4* – "world leading," listed among Financial Times' Top 50 Journals in Business Schools, Impact Factor: 3.385), 21 (1), 24-37.

Dimofte, Claudiu V., Ronald C. Goodstein, and Ajay Kalra (2011), "Context-Sensitive Advertising: A Fitting Story," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 38.

Dimofte, Claudiu V. and Richard F. Yalch (2010), "The Role of Frequency of Experience with a Product Category and Temporal Orientation in Self-Referent Advertising," *Journal of Consumer Psychology* (Q1 SJR, ABS category 4* – "world leading," listed among Financial Times' Top 50 Journals in Business Schools, Impact Factor: 3.385), 20 (3), 343-354.

Dimofte, Claudiu V., Johny K. Johansson, and Richard P. Bagozzi (2010), "Global Brands in America: How Consumer Ethnicity Mediates the Global Brand Effect," *Journal of International Marketing* (Q1 SJR, ABS category 3 – "highly regarded," Impact Factor: 3.375), 18 (3), 82-106.

Dimofte, Claudiu V. (2010), "Implicit Measures of Consumer Cognition: A Review," *Psychology & Marketing* (Q1 SJR, ABS category 3 – "high quality," Impact Factor: 2.023), 27 (10), 921-937 (invited article).

Dimofte, Claudiu V. and Richard F. Yalch (2010), "Consumer Processing of Irrelevant Brand Associations," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 37.

Dimofte, Claudiu V. and Johny K. Johansson (2009), "Scale-Dependent Automatic Shifts in Brand Evaluation Standards," *Journal of Consumer Psychology* (Q1 SJR, ABS category 4* – "world leading," listed among Financial Times' Top 50 Journals in Business Schools, Impact Factor: 3.385), 19 (2), 158-170.

Dimofte, Claudiu V. and Johny K. Johansson (2009), "Consumer Expectations and The Automatic Shifting of Standards in Brand Evaluations," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 36.

Dimofte, Claudiu V., Johny K. Johansson, and Ilkka Ronkainen (2008), "Cognitive and Affective Reactions of American Consumers to Global Brands," *Journal of International Marketing* (Q1 SJR, ABS category 3 – "highly regarded," Impact Factor: 3.375), 16 (4), 115-137.

Dimofte, Claudiu V., Johny K. Johansson, and Ilkka Ronkainen (2008), "Spanning the Globe," *Marketing Management*, 17 (5), 40-43.

Dimofte, Claudiu V. and Richard F. Yalch (2008), "The Role of Product Category Familiarity in Self-Referent Advertising," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 35.

Dimofte, Claudiu V. and Richard F. Yalch (2007), "Consumer Response to Polysemous Brand Slogans," *Journal of Consumer Research* (Q1 SJR, ABS category 4* – "world leading," listed among Financial Times' Top 50 Journals in Business Schools, Impact Factor: 3.800), 33 (4), 515-522.

Dimofte, Claudiu V. and Richard F. Yalch (2007), "The SMAART Scale: A Measure of Individuals' Automatic Access to Secondary Meanings in Polysemous Statements," *Journal of Consumer Psychology* (Q1 SJR, ABS category 4* – "world leading," listed among Financial Times' Top 50 Journals in Business Schools, Impact Factor: 3.385), 17 (1), 49-58.

Dimofte, Claudiu V., Richard F. Yalch, and Anthony G. Greenwald (2006), "Brand Names and Transitive Implicit Associations," *European Advances in Consumer Research*, 7.

Dimofte, Claudiu V. and Richard F. Yalch (2005), "The SMAART Scale: Measure Development and Validation," *Advances in Consumer Research* (ABS category 2 – "well regarded"), 32.

Dimofte, Claudiu V., Mark R. Forehand, and Rohit Deshpandé (2004), "Ad Schema Incongruity as Elicitor of Ethnic Self-Awareness and Differential Advertising Response," *Journal of Advertising* (Q1 SJR, ABS category 3 – "highly regarded," Impact Factor: 3.518), 32 (4), 7-18.

## Manuscripts Under Review

Dimofte, Claudiu V. and Ronald C. Goodstein, "On the Effectiveness of Context-Sensitive Advertising," *Journal of the Academy of Marketing Science* (Q1 SJR, ABS category 4* – "world leading," listed among Financial Times' Top 50 Journals in Business Schools, Impact Factor: 14.600).

Andriuzzi, Andria, Géraldine Michel, and Claudiu V. Dimofte, "How Brand Conversations on Social Media Prompt Jealousy in Brand Relationships," *European Journal of Marketing* (Q1 SJR, ABS category 3 – "highly regarded," Impact Factor: 5.500).

Dimofte, Claudiu V. and Richard F. Yalch, "Consumer Response to False Brand Information and Related Quelling Messages," *Psychology & Marketing* (Q1 SJR, ABS category 3 – "highly regarded," Impact Factor: 8.900).

Zeugner-Roth, Katharina, Claudiu V. Dimofte, and Fabian Bartsch, "Consumer Cosmopolitanism: a Meta-Analysis and New Applications." *Journal of International Business Studies* (Q1 SJR, ABS category 4* – "world leading," listed among Financial Times' Top 50 Journals in Business Schools, Impact Factor: 11.380).

## Conference Presentations

Zeugner-Roth, Katharina, Claudiu V. Dimofte, and Fabian Bartsch, "Consumer Cosmopolitanism: a Meta-Analysis and New Applications," ACR Conference in Paris, 2024.

Zeugner-Roth, Katharina, Claudiu V. Dimofte, and Fabian Bartsch, "Consumer Cosmopolitanism: a Meta-Analysis and New Applications," EMAC Conference in Bucharest, 2024.

Dimofte, Claudiu V., "Brand Associations Can Produce Implicit Trademark Infringement," ACR Conference in Seattle, 2023.

Whaley, Reid C., Cwalina, Sam N., Krueger, Evan A., Harlow, Alyssa F., Stone, Matthew D., Strong, David R., Dimofte, Claudiu V., Barrington-Trimis, Jessica L. E-cigarette device and e-liquid product characteristics that differentially appeal to young adults who never, former, and currently smoke cigarettes. Society for Research on Nicotine and Tobacco Annual Meeting in San Antonio, 2023.

Dimofte, Claudiu V., "Subjective Scales Can Enhance Consumer Expectations and Lower Product Evaluations," ACR Conference in Denver, 2022.

Zeugner-Roth, Katharina, Claudiu V. Dimofte, and Fabian Bartsch, "*The Brand Choices of Cosmopolitan Globetrotting Consumers*." SCP Conference in Singapore, 2022.

Braymiller, Jessica. L., Matthew D. Stone, Reid C. Whaley., Yi Zhang, David R Strong, Claudiu V. Dimofte, & Jessica L. Barrington-Trimis. *Relative importance of e-cigarette characteristics among young adults who vape: Findings from a novel maximum difference choice task*. Annual Meeting of the Society for Research on Nicotine and Tobacco, 2021.

Ngo Christie, Cwalina Sam N., Yi Zhang, Matthew D. Stone, David R. Strong, Claudiu V. Dimofte, and Jessica L. Barrington-Trimis. *Comparison of Five Online Data Collection Platforms for Recruitment of Young Adult Vapers.* 27th Annual Meeting of the Society for Research on Nicotine and Tobacco, 2021.

Dimofte, Claudiu V., "Assessing the Relationship between Product Scarcity and Consumer Utility," ACR Conference in Seattle, 2021.

Whaley, Reid C., Cwalina, S.N., E.A. Kreuger, Jessica L. Braymiller, Matthew D. Stone, Christie Ngo, David R. Strong, Claudiu V. Dimofte, and Jessica L. Barrington-Trimis. *The importance of e-cigarette device and e-liquid product characteristics among young adults who vape.* Society for Research on Nicotine and Tobacco Annual Meeting, 2021.

Andriuzzi, Andria, Géraldine Michel, and Claudiu V. Dimofte, "How Brand Conversations on Social Media Prompt Jealousy in Brand Relationships," ACR Conference in Paris, 2020.

Dimofte, Claudiu V., "American Conservatives: Anti-Globalist Global Brand Consumers," ACR Conference in Atlanta, 2019.

Dimofte, Claudiu V., "When Anti-Globalization Stance and Global Brand Preference Coexist: The Curious Case of Conservative-Leaning U.S. Consumers," AMA Global Marketing SIG Conference in Buenos Aires, 2019.

Dimofte, Claudiu V., "Affective Debriefing in Experimental Consumer Psychology Research Employing Deception," ICPS Conference in Paris, 2019.

Dimofte, Claudiu V., "Dissimilarities Loom Larger than Similarities in Social Perception," SCP Conference in Savannah, 2019.

Dimofte, Claudiu V., "Affective Debriefing in Experimental Consumer Psychology Research Employing Deception," SCP Conference in Savannah, 2019.

Stone, Matthew, Claudiu V. Dimofte, Adrianna Villaseñor, Jessica Oratowski, Eliza Jeong, John P. Pierce, David R. Strong. "The Effect of Graphic Warning Labels on the Sensitivity to Cigarettes Pack Prices," Annual Conference of the Society for Research on Nicotine and Tobacco in San Francisco, 2019.

Zeugner-Roth, Katharina, Claudiu V. Dimofte, and Fabian Bartsch, "The Role of Consumer Nationality and Product Country-of-Origin for Brand Choice in Countries of Low Product Ethnicity," AMA Global Marketing SIG Conference in Santorini, 2018.

Dimofte, Claudiu V. and Chris Janiszewski, "Round Numbers Produce Unwarranted Skepticism," La Londe Consumer Behavior Conference in La Londe Les Maures, 2017.

Dimofte, Claudiu V. and Richard F. Yalch, "Developing Effective Counter Messages to False Marketplace Information," Consumer Behavior Conference in La Londe Les Maures, 2017.

Dimofte, Claudiu V., and Negin Latifi Kasani, "When Celebrity Ad Placements Backfire," ACR Conference in Berlin, 2016.

Strong, David R., Claudiu V. Dimofte, Eric Leas, Samantha Hurst, Adrianna Villaseñor, Jessica Oratowski, Eliza Jeong, John P. Pierce, *Appeal of Tobacco Product Packaging: Influences of Removing Brand Imagery.* Annual Conference of the Society for Research on Nicotine and Tobacco in Chicago, 2016.

Ivanic, Arti, Claudiu V. Dimofte, Rastislav Ivanic, and Maros Ivanic, "The GroupSolver Method for Quantifying Qualitative Research," ACR Conference in New Orleans, 2015.

Dimofte, Claudiu V., Richard F. Yalch, and Kyra Wiggin, "To Wait or Not? Why Creating Curiosity May Increase Patience," ACR Conference in Baltimore, 2014.

Zeugner-Roth, Katharina, and Claudiu V. Dimofte, "Consumers' Global vs. Local Brand Choice in Foreign Contexts," EMAC Conference in Valencia, 2014.

Dimofte, Claudiu V, and Arnd Florack, "The Effect of Background Music on Consumer Response," EMAC Conference in Valencia, 2014.

Dimofte, Claudiu V., and Katharina Zeugner-Roth, "The Effects of Consumer Ethnocentrism and Cosmo-politanism on Consumers' Global vs. Local Brand Choice," ACR Conference in Chicago, 2013.

Dimofte, Claudiu V, and Chris Janiszewski, "The Illusion of Lie Effect: The Suspicious Fluency of Round Numbers," ACR Conference in Chicago, 2013.

Dimofte, Claudiu V, Ronald C. Goodstein, and Ajay Kalra, "Context-Sensitive Advertising: A Fitting Story," SCP Conference in San Antonio, 2013.

Dimofte, Claudiu V., Richard F. Yalch, and Kyra Wiggin, "False but Persuasive Information: The Automatic Success of Infomercials," ACR Conference in Vancouver, 2012.

Florack, Arnd, Claudiu V. Dimofte, Karin Rossler, and Susanne Leder, "Brand-Related Background Music and Consumer Choice," ACR Conference in Vancouver, 2012.

Cassab, Harold, and Claudiu V. Dimofte, "Everyday Objects of Desire: Dimensions of Design Innovation and the Centrality of Product Aesthetics," ACR Conference in Vancouver, 2012.

Florack, Arnd, Susanne Leder, and Claudiu V, Dimofte, "Brand-Related Background Music and Consumer Choice," EIRASS Conference in Vienna, 2012.

Florack, Arnd, Susanne Leder, and Claudiu V, Dimofte, "Brand-Related Background Music and Consumer Choice," AMA/ACRA Conference in Seattle, 2012.

Florack, Arnd, Susanne Leder, and Claudiu V, Dimofte, "Brand-Related Background Music and Consumer Choice," SCP Conference in Las Vegas, 2012.

Dimofte, Claudiu V, Ronald C. Goodstein, and Ajay Kalra, "Context-Sensitive Advertising: A Fitting Story," ACR Conference in St. Louis, 2011.

Johansson, Johny K. and Claudiu V. Dimofte, "Brand Value Effects on Stock Market Performance," Global Branding Conference in Istanbul, 2010.

Johansson, Johny K. and Claudiu V. Dimofte, "Brand Value Effects on Stock Market Performance," AIB Conference in Rio de Janeiro, 2010.

Dimofte, Claudiu V., Johny Johansson, and Katharina Zeugner-Roth, "Global and Local Brands in the Beer Market: A Dual-Nation Analysis," Global Branding Conference in Istanbul, 2010.

Dimofte, Claudiu V., Anne Brumbaugh, and Ronald C. Goodstein, "Consumer Comparison to the Product User Prototype Affects Brand Attitudes," SCP Conference in St. Petersburg, 2010.

Dimofte, Claudiu V. and Richard F. Yalch, "Consumer Processing of Irrelevant Brand Associations," ACR Conference in Pittsburgh, 2009.

Dimofte, Claudiu V. and Johny K. Johansson, "The Automatic Shifting of Standards in Brand Evaluations," ACR Conference in San Francisco, 2008 and the La Londe Consumer Behavior Conference in La Londe Les Maures, 2009.

Dimofte, Claudiu V. and Richard F. Yalch, "Brand Rumors: Cognitive Mechanisms for Acceptance and Strategies for Quelling," SCP Conference in Las Vegas, 2007.

Dimofte, Claudiu V. and Richard F. Yalch, "The Role of Consumer Familiarity with the Product Category in Self-Referent Persuasion," ACR Conference in Memphis, 2006.

Dimofte, Claudiu V., Richard F. Yalch, and Anthony G. Greenwald, "Brand Names as Sources and Targets of Tangential Implicit Associations," APA Conference in New Orleans, 2006.

Dimofte, Claudiu V., Johny K. Johansson, and Ilkka Ronkainen, "Measuring Brand Globality," AIB Conference in Beijing, 2006.

Dimofte, Claudiu V. and Ronald C. Goodstein: "Explaining the Negative Spillover Effect in Target Marketing," ACR Conference in San Antonio, 2006.

Dimofte, Claudiu V. and Johny K. Johansson, "Brand Stereotypes and Consumer Judgments: The Automatic Shifting of Standards in Brand Evaluations," EMAC Conference in Athens, 2006.

Dimofte, Claudiu V. and Johny K. Johansson, "Brand Stereotypes and Consumer Judgments: The Automatic Shifting of Standards in Brand Evaluations," ACR Conference in San Antonio, 2006.

Dimofte, Claudiu V. "Brand Names and Transitive Implicit Associations," European ACR Conference in Göteborg, 2005.

Dimofte, Claudiu V. and Richard F. Yalch, "The SMAART Scale: Measure Development and Validation," ACR Conference in Portland, 2004.

Dimofte, Claudiu V. and Richard F. Yalch, "Consumer Disbelief and Attitudes: Implicit Memory Explanations for Why Believability Is Not Necessary for Persuasion," SCP Conference in Montréal, 2004.

Dimofte, Claudiu V., Richard F. Yalch, and Anthony G. Greenwald, "Brand Names as Sources and Targets of Tangential Implicit Associations," ACR Conference in Toronto, 2003.

Dimofte, Claudiu V. and Richard F. Yalch, "The Role of Advertisement Copy in Prompting Consumer Access to Slogan Meaning," ACR Conference in Atlanta, 2002.

**Invited Research Presentations**

| | |
|---|---|
| Berlin School of Economics and Law, Germany | ESSEC Paris, France |
| Indiana University | HEC Paris, France |
| George Mason University | IÉSEG School of Management Lille, France |
| Georgetown University | IÉSEG School of Management Paris, France |
| Rutgers University | Sorbonne Business School Paris, France |
| San Diego State University | Technische Universität Dortmund, Germany |
| University of British Columbia | Universidad Católica Portuguesa Lisbon, Portugal |
| University of Central Florida | Université Paris-Dauphine Paris, France |
| University of San Diego | University of Auckland, New Zealand |
| University of South Carolina | University of Basel, Switzerland |
| University of Washington | University of Vienna, Austria |
| Université Jean Monnet, France | Université Louis Lumière Lyon 2, France |
| Zeppelin University, Germany | |

**Scholarly Awards and Funded Research Grants**

| | |
|---|---|
| Society for Consumer Psychology: | Best Working Paper Award, Annual Conference (2019) |
| Erasmus+ Grant: | Berlin School of Economics and Law (2016) |
| National Institutes of Health: | Tobacco Packaging Research Grant (with UCSD researchers, 2015) |
| San Diego State University: | Fowler College of Business Research Grant (2013, 2015, 2020) |
| | Most Influential MBA Marketing Faculty Award (2014) |
| | Outstanding Faculty Award: Research, Teaching, Service (2014) |
| Society for Consumer Psychology: | Nominee, C.W. Park Award for Outstanding Contribution to JCP |
| National Institutes of Health: | Tobacco Packaging Research Grant (with UCSD researchers, 2015) |
| Academy of International Business: | Best International Mktg. Paper Award, Annual Conference (2010) |
| American Marketing Association: | Student Fellow, Sheth Doctoral Consortium (2004) |
| | Nominee, Howard Award (2005) |
| | Faculty Fellow, Sheth Doctoral Consortium (2012) |
| San Diego State University: | University Research Grant (2011) |
| | Fowler College of Business Graduate Fee Grant (2012, 2017, 2021) |
| | University Mid-Career Research Grant (2020) |

| | |
|---|---|
| | Outstanding Faculty Contribution Award (2014) |
| Georgetown University: | University Competitive Grant (2005) |
| | University Research Infrastructure Award (2005) |
| | International Collaborative Research Grant (2007) |
| | MSB Capital Markets Research Center Grant (2008) |
| University of Washington: | Boeing Fellowship for Academic Excellence (2002) |
| | Dean's Award for Outstanding Academic Achievement (2002) |
| | Evert McCabe Endowed Fellowship (2003) |
| | CIBER Research Award (2004) |
| | Magna Cum Laude PhD (2004) |
| University of South Carolina: | Graduate Fellowship Grant (1996 – 1998) |
| | Magna Cum Laude MBA (1998) |
| West University: | National Merit Scholarship (1991 – 1996) |
| | Summa Cum Laude BS (1996) |
| University of Auckland: | Research Development Program Award (with H. Cassab, 2007) |
| University of Basel: | Research Award (with A. Florack, 2008) |
| Vlerick Leuven Management School: | Research Award (with K. Zeugner-Roth, 2010) |

## TEACHING

Interests:      Marketing Management, Consumer Behavior, Marketing Strategy, Marketing Research
Evaluations:   *Georgetown University* (7 years)
  ▪  Principles of Marketing (MARK 220):     4.14 out of 5
  ▪  Consumer Behavior (MARK 222):           4.39 out of 5
*San Diego State University* (14 years)
  ▪  Marketing Management (BA 672):            4.60 out of 5
SDSU Outstanding Faculty Award – Most Influential MBA Professor (2014, 2021)
Fowler College of Business Teaching Excellence Award (2019)

## SERVICE

| | |
|---|---|
| Member – Fowler College of Business Faculty Development Committee | (since 2013) |
| Member – Fowler College of Business Rank, Tenure, and Promotion Committee | (since 2022) |
| Graduate Student Advisor for Marketing Area | (since 2013) |
| Member – University Senate | (2012-2018) |
| Editorial Board member for:  *Journal of Consumer Psychology* (ABS 4*, world leading) | (since 2012) |
| *Journal of the Academy of Marketing Science* (ABS 4*, world leading) | (since 2017) |
| *Journal of International Marketing* (ABS 3, highly regarded) | (since 2019) |
| Committee Member, *Journal of Consumer Psychology Young Contributor Award* | (since 2018) |
| Committee Member, *American Marketing Association Dissertation Award* | (since 2022) |

Conference Co-Chair, *SCP Advertising and Consumer Psychology Conference – San Diego, 2013*
Working Paper Track Co-Chair, *Association for Consumer Research Conference – New Orleans, 2015*
Consumer Behavior Track Co-Chair, *Academy of Marketing Science Conference – Baltimore, 2009*
Media Coverage: *Newsweek, Wall Street Journal, PBS, Wallethub.com, Prnewswire.com, Newneuromarketing.com*

## Appendix B

### Claudiu V. Dimofte, PhD – Expert Depositions / Testimony Provided Since 2018

- UNITED STATES DISTRICT COURT
  NORTHERN DISTRICT OF CALIFORNIA
  LAURA MARKS, GAYLIA PICKLES and DONNA VANDIVER individually and on behalf of all others similarly situated,
  Plaintiffs,
  v.
  KATE SPADE AND COMPANY, A DELAWARE CORPORATION; and DOES 1-50, INCLUSIVE,
  Defendants.
  Case No. 4:15-CV-05329-VC

- SUPERIOR COURT OF THE STATE OF CALIFORNIA
  COUNTY OF ORANGE
  CHELSEA VANCLEVE, CHELSEA VESELY, and ROSITA SHOUSE
  Plaintiffs,
  v.
  CHIEN ET CHAT. INC. d/b/a BARKWORKS PET STORES, and DOES 1-10, INCLUSIVE,
  Defendants.
  Case No. 30-2014-00747275-CU-BT-CJC

- UNITED STATES DISTRICT COURT
  SOUTHERN DISTRICT OF FLORIDA
  JOSHUA WASSER, ILA GOLD, and ROBERTO ISRAEL J. BARAJAS-RAMOS,
  on behalf of themselves and all others similarly situated,
  Plaintiffs,
  v.
  ALL MARKET INC.,
  Defendant.
  Case No. 1:16-CV-21238

- SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
  ANIMAL LEGAL DEFENSE FUND
  on behalf of the general public,
  Plaintiff,
  v.
  HORMEL FOODS CORPORATION,
  Defendant.
  Case No. 2016CA-004744

- SUPERIOR COURT OF THE STATE OF ARIZONA
  COUNTY OF MARICOPA

DEBORAH BRITT, MELISSA CHRISTIAN, WARREN DUNN, MARTIN GARCIA, KELLIE LANGER, ERICA MARXMANN, WALTER SHIFFLETT, RICKY TUCKER, JAQUELINE VILLEGAS, MELISSA WAGSTAFF; and DOES I-X,
Plaintiffs,
v.
PUPPIES.COM, LLC, an Arizona Limited Liability Company d/b/a PUPPYFIND.COM; JOHN and JANE DOES I-X; BLACK and WHITE CORPORATIONS I-X,
Defendants.
Case No. CV2016-016116

▪ UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
FRIENDS OF THE EARTH and CENTER FOR FOOD SAFETY
Plaintiffs,
v.
SANDERSON FARMS, INC., a Mississippi corporation,
Defendant.
Case No. 3:17-CV-03592-RS

▪ SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES
RAMON TINOCO LOPEZ, ANDRES TINOCO LOPEZ, PEDRO TINOCO LOPEZ, and JAVIER TINOCO LOPEZ, individually and as Surviving Heirs and Successors in
Interest of Jose Lopez Marin, Deceased, and Guadalupe Tinoco Docil, Deceased; CONCEPTION TINOCO LOPEZ, CIRIA TINOCO LOPES, ROSALINA TINOCO LOPEZ, MARISELA TINOCO LOPEZ, TINOCO LOPEZ and NORMA TETOCO LOPEZ, as Surviving Heirs and Successors in Interest of Jose Lopez Marin, Deceased, and Guadalupe Tinoco Docil, Deceased;
Plaintiffs,
vs.
LAURO LEAL and MARIA C. LEAL d/b/a L&L TIRES, and MICHELIN NORTH AMERICA, INC., FORD MOTOR
COMPANY, DOE Defendants 1-50,
Defendants.
CASE NO. 19STCV21650

▪ UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
FARID KHAN, an individual, on behalf of himself and all others similarly situated,
Plaintiff,
v.
BOOHOO.COM USA, INC., a Delaware corporation, BOOHOO.COM UK LIMITED, a United Kingdom private limited company, BOOHOO GROUP PLC, a Jersey public limited company, and DOES 1-10, inclusive.
Defendants.
Case No. 2:20-cv-03332-GW-JEM

2025 © Claudiu V. Dimofte, PhD

- UNITED STATES DISTRICT COURT
  FOR THE CENTRAL DISTRICT OF CALIFORNIA
  AUDIO-TECHNICA CORPORATION and AUDIO-TECHNICA U.S., INC.
  Plaintiffs,
  v.
  MUSIC TRIBE COMMERCIAL MY SDN. BHD
  Defendant.
  Case No. 2:21-cv-09009-ODW-AS

- UNITED STATES DISTRICT COURT
  FOR THE DISTRICT OF COLUMBIA
  RANCHERS-CATTLEMEN ACTION LEGAL FUND, UNITED STOCKGROWERS OF AMERICA,
  Plaintiff,
  v.
  UNITED STATES DEPARTMENT OF AGRICULTURE, and
  SONNY PERDUE, in his official capacity as Secretary of the United States Department of Agriculture,
  Defendants.
  Case No. 20-2552

- AMERICAN ARBITRATION ASSOCIATION
  CYNTHIA KOBEL, an individual, and SHALANDA HOUSTON, an individual, on behalf of themselves and all others similarly situated,
  Claimants,
  v.
  JPAY, INC.,
  Respondent.
  Case No.: 01-15-0005-3477

- UNITED STATES DISTRICT COURT
  FOR THE NORTHERN DISTRICT OF CALIFORNIA
  SAN JOSE DIVISION
  CARL BARRETT, MICHEL POLSTON, NANCY MARTIN, MICHAEL RODRIGUEZ, MARIA RODRIGUEZ, and ANDREW HAGENE
  Individually, and on Behalf of All Others Similarly Situated,
  Plaintiffs,
  v.
  APPLE INC., a California Corporation; APPLE VALUE SERVICES LLC; and DOES 1 Through 10, Inclusive,
  Defendants.
  Case No.: 5:20-cv-04812-EJD

- UNITED STATES DISTRICT COURT
  FOR THE NORTHERN DISTRICT OF CALIFORNIA
  OAKLAND DIVISION
  ANDREW AXELROD and ELIOT BURK

Individually, and on behalf of all others similarly situated,
Plaintiffs,
v.
LENOVO (UNITED STATES) INC., a Delaware corporation,
Defendant.
Case No.: 4:21-cv-06770-JSW

- UNITED STATES DISTRICT COURT
  FOR THE CENTRAL DISTRICT OF CALIFORNIA
  ACTIVISION PUBLISHING, INC., a Delaware corporation,
  Plaintiff / Counterclaim Defendant,
  v.
  WARZONE.COM, LLC,
  Defendant / Counterclaimant.
  CASE NO. 2:21-cv-3073-FLA (JVX)

**Appendix C**

**Materials Considered**

Case, No. 2:22-cv-00163-MWF-SK, United States District Court, Central District of California.

Center, Judicial. *Manual for Complex Litigation* (2004).

Diamond, Shari S. "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, National Academies Press (2011): 359-423.

Jacoby, Jacob. "Are Closed-Ended Questions Leading Questions?" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Shari S. Diamond and Jerre B. Swann, eds., American Bar Association (2012): 261-285.

2025 © Claudiu V. Dimofte, PhD

## Appendix D

## Consumer Perceptions Study – Response Statistics

|  | N | % |
|---|---|---|
| **Full Prospective Sample [1]** | **1,690** | **100.00** |
| **Screened out of Survey [2]** | **1,189** | **70.35** |
| Failed item *employment* [3] | 225 | 13.31 |
| Failed item *history* [4] | 325 | 19.23 |
| Failed item *did.plums* [5] | 113 | 6.69 |
| Failed item *will.crypto* [6] | 21 | 1.24 |
| **Failed to Complete Survey** | **7** | **.01** |
| **Final Analytical Sample [7]** | **501** | **29.64** |

[1] Respondents who started the survey.

[2] Note that some respondents were screened out after failing more than one selection filter.

[3] Respondents who reported having been employed (themselves or their family members) in one of the following industries: Advertising or marketing research; Cryptocurrency/virtual currency brokering, dealing, or marketing; Legal services; Social networks or other media networks and content providers.

[4] Respondents who answered "Not sure" to having any of the presented items (*bicycle, boat, car, dog, graduate degree, smartphone, telegraph, toothbrush,* and *TV set,*), answered "Do not have one" to the item *toothbrush*, or answered "Have at least one" to the item *telegrap*h.

[5] Respondents who reported having purchased French Mirabelle plums from their local grocery store in the last year.

[6] Respondents who reported not having bought cryptocurrency within the past year or two and not planning to do so in the next year or two.

[7] Data used in the analyses.

**Appendix E**

**Consumer Perceptions Study – Sample Demographics by Retention Status**

| Sample | Not retained | Retained[1] |
|---|---|---|
| **Sample Size** | **1,189** | **501** |
| **Gender** | | |
| Male | 53.1% | 53.5% |
| Female | 46.0% | 46.3% |
| Other | .6% | .0% |
| Prefer not to respond | .3% | .2% |
| **Mean Age** | 39.51 | 35.63 |
| **Ethnicity** [2] | | |
| Asian | 4.1% | 3.2% |
| Black | 19.2% | 33.1% |
| Hispanic | 11.4% | 15.6% |
| Native American | 3.3% | 2.2% |
| Pacific Islander | .3% | .0% |
| White | 69.9% | 56.9% |
| Other | 1.2% | .4% |
| **Marital Status** | | |
| Single (not in a relationship) | 41.8% | 41.7% |
| In a relationship (not married) | 18.9% | 17.6% |
| Married | 38.0% | 40.3% |
| Other | 1.3% | .4% |
| **Children** | | |
| No | 38.0% | 28.7% |
| Yes | 62.0% | 71.3% |
| **Education** | | |
| High-school or less | 21.7% | 22.4% |
| Some college/technical school | 26.2% | 25.3% |
| 2-year college | 12.2% | 11.6% |
| 4-year college | 27.4% | 30.7% |
| Graduate school degree | 12.5% | 10.0% |
| **Employment Status** | | |
| Student (full-time) | 3.7% | 4.2% |
| Unemployed (not a student) | 12.6% | 6.0% |
| Employed part-time | 12.1% | 9.0% |
| Employed full-time | 65.7% | 79.4% |
| Other | 5.8% | 1.4% |
| **Median Annual Household Income** | $56,000 | $65,000 |

[1] Respondents in the final analytical sample.
[2] Some respondents selected multiple ethnicities.

2025 © Claudiu V. Dimofte, PhD

**Appendix F**

**Consumer Perceptions Study – Survey Items**

---

**Start of Block: Start**

*intro* Thank you for your interest in this marketing research study that addresses some of your personal perceptions about the marketplace. It should only take a few minutes to complete. In responding to the questions, please pay attention and read the information carefully before selecting the response that best reflects your thoughts and feelings. There are no right or wrong answers and your responses are completely anonymous.

Please click below to proceed.

${e://Field/transaction_id}

---

Page Break ————————————————————————————

*vision* Do you normally wear glasses or contact lenses when you read?

○ Yes  (1)

○ No  (2)

---

Display This Question:

    If vision = 1

*puton* If you normally wear glasses or contact lenses when you read, please use them while completing this survey.  Thank you.

**End of Block: Start**

**Start of Block: Screening**

Page Break

*device* What type of device are you using to answer these questions?

○ Desktop or Laptop  (1)

○ Tablet  (2)

○ Smart phone  (3)

○ Other  (4) _____

---

Page Break ──────────────────────────────

*gender* What is your gender?

○ Male  (1)

○ Female  (2)

○ Other  (3)

○ Prefer not to answer  (4)

---

[*]

*age* What is your age?

(please enter number below)

_____

---

Page Break ──────────────────────────────

*ethnicity* What is your ethnicity?

(please check all that apply)

☐     Asian  (1)

☐     Black  (2)

☐     Hispanic  (3)

☐     Native American  (4)

☐     Pacific Islander  (5)

☐     White  (6)

☐     Other  (7) _____

---

Page Break ———————————————————————————

*marital* What is your marital status?

○ Single (not in a relationship)  (1)

○ In a relationship (not married)  (2)

○ Married  (3)

○ Other  (4) _____

*kids* Do you have children?

○ No  (1)

○ Yes  (2)

Page Break ———————————————————————————

*edu* What is your highest completed education level?

○ High school or less  (1)

○ Some college/technical school  (2)

○ 2-yr college degree  (3)

○ 4-yr college degree  (4)

○ Graduate school degree  (5)

Page Break ———————————————————————————

*employ* What best describes your current employment status?

○ Student (full-time)  (1)

○ Unemployed (not a student)  (2)

○ Employed part-time  (3)

○ Employed full-time  (4)

○ Other  (5) _____

---

Page Break ────────────────────────────────────────────

✳

*income* What is your total annual household (i.e., not personal) income, before taxes?    (in U.S. dollars, please insert numbers only)

_____

---

Page Break ────────────────────────────────────────────

*state* Where do you currently reside?

▼ I do not reside in the United States (53) ... Wyoming (52)

Skip To: End of Block If state = 53

Page Break ────────────────────────────────────────────

*work* Have you or any member of your household ever worked in the following industries? (please check all that apply)

- ☐ Advertising or market research  (1)
- ☐ Animal care or veterinarian services  (2)
- ☐ Book publishing, distribution, or sales  (3)
- ☐ Clothing / shoe manufacturing, distribution, or sales  (4)
- ☐ Cryptocurrency / virtual currency brokering, dealing, or marketing  (5)
- ☐ Entertainment content production, distribution, or sales  (7)
- ☐ Food / beverage manufacturing, distribution, or sales  (8)
- ☐ Legal services  (9)
- ☐ Newspaper / magazine publishing, distribution, or sales  (10)
- ☐ Pet breeding, grooming, distribution, or sales  (11)
- ☐ Social networks and other media networks and content providers  (12)
- ☐ Travel, tourism, or hospitality  (13)
- ☐ ⊗None of the above  (14)

*Skip To: End of Block If work = 1*
*Skip To: End of Block If work = 5*
*Skip To: End of Block If work = 9*
*Skip To: End of Block If work = 12*

Page Break

2025 © Claudiu V. Dimofte, PhD

*history* Please select the option that best describes your status relative to each of the following items:

|  | Do not have one (1) | Have at least one (2) | Not sure (3) |
|---|---|---|---|
| Bicycle (1) | ○ | ○ | ○ |
| Boat (2) | ○ | ○ | ○ |
| Car (3) | ○ | ○ | ○ |
| Dog (4) | ○ | ○ | ○ |
| Graduate degree (5) | ○ | ○ | ○ |
| Smartphone (6) | ○ | ○ | ○ |
| Telegraph (7) | ○ | ○ | ○ |
| Toothbrush (8) | ○ | ○ | ○ |
| TV set (9) | ○ | ○ | ○ |

*Skip To: End of Block If history = 1 [ 3 ]*
*Skip To: End of Block If history = 2 [ 3 ]*
*Skip To: End of Block If history = 3 [ 3 ]*
*Skip To: End of Block If history = 4 [ 3 ]*
*Skip To: End of Block If history = 5 [ 3 ]*
*Skip To: End of Block If history = 6 [ 3 ]*
*Skip To: End of Block If history = 7 [ 2 ]*
*Skip To: End of Block If history = 7 [ 3 ]*
*Skip To: End of Block If history = 8 [ 1 ]*
*Skip To: End of Block If history = 8 [ 3 ]*
*Skip To: End of Block If history = 9 [ 3 ]*

Page Break

*did.car* In the last year or two, did you purchase or lease a new vehicle from a car dealership?

○ No  (1)

○ Yes  (2)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break

*did.shoes* In the last year or two, did you purchase running shoes from a brick-and-mortar shoe store?

○ No  (1)

○ Yes  (2)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break

*did.plums* In the last year or two, did you purchase French Mirabelle plums from a local grocery store?

○ No  (1)

○ Yes  (2)

| *Skip To: End of Block If did.plums = 2* |
|---|

Page Break

*did.crypto* In the last year or two, did you buy or sell any cryptocurrency?

○ No  (1)

○ Yes  (2)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break

| *Display This Question:* |
|---|
| *If did.crypto = 1* |

*will.crypto* In the next year or two, do you plan to buy any cryptocurrency?

○ No  (1)

○ Yes  (2)

*Skip To: End of Block If will.crypto = 1*

Page Break ─────────────────────────────

*will.car* In the next year or two, do you plan to purchase or lease a new vehicle from a car dealership?

○ No  (1)

○ Yes  (2)

Page Break ─────────────────────────────

*will.shoes* In the next year or two, do you plan to purchase running shoes from a brick-and-mortar shoe store?

○ No  (1)

○ Yes  (2)

Page Break ─────────────────────────────

*will.plums* In the next year or two, do you plan to purchase French Mirabelle plums from a local grocery store?

○ No  (1)

○ Yes  (2)

Page Break ─────────────────────────────

*follower* Which of the following public figures do you currently follow or may follow in the future on social media?

☐     Barack Obama  (1)

☐     Cristiano Ronaldo  (2)

☐     Doctor Mike  (3)

☐     Elon Musk  (4)

☐     Floyd Mayweather, Jr.  (5)

☐     Justin Bieber  (6)

☐     Kim Kardashian  (7)

☐     Kylie Jenner  (8)

☐     Leo Messi  (9)

☐     Mr. Beast  (10)

☐     Paul Pierce  (11)

☐     Selena Gomez  (12)

☐     Taylor Swift  (13)

☐     ⊗None  (14)

End of Block: Screening

Start of Block: Ineligible

*ineligible* Unfortunately, you are not eligible for this survey.
Thank you nonetheless for your interest.
Please click below to continue.

End of Block: Ineligible

Start of Block: Eligible

2025 © Claudiu V. Dimofte, PhD

*eligible* You are eligible to participate in this survey - thank you for your interest. Please click below to continue.

---

Page Break

---

*welcome* You are one of many consumers across the U.S. taking this survey and you have been assigned to answer questions about the following industry: Cryptocurrency / virtual currency brokering, dealing, or marketing.   The survey will address some of your related perceptions and opinions.   We just want your first impressions of what you see here, so please spend as much time as you would spend if you were exposed to these stimuli in your daily life. Different respondents in this survey will be exposed to different information they may encounter in the marketplace.   Once again, there are no right or wrong answers but we do ask that you be truthful and pay attention in order to be retained in the study and paid.   Please click below to continue.

---

Page Break

---

**End of Block: Eligible**

**Start of Block: General**

*trust* How confident are you that the current ways to invest in, trade, or use cryptocurrencies are reliable and safe?

○ Not at all confident  (1)

○ Not very confident  (2)

○ Somewhat confident  (3)

○ Very confident  (4)

○ Extremely confident  (5)

---

Page Break

| X→ |
|---|

*accept* How would you feel if more businesses accepted cryptocurrency payments?

○ Very unhappy  (1)

○ Unhappy  (2)

○ Somewhat unhappy  (3)

○ Neither happy nor unhappy  (4)

○ Somewhat happy  (5)

○ Happy  (6)

○ Very happy  (7)

---

Page Break

| X→ |
|---|

*expert* How would you describe your personal expertise when it comes to investing in, trading, or using cryptocurrencies?

○ Extremely limited  (1)

○ Limited  (2)

○ Somewhat limited  (3)

○ Neither limited nor extensive  (4)

○ Somewhat extensive  (5)

○ Extensive  (6)

○ Extremely extensive  (7)

---

Page Break

*focal* For these next questions, we want you to imagine that you are browsing the X (formerly Twitter) feeds of some of your favorite celebrities. Imagine that while there, you run across a post by one such public figure.

End of Block: General

Start of Block: PP

*pp.i*



**Paul Pierce** ✔
3,003 posts

**Paul Pierce** ✔
@paulpierce34

**420** Following    **3.8M** Followers

**Posts**          Replies          Media

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break

*pb+pp* Imagine that Paul Pierce's feed featured a post where he mentioned a new cryptocurrency that his friends recommended and that he shared with his followers.   What is the probability (in percentage terms) that you would buy this new cryptocurrency based on this post?

        0   10   20   30   40   50   60   70   80   90   100

| Please indicate on the scale the probability that you would purchase | |
|---|---|

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break

*pb-pp* Assume that this post from Paul Pierce did not exist and instead you learned about this new cryptocurrency from online chatter.  What is the probability (in percentage terms) that you would buy this new currency in the absence of Paul Pierce's post?



Page Break

*pp.extra$* How much of a premium (e.g., 0%, 10%, etc.) would you be willing to pay for that new cryptocurrency if Paul Pierce endorsed it compared to if he did not?

|  | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
|---|---|---|---|---|---|---|---|---|---|---|---|

Please indicate on the scale the premium you would be willing to pay

Page Break

2025 © Claudiu V. Dimofte, PhD

45

*pp.bimpact* In short, how would you assess the impact of a Paul Pierce endorsement on your willingness to buy a new cryptocurrency?

○ Extremely unimportant  (1)

○ Unimportant  (2)

○ Somewhat unimportant  (3)

○ Neither important nor unimportant  (4)

○ Somewhat important  (5)

○ Important  (6)

○ Extremely important  (7)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break ——————————————————————————————————————

*ph+pp* Now imagine that you have already bought a new cryptocurrency and after that you notice a Paul Pierce social media post where he mentions that same new cryptocurrency being recommended by his friends.   What is the probability (in percentage terms) that you would hold on to this new cryptocurrency (rather than sell it) based on this post?

| | 0  10  20  30  40  50  60  70  80  90  100 |
|---|---|
| Please indicate on the scale the probability that you would hold and not sell | ▬▬▬▬▬▬▮▬▬▬▬▬ |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break ——————————————————————————————————————

2025 © Claudiu V. Dimofte, PhD

*pp.himpact* In short, how would you assess the impact of a Paul Pierce endorsement on your willingness to hold on to (rather than sell) a cryptocurrency you already bought?

○ Extremely unimportant  (1)

○ Unimportant  (2)

○ Somewhat unimportant  (3)

○ Neither important nor unimportant  (4)

○ Somewhat important  (5)

○ Important  (6)

○ Extremely important  (7)

**End of Block: PP**

**Start of Block: KK**

*kk.i*



*pb+kk* Imagine that Kim Kardashian's feed featured a post where she mentioned a new cryptocurrency that her friends recommended and that she shared with her followers.   What is the probability (in percentage terms) that you would buy this new cryptocurrency based on this post?

0   10   20   30   40   50   60   70   80   90   100

| Please indicate on the scale the probability that you would purchase | |
| --- | --- |

Page Break

*pb-kk* Assume that this post from Kim Kardashian did not exist and instead you learned about this new cryptocurrency from online chatter.  What is the probability (in percentage terms) that you would buy this new currency in the absence of Kim Kardashian's post?

| | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Please indicate on the scale the probability that you would purchase | |
|---|---|

---

Page Break

---

*kk.extra$* How much of a premium (e.g., 0%, 10%, etc.) would you be willing to pay for that new cryptocurrency if Kim Kardashian endorsed it compared to if she did not?

| | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Please indicate on the scale the premium you would be willing to pay | |
|---|---|

---

Page Break

---

*kk.bimpact* In short, how would you assess the impact of a Kim Kardashian endorsement on your willingness to buy a new cryptocurrency?

○ Extremely unimportant  (1)

○ Unimportant  (2)

○ Somewhat unimportant  (3)

○ Neither important nor unimportant  (4)

○ Somewhat important  (5)

○ Important  (6)

○ Extremely important  (7)

---

Page Break

---

2025 © Claudiu V. Dimofte, PhD

49

*ph+kk* Now imagine that you have already bought a new cryptocurrency and after that you notice a Kim Kardashian social media post where she mentions that same new crypto cryptocurrency being recommended by her friends.   What is the probability (in percentage terms) that you would hold on to this new cryptocurrency (rather than sell it) based on this post?

0    10   20   30   40   50   60   70   80   90   100

| Please indicate on the scale the probability that you would hold and not sell | |
|---|---|

---

Page Break

---

*kk.himpact* In short, how would you assess the impact of a Kim Kardashian endorsement on your willingness to hold on to (rather than sell) a cryptocurrency you already bought?

○ Extremely unimportant  (1)

○ Unimportant  (2)

○ Somewhat unimportant  (3)

○ Neither important nor unimportant  (4)

○ Somewhat important  (5)

○ Important  (6)

○ Extremely important  (7)

End of Block: KK

Start of Block: FM

*fm.i*



Page Break

*pb+fm* Imagine that Floyd Mayweather's feed featured a post where he mentioned a new cryptocurrency that his friends recommended and that he shared with his followers.   What is the probability (in percentage terms) that you would buy this new cryptocurrency based on this post?

0   10   20   30   40   50   60   70   80   90   100

| Please indicate on the scale the probability that you would purchase | |
| --- | --- |

Page Break

*pb-fm* Assume that this post from Floyd Mayweather did not exist and instead you learned about this new cryptocurrency from online chatter.  What is the probability (in percentage terms) that you would buy this new currency in the absence of Floyd Mayweather's post?

|   |   |   |   |   |   |   |   |   |   |   |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |

| | |
|---|---|
| Please indicate on the scale the probability that you would purchase | |

Page Break

*fm.extra$* How much of a premium (e.g., 0%, 10%, etc.) would you be willing to pay for that new cryptocurrency if Floyd Mayweather endorsed it compared to if he did not?

|   |   |   |   |   |   |   |   |   |   |   |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |

| | |
|---|---|
| Please indicate on the scale the premium you would be willing to pay | |

Page Break

*fm.bimpact* In short, how would you assess the impact of a Floyd Mayweather endorsement on your willingness to buy a new cryptocurrency?

○ Extremely unimportant  (1)

○ Unimportant  (2)

○ Somewhat unimportant  (3)

○ Neither important nor unimportant  (4)

○ Somewhat important  (5)

○ Important  (6)

○ Extremely important  (7)

Page Break

2025 © Claudiu V. Dimofte, PhD

*ph+fm* Now imagine that you have already bought a new cryptocurrency and after that you notice a Floyd Mayweather social media post where he mentions that same new cryptocurrency being recommended by his friends.   What is the probability (in percentage terms) that you would hold on to this new cryptocurrency (rather than sell it) based on this post?

0   10   20   30   40   50   60   70   80   90   100

| Please indicate on the scale the probability that you would hold and not sell | |
|---|---|

---

Page Break

---

*fm.himpact* In short, how would you assess the impact of a Floyd Mayweather endorsement on your willingness to hold on to (rather than sell) a cryptocurrency you already bought?

○ Extremely unimportant  (1)

○ Unimportant  (2)

○ Somewhat unimportant  (3)

○ Neither important nor unimportant  (4)

○ Somewhat important  (5)

○ Important  (6)

○ Extremely important  (7)

End of Block: FM

Start of Block: Follow-ups

Page Break

*assess.beh* If a public figure with a large following endorsed a cryptocurrency in a social media post but did not disclose that they were paid to do so (i.e., they essentially advertised the cryptocurrency without clarifying the post was an ad), how would you view that person's behavior?

| | Definitely not (1) | (2) | (3) | (4) | (5) | (6) | Definitely yes (7) | No opinion (8) |
|---|---|---|---|---|---|---|---|---|
| Acceptable (assess.beh_1) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Misleading (assess.beh _2) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Truthful (assess.beh _3) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Unacceptable (assess.beh _4) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Unethical (assess.beh _5 | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Excusable (assess.beh _6) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Deceptive (assess.beh _7) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Appropriate (assess.beh _8) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

Page Break

2025 © Claudiu V. Dimofte, PhD

`X→`

*if.nodisclos* If you learned that the public figure was paid to endorse a specific cryptocurrency but they hid that fact from their followers, how would this knowledge influence your decision to purchase it?

○ Would make me much less likely to buy  (1)

○ Would make me less likely to buy  (2)

○ Would make me somewhat less likely to buy  (3)

○ Would make me neither less nor more likely to buy  (4)

○ Would make me somewhat more likely to buy  (5)

○ Would make me more likely to buy  (6)

○ Would make me much more likely to buy  (7)

○ Do not know / no opinion  (8)

---

Page Break ──────────────────────────────────

`X→`

*if.false* Assume that you purchased a cryptocurrency that was advertised as being the exclusive payment method accepted at specific venues and events (e.g., clubs, sporting events, etc.), only to later find out that was not the case (i.e., those venues and events did not in fact accept that cryptocurrency as payment). To what extent would you have still purchased the cryptocurrency if you knew those claims were false?

○ Definitely would not have purchased  (1)

○ Probably would not have purchased  (2)

○ Possibly would not have purchased  (3)

○ Not sure  (4)

○ Possibly would have still purchased  (5)

○ Probably would have still purchased  (6)

○ Definitely would have still purchased  (7)

○ Do not know / no opinion  (8)

---

Page Break ──────────────────────────────────

2025 © Claudiu V. Dimofte, PhD



*what.endorse* To what do you feel that each of the following behaviors of a public figure represent an endorsement from them?

|  | Definitely not (1) | (2) | (3) | Somewhat (4) | (5) | (6) | Definitely yes (7) | No opinion (8) |
|---|---|---|---|---|---|---|---|---|
| Asking followers to buy a product / brand. (1) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Attending a function at brand headquarters. (2) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Mentioning a brand in a personal story. (3) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Posting a photo of a branded product. (4) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Wearing a brand logo on personal clothing. (5) | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

--- Page Break ---

*if.wpaper* Whitepapers in cryptocurrency are documents released by the founders of a new token during its initial offering stage. They give investors technical information about its concept and a roadmap for how it plans to grow and succeed.  Assume that a cryptocurrency only releases its whitepaper after your bought it and reveals that its business model relies on using constant marketing and promotional activities, often from celebrities, to induce new potential investors into trusting the financial opportunities available with its token. How would knowing about the cryptocurrency's business model before your purchase have impacted your decision to buy?

2025 © Claudiu V. Dimofte, PhD

○ Would have made me much less likely to buy  (1)

○ Would have made me less likely to buy  (2)

○ Would have made me somewhat less likely to buy  (3)

○ Would have made me neither less nor more likely to buy  (4)

○ Would have made me somewhat more likely to buy  (5)

○ Would have made me more likely to buy  (6)

○ Would have made me much more likely to buy  (7)

○ Do not know / no opinion  (8)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break ——————————————————————————————————



*if.felon* If you learned that a public figure was secretly paid to endorse a specific cryptocurrency and the key person in securing that endorsement was someone who previously pled guilty to conspiracy to commit wire fraud in connection with a bribery scheme, how would this knowledge influence your decision to consider/trade that cryptocurrency?

○ Would make me much less likely to consider it  (1)

○ Would make me less likely to consider it  (2)

○ Would make me somewhat less likely to consider it  (3)

○ Would make me neither less nor more likely to consider it  (4)

○ Would make me somewhat more likely to consider it  (5)

○ Would make me more likely to consider it  (6)

○ Would make me much more likely to consider it  (7)

○ Do not know / no opinion  (8)

**End of Block: Follow-ups**

**Start of Block: Finals**



2025 © Claudiu V. Dimofte, PhD

*ease1* Please rate how easy or difficult it was for you to understand the questions you were asked in this survey.

○ Very easy  (1)

○ Easy  (2)

○ Somewhat easy  (3)

○ Neither easy nor difficult  (4)

○ Somewhat difficult  (5)

○ Difficult  (6)

○ Very difficult  (7)

------

Page Break

*aware1* Are you aware of any current litigation involving Kim Kardashian, Floyd Mayweather Jr., or Paul Pierce?

○ No  (1)

○ Yes  (2)

------

Page Break

**Display This Question:**
   *If aware1 = 2*

*what1* Please mention who that public figure is and briefly describe your knowledge about the litigation involving them.

○ (please type answer below)  (1) _____

○ Cannot remember  (2)

End of Block: Finals

Start of Block: End

*thx* Thank you for your participation.   Please click below to submit your data.

End of Block: End

2025 © Claudiu V. Dimofte, PhD

## Appendix G

## Consumer Perceptions Survey – Response Distributions for Main Quantitative Items

**How would you describe your personal expertise when it comes to investing in, trading, or using cryptocurrencies?**

|  |  | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Extremely limited | 14 | 2.8 | 2.8 | 2.8 |
|  | Limited | 13 | 2.6 | 2.6 | 5.4 |
|  | Somewhat limited | 54 | 10.8 | 10.8 | 16.2 |
|  | Neither limited nor extensive | 65 | 13.0 | 13.0 | 29.1 |
|  | Somewhat extensive | 157 | 31.3 | 31.3 | 60.5 |
|  | Extensive | 123 | 24.6 | 24.6 | 85.0 |
|  | Extremely extensive | 75 | 15.0 | 15.0 | 100.0 |
|  | Total | 501 | 100.0 | 100.0 |  |

**In short, how would you assess the impact of a Kim Kardashian endorsement on your willingness to buy a new cryptocurrency?**

|  |  | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Extremely unimportant | 21 | 4.2 | 10.0 | 10.0 |
|  | Unimportant | 13 | 2.6 | 6.2 | 16.3 |
|  | Somewhat unimportant | 13 | 2.6 | 6.2 | 22.5 |
|  | Neither important nor unimportant | 26 | 5.2 | 12.4 | 34.9 |
|  | Somewhat important | 47 | 9.4 | 22.5 | 57.4 |
|  | Important | 42 | 8.4 | 20.1 | 77.5 |
|  | Extremely important | 47 | 9.4 | 22.5 | 100.0 |
|  | Total | 209 | 41.7 | 100.0 |  |
| Missing | System | 292 | 58.3 |  |  |
| Total |  | 501 | 100.0 |  |  |

**In short, how would you assess the impact of a Kim Kardashian endorsement on your willingness to hold on to (rather than sell) a cryptocurrency you already bought?**

|  |  | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Extremely unimportant | 11 | 2.2 | 5.3 | 5.3 |
|  | Unimportant | 9 | 1.8 | 4.3 | 9.6 |
|  | Somewhat unimportant | 8 | 1.6 | 3.8 | 13.4 |
|  | Neither important nor unimportant | 29 | 5.8 | 13.9 | 27.3 |
|  | Somewhat important | 42 | 8.4 | 20.1 | 47.4 |

| | | | | | |
|---|---|---|---|---|---|
| | Important | 52 | 10.4 | 24.9 | 72.2 |
| | Extremely important | 58 | 11.6 | 27.8 | 100.0 |
| | Total | 209 | 41.7 | 100.0 | |
| Missing | System | 292 | 58.3 | | |
| Total | | 501 | 100.0 | | |

**In short, how would you assess the impact of a Floyd Mayweather endorsement on your willingness to buy a new cryptocurrency?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Extremely unimportant | 10 | 2.0 | 6.0 | 6.0 |
| | Unimportant | 8 | 1.6 | 4.8 | 10.7 |
| | Somewhat unimportant | 12 | 2.4 | 7.1 | 17.9 |
| | Neither important nor unimportant | 18 | 3.6 | 10.7 | 28.6 |
| | Somewhat important | 58 | 11.6 | 34.5 | 63.1 |
| | Important | 37 | 7.4 | 22.0 | 85.1 |
| | Extremely important | 25 | 5.0 | 14.9 | 100.0 |
| | Total | 168 | 33.5 | 100.0 | |
| Missing | System | 333 | 66.5 | | |
| Total | | 501 | 100.0 | | |

**In short, how would you assess the impact of a Floyd Mayweather endorsement on your willingness to hold on to (rather than sell) a cryptocurrency you already bought?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Extremely unimportant | 7 | 1.4 | 4.2 | 4.2 |
| | Unimportant | 6 | 1.2 | 3.6 | 7.7 |
| | Somewhat unimportant | 12 | 2.4 | 7.1 | 14.9 |
| | Neither important nor unimportant | 23 | 4.6 | 13.7 | 28.6 |
| | Somewhat important | 47 | 9.4 | 28.0 | 56.5 |
| | Important | 41 | 8.2 | 24.4 | 81.0 |
| | Extremely important | 32 | 6.4 | 19.0 | 100.0 |
| | Total | 168 | 33.5 | 100.0 | |
| Missing | System | 333 | 66.5 | | |
| Total | | 501 | 100.0 | | |

**In short, how would you assess the impact of a Paul Pierce endorsement on your willingness to buy a new cryptocurrency?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Extremely unimportant | 6 | 1.2 | 4.8 | 4.8 |
| | Unimportant | 9 | 1.8 | 7.3 | 12.1 |
| | Somewhat unimportant | 6 | 1.2 | 4.8 | 16.9 |
| | Neither important nor unimportant | 13 | 2.6 | 10.5 | 27.4 |

| | | | | | |
|---|---|---|---|---|---|
| | Somewhat important | 29 | 5.8 | 23.4 | 50.8 |
| | Important | 32 | 6.4 | 25.8 | 76.6 |
| | Extremely important | 29 | 5.8 | 23.4 | 100.0 |
| | Total | 124 | 24.8 | 100.0 | |
| Missing | System | 377 | 75.2 | | |
| Total | | 501 | 100.0 | | |

**In short, how would you assess the impact of a Paul Pierce endorsement on your willingness to hold on to (rather than sell) a cryptocurrency you already bought?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Extremely unimportant | 1 | .2 | .8 | .8 |
| | Unimportant | 5 | 1.0 | 4.0 | 4.8 |
| | Somewhat unimportant | 4 | .8 | 3.2 | 8.1 |
| | Neither important nor unimportant | 15 | 3.0 | 12.1 | 20.2 |
| | Somewhat important | 26 | 5.2 | 21.0 | 41.1 |
| | Important | 43 | 8.6 | 34.7 | 75.8 |
| | Extremely important | 30 | 6.0 | 24.2 | 100.0 |
| | Total | 124 | 24.8 | 100.0 | |
| Missing | System | 377 | 75.2 | | |
| Total | | 501 | 100.0 | | |

**If a public figure with a large following endorsed a cryptocurrency in a social media post but did not disclose that they were paid to do so (i.e., they essentially advertised the cryptocurrency without clarifying the post was an ad), an ad), how would you view that person's behavior? – Acceptable**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Definitely not | 63 | 12.6 | 12.6 | 12.6 |
| | 2 | 33 | 6.6 | 6.6 | 19.2 |
| | 3 | 42 | 8.4 | 8.4 | 27.5 |
| | 4 | 69 | 13.8 | 13.8 | 41.3 |
| | 5 | 81 | 16.2 | 16.2 | 57.5 |
| | 6 | 85 | 17.0 | 17.0 | 74.5 |
| | Definitely yes | 118 | 23.6 | 23.6 | 98.0 |
| | No opinion | 10 | 2.0 | 2.0 | 100.0 |
| | Total | 501 | 100.0 | 100.0 | |

**If a public figure with a large following endorsed a cryptocurrency in a social media post but did not disclose that they were paid to do so (i.e., they essentially advertised the cryptocurrency without clarifying the post was an ad), an ad), how would you view that person's behavior? – Misleading**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Definitely not | 94 | 18.8 | 18.8 | 18.8 |
| | 2 | 55 | 11.0 | 11.0 | 29.7 |

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| | 3 | 58 | 11.6 | 11.6 | 41.3 |
| | 4 | 46 | 9.2 | 9.2 | 50.5 |
| | 5 | 82 | 16.4 | 16.4 | 66.9 |
| | 6 | 67 | 13.4 | 13.4 | 80.2 |
| | Definitely yes | 88 | 17.6 | 17.6 | 97.8 |
| | No opinion | 11 | 2.2 | 2.2 | 100.0 |
| | Total | 501 | 100.0 | 100.0 | |

**If a public figure with a large following endorsed a cryptocurrency in a social media post but did not disclose that they were paid to do so (i.e., they essentially advertised the cryptocurrency without clarifying the post was an ad), an ad), how would you view that person's behavior? – Truthful**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Definitely not | 90 | 18.0 | 18.0 | 18.0 |
| | 2 | 24 | 4.8 | 4.8 | 22.8 |
| | 3 | 58 | 11.6 | 11.6 | 34.3 |
| | 4 | 52 | 10.4 | 10.4 | 44.7 |
| | 5 | 90 | 18.0 | 18.0 | 62.7 |
| | 6 | 71 | 14.2 | 14.2 | 76.8 |
| | Definitely yes | 106 | 21.2 | 21.2 | 98.0 |
| | No opinion | 10 | 2.0 | 2.0 | 100.0 |
| | Total | 501 | 100.0 | 100.0 | |

**If a public figure with a large following endorsed a cryptocurrency in a social media post but did not disclose that they were paid to do so (i.e., they essentially advertised the cryptocurrency without clarifying the post was an ad), an ad), how would you view that person's behavior? – Unacceptable**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Definitely not | 105 | 21.0 | 21.0 | 21.0 |
| | 2 | 57 | 11.4 | 11.4 | 32.3 |
| | 3 | 65 | 13.0 | 13.0 | 45.3 |
| | 4 | 72 | 14.4 | 14.4 | 59.7 |
| | 5 | 62 | 12.4 | 12.4 | 72.1 |
| | 6 | 53 | 10.6 | 10.6 | 82.6 |
| | Definitely yes | 77 | 15.4 | 15.4 | 98.0 |
| | No opinion | 10 | 2.0 | 2.0 | 100.0 |
| | Total | 501 | 100.0 | 100.0 | |

**If a public figure with a large following endorsed a cryptocurrency in a social media post but did not disclose that they were paid to do so (i.e., they essentially advertised the cryptocurrency without clarifying the post was an ad), an ad), how would you view that person's behavior? – Unethical**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Definitely not | 102 | 20.4 | 20.4 | 20.4 |

|  |  | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
|  | 2 | 59 | 11.8 | 11.8 | 32.1 |
|  | 3 | 54 | 10.8 | 10.8 | 42.9 |
|  | 4 | 68 | 13.6 | 13.6 | 56.5 |
|  | 5 | 66 | 13.2 | 13.2 | 69.7 |
|  | 6 | 55 | 11.0 | 11.0 | 80.6 |
|  | Definitely yes | 83 | 16.6 | 16.6 | 97.2 |
|  | No opinion | 14 | 2.8 | 2.8 | 100.0 |
|  | Total | 501 | 100.0 | 100.0 |  |

**If a public figure with a large following endorsed a cryptocurrency in a social media post but did not disclose that they were paid to do so (i.e., they essentially advertised the cryptocurrency without clarifying the post was an ad), an ad), how would you view that person's behavior? – Excusable**

|  |  | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Definitely not | 77 | 15.4 | 15.4 | 15.4 |
|  | 2 | 32 | 6.4 | 6.4 | 21.8 |
|  | 3 | 55 | 11.0 | 11.0 | 32.7 |
|  | 4 | 84 | 16.8 | 16.8 | 49.5 |
|  | 5 | 103 | 20.6 | 20.6 | 70.1 |
|  | 6 | 55 | 11.0 | 11.0 | 81.0 |
|  | Definitely yes | 67 | 13.4 | 13.4 | 94.4 |
|  | No opinion | 28 | 5.6 | 5.6 | 100.0 |
|  | Total | 501 | 100.0 | 100.0 |  |

**If a public figure with a large following endorsed a cryptocurrency in a social media post but did not disclose that they were paid to do so (i.e., they essentially advertised the cryptocurrency without clarifying the post was an ad), an ad), how would you view that person's behavior? – Deceptive**

|  |  | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Definitely not | 79 | 15.8 | 15.8 | 15.8 |
|  | 2 | 57 | 11.4 | 11.4 | 27.1 |
|  | 3 | 48 | 9.6 | 9.6 | 36.7 |
|  | 4 | 68 | 13.6 | 13.6 | 50.3 |
|  | 5 | 83 | 16.6 | 16.6 | 66.9 |
|  | 6 | 61 | 12.2 | 12.2 | 79.0 |
|  | Definitely yes | 94 | 18.8 | 18.8 | 97.8 |
|  | No opinion | 11 | 2.2 | 2.2 | 100.0 |
|  | Total | 501 | 100.0 | 100.0 |  |

**If a public figure with a large following endorsed a cryptocurrency in a social media post but did not disclose that they were paid to do so (i.e., they essentially advertised the cryptocurrency without clarifying the post was an ad), an ad), how would you view that person's behavior? – Appropriate**

|  |  | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|

| Valid | Definitely not | 72 | 14.4 | 14.4 | 14.4 |
|---|---|---|---|---|---|
| | 2 | 23 | 4.6 | 4.6 | 19.0 |
| | 3 | 56 | 11.2 | 11.2 | 30.1 |
| | 4 | 66 | 13.2 | 13.2 | 43.3 |
| | 5 | 86 | 17.2 | 17.2 | 60.5 |
| | 6 | 79 | 15.8 | 15.8 | 76.2 |
| | Definitely yes | 109 | 21.8 | 21.8 | 98.0 |
| | No opinion | 10 | 2.0 | 2.0 | 100.0 |
| | Total | 501 | 100.0 | 100.0 | |

**If you learned that the public figure was paid to endorse a specific cryptocurrency but they hid that fact from their followers, how would this knowledge influence your decision to purchase it?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Would make me much less likely to buy | 112 | 22.4 | 22.4 | 22.4 |
| | Would make me less likely to buy | 41 | 8.2 | 8.2 | 30.5 |
| | Would make me somewhat less likely to buy | 52 | 10.4 | 10.4 | 40.9 |
| | Would make me neither less nor more likely to buy | 106 | 21.2 | 21.2 | 62.1 |
| | Would make me somewhat more likely to buy | 48 | 9.6 | 9.6 | 71.7 |
| | Would make me more likely to buy | 78 | 15.6 | 15.6 | 87.2 |
| | Would make me much more likely to buy | 58 | 11.6 | 11.6 | 98.8 |
| | Do not know / no opinion | 6 | 1.2 | 1.2 | 100.0 |
| | Total | 501 | 100.0 | 100.0 | |

**Assume that you purchased a cryptocurrency that was advertised as being the exclusive payment method accepted at specific venues and events (e.g., clubs, sporting events, etc.), only to later find out that was not the case (i.e., those venues and events did not in fact accept that coin as payment).**
**To what extent would you have still purchased the cryptocurrency if you knew those claims were false?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Definitely would not have purchased | 113 | 22.6 | 22.6 | 22.6 |
| | Probably would not have purchased | 51 | 10.2 | 10.2 | 32.7 |
| | Possibly would not have purchased | 55 | 11.0 | 11.0 | 43.7 |
| | Not sure | 52 | 10.4 | 10.4 | 54.1 |
| | Possibly would have still purchased | 91 | 18.2 | 18.2 | 72.3 |
| | Probably would have still purchased | 75 | 15.0 | 15.0 | 87.2 |
| | Definitely would have still purchased | 63 | 12.6 | 12.6 | 99.8 |
| | Do not know / no opinion | 1 | .2 | .2 | 100.0 |
| | Total | 501 | 100.0 | 100.0 | |

2025 © Claudiu V. Dimofte, PhD

**To what do you feel that each of the following behaviors of a public figure represent an endorsement from them? - Asking followers to buy a product / brand.**

|       |                | Frequency | Percent | Valid Percent | Cumulative Percent |
|-------|----------------|-----------|---------|---------------|--------------------|
| Valid | Definitely not | 16        | 3.2     | 3.2           | 3.2                |
|       | 2              | 13        | 2.6     | 2.6           | 5.8                |
|       | 3              | 24        | 4.8     | 4.8           | 10.6               |
|       | Somewhat       | 86        | 17.2    | 17.2          | 27.7               |
|       | 5              | 83        | 16.6    | 16.6          | 44.3               |
|       | 6              | 115       | 23.0    | 23.0          | 67.3               |
|       | Definitely yes | 155       | 30.9    | 30.9          | 98.2               |
|       | No opinion     | 9         | 1.8     | 1.8           | 100.0              |
|       | Total          | 501       | 100.0   | 100.0         |                    |

**To what do you feel that each of the following behaviors of a public figure represent an endorsement from them? - Attending a function at brand headquarters.**

|       |                | Frequency | Percent | Valid Percent | Cumulative Percent |
|-------|----------------|-----------|---------|---------------|--------------------|
| Valid | Definitely not | 14        | 2.8     | 2.8           | 2.8                |
|       | 2              | 15        | 3.0     | 3.0           | 5.8                |
|       | 3              | 18        | 3.6     | 3.6           | 9.4                |
|       | Somewhat       | 110       | 22.0    | 22.0          | 31.3               |
|       | 5              | 91        | 18.2    | 18.2          | 49.5               |
|       | 6              | 113       | 22.6    | 22.6          | 72.1               |
|       | Definitely yes | 132       | 26.3    | 26.3          | 98.4               |
|       | No opinion     | 8         | 1.6     | 1.6           | 100.0              |
|       | Total          | 501       | 100.0   | 100.0         |                    |

**To what do you feel that each of the following behaviors of a public figure represent an endorsement from them? - Mentioning a brand in a personal story.**

|       |                | Frequency | Percent | Valid Percent | Cumulative Percent |
|-------|----------------|-----------|---------|---------------|--------------------|
| Valid | Definitely not | 12        | 2.4     | 2.4           | 2.4                |
|       | 2              | 11        | 2.2     | 2.2           | 4.6                |
|       | 3              | 21        | 4.2     | 4.2           | 8.8                |
|       | Somewhat       | 107       | 21.4    | 21.4          | 30.1               |
|       | 5              | 82        | 16.4    | 16.4          | 46.5               |
|       | 6              | 107       | 21.4    | 21.4          | 67.9               |
|       | Definitely yes | 154       | 30.7    | 30.7          | 98.6               |
|       | No opinion     | 7         | 1.4     | 1.4           | 100.0              |
|       | Total          | 501       | 100.0   | 100.0         |                    |

**To what do you feel that each of the following behaviors of a public figure represent an endorsement from them? - Posting a photo of a branded product.**

|  | Frequency | Percent | Valid Percent | Cumulative Percent |
|--|-----------|---------|---------------|--------------------|

| Valid | | | | | |
|---|---|---|---|---|---|
| Valid | Definitely not | 12 | 2.4 | 2.4 | 2.4 |
| | 2 | 4 | .8 | .8 | 3.2 |
| | 3 | 19 | 3.8 | 3.8 | 7.0 |
| | Somewhat | 112 | 22.4 | 22.4 | 29.3 |
| | 5 | 95 | 19.0 | 19.0 | 48.3 |
| | 6 | 99 | 19.8 | 19.8 | 68.1 |
| | Definitely yes | 154 | 30.7 | 30.7 | 98.8 |
| | No opinion | 6 | 1.2 | 1.2 | 100.0 |
| | Total | 501 | 100.0 | 100.0 | |

**To what do you feel that each of the following behaviors of a public figure represent an endorsement from them? - Wearing a brand logo on personal clothing.**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Definitely not | 16 | 3.2 | 3.2 | 3.2 |
| | 2 | 5 | 1.0 | 1.0 | 4.2 |
| | 3 | 26 | 5.2 | 5.2 | 9.4 |
| | Somewhat | 97 | 19.4 | 19.4 | 28.7 |
| | 5 | 94 | 18.8 | 18.8 | 47.5 |
| | 6 | 113 | 22.6 | 22.6 | 70.1 |
| | Definitely yes | 143 | 28.5 | 28.5 | 98.6 |
| | No opinion | 7 | 1.4 | 1.4 | 100.0 |
| | Total | 501 | 100.0 | 100.0 | |

**Whitepapers in cryptocurrency are documents released by the founders of a new cryptocurrency during its initial offering stage. They give investors technical information about its concept and a roadmap for how it plans to grow and succeed.  Assume that a cryptocurrency only releases its whitepaper after your bought it and reveals that its business model relies on using constant marketing and promotional activities, often from celebrities, to induce new potential investors into trusting the financial opportunities available with its token. How would knowing about the cryptocurrency's business model before your purchase have impacted your decision to buy?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Would have made me much less likely to buy | 41 | 8.2 | 8.2 | 8.2 |
| | Would have made me less likely to buy | 30 | 6.0 | 6.0 | 14.2 |
| | Would have made me somewhat less likely to buy | 63 | 12.6 | 12.6 | 26.7 |
| | Would have made me neither less nor more likely to buy | 95 | 19.0 | 19.0 | 45.7 |
| | Would have made me somewhat more likely to buy | 103 | 20.6 | 20.6 | 66.3 |
| | Would have made me more likely to buy | 88 | 17.6 | 17.6 | 83.8 |
| | Would have made me much more likely to buy | 73 | 14.6 | 14.6 | 98.4 |
| | Do not know / no opinion | 8 | 1.6 | 1.6 | 100.0 |

2025 © Claudiu V. Dimofte, PhD

| | | | | |
|---|---|---|---|---|
| | Total | 501 | 100.0 | 100.0 | |

**If you learned that a public figure was secretly paid to endorse a specific cryptocurrency and the key person in securing that endorsement was someone who previously pled guilty to conspiracy to commit wire fraud in connection with a bribery scheme, how would this knowledge influence your decision to consider/trade that cryptocurrency?**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Would make me much less likely to consider it | 128 | 25.5 | 25.5 | 25.5 |
| | Would make me less likely to consider it | 42 | 8.4 | 8.4 | 33.9 |
| | Would make me somewhat less likely to consider it | 47 | 9.4 | 9.4 | 43.3 |
| | Would make me neither less nor more likely to consider it | 84 | 16.8 | 16.8 | 60.1 |
| | Would make me somewhat more likely to consider it | 68 | 13.6 | 13.6 | 73.7 |
| | Would make me more likely to consider it | 68 | 13.6 | 13.6 | 87.2 |
| | Would make me much more likely to consider it | 55 | 11.0 | 11.0 | 98.2 |
| | Do not know / no opinion | 9 | 1.8 | 1.8 | 100.0 |
| | Total | 501 | 100.0 | 100.0 | |

2025 © Claudiu V. Dimofte, PhD