QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Steve Madison (Bar No. 101006)
  stevemadison@quinnemanuel.com
  Jeffrey Boxer (Bar No. 346231)
  jeffreyboxer@quinnemanuel.com
  865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:   (213) 443 3000
Facsimile:   (213) 443 3100

*Attorneys for Paul Pierce*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ETHEREUMMAX INVESTOR LITIGATION | Lead Case No. 2:22-cv-00163-MWF-SK |
| | **DEFENDANT PAUL PIERCE'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| | Judge: Hon. Michael Fitzgerald<br>Date: June 16, 2025<br>Time: 10:00 a.m.<br>Place: First Street Courthouse, Courtroom 5A |
| | Trial Date: January 27, 2026 |

# **TABLE OF CONTENTS**

Page

I.    PRELIMINARY STATEMENT ...................................................................1

II.   FACTUAL BACKGROUND ......................................................................2

    A.    Plaintiffs Rely On Three Paul Pierce Tweets About EMAX
          Tokens ..............................................................................................2

    B.    Plaintiffs Cite Dozens Of Other Statements That Allegedly
          Induced Plaintiffs To Purchase And/Or Hold EMAX Tokens ..............3

    C.    Named Plaintiffs Claim That Numerous Social Media Posts By
          Mr. Pierce And Other Defendants Induced Them To Purchase
          EMAX ................................................................................................7

III.  ARGUMENT ...........................................................................................9

    A.    A Class Action Is Not The Superior Method Of Resolving
          Plaintiffs' Claims ..............................................................................9

        1.    The Putative Class Is Overbroad Because It Includes
              Members That Were Not Harmed By Mr. Pierce .....................10

        2.    Class Members That Did Not See Mr. Pierce's Social
              Media Posts Cannot Bring Consumer Protection Claims ..........12

        3.    Individual Issues Relating To Liability Predominate.................14

    B.    Plaintiffs' Proposed Class Is An Overbroad "Fail-Safe" ....................16

IV.   Conclusion ...........................................................................................17

DEFENDANT PIERCE'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Apple iPhone Antitrust Litig.*,
  2022 WL 1284104 (N.D. Cal. Mar. 29, 2022)..................................................10

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018) ...........................................................................16

*Bowerman v. Field Asset Servs., Inc.*,
  60 F.4th 459 (9th Cir. 2023)....................................................................14, 15

*Brown v. Google, LLC*,
  2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) .............................................16

*Diacakis v. Comcast Corp.*,
  2013 WL 1878921 (N.D. Cal. May 3, 2013) ..................................................11

*Dolphin LLC v. WCI Communities, Inc.*,
  715 F.3d 1243 (11th Cir. 2013)......................................................................14

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011)............................................................................9

*Kurimski v. Shell Oil Co.*,
  2022 WL 2913742 (S.D. Fla. June 30, 2022) ................................................13

*Kwikset Corp. v. Superior Ct.*,
  51 Cal. 4th 310 (2011) ..............................................................................12, 13

*Mazur v. eBay Inc.*,
  257 F.R.D. 563 (N.D. Cal. 2009) ...................................................................15

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012)....................................................................11, 13

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012)..........................................................................17

*Molina v. Aurora Loan Svcs., LLC*,
  635 F. App'x 618 (11th Cir. 2015)..................................................................14

*Morizur v. Seaworld Parks & Ent., Inc.*,
  2020 WL 6044043 (N.D. Cal. Oct. 13, 2020)................................................13

*O'Connor v. Boeing N. Am., Inc.*,
 184 F.R.D. 311 (C.D. Cal. 1998) ....................................................................10

*Oddo v. Arocaire Air Conditioning & Heating*,
 2020 WL 5267917 (C.D. Cal. May 18, 2020) ...................................................16

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
 31 F.4th 651 (9th Cir. 2022) (en banc) ............................................... 9, 10, 16, 17

*Oshana v. Coca-Cola Co.*,
 472 F.3d 506 (7th Cir. 2006) ..........................................................................11

*Red v. Kraft Foods, Inc.*,
 2011 WL 4599833 (C.D. Cal. Sept. 29, 2011) .................................................10

*Stemmelin v. Matterport, Inc.*,
 2022 WL 783206 (N.D. Cal. Mar. 14, 2022)..........................................9, 13, 14

*In re Tobacco II Cases*,
 46 Cal. 4th 298 (2009) ....................................................................................12

*Turcios v. Carma Lab'ys, Inc.*,
 296 F.R.D. 638 (C.D. Cal. 2014) ...............................................................9, 12

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011)...................................................................................14, 16

## Statutes

Cal. Bus. & Prof. Code § 17200................................................................3, 12

California Corporate Securities Law of 1968 .............................................3

Fla. Stat. § 501.211 ....................................................................................3, 14

New York's General Business Law Art. 22-A .............................................3

## Other Authorities

Fed. R. Civ. P. 23, 1966 Advisory Committee Notes ........................9, 14

# I.     PRELIMINARY STATEMENT

Plaintiffs allege NBA icon and Hall of Famer Paul Pierce is liable to a class of U.S. purchasers of EthereumMax ("EMAX") cryptocurrency, who bought "EMAX Tokens" between May 14 and June 27, 2021.  Plaintiffs claim Mr. Pierce has class liability because he tweeted three statements over a 5-day period between May 26 and 30.  As shown below, under applicable caselaw, Plaintiffs fail to establish the required elements of class certification; indeed, they fail to even mount a credible attempt to do so in many respects.  The putative class includes any EMAX purchaser during the six-week time period, ***whether or not they read Mr. Pierce's tweets, and whether or not they relied on them*** (reliance is itself a dubious proposition given the contents of the tweets, the highly speculative nature of cryptocurrency, and Mr. Pierce's undisputed role not as an EthereumMax insider, but as a celebrity who lent his name to promotions authored by the insiders).  Plaintiffs' motion is silent on a method to calculate which putative class members saw Mr. Pierce's tweets for good reason: none exists.

The shortcomings in the instant motion are exacerbated by Plaintiffs' attempt to define a class that encompasses (1) unrelated alleged statements by internet influencer Kim Kardashian, boxing champion Floyd Mayweather, and at least five other Defendants that occurred at different times, had different content, and reached different purchasers, as well as (2) the statements and conduct of the insiders at EthereumMax who engineered, carried out, and profited from the alleged scheme. The motion's reach exceeds its grasp, and it collapses of its own weight.

Class certification should be denied as to Mr. Pierce; any purchaser of EMAX claiming to have relied on any materially false statements of his in purchasing cryptocurrency should bring such claims individually.

DEFENDANT PIERCE'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## II.    FACTUAL BACKGROUND

### A.    Plaintiffs Rely On Three Paul Pierce Tweets About EMAX Tokens

Plaintiffs allege a "pump and dump" cryptocurrency scheme by the owner/operators of EMAX whereby tokens were misleadingly promoted to unsuspecting investors so that Defendants could profit.  TAC ¶ 2.[1]  Plaintiffs sued EthereumMax executives (which Plaintiffs define as the "Executive Defendants") and a group of celebrities that promoted the cryptocurrency, including Kardashian, Mayweather, and former athletes Antonio Brown and Mr. Pierce (the "Promoter Defendants").[2]  *Id.*  Plaintiffs allege Mr. Pierce "acted as a promoter for EthereumMax and the EMAX Tokens," but not that Mr. Pierce created, developed, or exercised control over EthereumMax.  *Compare* TAC ¶ 22 with TAC ¶¶ 16–20, 23.

Plaintiffs point to three social media posts that Mr. Pierce posted to his Twitter (now X) account on May 26, 28, and 30 about EthereumMax.[3]  TAC ¶¶ 69, 76, 82. They allege the posts were false and misleading, and that Mr. Pierce failed to disclose that he was compensated for the posts.  TAC ¶¶ 70, 77, 83.  Plaintiffs also allege that Mr. Pierce "had access to material, non-public information about the timing of various celebrity promotions of the EMAX Tokens (including his own), and improperly used that information to perfectly time his purchases and sale of EMAX Tokens to maximize his ill-gotten profits."  TAC ¶ 85.  Plaintiffs claim that as a result of Mr. Pierce's May 26 post, the "trading volume for the EMAX Token exploded."  TAC ¶

---

[1]  Plaintiffs' Corrected Third Amended Class Action Complaint (Dkt. 190) is cited as "TAC."

[2]  In the interest of judicial economy, this Opposition does not repeat arguments made by the other Promoter Defendants.  Mr. Pierce incorporates by reference arguments made by the other Promoter Defendants into this Opposition.

[3]  Unless stated otherwise, all dates in this Opposition are from 2021.

78.   Through discovery, substantial evidence has come to light that the Executive Defendants controlled and even authored Mr. Pierce's social media posts.[4]

Plaintiffs' description of Mr. Pierce's alleged EMAX Token trading activity also contains several inconsistencies.   Plaintiffs extensively highlight the EMAX trading of a cryptocurrency wallet that appears in a screenshot in Mr. Pierce's May 28 tweet.  *See* TAC ¶¶ 68–85.  Yet Plaintiffs admit that "the screenshot was of another person's holdings that were provided to [Mr. Pierce] for promotional purposes." TAC ¶ 70.   In other words, this wallet was *not* "controlled by someone either working as an agent on [Mr. Pierce's] behalf or close to him personally." TAC ¶ 71.  As another example, Plaintiffs claim Mr. Pierce received $1.35 million worth of EMAX on May 25, 2021, TAC ¶ 74, then immediately admit that, as of *the following day*, Mr. Pierce had received just $46,000 worth of EMAX in total.  TAC ¶ 77.

Plaintiffs have seven operative claims against Mr. Pierce under: the California Unfair Competition Law ("UCL") (Claims 1–3); the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Claim 5); New York's General Business Law Art. 22-A (Claim 6); the California Corporate Securities Law of 1968 (Claim 9); and unjust enrichment / restitution under California common law (Claim 14).  *See* TAC ¶¶ 196–521.

## B.   Plaintiffs Cite Dozens Of Other Statements That Allegedly Induced Plaintiffs To Purchase And/Or Hold EMAX Tokens

In addition to Mr. Pierce's May 26, May 28, and May 30 tweets, Plaintiffs cite dozens of social media posts made by other individuals that allegedly induced Plaintiffs to purchase EMAX Tokens and/or hold on to an investment in EMAX Tokens when they otherwise would not have done so:

---

[4]   *See, e.g.*, GP-SEC-004268; GP-SEC-028368 at -385; GP-SEC-028638; GP-SEC-029409.  These documents have been marked "Confidential Treatment Requested" by Defendants Giovanni Perone and EMAX Holdings, LLC.

- On May 14, 2021, Defendant Justin Maher posted a screenshot of financial metrics to the "InRussWeTrust" Facebook page displaying a "466,590.48%" increase in the EMAX Tokens price over a 24-hour period. TAC ¶ 60.

- On May 16, Defendant Russell Davis posted to the "InRussWeTrust" Facebook page that EMAX Tokens were 'the fastest growing #crypto in history." TAC ¶ 112.

- On May 16, the EthereumMax Instagram account posted that EMAX Tokens grew "500,00+% in the first 24 hours," that EthereumMax had "locked in partnership with global digital marketing agency," and "the train is just getting rolling." TAC ¶ 62.

- On May 16, Defendant Mike Speer promoted EMAX Tokens on his YouTube channel, advising potential investors "[h]ow to buy EthereumMax" and that the EMAX Token "is taking off" and has "tons of room to go." TAC ¶ 114.

- On May 16 and 17, Maher made Facebook posts to "encourage further purchasing and/or holding of the tokens." TAC ¶¶ 61, 63.

- On May 18, Davis posted that it was "Just the start" for EthereumMax. TAC ¶ 64.

- On May 19, Defendant Perone promoted EAX Tokens on the EthereumMax Instagram account. TAC ¶ 121.

- On May 21 and 23, Speer uploaded additional YouTube videos promoting EthereumMax. TAC ¶¶ 122, 123.

- On May 26, EthereumMax's twitter page posted, "Our new token to buy $eMax is LIVE!" and included a lengthy "Beginners Guide to Buying EthereumMax." TAC ¶ 97.

- On May 28 and 30, EthereumMax issued press releases stating that EMAX Tokens were "now the exclusive CryptoCurrency accepted for online ticket purchasing for the highly anticipated Floyd Mayweather vs. Logan Paul Pay-Per-View event" and that EMAX Tokens were the "fastest-growing Altcoin on the market," with prices "up over 21,000% with over 32,000 holders." TAC ¶¶ 130, 134.

- On May 29, Antonio Brown posted on his personal Instagram account, "Next contract pay me Emax @ethereummax." TAC ¶ 136.

- On May 30, Kim Kardashian and famous nightclub promoter and hotelier David Grutman promoted EthereumMax on their social media accounts. TAC ¶ 137.

- On June 3, the Executive Defendants posted on the EthereumMax Instagram account that Emax Tokens were "the fastest growing cryptocurrency, with over 75,000 holders in less than 3 weeks" and that EthereumMax was "on a path to shatter records and bring cryptocurrency into walks of life we have yet seen or even imagined." The post adds about the Mayweather fight: "On Sunday, June 6th, millions and millions of people from across the world find out who eMax is. Then, the next chapter begins and the story only continues to grow." TAC ¶ 141.

- On June 3, Davis posted on the "InRussWeTrust" Facebook group, "I think it is a rock bottom right now which is why I'm posting. If anybody wants emax for 90% off. Now is the time!! This is a Solid BUYING OPPORTUNITY in my mind!!" TAC ¶ 142.

- On June 4, Mayweather attended the "Bitcoin 2021" conference in Miami wearing an EthereumMax t-shirt. Fox Business interviewed Mayweather at the conference (and displayed Mayweather's t-shirt) while calling it the "largest cryptocurrencies event ever to be held on the planet." TAC ¶ 143.

Defendants Maher and Perone posted Mayweather's interview to the EthereumMax Facebook and Instagram pages, as well as the "InRussWeTrust" Facebook group.  TAC ¶ 144.

- On June 4, the EthereumMax Instagram account posted a video promoting a shopping event a jewelry store in Miami where EthereumMax would be accepted.  TAC ¶ 145.

- On June 6, Mayweather wore a t-shirt and boxing shorts with the EthereumMax logo and brand before and during his fight with Logan Paul.  TAC ¶¶ 147–48.

- On June 6, Club LIV in Miami tagged the EthereumMax Instagram page and posted the EthereumMax logo on Instagram to promote the "Official Afterparty" for Mayweather's fight.  TAC ¶ 149.

- Also on June 6, Davis posted a photo of himself and Mayweather to the "InRussWeTrust" Facebook group announcing a "long term deal" between EthereumMax, Mayweather, and Davis' InRussWeTrust cryptocurrency consulting business.  TAC ¶ 150.

- On June 8, Perone and others posted a video to Speer's YouTube channel stressing that the Executive Defendants were "looking to lock the wallets" to show investors that they "were here to stay."

- On June 14, Kardashian posted on Instagram, "A few minutes ago Ethereum Max burned 400 trillion tokens- Literally 50% of their admin wallet giving back to the entire E-MAX community" and encouraging her 250 million+ followers to "Swipe up to join the E-MAX community."  TAC ¶ 156.

Plaintiffs allege that each of these social media posts caused certain named plaintiffs and/or putative class members to purchase and/or hold EMAX Tokens.

## C.    Named Plaintiffs Claim That Numerous Social Media Posts By Mr. Pierce And Other Defendants Induced Them To Purchase EMAX

Seven of the ten named Plaintiffs allege that they saw Mr. Pierce's social media posts, and that those social media posts induced them to purchase and/or not sell EMAX Tokens.  *See* TAC.[5]  These seven Plaintiffs each allege they saw and were induced to act by a number of social media posts:

Plaintiff Tunisia Brignol alleges that she saw Mr. Pierce's May 26 and May 28 social media posts, and that those two posts induced her to purchase EMAX Tokens on May 29 and May 31.  TAC ¶ 339.  Brignol also alleges that she saw a May 28 press release about Mayweather's fight, which induced her to purchase more EMAX Tokens on June 8.  *Id.*  Brignol further alleges that EthereumMax Instagram posts on May 16 and June 3, which caused her to make all three EthereumMax purchases. TAC ¶ 340.

Plaintiff Michael Buckley alleges that he saw Mr. Pierce's May 26 and May 28 social media posts, and that those two posts—as well as four posts from Davis and Maher between May 14 and May 18—induced Buckley to purchase EMAX Tokens on May 28.  TAC ¶¶ 207, 209.  Buckley also alleges that the following social media posts induced him to purchase EMAX Tokens on June 14:  (1) a May 28 press release about Mayweather's fight; (2) Brown's May 29 post that Brown wanted his next football contract to be paid in EMAX; (3) Mr. Pierce's May 30 post; (4) a June 3 post on the EthereumMax Instagram page; and (5) Kardashian's June 14 post.  TAC ¶¶ 207–08.

Plaintiff Marko Ciklic allegedly saw Mr. Pierce's May 26 and May 28 posts, the May 28 press release, and Brown's May 29 post, all of which allegedly induced Ciklic to purchase EMAX Tokens on May 28 and May 29.  TAC ¶ 365.  Separately,

---

[5]    Plaintiffs Christopher DeLuca, Ryan Huegerich, and Milan Puda do not allege that they saw or relied on Mr. Pierce's social media posts.

Ciklic allegedly saw an EthereumMax Instagram post on June 3 and Kardashian's social media posts on May 30 and June 14, which induced Ciklic to purchase and hold additional EMAX Tokens. TAC ¶¶ 365–66.

Plaintiff Till Freeman alleges that he saw Mr. Pierce's May 26 and May 28 social media posts, and that those two posts induced Freeman to make two EMAX purchases on June 2. TAC ¶ 337. Freeman also alleges that Brown's May 29 post induced Freeman to make those same two purchases of EMAX Tokens on June 2. *Id.* Freeman *further* alleges that he saw various other social media posts about EthereumMax prior to June 2—including a May 16 post on the EthereumMax Instagram page, a May 28 press release about Mayweather's fight, and Kim Kardashian's May 30 social media post—but does not allege that those posts induced him to make his June 2 purchases. *See Id.*

Plaintiff Nabil Nahlah alleges he saw Mr. Pierce's May 26 and May 28 social media posts, and that those two posts induced him to purchase EMAX Tokens on May 28. TAC ¶ 332. Nahlah also alleges that social media posts by Maher and Davis on May 14, 15, 17, and 18 induced him to purchase EMAX Tokens on May 28. TAC ¶ 334. Nahlah alleges that he saw two other social media posts about EthereumMax prior to May 28—the May 16 post on the EthereumMax Instagram page and the May 28 press release about Mayweather's fight—but does not allege that those posts induced him to make his June 2 purchases. TAC ¶¶ 332–33. Instead, Nahlah alleges that the latter two social media posts induced him to make six EMAX Token Purchases between June 4 and June 10. TAC ¶ 333.

Plaintiff Jonathan Semerjian alleges that Mr. Pierce's May 26, May 28, and May 30 social media posts induced him to purchase EMAX Tokens on May 31 and June 1. TAC ¶ 205. Semerjian also saw the May 28 press release about Mayweather's fight, which allegedly did not influence his EMAX Token purchase that same day, but instead induced him to make a second purchase on June 4. *Id.* Semerjian further alleges that a June 3 EthereumMax Instagram post induced his June 4 purchase, and

that Kardashian's June 14 social media post induced him to hold his EMAX Tokens when he otherwise would not have done so.  TAC ¶¶ 205–06.

Finally, Plaintiff Neil Shah alleges that Mr. Pierce's May 26, May 28, and May 30 tweets induced him to purchase EMAX Tokens on May 29 and June 1. TAC ¶ 210. Shah also allegedly saw the May 28 press release about Mayweather's fight and a June 3 EthereumMax Instagram post, both of which induced him to purchase additional EMAX Tokens on June 3 and June 11.  TAC ¶¶ 210–11.  Shah further alleges that Kardashian's May 30 and June 14 posts induced him to hold his EMAX Tokens when he otherwise would not have done so.  TAC ¶ 210.

## III.    ARGUMENT

### A.    A Class Action Is Not The Superior Method Of Resolving Plaintiffs' Claims

Class certification under Rule 23(b)(3) is a two-step process.  A plaintiff must first show that the four prerequisites of Rule 23(a) are met:  numerosity, commonality, typicality, and adequacy of representation.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011).  For a damages class under Rule 23(b)(3), a plaintiff must also establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).  Plaintiffs "must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23."  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (en banc).  The predominance "requirement is satisfied when common questions represent a significant portion of the case and can be resolved for all members of the class in a single adjudication."  *Stemmelin v. Matterport, Inc.*, 2022 WL 783206, at *4 (N.D. Cal. Mar. 14, 2022).  Finally, "[i]n addition to the explicit requirements of Rule 23, an implied prerequisite to class certification is that the class must be sufficiently definite; the party seeking certification must demonstrate that an identifiable and

ascertainable class exists." *Turcios v. Carma Lab'ys, Inc.*, 296 F.R.D. 638, 645 (C.D. Cal. 2014).

Plaintiffs seek to certify the following nationwide class: "All persons in the United States who, between May 14, 2021, and June 27, 2021, purchased unregistered EthereumMax tokens and were subsequently damaged thereby." Mot. at 6.[6]  For claims brought under state consumer protection laws, Plaintiffs seek to certify four separate classes: "All persons in [California / Florida / New Jersey / New York] who, between May 14, 2021, and June 27, 2021, purchased EthereumMax tokens and were subsequently damaged thereby." Mot. at 7.

Plaintiffs' arguments in favor of predominance fail on the facts and the law.

### 1.    The Putative Class Is Overbroad Because It Includes Members That Were Not Harmed By Mr. Pierce

"A class definition should be precise, objective, and presently ascertainable" so that the putative class is not overbroad. *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998) (quotation omitted).  That includes proving that the class is "defined in such a way that anyone within it would have standing." *Red v. Kraft Foods, Inc.*, 2011 WL 4599833, at *8 (C.D. Cal. Sept. 29, 2011) (quotation omitted). "If injury cannot be proven on a class wide basis, an individualized analysis is required, and such analysis will defeat predominance." *In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *15 (N.D. Cal. Mar. 29, 2022).

Plaintiffs here are unable to meet this standard in the face of overwhelming evidence that many class members suffered no injury as a result Mr. Pierce's conduct. *Olean*, 31 F.4th at 669 n.14 ("When a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification.").

---

[6]  Plaintiffs' Motion for Class Certification (Dkt. 242) is cited as "Mot."

Plaintiffs' classes are fatally overbroad because they include members that were never exposed to Pierce's social media posts. There is ample evidence that both named Plaintiffs and numerous class members did not see Mr. Pierce's social media posts before purchasing EMAX Tokens:

- Three Plaintiffs—Christopher DeLuca, Ryan Huegerich, and Milan Puda—do not allege to have seen or relied on Mr. Pierce's social media posts. *See generally* TAC.

- The putative classes are not limited to EMAX Token purchasers that saw Mr. Pierce's social media posts. The putative class includes *all* EMAX Token purchasers that were "subsequently damaged thereby," regardless of whether they saw Mr. Pierce (or any Defendant's) social media content before purchasing EMAX Tokens.

- The putative classes include all person who purchased EMAX Tokens between May 14, 2021 and June 27, 2021. Yet Mr. Pierce did not post about EthereumMax until *the afternoon of May 26, 2021*. TAC ¶ 76. Any class member that purchased EMAX Tokens before May 26 could not have seen or relied on Mr. Pierce's social media posts before doing so.

The putative classes include persons who could not have been injured by Mr. Pierce's allegedly misleading social media posts because they never saw the posts. Yet those EMAX Token purchasers are inherently included in, and cannot be extricated from, the proposed classes. The classes are thus unworkably overbroad. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012) (holding that a false advertising class was fatally overbroad where many members had never been exposed to the allegedly misleading advertisements "because common questions of fact do not predominate where an individualized case must be made for each member showing reliance"); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (denying class certification because the putative class "could include millions who

were not deceived and thus have no grievance").

Plaintiffs' Motion is conspicuously silent on this point.  Plaintiffs argue that "whether the class members were reasonably misled by defendants' misrepresentations can be determined on a class-wide basis" by showing "a uniform expectation of consumers regarding the celebrity marketing scheme." Mot. at 19.  But the Motion fails to either establish that all putative class members saw Mr. Pierce's social media posts, or to offer a method for determining which did.  A presumption of class-wide *reliance* cannot arise without proving class-wide *receipt* of a common misrepresentation.  *Diacakis v. Comcast Corp.*, 2013 WL 1878921, at *4 (N.D. Cal. May 3, 2013) (denying class certification because plaintiff's UCL claims "require a showing of consumer deception" yet "the class includes *anyone* who purchased [the relevant product], irrespective of whether he or she was deceived" by defendant's statements).

### 2.    Class Members That Did Not See Mr. Pierce's Social Media Posts Cannot Bring Consumer Protection Claims

Additionally, class members that did not see Mr. Pierce's social media posts before purchasing cannot bring UCL or FDUTPA claims.  As Plaintiffs admit, "[t]he predominance inquiry begins, of course, with the elements of the underlying causes of action.  Mot. at 17 (quotation omitted).

California's unfair competition law prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.  In 2004, California ballot Proposition 64 "amended the UCL to limit standing to those who have suffered injury in fact and have lost money or property as a result of such unfair competition." *Turcios*, 296 F.R.D. at 643–44.  "***The intent of this change was to . . . curtail the prior practice of filing suits on behalf of clients who have not*** used the defendant's product or service, ***viewed the defendant's advertising***, or had any other business dealing with the defendant." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 321 (2011) (quotation

omitted) (emphasis added).

As a result, to show UCL standing, a plaintiff "must demonstrate actual reliance on the allegedly deceptive or misleading statements." *Id.* at 326–27 (2011) (quotation omitted); *Turcios*, 296 F.R.D. at 644 ("If the predicate statute is based on misrepresentation, the plaintiff must show reliance in order to have UCL standing."). A plaintiff demonstrates reliance by showing the defendant's material misrepresentation or omission was an immediate cause of the plaintiff's injury-producing conduct. *In re Tobacco II Cases*, 46 Cal. 4th 298, 325–26 (2009). For UCL and false advertising claims[7] "*the relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading*." *Mazza*, 666 F.3d at 595–96.

Putative members of the California class that were not aware of Mr. Pierce's social media posts at the time they purchased EMAX Tokens do not have standing to bring UCL claims because they could not have relied on the alleged misrepresentations and omissions within those posts when making their "injury-inducing" purchases. *Kwikset*, 51 Cal. 4th at 327 n.10 (a UCL plaintiff "must allege he or she was motivated to act or refrain from action based on the truth or falsity of a defendant's statement, *not merely on the fact it was made*"); *Morizur v. Seaworld Parks & Ent., Inc.*, 2020 WL 6044043, at *16 (N.D. Cal. Oct. 13, 2020) (failure to prove seeing the relevant advertisement defeats UCL standing). Because Plaintiffs' proposed California class includes members without standing to bring UCL claims against Mr. Pierce, the Court cannot certify a UCL class. *Stemmelin*, 2022 WL 783206, at *8 ("Because Stemmelin has failed to reasonably limit the putative classes to only those consumers who were exposed to the alleged misrepresentations, he has failed to establish a presumption of reliance.").

---

[7] Plaintiffs claim Mr. Pierce violated California false advertising laws as the basis for violations of the "unlawful" and "fraudulent" prongs of the UCL. TAC ¶¶ 202, 271.

While FDUTPA claims do not require establishing actual reliance, "Florida appellate courts and the Eleventh Circuit have rejected FDUTPA claims based on lack of proximate causation or an insufficient causal link between the deceptive act and damages." *Kurimski v. Shell Oil Co.*, 2022 WL 2913742, at *11 (S.D. Fla. June 30, 2022) (collecting cases). *See also* Fla. Stat. § 501.211 ("In any action brought by a person who has suffered a loss *as a result of* a violation of this part, such person may recover actual damages. . .") (emphasis added).[8]  If a plaintiff fails to show a causal link between an alleged deception and his or her damages, the FDUTPA claim fails. *Molina v. Aurora Loan Svcs., LLC*, 635 F. App'x 618, 627 (11th Cir. 2015).

Here, individual issues regarding proximate cause predominate for the reasons previously explained:  Plaintiffs' proposed Florida class includes both a named Plaintiff (Puda) and proposed class members that never saw Mr. Pierce's social media posts.  Those posts therefore could not have been the proximate cause of their damages. *See Dolphin LLC v. WCI Communities, Inc.*, 715 F.3d 1243, 1247 (11th Cir. 2013) (affirming summary judgment on FDUTPA claim because Plaintiff failed to show "that [Defendant's] alleged misrepresentation was the cause of [the plaintiff's] claimed damages).  The Court cannot certify a FDUTPA class.

### 3.    Individual Issues Relating To Liability Predominate

To establish predominance, Plaintiffs must show that individualized liability calculations "would not be prohibitively cumbersome." *Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 469 (9th Cir. 2023).  Courts cannot certify classes where "key liability issues can only be resolved on an individual basis." *Stemmelin*, 2022 WL 783206, at *8. *See also* Fed. R. Civ. P. 23, 1966 Advisory Committee Notes ("[A] fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the

---

[8]  This Court previously held the same:  "under the FDUTPA, plaintiffs must plead, with specificity, how the alleged misrepresentations or omissions *caused* their damages." Dkt. 99 at 38 (emphasis in original).

persons to whom they were addressed.").   "[A] class cannot be certified on the premise that [Defendants] will not be entitled to litigate its statutory defenses to individual claims."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011).

Here, Plaintiffs cite more than *two dozen* social media posts by eight defendants and several non-defendants, each of which allegedly induced *some* of the named Plaintiffs and/or class members to purchase EMAX.  *See* Sections II.B and II.C, *supra*.  As this Court previously noted, "Plaintiffs allege that various different Defendants made or failed to make *very different statements* that Plaintiffs allege were *misleading for vastly different reasons*."  Dkt. 99 at 39 (emphasis added).

As a result, liability will need to be individually decided *for each class member* by determining which social media posts they saw and when they saw those posts in relation to each purchase of EMAX Tokens.[9]  *Mazur v. eBay Inc.*, 257 F.R.D. 563, 570 (N.D. Cal. 2009) (denying class certification where "[c]ommon questions of law or fact fail to predominate over **individual** questions" because "any liability based on alleged misrepresentations hinges on individual determinations of reliance").

The Named Plaintiffs demonstrate the clear need for individual inquiry to apportion liability in this case.  Plaintiff Buckley, a proposed class representative for California, alleges that he saw 11 different social media posts by at least five different Defendants prior to his two EMAX Token purchases.  *See* Section II.C, *supra*.  Plaintiff Shah alleges that he saw seven different social media posts from at least three different Defendants, which induced him to make four EthereumMax purchases.  *Id.*  For each, the complexity of the liability determination requires "individualized mini-trials" to show which Defendants' social media posts they actual relied upon.  *Bowerman*, 60 F.4th at 470.

---

[9]   Plaintiffs do not allege that Mr. Pierce is liable for statements made by unrelated parties.

So, too, for the proposed class representatives for Florida:  Plaintiff Freeman alleges that he saw at least six different social media posts by at least five different Defendants prior to his June 2 EMAX Token purchases.  *See* Section II.C, *supra*. Plaintiff Nahlah similarly alleges that he saw eight different social media posts by at least three different Defendants before purchasing EMAX Tokens on May 28.  *Id.*

If this case proceeded to trial, the individualized inquires needed to adjudicate the claims of named Plaintiff would have to be repeated across the vast proposed class. Each member will have seen a different cocktail of social media posts made by a different Defendant.  Each Defendant would thus make a class-member-by-class-member showings of which social media post each class member actually relied upon. Indeed, each Defendant would have a constitutional right to do so.  *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018); *Wal-Mart Stores*, 564 U.S. at 367. There is thus no predominance because of the myriad individualized questions regarding what information "certain class members knew, read, saw, or encountered." *Brown v. Google, LLC*, 2022 WL 17961497, at *19 (N.D. Cal. Dec. 12, 2022) (denying class certification in relevant part); *Oddo v. Arocaire Air Conditioning & Heating*, 2020 WL 5267917, at *22 (C.D. Cal. May 18, 2020) (no class certification "where a putative class is exposed to a varied mix of representations communicated through different channels and absorbed in different ways and to different degrees") (cleaned up).  The putative classes therefore cannot be certified.

## B.    Plaintiffs' Proposed Class Is An Overbroad "Fail-Safe"

Plaintiffs' motion for class certification should also be denied because it is definitionally overbroad and includes class members who *profited* from the alleged scheme and thus did not suffer harm.  Plaintiffs' class definition is not limited only to those who purchased and held EMAX Tokens (or sold them at a loss).  Instead, the putative class includes "[a]ll persons" who purchased EMAX Tokens from May 14, 2021—the day the EMAX Token was launched—until after the alleged conduct.  Mot. at 6; TAC ¶ 51.  The classes thus include uninjured members, requiring the Court to

"consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad." *Olean*, 31 F.4th at 669 n.14 (9th Cir. 2022).

Plaintiffs attempt to avoid this issue by defining the classes to cover only EMAX Token purchasers who "were subsequently damaged thereby." Mot. at 6, 7. But these circular "fail-safe" class definitions are improper and should be rejected here. "A court may not [] create a 'fail safe' class that is defined to include only those individuals who were injured by the allegedly unlawful conduct." *Olean*, 31 F.4th at 669 n.14 (9th Cir. 2022). "Such a class definition is improper because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Id.* (*quoting Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012)). The proposed classes cannot be certified as defined.

## IV.   Conclusion

For the foregoing reasons, the Court should deny Plaintiffs' motion for class certification as to Paul Pierce.

DATED:  April 28, 2025                    QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP


                                          By    /s/ *Steve Madison*
                                              Steve Madison (Bar No. 101006)
                                              stevemadison@quinnemanuel.com
                                              Jeffrey Boxer (Bar No. 346231)
                                              jeffreyboxer@quinnemanuel.com
                                              865 South Figueroa Street, 10th Floor
                                              Los Angeles, California 90017-2543
                                              Telephone:  (213) 443-3000
                                              Facsimile:   (213) 443-3100

                                              *Attorneys for Paul Pierce*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 5,170 words (as determined by the Microsoft Word word-processing system used to prepare the brief), excluding the items exempted by Local Civil Rule 11-6.1, which complies with the word limit of L.R. 11-6.1.

DATED: April 28, 2025                QUINN EMANUEL URQUHART &
                                     SULLIVAN, LLP


                                     By  */s/ Steve Madison*
                                     _____
                                         Attorney for Paul Pierce

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2025, I caused the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

DATED: April 28, 2025                QUINN EMANUEL URQUHART &
                                     SULLIVAN, LLP


                                     By  */s/ Steve Madison*
                                         Attorney for Paul Pierce

DEFENDANT PIERCE'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION