# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| Ryan Huegerich, Jonathan Semerjian, Nabil | § | |
| Nahlah, Till Freeman, Marko Ciklic, Tunisia | § | |
| Brignol, Milan Puda, Neil Shah, Michael | § | |
| and Christopher Deluca, individually and on | § | |
| behalf of all others similarly situated, | § | |
| | § | Case No. 2:22-cv-00163-MWF-SK |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| EMAX Holdings, LLC, Giovanni Perone, | § | |
| Mike Speer, Justin Maher, Jona Rechnitz, | § | |
| Kimberly Kardashian, Floyd Mayweather, Jr., | § | |
| Paul Pierce, Russell Davis, and Antonio Brown | § | |
| | § | |
| Defendants | | |

**Expert Declaration of Professor Michael Hiscox, Ph.D.**

**April 28, 2025**

_Michael Hiscox_
_____

1

I.  Assignment ..................................................................................................... 4

II.  Qualifications................................................................................................. 4

III.  Summary of Opinions .................................................................................. 7

IV.  Case Background .......................................................................................... 9

  A.  Legal Background and Claims Against Ms. Kardashian .......................... 9

  B.  Summary of Professor Dimofte's Expert Report .................................. 10

  a.  First, he claims that his survey shows "a relatively high chance of cryptocurrency
  purchase based on the respective [social media] post, across the board." .......................... 12

  b.  Second, he claims that his survey shows "a relatively high chance of cryptocurrency
  purchase based on online consumer chatter, in the absence of an endorsing social media
  post from the public figure."................................................................................ 12

  c.  Third, he claims that his survey shows "a willingness to pay a premium for an
  endorsed (vs. not endorsed) cryptocurrency." .............................................. 13

  d.  Fourth, he claims that "in terms of a public figure's social media endorsement on
  likelihood to hold the already purchased cryptocurrency," his survey shows "a relatively
  high chance of not selling based on the respective post." ........................................ 13

  e.  Fifth, he claims that the survey shows that "false exclusive acceptance claims" have
  "a very mild negative effect on their decision to have purchased" that token. .................... 13

V.  Methodological Problems With Professor Dimofte's Survey .................................. 13

  A.  Professor Dimofte's selection of the survey sample is inappropriate and biased ........ 14

    1.  Professor Dimofte's sampling filters do not result in a representative sample ........ 15

    2.  Professor Dimofte's survey sample does not reflect cryptocurrency consumption
    patterns during the Relevant Period ................................................................ 17

    3.  Professor Dimofte fails to provide demographic information necessary to establish
    representativeness of his sample .............................................................. 19

  B.  The survey is not correctly designed to validly infer the causal impact of
  endorsements .............................................................................................. 20

1.    The survey does not use randomized assignment, which is the standard method for making causal inferences ....................................................................................21

2.    The survey's reliance on hypothetical decisions limits its ability to accurately predict real-world behavior ..................................................................................23

C.    The survey questions are biased and poorly designed .......................................25

1.    Some survey questions are written to "lead" respondents............................25

2.    The use of one-sided response options reinforces the leading nature of the questions..................................................................................................................28

3.    Some survey questions are overly complicated and confusing....................29

4.    Some survey response categories encourage guessing and affirmative bias............33

D.    Professor Dimofte's survey design and execution do not adhere to best-practice survey research standards ........................................................................................35

1.    Professor Dimofte references literature on survey methodology that is not commonly used............................................................................................................35

2.    Professor Dimofte does not adhere to the standards outlined in the very literature he cites..........................................................................................................37

3.    Professor Dimofte does not provide evidence of imparting basic quality control measures ......................................................................................................39

4.    Professor Dimofte fails to provide necessary information to evaluate several supposedly adopted testing protocols ....................................................................41

5.    Professor Dimofte inexplicably omits sample statistics for several of his key responses ......................................................................................................................44

VI.  Conclusion..............................................................................................................45

## I.    ASSIGNMENT

1.    I have been retained by Cooley LLP (hereafter, "Counsel") representing Defendant Kim Kardashian in the case *In Re: EthereumMax Investor Litigation*. I have been asked by Counsel to evaluate whether there are any methodological flaws in the *Consumer Perception Study* conducted by Professor Claudio Dimofte who Plaintiffs have identified as an expert and for whom Plaintiffs submitted a report on February 11, 2025 as part of their *Motion for Class Certification*. In preparation for my declaration in this matter, Counsel requested that I review and analyze *Corrected Third Amended Class Action Complaint* [1] ("Third Amended Complaint"), the *Memorandum of Law in Support of Plaintiffs' Motion for Class Certification*[2] ("Plaintiff Class Cert Brief"), and the *Expert Report of Claudiu V. Dimofte, Ph.D.*[3] ("Dimofte Report.").

## II.    QUALIFICATIONS

2.    I am the Clarence Dillon Professor of International Affairs at Harvard University. I am also the Director of the Sustainability, Transparency, Accountability Research (STAR) Lab at Harvard and a faculty associate of Harvard's Behavioral Insights Group, Institute for Quantitative Social Science, the Weatherhead Center for International Affairs, and the Harvard University Center for the Environment. I earned my Bachelor of Economics degree (1st class) from the University of Sydney (1989) and my PhD in Government from Harvard University (1997).  I have held faculty positions previously at the University of

---

[1] *In re: EthereumMax Investor Litigation*, "Corrected Third Amended Class Action Complaint," October 6, 2023, ("Third Amended Complaint").

[2] *In re: EthereumMax Investor Litigation*, "Memorandum of Law in Support of Plaintiffs' Motion for Class Certification," February 11, 2025, ("Plaintiff Class Cert Brief").

[3] Claudiu V. Dimofte, "Expert Report of Claudiu V. Dimofte, Ph.D.," (February 11, 2025), ECF No. 243-9 ("Dimofte Report").

California San Diego (Assistant Professor 1997-2001) and Harvard University (Associate Professor 2001-2005). I have held my current full professorship at Harvard since 2005.

3.      For the past 15 years the focus of my research and teaching has been the field of applied behavioral economics. My research has examined how the choices individuals make in a broad range of domains (including consumer spending, saving and investing, borrowing, education, healthcare, and energy consumption) are affected by the specific ways in which businesses offer products to customers and by government policies and regulations.

4.      Between 2008 and 2014, I conducted survey research and implemented randomized trials with major companies, including Whole Foods, Gap, and Qantas. These trials were designed to assess consumer response to labels and messages about their products, including sustainability attributes such as Fair Trade certification. I designed these studies to measure and report the impacts of communications on actual buying behavior (in stores and online).

5.      While on leave from Harvard between 2015 and 2017, I served as the Director of the Australian Behavioral Economics Team ("BETA") in the Department of the Prime Minister and Cabinet, Australian Government. I continue to serve as adviser to BETA and serve on BETA's Academic Advisory Committee. BETA has conducted a large number of studies, including randomized controlled trials, examining consumer responses to business practices and communications about products. BETA implemented many of these studies in partnership with various Australian Government agencies and with several Australian companies.

6.      I have conducted several BETA trials specifically to examine financial decisions and individual responses to online and digital information and/or information about product

attributes. One study, for example, conducted in partnership with the Australian Treasury and several superannuation (retirement) funds, implemented a large-sample survey to examine people's comprehension of options for investing their retirement savings at the point they retire. Other studies conducted with the Department of Environment and Energy, working with an online retailer and a major Australian airline, examined online company communications about products and services and the impacts on consumer product choices. A crucial aspect of this behavioral research was assessing the extent to which communications enable customers to align their actions (as consumers and investors) with their best intentions and improve their wellbeing. The research also examined the impact of third-party endorsements and certifications on consumer choices.

7.    Since 2017, via Harvard's STAR Lab, I have supervised and or directly conducted studies in both Australia and the United States, in partnership with a variety of companies, examining behavioral responses among customers to new information about products provided in digital platforms. These studies have included survey research and field trials conducted with large banks and other retail companies that have assessed customer beliefs about products and how company communications and recommendations influence customer purchasing decisions. In Australia I have conducted multiple surveys and field experiments with the largest bank, the Commonwealth Bank of Australia, examining a range of products (e.g., mortgages, credit cards, loans for home solar installation, and electric vehicles), focusing on the information made available to customers at the time they are making their decisions and how financial products are framed and presented to customers.

8.    For the past seven years I have taught *Behavioral Insights and Public Policy*, now one of the largest undergraduate courses at Harvard, which covers key insights from

behavioral economics and how they can be applied to address critical issues. I also teach a course *on Evaluating the Impacts of Public Policies*, which covers statistical methods and includes an extensive module on survey design and how to conduct survey experiments using best-practice techniques with online survey platforms.

9.      I estimate that I have designed and implemented 80 to 100 large-sample surveys over the course of the past 15 years. I conducted these surveys in multiple countries, with multiple survey panel providers such as Qualtrics, IPSOS, YouGov, and Dynata. Almost all these surveys have included questions (and experiments) specifically designed to assess individuals' willingness to buy products in a way that is scientifically rigorous. The findings of these studies have been published in peer-reviewed journals and have helped to inform key decisions made by government agencies and major companies.

10.      I have attached a copy of my curriculum vitae to this report as **Appendix A**. I have no stake in the outcome of this case. I am being compensated for my work in this case at the rate of $1,000 per hour. The materials I relied upon in forming my opinions are summarized in **Appendix B**. I reserve the right to supplement my opinions as more information becomes available.

## III.    SUMMARY OF OPINIONS

11.      Professor Dimofte's survey suffers from serious methodological problems that render its results unreliable and therefore unusable for evaluating any of the Plaintiffs' allegations around Ms. Kardashian's purported influence on the EMAX trading behavior of members of the proposed classes. My conclusion is informed by the following opinions that I have formed based on my review of materials in this matter and my experience in designing and conducting surveys and studies of consumer behavior.

12.     *First*, Professor Dimofte's sampling methods are inappropriate and biased. His approach produces a sample that does not reflect the target population in this matter, even under the Plaintiffs' own proposed class definitions. Professor Dimofte does not provide demographic information to show that his sample is representative of the target population with respect to key dimensions such as age, gender, and income levels. Professor Dimofte does not conduct any tests to establish that his sample reflects cryptocurrency consumption patterns during the Relevant Period. Professor Dimofte offers no analysis to show that the responses to a survey conducted in 2025 accurately reflect consumer behavior as at the time of the alleged conduct in 2021.

13.     *Second*, Professor Dimofte's survey is not designed to validly infer the causal impact of endorsements on consumer behavior. The survey is premised on *hypothetical* decision making, not real purchasing decisions. Nor does the study follow scientific, best practices of using treatment and control groups in a randomized experiment. These methodological flaws severely limit the survey's validity in assessing the causal impact of celebrity endorsements.

14.     *Third*, the survey questions and response options in Professor Dimofte's survey are poorly designed and biased towards receiving responses that indicate a positive impact from celebrity endorsements. Many of his key questions are written in a non-neutral or "leading" way. Many of his response options are one-sided, failing to allow respondents to report negative views on celebrity endorsements. These issues encourage respondents to answer in a way that aligns with Professor Dimofte's preconceived hypotheses. The flaws in his questions and response options are exacerbated by the fact that his questions are overly complicated and do not provide an "I don't know" response option.

8

15.     **Fourth**, Professor Dimofte's survey does not adhere to standard best practices in survey research design and execution. He bases his methodology on literature from the early 2000s and 2010s which predates important developments in survey methodology such as mobile survey optimization. Even if Professor Dimofte's chosen sources were considered appropriate references, he does not comply with the important standards they prescribe. Moreover, the survey suffers from a range of execution issues that further undermine its reliability such as a lack of attention checks or comprehension testing. Professor Dimofte fails to provide adequate information to verify his claims about the use of specific protocols (e.g., randomization of question order) and presents results for his survey questions without critical sample statistics necessary for the accurate interpretation of results.

## IV.    CASE BACKGROUND

### A.    Legal Background and Claims Against Ms. Kardashian

16.     I understand that following an initial complaint filed on January 7, 2022[4] and two amended complaints thereafter, the Plaintiffs in this matter filed a *Third Amended Complaint* on October 6, 2023.[5] The *Third Amended Complaint* concerns what the Plaintiffs describe as "a scheme among various individuals in the cryptocurrency sector to misleadingly promote and sell the digital asset associated with EthereumMax (the EMAX Tokens) to unsuspecting investors."[6] The Plaintiffs name Ms. Kardashian as one of these individuals.[7] Specifically, the Plaintiffs allege that Ms. Kardashian, through her two Instagram stories[8] posted on May 30, 2021 and June 14, 2021, promoted EMAX to "her hundreds of millions of

---

[4] *In re: EthereumMax Investor Litigation*, "Class Action Complaint," January 7, 2022.
[5] Third Amended Complaint.
[6] Third Amended Complaint, at ¶ 2.
[7] Third Amended Complaint, at ¶ 20. The Complaint also names Floyd Mayweather and Paul Pierce as Promoter Defendants, among others.
[8] Instagram Stories are temporary photo or video posts that disappear after 24 hours.

followers" and specifically allege that her June 14 story had "tremendous reach."[9] The Complaint further alleges that Ms. Kardashian's posts "induced [class members] to make [their] purchase[s] of EMAX Tokens,"[10] and that they "induced [class members] to continue to hold on to [their] investment in EMAX Tokens when [they] otherwise would not have done so."[11]

17.    I understand that the Plaintiffs define the proposed nationwide class in the matter as "all persons in the United States who, between May 14, 2021, and June 27, 2021, purchased unregistered EthereumMax tokens and were subsequently damaged thereby."[12] I understand that Plaintiffs do not assert any the claims against Ms. Kardashian on behalf of the proposed nationwide class.  The Plaintiffs also propose certification under four separate state classes for California, New York, Florida, and New Jersey under state-specific consumer protection causes of action and certain common law claims.[13]  I understand that Plaintiffs assert these state law claims against Ms. Kardashian as well as other Defendants on behalf of the proposed state classes.

### B.    Summary of Professor Dimofte's Expert Report

18.    The Plaintiffs retained Professor Claudiu V. Dimofte to conduct a survey to determine "whether the alleged behavior of the Plaintiffs has produced consumer behavior in the marketplace that negatively impacted the welfare of cryptocurrency buyers—including but not limited to assessing any impact that public figure endorsements of tokens on social

---

[9] Third Amended Complaint, at ¶ 137, ¶ 158.

[10] *See, e.g.,* Third Amended Complaint, ¶¶ 206, 207, 211, 247.

[11] *See, e.g.,* Third Amended Complaint, ¶¶ 205, 207, 210, 245.

[12] Plaintiff Class Cert Brief at p. 6 ("**Nationwide Class:** All persons in the United States who, between May 14, 2021, and June 27, 2021, purchased unregistered EthereumMax tokens and were subsequently damaged thereby.")

[13] Plaintiff Class Cert Brief at p. 7 ("As for the California, New York, Florida, and New Jersey consumer protection causes of action, Plaintiffs propose certification of four separate state classes.")

media may have on consumer decisions to buy, hold, and/or sell these tokens, as well as on their willingness to pay for them."[14] Professor Dimofte concludes from his survey results that "[a] cryptocurrency's endorsement by public figures (such as KK, FM, and PP[15]) renders consumers significantly more likely to purchase it or hold it (if already purchased)" [16] and that "[c]onsumers are willing to pay a premium for a cryptocurrency that is endorsed by public figures."[17]

19.    In his report, Professor Dimofte first describes his sample selection and survey design for his survey conducted from January 30 and February 4, 2025.[18] He recruited survey participants who had purchased cryptocurrency in the previous two years or indicated they planned to purchase cryptocurrencies in the next two years[19] and who were also actual or potential social media followers of Kim Kardashian, Floyd Mayweather, or Paul Pierce.[20] The final sample size in Professor Dimofte's survey is 501, and he contends "that the analytical sample was unbiased and largely in line with the desired targeting."[21] Professor Dimofte contends that in designing the survey questions he has adhered to guidelines set forth in the 2011 *Manual for Complex Litigation* to avoid for bias introduced by "demand effects" and check for attention and comprehension.[22]

---

[14] Dimofte Report at ¶ 7.
[15] Professor Dimofte's survey also asked questions about the impact of posts by other Defendants, namely Floyd Mayweather and Paul Pierce.
[16] Dimofte Report at ¶ 81.
[17] Dimofte Report at ¶ 81.
[18] Dimofte Report at Section II.A.
[19] Dimofte Report at ¶ 24.
[20] Dimofte Report at ¶ 25.
[21] Dimofte Report at ¶ 61.
[22] Dimofte Report at ¶ 18 and at ¶¶ 29-34.

20.    Professor Dimofte's survey included questions relating to baseline purchase likelihood,[23] whether celebrity endorsement of a token would increase their purchase likelihood[24] or increase the likelihood that they would hold or not sell the cryptocurrency,[25] whether a celebrity endorsement would impact their willingness-to-pay for the cryptocurrency,[26] and whether "false exclusive claims" would have any negative impact on purchase.[27]

21.    In discussing the results of his survey, Professor Dimofte claims that his survey shows five propositions:

a.    First, he claims that his survey shows "a relatively high chance of cryptocurrency purchase based on the respective [social media] post, across the board."[28]

b.    Second, he claims that his survey shows "a relatively high chance of cryptocurrency purchase based on online consumer chatter, in the absence of an endorsing social media post from the public figure."[29]

---

[23] Dimofte Report at ¶ 47 (Respondents were asked "to estimate the probability (0-100%) that they would purchase a new cryptocurrency based on online consumer chatter in the absence of an endorsing social media post from a followed public figure.")

[24] Dimofte Report at ¶ 46 (Participants "were assigned to one of three identical conditions that differed simply in terms of the public figure described as the source of a social media post mentioning a new cryptocurrency that had been recommended by friends and shared with followers. Respondents were asked to estimate the probability (0-100%) that they would purchase that new cryptocurrency based on the respective post.")

[25] Dimofte Report at ¶ 50 (Participants were asked about a scenario "where the public figure's post occurred after they had purchased the respective cryptocurrency and were asked to estimate the probability (0-100%) that they would hold on to it (and not sell it) based on the respective post.")

[26] Dimofte Report at ¶ 48 ("Respondents were asked to report the premium (0-100%) they would be willing to pay for a new cryptocurrency if endorsed by a followed public figure compared to the absence of that endorsement.")

[27] Dimofte Report at ¶ 54 (Respondents were asked whether "learning, after purchase, that a new cryptocurrency's initial claims of being the exclusive payment method accepted at specific venues and events were in fact not true would have had [any impact] on their decision to buy it.")

[28] Dimofte Report at ¶ 66. His statistical analysis shows "$M$ = 66.12% likelihood for KK, 65.90% for FM, and 69.05% for PP, respectively ($p < .001$ in the contrast against 50% for each value)."

[29] Dimofte Report at ¶ 67. His statistical analysis shows "$M$ = 61.48% likelihood for KK, 60.62% for FM, and 63.09% for PP, respectively ($p < .001$ in the contrast against 50% for each value)."

c. Third, he claims that his survey shows "a willingness to pay a premium for an endorsed (vs. not endorsed) cryptocurrency."[30]

d. Fourth, he claims that "in terms of a public figure's social media endorsement on likelihood to hold the already purchased cryptocurrency," his survey shows "a relatively high chance of not selling based on the respective post."[31]

e. Fifth, he claims that the survey shows that "false exclusive acceptance claims" have "a very mild negative effect on their decision to have purchased" that token.[32]

## V.    METHODOLOGICAL PROBLEMS WITH PROFESSOR DIMOFTE'S SURVEY

22.    Professor Dimofte's survey suffers from serious methodological problems that render its results unreliable for the issues at stake in this matter. First, Professor Dimofte selects a survey sample that does not reflect the target population in this matter, even by the Plaintiffs' own definitions of the proposed classes. Second, his survey is premised on hypothetical decision making with no clear treatment or control group, undermining the survey's validity in assessing the causal impact, if any, of celebrity endorsements on real purchasing decisions. Third, his survey includes leading and overly complicated questions and biased response options. Fourth, his survey does not adhere to best practices in survey research standards in particular when it comes to the inclusion of checks on attention and

---

[30] Dimofte Report at ¶ 69. His statistical analysis shows "$M$ = 52.23% extra for KK, 51.38% for FM, and 51.83% for PP, respectively ($p$ < .001 in the contrast against 0% for each value)."

[31] Dimofte Report at ¶ 71. His statistical analysis shows "$M$ = 67.60% likelihood for KK, 67.40% for FM, and 72.77% for PP, respectively ($p$ < .001 in the contrast against 50% for each value)."

[32] Dimofte Report at ¶ 76 ("In terms of respondent perceptions regarding the effect that learning, after purchase, that a new cryptocurrency's initial claims of being the exclusive payment method accepted at specific venues and events were false, respondents reported a very mild negative effect on their decision to have purchased that cryptocurrency."). This latter effect is not statistically significant at the standard 5 percent level of significance, *see* Dimofte Report at ¶ 76 ("$M$ = 3.87 ($p$ = .08 in the contrast against middle of the scale).")

comprehension among respondents, and transparent reporting of pretesting and data-cleaning. I expand on each of these points in the section below.

### A.    Professor Dimofte's selection of the survey sample is inappropriate and biased

23.    Accurate sample selection is a critical initial step in ensuring the validity and reliability of survey results. The goal of sampling is to draw conclusions about a larger population of interest.[33] A sample that is not representative may lead to results that simply represent the characteristics of the sampled group and cannot be generalized across the target population.[34] Professor Dimofte's sample is not representative of the relevant population of interest in this matter. His results simply speak to the sampled group and cannot reliably be used to draw inferences about the target population.

24.    To draw reliable inferences about the class-wide impact of Kim Kardashian's social media post, a study such as Professor Dimofte's should identify and gather a representative sample that matches the proposed class.[35] Instead, Professor Dimofte (1) applies inappropriate target population filters, (2) focuses on an irrelevant time period for sampling, and (3) fails to demonstrate that the demographic make-up of the population of potential respondents matches the make-up of the Plaintiffs' proposed class. I detail these flaws below.

---

[33] Gary Langer, "The Importance of Probability-Based Sampling Methods for Drawing Valid Inferences," in David L. Vannette and Jon A. Krosnick (Eds.) *The Palgrave Handbook of Survey Research*, pp. 7–13 at p. 8 ("After spirited debate, survey researchers coalesced around probability sampling as a scientifically rigorous method for efficiently and cost-effectively drawing a representative sample of the population.")

[34] Jon A. Krosnick, "Survey research," *Annual Review of Psychology*, 50(1) (1999): 537-567, at p. 538 ("representative sampling methods are essential to permit confident generalization of results.")

[35] This is discussed in one of the two main methodological references that Professor Dimofte cites to, *i.e.*, Diamond, Shari S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence* (Third Edition), National Academies Press, 2011, pp. 359–423, at p. 376 ("The target population consists of all elements (i.e., individuals or other units) whose characteristics or perceptions the survey is intended to represent. Thus, [] the population for a discovery survey may include all potential plaintiffs.")

1.    Professor Dimofte's sampling filters do not result in a representative sample

25.    As I noted in Section IV, the Plaintiffs define the proposed nationwide class in the matter as "all persons in the United States who, between May 14, 2021, and June 27, 2021, purchased unregistered EthereumMax tokens and were subsequently damaged thereby."[36]  Plaintiffs similarly define proposed state classes for California, Florida, New Jersey, and New York, which are the only proposed classes on whose behalf Plaintiffs assert claims against Ms. Kardashian.

26.    In his report, Professor Dimofte applies three levels of filtering to identify his target sample, which ultimately has no clear connection to characteristics of the proposed classes:

a)  Professor Dimofte first claims that: "The appropriate universe or target population (i.e., that to which the sample results are meant to generalize) for the study is actual or potential U.S. individual buyers of cryptocurrency."[37]

b)  He then changes the definition and narrows this population further stating that: "To further create a sample that reflected the class population in this case, respondents were retained if they reported (a) being an actual social media follower of Kim Kardashian, Floyd Mayweather, or Paul Pierce, or (b) seeing themselves as potentially becoming a social media follower of these public figures."[38]

---

[36] Plaintiff Class Cert Brief at p. 6 ("**Nationwide Class:** All persons in the United States who, between May 14, 2021, and June 27, 2021, purchased unregistered EthereumMax tokens and were subsequently damaged thereby.")
[37] Dimofte Report at ¶ 24.
[38] Dimofte Report at ¶ 25.

c) Professor Dimofte changes the definition of the target population once again by excluding "individuals with specialized knowledge or expertise" in several professional fields including cryptocurrency. Specifically, "respondents were screened out of the sample if they had ever worked themselves or had family members who had ever worked in the following industries: Advertising or market research, Cryptocurrency / virtual currency brokering, dealing, or marketing, Legal services, or Social networks and other media networks and content providers."[39]

27.     Professor Dimofte's survey sample is not representative of the Plaintiffs' proposed classes. Professor Dimofte does not demonstrate how his survey sample produces results that could be generalized to the group of investors who bought EMAX tokens and were exposed to Ms. Kardashian's social media posts, let alone the investors within the particular states in Plaintiffs' proposed state classes. As such, Professor Dimofte does not demonstrate how his survey sample produces results that would help in measuring the purported harm from Ms. Kardashian's social media posts of allegedly causing certain investors to overpay for EMAX tokens.

28.     As I noted above, Professor Dimofte screened out "individuals with specialized knowledge or expertise."[40] His survey sample thus is more likely to represent the general population rather than the specific subpopulation demographic of active or sophisticated cryptocurrency investors. Individuals who lack specialized knowledge or expertise may be

---

[39] Dimofte Report at ¶ 26. It is not unusual in survey sampling for marketing research to exclude market research experts and people who work in advertising, under the presumption that they will give biased responses based on 'insider' knowledge about marketing surveys. However, Professor Dimofte does not explain why he removes respondents with specialized cryptocurrency knowledge. Individuals with specialized crypto knowledge would presumably be more likely to have purchased EMAX—an esoteric meme coin—and hence to be in the class.

[40] Dimofte Report at ¶ 26.

more impressionable[41] or more inclined to rely on celebrity endorsements when making investment decisions. The overrepresentation of inexperienced participants in the sample likely inflates the perceived influence of celebrity endorsements on investment behavior, since the group most susceptible to such influence is disproportionately represented.

29.    Further, I understand from Professor Howell's report that EMAX was a niche token, lacking the widespread recognition and trading activity of more established cryptocurrency assets like Bitcoin.[42] Professor Dimofte does not demonstrate how his survey sample would reflect the types of investors who would choose to invest in a niche cryptocurrency like EMAX, who are likely to be different from the broader spectrum of investors who would choose to invest in a more established cryptocurrency.

2.    Professor Dimofte's survey sample does not reflect cryptocurrency consumption patterns during the Relevant Period

30.    Conducting a survey today to draw conclusions about past decisions and events is fraught, as changes in markets, industries, and even the broader economy can limit the reliability of applying current findings to historical contexts. Decisions are highly sensitive to contexts and contexts change markedly over a span of several years.

31.    Professor Dimofte's "survey was in the field between January 30 and February 4, 2025."[43] His study takes a general sample of individuals from the United States who report either having recently bought or expressed interest in buying any type of cryptocurrency.[44] The Relevant Period for  Plaintiffs' claims is "May 14, 2021 [to] June 27, 2021."[45] Thus, the

---

[41] *See e.g.,* List, John A. "Does market experience eliminate market anomalies?" *The Quarterly Journal of Economics* 118(1) (2003): 41-71; Haigh, Michael S., and John A. List, "Do Professional Traders Exhibit Myopic Loss Aversion? An Experimental Analysis" *The Journal of Finance* 60(1) (2005): 523–534.
[42] *See e.g.,* Howell Report section III.C.2.
[43] Dimofte Report at footnote 19, ¶ 35.
[44] Dimofte Report at ¶ 38.
[45] Third Amended Complaint at ¶ 1.

survey was conducted almost four years after the period when the challenged conduct occurred.

32.     The cryptocurrency market has changed considerably in the past few years, displaying increased adoption. The number of worldwide cryptocurrency users has increased eightfold between January 2021 and 2025.[46] In the U.S. alone, 28% of adults reported owning cryptocurrency in 2025, almost doubling from the 15% reported in 2021.[47]

33.     Professor Dimofte asks respondents to evaluate their behavior in the present. Specifically, he asks them "to imagine that [they] are browsing the X (formerly Twitter) feeds of some of [their] favorite celebrities."[48] He then asks them to "[i]magine that while there, [they] run across a post by one such public figure."[49] The questions that follow evaluate respondents' willingness to pay and other behavior based on a scenario anchored in the present.

34.     Professor Dimofte does not test whether the results from a 2025 survey can inform behaviors of proposed class members who made purchases in 2021. The set of individuals selected by Professor Dimofte, drawn from a broader and more mainstream user base, is unlikely to reflect the characteristics of the  group of investors who purchased EMAX in 2021.

---

[46] The number of worldwide cryptocurrency users has increased eightfold between January 2021 and 2025, from 106 million users to 900 million. *See* Statista, "Number of identity-verified cryptoasset users from 2016 to November 2024, with a forecast for 2025," December 2021, accessed on March 27, 2025, https://www.statista.com/statistics/1202503/global-cryptocurrency-user-base/.
[47] Security.org, "2025 Cryptocurrency Adoption and Consumer Sentiment Report," January 2025, accessed on March 27, 2025, https://www.security.org/digital-security/cryptocurrency-annual-consumer-report/.
[48] Dimofte Report at p. 43.
[49] Dimofte Report at p. 43.

3.    Professor Dimofte fails to provide demographic information necessary to establish representativeness of his sample

35.    Professor Dimofte presents limited summary statistics on the demographic makeup of the final survey sample in Appendix E to his Expert Report. However, these summary statistics are not specific to respondents who have purchased EMAX (or any cryptocurrency) or those who follow celebrities like Kim Kardashian.

36.    Professor Dimofte uses the commercial survey platform Qualtrics.[50] He indicates that "start quotas" were applied based on age, gender, and income, "such that potential respondents match the target population" and "a sampling group was obtained that was aimed to be representative of consumers who purchased or are planning to purchase cryptocurrency and would be actual or potential social media followers of the specific public figures at issue in this case."[51]

37.    Despite this, Professor Dimofte does not disclose any demographic information on these 'quotas.'[52] It is unclear whether the 'quotas' referenced in his Report are generic panel-provider benchmarks, typically used to mirror the general U.S. population as reflected in the Census data.[53]  These standard quotas are not tailored to the specific population at issue—namely, individuals who purchased EMAX (or any cryptocurrency) and follow the specific named celebrities on social media.

---

[50] Dimofte Report at ¶ 35. Dimofte notes that the Qualtrics survey was conducted "using a PureSpectrum respondent panel," presumably for sampling and data collection.

[51] Dimofte Report at ¶ 27 ("The survey employed start quotas based on relevant consumer age, gender, and income. By restricting survey starts such that potential respondents match the target population, a sampling group was obtained that was aimed to be representative of consumers who purchased or are planning to purchase cryptocurrency and would be actual or potential social media followers of the specific public figures at issue in this case.")

[52] Dimofte Report at ¶ 27 ("The survey employed start quotas based on relevant consumer age, gender, and income.")

[53] *See e.g.,* PureSpectrum, "Feature Highlight: Quota Nesting," March 13, 2020, accessed on March 27, 2025, https://www.purespectrum.com/blog/feature-highlight-quota-nesting/.

38.     The absence of this demographic detail precludes an independent reviewer from evaluating whether the sample is appropriately reflective of the proposed classes. Professor Dimofte at no point uses data on demographic characteristics to compare the final study sample with any independent data on the characteristics of the members of the proposed classes.

**B.     The survey is not correctly designed to validly infer the causal impact of endorsements**

39.     Professor Dimofte's survey is designed poorly and lacks the methodological rigor necessary to make valid causal inferences about the impact of celebrity endorsements on consumer purchasing decisions or willingness to pay. Unlike standard experimental designs that use random assignment to assign respondents to treatment and control groups in order to isolate causal effects, if any, Professor Dimofte presents all respondents with the same hypothetical scenario.  There is no baseline for comparison. As a result, it is impossible to determine whether the observed responses reflect any influence from the endorsement itself and to what degree. The survey captures stated preferences rather than revealed behavior. Such hypothetical responses are often unreliable predictors of actual behavior, especially when respondents face no real costs or consequences. Given these fundamental design flaws, the conclusions drawn from the survey regarding the causal impact of celebrity endorsements on consumer purchasing decisions and willingness to pay are unreliable.

1.    The survey does not use randomized assignment, which is the
standard method for making causal inferences

40.    The scientific experimental method for making valid causal inferences relies on

the principle of randomized assignment to 'treatment' and 'control' conditions.[54] Under this

method, experiment participants are randomly allocated to either a group that receives the

intervention being studied (the 'treatment' group) or to a group that does not (the 'control'

group). Randomized assignment to 'treatment' and 'control' conditions creates statistically

matched experiment groups with the only difference between them being exposure to the

treatment. Any difference in outcomes between the groups could thus be attributed to the

treatment. This allows the study to isolate the causal impact of the treatment subject to the

degree of confidence evaluated in the study.[55]

41.    This scientific experimental method is the standard methodology applied in

many fields, including surveys designed for academic research,[56] or in online platforms to

"A/B test" digital marketing messages (including social media posts).[57] Survey design

---

[54] Imbens, Guido W., and Donald B. Rubin, *Causal Inference for Statistics, Social, and Biomedical Sciences: An Introduction*, (Cambridge University Press, 2015), Chapters 1 and 2; Morgan, Stephen L., and Christopher Winship, *Counterfactuals and Causal Inference: Methods and Principles for Social Research* (*Analytical Methods for Social Research*), (Cambridge University Press, 2007), Chapters 1 and 2. The classic texts on the experimental method are Fisher, Ronald A.,. *The Design of Experiments* (Macmillan, 1935) and Kempthorne, Oscar, *The Design and Analysis of Experiments*, (Wiley, 1952).

[55] Imbens, Guido W., and Donald B. Rubin, *Causal Inference for Statistics, Social, and Biomedical Sciences: An Introduction*, (Cambridge University Press, 2015), Chapters 1 and 2; Morgan, Stephen L., and Christopher Winship, *Counterfactuals and Causal Inference: Methods and Principles for Social Research* (*Analytical Methods for Social Research*), (Cambridge University Press, 2007), Chapters 1 and 2.

[56] For a discussion of the growth in the application of survey experiments in a range of academic fields, see: Thomas Katrin, "The Advent of Survey Experiments in Politics and International Relations," *Government and Opposition*, (2024) 59(1): 297-320; Schachter, Ariela, and Katherine Weisshaar, "Survey Experiments in Sociology," *Annual Review of Sociology* 51 (2024).

[57] Dan Siroker and Pete Koomen, *A/B Testing: The Most Powerful Way to Turn Clicks into Customers*, (2013) John Wiley & Sons, Inc., Hoboken, New Jersey ("The concept of A/B testing is simple: show different variations of your website to different people and measure which variation is the most effective at turning them into customers. If each visitor to your website is randomly shown one of these variations and you do this over the same period of time, then you've created a controlled experiment known as an A/B test. A/B testing has gone from a secret weapon within the purview of only a handful of tech companies to an increasingly ubiquitous and critical part of doing business online.") *See also* Gallo, Amy, "A Refresher on A/B Testing," *Harvard Business Review* 28 (2017); Kohavi, Ron, Roger Longbotham, Dan Sommerfield, and Randal M. Henne,

platforms such as Qualtrics are designed to make such experimentation simple and easy, randomizing a proportion of the sample to a control group.[58]

42.    Professor Dimofte does not set up a 'control' group in his survey design. All respondents who report being actual or potential followers of Ms. Kardashian are told to imagine reading a post from her that appears to endorse buying a new cryptocurrency.[59] Without a control group of similar respondents who were not told about the post, but who were asked about their interest in buying the cryptocurrency, it is impossible to make valid inferences about the impact of knowing about the post.

43.    It is thus unclear how Professor Dimofte draws the conclusion that "[a] cryptocurrency's endorsement by public figures (such as KK, FM, and PP) renders consumers significantly more likely to purchase it or hold it (if already purchased)" and that "[c]onsumers are willing to pay a premium for a cryptocurrency that is endorsed by public figures."[60]

44.    Moreover, Professor Dimofte's study lacks contextual testing, as it does not consider other common factors that could drive cryptocurrency purchases (*e.g.*, broader market trends, news stories, the influence of a cryptocurrency whitepaper, etc.). Without

---

"Controlled Experiments on the Web: Survey and Practical Guide," *Data Mining and Knowledge Discovery* 18 (2009): 140-181. The dominant platforms that have helped make A/B testing nearly universal among online and digital retailers when testing marketing, communications, and many other aspects of customer experience include MailChimp (*e.g.*, https://mailchimp.com/marketing-glossary/ab-tests/), Optimizely (*e.g.*, https://docs.developers.optimizely.com/), FaceBook Experiments (*e.g.*, https://www.facebook.com/business/help/1738164643098669), Google Optimize (*e.g.*, https://support.google.com/analytics/answer/12979939), and FireBase A/B Testing (*e.g.*, https://firebase.google.com/docs/ab-testing).

[58] *See e.g.,* Qualtrics, "Randomizer," [No date], accessed on March 27, 2025, https://www.qualtrics.com/support/survey-platform/survey-module/survey-flow/standard-elements/randomizer/ ("You could use the randomizer element to assign respondents to either a control block of questions or an experimental block of questions.")

[59] Dimofte Report at pp. 48-49.

[60] Dimofte Report at ¶ 81.

evaluating Ms. Kardashian's posts against alternative sources of information and motivations, the survey provides an incomplete picture of the factors affecting consumer decision-making.

2.    The survey's reliance on hypothetical decisions limits its ability to accurately predict real-world behavior

45.    In the study of consumer behavior, a fundamental distinction exists between 'stated preferences' and 'revealed preferences.'[61] Stated preferences refer to what individuals say they would do in hypothetical scenarios—such as expressing a willingness to buy a product in a survey.[62] In contrast, revealed preferences are inferred from actual choices observed in real-world settings.[63]

46.    Within the context of a survey, respondents face no real costs or risks when indicating a willingness to purchase a product in a hypothetical scenario. In contrast, real-world decisions involve financial trade-offs and risk assessment. Consequently, stated intentions frequently diverge from revealed preferences. What individuals say they would do in a hypothetical scenario is thus a poor guide to actual consumer decisions.[64]

---

[61] Kenneth Train, *Discrete Choice Methods with Simulation*, Cambridge University Press, 2009 at p. 152 ("Revealed-preference data relate to people's actual choices in real-world situations. These data are so called because people reveal their tastes, or preferences, though the choices they make in the world. Stated-preference data are data collected in experimental or survey situations where respondents are presented with hypothetical choice situations. The term refers to the fact that the respondents state what their choices would be in the hypothetical situations."); *see also* Bernheim, B. Douglas, and Antonio Rangel, "Toward choice-theoretic foundations for behavioral welfare economics," *American Economic Review* 97(2) (2007): 464-470; Bernheim, B. Douglas, and Antonio Rangel, "Beyond revealed preference: choice-theoretic foundations for behavioral welfare economics," *The Quarterly Journal of Economics* 124(1) (2009): 51-104.

[62] Kenneth Train, *Discrete Choice Methods with Simulation*, Cambridge University Press, 2009 at p. 152; Bernheim, B. Douglas, and Antonio Rangel, "Toward choice-theoretic foundations for behavioral welfare economics," *American Economic Review* 97(2) (2007): 464-470.

[63] Kenneth Train, *Discrete Choice Methods with Simulation*, Cambridge University Press, 2009 at p. 152; Bernheim, B. Douglas, and Antonio Rangel, "Toward choice-theoretic foundations for behavioral welfare economics," *American Economic Review* 97(2) (2007): 464-470.

[64] Kenneth Train, *Discrete Choice Methods with Simulation*, Cambridge University Press, 2009 at p. 153 ("The limitations of stated-preference data are obvious: what people say they will do is often not the same as what they actually do. People may not know what they would do if a hypothetical situation were real. Or they may not be willing to say what they would do."). For an excellent review and a discussion of the difference between stated and revealed preferences with respect to measures of willingness-to-buy (and willingness-to-pay) in marketing research, see Breidert, Christoph, Michael Hahsler, and Thomas Reutterer, "A review of methods for

47.     Professor Dimofte's survey design only focuses on hypothetical decisions and stated preferences, including stated willingness to buy a new cryptocurrency and how much of a price premium respondents say they would be willing to pay. Researchers have identified that surveying individuals on their willingness-to-pay does not yield reliable results: Beidert, Hahlser, and Reutteter review the literature and conclude that "directly asking customers' [willingness-to-pay] for different products seems not to be a reliable method,"[65] while Nagle and Holden say that "uncontrolled direct questioning as a research technique to estimate price sensitivity should never be accepted as a valid methodology. The results of such studies are at best useless and are potentially highly misleading."[66]

48.     The discrepancy between stated and revealed preferences is particularly pronounced when respondents are asked about potentially buying products in a context that implicitly suggests such a decision is appropriate, while offering very few other details. For example, the survey asked respondents: "Imagine that Kim Kardashian's feed featured a post where she mentioned a new cryptocurrency that her friends recommended and that she shared with her followers. What is the probability (in percentage terms) that you would buy this new cryptocurrency based on this post?" or "Assume that this post from Kim Kardashian did not exist and instead you learned about this new cryptocurrency from online chatter. What is the probability (in percentage terms) that you would buy this new currency in the

---

measuring willingness-to-pay.," *Innovative Marketing* 2(4) (2006): 8–32. Comparative studies of estimates of willingness-to-pay using alternative methods show significant and substantial differences between stated and revealed preferences, the latter estimates derived from studies in which subjects actually had to pay for products: *see e.g.,* Voelckner, Franziska, "An empirical comparison of methods for measuring consumers' willingness to pay," *Marketing Letters* 17 (2006): 137-149; Schmidt, Jonas, and Tammo H. A. Bijmolt, "Accurately measuring willingness to pay for consumer goods: A meta-analysis of the hypothetical bias," *Journal of the Academy of Marketing Science* 48 (2020): 499-518.).
[65] Breidert, Christoph, Michael Hahsler, and Thomas Reutterer, "A review of methods for measuring willingness-to-pay.," *Innovative Marketing* 2(4) (2006): 8–32, at p. 14.
[66] Nagle, Thomas T., and Georg Müller, *The Strategy and Tactics of Pricing: A Guide to Growing More Profitably* (Sixth Edition) (Routledge, 2018), at p. 186.

absence of Kim Kardashian's post?"[67] Such questions also force respondents to imagine
complex hypotheticals and to estimate abstract probabilities using a sliding scale.

49.      Overall, the survey says nothing about actual consumer behavior. It makes no
attempt to confirm that the reported willingness to purchase a new cryptocurrency among
respondents is related to their propensity to actually purchase such tokens in real life and is
not simply 'cheap talk,' encouraged by the wording of the questions.

**C.      The survey questions are biased and poorly designed**

50.      To make reliable inferences, a survey should have well-designed questions and
response options which elicit the true opinions of the respondents. Specifically, the survey
questions should not "lead" respondents to provide a certain answer, present one-sided
response options that force a certain type of answer, offer words or phrases without
explanations that respondents may fail to understand, or encourage guessing. Professor
Dimofte's survey questions have all of these flaws, as I describe next.

1.      Some survey questions are written to "lead" respondents

51.      A fundamental principle of sound survey methodology is that questions must
be worded in a neutral, unbiased manner. Questions that are framed in a way that encourages
respondents to agree with a particular hypothesis can introduce systematic bias, rendering
survey study results unreliable and potentially misleading. When survey questions are
"leading," the responses may merely reflect the suggested narrative rather than representing
the respondents' actual beliefs or attitudes. Several of Professor Dimofte's survey questions
are written to "lead" respondents, raising questions over the validity of his survey results.

---

[67] Dimofte Report at pp. 48-49.

52.     For example, Professor Dimofte's survey asks respondents to "[i]magine that Kim Kardashian's feed featured a post where she mentioned a new cryptocurrency that her friends recommended and that she shared with her followers. What is the probability (in percentage terms) that you would buy this new cryptocurrency based on this post?"[68] This question is ostensibly aimed at assessing whether a social media post endorsing EMAX Token by Ms. Kardashian affected consumer decisions.

53.     The wording of this question, however, is highly leading. Specifically, this question leads the respondent to conclude that such a post is *expected to affect* a person's decision to buy the new cryptocurrency. For example, by explicitly referencing the post in the context of asking about purchasing behavior, the question creates a built-in cognitive association between the post and the act of buying. The phrasing "buy this cryptocurrency based on the post" further reinforces this cognitive link between the post and the purchase decision. This is compounded by the cognitive bias known as "acquiescence bias" in which respondents are more prone to agree with survey questions.[69]

54.     This question embeds an implicit expectation and hence encourages the respondent to 'agree' with the premise that Ms. Kardashian's hypothetical post would increase the likelihood of purchasing the cryptocurrency. In general, survey methodology

---

[68] Dimofte Report at p. 48.

[69] Holbrook, Allyson, "Acquiescence response bias," *Encyclopedia of Survey Research Methods* 1 (2008): 3-4 at p. 3 ("Acquiescence response bias is the tendency for survey respondents to agree with statements regardless of their content."); Jon A. Krosnick, "Survey research," *Annual Review of Psychology*, 50(1) (1999): 537-567, at p. 552 ("Agree/disagree, true/false, and yes/no questions are very popular, appearing in numerous batteries developed for attitude and personality measurement[]. They are appealing from a practical standpoint, because they are easy to write and administer. These formats are also seriously problematic, because they are susceptible to bias due to acquiescence—the tendency to endorse any assertion made in a question, regardless of its content."). *See also* Vannette, David L., and Jon A. Krosnick, "Answering questions: a comparison of survey satisficing and mindlessness.," *The Wiley Blackwell Handbook of Mindfulness* (2014): 312-327. Acquiescence bias is also known as 'agreement bias' and is easily demonstrated in experiments in which questions are flipped so that 'agreement' with the proposition embedded in a question is reversed (e.g., whether one is likely to avoid an action rather than take the action). The tendency is linked to a desire to please the interviewer/researcher or simple 'satisficing' (conservation of mental effort) among respondents.

texts warn about these types of questions that ask respondents about causality because most events and decisions are affected by so many causal factors.[70] Consequently, Professor Dimofte's estimate of the impact of Ms. Kardashian's posts in 2021 on the probability of purchasing a cryptocurrency is likely biased upwards.

55.    The best approach for assessing the causal impact of a social media post, as I have stated above, is to conduct a randomized experiment and include a control group.[71] For example, as I described above in Section V.B.1, Professor Dimofte should have set up a proper experiment with random assignment to control and treatment groups to compare purchase intentions. Other experimental groups could also be included to allow for other potential influences (e.g., news headlines) to compare how a range of factors might affect the willingness to buy cryptocurrencies.

56.    As another example of a leading question, Professor Dimofte asks respondents to imagine that a token's whitepaper "reveals that its business model relies on using constant marketing and promotional activities, often from celebrities, to induce new potential investors into trusting the financial opportunities available with its token."[72] The phrase "induce new potential investors into trusting" implies deceptive intent. Professor Dimofte further assumes in this question that respondents know what the industry-specific term "whitepaper" means without a provided definition. Respondents without cryptocurrency-specific knowledge may not be familiar with terminology such as "whitepaper."

57.    Similarly, another question asks about the impact of knowledge that "the key person in securing [a crypto] endorsement was someone who previously pled guilty to

---

[70] See Fowler, Floyd J., Jr., *Improving Survey Questions: Design and Evaluation*, (Sage Publications, 1995) at pp. 80-81.
[71] See Section V.B.1.
[72] Dimofte Report at p. 56.

conspiracy to commit wire fraud in connection with a bribery scheme."[73] This framing explicitly associates cryptocurrency endorsements with criminal activity and is likely to prompt respondents to conflate paid promotion with fraud. The suggestive tone of this question encourages respondents to form negative perceptions of the cryptocurrency. As a result, findings drawn from responses to this question are likely biased.

### 2. The use of one-sided response options reinforces the leading nature of the questions

58.    Another flaw in Professor Dimofte's surveys is his use of one-sided response options. In many of the survey questions, respondents provide their answer by selecting a value on a sliding scale ranging from 0 to 100. The one-sidedness of the responses can further lead respondents to provide an affirmative answer.

59.    For example, in the question asking about the impact of Ms. Kardashian's post on their purchase probability, respondents must select a value from 0 to 100, reflecting "the probability (in percentage terms) that you would buy this new cryptocurrency based on this post."[74] This answer format assumes—and reinforces the expectation—that the respondent should report some positive impact on their purchase probability from seeing Ms. Kardashian's posts. Moreover, by design, the response field does not allow for the possibility that the respondent might have a negative response to a post by Ms. Kardashian, for example selling the cryptocurrency if they have any or warning friends and family not to purchase it. Hence, the results from this question are likely biased upwards.

60.    Professor Dimofte also uses this one-sided response form for his question aimed at determining the price premium Plaintiffs contend was caused by Ms. Kardashian's

---

[73] Dimofte Report at p. 57.
[74] Dimofte Report at p. 48.

post. This question asks respondents "[h]ow much of a premium (e.g., 0%, 10%, etc.) [they] would [] be willing to pay for that new cryptocurrency if Kim Kardashian endorsed it compared to if she did not."[75] Again, the possible responses are a sliding scale from 0 to 100. This inherently assumes that the respondent will report that the social media post generates *only* a positive premium for them in terms of the value of the cryptocurrency.[76]

61.     Professor Dimofte appears to be aware of the leading nature of his response category in terms of generating positive price premium responses. In his report, he concedes that "at least conceptually, it is possible that this premium may be negative if the celebrity endorsement creates avoidance rather than approach among investors."[77]    Professor Dimofte, however,  does not allow for this possibility in his survey responses. Instead, he justifies his use of the one-sided scale by asserting—without evidence—his "expectation that the use of endorsements from public figures elicits interest for the average consumer."[78] To summarize, Professor Dimofte has a preconceived "expectation" of what the responses should look like and only permits responses that align with this preconception. This means that any results from this question are biased towards finding a positive price premium.

### 3.    Some survey questions are overly complicated and confusing

62.     Survey questions should be straightforward and easy to understand to ensure that all respondents interpret them consistently. Overly complicated or confusing questions

---

[75] Dimofte Report at p. 49.
[76] As well as being leading, this question is further flawed since it directly asks respondents to estimate their wiliness-to-pay for EMAX given Ms. Kardashian's endorsement. As discussed in Section V.B.2, the research literature has identified that survey respondents cannot reliably estimate their own willingness to pay.
[77] Dimofte Report at p. 12.
[78] Dimofte Report at p. 12.

can lead to misinterpretation, or disengagement, which ultimately compromises the reliability of the data collected.[79]

63.     Professor Dimofte's questions present respondents with overly complicated and confusing hypothetical scenarios. Taking the same example of the question I discussed in Section V.C.1,[80] Professor Dimofte asks respondents first to imagine a post by Ms. Kardashian "where she mentioned a new cryptocurrency that her friends recommended and that she shared with followers" and to report the probability that they would "buy this new cryptocurrency based upon this post."[81]  It is not clear whether the starting premise for the question is that there is zero probability that respondents would buy the currency otherwise, or whether they should start at a potentially non-zero baseline purchase probability and then adjust for Ms. Kardashian's hypothetical posts. In other words, it is not clear from this question whether the respondent is supposed to report the probability that they would buy the new currency based <u>only</u> on the post or whether they should consider other factors that may influence their willingness to purchase. Similarly, it is not clear whether respondents should imagine they have time to do additional research on the new currency in this hypothetical scenario, or whether they must make their purchase decision based only on the information of the post's existence.

---

[79] Vannette, David, L., Jon A. Krosnick, *The Palgrave Handbook of Survey Research,* (2018), p. 100 ("Question wording is another important area of questionnaire design that has generated considerable prior research and a number of best practices can be extracted from the literature. In general the conventional wisdom regarding question wording is: Simple, direct, comprehensible, No jargon, Be specific, Avoid ambiguous words, Avoid double-barreled questions, Avoid negations, Avoid leading questions, Include filter questions, Be sure questions read smoothly aloud, Avoid emotionally charged word, Avoid prestige names, Allow for all possible responses.")

[80] "Imagine that Kim Kardashian's feed featured a post where she mentioned a new cryptocurrency that her friends recommended and that she shared with her followers. What is the probability (in percentage terms) that you would buy this new cryptocurrency based on this post?" (Dimofte Report at p. 48)

[81] Dimofte Report at p. 48.

64.     In the next question in his survey, the respondent is told to "[a]ssume that this post from Kim Kardashian did not exist and instead you learned about this new cryptocurrency from online chatter."[82]  They are then asked to report the probability they would buy the new currency "in the absence of Kim Kardashian's post."[83] Ostensibly, Professor Dimofte is aiming to use this question to establish a counterfactual about how likely the respondents would be to purchase the currency if they did not see the Kardashian post.

65.     This question is flawed in two main ways. First, although it is possible in principle to estimate counterfactuals using either within-subject (i.e., where each respondent is exposed to both treatment and control scenarios) or across-subject designs (i.e., with a distinct treatment and control group), the reliability of within-subject designs depends critically on careful randomization of the order in which scenarios are presented across respondents to mitigate bias. Professor Dimofte does not randomize any conditions or scenarios here.[84] Second, even setting aside the issue of design choice, the wording and ordering of the question would likely lead to confusion. Specifically, the sequencing of the scenarios between this and the previous question creates confusion: the respondent, told to imagine themselves browsing social media feeds of their favorite celebrities, is now told to think about how a hypothetical post that was just discussed does not exist, but that they hear other unspecified things about the currency—which could be negative or positive—and they are asked again about the probability that they would buy the cryptocurrency, now "in the

---

[82] Dimofte Report at p. 49.
[83] Dimofte Report at p. 49.
[84] This is evident from the question's built-in premise that the post did not exist ("Assume that this post from Kim Kardashian **did not exist** and instead you learned about this new cryptocurrency from online chatter. What is the probability (in percentage terms) that you would buy this new currency **in the absence of Kim Kardashian's post**?" [emphasis added])

absence"[85] of something hypothetical. This confusing sequence of questions means that the responses to the "counterfactual" question are tainted and hence unreliable.

66.    Another question that presents ample opportunity for confusion is the one aimed at eliciting the "[e]ffect of false exclusive acceptance claims"[86] on the decision to purchase a cryptocurrency. For this question, the respondent is shown the following:[87]

*if.false* Assume that you purchased a cryptocurrency that was advertised as being the exclusive payment method accepted at specific venues and events (e.g., clubs, sporting events, etc.), only to later find out that was not the case (i.e., those venues and events did not in fact accept that cryptocurrency as payment). To what extent would you have still purchased the cryptocurrency if you knew those claims were false?

○ Definitely would not have purchased  (1)

○ Probably would not have purchased  (2)

○ Possibly would not have purchased  (3)

○ Not sure  (4)

○ Possibly would have still purchased  (5)

○ Probably would have still purchased  (6)

○ Definitely would have still purchased  (7)

○ Do not know / no opinion  (8)

67.    This question is a hypothetical scenario nested within another hypothetical scenario. The respondent must simultaneously *accept* the premise of the hypothetical scenario—i.e., that they had chosen to purchase the cryptocurrency—and *deny* the premise of the scenario—i.e., to imagine that they had not purchased, and hence could choose to "still purchase[]"[88] the cryptocurrency or not.  The question is designed to lead respondents to simply agree with the story created for them here—that if they had been fooled into buying the currency by false claims and they could go back in time and not make the purchase, they

---

[85] Dimofte Report at p. 49.
[86] Dimofte Report at ¶ 54.
[87] Dimofte Report at p. 55.
[88] Dimofte Report at p. 55.

would do so. The leading and confusing nature of this question means that the responses are
unreliable.

68.     None of these overly confusing questions is accompanied by any form of visual
aid. Professor Dimofte includes only a screenshot of the celebrities' profiles, without
providing any mock-ups of the specific hypothetical posts he refers to. Rather than being
shown concrete examples, respondents are required to "imagine" the hypothetical posts
based solely on textual descriptions. This reliance on imagination introduces additional
variability in the interpretation of the questions.

4.     Some survey response categories encourage guessing and affirmative
bias

69.     Another flaw with Professor Dimofte's survey is his omissions of "I don't know"
or "I'm not sure" response categories for many questions. Allowing for these types of answer
options is a standard practice approach in survey methodology when people may reasonably
be expected to be uncertain when asked to answer a question.[89] We can expect respondents
may be reasonably uncertain about how to answer when asked about financial decisions and
when posed questions with complicated hypothetical scenarios, both of which are applicable
to Professor Dimofte's survey. In the absence of these types of response options, respondents

---

[89] *See* Kiviniemi, Marc, Erin Ellis, Heather Orom, Erika Waters, and Jennifer Hay, "'Don't know responding and
estimates of perceived risk: failing to provide a 'don't know' response systematically biases laypeople's
perceived risk estimates," *Health, Risk & Society* 22(1): 69–85; Fowler (1995:75-76) points out that results vary
significantly based on whether or not these options are included. Note that, as Krosnick and Presser (2010)
point out, researchers interested not in behavior and decisions but in opinions may be advised not to offer
respondents a "no opinion" option to capture latent or weakly held sentiments. But when examining decisions
in which individuals may genuinely not feel informed enough to make a choice, allowing a "not sure," "don't
know," or "other" option is important and can be completed with a follow up question asking respondents
why they answered in this way. In behavioral health research, inclusion of "don't know" options for health
decisions is a critical issue for allowing for accurate responses from less-informed types of patients. *See*
Denman Deanna C., Austin Baldwin, Andrea Betts, Amy McQueen, and Jasmin Tiro, "Reducing "I Don't Know"
Responses and Missing Survey Data: Implications for Measurement," *Medical Decision Making*, 38 (6) 2018:
673-682.

33

may guess their responses and are more susceptible to "acquiescence bias."[90] Per Appendix F of Professor Dimofte's report, this type of response category was omitted for key survey items, including the questions on the impact of Ms. Kardashian's posts on the purchase probability[91] and price premium.[92] Professor Dimofte does not explain why this response option is omitted from these questions, despite being included for other questions.

70.    As discussed in Section V.C.3, many of Professor Dimofte's questions are complex and confusingly written. Given the difficulty of the questions, at least a subset of the respondents would be likely to respond with "I'm not sure." However, Professor Dimofte's flawed survey design presents respondents with no choice but to provide an answer to the question.

71.    Indeed, even beyond the confusing nature of the survey questions, there are many potential reasons why a respondent may sincerely not know what to say about the decisions they would make in the scenarios presented in the survey. For example, they may reasonably say that they would need more information about the hypothetical new cryptocurrency, including its price and the transaction fees. Similarly, they may require more detail about what exactly was said in the social media post or elsewhere in social media. They may also need to consider the state of their own finances at the time before making a decision as to whether they would buy the cryptocurrency or pay a premium for it.

72.    Professor Dimofte's survey does not allow for any conditionality or hesitancy but instead requires respondents to answer with a definitive number—and by the nature of the response categories, to report a positive probability of buying the cryptocurrency and a

---

[90] Diamond, Shari S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence* (Third Edition), National Academies Press, 2011, p. 390.
[91] Specifically, the question "pb+kk" on p. 48 of the Dimofte Report.
[92] Specifically, the question "kk.extra$" on p. 49 of the Dimofte Report.

positive premium for it. As such, the responses that Professor Dimofte elicits based on these questions are unreliable and likely biased towards finding an impact from Ms. Kardashian's posts.

**D.     Professor Dimofte's survey design and execution do not adhere to best-practice survey research standards**

73.     Professor Dimofte's survey methodology suffers from several critical flaws that undermine the credibility of his findings. He relies on seldomly used sources, yet fails to follow even the basic principles they outline, overlooking essential elements such as control groups, and representative sampling. His report also lacks transparency regarding basic quality control measures, such as dropout rate, attention checks, and assessments of respondent comprehension. Professor Dimofte also fails to provide essential information on the pretesting and randomization protocols he claims to have used, as well as sample statistics. This prevents independent verification of his results. These shortcomings collectively cast significant doubt on the reliability of his conclusions about consumer purchasing behavior and willingness to pay.

1.     Professor Dimofte references literature on survey methodology that is not commonly used

74.     Professor Dimofte claims that his "methodological approach [] adheres to best practices, both generally for marketing research and for research conducted for the purpose of litigation."[93] He justifies this claim by stating that his "research follows the standards

---

[93] Dimofte Report at ¶ 21.

established by"[94] two sources: the *Manual for Complex Litigation*[95] and the *Reference Guide on Survey Research*.[96]

75.    These references are not commonly used by academics or professional survey researchers to guide study design or implementation.[97] Moreover, they are dated—the *Reference Guide on Survey Research* was published in 2011, while the *Manual for Complex Litigation* was published in 2004. Both provide outdated recommendations and fail to address key topics that survey researchers face today.

76.    As an indication of this outdatedness, the 2011 *Reference Guide on Survey Research* refers to internet surveys as "[a] **more recent innovation** in survey technology,"[98] [emphasis added] and the 2004 *Manual for Complex Litigation* does not mention the internet at all in its section on "Sampling/Opinion Surveys."[99] Neither reference discusses surveys conducted on smartphones or tablets. Professor Dimofte presumably expected many of his respondents to be completing the survey on a tablet or smartphone, since these are two of the three default response options for his question "What type of device are you using to answer these questions?"[100] Further, neither source discusses more current key issues such

---

[94] Dimofte Report at footnote 9.

[95] Federal Judicial Center, *Manual for Complex Litigation* (Fourth edition), Federal Judicial Center, 2004.

[96] Diamond, Shari S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence* (Third Edition), National Academies Press, 2011, pp. 359–423.

[97] Indeed, the *Manual for Complex Litigation* does not provide guidance on how to design or implement a survey at all. Instead, it provides two brief pages of general points to consider when using survey evidence in litigation, such as "sampling methods used must conform to generally recognized statistical standards" and "the judge should take into account [] whether the questions asked were clear and not leading" (*Manual for Complex Litigation* at p. 103). It does not provide any metrics for testing whether these standards are met, nor methodologies for ensuring that a study design meets the standards.

[98] Diamond, Shari S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence* (Third Edition), National Academies Press, 2011, p. 264.

[99] Federal Judicial Center, *Manual for Complex Litigation* (Fourth edition), Federal Judicial Center, 2004, at pp. 102–104.

[100] Dimofte Report at p. 33. The other default option was "Desktop or Laptop," and the question also provided an open-ended "Other" option. Professor Dimofte does not report the responses to this question.

as how to implement attention checks in online surveys.[101] More recent handbooks such as *The Palgrave Handbook of Survey Research* (2018) are more widely recognized in the field.[102]

        2.      <u>Professor Dimofte does not adhere to the standards outlined in the very literature he cites</u>

77.    Professor Dimofte asserts that his "research follows the standards established by"[103] the *Manual for Complex Litigation* and the *Reference Guide on Survey Research*. This assertion is incorrect. There are several standards outlined in the *Manual for Complex Litigation* and the *Reference Guide on Survey Research* to which Professor Dimofte fails to adhere.

78.    For example, the *Reference Guide on Survey Research* explains that:

    i.   surveys designed to test a causal proposition should include an appropriate control group or question.[104] As I detailed in section V.B.1, Professor Dimofte fails to set up treatment and control groups to validate the causal impact of celebrity endorsements.

    ii.   a survey report should include a discussion of any differences between the target population to the "sampling frame" and "an evaluation of the likely

---

[101] Qualtrics, "Improve data quality by using a commitment request instead of attention checks," August 4, 2022, https://www.qualtrics.com/blog/attention-checks-and-data-quality/.

[102] *See* Vannette, David, L., Jon A. Krosnick, *The Palgrave Handbook of Survey Research,* (2018).

[103] Dimofte Report at footnote 9.

[104] Diamond, Shari S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence* (Third Edition), National Academies Press, 2011, p. 398 ("By adding one or more appropriate control groups, the survey expert can test directly the influence of the stimulus.")

consequences of that difference."[105] Professor Dimofte does not include
these discussions in his report.[106]

iii. it is appropriate to submit the results of the pretest,[107] which Professor
Dimofte fails to do.

iv. a survey design can reduce guessing by adding "don't know" or "no
opinion" as response options.[108] As explained in Section V.C.4, some survey
response categories in Professor Dimofte's survey fail to offer these
options and thus encourage guessing.

79.     Similarly, the *Manual for Complex Litigation* states that:

v. "[t]he sampling methods used must conform to generally recognized
statistical standards,"[109] including that "the population was properly
chosen and defined[,] the sample chosen was representative of that

---

[105] Diamond, Shari S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence* (Third Edition), National Academies Press, 2011, p. 377 ("The survey report should contain (1) a description of the target population, (2) a description of the sampling frame from which the sample is to be drawn, (3) a discussion of the difference between the target population and the sampling frame, and, importantly, (4) an evaluation of the likely consequences of that difference.")

[106] Professor Dimofte does provide a table showing "Sample Demographics by Retention Status" in Appendix E (Dimofte Report at p. 32). However, he does not provide any demographics for his overall target population, nor any discussion of how differences between his sample and the target population may impact his results.

[107] Diamond, Shari S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence* (Third Edition), National Academies Press, 2011, p. 389 ("A more appropriate reaction is to recognize that pilot work can improve the quality of a survey and to anticipate that it often results in word changes that increase clarity and correct misunderstandings.")

[108] Diamond, Shari S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence* (Third Edition), National Academies Press, 2011, p. 390 ("Second, the survey can use a quasi-filter question to reduce guessing by providing "don't know" or "no opinion" options as part of the question (e.g., "Did you understand the guarantee offered by Clover to be for more than a year, a year, or less than a year, or don't you have an opinion?"). By signaling to the respondent that it is appropriate not to have an opinion, the question reduces the demand for an answer and, as a result, the inclination to hazard a guess just to comply. Respondents are more likely to choose a "no opinion" option if it is mentioned explicitly by the interviewer than if it is merely accepted when the respondent spontaneously offers it as a response. The consequence of this change in format is substantial. Studies indicate that, although the relative distribution of the respondents selecting the listed choices is unlikely to change dramatically, presentation of an explicit "don't know" or "no opinion" alternative commonly leads to a 20%–25% increase in the proportion of respondents selecting that response.")

[109] Federal Judicial Center, *Manual for Complex Litigation* (Fourth edition), Federal Judicial Center, 2004, at p. 103.

population[, and] the data were analyzed in accordance with accepted statistical principles."[110] In Section V.A, I discussed several examples of how Professor Dimofte's sampling methodology failed to meet any of these criteria.

vi. the questions asked should be clear and not leading,[111] which, as I described in Section V.C.1 is not the case for many of the questions in Professor Dimofte's survey.

### 3. Professor Dimofte does not provide evidence of imparting basic quality control measures

80. First, a standard practice used in the data cleaning process for online surveys involves identifying and removing poor quality respondents who obviously did not take the time necessary to read the questions and deliberate and answer accurately. However, Professor Dimofte does not provide information on drop-out rates among the initial set of respondents or any information about whether respondents were removed from the sample due to poor quality responses (based on the total time they spent to complete the survey or its key questions).

81. Second, Professor Dimofte does not appear to have included any "attention checks" in the survey. These are questions designed specifically to assess whether the respondent is paying attention and actually reading the questions that are being asked. For example, these can take the form of a request to provide thoughtful answers, a factual question asking to check respondents' attention, asking respondents to type a specific

---

[110] Federal Judicial Center, *Manual for Complex Litigation* (Fourth edition), Federal Judicial Center, 2004, at p. 103.

[111] Federal Judicial Center, *Manual for Complex Litigation* (Fourth edition), Federal Judicial Center, 2004, at p. 103 ("In addition, in assessing the validity of a survey, the judge should take into account the following factors: whether the questions asked were clear and not leading.")

response, or the monitoring of response speed.[112] Without verification that respondents have passed these attention checks and taken enough time to read and answer the questions (using timing data) it is not clear that the responses reported in the study can be taken seriously as accurate assessments of respondent attitudes.

82.    Third, Professor Dimofte does not properly assess comprehension levels among respondents. The survey includes one question in which respondents are asked to self-report their level of comprehension. The question reads: "Please rate how easy or difficult it was for you to understand the questions you were asked in this survey."[113] Asking respondents to admit to not understanding things is not a good way to assess comprehension, especially in surveys asking about financial decisions with which many individuals feel unfamiliar. Respondents may exhibit "social desirability bias," which refers to the tendency of individuals to respond to questions in a manner that will be viewed favorably by others.[114] The best-practice standard to assess comprehension of issues is to ask questions to test understanding of the issues.[115]

83.    Finally, Professor Dimofte does not clarify whether respondents could edit their previous responses by going backwards in the survey. Permitting such behavior could bias responses. For example, the final question of the survey asks: "Are you aware of any

---

[112] *See* Muszyński, Marek, "Attention Checks and How to Use Them", *Research and Methods*, 32, 2023. *See also* Qualtrics, "Improve data quality by using a commitment request instead of attention check," August 4, 2022, accessed on April 4, 2025, https://www.qualtrics.com/blog/attention-checks-and-data-quality/. The Qualtrics platform also recommends asking online respondents to commit at the outset to providing careful and thoughtful responses to questions in order to proceed with the survey – an approach also not implemented in the Dimofte survey.

[113] Dimofte Report at p. 8.

[114] Vannette, David, L., Jon A. Krosnick, *The Palgrave Handbook of Survey Research,* (2018), p. 45 ("Social desirability bias (the tendency of respondents to provide inaccurate reports to present themselves in a more favorable light.)")

[115] Peer, Eyal, David Rothschild, Andrew Gordon, "Data quality of platforms and panels for online behavioral research," *Behavior Research Methods* 54, (2022), 1643–1662 ("Comprehension was assessed by asking participants to summarize, in their own words, the instructions to two tasks.")

current litigation involving Kim Kardashian, Floyd Mayweather Jr., or Paul Pierce?"[116] It is unclear from the Dimofte Report whether participants who answer "yes" could go back to earlier questions and edit their responses upon being reminded about or alerted to current litigation.

              4.    <u>Professor Dimofte fails to provide necessary information to evaluate several supposedly adopted testing protocols</u>

84.    Pretesting involves leading a draft version of a survey to a small, representative group of respondents before the launch of the finalized survey to the full study sample.[117] The goal of pretesting is to observe how respondents understand the survey.[118] It is critical in the development of a survey as it helps identify potential issues with question wording and overall design before the survey is distributed to a larger sample.[119] Pretesting can help detect confusing language or other issues such as problems with the survey's length.[120] It ultimately

---

[116] Dimofte Report at p. 58.

[117] Vannette, David, L., Jon A. Krosnick, *The Palgrave Handbook of Survey Research,* (2018), p. 335 ("Best Practices for Survey Research: "Implement "cognitive pretesting" of all questions and change question wordings to eliminate misinterpretations or eliminate respondent confusion or lack of clarity of meaning (Willis 2005). – Conduct multiple iterative rounds of cognitive pretesting to be sure that questionnaire revision does not introduce more error (Willis 2006). – Behavior coding of interview administration can identify problematic questions that require revision."))

[118] Vannette, David, L., Jon A. Krosnick, *The Palgrave Handbook of Survey Research,* (2018), p. 335 ("Best Practices for Survey Research: "Implement "cognitive pretesting" of all questions and change question wordings to eliminate misinterpretations or eliminate respondent confusion or lack of clarity of meaning (Willis 2005). – Conduct multiple iterative rounds of cognitive pretesting to be sure that questionnaire revision does not introduce more error (Willis 2006). – Behavior coding of interview administration can identify problematic questions that require revision.")

[119] Vannette, David, L., Jon A. Krosnick, *The Palgrave Handbook of Survey Research,* (2018), p. 335 ("Best Practices for Survey Research: "Implement "cognitive pretesting" of all questions and change question wordings to eliminate misinterpretations or eliminate respondent confusion or lack of clarity of meaning (Willis 2005). – Conduct multiple iterative rounds of cognitive pretesting to be sure that questionnaire revision does not introduce more error (Willis 2006). – Behavior coding of interview administration can identify problematic questions that require revision.")

[120] Vannette, David, L., Jon A. Krosnick, *The Palgrave Handbook of Survey Research,* (2018), p. 335 ("Best Practices for Survey Research: "Implement "cognitive pretesting" of all questions and change question wordings to eliminate misinterpretations or eliminate respondent confusion or lack of clarity of meaning (Willis 2005). – Conduct multiple iterative rounds of cognitive pretesting to be sure that questionnaire revision does not introduce more error (Willis 2006). – Behavior coding of interview administration can identify problematic questions that require revision.")

enables researchers to improve the final version of the survey, and thus enhances the reliability of the data collected.

85.     Professor Dimofte notes that "the study was pretested"[121] to "avoid 'demand' effects' (i.e., instances wherein the survey 'suggests' to respondents that they should provide a particular response that is 'demanded' or desired by the researcher)."[122] However, Professor Dimofte does not provide any details on this pretesting, how it affected the survey design, and how helped to avoid demand effects (if it did).

86.     The absence of any information regarding pretesting in Professor Dimofte's Report raises concerns about whether pretesting was conducted in any rigorous way and whether it meaningfully influenced revisions to the survey's wording and structure. Without access to the underlying data and a description of the process, it is possible that poorly phrased or confusing questions remained in the final version (indeed, as argued above, it seems they did). It is generally expected that a survey designer would disclose information about how pretesting informed modifications to the final survey.

87.     Further, Professor Dimofte claims that randomization was used in the survey in both ways "whenever appropriate"[123] but provides no documentation of where this is implemented in the survey. Randomization of questions and response options is a critical design step when conducting a survey. Randomization helps minimize order effects created when the specific sequence of questions or response options influences how respondents

---

[121] Dimofte Report at ¶ 29.
[122] Dimofte Report at ¶ 29.
[123] Dimofte Report at ¶ 29.

interpret and answer questions,[124] and it reduces patterns in answering that may result from fatigue or predictability. Randomization thus enhances the reliability of the survey data.[125]

88.    If some respondents were shown questions referring to deceptive or fraudulent endorsements of cryptocurrencies prior to being asked questions about a social media post made by a celebrity such as Ms. Kardashian, they are likely to answer the later question very differently than if they were shown the questions in a different order. Professor Dimofte reports a subset of question blocks for which individual items were randomized.[126] He does not provide any explanation for why these particular question blocks were randomized and why others were not. He also does not discuss whether the ordering of the overall questions blocks was randomized. Similarly, Professor Dimofte provides no information on the potential randomized orderings for response options. Professor Dimofte states that this was randomized in some cases,[127] but does not discuss why randomization was used in these specific cases but not others.

---

[124] Qualtrics, *The Qualtrics Handbook of Survey Design*, 2019 ("For questions that offer categorical responses, the best practice is to randomize the order of all of the response alternatives, which usually reduces potential bias at the expense of increased variance. For rating scales, randomizing which end of the response scale is on the top or left— depending on whether the orientation of the scale is vertical or horizontal—may also help reduce bias (Malhotra 2009).")

[125] Qualtrics, *The Qualtrics Handbook of Survey Design*, 2019 ("For questions that offer categorical responses, the best practice is to randomize the order of all of the response alternatives, which usually reduces potential bias at the expense of increased variance. For rating scales, randomizing which end of the response scale is on the top or left— depending on whether the orientation of the scale is vertical or horizontal—may also help reduce bias (Malhotra 2009).")

[126] Professor Dimofte provides two examples of question blocks where he used random orderings for the individual items. The first is the set of questions "about the extent to which eight specific affective responses would describe [respondents] feelings about the case of a public figure with a large following who would endorse a cryptocurrency in a social media post without disclosing that they were paid to do so"; these items were randomized, in that the "adjectives employed [were] presented in random order in the evaluative item" (Dimofte Report at ¶ 52). The second is the set of questions in which "respondents were asked to assess the extent to which [public figure behaviors that involved marketplace brands] represented an endorsement of the brand"; again, the items were randomized in that the "behaviors [were] listed in random order" (Dimofte Report at ¶ 53).

[127] The only example of random answer ordering given in the Dimofte Report is for two sampling questions. First, "Respondents were asked, 'In the past year, did you purchase…?' [and] Several items were presented in randomized order," (Dimofte Report footnote 22 at ¶ 38). Second "Respondents were asked, 'In the next year

5.    Professor Dimofte inexplicably omits sample statistics for several of
his key responses

89.    Summary statistics are essential for interpreting survey results. While statistics like the mean and median provide a general sense of central tendency, the standard deviation provides critical information about the degree of variation, including whether responses reflect a consensus or broad divergence of views.[128] Without such metrics, particularly measures of dispersion like the standard deviation, it is difficult to evaluate the reliability or interpretive value of the survey findings.

90.    Professor Dimofte presents the empirical results of his survey by listing the mean numeric response and the result of a test of statistical significance for each question.[129] He does not report other sample statistics, such as the standard deviation of the responses. A standard survey report would report these statistics for every question. Failure to do so means that other researchers are not able to verify and fully review the numbers that Professor Dimofte reports.

91.    For some questions—those where the respondent gave an answer between 1 and 7—Professor Dimofte reports detailed counts of the responses.[130] For these questions, it is possible to replicate Professor Dimofte's responses and estimate sample statistics.

---

or two, do you plan to purchase…?' [and] The same product options were presented in randomized order," (Dimofte Report footnote 23 at ¶ 38).

[128] Angrist, Joshua D., and Jorn-Steffen Pischke. 2008. *Mostly Harmless Econometrics: An Empiricist's Companion*. Princeton University Press.

[129] *See e.g.*, Dimofte Report at ¶ 63 "*Crypto perceptions*. Respondents displayed a relatively high level of confidence associated with the reliability and safety of current ways to invest in, trade, or use cryptocurrencies: $M = 4.04$ ($p < .001$ in the contrast against the middle of the scale)."). Here "$M = 4.04$" refers to the sample mean of the numerical responses, and "$p < .001$ in the contrast against the middle of the scale" is the $p$-value for a standard $t$-test of statistical significance of the sample mean. A threshold of $p < 0.05$ is typically used to indicate statistical significance.

[130] Dimofte Report, pp. 59–67.

However, for all other questions—such as those where the respondent provides their answer on a sliding scale—Professor Dimofte does not provide any additional information.

92.    For example, a key finding in Professor Dimofte's report is that "consumer exposure to [a celebrity's] cryptocurrency endorsement on social media produced a statistically significant increase in purchase likelihood [] compared to lack thereof."[131] Professor Dimofte reaches this conclusion by comparing the result of his "Endorsed purchase likelihood" question[132] to his "Baseline purchase likelihood" question.[133] However, since these questions both have 'sliding scale' responses, there is no additional sample information provided. Hence, it is not possible to test the veracity or reliability of Professor Dimofte's key claim.

## VI.    CONCLUSION

93.    Professor Dimofte's survey suffers from serious methodological problems that render it unreliable for drawing conclusions about the causal impact, if any, of Ms. Kardashian's social media posts on the proposed class members' EMAX token purchases or the amount they paid for such purchases.

94.    My report highlighted four main flaws. First, Professor Dimofte's sample is not representative of the proposed classes, is drawn from the wrong time period, and fails to reflect the context in which EMAX token purchases were made. Second, Professor Dimofte's survey does not adhere to established scientific standards for inferring causality. It offers no treatment or control groups and merely relies on hypothetical scenarios and stated preferences. Third, Professor Dimofte's survey design is biased in its design: the questions are

---

[131] Dimofte Report ¶ 68.
[132] Dimofte Report ¶ 66.
[133] Dimofte Report ¶ 67.

often leading or overly complex, the response options are one-sided, and the scenarios presented encourage guessing and affirmation bias. Finally, Professor Dimofte's survey does not follow best-practice standards in survey design. Professor Dimofte relies on outdated literature and fails to provide essential quality control measures, such as attention checks and comprehension testing.

95.    Taken together, these flaws render the survey results unreliable and unsuitable as a basis for evaluating the alleged impact of Ms. Kardashian's social media posts on EMAX token purchases on a class-wide basis for the proposed classes. Consequently, the survey fails to provide a sound evidentiary basis for evaluating the claims of the proposed classes.

# Appendix A

# Curriculum Vitae
# Michael J. Hiscox
March 1, 2025

## Contact Information

Department of Government
Harvard University
1737 Cambridge Street
Cambridge MA, 02138
Telephone: +1 617 495 2605
E-mail: hiscox@fas.harvard.edu
Website: http://scholar.harvard.edu/hiscox/

## Current Academic and Professional Positions

- Clarence Dillon Professor of International Affairs, Department of Government, Harvard University
- Director, Sustainability, Transparency, and Accountability Research (STAR) Lab, Harvard University
- Advisor, Behavioral Economics Team of the Australian Government (BETA)

## Previous Academic and Professional Positions

- Berggruen Fellow, Center for Advanced Study in the Behavioral Sciences, Stanford, 2019-2020
- Founding Director, Behavioral Economics Team of the Australian Government (BETA), 2015-2017
- Visiting Professor of Management and Ethical Business, University of Sydney, 2012-2015
- Professor of Government, Department of Government, Harvard University, 2005-2008
- John L. Loeb Associate Professor of the Social Sciences, Harvard University, 2001-2005
- Assistant Professor, Department of Political Science, University of California, San Diego, 1997-2001

## Education

- Ph.D., Political Science, Harvard University, 1997
- B.Economics, First Class Honours, University of Sydney, 1989

## Selected Awards and Prizes

- *William H. Riker Prize* for the best book published in political economy in 2001-2002, awarded by the American Political Science Association in 2003.
- *Helen Dwight Reid Award* for the best dissertation in international relations in 1996-1997, awarded by the American Political Science Association in 1998.
- *Toppan Prize* for the best dissertation in political science, awarded by Harvard University in 1997.

## Books

- *High Stakes: The Political Economy of U.S. Trade Sanctions*. Cambridge: Cambridge University Press, forthcoming.
- *International Trade and Political Conflict: Commerce, Coalitions, and Mobility*. Princeton: Princeton University Press, 2002.

## Selected Journal Articles

- Altruistic or Expected Leadership? Laboratory Evidence on What Motivates Pro-Social Influence. *Journal of Economic Psychology*, 94 (2023). With M. Fernendez-Duque.
- Audience Effects on Anonymous Pro-Social Followership. *Economic Letters*, 212 (2022). With M. Fernendez-Duque.
- Starting a Behavioural Insights Team. Three Lessons from the Behavioural Economics Team of the Australian Government. *Journal of Behavioural Economics for Policy* (2017). With S. Ball, T. Oliver.
- Do Concerns about Labor Market Competition Shape Attitudes towards Immigration. *Journal of International Economics*, 97, 1 (September 2015): 193-207. With J. Hainmueller and Y. Margalit.
- Consumer Demand for the Fair Trade Label: Evidence from a Multi-Store Field Experiment. *Review of Economics and Statistics*, 97, 2 (May 2015): 242-256. With J. Hainmueller and S. Sequeira.
- Comparing Immigration Policies: An Overview from the IMPALA Database. *International Migration Review,* 50, 4 (Winter 2016): 825-1076. With M. Beine, et.al.
- Concussion Management in United States College Sports. *The American Journal of Sports Medicine*. October 21, 2014. With C. Baugh, E. Kroshus, D. Daneshvar, N. Filali, and L. Glantz.
- Measuring and Comparing Migration, Asylum and Naturalization Policies Globally: Challenges and Solutions. *Global Policy*, 5, 3 (September 2014): 261-273. With M. Beine, et al.
- Attitudes Towards Highly Skilled and Low Skilled Immigration: Evidence from a Survey Experiment.*American Political Science Review*, 101, 4 (February 2010): 61-84. With J. Hainmueller.

- Educated Preferences: Explaining Individual Attitudes toward Immigration in Europe. *International Organization*, 61, 2 (Spring, 2007): 399-442. With J. Hainmueller.
- Through a Glass and Darkly: Framing Effects and Individuals' Attitudes towards International Trade. *International Organization*, 60, 3 (Summer, 2006): 755-780.
- Learning to Love Globalization: The Effects of Education on Individual Attitudes towards International Trade. *International Organization*, 60, 2 (Spring, 2006): 469-498. With J. Hainmueller.
- International Capital Mobility and Trade Politics: Capital Flows and Political Coalitions. *Economics and Politics*, 16, 3 (November, 2004): 253-285.
- Commerce, Coalitions, and Factor Mobility: Evidence from Congressional Votes on Trade Legislation. *American Political Science Review*, 96, 3 (September, 2002): 593-608.
- Interindustry Factor Mobility and Technological Change: Evidence on Wage and Profit Dispersion across U.S. Industries. 1820 and 1990, *Journal of Economic History*, 62, 2 (June. 2002): 383-416.
- Class versus Industry Cleavages: Inter-Industry Factor Mobility and the Politics of Trade. *International Organization*, 55, 1 (Winter, 2001): 1-46.
- The Magic Bullet? The RTAA, Institutional Reform, and Trade Liberalization. *International Organization*, 53, 4 (Fall, 1999): 669-698.

## Selected Book Chapters and Other Publications

- The Domestic Sources of Foreign Economic Policies. In *Global Political Economy*, J. Ravenhill (ed.). Oxford: Oxford University Press, 2020. (latest edition)
- Voter Attitudes towards High-and Low-Skilled Immigrants. In *Immigration and Public Opinion in Liberal Democracies*, G. Freeman, et al. (eds.). London: Routledge, 2012. With J. Hainmueller.
- Evaluating the Impact of SA8000 Certification. In *SA8000 The First Decade: Implementation, Influence, and Impact*, D. Leipziger (ed.). London: Greenleaf, 2009. With C. Schwartz and M. Toffel.
- Trade Policy Openness, Government Spending, and Democratic Consolidation. In *Global Democracy and Its Difficulties*, A. Langlois (ed.). New York: Routledge, 2008. With S. Kastner.

3

# Appendix B

# Materials Cited

## Case Documents

Corrected Third Amended Class Action Complaint, October 6, 2023.

Expert Report of Claudiu V. Dimofte, Ph.D., February 11, 2025.

Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, February 11, 2025.

Declaration of Professor Sabrina Howell, Ph.D., April 28, 2025.

## Academic Literature and Public Sources

Angrist, Joshua D., and Jorn-Steffen Pischke. 2008. Mostly Harmless Econometrics: An Empiricist's Companion.

Bernheim, B. Douglas, and Antonio Rangel. 2007. Toward choice-theoretic foundations for behavioral welfare economics. In *American Economic Review* 97(2): 464-470

Bernheim, B. Douglas, and Antonio Rangel. 2009. Beyond revealed preference: choice-theoretic foundations for behavioral welfare economics. In *The Quarterly Journal of Economics* 124(1) (2009): 51-104.

Breidert, Christoph, Michael Hahsler, and Thomas Reutterer. 2006. A review of methods for measuring willingness-to-pay. In *Innovative Marketing* 2(4): 8–32.

Diamond, Shari S., 2011. Reference Guide on Survey Research. In *Reference Manual on Scientific Evidence*.

Denman, Denna C., Austin Baldwin, Andrea Betts, Amy McQueen, and Jasmin Tiro. 2018. Reducing "I Don't Know" Responses and Missing Survey Data: Implications for Measurement. In *Medical Decision Making* 38 (6): 673-682.

FaceBook Experiments, https://www.facebook.com/business/help/1738164643098669.

Federal Judicial Center. 2004. Manual for Complex Litigation.

FireBase A/B Testing, https://firebase.google.com/docs/ab-testing.

Fisher, Ronald A. 1935. The Design of Experiments.

Fowler, Floyd J., Jr. 1995. Improving Survey Questions: Design and Evaluation.

Gallo, Amy. 2017. A Refresher on A/B Testing. In *Harvard Business Review* 28.

Google Optimize, https://support.google.com/analytics/answer/12979939.

Haigh, Michael S., and John A. List. 2005. Do Professional Traders Exhibit Myopic Loss Aversion? An Experimental Analysis. In *The Journal of Finance* 60(1): 523–534.

Holbrook, Allyson. 2008. Acquiescence response bias. In *Encyclopedia of Survey Research Methods* 1: 3-4.

Imbens, Guido W., and Donald B. Rubin. 2015. Causal Inference for Statistics, Social, and Biomedical Sciences: An Introduction.

Katrin, Thomas. 2024. The Advent of Survey Experiments in Politics and International Relations. In *Government and Opposition* 59(1): 297-320.

Kempthorne, Oscar. 1952. The Design and Analysis of Experiments.

Kiviniemi, Marc, Erin Ellis, Heather Orom, Erika Waters, and Jennifer Hay. 2020. 'Don't know responding and estimates of perceived risk: failing to provide a 'don't know' response systematically biases laypeople's perceived risk estimates. In *Health, Risk & Society* 22(1): 69–85.

Kohavi, Ron, Roger Longbotham, Dan Sommerfield, and Randal M. Henne. 2009. Controlled Experiments on the Web: Survey and Practical Guide. In *Data Mining and Knowledge Discovery* 18: 140-181.

Krosnick, Jon A. 1999. Survey Research. In *Annual Review of Psychology* 50(1): 537–67.

Krosnick, Jon A., and Stanley Presser. 2010. Question and Questionnaire Design. In *Handbook of Survey Research*.

List, John A. 2003. Does market experience eliminate market anomalies? In *The Quarterly Journal of Economics* 118(1): 41-71.

Nagle, Thomas T., and Georg Müller. 2018. *The Strategy and Tactics of Pricing: A Guide to Growing More Profitably.*

MailChimp, https://mailchimp.com/marketing-glossary/ab-tests/.

Morgan, Stephen L., and Christopher Winship. 2007. Counterfactuals and Causal Inference: Methods and Principles for Social Research (Analytical Methods for Social Research).

Muszyński, Marek. 2023. Attention Checks and How to Use Them. In *Research and Methods*, 32. Optimizely, https://docs.developers.optimizely.com/

Peer, Eyal, David Rothschild, Andrew Gordon. 2022. Data quality of platforms and panels for online behavioral research. In *Behavior Research Methods* 54: 1643–1662.

PureSpectrum. 2020. Feature Highlight: Quota Nesting. https://www.purespectrum.com/blog/feature-highlight-quota-nesting/

Qualtrics. 2019. The Qualtrics Handbook of Survey Design.

Qualtrics. 2022. Improve data quality by using a commitment request instead of attention checks. https://www.qualtrics.com/blog/attention-checks-and-data-quality/.

Qualtrics. Randomizer. https://www.qualtrics.com/support/survey-platform/survey-module/survey-flow/standard-elements/randomizer/.

Schachter, Ariela, and Katherine Weisshaar. 2024. Survey Experiments in Sociology. In *Annual Review of Sociology* 51.

Security.org. 2025. 2025 Cryptocurrency Adoption and Consumer Sentiment Report. https://www.security.org/digital-security/cryptocurrency-annual-consumer-report

Schmidt, Jonas, and Tammo H. A. Bijmolt. 2020. Accurately measuring willingness to pay for consumer goods: A meta-analysis of the hypothetical bias. In *Journal of the Academy of Marketing Science* 48: 499-518.

Siroker, Dan and Pete Koomen. 2013. A/B Testing: The Most Powerful Way to Turn Clicks into Customers.

Statista. 2021. Number of identity-verified cryptoasset users from 2016 to November 2024, with a forecast for 2025. https://www.statista.com/statistics/1202503/global-cryptocurrency-user-base/.

Train, Kenneth. 2009. Discrete Choice Methods with Simulation.

Vannette, David L, and Jon A. Krosnick. 2014. Answering Questions: A Comparison of Survey Satisficing and Mindlessness. In *The Wiley Blackwell Handbook of Mindfulness*.

Vannette, David L, and Jon A. Krosnick. 2018. *The Palgrave Handbook of Survey Methodology*.

Voelckner, Franziska. 2006. An empirical comparison of methods for measuring consumers' willingness to pay. In *Marketing Letters* 17: 137-149.