# EXHIBIT A

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Ryan Huegerich, Jonathan Semerjian, Nabil Nahlah, Till Freeman, Marko Ciklic, Tunisia Brignol, Milan Puda, Neil Shah, Michael Buckley and Christopher Deluca, individually and on behalf of all others similarly situated, | § § § § § § | |
| | § | Case No. 2:22-cv-00163-MWF-SK |
| Plaintiffs, | § § | |
| vs. | § § | |
| EMAX Holdings, LLC, Giovanni Perone, Mike Speer, Justin Maher, Jona Rechnitz, Kimberly Kardashian, Floyd Mayweather, Jr., Paul Pierce, Russell Davis, and Antonio Brown | § § § § § | |
| Defendants | | |

**<u>Expert Declaration of Professor Sabrina Howell, Ph.D.</u>**

**April 28, 2025**

1

I.   Introduction ........................................................................................................................ 4

   A.   Assignment ................................................................................................................... 4

   B.   Qualifications ............................................................................................................... 5

   C.   Summary of Opinions .................................................................................................. 6

II.   Case Background ............................................................................................................... 10

   A.   Allegations and claims against Defendant Kardashian ............................................... 10

   B.   Summary of Named Plaintiffs' EMAX transactions .................................................. 11

   C.   Data discrepancies in Plaintiffs' allegations .............................................................. 12

      1.   Discrepancies between Complaint and produced data files ................................. 12

      2.   Discrepancies in event timing in the Complaint .................................................. 14

III.   Background on Relevant Concepts .................................................................................... 16

   A.   EthereumMax (EMAX) ............................................................................................. 16

   B.   Meme coins ................................................................................................................ 17

   C.   Markets for trading EMAX ........................................................................................ 18

      1.   EMAX was traded in liquidity pools on decentralized exchanges ...................... 18

      2.   EMAX had limited liquidity and was extremely volatile ................................... 19

   D.   Instagram Stories ....................................................................................................... 20

IV.   Plaintiffs' Damages Theory and Methodology Fail to Establish Class-Wide Impact From Ms. Kardashian's Posts ...................................................................................................................... 21

   A.   Professor Clark's Declaration does not purport to offer a methodology for calculating damages 21

      1.   Professor Clark only explains how to calculate profits and losses for Ethereum addresses ....... 21

      2.   Professor Clark's methodology is not designed to estimate damages ................. 23

   B.   Professor Clark's analysis of Ethereum wallet address trading activity would be of limited use for calculating damages ....................................................................................................................... 24

      1.   The size of the putative class cannot be determined from wallet addresses ....... 24

      2.   Professor Clark does not account for individuals who had offsetting gains and losses on different addresses ............................................................................................................................. 25

   C.   Plaintiffs' damages methodology does not establish that Ms. Kardashian's posts affected transaction decisions or the price of EMAX ............................................................................... 26

      1.   Heterogeneity in timing and exposure across proposed class members prohibits a class-wide assessment of causality as related to Ms. Kardashian's posts ................................................. 28

a)    Some proposed class members may have benefited—and therefore suffered no harm—from Ms. Kardashian's posts .................................................................................................................. 30

b)    Plaintiffs' claim that class members were harmed by holding tokens requires individualized inquiry ......................................................................................................................................... 31

2.    The presence of many other EMAX promotions around the timing of Ms. Kardashian's posts confounds attempts to identify any alleged damage concerning the posts on a class-wide basis........ 32

3.    The EMAX price movements following Ms. Kardashian's two posts contradict a 'price premium' theory............................................................................................................................. 36

D.    EMAX's characteristics imply that price impacts from news cannot be presumed......................... 37

1.    EMAX does not have any fundamental value ...................................................................... 37

2.    Plaintiffs do not establish that the market for EMAX is efficient and hence that the price accurately reflects news................................................................................................................. 38

E.    Survey responses solicited by Professor Dimofte undermine Plaintiffs' theory .............................. 40

1.    Plaintiffs' survey responses indicate wide variation in what constitutes 'good' and 'bad' news about EMAX ..................................................................................................................................... 40

2.    Plaintiffs' survey responses suggest that Ms. Kardashian's posts would have had no impact on many proposed class members to purchase EMAX ................................................................. 46

# I.    INTRODUCTION

## A.    Assignment

1. Plaintiffs in *In Re: EthereumMax Investor Litigation* allege that Defendant Kim Kardashian made "false or misleading statements"[1] in two Instagram Stories (hereafter, "posts") about the digital token EthereumMax (EMAX), which, in addition to many statements made by the other Defendants about EMAX, allegedly harmed EMAX purchasers. I have been retained by Counsel for Ms. Kardashian (hereafter, "Counsel") to evaluate Plaintiffs' class certification motion, including their proposed damages methodology. Specifically, I have been asked to evaluate whether Plaintiffs' proposed methodology could establish class-wide impact based on Plaintiffs' allegations and damages theory concerning Ms. Kardashian's posts.

2. In evaluating Plaintiffs' claims and proposed damages methodology, I analyzed, among other things, the *Corrected Third Amended Class Action Complaint*[2] ("Third Amended Complaint"), the *Memorandum of Law in Support of Plaintiffs' Motion for Class Certification*[3] ("Plaintiff Class Cert Brief"), the *Declaration of Jeremy Clark in Support of Motion for Class Certification*[4] ("Clark Declaration") and the *Expert Report of Claudiu V. Dimofte, Ph.D.*[5] (" Dimofte Report").

---

[1] *In re: EthereumMax Investor Litigation*, "Memorandum of Law in Support of Plaintiffs' Motion for Class Certification," (February 11, 2025), ECF No. 242-1 ("Plaintiffs' Class Cert Brief") at p. 1. ("The EthereumMax project's de facto leaders, Defendants Giovanni Perone and Jona Rechnitz, collaborated with several celebrity promotors (Defendants Kim Kardashian, Floyd Mayweather, and Paul Pierce) to make false or misleading statements to investors about EthereumMax through social media and other promotional activities.")

[2] *In re: EthereumMax Investor Litigation*, "Corrected Third Amended Class Action Complaint," (October 6, 2023), ECF No. 190 ("Third Amended Complaint").

[3] *In re: EthereumMax Investor Litigation*, "Memorandum of Law in Support of Plaintiffs' Motion for Class Certification," (February 11, 2025) ("Plaintiffs' Class Cert Brief").

[4] Jeremy Clark, "Declaration of Jeremy Clark in Support of Motion for Class Certification," (February 10, 2025), ECF No. 243-8 ("Clark Declaration").

[5] Claudiu V. Dimofte, "Expert Report of Claudiu V. Dimomfte, Ph.D.," (February 11, 2025), ECF No. 243-9 ("Dimofte Report").

### B.    Qualifications

3.  I am a Professor of Finance at the New York University Stern School of Business ("NYU Stern"). I am also currently a Visiting Professor at the Harvard Business School. I serve as a Research Associate at the National Bureau of Economic Research and a Research Fellow at the Institute for Private Capital. My research and teaching focus on entrepreneurial finance, fintech, private equity, and innovation. My research has been published in *The Journal of Finance*, *The Quarterly Journal of Economics, The Review of Financial Studies, The Journal of Financial Economics, the Journal of Corporate Finance, Management Science*, the *American Economic Review*, and the *Review of Finance*. My paper entitled "Initial coin offerings: Financing growth with cryptocurrency token sales," published in 2020 in *The Review of Financial Studies*,[6] has been cited over 825 times as of this writing, making it to my knowledge the most highly cited article in financial economics about Initial Coin offerings ("ICOs").[7]

4.  At NYU Stern, I created and teach a course titled "Applications in Entrepreneurial Finance: Fintech" for graduate and undergraduate students. A substantial portion of this course is devoted to cryptocurrency markets, including sessions on applications of blockchain to financial markets, ICOs, and NFTs.

5.  I have received awards for my teaching and research, including being named a *Poets & Quants* Best 40-Under-40 MBA Professor in 2023 and winning the AQR Asset Management Institute Young Researcher Award in 2021 as well as the Kauffman Foundation Junior Faculty Research Fellowship in 2017 (which goes to the top researcher in

---

[6] Howell, Sabrina T., Marina Niessner, and David Yermack, "Initial Coin Offerings: Financing Growth with Cryptocurrency Token Sales," *The Review of Financial Studies* 33, no. 9, (2020): 3925–3974.

[7] An ICO is an event in which "a blockchain-based issuer sells cryptographically secured digital assets, usually called tokens" Howell, Sabrina T., Marina Niessner, and David Yermack, "Initial Coin Offerings: Financing Growth with Cryptocurrency Token Sales," *The Review of Financial Studies* 33, no. 9, (2020): 3925–3974, at pp. 3925–3926.

entrepreneurship) and the Brattle Group Distinguished Paper Prize in 2025 (for a top paper in the *Journal of Finance).*

6. I received my B.A. in Economics and East Asian Studies from Yale University in 2008, my M.A. in Economics from Harvard University in 2012, and my Ph.D. in Political Economy and Government, Economics Track, from Harvard University in 2015. From 2008 to 2009, I was a consultant at Charles River Associates, an international economic consulting firm. Before pursuing my doctoral studies, I worked at Securing America's Future Energy, with a focus on energy security policy.

7. I joined the faculty of NYU Stern in 2015. I received tenure in 2022 and was promoted to Full Professor in 2023. I have served as an Associate Editor for *Management Science* (2020-2022), *The Review of Financial Studies* (2022-present), and *The Review of Corporate Finance Studies* (2022-present).

8. I am being compensated for my time spent working on this matter, including any testimony, at my standard billing rate of $950 per hour. My compensation is not contingent upon my findings, the testimony I may give, or the outcome of this matter. I have been assisted by individuals at Keystone, an economic consulting firm, working under my direction and supervision.

9. My curriculum vitae is attached to this report as Appendix A. Appendix B to this report lists documents and data sources that I relied upon in preparing this report. My work in this matter is ongoing, and I reserve the right to supplement this report if information that alters any of my opinions comes to my attention after this report is submitted.

### C.    Summary of Opinions

10.        Based on my knowledge and review of documents pertinent to this matter, I conclude that Plaintiffs do not offer a methodology that can establish the presence or

amount of damages resulting from Ms. Kardashian's posts on a class-wide basis. This conclusion is based on the following opinions.

11.      Plaintiffs claim that "[Professor] Clark offers a simple model by which Plaintiffs' damages can be calculated on a class-wide basis."[8] This claim is not justified. The Clark Declaration only explains that it is possible to "compute the profit and loss of any address"[9] using blockchain and price data (where addresses on the Ethereum blockchain would presumably be associated with class members for damages purposes). The Clark Declaration does not contain, nor does it purport to contain, a methodology that is relevant for estimating alleged damages on a class-wide basis that result from a "price premium" allegedly caused by Ms. Kardashian's posts.

12.      Professor Clark's methodology operates at the level of Ethereum 'addresses' or 'wallets,' not at the level of individuals. This is an issue because an individual may have many wallets. Professor Clark offers no way to estimate offsetting gains and losses across different wallets for such an individual. Further, this creates a problem for Plaintiffs' class certification claims, because Professor Clark's Declaration does not establish that the proposed class is numerous: The number of individuals may be much smaller than the number of Ethereum addresses.

13.      Plaintiffs allege that proposed class members "overpaid"[10] for EMAX due to a "price premium" resulting from Ms. Kardashian's posts,[11] but Plaintiffs offer no empirical evidence that Ms. Kardashian's posts created any price premium. In fact, there was no consistent pattern to the EMAX price movements around her posts. Therefore, there is no way to know based on Plaintiffs' methodology whether any proposed class member was

---

[8] Plaintiff Class Cert Brief at p. 20.

[9] Clark Declaraion at p. 14.

[10] Third Amended Complaint at ¶ 239.

[11] *See, e.g.,* Third Amended Complaint at ¶ 395.

7

harmed specifically by Ms. Kardashian's conduct. For example, Plaintiffs' methodology does not address confounding factors, such as crypto market sentiment or other roughly contemporaneous EMAX promotional activity. In other words, Plaintiffs' proposal to quantify damages using Professor Clark's measure of aggregate trading losses during the Class Period fails to offer any causal mechanism to identify which transactions were and which were not affected by Ms. Kardashian's posts.

14.     Plaintiffs propose no explanation for what determines the price of EMAX—no theory of what is 'good' or 'bad' news—and therefore no basis for using the price to estimate damages. Survey evidence put forward by Plaintiffs' expert, Professor Dimofte, contradicts Plaintiffs' claims that Defendant promotions would have affected all members of the proposed class in a similar way.[12] Conversely, the survey suggests divergent views of what constitutes 'good' and 'bad' news about a cryptocurrency like EMAX.

15.     In a market that meets certain standards for 'efficiency,'[13] the price incorporates value-relevant public information in an accurate and timely manner, with 'good' news causing the price to increase and 'bad' news having the reverse effect.[14] The market for EMAX had limited liquidity and high price volatility during the relevant period. Moreover, EMAX has never had any fundamental value and operated similarly to a 'meme coin.' These characteristics indicate that the market for EMAX cannot be presumed to be efficient during the relevant period. Plaintiffs do not offer evidence that the market for EMAX was efficient,

---

[12] *See, e.g.,* Plaintiff Class Cert Brief at p. 19.

[13] Bodie, Zvi, Alex Kane, Alan J. Marcus, *Investments* (9th Edition) (McGraw Hill, 2014), p. 235 ("The notion that stocks already reflect all available information is referred to as the **efficient market hypothesis** [] The hypothesis that prices of securities fully reflect available information about securities."); Fama, Eugene, "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2, (1970): 383–417 at p. 383 ("A market in which prices always 'fully reflect' available information is called 'efficient.'").

[14] Bodie, Zvi, Alex Kane, Alan J. Marcus, *Investments* (Ninth Edition) (McGraw Hill, 2014), p. 249 ("A fundamental principle of efficient markets is that any new information ought to be reflected in stock prices very rapidly. When good news is made public, for example, the stock price should jump immediately.").

nor do they provide an alternative methodology for documenting that Ms. Kardashian's posts affected the price in the absence of market efficiency.

16.    Heterogeneity among the proposed class members in at least two dimensions—the timing of their trades and their motivations for buying, holding, and selling the token—means that individualized analysis for each proposed class member is necessary to determine a causal impact of Ms. Kardashian's posts on EMAX purchase behavior.

a) The first dimension of heterogeneity is the timing of their transactions. Many proposed class members—including Named Plaintiffs—purchased EMAX before either of Ms. Kardashian's posts, undermining their claim that her promotions "induced"[15] them to purchase EMAX. This timing heterogeneity also implies that under the unproven assumption of a price premium due to Ms. Kardashian's posts, some members of the proposed class may have *benefited* from the posts, because they sold at a higher price than they would have in the absence of her posts. Plaintiffs offer no way to identify and exclude these unharmed class members. Plaintiffs also claim that some proposed class members were damaged because they "continue[d] to hold on to [their] investment in EMAX Tokens when [they] otherwise would not have done so,"[16] but they provide no methodology to determine when such individuals would have sold in the absence of Ms. Kardashian's posts.

b) The second dimension of heterogeneity is whether the proposed class members were exposed to Ms. Kardashian's posts. For example, Plaintiffs do not claim that all Named Plaintiffs followed Ms. Kardashian on Instagram or saw her posts.

---

[15] *See, e.g.,* Third Amended Complaint at ¶ 207.

[16] *See e.g.,* Third Amended Complaint at ¶ 205.

## II.    CASE BACKGROUND

### A.    Allegations and claims against Defendant Kardashian

17.    Plaintiffs allege that Ms. Kardashian "acted as a promoter for EthereumMax and the EMAX Tokens."[17] Plaintiffs point to two instances of Ms. Kardashian's social media activity on May 30, 2021 and June 14, 2021 as evidence of her promotions.[18] Plaintiffs allege that Ms. Kardashian's May 30, 2021 post caused a "spike" in the EMAX trading volume of $75.5 million on May 30, 2021.[19] In addition, Plaintiffs allege that Ms. Kardashian's June 14, 2021 post "had tremendous reach."[20]

18.    Plaintiffs claim that "taken together, the misleading statements and omissions of the Executive Defendants and Promoter Defendants," including Ms. Kardashian, "contributed to the deceptive marketing tactics as a whole, which were used to solicit sales of EMAX Tokens."[21]

19.    I have been informed by Counsel that Plaintiffs have legal claims against Ms. Kardashian under the state consumer laws of California, Florida, New Jersey, and New York, as well as under California common law for unjust enrichment and restitution. I also understand that Plaintiffs do not have any claims against Ms. Kardashian under securities laws.

20.    Relevant to their claims against Ms. Kardashian, Plaintiffs seek to certify separate state classes for California, Florida, New Jersey, and New York of "[A]ll persons . . . who, between May 14, 2021, and June 27, 2021, purchased EthereumMax tokens and were

---

[17] Third Amended Complaint at ¶ 20.

[18] Third Amended Complaint at ¶ 137.

[19] Third Amended Complaint at ¶ 138.

[20] Third Amended Complaint at ¶ 158.

[21] Third Amended Complaint at ¶ 223.

subsequently damaged thereby."[22] I refer to the period of May 14, 2021, to June 27, 2021, as the "relevant period."

**B.    Summary of Named Plaintiffs' EMAX transactions**

21.    The Named Plaintiffs varied considerably in the timing, frequency, and size of their EMAX transactions during the relevant period. Table 1 summarizes the transactions of the Named Plaintiffs, including their number of purchases before Ms. Kardashian's first post on May 30, 2021. As Table 1 illustrates, most Named Plaintiffs made at least one EMAX purchase prior to Ms. Kardashian's first Instagram post on May 30, 2021. In fact, Plaintiffs Buckley and Ciklic did not make *any* purchases after Ms. Kardashian's May 30, 2021 Instagram post. In Appendix D, I show charts detailing the transactions for each Named Plaintiff.

**Table 1: Transaction summary for Named Plaintiffs during the Relevant Period[23]**

| Plaintiff | Total Number of Transactions in Relevant Period | Average Transaction Size (USD) | Earliest Purchase Date | Number of purchases before Ms. Kardashian's first post |
|---|---|---|---|---|
| Tunisia Brignol | 16 | ▉ | May 14, 2021 | 9 |
| Michael Buckley | 4 | ▉ | May 21, 2021 | 4 |
| Marko Ciklic | 4 | ▉ | May 28, 2021 | 3 |
| Christopher DeLuca | 3 | ▉ | June 1, 2021 | 0 |
| Till Freeman | 3 | ▉ | June 1, 2021 | 0 |
| Ryan Huegerich | 2 | ▉ | May 23, 2021 | 1 |
| Nabil Nahlah | 29 | ▉ | May 16, 2021 | 12 |
| Milan Puda | 1 | ▉ | May 30, 2021 | 0 |
| Jon Semerjian | 3 | ▉ | May 30, 2021 | 0 |
| Neil Shah | 4 | ▉ | May 29, 2021 | 1 |

Sources: EMXPLS_000001–002, KARD0000010–029.

Note: Plaintiffs allege that Ms. Kardashian made her first Instagram post concerning EMAX, on May 30, 2021. I understand from Remi Screen's Declaration that Ms. Kardashian made the post at 11:00 AM PDT. The "Transactions" in column 2 only include sales and purchases, not Airdrops. Airdrops are free distributions of

---

[22] I understand from Counsel that Plaintiffs' proposed "Nationwide Class" of persons who allegedly "purchased unregistered EthereumMax tokens" does not apply to Ms. Kardashian because Plaintiffs do not assert any securities claims against her.

[23] *See* my Back-up Materials.

digital assets by project developers, typically with the intent of building a user base and gaining attention in order to jump-start interest in the asset.

    **C.**    **Data discrepancies in Plaintiffs' allegations**

        1.    <u>Discrepancies between Complaint and produced data files</u>

22.    The Complaint describes the EMAX purchases made by Plaintiffs. For four Plaintiffs—Ciklic, Brignol, Freeman, and Buckley—there are more purchases alleged than appear in the produced data. Specifically, there are discrepancies between the purchases alleged in the Complaint and the transaction data produced by Plaintiffs in the files EMXPLS_000001 and EMXPLS_000002.[24] These discrepancies suggest that either the Complaint mentions transactions that did not occur, or that Plaintiffs' production is incomplete.

23.    In Table 2 below, I list all purchases mentioned in the Complaint for these four Plaintiffs and note whether each appears in the produced data files EMXPLS_000001 and EMXPLS_000002. For each Plaintiff, there is at least one purchase which is not in the produced data. I describe my methodology in detail—including checks against blockchain data—in Appendix E.

**Table 2: Alleged transactions for Plaintiffs Ciklic, Brignol, Freeman, and Buckley**

| Plaintiff | Transaction date in Complaint | Relevant text from Complaint | In production files? |
|---|---|---|---|
| Ciklic | May 28, 2021 | *These promotions by Pierce, Brown, and Mayweather induced Ciklic to make two purchases of EMAX Tokens on May 28, 2021 and May 29, 2021*[25] | **Yes** |

---

[24] I understand that these two files contain "each TRANSACTION, or attempted TRANSACTION involving [each of the named Plaintiffs] in ANY way in connection with the EMAX Tokens." *See Plaintiff Marko Ciklic's Amended Objections and Responses to Defendant Kim Kardashian's First Set of Interrogatories*, (December 18, 2024) at p. 3; *Plaintiff Tunisia Brignol's Amended Objections and Responses to Defendant Kim Kardashian's First Set of Interrogatories*, (December 18, 2024) at p. 3; *Plaintiff Till Freeman's Amended Objections and Responses to Defendant Kim Kardashian's First Set of Interrogatories*, (December 18, 2024) at p. 3; *Plaintiff Michael Buckley's Amended Objections and Responses to Defendant Kim Kardashian's First Set of Interrogatories*, (December 18, 2024) at p. 3.

[25] Third Amended Complaint at ¶ 365.

| Plaintiff | Transaction date in Complaint | Relevant text from Complaint | In production files? |
|---|---|---|---|
| Ciklic | May 29, 2021 | *These promotions by Pierce, Brown, and Mayweather induced Ciklic to make two purchases of EMAX Tokens on May 28, 2021 and May 29, 2021*[26] | **Yes** |
| Ciklic | June 6, 2021 | *The misleading statements and omissions [] induced Ciklic to make his June 6, 2021 purchase of EMAX Tokens*[27] | **No** |
| Brignol | May 29, 2021 | *These promotions induced Brignol to make her first[28] purchases of EMAX Tokens on May 29, 2021 and May 31, 2021 (made in four separate transactions).*[29] | **Yes** |
| Brignol | May 31, 2021 | *These promotions induced Brignol to make her first purchases of EMAX Tokens on May 29, 2021 and May 31, 2021 (made in four separate transactions).*[30] | **Yes** |
| Brignol | June 8, 2021 | *These promotions induced Brignol to make her fifth and final purchase of EMAX Tokens on June 8, 2021.*[31] | **No**[32] |
| Freeman | May 29, 2021 | *The misleading statements and omissions [] caused Freeman to make her May 29, 2021 and May 31, 2021, and June 8, 2021 purchases of EMAX Tokens.*[33] | **No** |
| Freeman | May 31, 2021 | *The misleading statements and omissions [] caused Freeman to make her May 29, 2021 and May 31, 2021, and June 8, 2021 purchases of EMAX Tokens.*[34] | **No** |
| Freeman | June 2, 2021 | *Each of these promotions [] induced Freeman to make his first and second purchases of EMAX Tokens on June 2, 2021.*[35] | **Yes** |

---

[26] Third Amended Complaint at ¶ 365.

[27] Third Amended Complaint at ¶ 366.

[28] The produced data in EMXPLS_000001 shows EMAX purchases made from Plaintiff Brignol's wallet address prior to this date, indicating that this was not her "first" purchase of EMAX tokens as alleged by the Complaint.

[29] Third Amended Complaint at ¶ 339.

[30] Third Amended Complaint at ¶ 339.

[31] Third Amended Complaint at ¶ 339.

[32] The produced data in EMXPLS_000001 shows a sale of EMAX made by Plaintiff Brignol's wallet address on June 8th but no purchases.

[33] Third Amended Complaint at ¶ 340. This appears to be a typo in the complaint—it is likely that this sentence should actually refer to Plaintiff Brignol, given the timing of the purchases.

[34] Third Amended Complaint at ¶ 340. This appears to be a typo in the complaint—it is likely that this sentence should actually refer to Plaintiff Brignol, given the timing of the purchases.

[35] Third Amended Complaint at ¶ 337.

| Plaintiff | Transaction date in Complaint | Relevant text from Complaint | In production files? |
|---|---|---|---|
| Freeman | June 4, 2021 | *The misleading statements and omissions [] caused Freeman to make his June 4, 2021 purchase of EMAX Tokens.* [36] | **No** |
| Freeman | June 6, 2021 | *These promotions [] induced Freeman to make his third purchase of EMAX Tokens on June 6, 2021.* [37] | **Yes** |
| Freeman | June 8, 2021 | *The misleading statements and omissions [] caused Freeman to make her May 29, 2021 and May 31, 2021, and June 8, 2021 purchases of EMAX Tokens.* [38] | **No** |
| Buckley | May 28, 2021 | *These promotions [] induced Buckley to make his first two purchases of EMAX Tokens on May 28, 2021.* [39] | **Yes** |
| Buckley | June 18, 2021 | *Each of these promotions induced Buckley to make his third and final purchase of EMAX Tokens on June 18, 2021.* [40] | **No** |

Source: EMAX Ledger data, Third Amended Complaint.

Notes: Transactions highlighted in green appear in the Complaint and the produced data files. Transactions highlighted in orange appear in the Complaint but not the produced data files.

## 2. Discrepancies in event timing in the Complaint

24.      The Complaint includes a chart from a *Financial Times* article purporting to

show "the rise and fall of the EMAX Tokens' [sic] price in conjunction with the Promoter

Defendants' promotional activities."[41] I reproduce this chart as Figure 1 below.

---

[36] Third Amended Complaint at ¶ 338.

[37] Third Amended Complaint at ¶ 337.

[38] Third Amended Complaint at ¶ 340. This appears to be a typo in the complaint—it is likely that this sentence should actually refer to Plaintiff Brignol, given the timing of the purchases.

[39] Third Amended Complaint at ¶ 247.

[40] Third Amended Complaint at ¶ 247. The produced data in EMXPLS_000001 shows an Airdrop of EMAX made by Plaintiff Buckley's wallet address on June 18th but no purchases.

[41] Third Amended Complaint at ¶ 182.

**Figure 2:** ***Financial Times*** **chart purporting to show the EMAX Token price and Promoter Defendants' promotional activities**



Source: Financial Times.

25.    This chart misrepresents the date of Ms. Kardashian's second EMAX-related post, which Plaintiffs allege took place on June 14, 2021.[42] Specifically, the arrow identifying Ms. Kardashian's post points to June 12, 2021, two days *before* Plaintiffs allege that Ms. Kardashian made her second EMAX post. This makes it seem as though the EMAX price and volume *increased* following the post, when in fact price and volumes *decreased* after Ms. Kardashian's post. As I explain further in Section IV.B.3, the decrease in the EMAX price and volume after Ms. Kardashian's Instagram post on June 14, 2021 contradicts Plaintiffs' theory of how news influences the EMAX price and purchase decisions.

---

[42] Third Amended Complaint at ¶ 156 ("On June 14, 2021, Kardashian posted the following solicitation for EthereumMax on her Instagram account.").

## III.    BACKGROUND ON RELEVANT CONCEPTS

### A.    EthereumMax (EMAX)

26.    EthereumMax (EMAX) is a digital asset (which I will subsequently refer to as a 'token') created using the Ethereum blockchain on May 14, 2021.[43] The Executive Defendants used the ERC-20 token standard. The Executive Defendants minted 2 quadrillion EMAX tokens.[44]

27.    The EMAX developers released a 'whitepaper,' which is the standard form of voluntary disclosure for new cryptocurrency projects,[45] in October 2021.[46] In the whitepaper, the developers describe EMAX as follows:

"We launched EMAX with a vision to bridge the gap between the emergence of community-driven tokens and the well-known foundational coins of crypto, creating a unique token that provides lifestyle perks with financial rewards and incentives to its holders with a pathway for practical long-term use in everyday life. This is the essence of the Culture Token."[47]

---

[43] EthereumMax, "Disrupt History," Whitepaper, October 2021, p. 19. EMAX had a "Hard Fork" on May 25, 2021.

[44] EthereumMax, "Disrupt History," Whitepaper, October 2021, p. 8 ("we launched EMAX with a total supply of 2 quadrillion tokens."); Third Amended Complaint at ¶ 162 ("two quadrillion tokens had been originally created."); Forbes, "EthereumMax," [No date], accessed on March 6, 2025, https://www.forbes.com/digital-assets/assets/ethereummax-emax/ ("EMAX launched with a total supply of 2 quadrillion tokens."). The Third Amended Complaint alternatively claims that "The total market supply of EMAX Tokens minted was 4 quadrillion" (at ¶ 51); ultimately my assessment of Plaintiffs' claims and of EMAX as a token hold irrespective of whether the total initial offering was 2 quadrillion or 4 quadrillion tokens.

[45] Third Amended Complaint at ¶ 53 ("Whitepapers in cryptocurrency are documents released by the founders of the project that gives investors technical information about its concept, and a roadmap for how it plans to grow and succeed.").

[46] EthereumMax, "Disrupt History," Whitepaper, October 2021.

[47] EthereumMax, "Disrupt History," Whitepaper, October 2021, p. 8, accessed March 4, 2025, https://ethereummax.org/wp-content/uploads/EthereumMax-Whitepaper-v1-Final.pdf.

28.     The whitepaper repeatedly emphasizes the importance of building a community (they would "create a project that was fueled by community engagement"[48]) and the central role of marketing ("We strongly believe that our expertise in marketing strategy and managing relationships is one of the things we do best."[49])

**B.    Meme coins**

29.     Meme coins are digital assets which refer to an item or idea that spreads on the Internet, such as a pop culture reference or joke.[50] Meme coins typically have no fundamental value (*i.e.*, future cash flows that the asset or project might produce) and are inherently speculative, so their prices tend to be highly volatile.[51] As they offer no expectations of profits (besides those from speculation on price movements), they do not typically appear to be a securities.[52] Consistent with this, the U.S. Securities and Exchange Commission ("SEC") recently issued a statement asserting that a "meme coin is not itself a security." It further pointed out that meme coin purchasers can have varying motivations—they "typically

---

[48] EthereumMax, "Disrupt History," Whitepaper, October 2021, p. 7, accessed March 4, 2025, https://ethereummax.org/wp-content/uploads/EthereumMax-Whitepaper-v1-Final.pdf ("We loved the community aspect of meme tokens as it gave us an excuse to talk with each other more often, strategize our next moves, and commiserate together about our wins and losses. Though we realized that tokens focused on cartoons or animals was not a serious long-term investment strategy. A more serious long-term investment strategy was serious projects that had a purpose years from now. And it was at these crossroads that we had a realization — could we create a project that was fueled by community engagement, yet at the same time driven by purpose and utility for the long-term? The project needed to be built on a secure, reliable, and trustworthy platform (Ethereum), but with the added benefit of a community of raging fans that went above and beyond network stability, something more (Max)…and at this moment, EthereumMax was born.")

[49] EthereumMax, "Disrupt History," Whitepaper, October 2021, p. 46, accessed March 4, 2025, https://ethereummax.org/wp-content/uploads/EthereumMax-Whitepaper-v1-Final.pdf.

[50] Crypto.com, "What Are Meme Coins And How Do They Work?," August 22, 2024, accessed on March 6, 2025, https://crypto.com/university/what-are-meme-coins. *See also* Merriam-Webster Dictionary, "Meme," [No date], accessed on March 6, 2025, https://www.merriam-webster.com/dictionary/meme.

[51] Crypto.com, "What Are Meme Coins And How Do They Work?," August 22, 2024, available at https://crypto.com/university/what-are-meme-coins ("Unlike established cryptocurrencies like Bitcoin or Ethereum, meme coins often lack a solid foundation in technology or utility, making them highly speculative assets. Their value is primarily driven by social media trends, community hype, and sometimes even celebrity endorsements, rather than underlying financial fundamentals. This lack of intrinsic value can contribute to extreme volatility, where prices can surge rapidly but also plummet just as quickly, leaving traders exposed to potential significant losses."); Li, Tao, Donghwa Shin, Chuyi Sun, and Baolian Wang, "The Dark Side of Decentralized Finance: Evidence from Meme Tokens," *Working Paper*, July 12, 2023.

[52] Howell, Sabrina T., Marina Niessner, and David Yermack, "Initial Coin Offerings: Financing Growth with Cryptocurrency Token Sales," *The Review of Financial Studies* 33, no. 9, (2020): 3925–3974.

are purchased for entertainment, social interaction, and cultural purposes, and their value is driven primarily by market demand and speculation."[53]

30.    Based on the materials I have reviewed, the EMAX token operated largely like a meme coin. Holding EMAX has never entailed rights to future cash flows or monetizable benefits.[54] In addition to the absence of any underlying utility or fundamental value, EMAX also shares with meme coins a focus on community and marketing.

## C.    Markets for trading EMAX

### 1.    <u>EMAX was traded in liquidity pools on decentralized exchanges</u>

31.    EMAX was traded primarily in "liquidity pools" established on Uniswap, a decentralized exchange ("DEX").[55] On the DEX, EMAX could only be directly exchanged for ETH, unlike traditional stock markets or cryptocurrency exchanges where assets can be bought and sold for dollars or other fiat currency.[56] Once a trader obtained ETH, she could exchange it for fiat currency or other digital assets on centralized exchanges such as Coinbase.

32.    In a paper that I co-authored about Initial Coin Offerings ("ICOs"), I explain that listing on a centralized exchange is an important step for a new token, enabling

---

[53] U.S. Securities and Exchange Commission, "Staff Statement on Meme Coins," February 27, 2025, accessed on April 24, 2025, https://www.sec.gov/newsroom/speeches-statements/staff-statement-meme-coins.

[54] For example, the EMAX whitepaper (EthereumMax, "Disrupt History," Whitepaper, October 2021) does not contain the word "cash" or "revenue," and the only future benefits discussed are "the benefits of growth, rewards, staking, and a stable payment utility into a single ecosystem" (at p. 36). Moreover, the whitepaper states that the "return [on bonding EMAX or XMAX tokens] is in XMAX and thus the bonder's profit would depend on [the] XMAX price when the bond matures" (at p. 25). There is no discussion of the EMAX price being linked to any market fundamental.

[55] Clark Declaration at pp. 11–12.

[56] In practice, all liquidity pools use Wrapped Ether (WETH) because the Uniswap Protocol exclusively supports swaps between ERC-20 tokens (Clark Declaration at pp. 11–12). Because WETH and ETH are economically equivalent for the purpose of my report, I refer to them interchangeably. *See, e.g.*, Uniswap Help Center, "Why do ETH swaps involve converting to WETH?," [No date], accessed on April 27, 2025, https://support.uniswap.org/hc/en-us/articles/16015852009997-Why-do-ETH-swaps-involve-converting-to-WETH ("Swaps on the Uniswap Protocol can start and end with ETH. However, during the swap all ETH is wrapped into WETH."); *See also* Cointelegraph, "What is wrapped Ethereum (wETH) and how does it work," [No date], accessed on April 27, 2025, https://cointelegraph.com/news/what-is-wrapped-ethereum-weth-and-how-does-it-work.

wider circulation and liquidity.[57] The same is true in the meme coin market, where lists of sustainable or successful meme coins are generally drawn from centralized exchanges such as Coinbase and Binance.[58] Since listing on a centralized exchange is crucial for meaningful liquidity and success in crypto markets, it is notable that EMAX was never traded on a centralized exchange. For example, in May 2021, DEXes accounted for only 6.0 percent of total cryptocurrency trading volume.[59]

### 2. EMAX had limited liquidity and was extremely volatile

33.       During the relevant period, EMAX trading volumes were low and volatile. The median daily trading volume during the class period was $10.34 million.[60] By contrast, during the class period, Bitcoin's ("BTC") median trading volume during this period was $39.8 billion and ETH's was $39.1 billion.[61] Many meme coins also had greater liquidity than EMAX. For example, during the class period, the median trading volume of DogeCoin was $4.1 billion and that of Shiba-Inu was $750 million.[62] Only 13 of the 41 days with data available during the class period saw EMAX trading volumes above $20 million.[63]

34.       Consistent with a relatively illiquid asset, the price of EMAX was extremely volatile during the relevant period. A commonly-used measure of the volatility of a security is

---

[57] Howell, Sabrina T., Marina Niessner, and David Yermack, "Initial Coin Offerings: Financing Growth with Cryptocurrency Token Sales," *The Review of Financial Studies* 33, no. 9, (2020): 3925–3974.

[58] *See* Coinbase, "Crypto prices," [No date], accessed April 17 2025, https://www.coinbase.com/explore; Binance, "Popular", [No date], accessed April 17, 2025, https://www.binance.com/en.

[59] Trading volume on DEXes was $263.27 billion while trading on centralized exchanges was $4.16 trillion. $263.27 billion / ($263.27 billion + $4.16 trillion) × 100 = 5.95. *See* The Block, "Cryptocurrency Monthly Exchange Volume," [No date], accessed on April 27, 2025, https://www.theblock.co/data/crypto-markets/spot/cryptocurrency-exchange-volume-monthly; The Block, "DEX Volume," [No date], accessed on April 27, 2025, https://www.theblock.co/data/decentralized-finance/dex-non-custodial/dex-volume-monthly.

[60] *See* my Back-up Materials.

[61] *See* my Back-up Materials.

[62] *See* my Back-up Materials.

[63] *See* my Back-up Materials. EMAX price and volume data are not available before May 18, 2021.

the standard deviation of the return.[64] The annualized standard deviation of the EMAX return during the relevant period was 557.9 percent.[65] Other cryptocurrency tokens were much less volatile during this period: for example, Bitcoin's annualized standard deviation of the return was 108.0 percent, Ether's was 159.0 percent, DogeCoin's was 206.8 percent, and Shiba-Inu's was 226.7 percent.[66] As a benchmark, the annualized standard deviation of S&P 500 returns for the same period was 8.7 percent.[67]

### D.    Instagram Stories

35.    Plaintiffs allege that on May 30, 2021, and June 14, 2021, Ms. Kardashian promoted EMAX in two Instagram "Stories."[68] Instagram Stories are short-term posts which allow an Instagram user to "capture the everyday, highlight the special moments, or express [them]self with text, music, interactive stickers, filters, and GIFs."[69] Instagram Stories have two features which limit their ability to generate a viral response.

36.    First, they are temporary, disappearing after 24 hours.[70] This feature restricts viewing of Stories to only those individuals who accessed Ms. Kardashian's Instagram

---

[64] Jordan, Bradford D., Thomas W. Miller, and Steven D. Dolvin, *Fundamentals of investments: Valuation and management*, (McGraw-Hill, 2015), p. 19 ("[W]e need a measure of the volatility of returns. The variance and its square root, the standard deviation, are the most commonly used measures of volatility.").

[65] The typical approach to convert daily standard deviations into annualized standard deviations is to multiply by the square root of the number of trading days in a year. *See* Hull, John C., *Options, Futures, and Other Derivatives* (11th Edition) (Pearson, 2022), pp. 345–346 ("The volatility per annum is calculated from the volatility per trading day using the formula $Volatility\ per\ annum = Volatility\ per\ day\ \times \sqrt{Number\ of\ trading\ days\ per\ annum}$.") Since cryptocurrencies can be traded every day, I compute the annualized standard deviation as (standard deviation of daily returns)$\times\sqrt{365}\times100$. *See* my Back-up Materials.

[66] *See* my Back-up Materials. For these calculations, I use the capital gains yield, defined as $(P_{t+1} - P_t)/P_t$ where $P_t$ is the price of the security on day $t$ (Jordan, Bradford D., Thomas W. Miller, and Steven D. Dolvin, *Fundamentals of investments: Valuation and management*, (McGraw-Hill, 2015), p. 4.).

[67] I compute the annualized standard deviation as (standard deviation of daily returns)$\times\sqrt{252}\times100$, reflecting the standard measure of 252 trading days in a year for stocks. John C. Hull, *Options, Futures, and Other Derivatives* (11th Edition) (Pearson, 2022), Essex, United Kingdom, at p. 346 ("The number of trading days in a year is usually assumed to be 252 for stocks.") *See* my Back-up Materials.

[68] Third Amended Complaint at ¶ 137 and ¶ 156.

[69] Instagram, "Stories," [No date], accessed March 11, 2025, https://about.instagram.com/features/stories.

[70] Instagram, "Stories," [No date], accessed March 11, 2025, https://about.instagram.com/features/stories.

page within 24 hours of her posting the Stories—or less than 24 hours if the Stories were deleted before the 24-hour period ended.[71] Ms. Remi Screen (Ms. Kardashian's social media coordinator) explained that since there is no record of a post about EMAX on June 13 or June 14, 2021 in Ms. Kardashian's Instagram account, if such a post occurred it must have been viewable on Instagram for less than 24 hours.[72]

37.      Second, only the Story creator can see who has viewed the Story—other followers of the Story cannot see who else has viewed it and cannot publicly 'like' or comment on the Story.[73] Since there is no way to see how other followers are responding, it is difficult for users to know the reach or impact of a Story.[74]

## IV.   PLAINTIFFS' DAMAGES THEORY AND METHODOLOGY FAIL TO ESTABLISH CLASS-WIDE IMPACT FROM MS. KARDASHIAN'S POSTS

38.      In this section, I analyze Plaintiffs' proposed damages methodology, focusing on whether it can be used to show that Ms. Kardashian's Instagram posts had a class-wide impact and whether it offers a reliable method to estimate class-wide damages.

### A.   Professor Clark's Declaration does not purport to offer a methodology for calculating damages

#### 1.   Professor Clark only explains how to calculate profits and losses for Ethereum addresses

39.      Plaintiffs engaged Professor Jeremy Clark to "independently analyze and opine on the EMAX token, its technical implementation, and the mechanisms used to

---

[71] However, if a Story is reposted by another user, the reposted version will have its own new 24-hour viewing window starting from the time of the repost.

[72] Declaration of Remi Screen, April 21, 2025. ("There is no Instagram story referencing EthereumMax from June 13 or June 14, 2021 available to view in the archives of Ms. Kardashian's Instagram account. This means that if there was such a story posted on either of those dates, the story was available to view on her profile for less than 24 hours.")

[73] California Learning Resource Network, "Can someone see who viewed their story on Instagram?," November 13, 2024, accessed on March 11, 2025, https://www.clrn.org/can-someone-see-who-viewed-their-story-on-instagram/ ("Only the story's creator can view the list of people who have viewed their own story.")

[74] This is in contrast to, for example, an Instagram post, in which "likes" and comments are usually publicly visible, and so it is possible for followers to engage in community discussion on the post. I note that Instagram Stories can also be reshared by other Instagram users on their own personal Stories.

exchange the token and establish its price."[75] He was also asked to provide opinions on "how data can be collected about transfers, purchases, and sales of the EMAX token."[76]

40.     Much of Professor Clark's Declaration provides basic factual information and background regarding cryptocurrency trading and EMAX. He summarizes blockchain technology, including an overview of Bitcoin,[77] Ethereum,[78] "smart contracts,"[79] and Ethereum's system of "gas" fees.[80] He also provides technical information on EthereumMax and the EMAX token[81] and describes the role of "automated market makers" on a DEX platform such as Uniswap v2, where EMAX was traded.[82]

41.     Professor Clark then provides two opinions. First, he opines that "[o]n-chain actions involving the EMAX token can be determined."[83] Second, he opines that "[a] common methodology can be used to determine EMAX purchases on Uniswap,"[84] and that he can use this methodology to "compute the profit and loss of any [Ethereum] address."[85]

42.     The "common methodology"[86] that Professor Clark proposes to determine gains and losses on an Ethereum address has the following steps:

---

[75] Clark Declaration at p. 2.

[76] Clark Declaration at p. 13.

[77] Clark Declaration at p. 4.

[78] Clark Declaration at p. 5.

[79] Clark Declaration at p. 5.

[80] Clark Declaration at p. 7.

[81] "EthereumMax" refers to the project and "EMAX" refers to the token itself. *See* Clark Declaration at p. 7. ("EthereumMax project implemented a 'token' which is called EMAX.").

[82] Clark Declaration at p. 12.

[83] Clark Declaration at p. 13.

[84] Clark Declaration at p. 14.

[85] Clark Declaration at p. 14.

[86] Clark Declaration at p. 14.

a)  Determine the set of EMAX activities (purchases, sales, transfers) for each Ethereum address provided by Plaintiffs.

b)  Determine the timestamp of each activity and the associated EMAX price.

c)  Compute the profit and loss for each Ethereum address.[87]

43.  Professor Clark states that he has "built a proof-of-concept tool"[88] to test this methodology and claims that it "works for any EMAX purchases made on Uniswap from any address."[89] Professor Clark claims that his methodology "could be expanded to cover airdrops, other DEXes, liquidity provision, or any on-chain event."[90]

## 2.  Professor Clark's methodology is not designed to estimate damages

44.  Plaintiffs claim that Professor Clark "offers a simple model by which Plaintiffs' damages can be calculated on a class-wide basis."[91] They are incorrect. From an economic perspective, trading losses do not on their own constitute damages, because they are typically driven by many factors, not all of which are related to the purported source of harm. For example, trading losses may be driven by broader market sentiment and thus unrelated to the specific alleged wrongdoing. To constitute damages, trading losses must be conceptually and empirically linked to injury.

45.  Plaintiffs have not put forward a methodology to assess damages for any trader, let alone to do so on a class-wide basis. Indeed, Professor Clark does not claim that his methodology is a damages model—he does not use the word "damage" (or "damages") at all in his Declaration. There is nothing in Professor Clark's Declaration that discusses a

---

[87] Clark Declaration at p. 14. Professor Clark also states that the methodology would involve "subtract[ing] the value of any unsold tokens currently held" but that these tokens "would likely have zero or *de minimus* value."

[88] Clark Declaration at p. 15.

[89] Clark Declaration at p. 15.

[90] Clark Declaration at p. 15.

[91] Plaintiff Class Cert Brief at p. 20.

causal price premium attributable to either of Ms. Kardashian's posts (or any other alleged wrongdoing on the part of the Defendants). This is because, as I explain below, Professor Clark's methodology does not enable the calculation of *counterfactual* profit and loss in the world without Ms. Kardashian's posts.

## B. Professor Clark's analysis of Ethereum wallet address trading activity would be of limited use for calculating damages

### 1. The size of the putative class cannot be determined from wallet addresses

46.    Professor Clark states that "over the relevant period, over 300,000 purchases of EMAX-Pilot or EMAX was [sic] made" and that "of these [purchases], 100,000 were made by unique Ethereum addresses."[92] Plaintiffs claim that "[t]he number of Class members can be determined based on EthereumMax's and other third parties' records."[93] However, Professor Clark admits that "Ethereum makes no restriction on how many addresses a single individual may operate."[94] In addition, there is widespread bot trading and wash trading[95] in these markets which can involve using many addresses to accomplish a single individual's or institution's trading strategy.[96]

47.    Therefore, it is not possible to determine how many individuals control the 100,000 Ethereum addresses. The size of the putative class may be much smaller than the number of Ethereum addresses, and Professor Clark's methodology does not provide a framework for determining the actual number of individuals allegedly harmed by Ms. Kardashian's posts.

---

[92] Clark Declaration at p. 14.

[93] Third Amended Complaint at ¶ 190.

[94] Clark Declaration at p. 14.

[95] Winston & Strawn, "What Is Wash Trading?," [No date], accessed on March 6, 2025, https://www.winston.com/en/legal-glossary/what-is-wash-trading

[96] Cong, Lin William, Xi Li, Ke Tang, Yang Yang, "Crypto Wash Trading," April 2021, accessed on March 20, 2025, https://cowles.yale.edu/sites/default/files/2022-11/cryptowashtrading040521-crypto-wash-trading.pdf

2.      Professor Clark does not account for individuals who had offsetting gains and losses on different addresses

48.      The methodology that Professor Clark proposes "to determine EMAX purchases on Uniswap" operates at the "Ethereum address" level.[97] Specifically, Professor Clark claims that his methodology can "compute the profit and loss of any address,"[98] and Plaintiffs "have collected and produced their addresses and transaction records in discovery"[99] allowing him to map address-level to specific Plaintiffs.

49.      Yet a single individual in the proposed class may have held multiple Ethereum addresses, potentially with offsetting trading gains and losses. Individuals may use multiple Ethereum addresses for a range of reasons, including privacy and security.[100] For example, Plaintiffs' own transaction data produced shows that Nabil Nahlah has two wallet addresses.[101]

50.      Professor Clark's methodology, as proposed, would not be able to accurately calculate profits and losses for an individual holding multiple wallets. For instance, suppose that a member of the proposed class owned two Ethereum addresses which they used to transact EMAX, denoted Address A and Address B. Suppose that through Address A, the individual purchased EMAX early in the relevant period, sold near the price peak, and made a profit of $100. Suppose that through Address B, the individual purchased EMAX later in the period and sold at a loss of $100. In aggregate, this individual incurred no loss or gain from purchasing EMAX tokens during the class period, since the two wallets offset.

---

[97] Clark Declaration at p. 14.

[98] Clark Declaration at p. 14.

[99] Clark Declaration at p. 14.

[100] Clark Declaration at p. 14. Although Ethereum accounts are anonymous by construction, researchers have used heuristics such as clustering, graph representations, and self-authorization to identify possible groups of addresses held by entities. For example, one research project identified an entity with 500 distinct addresses. *See* Friedhelm, Victor, "Address clustering heuristics for Ethereum," *Revised Selected Papers of the 24th International Financial Cryptography and Data Security Conference*, Springer International Publishing, (2020), pp. 617-633.

[101] EMXPLS_000001 lists Nabil Nahlah's two addresses as ███████████████ .

However, Plaintiffs' methodology would erroneously assign a $100 in damages to Wallet B and no damages to Wallet A, for a total of $100 in damages to the individual. Professor Clark does not propose any methodology for identifying such situations and excluding those unharmed individuals from the proposed class.

### C.    Plaintiffs' damages methodology does not establish that Ms. Kardashian's posts affected transaction decisions or the price of EMAX

51.    Damages assessments based on EMAX transactions require calculating proposed class members' profit or loss in a hypothetical scenario, where everything remains the same but there is no allegedly wrongful conduct. Economists typically refer to such a scenario as a 'counterfactual'[102] or 'but-for' world.[103] In this matter, the counterfactual world would be the same as the actual one, except without Ms. Kardashian's two Instagram posts. The difference between proposed class members' trading gains and losses in the actual and counterfactual worlds can be interpreted as the *causal* impact of Ms. Kardashian's posts.[104] This difference could then be the basis for developing damages estimates.

52.    Plaintiffs' theory of harm ultimately rests on a chain of causality: that Ms. Kardashian's Instagram posts induced investors to purchase EMAX tokens, which in turn created a price premium. First, Plaintiffs claim that Ms. Kardashian's posts "induced" class

---

[102] Angrist, Joshua D. and Jörn-Steffen Pischke, "The credibility revolution in empirical economics: How better research design is taking the con out of econometrics," *Journal of Economic Perspectives* 24, no. 2 (2010): 3-30, at p. 22 ("Many new empirical industrial organization studies forecast counterfactual outcomes based on models and simulations.").

[103] Allen, Mark A., Robert E. Hall, and Victoria A. Lazear, "Reference guide on estimation of economic damages," *National Research Council, Reference Manual on Scientific Evidence* (2011): 425-502, at p. 432 ("a statement about the economic situation absent the wrongdoing, with the defendant's proper actions replacing the unlawful ones (the but-for scenario).").

[104] Allen, Mark A., Robert E. Hall, and Victoria A. Lazear, "Reference guide on estimation of economic damages," *National Research Council, Reference Manual on Scientific Evidence* (2011): 425-502, at p. 432 ("Damages measurement then determines the plaintiff's hypothetical value in the but-for scenario. Economic damages are the difference between that value and the actual value that the plaintiff achieved…A proper construction of the but-for scenario and measurement of the hypothetical but-for plaintiff's value by definition includes in damages only the loss *caused* by the harmful act." Emphasis in the original.).

members to purchase and hold EMAX.[105] To show this, Plaintiffs would need to establish that proposed class members would have been less likely to purchase or hold EMAX in the absence of Ms. Kardashian's posts.[106] Plaintiffs have not proposed a method for establishing this on a class-wide basis.

53.     Second, Plaintiffs also allege that Ms. Kardashian's posts *caused* a price premium for EMAX.[107] To establish this, Plaintiffs would need to show that the price of EMAX would have been lower in the absence of Ms. Kardashian's posts. Since we cannot observe the EMAX price in the counterfactual world without the posts, it is necessary to use financial and economic modelling tools to estimate what the EMAX price would have been in the counterfactual world. Plaintiffs do not do any empirical analysis to estimate the counterfactual EMAX price.

54.     Several conditions are important when establishing a causal relationship. First, the causal factor (here, Ms. Kardashian's posts) must happen before the result (the price premium).[108] Second, the observed relationship must not be confounded by other factors that could explain the result.[109] Third, it is useful to have a mechanism that intuitively connects the causal factor to the result; in this case, a mechanism through which Plaintiffs became aware of and decided to act on the information from Ms. Kardashian's posts. As I explain in detail in the remainder of this section, Plaintiffs have failed to show that any of these three

---

[105] *See, e.g.,* Third Amended Complaint at ¶ 211 and ¶ 245.

[106] Allen, Mark A., Robert E. Hall, and Victoria A. Lazear, "Reference guide on estimation of economic damages," *National Research Council, Reference Manual on Scientific Evidence* (2011): 425-502, at p. 432 ("Damages measurement then determines the plaintiff's hypothetical value in the but-for scenario. Economic damages are the difference between that value and the actual value that the plaintiff achieved.").

[107] *See e.g.,* Third Amended Complaint at ¶ 395.

[108] Pearl, Judea, *Causality: Models, Reasoning, and Inference* (2nd ed.) (2009) Cambridge University Press, New York, at p. 39 ("Temporal precedence among variables may furnish some information about (the absence of) causal relationships—a later event cannot be the cause of an earlier event.").

[109] Wooldridge, Jeffrey, *Econometrics: A Modern Approach* (5th Edition) (South-Western Cengage, 2013), Mason, OH, at p. 12 ("The key question in most empirical studies is: Have enough other factors been held fixed to make a case for causality?").

conditions hold at all—let alone would hold similarly across members of the proposed class during the relevant period. Indeed, for each of these conditions, there is meaningful heterogeneity among the Named Plaintiffs that demonstrates why individualized issues would undermine any class-wide damages methodology.

### 1. Heterogeneity in timing and exposure across proposed class members prohibits a class-wide assessment of causality as related to Ms. Kardashian's posts

55.     Proposed class members are heterogeneous in at least two dimensions: (1) their purchase timing relative to Ms. Kardashian's posts; (2) whether they were exposed to Ms. Kardashian's post.

56.     Individuals acquired EMAX at different price points and on different dates. Their trading gains and losses depend on the timing of their buys and sells. Proposed class members who either purchased before Ms. Kardashian's first post or who were not exposed to Ms. Kardashian's Instagram activity are unlikely to have purchased EMAX tokens because of Ms. Kardashian's posts.

57.     The purported damages period alleged by Plaintiffs covers 45 days, from May 14, 2021, to June 27, 2021.[110] Ms. Kardashian's first post occurred almost two weeks into the period. Some members of the proposed class—including Named Plaintiffs—bought and sold EMAX before *either* of Ms. Kardashian's two posts, making it impossible to ascribe their purchases or the price at which they purchased to her posts. As shown above in Table 1, six of the ten Named Plaintiffs first purchased EMAX before Ms. Kardashian's first post. Notably, two of the Named Plaintiffs—Michael Buckley and Markco Ciklic—did not make any EMAX purchases on or after May 30, 2021.

58.     Even for those proposed class members who purchased EMAX after Ms. Kardashian had posted, Plaintiffs do not offer a way to link these trading decisions to Ms.

---

[110] Third Amended Complaint at ¶ 1.

Kardashian's posts. For instance, Plaintiffs do not claim that all Named Plaintiffs followed Ms. Kardashian on Instagram.[111] The Complaint alleges that Plaintiff Semerjian "saw [] promotions by [Defendant] Pierce on May 26, 2021, May 28, 2021, and May 30, 2021" which "induced Semerjian to make his first and second purchases of EMAX Tokens on May 31, 2021 and June 1, 2021." Semerjian also allegedly "saw [Defendant] Mayweather's promotions of EthereumMax during the Bitcoin Miami conference [], as well as the promotions of EMAX Tokens on the lead up to and during the pay-per-view fight with Logan Paul" which "induced Semerjian to make another purchase of EMAX Tokens on June 4, 2021."[112] The Third Amended Complaint does not allege that Ms. Kardashian caused Defendant Semerjian to make his EMAX purchases on May 31, June 1, or June 5, 2021.[113] Similarly, in his interrogatory responses, Plaintiff DeLuca claimed that he "does not recall following Kardashian on any social media platform" and does not mention seeing any of her posts.[114]

59.    By failing to offer a mechanism to test whether Ms. Kardashian's posts affected EMAX trading behavior, Plaintiffs cannot identify the impact of different Defendants' promotions on specific purchases. For example, Plaintiffs might attribute to Ms. Kardashian Defendant Semerjian's alleged EMAX losses, despite there being no evidence or allegations that her posts affected his trading activity. This highlights that Plaintiffs'

---

[111] The Third Amended Complaint explicitly mentions that Plaintiffs Brignol and Huegerich followed Ms. Kardashian's social media account(s) (Third Amended Complaint, ¶ 339, 363) but states that all other Plaintiffs just saw her posts. For certain Plaintiffs who did not follow Ms. Kardashian, the Complaint suggests indirect knowledge of her (e.g., "Ciklic is also aware of Defendant Kardashian from her reality television show and renowned business savvy.) *See e.g.,* Third Amended Complaint, ¶ 365.

[112] Third Amended Complaint at ¶ 205.

[113] The Third Amended Complaint does say that "[Ms.] Kardashian's promotion induced Semerjian to continue to hold on to his investment in EMAX Tokens when he otherwise would not have done so." I discuss the problems with Plaintiffs' claims of damages arising from 'holding' EMAX further in Section IV.B.1.

[114] *Plaintiff Christopher DeLuca's Amended Objections and Responses to Defendant Kim Kardashian's First Set of Interrogatories,* (December 18, 2024) at p. 3. Other Plaintiffs, including Buckley and Semerjian stated that they did not recall following Ms. Kardashian on social media, but that they visited her profile and / or saw ads featuring Ms. Kardashian on other sites. Plaintiff Puda claimed that "that they did not follow [Ms.] Kardashian on Instagram but checked [Ms.] Kardashian's Instagram page periodically" (*Plaintiff Milan Puda's Amended Objections and Responses to Defendant Kim Kardashian's First Set of Interrogatories* at p. 3).

methodology is inadequate for estimating damages on a class-wide basis. Instead, it would be necessary to assess how Ms. Kardashian's posts affected trading activity at the level of the individual purchaser, considering his or her buy and sell timing relative to the posts.

### a)   Some proposed class members may have benefited—and therefore suffered no harm—from Ms. Kardashian's posts

60.      Some proposed class members may have *benefited* from any alleged price premium due to Ms. Kardashian's posts, even if they sustained aggregate trading losses associated with their EMAX transactions. For example, individuals who bought before Ms. Kardashian's first post would have benefited if they sold during the allegedly inflated period.

61.      In Figure 2 below, I present a hypothetical example showing how class members could have benefited from Ms. Kardashian's first post by selling their holdings at a higher price than they would have in the counterfactual world without the post. This hypothetical supposes that the post did create a price premium (which, as I explain elsewhere, Plaintiffs have not demonstrated).

**Figure 2: Illustrative example of how proposed class members could have benefited from Ms. Kardashian's post because of the purported price premium**



62.       Professor Clark provides no methodology for calculating class-wide damages that could apply both to (a) proposed class members who bought at an alleged premium following her post; and (b) proposed class members who bought before her post (when, presumably, there was no premium) and sold during the allegedly inflated period.

         **b)**    <u>Plaintiffs' claim that class members were harmed by holding tokens requires individualized inquiry</u>

63.       Plaintiffs allege that some purchasers were harmed because "[Ms.] Kardashian's promotion induced [them] to continue to hold on to [their] investment in EMAX"[115] meaning that they were "left holding worthless tokens"[116] that they would otherwise have sold.[117] This notion of harm is highly speculative and does not appear to be

---

[115] *See e.g.,* Third Amended Complaint at ¶ 205.

[116] Plaintiff Class Cert Brief at p. 5.

[117] *See e.g.,* Third Amended Complaint at ¶ 205.

grounded in any evidence submitted with Plaintiffs' motion for class certification. For example, Professor Clark explains that that his methodology makes use of "a complete set of EMAX activities: every purchase, sale, and transfer."[118] Professor Clark does not purport to identify sales that would have occurred were it not for Ms. Kardashian's posts.

64.    Moreover, substantiating the claim that a given member of the proposed class suffered damages through holding an already-purchased token requires analysis at the individual level. Plaintiffs would need to determine when each purchaser would have chosen to sell their tokens were it not for Ms. Kardashian's posts. Furthermore, they would need to document that the decision not to sell was directly attributable to Ms. Kardashian's posts.

2.    The presence of many other EMAX promotions around the timing of Ms. Kardashian's posts confounds attempts to identify any alleged damage concerning the posts on a class-wide basis

65.    Plaintiffs do not explain how to isolate the impact of Ms. Kardashian's posts in light of the presence of other promotional activity around the same time. The Third Amended Complaint alleges many EMAX promotional activities during the relevant period which were unrelated to Ms. Kardashian. Specifically, the Third Amended Complaint lists 33 promotional events that happened between May 14 and June 14 alone (*See* Appendix C). These include Facebooks posts, Instagram posts, Twitter posts, YouTube videos, press releases, and promotions at live events. These promotions were made by nine different individuals, including both "Promoter Defendants" and "Executive Defendants."[119] Figure 3 shows the distribution of promotional activity listed in the Third Amended Complaint during the class period.

---

[118] Clark Declaraion at p. 14.

[119] Third Amended Complaint at p. 1 ("Defendant EMAX Holdings, LLC ("EMAX Holdings" or "Company"), Giovanni Perone, Mike Speer, Justin Maher, and Jona Rechnitz (the "Executive Defendants"), Kim Kardashian, Floyd Mayweather, Jr., Paul Pierce, Russell Davis, and Antonio Brown (the "Promoter Defendants" and, together with the Executive Defendants, the "Defendants")"). I also show two promotions made by David Grutman / Club LIV as "Other Promotions." These are both mentioned in the Third Amended Complaint, although David Grutman is not a Defendant in this matter.

**Figure 3: Promotional Activity Timeline During the Class Period[120]**



Source: BitGet, Third Amended Complaint.

Note: Promotions falling on the same date are spaced slightly apart to allow all promotions to be visible. The EMAX price shown is the average of the opening and closing price for that day.

66.     In the four days leading up to Ms. Kardashian's first post on May 30, 2021, other Defendants published three Twitter posts, two Instagram posts, and two press releases.[121] Moreover, two other promotional activities happened on the same day as Ms. Kardashian's first Instagram post on May 30. First, Defendant Pierce posted a tweet promoting EMAX.[122] Second, one of Club LIV's owners, David Grutman,[123] posted a promotion on his social media account.[124]

---

[120] *See* my Back-up Materials.

[121] *See* Appendix C.

[122] Third Amended Complaint at ¶ 82.

[123] Mr. Grutman is not one of the named Defendants in this matter.

[124] Third Amended Complaint at ¶ 137.

67.    Plaintiffs make no effort to disentangle the separate impact of these three

May 30 events on the increase in trading volume. In particular, both Mr. Grutman's and Ms.

Kardashian's posts promoted Club LIV. Club LIV's regular clients may have followed non-

Defendant Mr. Grutman's Instagram account and purchased EMAX tokens after learning

from Grutman's post that the club would soon accept them as a means of payment.

68.    Furthermore, the list of events described in the Third Amended Complaint

is unlikely to be comprehensive. It likely does not capture all the promotion and 'buzz'

surrounding EMAX during this period.[125] To establish the presence of other factors that may

have affected the price and volume during this period, I identified six EMAX promotional

activities during the relevant period that are not mentioned in the Complaint, which I have

listed in Appendix F. I expect that they are not exhaustive. Plaintiffs do not provide any

methodology for disentangling the impact of the promotions alleged in the Complaint from

such additional promotions.

69.    To further demonstrate why it cannot be presumed that Ms. Kardashian's

posts increased interest in the EMAX token, let alone induced individuals to purchase it or

led to a price increase, I show that interest in EMAX appears to have peaked *before* her first

post. To do this, I use Google Trends data to represent the relative popularity of the search

terms "EMAX"[126] and "Ethereum Max," and "EthereumMax." Google Trends measures are

relevant to economic and political realities in the U.S.[127] I have used Google Trends measures

---

[125] *See e.g.,* Business Insider, "$eMax Is the #1 Trending Crypto Across All Exchanges Worldwide," May 28, 2021, accessed on April 11, 2025, https://markets.businessinsider.com/news/stocks/emax-is-the-1-trending-crypto-across-all-exchanges-worldwide-1030476168; *See also* Figure 3.

[126] Google searches are case-insensitive, so the "EMAX" search will also cover searches for "emax" and "eMax" *etcetera. See,* Google, "Enabling case-sensitive searches," [No date], accessed April 16, 2025, https://developers.google.com/code-search/user/case-sensitive-search, ("By default, searches are case-insensitive.").

[127] Choi, Hyunyoung and Hal Varian, "Predicting the present with Google Trends," Economic record, 2012, 88, 2–9.; Stephens-Davidowitz, Seth, "The cost of racial animus on a black candidate: Evidence using Google search data," Journal of Public Economics, (2014), 118, 26–40.; Chae, David H, Sean Clouston, Mark L

in my own research.[128] Figure 4 shows that these three terms experienced a marked increase in popularity *before* Ms. Kardashian posted any promotion of this cryptocurrency, and in fact experienced a steep *drop off* in popularity after her first promotion.[129]

**Figure 4: Google Search Trends for different EMAX search terms over time[130]**



Source: Google. n.d. Google Trends. Accessed April 16, 2025. https://trends.google.com.

Note: Data with a relative index of <1 is normalized to 1. Data values of 0 mean insufficient data was available. A value of 100 is the peak popularity for the term. A value of 50 means that term is half as popular.

---

Hatzenbuehler, Michael R Kramer, Hannah LF Cooper, Sacoby M Wilson, Seth I Stephens-Davidowitz, Robert S Gold, and Bruce G Link, "Association between an internet-based measure of area racism and black mortality," PloS one, 2015, 10 (4), e0122963.

[128] Ewens, Michael, Arpit Gupta, and Sabrina T. Howell. "Local Journalism under Private Equity Ownership." *Available at SSRN 3939405* (2023).

[129] I am aware that Google Trends data are calculated using a random sample of searches and hence are not static over time. *See* Cebrián, Eduardo, and Josep Domenech, "Addressing Google Trends Inconsistencies," *Technological Forecasting and Social Change* 202 (2024): 123318 at p. 1 ("To compute the popularity, Google does not consider the whole set of searches received in a given time period, but a sample with unknown characteristics. Due to the sampling error, the reports are not completely consistent, as the same query can produce different time series which change from day to day.") Cebrián and Domenech suggest that "[t]o alleviate the sampling error, a usual solution is to extract data from [Google Trends] a certain number of times" (at p. 1). I have pulled data for these search terms over several days. The Google Trends patterns appear to be stable. Specifically, the peak search interest for EMAX-related terms consistently occur before Ms. Kardashian's first Instagram Story.

[130] *See* my Back-up Materials.

### 3.    The EMAX price movements following Ms. Kardashian's two posts contradict a 'price premium' theory

70.    Plaintiffs allege—without any evidence—that Ms. Kardashian's first post on May 30 "generated [] $75.5 million in EMAX token trading volume,"[131] and assume that this resulted in a price premium. As explained earlier, Plaintiffs would need to assess the EMAX price in the counterfactual world without Ms. Kardashian's posts in order to estimate a price premium. This would involve calculating how the price of EMAX responds to the 'news' of Ms. Kardashian's posts and addressing confounding factors such as overall market sentiment and other news about EMAX.

71.    From my review of Plaintiffs' materials, including the expert declarations submitted with their class certification motion, they have not done this analysis. They take no stance on how news affects the EMAX price. They offer no analysis establishing the price impact of Ms. Kardashian's posts or even propose a methodology for doing so. Finally, they make no claims as to the duration of the alleged price premium.

72.    If Ms. Kardashian's posts indeed caused a price premium for EMAX, I expect that the price of EMAX would increase after her posts.[132] However, there was no consistent increase in the EMAX price around the time of Ms. Kardashian's posts and the price movements do not align with a theory in which Ms. Kardashian's two Instagram posts create a price premium.

73.    Specifically, after Ms. Kardashian's second post, the price declined by about 14% within one day, and by about 48% over the following four days. Therefore, either this post did not increase the price, or there are so many other factors affecting the price that the net effect was significantly negative. In the latter case, if these other factors happened

---

[131] Third Amended Complaint at ¶ 138.

[132] Of course, this would not be *sufficient* for establishing that Ms. Kardashian's *caused* the price premium, since there may have been other confounding factors such as promotions by other defendants.

roughly simultaneously with Ms. Kardashian's post, it would be difficult to separate their effect from any effect of her post. Plaintiffs do not provide any explanation for why the price would fall or a way to disentangle the alleged price premium of the post from other factors that might explain the overall price decline.

### D. EMAX's characteristics imply that price impacts from news cannot be presumed

74.    Evaluating whether Ms. Kardashian's posts caused a price premium requires analyzing how prices are set in the EMAX market. EMAX lacks fundamental value and market efficiency. In such an environment, it is difficult to predict price changes in response to news, especially in response to a single event. In the following sections, I explain the connection between fundamental value, market efficiency, and interpreting news.

### 1.    EMAX does not have any fundamental value

75.    In financial economics, prices can normally be tied to news through the theory of fundamental value. The fundamental value of an asset is the present value of the expected cash flows it generates.[133] One reason it is necessary to conduct a rigorous analysis establishing the alleged price premium in response to the news of Ms. Kardashian's posts is that EMAX has no fundamental value. EMAX was at certain times purported to have some consumptive value and some buyers may have purchased for this reason.[134] However, since EMAX tokens were never claims on future cash flows or monetizable benefits, my assessment is that they do not have, and never had, any fundamental value.

76.    The lack of fundamental value means that the trading price of a token such as EMAX is determined on a speculative basis. Since there is no inherent value in holding the token, trading it is only profitable to the extent someone else in the future will be willing to

---

[133] *See, e.g.*, Cochrane, John H., *Asset Pricing (Revised Edition)* (Princeton University Press, 2005), pp. 4-5.

[134] Third Amended Complaint at ¶ 30.

buy it at a higher price than the price at which it was purchased. This speculative price

determination is sometimes referred to as the "greater fool theory,"[135] where the trader buys

the asset in the hope that in the future a "greater fool" will buy at a higher price.[136] Prices

determined in this fashion are not anchored to any ground truth.[137] In sum, the traditional

drivers of price fluctuations in financial economics—which rely on the assumption that news

updates investor beliefs about fundamental value—do not apply to EMAX.

      2.    <u>Plaintiffs do not establish that the market for EMAX is efficient and
hence that the price accurately reflects news</u>

77.    A second important concept is 'market efficiency,' which measures

whether the price of an asset quickly adjusts to incorporate all relevant information.[138] In

relatively efficient markets such as those for publicly traded stocks, relevant news is typically

incorporated into the price within minutes.[139]

78.    Markets—even those for publicly traded stocks—are not automatically

efficient, because there are frictions that prevent arbitrageurs from trading away new

---

[135] *See, e.g.,* Blundell-Wignall, Adrian, "The Bitcoin question. Currency versus trust-less transfer technology," *OECD Working Papers on Finance, Insurance and Private Pensions*, 37, (2014), p. 9.

[136] *See, e.g.,* Malkiel, Burton G., *A Random Walk Down Wall Street* (*13th Edition*), (W. W. Norton & Company, 2024), pp. 42. The origins of this theory reach back to George Maynard Keynes, who likened this dynamic to a problem where traders, instead of trying to assess the objective value of an asset, focus on attempting to guess what the typical trader may think about the value of the asset, and buy or sell accordingly. *See* Keynes, George M., *The General Theory of Employment, Interest and Money*, (New York: Harcourt Brace and Co., 1936), Chapter 12. Additionally *see*, Brunnermeier, Markus K., and Stefan Nagel, "Hedge funds and the technology bubble," *The Journal of Finance* 59, no. 5 (2004): 2013-2040. at p. 2014 ("investors might find it optimal to ride bubbles for a while before attacking them.").

[137] Pan, Li, Ya Tang, and Jianguo Xu, "Speculative trading and stock returns," *Review of Finance* 20, no. 5 (2016): 1835-1865; Cochrane, John H., *Asset Pricing* (*Revised Edition*) (Princeton University Press, 2005), at pp. 403–404; Brunnermeier, Markus K., Martin Oehmke, "Chapter 18 - Bubbles, Financial Crises, and Systemic Risk," George M. Constantinides, Milton Harris, Rene M. Stulz, (Eds.) *Handbook of the Economics of Finance*, Elsevier, (2013), pp. 1221–1288.

[138] Bodie, Zvi, Alex Kane, Alan J. Marcus, *Investments* (*9th Edition*) (McGraw Hill, 2014), p. 235 ("The notion that stocks already reflect all available information is referred to as the **efficient market hypothesis** [] The hypothesis that prices of securities fully reflect available information about securities."); Fama, Eugene, "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2, (1970): 383–417 at p. 383 ("A market in which prices always 'fully reflect' available information is called 'efficient.'").

[139] *See, e.g.,* Busse, Jeffrey A., and T. Clifton Green, "Market Efficiency in Real Time," *Journal of Financial Economics* 65, no. 3, (2002): 415-437.

discrepancies between the value and price.[140] For example, there can be constraints on attention, trading, or funding.[141] Therefore, it cannot be assumed that a market is efficient and incorporates news. Instead, it is necessary to empirically test for efficiency using the particular asset during the relevant period. Furthermore, it is necessary to establish what constitutes 'good' vs. 'bad' news for value and to ensure that the market responds in the appropriate direction. Economic modelling tools can be used to determine whether alleged wrongful acts or statements have price impacts.

79.     Plaintiffs allege that Ms. Kardashian's posts caused a price premium for EMAX.[142] An implicit assumption underpinning this allegation is that the market for EMAX was efficient, and so the price of EMAX adjusted upwards to the 'news' of the posts. However, Plaintiffs offer no evidence that the market for EMAX was efficient during the relevant period. There are several features of the EMAX token and market (discussed above) which suggest that the market was unlikely to satisfy efficiency conditions in the relevant period. Specifically, the price of EMAX was highly volatile,[143] the markets for trading EMAX had limited liquidity,[144] and the token did not have any fundamental value.

80.     In sum, in the absence of fundamental value or efficiency, it is not evident what types of news should increase or decrease EMAX's price; and without further analysis, one cannot ascribe price changes to a single event, especially if the relevant buy, hold, or sell

---

[140] Market participants systematically taking advantage of mispricing or price discrepancies are known as arbitrageurs. Academic literature acknowledges the role of arbitrage in keeping markets efficient. *See* Shleifer, Andrei, and Robert Vishny, "The Limits of Arbitrage," *The Journal of Finance* 52, no. 1, (1997): 35–55; See, e.g., Lamont, Owen and Richard Thaler, "Anomalies: The Law of One Price in Financial Markets," *Journal of Economic Perspectives* 17, no. 4, (2003): 191–202 at pp. 195–196.

[141] *See, e.g.*, Mitchell, Mark and Todd Pulvino, "Arbitrage Crashes and the Speed of Capital," *Journal of Financial Economics* 104, no. 3, (2012): 469–490; D'Avolio, Gene, "The Market for Borrowing Stock," *Journal of Financial Economics* 66, no. 2–3, (2002): 271–306; Hirshleifer, David, Sonya Lim, and Siew Hong Teoh, "Driven to Distraction: Extraneous Events and Under-reaction to Earnings News," *The Journal of Finance* 64, no. 5, (2009): 2289–2325.

[142] Third Amended Complaint at ¶ 395.

[143] I discussed in detail in Section III.C.2.

[144] I discussed in detail in Section III.C.2.

activities are far removed from the event (e.g., more than a day). Professor Clark does not purport to do such an analysis or describe how it could be done.

### E.    Survey responses solicited by Professor Dimofte undermine Plaintiffs' theory

81.     Plaintiffs put forward a survey conducted by Professor Claudiu V. Dimofte, aimed at determining "whether the alleged behavior of Plaintiffs has produced consumer behavior in the marketplace that negatively impacted the welfare of cryptocurrency buyers," including "assessing any impact that public figure endorsements of tokens on social media may have on consumer decisions to buy, hold, and/or sell these tokens, as well as on their willingness to pay for them."[145]

82.     I understand that Professor Hiscox has submitted a declaration documenting fundamental flaws in the design and implementation of Professor Dimofte's survey. However, supposing that Professor Dimofte's results were reliable, they contradict Plaintiffs' claims that damages can be assessed on a class-wide basis. This is because there is striking heterogeneity in the responses to many of his survey questions. First, the responses indicate that proposed class members likely have divergent views about what constitutes 'good' and 'bad' news for cryptocurrencies like EMAX. Second, the responses suggest that a significant share of proposed class members' trading activity would not have been influenced by Ms. Kardashian's posts.

#### 1.    Plaintiffs' survey responses indicate wide variation in what constitutes 'good' and 'bad' news about EMAX

83.     Plaintiffs claim that "promotions and celebrity endorsements were able to artificially increase the interest in and price of the EMAX Tokens during the Relevant Period."[146]  For this theory to hold, class members must generally view the promotions and

---

[145] Dimofte Report at p. 4.

[146] Third Amended Complaint at ¶ 4.

celebrity endorsements in similar ways. That is, a class-wide damages model would depend on the assumption that proposed class members assessed information and acted on that information in a reasonably uniform manner. Professor Dimofte's survey responses suggest that this assumption does not hold.

84.     First, Professor Dimofte's survey asks respondents whether information that "the key person in securing [a celebrity's] endorsement [of a cryptocurrency] was someone who previously pled guilty to conspiracy to commit wire fraud in connection with a bribery scheme" would "influence [their] decision to consider/trade that cryptocurrency?"[147] Professor Dimofte highlights that the average survey response suggests that this information would have "a negative impact on respondent decision to consider" the cryptocurrency.[148] However, his results show that this "negative impact" is not uniform—in fact, 38.2 percent of survey respondents reported that this information would make them at least *somewhat more likely to consider/trade* the cryptocurrency.[149]

---

[147] Dimofte Report at p. 57.

[148] Dimofte Report at ¶ 79.

[149] Dimofte Report at p. 67. This number is the sum of the percentages for "Would make me somewhat more likely to consider it" (13.6 percent), "Would make me more likely to consider it" (13.6 percent) and "Would make me much more likely to consider it" (11 percent) responses. These survey responses are consistent with the view that EMAX is a tool for monetizing attention, as meme coins have been described, then one might reasonably expect the price to go up in response to negative news about, say, the project's developer, since of course attention arises at least as much in response to bad news as good news.

**Figure 5: Impact of "conspiracy to commit wire fraud" on purchase decision**[150]



Source: Dimofte Report.

Note: Full question text: "If you learned that a public figure was secretly paid to endorse a specific cryptocurrency and the key person in securing that endorsement was someone who previously pled guilty to conspiracy to commit wire fraud in connection with a bribery scheme, how would this knowledge influence your decision to consider/trade that cryptocurrency?" The numbers above each bar show the frequency and percentage of each response. I omit the "Do not know / No opinion" responses for presentation purposes.

85.    Second, Professor Dimofte's survey asks respondents: "If you learned that the public figure was paid to endorse a specific cryptocurrency but they hid that fact from their followers, how would this knowledge influence your decision to purchase it?"[151] Dimofte reports that on average this information would have "a relatively mild negative effect on

[150] *See* my Back-up Materials.

[151] Dimofte Report at p. 64.

[respondents] likelihood to buy that cryptocurrency."[152] However, again this is far from a uniform view—36.8 percent of respondents said that this information would make them at least *somewhat more likely to buy* the endorsed cryptocurrency.[153]

**Figure 6: Impact of "hidden influencer payment" on purchase decision[154]**



Source: Dimofte Report

Note: Full question text: "If you learned that the public figure was paid to endorse a specific cryptocurrency but they hid that fact from their followers, how would this knowledge influence your decision to purchase it?" The numbers above each bar show the frequency and percentage of each response. I omit the "Do not know / No opinion" responses for presentation purposes.

---

[152] Dimofte Report at ¶ 75.

[153] Dimofte Report at p. 64. This number is the sum of the percentages for "Would make me somewhat more likely to buy" (9.6 percent), "Would make me more likely to buy" (15.6 percent) and "Would make me much more likely to buy" (11.6 percent) responses.

[154] *See* my Back-up Materials.

86.     Third, the survey asks respondents to "assume that [they] purchased a cryptocurrency that was advertised as being the exclusive payment method accepted at specific venues and events [] only to later find out that was not the case (i.e., those venues and events did not in fact accept that token as payment)."[155] They were then asked whether they "would [] have still purchased the cryptocurrency if [they] knew those [exclusive payment method] claims were false?"[156] Professor Dimofte reports that "false exclusive acceptance claims" would have "a very mild negative effect on their decision to have purchased that cryptocurrency" which is not statistically significant at conventional levels.[157] The effect is mild because of the heterogeneity in responses, with 45.8 percent of respondents reporting that they at least *possibly would have still purchased* the cryptocurrency.[158]

---

[155] Dimofte Report at p. 64.

[156] Dimofte Report at p. 64.

[157] Dimofte Report at ¶ 76. Professor Dimofte's one-sided t-test has a p-value of 0.08. Most economist and statisticians use 0.05 as the conventional upper bound on a *p*-value to establish statistical significance.

[158] Dimofte Report at p. 64. This number is the sum of the percentages for "Possibly would have still purchased" (18.2 percent), "Probably would have still purchased" (15.0 percent) and "Definitely would have still purchased" (12.6 percent) responses.

**Figure 7: Impact of "false exclusive payment method claim" on purchase decision[159]**



Source: Dimofte Report.

Note: Full question text: "Assume that you purchased a cryptocurrency that was advertised as being the exclusive payment method accepted at specific venues and events (e.g., clubs, sporting events, etc.), only to later find out that was not the case (i.e., those venues and events did not in fact accept that coin as payment). To what extent would you have still purchased the cryptocurrency if you knew those claims were false?" The numbers above each bar show the frequency and percentage of each response. I omit the "Do not know / No opinion" responses for presentation purposes.

87.    In line with my own opinions discussed above about the features of meme coin markets, these examples from Plaintiffs' own survey demonstrate that members of the proposed class likely differ widely in their assessment of new information about EMAX. If market participants have widely varying perceptions about what is 'good' versus 'bad' news for EMAX, we cannot say how the price should respond to a given piece of news, and thus

---

[159] *See* my Back-up Materials.

have no clear way to use news about EMAX to construct a common methodology with which to establish class-wide damages.

> 2.    Plaintiffs' survey responses suggest that Ms. Kardashian's posts would have had no impact on many proposed class members to purchase EMAX

88.    The Complaint alleges that proposed class members were induced by Ms. Kardashian's posts to purchase EMAX.[160] Professor Dimofte's survey results suggest that a significant share of the proposed class would not have been affected by Ms. Kardashian's posts. Professor Dimofte's survey asks respondents whether an endorsement of a cryptocurrency by Ms. Kardashian would impact their willingness to purchase that cryptocurrency.[161] His survey results, presented in Figure 8 below, show that 10 percent of individuals would find Ms. Kardashian's endorsement "Extremely unimportant" for their willingness to purchase, 12.4 percent would find it "Unimportant" or "Somewhat unimportant," and a further 12.4 percent would find it "Neither important nor unimportant."[162] These individuals would therefore not have been "induced" to purchase EMAX as a result of Ms. Kardashian's promotion. Plaintiffs' proposed damages methodology offers no means to identify and exclude from the class this 34.8 percent[163] of individuals.

---

[160] *See* Table 2.

[161] Dimofte Report at ¶ 49.

[162] Dimofte Report at p. 59. The survey also asks about the impact of Ms. Kardashian's endorsement on individuals' willingness to hold cryptocurrencies. For this question, 13.4 percent of respondents reported that the endorsement would be "Extremely unimportant," "Unimportant," or "Somewhat Unimportant."

[163] 34.8 percent = 10 + 6.2 + 6.2 + 12.4 percent, i.e., the sum of the "Extremely unimportant," "Unimportant," "Somewhat unimportant," and "Neither important nor unimportant" responses.

**Figure 8: Impact of Ms. Kardashian's endorsement on willingness to purchase a cryptocurrency[164]**



Source: Dimofte Report.

Note: Full question text: "In short, how would you assess the impact of a Kim Kardashian endorsement on your willingness to buy a new cryptocurrency?" The numbers above each bar show the frequency and percentage of each responses. I omit the "Do not know / No opinion" responses for presentation purposes.

89.     Similarly, Plaintiffs allege that Ms. Kardashian's suggestion that EMAX tokens could be used at Club LIV harmed some proposed class members.[165] Plaintiffs claim that some class members purchased EMAX because of this allegedly misleading post and were thereby harmed. However, as I showed in Figure 7, a large share of respondents would

---

[164] *See* my Back-up Materials.

[165] *See e.g.,* Third Amended Complaint at ¶ 388.

still have possibly purchased a cryptocurrency even after learning that "exclusive payment method claims" were false.[166] If these proposed class members would have purchased EMAX despite knowing that any "exclusive payment method" claims were false, then they cannot have been harmed by Ms. Kardashian's alleged misrepresentation about Club LIV's acceptance of EMAX.

---

[166] Dimofte Report at p. 64.

# Appendix A

# SABRINA T. HOWELL

Professor
Finance Department
New York University Stern School of Business

Website: www.sabrina-howell.com
Email: sabrina.howell@nyu.edu
Phone: (212) 998-0719

## ACADEMIC POSITIONS & AFFILIATIONS

Full Professor, NYU Stern (2024-)
Associate Professor, NYU Stern (with tenure) (2022-2024)
Assistant Professor, NYU Stern (2015-2022)

Research Associate, NBER (2022-)
ABFER Fellow (2022-)
Faculty Research Fellow, NBER (2017-2022)
IPC PERC Research Fellow (2021-)

Associate Editor, *Review of Financial Studies* (2022-25)
Associate Editor, *Review of Corporate Finance Studies* (2022-25)
Associate Editor, *Management Science* (2020-22)

## EDUCATION

PhD, Harvard University, 2015
    Economics Track, Political Economy & Government Program
    Advisors: Professors Josh Lerner (Chair), David S. Scharfstein, Raj Chetty, and Joseph E. Aldy

BA, Yale University, 2008
    Majors: Economics, East Asian Studies
    *Summa cum laude,* Phi Beta Kappa Junior Year (top 1% of class)

## RESEARCH INTERESTS

Entrepreneurial finance, Innovation, Private Equity, Fintech, Energy, China

## PEER-REVIEWED PUBLICATIONS

Greenwald, Daniel L., Sabrina T. Howell, Cangyuan Li, and Emmanuel Yimfor. 2024. "Regulatory Arbitrage or Random Errors? Implications of Race Prediction Algorithms in Fair Lending Analysis." *The Journal of Financial Economics* 157.

Howell, Sabrina T., Theresa Kuchler, David Snitkof, Johannes Stroebel, and Jun Wong. 2024. "Lender Automation and Racial Disparities in Credit Access." *The Journal of Finance* 79(2).

Gupta, Atul, Sabrina T. Howell, Constantine Yannelis and Abhinav Gupta. 2024. "Does Private Equity Investment in Healthcare Benefit Patients? Evidence from Nursing Homes." *The Review of Financial Studies* 37(4). Lead Article & Editor's Choice.
    Best Paper Prize in Health and Finance, 2021 Midwest Finance Association

Babina, Tania, Alex He, Sabrina T. Howell, Elizabeth Perlman, and Joseph Staudt. 2023. "The Color of Money: Federal vs. Industry Funding of University Research." *The Quarterly Journal of Economics*, 895-954.
    Yuki Arai Faculty Award for Best Paper in Finance 2020

Denes, Matthew, Sabrina T. Howell, Filippo Mezzanotti, Xinxin Wang, and Ting Xu. 2023. "Investor Tax Credits and Entrepreneurship: Evidence from U.S. States." *The Journal of Finance* 78(5).

Howell, Sabrina T. and J. David Brown. 2023. "Do Cash Windfalls Affect Wages? Evidence from R&D Grants to Small Firms." *The Review of Financial Studies* 36(5).

Gornall, Will, Oleg Gredil, Sabrina T. Howell, Xing Liu, and Jason Sockin. 2024. "Do Employees Cheer for Private Equity? The Heterogeneous Effects of Buyouts on Job Quality." *Management Science* (online pre-print: https://doi.org/10.1287/mnsc.2022.00951).

Babina, Tania and Sabrina T. Howell. 2024. "Entrepreneurial Spillovers from Corporate R&D." *The Journal of Labor Economics* 42 (2).
    Yuki Arai Faculty Award Honorable Mention for Best Paper in Finance 2018

Howell, Sabrina T. and Ramana Nanda. 2023. "Networking Frictions in Venture Capital, and the Gender Gap in Entrepreneurship." *Journal of Financial and Quantitative Analysis* 1-29.
    Best Paper Prize, 2020 Midwest Finance Association

Howell, Sabrina T. 2021. "Learning from Feedback: Evidence from New Ventures." *Review of Finance* 25. Lead Article & Editor's Choice.

Howell, Sabrina T., Marina Niessner, and David Yermack. 2020. "Initial Coin Offerings: Financing Growth with Cryptocurrency Token Sales." *The Review of Financial Studies* 33(9). Lead Article & Editor's Choice.

Eaton, Charlie, Sabrina T. Howell, and Constantine Yannelis. 2020. "When Investor Incentives and Customer Interests Diverge: Private Equity in Higher Education."
*The Review of Financial Studies* 33(9).
    Best Paper Prize at the 2018 UNC Private Equity Research Council Annual Symposium.

Cong, Lin William and Sabrina T. Howell, 2021. "IPO Intervention and Innovation: Evidence from China." *Management Science* 67(11).
    Management Science Best Paper Prize in Finance (among all papers published 2020-2022).

Howell, Sabrina T. 2020. "Reducing Information Frictions in Venture Capital: The Role of New Venture Competitions." *The Journal of Financial Economics* 136(3).

Howell, Sabrina T. 2020. "Firm Type Variation in the Cost of Risk Management." *Journal of Corporate Finance* 64.

Howell, Sabrina T. 2018. "Joint Ventures and Technology Adoption: A Chinese Industrial Policy that Backfired." *Research Policy* 47(8).

Howell, Sabrina T. 2017. "Financing Innovation: Evidence from R&D Grants." *The American Economic Review* 107(4).

Minsk, Ronald E., Sam P. Ori, and Sabrina Howell. 2009. "Plugging Cars into the Grid: Why the Government Should Make a Choice." *Energy Law Journal* 30(2).

**WORKING PAPERS**

Howell, Sabrina T., John Van Reenen, and Jun Wong. 2024. "**Open**ing up Military Innovation: Causal Effects of 'Bottom-Up' Reforms to U.S. Defense Research." Revise & Resubmit at the *Journal of Political Economy*.

   Best Empirical Finance Paper at the WFA 2021.

Howell, Sabrina T., Yeejin Jang, Hyeik Kim, and Michael Weisbach. 2023. "All Clear for Takeoff: Evidence from Airports on the Effects of Infrastructure Privatization." R&R at *The Review of Financial Studies*.

Ewens, Michael, Arpit Gupta, and Sabrina T. Howell. 2023. "Local Journalism Under Private Equity Ownership." R&R at *The Review of Financial Studies*.

Collier, Benjamin, Sabrina T. Howell, and Lea Rendell. 2024. "After the Storm: How Emergency Liquidity Helps Small Businesses Following Natural Disasters."

Bhardwaj, Abhishek, Abhinav Gupta, and Sabrina T. Howell. 2024 "Leveraged Payouts: How Using New Debt to Pay Returns in Private Equity Affects Firms, Employees, Creditors, and Investors."

**NON-PEER REVIEWED PUBLICATIONS**

Howell, Sabrina T. 2024. Government Intervention in Innovation. *Annual Review of Financial Economics*.

Howell, Sabrina T., Liu, T. 2023. Private Equity in Healthcare. In: Cumming, D., Hammer, B. (eds) The Palgrave Encyclopedia of Private Equity. Palgrave Macmillan, Cham.

Howell, Sabrina T., Arpit Gupta. 2023. The role of private equity in the U.S. economy, and whether and how favorable tax policies for the sector need to be reformed. The Washington Center for Equitable Growth.

Howell, Sabrina T. 2022. "Mechanisms and Impacts of Innovation Policy." NBER Reporter, No. 4, December.

Howell, Sabrina T., Ramana Nanda, Josh Lerner, and Rick Townsend. 2020. "How Resilient is Venture-Backed Innovation? Evidence from Four Decades of US Patenting."

Howell, Sabrina T. 2021. "Testimony before the House Ways & Means Committee: "Examining Private Equity's Expanded Role in the U.S. Health Care System." March 25.

Howell, Sabrina. 2014. "Financing Innovation in the Private Sector: The Small Business Innovation Research Program." Case in Tsinghua-Harvard Workshop on Market Mechanisms to Achieve a Low-Carbon Future for China Casebook, p. 30.

Howell, Sabrina, Lee, Henry, and Heal, Adam. 2014. "Leapfrogging or Stalling Out? Electric Vehicles in China." Discussion Paper, Belfer Center for Science and International Affairs, Harvard Kennedy School.

Howell, Sabrina. 2013. "Pathways for Reducing Oil Consumption in the U.S." Carbon War Room & Fuel Freedom Foundation Research Report.

Howell, Sabrina. 2009. "Jia You! (Add Oil!): Chinese Energy Security Strategy." In Luft, Gal
and Anne Korin, eds. *Energy Security Challenges for the 21 Century*. California: Praeger
Publishing.

**CASES**

Kluender, Raymond, Emanuele Colonnelli, Sabrina Howell, and Karina Souza. "Mercado Bitcoin:
M&A, IPO, or Series B?" Harvard Business School Case 825-047, September 2024.

Kluender, Raymond, Emanuele Colonnelli, Sabrina Howell, and Karina Souza. "Mercado Bitcoin:
To Acquire or Be Acquired?" Harvard Business School Case 825-077, September 2024.

Kluender, Raymond, Emanuele Colonnelli, Sabrina Howell, and Karina Souza. "Teaching note for
Mercado Bitcoin." Harvard Business School Case 825-047, September 2024.

Bernstein, Shai, Josh Lerner, and Sabrina Howell. "The Israeli Innovation Authority: Decision-
making in a Time of Uncertainty." Harvard Business School Case 824-715, April 2024.

Bernstein, Shai, Josh Lerner, and Sabrina Howell. "Teaching Note for The Israeli Innovation
Authority." Harvard Business School Case 824-715, April 2024.

Kerr, Bill, Sabrina Howell, and James Palano. "Spok'n." In progress.

**TEACHING**

| 2024 | Entrepreneurial Finance (Fintech MS and EMBA) |
| 2017-23 | Applications in Entrepreneurial Finance: Fintech, NYU Stern (new course)<br>  2023 Poets & Quants Best 40-Under-40 MBA Professor |
| 2016 | Topics in Entrepreneurial Finance, NYU Stern (created all course materials) |
| 2013 | Energy Industry Economics & Policy Sophomore Tutorial, Harvard University<br>Economics Department (created course, solo teaching) |
| 2012-13 | Energy Policy Analysis, Harvard Kennedy School – doctoral-level course of the Harvard<br>Graduate Consortium on Energy and the Environment (teaching fellow for Professor<br>Joseph E. Aldy) |
| 2008 | Sustainability Economics, Hong Kong University and Zhejiang University. Harvard<br>Graduate School of Education Crimson Fellow |

**NON-ACADEMIC EMPLOYMENT**

| 2021- | U.S. Census Bureau Schedule A Employee |
| 2019- | U.S. Air Force, Special Government Employee (unpaid) |
| 2013-14 | U.S. Department of Energy, Intern in the Office of Strategic Programs in the Office of<br>Energy Efficiency and Renewable Energy (unpaid) |
| 2012 | Georgetown Economics Department, Research Assistant to Arik Levinson |
| 2011 | Harvard Center for the Environment, Research Assistant to Joseph E. Aldy |

| 2011 | National Economic Council, White House Intern for Nathaniel Keohane, the Special Assistant to the President for Energy and the Environment |
| 2009-10 | Securing America's Future Energy (SAFE), Senior Policy Analyst |
| 2008-09 | Charles River Associates, Analyst |
| 2007 | Hess Corporation, Summer Analyst |
| 2005-06 | Yale University Economics Department, Research Assistant to George Hall |

## HONORS, GRANTS, AND FELLOWSHIPS

| 2024 | Alfred P. Sloan Foundation Grant ($375,430 together with Josh Lerner and David Robinson for NBER Place-Based Entrepreneurship Research Program) |
| 2023 | Poets & Quants Best 40-Under-40 MBA Professor |
| 2022 | Alfred P. Sloan Foundation Grant ($50,000)<br>Omidyar Network Grant ($94,000) |
| 2021 | Appointed as Private Equity Research Consortium Research Fellow<br>NYU Stern Yuki Arai Faculty Award for Best Paper in Finance ($10,000) |
| 2020 | *Review of Financial Studies* Referee of the Year ($1,000)<br>AQR Asset Management Institute Young Researcher Award (£10,000)<br>*Review of Finance* Distinguished Referee<br>Kauffman Foundation Research Grant ($100,000) |
| 2019 | NBER Science of Science Funding Grant ($6,000) |
| 2018 | Private Equity Research Consortium Small Grant Program ($10,000)<br>Stern Center for Global Economy and Business Research Grant ($6,000) |
| 2017 | Kauffman Foundation Junior Faculty Research Fellowship ($35,000)<br>Kauffman Foundation Research Grant ($150,000) |
| 2015 | Kauffman Foundation Research Grant ($24,500)<br>Stern Center for Global Economy and Business Research Grant ($7,000)<br>Top Finance Graduate Award 2015 (Copenhagen Business School-AQR) |
| 2014 | Kauffman Best Student Paper Award Session, Roundtable for Engineering Entrepreneurship Research (REER) |
| 2010-13 | National Science Foundation Graduate Research Fellow |
| 2013 | Derek Bok Center for Teaching and Learning Certificate of Distinction in Teaching (reflects very high student ratings) |
| 2011 | Mossavar-Rahmani Center for Business and Government Summer Fellowship |
| 2011-15 | Harvard Environmental Economics Program Pre-Doctoral Fellow |
| 2008 | Emerson Tuttle Cup Winner (most distinguished student in Yale's Davenport College) |

**SERVICE**

Member of the Advisory Board to the American Female Finance Committee of the American Finance Association (2019-2022), and am currently the AFFECT liaison for my department.

Member of the 2019-20 American Finance Association Nominating Committee, chaired by President Kenneth Singleton.

Current or previous Associate Editor at *The Review of Financial Studies*, *Review of Corporate Finance Studies*, and *Management Science*.

Founded and co-organize the Women Assistant Professors of Finance Conference at NYU Stern (WAPFIN@Stern), 2015-2024.

Co-organize the NBER Productivity, Innovation and Entrepreneurship meetings (2018-), and the NBER December Entrepreneurship meeting (2024-).

Co-organized the virtual Junior Entrepreneurial Finance/Innovation Lunch 2020-21.


**PERSONAL INFORMATION**

I am married with two children, born October 2018 and June 2023. I am a U.S. citizen.

# Appendix B

| Case Documents |
|---|
| Corrected Third Amended Class Action Complaint, October 6, 2023 |
| Plaintiff Christopher DeLuca's Amended Objections and Responses to Defendant Kim Kardashian's First Set of Interrogatories, December 18, 2024 |
| Plaintiff Marko Ciklic's Amended Objections and Responses to Defendant Kim Kardashian's First Set of Interrogatories, December 18, 2024 |
| Plaintiff Tunisia Brignol's Amended Objections and Responses to Defendant Kim Kardashian's First Set of Interrogatories, December 18, 2024 |
| Plaintiff Till Freeman's Amended Objections and Responses to Defendant Kim Kardashian's First Set of Interrogatories, December 18, 2024 |
| Plaintiff Michael Buckley's Amended Objections and Responses to Defendant Kim Kardashian's First Set of Interrogatories, December 18, 2024 |
| Plaintiff Milan Puda's Amended Objections and Responses to Defendant Kim Kardashian's First Set of Interrogatories, December 18, 2024 |
| Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, February 11, 2025 |
| Declaration of Jeremy Clark, Ph. D., February 10, 2025 |
| Expert Report of Claudiu V. Dimofte, Ph.D., February 11, 2025 |
| Declaration of Remi Screen, April 21, 2025 |
| Declaration of Miranda Camoozi, April 25, 2025 |
| Declaration of Professor Michael Hiscox, Ph.D., April 28, 2025 |

| Bates Documents |
|---|
| EMXPLS_000001-002 |
| KARD0000010–029 |

| Economic Literature |
|---|
| Allen, Mark A., Robert E. Hall, and Victoria A. Lazear, "Reference guide on estimation of economic damages," National Research Council, Reference Manual on Scientific Evidence (2011) |
| Angrist, Joshua D., and Jörn-Steffen Pischke, "The credibility revolution in empirical economics: How better research design is taking the con out of econometrics," Journal of Economic Perspectives 24, no. 2 (2010) |
| Blundell-Wignall, Adrian, "The Bitcoin question. Currency versus trust-less transfer technology," OECD Working Papers on Finance, Insurance and Private Pensions, 37, (2014) |
| Brunnermeier, Markus K., and Martin Oehmke, "Chapter 18 - Bubbles, Financial Crises, and Systemic Risk," Handbook of the Economics of Finance, 2 B (2013) |
| Brunnermeier, Markus K. and Stefan Nagel, "Hedge funds and the technology bubble," The Journal of Finance 59, no. 5 (2004) |
| Busse, Jeffrey A., and T. Clifton Green, "Market Efficiency in Real Time," Journal of Financial Economics 65, no. 3, (2002) |
| Cebrián, Eduardo, and Josep Domenech, "Addressing Google Trends Inconsistencies," Technological Forecasting and Social Change 202 (2024) |
| Chae, David H, Sean Clouston, Mark L Hatzenbuehler, Michael R Kramer, Hannah LF Cooper, Sacoby M Wilson, Seth I Stephens-Davidowitz, Robert S Gold, and Bruce G Link, "Association between an internet-based measure of area racism and black mortality," PloS one, (2015) |
| Choi, Hyunyoung and Hal Varian, "Predicting the present with Google Trends," Economic record, (2012) |
| Cong, Lin William, Xi Li, Ke Tang, Yang Yang, "Crypto Wash Trading," April 2021, https://cowles.yale.edu/sites/default/files/2022-11/cryptowashtrading040521-crypto-wash-trading.pdf. |
| Constantinides, George M., Milton Harris, Rene M. Stulz, (Eds.) Handbook of the Economics of Finance, Elsevier, (2013) |
| D'Avolio, Gene, "The Market for Borrowing Stock," Journal of Financial Economics 66, no. 2–3, (2002) |
| Ewens, Michael, Arpit Gupta, and Sabrina T. Howell, "Local Journalism under Private Equity Ownership," Available at SSRN 3939405 (2023) |
| Fama, Eugene, "Efficient Capital Markets: A Review of Theory and Empirical Work," The Journal of Finance 25, no. 2, (1970) |

| Economic Literature |
|---|
| Friedhelm, Victor, "Address clustering heuristics for Ethereum," in Revised Selected Papers of the 24th International Financial Cryptography and Data Security Conference, (2020) |
| Hirshleifer, David, Sonya Lim, and Siew Hong Teoh, "Driven to Distraction: Extraneous Events and Under-reaction to Earnings News," The Journal of Finance 64, no. 5, (2009) |
| Howell, Sabrina T., Marina Niessner, and David Yermack, "Initial Coin Offerings: Financing Growth with Cryptocurrency Token Sales," The Review of Financial Studies 33, no. 9, (2020) |
| Lamont, Owen and Richard Thaler, "Anomalies: The Law of One Price in Financial Markets," Journal of Economic Perspectives 17, no. 4, (2003) |
| Li, Tao, Donghwa Shin, Chuyi Sun, and Baolian Wang, "The Dark Side of Decentralized Finance: Evidence from Meme Tokens," Working Paper, (July 12, 2023) |
| Mitchell, Mark and Todd Pulvino, "Arbitrage Crashes and the Speed of Capital," Journal of Financial Economics 104, no. 3, (2012) |
| Pan, Li, Ya Tang, and Jianguo Xu, "Speculative trading and stock returns," Review of Finance 20, no. 5 (2016) |
| Shleifer, Andrei, and Robert Vishny, "The Limits of Arbitrage," The Journal of Finance 52, no. 1, (1997) |
| Stephens-Davidowitz, Seth, "The cost of racial animus on a black candidate: Evidence using Google search data," Journal of Public Economics, (2014) |

| Books |
|---|
| Bodie, Zvi, Alex Kane, Alan J. Marcus, Investments (9th Edition) (McGraw Hill, 2014) |
| Cochrane, John H., Asset Pricing (Revised Edition) (Princeton University Press, 2005) |
| Wooldridge, Jeffrey, Econometrics: A Modern Approach (5th Edition) (South-Western Cengage, 2013) |
| Hull, John C., Options, Futures, and Other Derivatives (11th Edition) (Pearson, 2022) |
| Jordan, Bradford D., Thomas W. Miller, and Steven D. Dolvin, Fundamentals of investments: Valuation and management, (McGraw Hill, 2015) |
| Keynes, George M., The General Theory of Employment, Interest and Money, (New York: Harcourt Brace and Co., 1936) |
| Malkiel, Burton G., A Random Walk Down Wall Street (13th Edition) (W. W. Norton & Company, 2024) |
| Pearl, Judea, Causality: Models, Reasoning, and Inference (2nd Edition) (Cambridge University Press, 2009) |

| Websites |
|---|
| 9gag, "kalstopable," June 7, 2021, https://9gag.com/gag/arMBGj5 |
| Alice Grahns, "What is EthereumMax and why is the price going up?," June 5, 2021, https://www.thesun.co.uk/money/15173830/what-is-ethereummax-why-price-going-up/ |
| Binance, "Popular," https://www.binance.com/en |
| BitGet, "EthereumMax Price History," https://www.bitget.com/price/ethereummax/historical-data. |
| Business Insider, "$eMax Is the #1 Trending Crypto Across All Exchanges Worldwide," May 28, 2021, https://markets.businessinsider.com/news/stocks/emax-is-the-1-trending-crypto-across-all-exchanges-worldwide-1030476168 |
| California Learning Resource Network, "Can someone see who viewed their story on Instagram?," November 13, 2024, https://www.clrn.org/can-someone-see-who-viewed-their-story-on-instagram/ |
| Coinbase, "Crypto prices," https://www.coinbase.com/explore |
| Coingecko, "Bitcoin USD (Historical Data)," https://www.coingecko.com/en/coins/bitcoin/historical_data?start=2021-05-14&end=2021-06-30 |
| Coingecko, "Dogecoin USD (Historical Data)," https://www.coingecko.com/en/coins/dogecoin/historical_data?start=2021-05-14&end=2021-06-30 |
| Coingecko, "Ethereum USD (Historical Data)," https://www.coingecko.com/en/coins/ethereum/historical_data?start=2021-05-14&end=2021-06-30 |
| Coingecko, "EthereumMax USD (Historical Data)," https://www.coingecko.com/en/coins/ethereummax/historical_data?start=2021-05-14&end=2021-06-30 |
| Coingecko, "Shiba Inu USD (Historical Data)," https://www.coingecko.com/en/coins/shiba-inu/historical_data?start=2021-05-14&end=2021-06-30 |
| Coingecko, "Solana USD (Historical Data)," https://www.coingecko.com/en/coins/solana/historical_data?start=2021-05-14&end=2021-06-30 |

| Websites |
| --- |
| Cointelegraph, "What is wrapped Ethereum (wETH) and how does it work," https://cointelegraph.com/news/what-is-wrapped-ethereum-weth-and-how-does-it-work |
| Crypto.com, "What Are Meme Coins And How Do They Work?," August 22, 2024, https://crypto.com/en/university/what-are-meme-coins |
| Dustin Wood, "Let's get Ethereummax listed on Binance&Crypto.com," June 6, 2021, https://www.change.org/p/binance-let-s-get-ethereummax-listed-on-binance-crypto-com |
| EthereumMax, "Disrupt History," Whitepaper, October 2021, https://ethereummax.org/wp-content/uploads/EthereumMax-Whitepaper-v1-Final.pdf |
| Etherscan, "Address ███████," https://etherscan.io/address/███████ |
| Etherscan, "Address ███████," https://etherscan.io/address/███████ |
| Etherscan, "Address ███████," https://etherscan.io/address/███████ |
| Etherscan, "Address ███████," https://etherscan.io/address/███████ |
| Etherscan, "Ethereum Transaction Hash ███████," https://etherscan.io/tx/███████ |
| Etherscan, "Ethereum Transaction Hash ███████," https://etherscan.io/tx/███████ |
| Eva Semel, "Living Vogue Real Estate Adopts eMax and Kishu Inu Crypto for Property Sales & Agent Commissions," June 2, 2021, https://hudsonweekly.com/living-vogue-real-estate-adopts-emax-and-kishu-inu-crypto-for-property-sales-agent-commissions/ |
| Forbes, "EthereumMax," https://www.forbes.com/digital-assets/assets/ethereummax-emax/ |
| Google, "Enabling case-sensitive searches," https://developers.google.com/code-search/user/case-sensitive-search |
| Google. n.d. Google Trends, https://trends.google.com |
| Instagram, "Living Vogue Real Estate," June 3, 2021, https://www.instagram.com/livingvoguerealestate/p/CPrTI-AAFGO/ |
| Instagram, "Stories," https://about.instagram.com/features/stories |
| Merriam-Webster Dictionary, "Meme," https://www.merriam-webster.com/dictionary/meme |
| NewsWire, "Living Vogue Real Estate Adopts eMax and Kishu Inu Crypto for Property Sales & Agent Commissions," June 2, 2021, https://www.newswire.com/news/living-vogue-real-estate-adopts-emax-and-kishu-inu-crypto-for-property-21405271 |
| Reddit, "BILLBOARD IN TIMES SQUARE NYC . Pay attention!! Emax let's go!," June 3, 2021, https://www.reddit.com/r/eMaxCoin/comments/nrpd8c/billboard_in_times_square_nyc_pay_attention_emax/ |
| The Block, Cryptocurrency Monthly Exchange Volume, https://www.theblock.co/data/crypto-markets/spot/cryptocurrency-exchange-volume-monthly |
| The Block, DEX Volume, https://www.theblock.co/data/decentralized-finance/dex-non-custodial/dex-volume-monthly |
| TikTok, "Logicalgrowth," May 23, 2021, https://www.tiktok.com/@logicalgrowth/video/6965618134619311366 |
| Uniswap Help Center, "Why do ETH swaps involve converting to WETH?," https://support.uniswap.org/hc/en-us/articles/16015852009997-Why-do-ETH-swaps-involve-converting-to-WETH |
| U.S. Securities and Exchange Commission, "Staff Statement on Meme Coins," February 27, 2025, https://www.sec.gov/newsroom/speeches-statements/staff-statement-meme-coins |
| X, "EthereumMax," June 26, 2021, https://x.com/ethereum_max/status/1401581211143880706 |
| X, "EthereumMax," June 26, 2021, https://x.com/ethereum_max/status/1408840858317864967 |
| Winston & Strawn, "What Is Wash Trading?," https://www.winston.com/en/legal-glossary/what-is-wash-trading |

Appendix C

### Timeline of Alleged Defendant Promotional Activities Regarding EMAX

| Date | Defendant's Name | Defendant Category | Channel | Event description |
|------|------------------|--------------------|---------|-------------------|
| May 14, 2021 | Maher | Executive Defendant | Facebook post | Defendant Maher posted a promotion and solicitation for EMAX Tokens on the "InRussWeTrust" Facebook page (owned and operated by Promoter Defendant Davis)  Specifically, the following post showed a screenshot of the financial metrics for the EMAX Tokens and displayed a "466,590.48%" increase in the EMAX Tokens price over a 24-hour period. |
| May 15, 2021 | Maher | Executive Defendant | Facebook post | Maher posted on Facebook to ease concerns from EMAX token investors after a sharp price drop |
| May 16, 2021 | Perone | Executive Defendant | Instagram post | The EthereumMax Instagram account (which was ultimately controlled by Perone via his position as CEO of the de facto corporation, and operated by Perone or an agent working on his behalf) posted a promotion titled the "EthereumMax Pre-launch Kickoff" touting that EMAX grew "500,000+% in the first 24 hours," that the team had partnered with a digital marketing agency and lined up a "knockout influencer" for a nationwide campaign, and boasting a ~$100M market cap with "the train… just getting rolling" |
| May 16, 2021 | Davis | Promoter Defendant | Facebook post | Davis reposted a promotion from the EthereumMax official Twitter account to his own personal "InRussWeTrustCrypto" account |
| May 16, 2021 | Speer | Executive Defendant | YouTube video | Speer promoted the EMAX Tokens in a video he posted to his personal YouTube channel, wherein Speer advised retail investors "[h]ow to buy EthereumMax." |
| May 17, 2021 | Maher | Executive Defendant | Facebook post | Maher issued a statement regarding the Prelaunch Kickoff Post from the EMAX team |

| Date | Defendant's Name | Defendant Category | Channel | Event description |
|---|---|---|---|---|
| May 18, 2021 | Davis | Promoter Defendant | Unclear what Social Media Platform | Defendant Davis posted to his followers that it was "Not too late for EMAX and Bezoge! Just the start!" |
| May 19, 2021 | Perone | Executive Defendant | Instagram post | Executive Defendant Perone (or an agent of his) posted a message to investors on the EthereumMax Instagram account |
| May 21, 2021 | Speer | Executive Defendant | YouTube video | Speer uploaded a video to his YouTube channel promoting EthereumMax generally and specifically providing investors with instructions on how to purchase EMAX Tokens |
| May 23, 2021 | Speer | Executive Defendant | YouTube video | Speer uploaded an audio recording from Perone to Speer's YouTube channel, wherein Perone states that EthereumMax's use of "high level" brand ambassadors and promotors "legitimized" the project |
| May 26, 2021 | Pierce | Promoter Defendant | Twitter post | Pierce promoted EthereumMax in a post on the social media platform Twitter during an online dispute between Pierce and the television broadcasting network ESPN |
| May 26, 2021 | Perone | Executive Defendant | Twitter post | EthereumMax's official Twitter page (which, upon information and belief, is controlled by Executive Defendant Perone) issued a tweet stating "Our new token to buy $EMAX is LIVE! This is our updated and ONLY contract address – 0x15874d65e649880c2614e7a480cb7c9A55787FF6." The Tweet also had a lengthy how to buy picture called the "Beginners Guide to Buying EthereumMax." |
| May 26, 2021 | Perone | Executive Defendant | Press Release | EthereumMax issued a press release announcing that it was "now the exclusive CryptoCurrency accepted for online ticket purchasing for the highly anticipated Floyd Mayweather vs. Logan Paul Pay-Per View event, June 6, 2021 in Miami Gardens, Florida" |

| Date | Defendant's Name | Defendant Category | Channel | Event description |
|------|------|------|------|------|
| May 26, 2021[1] | Club LIV | N/A | Instagram post | Promotion from Club LIV, which tags the EthereumMax Instagram page and features the EthereumMax logo and website |
| May 28, 2021 | Pierce | Promoter Defendant | Twitter post | Pierce posted a screenshot of his trading account with 15,858,700,526,204.817 EMAX Tokens valued at "$2,520,087.34," which had increased "83.34% ($1,145,469.23)" on the one-day chart |
| May 28, 2021 | Perone | Executive Defendant | Press Release | EthereumMax released a press release out of Los Angeles entitled: "EthereumMax ($EMAX) Disrupts Miami Ahead of Mayweather vs. Paul Fight as the First Crypto Currency of Major Nightclubs LIV and Story" (the "5/28/21 Press Release") |
| May 29, 2021 | Brown | Promoter | Instagram story | Non-Defendant Antonio Brown promoted EthereumMax in a now-deleted "story" post on his personal Instagram account |
| May 30, 2021 | Pierce | Promoter Defendant | Twitter post | Pierce posted a tweet, promoting Ethereum Max |
| May 30, 2021 | Kardashian | Promoter Defendant | Instagram story | Defendant Kim Kardashian promoted EthereumMax on her social media accounts |
| May 30, 2021 | Grutman | N/A | Instagram post (or story; unclear) | Nightclub promotor and hotelier David Grutman promoted EthereumMax on his social media account |
| June 3, 2021 | Unclear | Executive Defendant | Instagram post | The Executive Defendants posted a statement on the EthereumMax Instagram account, which, upon information and belief, was released in response to Defendant Maher's selling activities |

---

[1] LIV Miami, "Official Afterparty @floydmayweather @headlinerworld @ethereummax @limitlessx 🔴 ," (May 26, 2021), https://www.instagram.com/p/CPWl7Den0lY/?igsh=aGZ5dGtneWl4N3Zx, accessed April 25, 2025. The date of this promotion is not given in the Third Amended Complaint.

| Date | Defendant's Name | Defendant Category | Channel | Event description |
|---|---|---|---|---|
| June 3, 2021 | Davis | Promoter Defendant | Facebook post | Davis posted a message on the "InRussWeTrust" Facebook group |
| June 4, 2021 | Mayweather | Promoter Defendant | Live event | Mayweather promoted EthereumMax. In particular, Mayweather and his entourage wore t-shirts with EthereumMax emblazoned across the chest. |
| June 4, 2021 | Maher | Executive Defendant | Facebook post | Defendant Maher posted Mayweather's interview on the EthereumMax Facebook page |
| June 4, 2021 | Maher | Executive Defendant | Facebook post | Maher also posted the Mayweather's interview on the InRussWeTrust Facebook group |
| June 4, 2021 | Perone | Executive Defendant | Instagram post | Defendant Perone posted Mayweather's interview on the EthereumMax Instagram account |
| June 4, 2021 | Unclear | Executive Defendant | Instagram post | EthereumMax Instagram account posted a video promoting a shopping event at a jewelry story in Miami |
| June 6, 2021 | Mayweather | Promoter Defendant | Live event | Mayweather similarly promoted EthereumMax during his highly viewed exhibition boxing match with internet celebrity-turned-boxer, Logan Paul |
| June 6, 2021 | Davis | Promoter Defendant | Facebook post | Defendant Davis posted a picture in the InRussWeTrust group on Facebook of himself and Mayweather together in Las Vegas earlier in the day, announcing a "long term deal" between EMAX, Mayweather, and Davis' InRussWeTrust cryptocurrency consulting business" |
| June 8, 2021 | Speer | Executive Defendant | YouTube video | Executive Defendant Perone, along with Steve Gentile and Josh James (the lead developer at EthereumMax), uploaded a video of themselves on Executive Defendant Speer's YouTube channel entitled: "Addressing the $EMAX Community – EthereumMax." |
| June 14, 2021 | Kardashian | Promoter Defendant | Instagram story | Kardashian posted a solicitation for EthereumMax on her Instagram account, which has over 250 million followers |
| Unclear [Likely same event as | Maher | Executive Defendant | Facebook post | Maher posted a message to the InRussWeTrust Facebook group |

| Date | Defendant's Name | Defendant Category | Channel | Event description |
|------|------------------|--------------------|---------|--------------------|
| June 6, 2021 post] | | | | |

# Appendix D



Source: EMXPLS_000001–002, KARD0000010–029, BitGet.



Source: EMXPLS_000001–002, KARD0000010–029, BitGet.



Source: EMXPLS_000001–002, KARD0000010–029, BitGet.



Source: EMXPLS_000001–002, KARD0000010–029, BitGet.



Source: EMXPLS_000001–002, KARD0000010–029, BitGet.



Source: EMXPLS_000001–002, KARD0000010–029, BitGet.



Source: EMXPLS_000001–002, KARD0000010–029, BitGet.



Source: EMXPLS_000001–002, KARD0000010–029, BitGet.



Source: EMXPLS_000001–002, KARD0000010–029, BitGet.



Source: EMXPLS_000001–002, KARD0000010–029, BitGet.

Appendix E

**Discrepancies between transactions in the Complaint and the produced data**

1. In Section II.C I described discrepancies between the Complaint and the produced data for four Plaintiffs: Buckley, Brignol, Ciklic, and Freeman. In this Section, I provide more detail on these discrepancies.

2. Some transactions specified in the Complaint do not appear in the Plaintiffs' produced data, which has spreadsheets detailing the Ethereum wallet addresses and EMAX transactions for each Plaintiff.[1] To assess whether some transactions mentioned in the Complaint perhaps occurred but were omitted from the spreadsheet, I gathered the full list of transactions on the Ethereum blockchain associated with all the wallet addresses that were provided in the produced data. I conducted this analysis using Etherscan.[2] Etherscan provides a full list of transactions associated with a particular wallet address.

3. For each of the four Plaintiffs with discrepancies between the Complaint and the produced data,[3] I was able to identify the transactions listed for that Plaintiff in the produced data files by comparing transaction hash values. For each of the purchases claimed in the

---

[1] EMXPLS_000001 and EMXPLS_000002.

[2] Professor Clark notes that Etherscan is an appropriate tool for analyzing Ethereum blockchain data, stating that "The blockchain data [] is also made available through third party sources including the website Etherscan" (at p. 13).

[3] Plaintiff Buckley: Etherscan, "Address ███████████████████████," https://etherscan.io/address/███████████.

Plaintiff Brignol: Etherscan, "Address ███████████████████," https://etherscan.io/address/███████████.

Plaintiff Ciklic: Etherscan, "Address ██████████████████," https://etherscan.io/address/███████████.

Plaintiff Freeman: Etherscan, "Address ████████████████████," https://etherscan.io/address/██████████.

Complaint that do not appear in the produced data (listed in Table 2), I was not able to identify any purchase on the corresponding date for that Plaintiff in Etherscan.[4]

4. The Complaint alleges that Plaintiff Brignol purchased EMAX on June 8, 2021, but the produced data shows only a sale on this date. Etherscan confirms that this transaction was indeed a sale,[5] with tokens being transferred from Plaintiff Brignol's wallet address to the "Uniswap V2: Router 2" address.[6]

5. The Complaint alleges Plaintiff Buckley purchased EMAX on June 18, 2021 (which is listed as an Airdrop in the produced data). This transaction[7] involved a single wallet[8] sending small amounts of EMAX to 180 wallets.[9] This is characteristic of an Airdrop, rather than a purchase.

6. The Complaint alleges Plaintiff Ciklic made purchases on June 6, 2021, but Plaintiff Ciklic's Ethereum wallet[10] address shows no purchases on this date.

---



[4] Etherscan reports dates in UTC. The purchase dates in the Complaint do not have an associated time of day or time zone. Hence, to be conservative, I looked for purchases in Etherscan that occurred up to one day before and one day after the date listed in the Complaint. For example, the Complaint alleges that Ciklic purchased EMAX on June 6, 2021. Since I do not know the time or the time zone for this purchase, I looked for purchases on Etherscan that occurred between June 5, 2021 at 12:00:01AM UTC and June 7, 2021 at 11:59:59PM UTC.

[5] Etherscan, "Ethereum Transaction Hash ████████████████████████," https://etherscan.io/tx/████████████████████████.

[6] ████████.

[7] Etherscan, "Ethereum Transaction Hash ████████████████████████," https://etherscan.io/tx/████████████████████████.

[8] ████████.

[9] Each transfer was about 300 million tokens, which was around $36 dollars at the time.

[10] Etherscan, "Address ████████████████████," https://etherscan.io/address/████████████████.

7.  The Complaint alleges Plaintiff Freeman made purchases May 29, 2021, May 31, 2021, June 4, 2021, and June 8, 2021, but Plaintiff Freeman's Ethereum wallet[11] shows no purchases on these dates.

---

[11] Etherscan, "Address █████████████████████████████," https://etherscan.io/address/████████████████████████████.

Appendix F

**EMAX promotional activities not mentioned in the Complaint**

1. The list of events described in the Third Amended Complaint is unlikely to be comprehensive. I identified a number of EMAX promotional activities during the relevant period that are not mentioned in the Complaint. I expect that this list is not exhaustive.

a) On June 3, 2021, Living Vogue Real Estate, a luxury Florida real estate agency, posted a promotion of EMAX to its 50,000 Instagram followers.[1] In the post, Living Vogue states that it was accepting EMAX for real estate transactions and agent commissions, calling these cryptocurrency technologies "the future of real estate."[2] This promotion was also picked up by news sources, including NewsWire[3] and HudsonWeekly.[4]

b) On June 3, 2021 an ad for EMAX was displayed on a billboard in New York City's Times Square.[5] According to the official EthereumMax Twitter page, this billboard was "donated"

---

[1] Instagram, "Living Vogue Real Estate," June 3, 2021, accessed on April 27, 2025, https://www.instagram.com/livingvoguerealestate/p/CPrTI-AAFGO/.

[2] Instagram, "Living Vogue Real Estate," June 3, 2021, accessed on April 27, 2025, https://www.instagram.com/livingvoguerealestate/p/CPrTI-AAFGO/, ("If you missed the recent buzz, we kind of did something. Living Vogue doesn't follow the trend, we create the trend. Now accepting $KISHU and $eMAX cryptocurrency for real estate transactions and agent commissions. Leveraging blockchain technology & secure smart contracts in the industry is imminent. The future of real estate is now.")

[3] NewsWire, "Living Vogue Real Estate Adopts eMax and Kishu Inu Crypto for Property Sales & Agent Commissions," June 2, 2021, accessed on April 27, 2025, https://www.newswire.com/news/living-vogue-real-estate-adopts-emax-and-kishu-inu-crypto-for-property-21405271, accessed April 16, 2025.

[4] Eva Semel, "Living Vogue Real Estate Adopts eMax and Kishu Inu Crypto for Property Sales & Agent Commissions," June 2, 2021, accessed on April 27, 2025, https://hudsonweekly.com/living-vogue-real-estate-adopts-emax-and-kishu-inu-crypto-for-property-sales-agent-commissions/, accessed April 16, 2025.

[5] Reddit, "BILLBOARD IN TIMES SQUARE NYC . Pay attention!! Emax let's go!," June 3, 2021, accessed on April 27, 2025, https://www.reddit.com/r/eMaxCoin/comments/nrpd8c/billboard_in_times_square_nyc_pay_attention_emax/, accessed April 16, 2025.

by "[a]n early holder in eMax" as "their way of showing their appreciation and saying thanks."[6]

c) *The Sun*, a major British newspaper, posted a story on June 5, 2021 titled *What is EthereumMax and why is the price going up?* The story noted that the EMAX price was "up by more than 20% over the past 24 hours."[7]

d) On June 6, 2021, Dustin Wood posted a petition to Change.org petitioning to "get Ethereummax listed on Binance [&] Crypto.com."[8] The petition collected 115 verified signatures.

e) On June 26, 2021, EMAX posted on Twitter that it was in a partnership with adventure celebrity Travis Pastrana. [9] Pastrana was participating in an P10 Offshore Powerboat Racing event with Miss Geico Racing, "the most well-known offshore speed boat."[10]

f) Numerous posts promoting EMAX were made to social media platforms, such as TikTok[11] and 9gag.[12]

---

[6] X, "EthereumMax," June 26, 2021, accessed on April 27, 2025, https://x.com/ethereum_max/status/1401581211143880706.

[7] Alice Grahns, "What is EthereumMax and why is the price going up?," June 5, 2021, accessed April 16, 2025, https://www.thesun.co.uk/money/15173830/what-is-ethereummax-why-price-going-up/

[8] Dustin Wood, "Let's get Ethereummax listed on Binance&Crypto.com," June 6, 2021, accessed April 16, 2025, https://www.change.org/p/binance-let-s-get-ethereummax-listed-on-binance-crypto-com

[9] X, "EthereumMax," June 26, 2021, accessed April 16, 2025, https://x.com/ethereum_max/status/1408840858317864967 ("#ethereummax is the first cryptocurrency to support 'the goat' @TravisPastrana this weekend in Sarasota, FL during the @P1Offshore").

[10] X, "EthereumMax," June 26, 2021, accessed April 16, 2025, https://x.com/ethereum_max/status/1408840858317864967 ("The @missgeicoracing is the most well-known offshore speed boat and $eMax has a piece of the action!").

[11] *See e.g.,* TikTok, "Logicalgrowth," May 23, 2021, accessed April 16, 2025, https://www.tiktok.com/@logicalgrowth/video/6965618134619311366

[12] *See e.g.,* 9gag, "kalstopable," June 7, 2021, accessed April 16, 2025, https://9gag.com/gag/arMBGj5