# EXHIBIT H

Page 35

1    in effect be trading 20 percent higher than it would
2    without the promotional boost?
3                    MR. SLADEK DE LA CAL:  Object to form.
4                    THE WITNESS:  That is possible, but
5           would be difficult to show.
6    BY MR. JASNOCH:
7           Q.    Would you agree that in this
8    hypothetical, that the promotion would have
9    conferred a price premium even though the price
10   still declined overall?
11                   MR. SLADEK DE LA CAL:  Object to form.
12                   THE WITNESS:  Can you clarify whether
13          you're talking about this matter specifically
14          or a hypothetical case in which it is
15          theoretically feasible to have a net decline
16          in the price, but a positive effect of some
17          event.
18   BY MR. JASNOCH:
19          Q.    I'm speaking as to whether your
20   analysis took into consideration whether a price
21   premium could only result in a price increase or
22   whether your analysis took into account whether --

Page 36

1  whether the promotion could have conferred a price

2  premium even though the price still declined?

3              MR. SLADEK DE LA CAL:  Object to form.

4              THE WITNESS:  My declaration does not

5       contain an analysis of the price premium.  It

6       explains that the plaintiffs provide no such

7       evidence or documentation, and notes that

8       there were many confounding factors around

9       the same time as Ms. Kardashian's posts,

10      including, for example, two other promotions

11      on the same day as her first post, which

12      would make it more difficult to isolate any

13      effect of her post on the price.

14  BY MR. JASNOCH:

15      Q.     Would you agree that there still can

16  be a price premium in the hypothetical scenario I

17  outlined even if a price declines overall?

18             MR. SLADEK DE LA CAL:  Object to form.

19             THE WITNESS:  In that case, there

20      would have to be so many confounding factors

21      that the overall effect is negative.  And the

22      analyst would have to causally estimate the

Page 52

 1   BY MR. JASNOCH:

 2        Q.    So you have no opinion as to whether
 3   EthereumMax was a pump and dump scheme?

 4        A.    That's correct, I have no opinion.  It
 5   would take further analysis.

 6        Q.    You have not done that analysis?

 7        A.    I have not done that analysis.

 8        Q.    Were the -- as to the three tokens in
 9   the FTX matter; Serum, Oxy, and Maps, were those
10   pump and dump schemes?

11        A.    Not to my knowledge.

12        Q.    Why were those tokens given a
13   100 percent discount?

14        A.    Because --

15              MR. SLADEK DE LA CAL:  Object to form.

16              THE WITNESS:  I'm sorry, go ahead,
17        Max.

18              MR. SLADEK DE LA CAL:  Just object to
19        form.  You can go ahead.

20              THE WITNESS:  Because FTX owned more
21        than 95 percent of total token supply for
22        both tokens, and thus liquidating even a

1      small portion of its holdings would have

2      crashed the price.

3  BY MR. JASNOCH:

4      Q.    Did you do an analysis of the top

5  wallets that held EthereumMax in this case?

6      A.    No.

7      Q.    Do you know what the -- directing your

8  attention to the third paragraph on page 14, there's

9  a reference for a budget for use of the proceeds.

10           Do you see that?

11     A.    I do.

12     Q.    Do you know what the EthereumMax

13 projects did with the proceeds from token sales?

14     A.    I do not.

15     Q.    Do you know -- directing your

16 attention to the stanza earlier in that sentence

17 regarding a vesting schedule for tokens assigned to

18 insiders, do you know whether there was a vesting

19 schedule for insiders for EthereumMax?

20     A.    I do not.

21     Q.    Okay.  Directing your attention to

22 page 15.  There's a reference to the importance of

Page 54

1    founder backgrounds.

2              Do you understand that?

3         A.   Yes.

4         Q.   Do you know whether the EthereumMax

5    founders had a background in the crypto community?

6         A.   No, I did not research the EMAX

7    developers as part of my work for this matter.

8         Q.   Okay.  Directing your attention to

9    page 16.  There's a reference to social media.

10             Do you see that?

11        A.   Yes.

12        Q.   Is it fair to say that the EthereumMax

13   token project used social media to communicate with

14   investors?

15        A.   I have seen posts on social media in

16   the complaint allegedly coming from the EMAX

17   developers.  But based on that, I can't tell you who

18   they were communicating with.

19        Q.   Did you do an independent analysis of

20   EthereumMax's social media posts?

21        A.   No.

22        Q.   Directing your attention to page 18,

Page 56

1    lacked knowledge about the intricacies of blockchain

2    technology?

3                   MR. SLADEK DE LA CAL:  Object to form.

4                   THE WITNESS:  I don't have information

5          about the individuals who purchased EMAX,

6          though the results of the Dimofte survey

7          suggests there was substantial heterogeneity

8          among individuals presumed to be potential

9          buyers in terms of their opinions about a

10         cryptocurrency like EMAX.

11   BY MR. JASNOCH:

12        Q.     As to the crypto market in general,

13   ICOs and cryptocurrency sales generally attract

14   investors who lack knowledge about intricacies of

15   blockchain technology?

16                  MR. SLADEK DE LA CAL:  Object to form.

17                  THE WITNESS:  No, that's a speculative

18         statement that I don't generally agree with.

19         To my knowledge, some investors in

20         cryptocurrency tokens are experts in

21         blockchain and token markets, while others

22         are new investors.  Some are purchasing for

Page 61

1  single class member that purchased during the
2  relevant period and didn't sell would have trading
3  losses if not -- if they have not -- even if they
4  have not been realized?
5              MR. SLADEK DE LA CAL:  Object to form.
6              THE WITNESS:  As of what date?
7  BY MR. JASNOCH:
8      Q.    If they didn't sell through to today,
9  they would have -- let me start over.
10             Is it fair to say that every single
11 person that purchased tokens during the relevant
12 period and didn't sell those tokens, that they would
13 have unrealized trading losses?
14     A.    I believe that is correct.
15     Q.    Directing your attention to page 16,
16 paragraph 27, there's a reference to practical
17 long-term use in everyday life.
18             Do you see that?
19     A.    I do.
20     Q.    Is that -- is that description
21 inconsistent with your description of the token as a
22 meme coin?

Page 62

1          MR. SLADEK DE LA CAL:  Object to form.

2          THE WITNESS:  No, because they never

3     explain what the use would be.  And in

4     practice, perhaps more importantly, the token

5     never had any monetizable benefits or

6     practical use or associated cash flows.

7          And, therefore, I conclude that it

8     never had any fundamental value, despite this

9     speculative statement about a pathway for in

10     the future.

11 BY MR. JASNOCH:

12     Q.    Is it fair to say that it was

13 represented to have monetizable benefits?

14     A.    It represents that the developers

15 intend for it to some day have monetizable benefits.

16     Q.    Is using the token at a nightclub for

17 drinks and table reservations, is that a monetizable

18 benefit?

19     A.    No, as we already discussed, my

20 understanding is that it was proposed to be used as

21 a substitute for fiat currency and, thus, as a

22 medium of exchange.